IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| 901 ERNSTON ROAD LLC, | Civil Action No.: 3:18-cv-02442-AET-TJB |
| *Plaintiff*, | |
| | **Oral Argument Requested** |
| v. | |
| | **Return Date: To be determined** |
| BOROUGH OF SAYREVILLE ZONING BOARD OF ADJUSTMENT; *and* BOROUGH OF SAYREVILLE, | |
| | *(Document filed electronically)* |
| *Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION FOR AN ORDER TO SHOW CAUSE WHY THE COURT SHOULD NOT ISSUE A PRELIMINARY INJUNCTION DIRECTING ISSUANCE OF NECESSARY ZONING APPROVALS AND ENJOINING DISCRIMINATORY CONDUCT**

Kevin H. Marino
John A. Boyle
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, NJ 07928-1488
(973) 824-9300

OF COUNSEL:
Steven M. Coren[*]
Matthew R. Williams[*]
KAUFMAN, COREN & RESS, P.C
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
(215) 735-8700

*Attorneys for Plaintiff 901 Ernston Road LLC*

---

[*] *Pro hac vice* applications to be submitted.

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

I.   STATEMENT PURSUANT TO LOCAL RULE 65.1(a)  ................................ 1

II.  INTRODUCTION ......................................................................................... 1

III. FACTUAL BACKGROUND ......................................................................... 6

     A.   Plaintiff's Mission ................................................................................ 6

     B.   Plaintiff's Lease of the Property ........................................................... 6

     C.   Plaintiff's Proposed Facility and Intended Patients ............................. 7

     D.   Plaintiff's Application for Zoning Interpretation ................................. 8

     E.   Plaintiff's Application for Use Variance ............................................... 8

     F.   The Board's Decision on Plaintiff's Application ................................ 12

     G.   Effect of Defendants' Denials on Plaintiff and Its Intended Patients ....... 15

IV.  LEGAL ARGUMENT ................................................................................ 16

     A.   The FHA, ADA, RA and Equal Protection Clause Prohibit Municipalities from Enforcing Ordinances in a Manner that Discriminates Against the Disabled ......... 16

          1.   The Legal Framework ................................................................ 16

          2.   The FHA, ADA, RA and Equal Protection Clause Apply to Zoning Decisions ......... 18

          3.   Drug and Alcohol Addiction Are Disabilities Under the FHA, ADA and RA ......... 19

          4.   Types of Discrimination ............................................................ 20

     B.   Plaintiff Should Be Granted a Preliminary Injunction and the Defendants Should Be Immediately Directed to Issue All Approvals Necessary for Plaintiff to Open and Operate the Facility ......... 22

          1.   Plaintiff is Likely to Prevail on the Merits ................................ 23

i

a)    Plaintiff Has Standing .......................................................................23

b)    This Action Is Ripe for Review ..........................................................24

c)    Defendants Intentionally Discriminated Against Plaintiff and Its Intended Patients by Treating Them Disparately from Those Without Disabilities ...........................................................................24

d)    Defendants' Application of the Ordinance to the Proposed Facility Has Had a Disparate Impact on Plaintiff ...........................................26

e)    Defendants Failed to Provide a Reasonable Accommodation ...........27

2.    Plaintiff and Its Patients Will Suffer Irreparable Harm ................................28

3.    Granting Relief Will Not Harm Defendants ...................................................29

4.    Granting Relief Best Serves the Public Interest ............................................29

V.    CONCLUSION ...............................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Addiction Specialists, Inc. v. Twp. of Hampton*,
  411 F.3d 399 (3d Cir. 2005) .................................................................. 24

*Anderson v. Duncan*,
  20 F. Supp. 3d 42 (D.D.C. 2013) .......................................................... 21

*Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*,
  179 F.3d 725 (9th Cir. 1999) ................................................................ 19

*Bogdan v. Abbott*,
  524 U.S. 624 (1998) .............................................................................. 20

*Bronk v. Ineichen*,
  54 F.3d 425 (7th Cir. 1995) .................................................................. 22

*Bryant Woods Inn, Inc. v. Howard County*,
  124 F.3d 597 (4th Cir. 1997) ................................................................ 22

*Caron Found. of Fla., Inc. v. City of Delray Beach*,
  879 F. Supp. 2d 1353 (S.D. Fla. 2012) ............................................ 19, 24

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) .............................................................................. 18

*City of Edmonds v. Oxford House, Inc.*,
  514 U.S. 725 (1995) .............................................................................. 30

*Cmty. Housing Trust v. Dep't of Consumer & Regulatory Affairs*,
  257 F. Supp. 2d 208 (D.D.C. 2003) ...................................................... 21

*Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*,
  421 F.3d 170 (3d Cir. 2005) .................................................................. 20

*Easter Seal Soc'y v. Twp. of N. Bergen*,
  798 F. Supp. 228 (D.N.J. 1992) ............................................................ 29

*Frasure v. Principi*,
  367 F. Supp. 2d 245 (D. Conn. 2005) ................................................... 30

*Gresham v. Windrush Partners, Ltd.*,
  730 F.2d 1417 (11th Cir.) ..................................................................... 28

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .............................................................................. 24

*Hovsons, Inc. v. Twp. of Brick*,
  89 F.3d 1096 (3d Cir. 1996) .................................................................. 23

*Innovative Health Sys., Inc. v. City of White Plains*,
  931 F. Supp. 222 (S.D.N.Y. 1996) ....................................................... 29

*J.M. Ex rel. A.M. v. E. Greenwich Twp. Bd. of Educ.*,
  2008 WL 819968 (D.N.J. Mar. 25, 2008)............................................................. 23

*Judy B. v. Borough of Tioga*,
  889 F. Supp. 792 (M.D. Pa. 1995)........................................................................ 30

*Kos Pharms., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) ................................................................................. 23

*Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Twp.*,
  455 F.3d 154 (3d Cir. 2006) ................................................................................. 20

*Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of the Twp. of Scotch Plains*,
  284 F.3d 442 (3d Cir. 2002) ..................................................................... 20, 21, 22

*Larkin v. State of Mich. Dep't of Soc. Servs.*,
  89 F.3d 285 (6th Cir. 1996) ................................................................................. 19

*LeBlanc-Sternberg v. Fletcher*,
  67 F.3d 412 (2d Cir. 1995) ............................................................................ 21, 24

*McKivitz v. Twp. of Stowe*,
  769 F. Supp. 2d 803 (W.D. Pa. 2010).............................................................. 19, 25

*Mhany Mgmt., Inc. v. County of Nassau*,
  819 F.3d 581 (2d Cir. 2016) ................................................................................. 24

*MX Group, Inc. v. City of Covington*,
  293 F.3d 326 (6th Cir. 2002) .......................................................................... 19, 24

*New Directions Treatment Servs. v. City of Reading*,
  490 F.3d 293 (3d Cir. 2007) ................................................................................. 18

*Newman v. GHS Osteopathic, Inc.*,
  60 F.3d 153 (3d Cir. 1995) ................................................................................... 18

*Oxford House, Inc. v. Twp. of Cherry Hill*,
  799 F. Supp. 450 (D.N.J. 1992) ................................................... 19, 20, 21, 30

*Oxford House-Evergreen v. City of Plainfield*,
  769 F. Supp. 1329 (D.N.J. 1991) ......................................................................... 29

*Pac. Shores Props., LLC v. City of Newport Beach*,
  730 F.3d 1142 (9th Cir. 2013) ............................................................................. 20

*Pathways Psychosocial v. Town of Leonardtown, MD*,
  133 F. Supp. 2d 772 (D. Md. 2001)...................................................................... 25

*Reg'l Econ. Cmty Action Program, Inc. v. City of Middletown*,
  294 F.3d 35 (2d Cir. 2002) ................................................................................... 22

*ReMed Recovery Care Ctrs. v. Twp. of Willistown*,
  36 F. Supp. 2d 676 (E.D. Pa. 1999)......................................................... 22, 30, 31

*RHJ Med. Ctr., Inc. v. City of DuBois*,
  754 F. Supp. 2d 723 (W.D. Pa. 2010)................................................................... 20

*Schwarz v. City of Treasure Island*,
   2006 WL 2521399 (M.D. Fla. Aug. 1, 2006) ......................................... 19

*Sullivan v. City of Pittsburgh, Pa.*,
   811 F.2d 171 (3d Cir. 1987) ............................................................... 20

*United States v. City of Black Jack, Mo.*,
   508 F.2d 1179 (8th Cir. 1974) ............................................................ 22

*Weiss v. Rutgers Univ.*,
   2014 WL 2608201 (D.N.J. June 10, 2014) ............................................. 31

**Statutes**

28 C.F.R. 41.31(b)(1)(i) ...................................................................... 20

29 U.S.C. § 705(9) ............................................................................. 20

29 U.S.C. § 794(a) ......................................................................... 17, 24

29 U.S.C. § 794a(a)(2) ........................................................................ 24

42 U.S.C. § 12101(b) .......................................................................... 30

42 U.S.C. § 12102(1) .......................................................................... 20

42 U.S.C. § 12132 ......................................................................... 17, 24

42 U.S.C. § 12133 .............................................................................. 24

42 U.S.C. § 3602(h) ............................................................................ 17

42 U.S.C. § 3602(h)(1) ........................................................................ 20

42 U.S.C. § 3604(f) ..................................................................... 17, 20, 24

42 U.S.C. § 3604(f)(3)(B) ................................................................ 21, 22

42 U.S.C. § 3613(c)(1) ........................................................................ 23

Comprehensive Addiction and Recovery Act of 2016, PL 114-198 [S. 524], July 22, 2016, 130
   Stat 695 ......................................................................................... 2

N.J.S.A. 10:5-12.5 ............................................................................. 31

**Regulations**

28 C.F.R. § 35.130(4)(i) ...................................................................... 18

28 C.F.R. § 35.130(b)(6) ...................................................................... 18

**Journals & Treatises**

ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 ...................... 22

Plaintiff, 901 Ernston Road LLC ("Plaintiff"), respectfully submits this memorandum of law, and the accompanying Certifications of Dr. Deni Carise (the "Carise Cert.") and David B. Himelman, Esq. (the "Himelman Cert."), in support of its application for entry of an Order requiring Defendants, Borough of Sayreville Zoning Board of Adjustment (the "Board") and Borough of Sayreville (the "Borough" and, with the Board, "Defendants"), to show cause why the Court should not grant for a preliminary injunction (a) directing Defendants to issue all zoning approvals necessary for the construction and operation of a proposed residential drug and alcohol treatment facility; and (b) enjoining Defendants from persisting in discriminatory conduct directed to the construction and operation of that facility.

## I.    STATEMENT PURSUANT TO LOCAL RULE 65.1(a)

The circumstances of this action necessitate emergent relief through a procedure other than notice of motion.  As detailed *infra*, Plaintiff seeks to construct and operate a residential drug and alcohol treatment facility at a specific location in the Borough of Sayreville, Carise Cert. ¶¶ 1-27, and Defendants have prevented Plaintiff from doing so for improper discriminatory reasons, *see* section II.F.  The landlord for the property at which Plaintiff is constructing the facility has imposed a March 31, 2018 deadline (allowing an additional ten days for written notice) for Plaintiff to decide whether to terminate the existing long-term lease agreement.  Carise Cert. ¶ 30.  If the Court does not issue the requested injunctive relief prior to the termination date, Plaintiff will be forced to either incur a 10-year lease obligation without knowing whether it will ever be able to use the property, or terminate the lease, forever losing the opportunity to operate at the desired location, a result that would cause irreparable harm to Plaintiff and Plaintiff's intended patients (individuals in and around Sayreville battling substance abuse).  *Id.*, ¶¶ 30-31.  Thus, Plaintiff has shown good and sufficient reason for this Court to proceed in an expedited manner.  *L. CIV. R.* 65.1(a).

## II.      INTRODUCTION

At the heart of this Action is a 6.96 acre property (the "Property") in a non-residential zoning district designated for Public, Recreational, Institutional, Municipal and Educational uses (the "PRIME" zone) in the Borough of Sayreville.  Plaintiff entered into a long-term lease agreement with the Property owner, 901 Ernston Realty, LLC (the "Landlord"), and plans to renovate an existing main building and add certain details, and then operate on the Property a drug and alcohol abuse treatment facility and residential healthcare facility (the "Facility").  Under the Sayreville Zoning Code (the "Ordinance"), that anticipated use—a long term healthcare facility— is a conditional use in the PRIME zone.  *See* Himelman Cert. ¶ 2, Ex. A (Ordinance, § 26-85(b)(5)).

Substance-abuse treatment facilities are desperately needed now more than ever because prescription opioid and heroin abuse have reached epidemic levels, as recognized both by the State of New Jersey (in Governor Christie's Executive Order No. 163 declaring that "our country and the State of New Jersey suffer under a substance abuse and addiction epidemic" and establishing a "Facing Addiction Task Force") and Congress (in its recent enactment of the Comprehensive Addiction and Recovery Act of 2016, which authorized the Attorney General and Secretary of Health and Human Services to award grants to address the crisis).[1]  The crisis is especially pronounced in New Jersey, where the heroin overdose rate is triple the national average, with one hard-hit community suffering an overdose death rate twenty-five times the national average.[2]

---

[1] *See* Comprehensive Addiction and Recovery Act of 2016, PL 114-198 [S. 524], July 22, 2016, 130 Stat 695.

[2] *See* Stephen Stirling, *N.J. heroin overdose death rate is triple the soaring U.S. rate*, N.J.com, July 8, 2015, available at http://www.nj.com/news/index.ssf/2015/07/nj_heroin_overdose_ death_rate_is_triple_the_soarin.html; Andy Polhamus, Inside the N.J. town with a heroin death-rate 25 times the national average, N.J.com, January 29, 2016, available at http://www.nj.com/gloucester-county/index.ssf/2016/01/meet_the_town_leading_the_fight _against _gloucester.html.

Plaintiff's efforts to combat this crisis in Middlesex County have been thwarted by Defendants, who have blocked the Facility based solely on unfounded not-in-my-backyard ("NIMBY") fears about Plaintiff's disabled patients. Defendants unlawfully denied Plaintiff's zoning applications and refused to provide reasonable accommodations, thereby preventing Plaintiff from operating the Facility, notwithstanding the clear language and intent of the Ordinance and the Board's express acknowledgements that the Facility constitutes an inherently beneficial use. Defendants' stated justifications for this conduct smack of unlawful discrimination against the disabled and handicapped, and find no factual support in the record. Indeed, at the final hearing on Plaintiff's request for a use variance (which itself was unnecessary), Board members freely offered patently discriminatory reasons for their actions animated by unfounded stereotypes:

- Zoning Board Chairman Ronald Green stated:
  - "[D]rug addicts are smart, at times desperate, and their personality sometimes matches their addiction. That's true. I've spent 35 years in the [police department]. I've seen thousands of drug addicts and people with alcohol (sic). That can create another safety problem for the facility and for the people outside." Himelman Cert. ¶ 11, Ex. E, 1/24/18 Zoning Board Hearing.

- Followed by Commissioner Anthony Esposito's remarks:
  - "The ramifications, in my opinion, of when something happens, versus if something happens, keeps me up at night." *Id.*, Ex. E, 1/24/18 Tr. at 140.
  - "I think the people who own homes in that area are convinced, as I am, that they're not safe -- entirely safe when they leave their homes at night, or even during the day." *Id.*, Ex. E, 1/24/18 Tr. at 140-41.
  - He would be unable to look his friends "in their eyes and say, you know what? I voted yes for this to come in, in this particular area, and I had no regard for your safety." *Id.*, Ex. E, 1/24/18 Tr. at 142.

- Commissioner Phil Emma:
  - "Public safety concerns troubled me the most. The proximity to the school, how residential areas surround the facility, and all you need is one accident, all you need is one person to escape, and they're really – if somebody wants out, there's really nothing stopping them from leaving. If they want out, they'll figure out a way to break out." *Id.*, Ex. E, 1/24/18 Tr. at 142-43.

- Commissioner Tom Kuczunksi:
  - "Police officers have stated that it draws a poor element near the facility. People that live nearby basically said that they're going to move out, they have families

3

which are going to move out to protect their families.  I think it's going to possibly disable the -- distable (sic) the community."  *Id.*, Ex. E, 1/24/18 Tr. at 144.

- o  "You know, we have families they're, they're going to move out, and possibly other types move in.  You know, Sayreville is a family oriented, working community, so I don't want that neighborhood to change because of this."  *Id.*, Ex. E, 1/24/18 Tr. at 144-45.

- Commissioner Maria Catallo:
  - o  "We need to protect the children that we have right next to this rehabilitation center that they want to put there.  It's no good.  We're 200 feet away from each other.  They're babies.  They're not even the older children that maybe would know what's going on, or what they're saying to them.  They're babies.  They're innocent."  *Id.*, Ex. E, 1/24/18 Tr. at 146.

- Commissioner John Corriagan:
  - o  "From my point of view, there is no more an important objective to have begin with, is to protect both our children and our elderly, who would almost certainly be the victims of any type of brazen crime."  *Id.*, Ex. E, 1/24/18 Tr. at 146-47.
  - o  "So I -- in all the weighing of all the facts, and all the conditions, I could not destroy the quality of life for the people in this neighborhood, and to put the people of the school, the children of the school, in danger."  *Id.*, Ex. E, 1/24/18 Tr. at 147.

Faced with such discrimination and unable—despite considerable efforts—to convince the Board to not base its decision on irrational fears, Plaintiff was forced to commence this action, asserting violations of, *inter alia*, the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988 (the "FHA"), the Americans with Disabilities Act (the "ADA"), the Rehabilitation Act (the "RA"), and the Fourteenth Amendment of the U.S. Constitution.

With this motion, Plaintiff seeks a preliminary injunction enjoining Defendants from persisting in their discriminatory conduct and directing them to issue the zoning approvals necessary to renovate and operate the existing building on the Property for use as a residential treatment facility for persons recovering from drug addiction and alcoholism.  As demonstrated below, Plaintiff has proffered evidence establishing all of the prerequisites for that injunctive relief.

**First**, Plaintiff has established a reasonable probability of success on the merits.  Numerous expert witnesses, including Defendants' own professional planning consultant, agreed that the Facility's proposed use is both "inherently beneficial" and nearly identical to the previously

approved nursing facility on the Property, a use determined by the Zoning Board to be permitted as of right in the PRIME zone.  Furthermore, statements of Defendants' own representatives at public hearings make clear that Defendants are actively discriminating against those with drug and alcohol addictions—recognized disabilities under settled law—for baseless and offensive reasons. The record thus establishes that Defendants have subjected Plaintiff and its intended patients to disparate treatment and disparate impact, and have not provided reasonable accommodations, all in violation of the FHA, ADA, RA and the Fourteenth Amendment.

**Second**, Plaintiff and its intended patients will suffer immediate and irreparable harm in the absence of the requested injunctive relief, as the delay in or denial of drug and alcohol treatment to Plaintiff's intended patients resulting from Defendants' obstructionist behavior is classic irreparable harm.  Further, because the Landlord has imposed a March 31, 2018 deadline to decide whether to terminate the lease agreement, an immediate decision from this Court is necessary to prevent Plaintiff from permanently losing its ability to construct the Facility at the desired location.

**Third**, Defendants will suffer no harm by issuance of the necessary approvals.  The Facility falls under the definition of "long-term care facility" as defined in the Ordinance, and the record demonstrates that the concerns and fears couched in the hearings as "negatives" that purportedly outweigh the Facility's beneficial use are mere pretense to disguise impermissible discrimination. The balance of equities thus tips decidedly in Plaintiff's favor.

**Fourth**, the requested relief will serve the public interest, as the drug and alcohol treatment the Facility will provide will address the addiction epidemic plaguing the country and New Jersey.

For the reasons outlined above and amplified below, the Court should enter a preliminary injunction directing Defendants to issue all zoning approvals necessary to renovate and operate the Facility, and enjoining Defendants from engaging in further discriminatory conduct.

III.    FACTUAL BACKGROUND

A.  Plaintiff's Mission

Plaintiff is an affiliate of Recovery Centers of America ("RCA"), a company whose mission is to provide neighborhood-based recovery campuses for patients suffering from drug and alcohol addiction.  Carise Cert., ¶ 2.  RCA's team of leading industry and academic professionals has designed an innovative treatment model to improve patient outcomes by extending the length of treatment while offering the full range of patient services in an integrated healthcare campus environment.  *Id.* ¶ 3.  RCA's approach to addiction treatment provides facilities that accommodate every stage of patient treatment within a structured environment, including residential detoxification, residential inpatient treatment, and outpatient treatment. Carise Cert. ¶ 4.  Critical to the success of its treatment model, RCA locates its healthcare campuses in or near the communities where its patients live, thereby ensuring that patients maintain connections with their peers in recovery and reintegrate into daily life without losing access to treatment providers.  Carise Cert. ¶ 5; Himelman Cert. ¶ 11, Ex. C, 11/8/17 Zoning Board Hearing Tr. at 32-33 ("all the science shows that if your family or employer is involved in your treatment, your chances of success go up very high.  So we invest a lot in having family therapists, having education for families").

B.  Plaintiff's Lease of the Property

Plaintiff and Landlord entered into a long-term lease agreement dated January 18, 2018 for the Property, which is located in the Borough's PRIME zone.  Carise Cert. ¶¶ 6-7.  According to the Sayreville Zoning Code, long-term healthcare facilities, nursing facilities, and nursing homes are conditionally approved uses within the PRIME zone.  *Id.* ¶ 8.  In fact, in May 2014, Sayreville Nursing, LLC received preliminary and final site plan approval from the Sayreville Planning Board to operate on the Property a long-term care nursing home facility, a use the Board's engineer and

the Borough's planner confirmed is an approved use as of right within the PRIME zone.  *Id.* ¶ 9;

Himelman Cert. ¶ 11, Ex. C, 11/8/17 Tr. at 9-10.

### C.  Plaintiff's Proposed Facility and Intended Patients

Plaintiff plans to renovate an existing main building on the Property, add parking and

landscaping details, and then operate the Facility in a campus-like setting as a substance abuse

treatment facility and residential healthcare facility.  Carise Cert. ¶ 10.  Plaintiff's plan for the

Facility includes nursing care around the clock—twenty-four hours a day and seven days a week—

as well as social workers, clinical and family therapists, counselors and patient support staff.  *Id.*

¶ 11.  The Facility's focus will be education, treatment, rehabilitation and continuing recovery

support for patients suffering with substance use and mental health disorders.  *Id.* ¶ 12.

Plaintiff will admit patients, based on their individual needs, for varying levels of care:

residential detoxification; residential in-patient care; and multiple levels of out-patient services.

Carise Cert. ¶ 13; Himelman Cert. ¶ 11, Ex. C, 11/8/17 Tr. at 36.  Only patients receiving

residential treatment will be permitted to reside on the treatment campus.  Carise Cert. ¶ 14;

Himelman Cert. ¶ 11, Ex. C, 11/8/17 Tr. at 36-37, 43.  The in-patient and out-patient services will

be strictly separated (with separate entrances), and their respective patients will have no contact

with one another.  Carise Cert. ¶ 15; Himelman Cert. ¶ 11, Ex. C, 11/8/17 Tr. at 105-06.

The Facility's patients will pose no safety risk to the surrounding community.  Carise Cert.

¶ 16.  Critically, patients are not referred to RCA from the criminal justice system as an alternative

to conviction or incarceration.  Carise Cert. ¶ 17; Himelman Cert. ¶ 11, Ex. D, 12/13/17 Zoning

Board Hearing Tr. at 75-76.  Plaintiff will have extensive screening procedures in place and will

not admit any patient who is deemed a danger to themselves or others.  Carise Cert. ¶ 18.  Plaintiff

will not allow patients to leave the Facility unaccompanied or on foot, and will employ RCA's

stringent policies for visitation, supervision, and safety and security protocols.  *Id.* ¶ 19.

7

### D.  Plaintiff's Application for Zoning Interpretation

On or about June 23, 2017, RCA requested that the Zoning Board confirm that the Facility's proposed use is permitted in the PRIME zone. *Id.* ¶ 20.  In response, the Sayreville Zoning Officer advised RCA to file a formal permit application requesting such confirmation. *Id.* Thus, on July 7, 2017, RCA filed a formal application with the Sayreville Zoning Officer for a zoning permit to seek approval and confirmation that the proposed drug and alcohol use disorder treatment facility and residential health care treatment facility to be operated by RCA on the Property is a conditionally permitted use in the PRIME zone. *Id.* ¶ 21.

Although Plaintiff's business operations are fundamentally similar to those of a long-term healthcare facility or nursing home, the Zoning Officer erroneously denied Plaintiff's permit application on July 14, 2017 without a valid nondiscriminatory reason. *Id.* ¶ 22.  On July 26, 2017, Plaintiff timely appealed that denial to the Board. *Id.* ¶ 23.  The Board scheduled a hearing on the appeal for August 23, 2017, but carried the matter to its September 27, 2017 meeting due to a lack of quorum. *Id.* ¶ 24.  During the September 27, 2017 hearing, RCA presented testimony demonstrating that the Facility's proposed use meets the definition of a long-term care facility under the Ordinance.  The Board, however, took no action on the appeal at the meeting. *Id.* ¶ 26.

### E.  Plaintiff's Application for a Use Variance

Even though the Facility did not require a variance, RCA—hoping to move the approval process forward—filed on September 15, 2017 an application with the Board for Use Variance and Amended Site Plan approval (the "Variance Application") for the Facility (under a reservation of rights and without prejudice to its appeal of the Zoning Officer's permit denial).  Carise Cert. ¶ 25.  The Zoning Board held three public hearings on the Variance Application on November 8, 2017, December 13, 2017, and January 24, 2018, *id.* ¶ 27, during which Plaintiff presented extensive evidence supporting the Variance Application.  Indeed, Dr. Deni Carise, RCA's Chief

Scientific Officer, outlined the urgent public interest in combating substance abuse—specifically, the critical need to address pharmaceutical and legal drug addiction—explaining that "the people that we treat, they are your neighbors.  They are your coworkers.  They are people that often got into addiction from a prescription drug."  Himelman Cert. ¶ 11, Ex. C, 11/8/17 Tr. at 32.  Dr. Carise detailed the RCA treatment model and the philosophy behind its commitment to supporting patients from the surrounding area and their families until complete recovery:  "We are heavily based on the neighborhood model . . . all the science shows that if your family or employer is involved in your treatment, your chances of success go up very high.  So we invest a lot in having family therapists, having education for families."  *Id.*, Ex. C, 11/8/17 Tr. at 33.

Experts and counsel for both parties advised the Board that because substance-abuse patients are a protected class under federal and state law, the Borough must provide reasonable accommodations to help house and rehabilitate the Facility's patients.  Himelman Cert. ¶ 11, Ex. E, 1/24/18 Hearing Tr. at 131-32.  For example, James Higgins, a licensed professional planner with forty years' experience, explained that the variance would satisfy the Borough's obligation to provide reasonable accommodation because the proposed use was "not permitted anywhere in the Borough. And in order to provide reasonable accommodation, it has to be permitted somewhere."  *Id.*, Ex. C, 11/8/17 Tr. at 133.  Christine Cofone, a planning and zoning expert, testified that "there have been decisions in New Jersey that have rendered these type of facilities as inherently beneficial."  *Id.*, Ex. D, 12/13/17 Tr. at 89.  As a result, Cofone opined, "I can't think of a more inherently beneficial use in this kind of climate than the proposed recovery center."  *Id.*

Furthermore, numerous witnesses addressed the potentially negative effects to weigh against the Facility's beneficial nature, and demonstrated that there are no "substantial negative impacts that are associated with this application."  *Id.*, Ex. C, 11/8/17 Tr. at 130.  Specifically, Mr.

Higgins identified five theoretical negative criteria—aesthetics, noise, traffic, safety, and impact on zoning—that might possibly weigh against the public interest served by the Facility.  *Id.*  Multiple experts addressed those criteria at length, presenting substantial evidence negating each one.  First, the undisputed testimony established that "aesthetics isn't a real concern . . . because it won't be that readily visible from -- from the street or from surrounding properties."  *Id.*, Ex. C, 11/8/17 Tr. at 129.   Second, due to the Property's location (next to a Garden State Parkway overpass, across the street from a multi-family development, and bordered on the remaining sides by wooded and open water areas), the experts agreed,  "clearly, with respect to use, there is not going to be any significant noise that would impact surrounding properties."  *Id.*  Third, Plaintiff's traffic safety expert testified that (a) the Facility would not impact the safety of the roadways; and (b) the existing driveway would accommodate projected traffic flow safely and efficiently, and would not impact operating conditions on Ernston Road.  *Id.*, Ex. C, 11/8/17 Tr. at 120.

Witness also addressed safety, the fourth potentially negative effect.  Dr. Carise testified that: "patient safety is our number one concern, as well as safety for our staff, safety for our neighbors.  Again, I've described who comes into treatment. These are not indigent criminals that are adjudicated to us.  These are people who are voluntarily coming into treatment."  *Id.*, Ex. C, 11/8/17 Tr. at 51.  Finally, regarding the impact to zoning (the fifth potentially negative criteria), Ms. Cofone testified that the Facility's proposed use is in line with and operationally nearly identical to the intentions of and potential uses imagined within the language of the existing Code, stating that "from a planning and land use impact point of view, I don't see the substantial detriment to your zone plan."  *Id.*, Ex. D, 12/13/17 Tr. at 90.  And Mr. Higgins observed that the building itself is "laid out perfectly for a nursing home, for a long-term care facility, other uses

that could exist in the PRIME zone.  So it's not going to have a substantial negative impact, either short term or long term, on your zoning ordinance." *Id.*, Ex. C, 11/8/17 Tr. at 130.

Experts further testified that the Property is well suited for the Facility's proposed use: "the site is ideal for [the proposed use] because of the layout of the site, the fact that it's not readily visible from surrounding properties.  The building is situated and well suited to the use.  And to provide it here I think is a very reasonable accommodation for this use, which is a necessary use." *Id.*, Ex. C, 11/8/17 Tr. at 133-34.  Mr. Higgins elaborated that the Board must consider:

> whether the site is particularly suited for this use and the general welfare would be advanced.  Clearly the use is a beneficial use.  The site, being a former nursing home, and because it's secluded from surrounding properties, you can't see it, the layout of the building, the layout of the site are ideally suited to this use, which, again, is very similar in its function to a nursing home or a long-term care facility. So I think the site is particularly suited to use and the general welfare is advanced because of that particular suitability.

*Id.*, Ex. C, 11/8/17 Tr. at 131-32.

All witnesses testified that the potential negatives were far outweighed by the positive criteria and inherently beneficial nature of the Facility, affirming that the variance should have been granted.  Even John Leoncavallo, Township Planner and Planning Consultant for the Board, conceded that the facts supported granting the application for the variance, stating for the record:

> Mr. Chairman, one comment.  We talked about this before.  Our ordinance has some obsolete items in it, because it was approved in 1999.  That's not a significant amount of time.  We are looking at some of these things in the PRIME zone.  Back then, we didn't have this type of animal.  We didn't have, you know, drug rehabilitation to this kind of degree and scale.  I agree with my research, yeah, we have a real problem.  And as Mr. Higgins said, it's a state problem and a nationwide problem.  And there's a lot of reasons for that.  So -- but I concur with him in terms of there is a significant need.
>
> And I think the need can be demonstrated that there is a licensure procedure to follow, and that is indicative of a need.  And then I think we can go to the issues with, you know, the populations that are in this.  And I think, of course, they're younger [even though the Ordinance states 'for older adults'], but you could have people that are older that -- that become addicted to opioids, you know, because of, you know, pain or relief of pain.  So -- and I think the policies of the state are apparent. I think -- I agree with his balancing test.

11

* * *

So I think it's something you have to think of.  He's looked at the aesthetics, the noise, the traffic, safety.  A lot of those things are minimal in this case.  I think this is a -- you know, an appropriate place for this.

And it is isolated, given the elevation it's at and the situation with the adjacent parkway being right there.  So I think we have to look at this in the future in terms of remodifying some of our ordinance.  We talked about doing signage over again, because a lot of the signage regulations that we have from then, or really before 1999, probably 1997, 1998, really don't -- aren't all applicable now. . . **So I concur with Jim [Higgins], and I agree with his opinions.**

*Id.*, Ex. C, 11/8/17 Tr. at 142-44 (emphasis added).

### F.  The Board's Decision on Plaintiff's Application

Despite repeated warnings by counsel, the Board shirked its legal obligation to rely on objective evidence and relied instead on unfounded concerns and pretext, voting unanimously to deny Plaintiff's variance application.  To the extent Board members voiced "safety" concerns, there were obvious solutions.  By rejecting or ignoring potential remedies, Defendants made clear their willingness to erect roadblocks to block the Facility and its patients from the Borough.

For example, Chairman Green cautioned that "cameras and monitors are only good as the staff who's responsible for them," and then discussed his own "experience with cameras and monitors" as a police officer, stating "if you get busy, you're not going to see these cameras; you're not going to see the shadow going by.  Security could be compromised if you're not watching these cameras at all times."  Himelman Cert. ¶ 11, Ex. E, 1/24/18 Tr. at 135.  Concern over the inadequacy of the security cameras and monitors was not premised on any objective evidence presented during the hearing, but rather on Chairman Green's purported experience in a different context.  Moreover, stated concerns about the security cameras were: (a) something that could be addressed with a condition (additional personnel, advanced technology, etc.); and (b) a thinly disguised pretext for discriminating against patients that the Chairman perceives as dangerous for no reason other than that they are receiving treatment for addiction.

Commissioner Esposito exemplified the Board's desire to fabricate unsolvable problems to get rid of the Facility and its patients. He reasoned that "[i]n previous testimony, RCA had mentioned that there is one un-armed security guard within the entire complex. I think that the complex is huge; I don't think it's nearly enough." *Id.*, Ex. E, 1/24/18 Tr. at 141. This subjective opinion about staffing levels was contrary to all evidence on the subject. Thereafter, Esposito acknowledged that Plaintiff is willing to work with the Board to impose conditions to ensure the Facility employs an acceptable level of security staff, noting "they [RCA] were kind enough, when we raised some objections about security, and about personnel, that they would increase security, they'd say, okay, well, what do you think the proper number of security guards are, we'll man them, we'll put them to work? As far as people coming and going, they would make sure that they would be escorted off the property, they just couldn't leave on their own." *Id.*

But instead of enumerating the conditions under which he would be satisfied with the security personnel at the Facility, Commissioner Esposito protested the very act of Plaintiff offering to agree to such conditions: "I appreciate that very much, but what bothers me a little bit here is that these should have been put in place before we had to ask. If my math is correct, you'll bill around $37,000,000 a year, 750 a day times 150 beds, or thereabouts, you could certainly afford more personnel." *Id.* Throughout the three hearings, Plaintiff expressed that it would accept and impose all conditions the Board suggested. *Id.*, Ex. C, 11/8/17 Tr. at 75-78, 130-31; Ex. D, 12/13/17 Tr. at 56-58, 90-91; Ex. E, 1/24/18 Tr. at 14-15. Certainly, Plaintiff's willingness to permit the Board to suggest the "proper number of security guards" should have been enough to alleviate Commissioner Esposito's security concern. It was not, because Commissioner Esposito did not want the supposed concerns alleviated, but rather wanted a pretext to reject the Facility.

Commissioner Esposito's rejection of an obvious solution to a perceived problem is clear evidence that his reasons for denying reasonable accommodations to the Facility were discriminatory.

Board members also stated reasons for denying reasonable accommodation based on "financial concerns" unsupported by the record, ignoring expert testimony in favor of unfounded assertions or fear-driven stereotypes. Commissioner Esposito barked that "home values would be reduced about 17 percent" (*Id.*, Ex. E, 1/24/18 Tr. at 142), an un-sourced statistic that was not backed up by any objective evidence. Vice Chairman Henry parroted testimony from one of the residents: "as to the police officer that came up here had indicated one of these facilities, they needed to have additional police patrols around these facilities. I'm not sure what the actual reasons were, but it cost the -- you know, the -- they seemed to need to have those additional police officers at these facilities, and I think that would be concern too for the residents of the area." *Id.*, Ex. E, 1/24/18 Tr. at 140. Vice Chairman Henry openly admitted that he had no idea if the public comment was accurate or relevant. *Id.* None of the proffered testimony (expert or otherwise) gave any indication that the "facilities" were comparable to the Facility here; nonetheless, the Board relied on unsubstantiated testimony from a member of the public to deny the variance.

Finally, Board members based their variance denial on factors that denied a reasonable accommodation *anywhere* in the Borough. For example, Chairman Green's argument that the criteria used to determine whether a prospective patient receives "outpatient versus inpatient" treatment presents a safety concern is a nonsensical, especially considering that no further explanation or objective evidence to support these findings was presented. *Id.*, Ex. E, 1/24/18 Tr. at 136. The Board was clearly attempting to use the insurance industry as a scapegoat because they do not want to say that it is the Facility's patients they do not trust based on their status as disabled individuals. Moreover, by denying the variance based on the insurance industry's role in

the treatment process, the Board precluded a treatment facility from being constructed anywhere in the Borough.  Another irrelevant objection from Chairman Green was that the substance-abuse business is self-regulated.  *Id.*, Ex. E, 1/24/18 Tr. at 136-37.  There is no evidence that the inspections and regulations imposed by both the Joint Commission of Hospitals and the New Jersey Office of Licensure are ineffective or that the regulatory scheme is, as Chairman Green put it, "a safety problem."  Similar to Chairman Green's reliance on the insurance industry's involvement, his denial based on the state regulatory agencies' involvement reveals that he would not approve a treatment facility at any location within the Borough.

In sum, no evidence was presented to establish any negative criteria, challenge the testimony of Plaintiff's experts, or offer objective reasons to deny the variance.  And yet the Board voted unanimously to deny Plaintiff's request for reasonable accommodation.  The lack of any evidentiary support for that denial is further proof that Defendants based their decision on unsupported discriminatory statements and opinions of residents and Board Members.

### G.  Effect of Defendants' Denials on Plaintiff and Its Intended Patients

Plaintiff's intended patients will benefit significantly from obtaining access to Plaintiff's innovative addiction treatment model.  Plaintiff presented evidence at the hearings establishing the seriousness of the addiction crisis, particularly in Middlesex County, as well in the rest of New Jersey and throughout the nation.  Himelman Cert. ¶ 11, Ex. C, 11/8/17 Tr. at 28-33, 66-68, 124-27.  Plaintiff also presented evidence establishing the dearth of addiction treatment options in the area, and the absence of opportunities for similar Facilities to operate anywhere, in any zone, within the Borough.  *Id.*, Ex. C, 11/8/17 Tr. at 132-33; Ex. D, 12/13/17 Tr. at 88-89.

Thus, by delaying the Facility through their unlawful zoning denials, Defendants are denying Plaintiff's prospective patients access to desperately needed medical treatment close to their homes, families and support networks.  *Id.* ¶ 31.  Plaintiff is ready, willing and able to proceed

with renovation and operation of the Facility, but cannot do so because the Defendants refuse to issue the necessary approvals and permits. *Id.* ¶ 32. Moreover, Plaintiff's intended patients lack any remedy that will allow them to access the addiction treatment the Facility will provide. Thus, every day that passes without injunctive relief exposes Plaintiff and its patients to irreparable harm.

Further, the Board's discriminatory conduct forced Plaintiff and Landlord to amend the lease agreement to include a clause allowing Plaintiff to terminate the lease without incurring additional financial obligations if notice is given to Landlord within ten days of March 31, 2018. Carise Cert. ¶ 30. If Plaintiff cannot obtain zoning approval by that deadline, they may lose entirely the opportunity to provide substance-abuse treatment to those in the Sayreville area.[3] *Id.*

## IV.    LEGAL ARGUMENT

### A. The FHA, ADA, RA and Equal Protection Clause Prohibit Municipalities from Enforcing Ordinances in a Manner that Discriminates Against the Disabled

#### 1. The Legal Framework

***The Fair Housing Act.*** Congress originally enacted the FHA in 1968 and then amended it in 1988 to extend its guarantee of fair housing to individuals with disabilities. The FHA defines the term "handicap" as "a physical or mental impairment which substantially limits one or more of such person's major life activities …" 42 U.S.C. § 3602(h). Under the FHA, it is unlawful:

(1) To discriminate against or otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap of-- (A) that buyer or renter; (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter.

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of the handicap of-- (A) that person; or (B) a person

---

[3] Moreover, Plaintiff has invested approximately $1,385,000 in the Property and Facility, including $226,000 to lease the Property, $458,000 for design and preconstruction activities, $651,000 for professional services, and $50,000 for facilities expenses. Carise Cert. ¶ 28. As a result of the delays caused by Defendants, Plaintiff will suffer a variety of economic damages, including substantial lost profits that are difficult to calculate with a reasonable degree of certainty. *Id.* ¶ 29.

residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that person.

42 U.S.C. § 3604(f).

*The Rehabilitation Act.*  The RA provides that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…."  29 U.S.C. § 794(a).

*The Americans with Disabilities Act.*  The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  ADA regulations prohibit public entities from discriminating against qualified individuals with disabilities (1) in administering a licensing program in a manner that subjects them to discrimination on the basis of the disability and (2) in establishing requirements for programs or activities of licensees that subject qualified individuals with disabilities to discrimination on the basis of disability.  28 C.F.R. § 35.130(b)(6).  The regulations prohibit public entities from determining the location of a facility in a way that has the purpose or "effect of excluding individuals with disabilities from, denying them the benefits of [the facility], or otherwise subjecting them to discrimination."  28 C.F.R. § 35.130(4)(i).[4]

*The Fourteenth Amendment to the U.S. Constitution.*  A law that treats disabled persons differently than those without disabilities when the distinction bears no rational relationship to a

---

[4] The Third Circuit has noted that "'[a]s the ADA simply expands the Rehabilitation Act's provisions against discrimination into the private sector, Congress has directed that the two acts' judicial and agency standards be harmonized' and we will accordingly analyze the two provisions together."  *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 302 (3d Cir. 2007) (*quoting Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 157-58 (3d Cir. 1995)).

legitimate state interest violates the equal protection clause of the Fourteenth Amendment.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).

       ***The Borough of Sayreville Land Development Ordinance.***  The Ordinance governs properties conditionally approved for use in the PRIME zone.  Himelman Cert. ¶ 2, Ex. A.  The Ordinance identifies a number of conditionally permitted uses within the PRIME zone, including long-term care and nursing facilities, *id.*, Ex. A (§ 26-85(b)(5)), which the Ordinance defines as:

> a facility which provides a full range of twenty-four (24) hour direct medical nursing and other health services. Registered nurses, licensed practical nurses and nurses' aides provide services prescribed by a residence physician.  It is for those older adults who need health supervision but not hospitalization.  The emphasis is on nursing care, but restorative physical occupational speech and respiratory therapies are also provided.  This level of care may also include specialized nursing services such as intravenous feeding or medication, tube feeding, injected medication, daily wound care, rehabilitation services and monitoring of unstable conditions.

*Id.*, Ex. A (§ 26-6).

### 2.  The FHA, ADA, RA and Equal Protection Clause Apply to Zoning Decisions

       The FHA, ADA and RA apply to municipal zoning decisions.  *See, e.g., McKivitz v. Twp. of Stowe*, 769 F. Supp. 2d 803, 823-24 (W.D. Pa. 2010) ("The FHA, the Rehabilitation Act and the ADA are all applicable to zoning decisions."); *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730 (9th Cir. 1999) (the ADA and RA "apply to zoning"); *Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996) ("Congress explicitly intended for the FHAA to apply to zoning ordinances").  Due to their close relationship and many similarities, courts analyze these statutes as essentially coextensive.  *See Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 n. 3 (9th Cir.1995) (noting that "Congress intended judicial interpretation of the Rehabilitation Act be incorporated by reference when interpreting the ADA"); *Schwarz v. City of Treasure Island*, 2006 WL 2521399, at *14 (M.D. Fla. Aug. 1, 2006) .

In applying the tenets of these anti-discrimination statutes, courts consistently find violations where municipalities apply their zoning laws in a manner that thwarts an addiction treatment provider's ability to open and operate in the community. *See New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 304-05 (3d Cir. 2007) (the application of a law that "singles out methadone clinics for different zoning procedures is facially discriminatory under the ADA and the Rehabilitation Act"); *MX Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002) (affirming judgment in favor of drug treatment provider challenging denial of zoning permit and ordinance targeting methadone clinics as discriminatory under the ADA and Rehabilitation Act); *Oxford House, Inc. v. Twp. of Cherry Hill*, 799 F. Supp. 450 (D.N.J. 1992) (finding township ordinance discriminatory under the FHA and enjoining defendant from enforcing it against operator of residential rental homes for individuals recovering from alcoholism and addiction).

3.    <u>Drug and Alcohol Addiction Are Disabilities Under the FHA, ADA and RA</u>

The FHA, ADA and RA define "disability" or "handicap" almost identically. *See Bogdan v. Abbott*, 524 U.S. 624, 631 (1998). Under these statutes, a disability is a physical or mental impairment that substantially limits one or more of a person's major life activities. 42 U.S.C. § 3602(h)(1); 42 U.S.C. § 12102(1); 29 U.S.C. § 705(9). Critically, "[i]t is clear that Congress contemplated alcoholism and drug addiction as being among the kinds of 'impairments' covered under this definition." *Oxford House, Inc.*, 799 F. Supp. at 459; *see also* 28 C.F.R. 41.31(b)(1)(i) (defining drug addiction and alcoholism as a "physical or mental impairment" qualifying as handicap under the ADA). Moreover, both alcoholism and opioid addiction may, and often do, substantially limit major life activities. *RHJ Med. Ctr., Inc. v. City of DuBois*, 754 F. Supp. 2d 723, 756-762 (W.D. Pa. 2010). Thus, individuals recovering from drug and alcohol addiction qualify as disabled under these anti-discrimination laws. *See Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Twp.*, 455 F.3d 154, 156 n.5 (3d Cir. 2006) ("recovering alcoholics and

drug addicts are handicapped, so long as they are not currently using illegal drugs"); *Sullivan v. City of Pittsburgh, Pa.*, 811 F.2d 171, 182 (3d Cir. 1987) .

4. Types of Discrimination

Violations of the FHA, ADA and RA's prohibitions on disability discrimination may proceed under any or all of three liability theories: (1) disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations. *See* 42 U.S.C. § 3604(f); *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of the Twp. of Scotch Plains*, 284 F.3d 442, 448 (3d Cir. 2002).

***Disparate Treatment.*** "To prevail on a disparate treatment claim, a plaintiff must demonstrate that some discriminatory purpose was a 'motivating factor' behind the challenged action." *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005). The discriminatory purpose need not be motivated by hostility towards a particular handicap, as "[t]he plaintiff is only required to 'show that a protected characteristic played a role in the defendant's decision to treat her differently.'" *Id.* (*quoting Cmty. Housing Trust v. Dep't of Consumer & Regulatory Affairs*, 257 F. Supp. 2d 208, 225 (D.D.C. 2003)); *see also Horizon House Developmental Servs., Inc. v. Twp. Of Upper Southampton*, 804 F. Supp. 683, 696 (E.D. Pa. 1992) ("In order to prove intentional discrimination it is not necessary to show an evil or hostile motive. It is a violation of the FHAA to discriminate even if the motive was benign or paternalistic"). In assessing whether a municipality acted with discriminatory intent, courts consider: (1) the discriminatory impact of the municipal action; (2) the historical background of the action; (3) the sequence of events leading to the action; (4) departures from normal procedural sequences; and (5) departures from normal substantive criteria. *See LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995); *Resident Advisory Bd. V. Rizzo*, 564 F.2d 126, 142 n. 22 (3d Cir. 1977).

***Disparate Impact.*** The discrimination statutes also prohibit municipal decisions having a "disparate impact" on the disabled. 42 U.S.C. § 3604(f)(3)(B); *Anderson v. Duncan*, 20 F. Supp.

3d 42, 54 (D.D.C. 2013).  Courts reviewing disparate impact claims under the FHA, ADA and RA

borrow the framework established for similar Title VII claims.  *Lapid-Laurel*, 284 F.3d at 466.  To

establish a prima facie case, the plaintiff must show the municipality's action had a greater adverse

impact on the protected group than on others, regardless of intent.  *Id.*  Once the plaintiff does so,

the burden shifts to the defendant to establish it had a legitimate, non-discriminatory reason for the

action and no less discriminatory alternatives were available.  *Id.* at 467.  Disparate impact is

established when the plaintiff shows that outwardly neutral practices have a significant adverse or

disproportionate impact on persons with disabilities.  *Id.*  This does not require any showing of

animus or intent.  *Oxford House*, 799 F. Supp. at 461 n.23.  Rather, the plaintiff "need prove no

more than that the conduct of defendants actually or predictably results in … discrimination; in

other words, that it has a discriminatory effect… Effect, and not motivation, is the touchstone…."

*United States v. City of Black Jack, Mo.*, 508 F.2d 1179, 1184-85 (8th Cir. 1974).

 *Failure to Make Reasonable Accommodations.*  Under the FHA, discrimination is defined

to include "refusal to make reasonable accommodations in the rules, policies, practices or services,

when such accommodations may be necessary to afford [a handicapped] person equal opportunity

to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).  Similarly, "[t]he ADA and the

Rehabilitation Act also prohibit all discrimination based on disability by public entities," and both

statutes "require[] that covered entities make reasonable accommodations in order to provide

qualified individuals with an equal opportunity to receive benefits from or to participate in

programs run by such entities."  *Reg'l Econ. Cmty Action Program, Inc. v. City of Middletown*,

294 F.3d 35, 45 (2d Cir. 2002), *superseded by statute on other grounds*, ADA Amendments Act

of 2008, Pub. L. No. 110-325, 122 Stat. 3553.  To succeed on a reasonable accommodation claim,

the plaintiff must show that "the requested accommodation is '(1) reasonable and (2) necessary to

(3) afford handicapped persons an equal opportunity to enjoy housing.'" *Lapid-Laurel*, 284 F.3d at 457 (*quoting Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 603 (4th Cir. 1997)).

Here, too, a burden-shifting analysis applies: the plaintiff must show that the requested accommodation is necessary to allow disabled persons an equal opportunity to use and enjoy a dwelling. *Id.* To show necessity, the plaintiff must establish that the proposed accommodation will "affirmatively enhance" a handicapped person's quality of life "by ameliorating the effects of [his or her] disability." *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995). Once the plaintiff establishes a prima facie case, the burden of proof shifts to the municipality, which must show that the accommodation is not reasonable. *ReMed Recovery Care Ctrs. v. Twp. of Willistown*, 36 F. Supp. 2d 676, 684 (E.D. Pa. 1999) (*citing Hovsons, Inc. v. Twp. of Brick*, 89 F.3d 1096, 1104 (3d Cir. 1996)). To meet this burden, the municipality must prove that the accommodation (1) imposes an undue financial and administrative burden; (2) would impose undue hardship; or (3) requires a fundamental alteration in the nature of its zoning scheme. *Hovsons*, 89 F.3d at 1104.

**B.** **Plaintiff Should Be Granted a Preliminary Injunction and the Defendants Should Be Immediately Directed to Issue All Approvals Necessary for Plaintiff to Open and Operate the Facility**

The FHA includes an express authorization of injunctive relief:

> [I]f the court finds that a discriminatory housing practice has occurred or is about to occur, the court … may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

42 U.S.C. § 3613(c)(1). The remedies available under the ADA and RA likewise include injunctive relief. *See J.M. Ex rel. A.M. v. E. Greenwich Twp. Bd. of Educ.*, 2008 WL 819968, at *5 n. 2 (D.N.J. Mar. 25, 2008) (*citing A.W. v. Jersey City Public Schools*, 486 F.3d 791, 804 (3d Cir. 2007)). To prevail on a motion for preliminary injunctive relief, the moving party must demonstrate: (1) a reasonable probability of success on the merits; (2) the probability of irreparable

harm if relief is not granted; (3) the balance of hardships favors the movant; and (4) the public interest favors granting relief. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

      1.   Plaintiff is Likely to Prevail on the Merits

Defendants' denial of Plaintiff's zoning application, insistence on a use variance application it had no intention of granting, and denial of that application constitute unlawful discrimination under the Equal Protection Clause and all three types of claims (disparate treatment, disparate impact and failure to provide reasonable accommodations) identified in the FHA, ADA and RA. Accordingly, for the reasons detailed below, Plaintiff is likely to prevail on the merits.

      *a)*  *Plaintiff Has Standing*

"Standing under the Fair Housing Act is as broad as Article III permits." *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016) (*citing Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)). The same is true of the ADA and RA. *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 407 (3d Cir. 2005).[5] As individuals suffering from alcoholism and drug addiction, Plaintiff's intended patients are "handicap[ped]" within the meaning of the FHA and "qualified individual[s] with a disabilit[ies]" within the meaning of the ADA and RA. *See* 42 U.S.C. § 3604(f); 42 U.S.C. § 12132; 29 U.S.C. § 794(a). As the operator of the proposed facility that has been prevented from providing rehabilitation services and housing to its handicapped and disabled intended patients, Plaintiff has suffered particularized injury sufficient to confer standing on it. *See Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F.

---

[5] The FHA confers standing to challenging discriminatory housing practices on any "aggrieved person," defined as anyone who (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." *LeBlanc-Sternberg*, 67 F.3d at 424. The ADA grants a right to relief to "any person alleging discrimination on the basis of disability," 42 U.S.C. § 12133, and the RA extends remedies to "any person aggrieved" by unlawful discrimination. 29 U.S.C. § 794a(a)(2). Thus, a plaintiff "denied a zoning permit because it cares for and/or associates with individuals who have disabilities" possesses standing to sue "on its own behalf." *MX Group*, 293 F.3d at 335.

Supp. 2d 1353, 1364 (S.D. Fla. 2012) (operator of facility that serves qualified individuals with disabilities possesses standing to sue).

### b) *This Action Is Ripe for Review*

Defendants have repeatedly denied Plaintiff's zoning applications and rejected its requests for reasonable accommodations.  Plaintiff's efforts to appeal the Zoning Officer's decision, and its Use Variance application were summarily denied.  Any attempt to return to the same Board for further consideration would be futile.  *Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Twp.*, 996 F. Supp. 409, 426 (D.N.J. 1998) ("The proposition that 'litigants are not required to make futile gestures to establish ripeness' has been applied [to zoning cases]") (quoting *Sammon v. New Jersey Bd. of Med. Examiners,* 66 F.3d 639, (3d Cir.1995)); *see also Easter Seal Soc'y of New Jersey v. Township of N. Bergen,* 798 F. Supp. 228, 236 (D.N.J.1992) (finding that "any further efforts to work within the municipal administrative apparatus [by pursuing appeals] would be an exercise in futility").  Thus, Plaintiff's claims are ripe for adjudication.[6]  *Pathways Psychosocial v. Town of Leonardtown, MD*, 133 F. Supp. 2d 772, 789 (D. Md. 2001) ("the issue is sufficiently concrete for judicial resolution once an accommodation is denied").

### c) *Defendants Intentionally Discriminated Against Plaintiff and Its Intended Patients by Treating Them Disparately from Those Without Disabilities*

As to Plaintiff's applications for zoning approval and use variance, Defendants' intentional discrimination could not have been more blatant.  Numerous expert witnesses testified that while the Facility's proposed use is not *exactly* enumerated within the language of the Ordinance, a drug and alcohol rehabilitation and residential care facility is "very similar . . . [and] not inconsistent

---

[6] Courts considering FHA and ADA cases consistently emphasize that housing discrimination gives rise to uniquely immediate injury, making such controversies ripe. *See, e.g., McKivitz*, 769 F. Supp. 2d at 820 ("a statutory violation occurs as soon as a request for a federally-mandated 'reasonable accommodation' is denied").

with other uses that are permitted in the zone." Himelman Cert. ¶ 11, Ex. C, 11/8/17 Tr. at 130. Even the Board's expert planning consultant testified that the Property is an appropriate place for the Facility. *Id.* at 142-44. Thus, zoning approval should not have been denied in the first place.

Having denied Plaintiff zoning approvals to which it is entitled, Defendants have treated Plaintiff differently than other property owners within the PRIME zone and other operators of residential healthcare facilities. The record establishes that Defendants have done so due entirely to Plaintiff's association with disabled recovering drug addicts and alcoholics, whom Defendants irrationally fear. Indeed, the Court need not employ much deductive effort to glimpse Defendants' discriminatory motivations because they laid them bare for all to see in various hearings (as detailed above). Refusing to accept Plaintiff's consent to multiple conditions placed on the Facility as solutions to a variety of concerns Board members brought up at the hearings, and relying on unfounded statements, including some that were directly contradicted by expert testimony, shows the extent to which the Board will go to justify a denial that has no legitimate rationale.

Because the Board members could not deny that the proposed use is inherently beneficial, each member feigned support for the Facility, but qualified their statements with impermissible NIMBY logic. For example, Chairman Green stated, that "[t]here are many other areas within Sayreville that could be explored for this type of facility . . . Sayreville understands this type of needed use, just not at the present location." *Id.*, Ex. E, 1/24/18 Tr. at 139. And Commissioner Kucynski admitted that "there's no doubt that this in an inherently beneficial use . . . I just think it's in the wrong place." *Id.*, Ex. E, 1/24/18 Tr. at 144. In other words, they simply did not want Plaintiff to use the Property for a purpose to which it was legally entitled because, in their view, if the Facility was located in the subject neighborhood, they would be putting "the people of the

school, the children of the school, in danger," and it would somehow "destroy the quality of life for the people in this neighborhood." *Id.*, Ex. E, 1/24/18 Tr. at 147.

These obvious departures from the reasonable interpretation of the Ordinance, and clear disregard for substantive criteria evince Defendants' discriminatory intent and resulted in undeniably disparate treatment.  Thus, Plaintiff is likely to succeed on the merits on their disparate treatment claims under the FHA, ADA and RA, as well as on their Equal Protection claim.

### d)  *Defendants' Application of the Ordinance to the Proposed Facility Has Had a Disparate Impact on Plaintiff*

By denying approval for a proposed residential treatment facility when they have already approved an operationally identical nursing home facility, Defendants' decision has had a greater adverse impact on a protected group—Plaintiff's disabled intended patients—than others similarly situated.  The record makes this crystal clear, though it is already obvious based on common sense: unlike Plaintiff, anyone who sought to operate a residential healthcare facility in the PRIME zone for patients without these types of disabilities—*i.e.*, people who, unlike recovering addicts, do not elicit fears of "safety issues," "brazen crime" or "a poor element" nearby—would have been free to do so without interference from Defendants.  In fact, Defendants advised Sayreville Nursing, LLC in 2014 that its facility was approved *as of right* in the PRIME zone (Himelman Cert., Ex. C, 11/8/17 Tr. at 9-10), and the Facility's use as a long-term care and rehabilitation center is, for zoning purposes, indistinguishable from the nursing home (*id.*, Ex. C, 11/8/17 Tr. at 100-03, 130-32, 142-44; Ex. D, 12/13/17 Tr. at 90).  This indisputably establishes Plaintiff's prima facie case.

Accordingly, the burden shifts to Defendants to show a legitimate, non-discriminatory reason and that no less-discriminatory alternative is available.  But Defendants have not offered and cannot offer *any* legitimate, non-discriminatory reason for their decision to deny Plaintiff's Variance Application.  Plaintiff is thus likely to succeed on its disparate impact claims as well.

26

### e) *Defendants Failed to Provide a Reasonable Accommodation*

Plaintiff reminded Defendants they were obligated, given the disabled status of Plaintiff's intended patients, to provide reasonable accommodations to permit the Facility, especially given that the Code does not expressly allow a drug and alcohol rehabilitation facility *anywhere* in the Borough. *See* Himelman Cert. ¶ 11, Ex. C, 11/8/17 Tr. at 133; Ex. D, 12/13/17 Tr. at 88-89. Plaintiff proffered a wealth of undisputed evidence that its treatment model will serve a therapeutic purpose for the disabled residents; the Board agreed that the use is inherently beneficial. Thus, Plaintiff has established a prima facie case for the necessity of a reasonable accommodation.

The burden then shifted to Defendants to show that the accommodation requested was not reasonable. Defendants, however, did not and cannot prove anything in this regard. To meet this heavy burden, Defendants would have to establish that Plaintiff's request imposes an undue financial and administrative burden; would impose undue hardship; or require a fundamental alteration in the Borough's zoning scheme. Defendants cannot make any such showing (and did not attempt to do so). Defendants offered no evidence to counter the statements of multiple experts that the Facility complies with the zoning requirements and poses no threat to the zoning scheme within the PRIME zone, as it is very similar to other established permitted uses. *See, e.g.,* Himelman Cert. ¶ 11, Ex. C, 11/8/17 Tr. at 130-32. The Board made no showing of hardship or burden resulting from Plaintiff's application, and cannot do so. This leaves Defendants with no hope of justifying their failure to grant the requested accommodation. Thus, Plaintiff demonstrated they are likely to succeed on their claims for failure to provide reasonable accommodations.

### 2. Plaintiff and Its Patients Will Suffer Irreparable Harm

Irreparable harm means injury that (a) is neither remote nor speculative, but actual and imminent; and (b) cannot be remedied by monetary damages. Some courts have held that a showing of a substantial likelihood of an FHA violation gives rise to a presumption of irreparable

harm and shifts the burden to the defendant to prove that the injury is not irreparable. *See Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423-24 (11th Cir. 1984); *Rogers v. Windmill Pointe Vill. Club Ass'n, Inc.*, 967 F.2d 525, 528 (11th Cir. 1992) ("when a plaintiff . . . shows a substantial likelihood that a defendant has violated specific fair housing statutes and regulations, that alone, if unrebutted, is sufficient to support an injunction remedying those violations") (citation omitted). This presumption "is not inconsistent with practice within the Third Circuit." *Assisted Living Associates of Moorestown*, 996 F.Supp. at 439 (holding that "given the very strong likelihood of success on the merits of the FHA claim, . . . a presumption of irreparable harm is warranted") (*citing, inter alia, United States Postal Serv. v. Beamish*, 466 F.2d 804 (3d Cir. 1972)).

But regardless of whether a presumption arises, "[c]ourts have held that the deprivation of treatment needed to recover from addiction or prevent relapse constitutes irreparable injury." *Innovative Health Sys., Inc. v. City of White Plains*, 931 F. Supp. 222, 240 (S.D.N.Y. 1996). Irreparable injury exists where there is a deprivation of housing or services that poses a serious risk of harm to vulnerable individuals. *See Easter Seal Soc'y v. Twp. of N. Bergen*, 798 F. Supp. 228, 237 (D.N.J. 1992) ("[F]or each day that this project is delayed, eight protected individuals are forced to move into other environments which endanger their recent recovery" constituting irreparable harm); *Oxford House-Evergreen v. City of Plainfield*, 769 F. Supp. 1329, 1345 (D.N.J. 1991) (holding that closure of group home for substance abusers would cause irreparable harm due to loss of home and supportive and stable environment). Thus, prospective patients' delay in receiving treatment as a result of defendants' actions constitutes imminent irreparable harm.

Here, Defendants' actions have denied treatment opportunities to the disabled, a loss not compensable by money damages. Moreover, Defendants' discriminatory denial of what they have already admitted represents an "inherently beneficial use" jeopardizes Plaintiff's financial ability

to renovate and operate the proposed facility in the future at the desired location, further harming both Plaintiff and its intended patients.  Furthermore, the opportunity to open and operate the Facility is not indefinite (*see* Carise Cert. ¶ 30), and Plaintiff may lose its interest in the Property altogether if immediate relief is not granted.  This more than suffices as irreparable harm.

### 3.   Granting Relief Will Not Harm Defendants

Defendants will not suffer undue financial or administrative burden or any other hardship if the appropriate approvals are issued for the Facility.  *See ReMed*, 36 F. Supp. 2d at 688; *Judy B. v. Borough of Tioga*, 889 F. Supp. 792, 801-02 (M.D. Pa. 1995).  Defendants have conceded that the Facility is a beneficial use, and that the use is appropriate for the PRIME zone.  *See, e.g.,* Himelman Cert. ¶ 11, Ex. C, 11/8/17 Tr. at 142-44.  The record is devoid of evidence that approving the Facility will result in a greater impact on municipal services than other permitted facilities.  Contrasted against the great harm Plaintiff and its intended patients have suffered and continue to suffer daily, the balance of the equities clearly supports issuance of an injunction.

### 4.   Granting Relief Best Serves the Public Interest

The requested injunction serves "the public interest in bettering the lives of the disabled and allowing them to live lives on a footing equal to the non-handicapped, policies endorsed by Congress with passage of the FHAA, section 504 of the rehabilitation act, and comparable legislation intended to remove impediments to the handicapped enjoying the same rights and privileges as all other citizens."  *Judy B.*, 889 F. Supp. at 801 (*citing Instant Air Freight*, 882 F.2d 797, 803 (3d Cir. 1989) (legislative expressions of public policy in statutes may be relied on to define "public interest" for purposes of preliminary injunction analysis)).  This is particularly so in light of the broad construction and remedial scope of these anti-discrimination statutes.  *See* 42 U.S.C. § 12101(b); *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995); *Frasure v. Principi*, 367 F. Supp. 2d 245, 258 (D. Conn. 2005).   As one court explained it, "we would be

hard-pressed to deny the significance of the public interest in supporting efforts … to assist in and encourage the recovery of alcoholics and drug addicts." *Oxford House*, 799 F. Supp. at 465. Thus, Congressional efforts to eliminate discrimination mirror the public interest here and far outweigh Defendants' non-existent interest in misinterpretation of their zoning Ordinance (by prohibiting a nursing or long-term care facility that does not serve "older adults," even though such a facility, for zoning purposes, is identical to a nursing home for elderly persons). *See ReMed*, 36 F. Supp. 2d at 688-89. Preventing discrimination is precisely what the requested injunction would achieve.[7]

## V.     CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction (a) directing Defendants to immediately issue all zoning approvals necessary for the construction and operation of the Facility; and (b) enjoining Defendants from persisting in discriminatory conduct designed to thwart the construction and operation of that Facility.

Dated:  March 6, 2018          MARINO, TORTORELLA & BOYLE, P.C.
        Chatham, New Jersey

                               Kevin H. Marino
                               John A. Boyle

                               AND

                               KAUFMAN, COREN & RESS, P.C
                               Steven M. Coren, Esq.
                               (admission *pro hac vice* to be sought)
                               Matthew R. Williams, Esquire
                               (admission *pro hac vice* to be sought)

                               *Attorneys for Plaintiff*

---

[7] Defendants' conduct also violates the New Jersey Law Against Discrimination ("NJLAD"), which makes it a violation for a "municipality . . . or an officer, employee, or agent thereof to exercise the power to regulate land use or housing in a manner that discriminates" on the basis of disability. N.J.S.A. 10:5-12.5. "New Jersey courts apply federal standards to [the NJLAD's] provisions." *Weiss v. Rutgers Univ.*, 2014 WL 2608201, at *4 (D.N.J. June 10, 2014) (citations omitted). Thus, analysis of Plaintiff's NJLAD claim mirrors that of its federal claims.