**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

|  |  |
|---|---|
| 901 ERNSTON ROAD, LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> BOROUGH OF SAYREVILLE ZONING BOARD OF ADJUSTMENT; *and* BOROUGH OF SAYREVILLE, <br><br> *Defendants*. | **Civil Action No.: 3:18-cv-02442** <br><br> **CERTIFICATION OF DAVID B. HIMELMAN, ESQ. IN SUPPORT OF PLAINTIFF'S APPLICATION FOR AN ORDER TO SHOW CAUSE WHY THE COURT SHOULD NOT ISSUE A PRELIMINARY INJUNCTION DIRECTING ISSUANCE OF NECESSARY ZONING APPROVALS AND ENJOINING DISCRIMINATORY CONDUCT** <br><br> *(Document filed electronically)* |

David Himelman, of full age, hereby certifies as follows:

1.      I am an attorney admitted to practice law in the State of New Jersey and the United States District Court for the District of New Jersey.  I was counsel of record to Plaintiff in the proceedings before the Sayreville Zoning Board of Adjustment and Borough of Sayreville, the Defendants in the above-captioned matter, and I make this certification on my own knowledge and belief.

2.      Attached hereto as Exhibit A is a true and correct copy of Sections 26-6 and 26-85(b) of the Sayreville Code of Ordinances, which governs and defines properties zoned as "Public, Recreational, Institutional Municipal and Educational (PRIME)."

3.      On or about June 23, 2017, RCA filed a request with the Zoning Board to confirm that the Facility's use was permitted in the PRIME zone. Sayreville Zoning Officer, Andrew Mashanski, advised RCA to file a formal permit application requesting such confirmation (which could then be appealed to the Zoning Board if denied).

1

4.      On July 7, 2017, RCA filed a formal application with the Sayreville Zoning officer for a zoning permit to seek approval and confirmation that the proposed drug and alcohol abuse treatment facility and residential health care treatment facility to be operated by RCA on the Property is a conditionally permitted use in the PRIME zone.

5.      On July 14, 2017, Andrew Mashanski, the Zoning Officer for the Borough, denied RCA's application for a zoning permit.

6.      On July 26, 2017, Plaintiff timely appealed the denial of the zoning permit to the Sayreville Zoning Board of Adjustment in accordance with the New Jersey Municipal Land Use Law, N.J.S.A. 40:55D-70 (a) and 72 (a).

7.      A hearing on the appeal of the zoning's officer administrative denial of the zoning permit was scheduled before the Zoning Board for August 23, 2017, but due to a lack of quorum at the August 23, 2017 meeting, the matter was carried to the September 27 meeting.

8.      On September 15, 2017, RCA filed an application with the Zoning Board for Use Variance and Amended Site Plan approval (the "Variance Application") for a drug and alcohol abuse treatment facility/residential health care treatment facility.  901 LLC filed the Variance Application under a reservation of rights and without prejudice, to the pending appeal of the Zoning Officer's determination.

9.      During the September 27, 2017 hearing, RCA presented testimony demonstrating that the proposed use falls within the definition of long term care facility as defined in the Code. Although the Zoning Board's questions and input during the hearing suggested that its members were unlikely to reverse the Zoning Officer's determination, the Board took no action or vote on the appeal at the meeting.  Excerpts from the transcript of the September 27, 2017 hearing are attached hereto as Exhibit B.

10.     The Zoning Board conducted public hearings on Plaintiff's application for a Use Variance and Amended Site Plan Approval on November 8, 2017, December 13, 2017, and January 24, 2018.

11.     Attached hereto as Exhibits C, D and E, respectively, are true and correct copies of excerpted pages from the transcripts of the November 8, 2017, December 13, 2017, and January 24, 2018 hearings before the Zoning Board.

12.     At the February 28, 2018 Zoning Board meeting, after being served with the complaint in this action, the Zoning Board failed to adopt a final resolution to deny Plaintiff's application for Use Variance and Amended Site Plan Approval.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Respectfully submitted,

David B. Himelman
Attorney At Law
Turnpike Metroplex
190 Route 18 North, Suite 205
East Brunswick, New Jersey 08816
*Counsel for Plaintiff*

Dated:  March 1, 2018                    David Himelman

3

# EXHIBIT A

## 26-6 - DEFINITIONS.

*Long term care facility/nursing facility/nursing home* means a facility which provides a full range of twenty-four (24) hour direct medical nursing and other health services. Registered nurses, licensed practical nurses and nurses' aides provide services prescribed by a residence physician. It is for those older adults who need health supervision but not hospitalization. The emphasis is on nursing care, but restorative physical occupational speech and respiratory therapies are also provided. This level of care may also include specialized nursing services such as intravenous feeding or medication, tube feeding, injected medication, daily wound care, rehabilitation services and monitoring of unstable conditions.

 (Ord. #637-99)

(Ord. No. 213-13, § 1, 4-8-2013)

## 26-85 - CONDITIONAL USES.

a.  *General.* The Board shall not approve a conditional use unless it finds that the use meets all the applicable requirements of this section. All conditional uses shall be subject to site plan review in accordance with Article III of this chapter.

b.  *Requirements for Specific Uses.*

1.  Home occupations which do not qualify as accessory uses pursuant to subsection 26-82.6.b.2. of this chapter shall be permitted in all residential zones as a conditional use, provided that the following conditions are met:

    (a)  The practitioner must be the owner or lessee of the residence in which the home occupation is contained.

    (b)  The practitioner must reside in the home as his or her principal residence.

    (c)  The practitioner shall not utilize the services of more than one on-site employee at any time. Use of any home occupation facility by a group or groups of clients or other persons shall not be permitted.

    (d)  The home occupation shall occupy less than fifty (50%) percent of the total area of the floor where located, excluding space used for a private garage or nine hundred (900) square feet, whichever is smaller.

    (e)  No clients shall remain on the premises overnight.

    (f)  The residential character of the neighborhood and the premises shall not be subordinated to the home occupation use.

    (g)  Adequate on-site parking spaces shall be provided in accordance with this article so that no parking related to the home occupation shall occur on the street.

    (h)  No retail sales, manufacturing or industrial operations shall be conducted on the site.

    (i)  No more than one (1) business visitor shall be permitted at any one time. There shall be no external evidence of the home occupation, except any parking spaces that may be required pursuant to this article.

    (j)  Home occupation deliveries and pick-ups shall be of the type customary to residential areas only.

    (k)  No sign identifying the home occupation shall be permitted and there shall be no identification of such home occupation upon any mailbox.

    (l)  No equipment or process shall be used in such home occupation which creates noise, glare, fumes, odors, electrical interference, medical waste or other nuisance factors detectable to the human senses, outside the lot on which the home occupation is conducted.

2.  Houses of Worship. Houses of worship shall be permitted as a conditional use in all zoning districts in compliance with the following:

    (a)  Compliance with Zoning Schedule III at the end of this chapter.

(b)   Screening and landscaping shall be provided where necessary to minimize the development's impact on adjacent properties.

3.   Gasoline Service Stations and Public Garages. All gasoline service stations and public garages shall comply with the following requirements:

(a)   Minimum lot size: The minimum lot size shall be twenty thousand (20,000) square feet.

(b)   Minimum lot width: The minimum lot width shall be one hundred (100′) feet.

(c)   No more than three (3) gasoline service stations shall be located within one (1) linear mile. The distance shall be measured along the center line of existing streets to the nearest lot line of land use for a gasoline service station. Further, such use shall be located no less than five hundred (500′) feet from any institutional or public use or house of worship.

(d)   Outdoor storage areas and landscaping requirements: All outdoor storage facilities shall be enclosed by a fence or a wall or other suitable visible screen adequate to conceal such facilities and the contents thereof from adjacent property.

(e)   All areas not covered by buildings and pavement shall be appropriately landscaped and maintained.

(f)   Location of oil drainage pits and hydraulic lifts: No outdoor hydraulic or mechanical lifts or oil drainage or mechanical pits shall be permitted.

(g)   Location of gasoline pumps: No gasoline pumps shall be nearer than twenty-five (25′) feet to any street right-of-way line and all property lines and at least fifty (50′) feet from the boundary of a residential zone.

(h)   The sale of used cars and the storage of any unlicensed vehicles shall be prohibited.

(i)   The sale of convenience items on-site, other than those that are clearly incidental to the gasoline service station use, shall not be considered an accessory use.

(j)   All other standards of the zone in which the use is located shall be met.

4.   Full-Service or Suite Hotel.

(a)   Full-service or suite hotels shall contain not less than one hundred forty (140) rooms and may contain ballroom and meeting spaces, restaurants, dining rooms, banquet halls, bars, convenience stores and other associated accessory uses.

(b)   Maximum height: two and one-half (2 ½) stories.

(c)   Shall comply with all other bulk standards of the zone.

5.   Long-term care facility or assisted living facility shall be permitted as a conditional use in the PRIME zone, subject to the following:

(a)   Minimum lot area: five (5) acres.

(b)   Minimum lot width: three hundred (300′) feet.

(c)   Minimum lot depth: four hundred (400′) feet.

(d)   Maximum height: thirty-five (35′) feet and two and one-half (2 ½) stories.

(e)     Maximum floor area ratio (FAR): 0.30.

(f)     Maximum impervious coverage: forty (40%) percent.

(g)     Minimum setbacks:

    (1)     Front yard: fifty (50′) feet.

    (2)     Side and rear yards:

        (i)     From single-family residential zone and/or single-family residence property line: one hundred (100′) feet.

        (ii)     From multi-family residential zone and/or multi-family building property line: fifty (50′) feet.

        (iii)     From non-residential zone property line: forty (40′) feet.

    (3)     All yards shall be utilized as buffer areas in accordance with Articles IV and V of this chapter.

(h)     No parking shall be permitted in any required front yard setback area.

(i)     Minimum parking setback from building: ten (10′) feet.

(j)     Maximum number of units: seventy-five (75).

(k)     Maximum number of occupants: one hundred (100).

(l)     No accessory structures shall be permitted.

(m)     Minimum gross floor area per unit:

    (1)     Single occupant unit: three hundred (300) square feet.

    (2)     Double occupant unit: four hundred fifty (450) square feet.

6.   Continuing care retirement community (CCRC) shall be permitted as a conditional use in the PRIME zone, in accordance with subsection 26-84.1b(4)(a) through (j) and (11) of this article.

7.   Public Utility Uses. Public utility uses shall be permitted as a conditional use in all zoning districts in accordance with the following conditions:

(a)     Site plans, specifications and a statement setting forth the need and purpose of the installation are filed with the Board.

(b)     Proof is furnished that the proposed installation in a specific location is necessary and convenient for the efficiency of the public or private utility system or the satisfactory and convenient provision of service by the utility to the neighborhood or area in which the particular use is located.

(c)     The design of any building utilized in connection with such facility conforms to the general character of the area and shall in no way adversely affect the adjacent properties.

(d)     Adequate and attractive fences and other safety devices and sufficient landscaping shall be provided to provide year-round visual screening from adjacent properties.

8.   Construction Staging and Storage. Construction staging and storage shall be permitted as a conditional use in the I District in accordance with the following:

(a) Maximum area of disturbance: four (4) acres total.

(b) The area and equipment shall not be visible from any public right-of-way.

(c) The area shall be used for construction staging and storage only during the time of construction. If construction is halted, for any reason, for a period of more than six (6) months, all construction equipment shall be removed from the area until construction commences again.

(d) The area shall be returned to its original condition, or a finished appearance, after construction is completed.

(e) The removal of mature trees shall be subject to Board approval.

(f) Construction staging shall not occur in any area where natural buffers adjacent to residential areas would be disturbed.

(g) Performance standards: Performance standards in accordance with Article V shall be met for noise, vibration and disposal, emission or handling of hazardous materials as required by the New Jersey Administrative Code as amended from time to time. Glare, dust and odors shall not be discernible at any property line.

9. Billboards.

(a) Billboards shall be permitted as a conditional use only in the B-3 zones that front on New Jersey State Highway No. 9 and comply with the following requirements:

(1) The parcel shall have a minimum lot frontage of two hundred (200′) feet along New Jersey State Highway No. 9.

(2) No billboard sign shall be closer than one thousand (1,000′) feet to another billboard sign located on the same or opposite side of New Jersey State Highway No. 9. This distance shall be measured along a straight line between the two (2) nearest points of the signs. The minimum spacing requirement shall not apply to two (2) panels viewed from different directions of travel on New Jersey Highway No. 9 and which share a common support structure.

(3) No advertising sign shall be located within three hundred (300′) feet of any intersection, interchange or right-of-way of any underpass, overpass or bridge.

(4) Only single-sided or double-faced signs with a single display per face shall be permitted. Flashing, moving or projected signs are prohibited.

(5) There shall be no more than one (1) advertising sign on a parcel, provided however, that the advertising sign may be double-faced.

(6) No billboard sign shall be erected within three hundred (300′) feet of the nearest property line of a residentially zoned property, property used for residential purposes, any public property or any public or private park.

(7) No billboard shall exceed a height of fifty (50′) feet at its highest point above the elevation at the base of the sign.

(8) The sign area of an advertising sign shall not exceed six hundred seventy-five (675) square feet per sign face.

    (9)    The minimum setback line of the billboard from any property line or right-of-way shall be thirty (30′) feet measured from the closest point of the billboard to the closest point of the right-of-way.

    (10)    The minimum setback line of the billboard sign from any structure shall be thirty (30′) feet.

    (11)    Lighting for the advertising sign shall be designed to minimize its impact upon the surrounding area.

    (12)    The base and the support structure of the advertising sign shall be designed to minimize its impact on the surrounding area.

    (13)    No advertising sign shall be permitted which, because of its size, shape and location, may obscure or obstruct the view of vehicular or pedestrian traffic or be confused with any authorized traffic signal.

(b)    Additional requirements for billboard applications:

    (1)    The Borough shall not accept an advertising sign application for consideration and issuance unless accompanied by a valid permit of the Department of Transportation of the State of New Jersey and any other State agency having jurisdiction over such signs.

    (2)    Site plan review shall be required for all advertising sign applications. Site plans shall include structural plans and drawings, foundation specifications, wind load calculations, electrical requirements, a survey depicting the distance between advertising signs and existing advertising signage installed as of the date of the subject application and any other data reasonably required by the Planning Board to determine compliance with the applicable conditions herein imposed.

    (3)    In addition to the required site plan checklist items, the applicant shall provide visual representations to the Board, demonstrating the visual impacts of the proposed advertising sign. These must be in the form of sealed diagrams and computer-generated simulations of the advertising sign proposed. These materials shall illustrate sign line and views of the proposed billboard from all adjoining property, from properties fronting on the opposite side of the highway and from points north and south of the site on New Jersey State Highway No. 9.

    (4)    Efforts shall be made to limit the visual impacts on any adjoining property and the highway corridor, particularly all impacts to property either zoned for residential use or developed for residential use. Efforts to enhance the aesthetics may consist of compatible color treatments for the support structure, landscaping around the base of the support structure, lighting and other site enhancements as deemed necessary by the Board.

(Ord. #637-99; Ord. #976-06, § 1)

# EXHIBIT B

BOROUGH OF SAYREVILLE BOARD OF
ADJUSTMENT MEETING
MIDDLESEX COUNTY, NEW JERSEY


IN THE MATTER OF:        )
                         )              TRANSCRIPT
                         )
                         )                 OF
RECOVERY CENTERS OF      )
AMERICA,                 )     BOARD OF ADJUSTMENT MEETING
901 Ernston Road         )
Sayreville, New Jersey   )


                    Place:  Municipal Building
                            167 Main Street
                            Sayreville, NJ 08872

                    Date:   September 27, 2017


PLANNING BOARD MEMBERS PRESENT:

  RONALD GREEN, Chairman
  THOMAS KUCZYNSKI
  KENNETH I. KREISMER
  MARIA CATALLO
  JOHN CORRIGAN
  WILLIAM HENRY
  PHIL EMMA
  ANTHONY ESPOSITO

PLANNING BOARD CONSULTANTS:

  JOHN LEONCAVALLO, PP (John Leoncavallo Associates)
  Township Planner
  JAY CORNELL, PE, PP (CME Associates)
  Township Engineer
  ANDREW MASHANSKI
  Zoning Officer of the Borough of Sayreville




                    Transcriber, Kimberly Upshur
                    **J&J COURT TRANSCRIBERS, INC.**
                    **268 Evergreen Avenue**
                    **Hamilton, NJ 08619**
                             **(609)586-2311**
                    **FAX NO.   (609)587-3599**
                    **E-mail:   jjcourt@jjcourt.com**
                    **Website:  www.jjcourt.com**


                    Audio Recorded

2

APPEARANCES:

   LAWRENCE B. SACHS, ESQ. (Law Offices of Lawrence B.
                               Sachs)
   Attorney for the Board


   DAVID B. HIMELMAN, ESQ. (Law Offices of David B.
                              Himelman)
   Attorney for the Applicant

---

3

### I N D E X

**WITNESS**                                              **PAGE**
DAVID DORSCHU
  Direct Examination by Mr. Himelman          24
  Cross Examination by Mr. Sachs               48

**EXHIBITS**
A-1   Approved use for Briarwood and proposed     27
     use for RCA at 901 Ernston Road

4

# **A D D E N D U M**

        Individuals identified within the text of the following transcript do not represent necessarily all of the individuals in attendance at this meeting. Their presence, speaker identification and other information regarding title page and appearance, along with various words, proper nouns and other spellings found within this transcript were able to have been extrapolated from minutes of the meeting and discussions with the Board Secretary and, of course, that which is evident and that which can be concluded by way of the tape recording itself, which is of fair quality.

        Areas of the tape which were unable to be discerned were identified by placing the word (indiscernible) or (inaudible) followed by a short explanation.

* * * * *

---

Colloquy      5

1         MR. CHAIRMAN:  The next application is 17-21
2  Recover Centers of America, 901 Ernston Road.  This is
3  an appeal.
4         MR. SACHS:  Mr. Chairman, let me just explain
5  what we have in front of us this evening, because we
6  normally don't have these.  We've had a few of them
7  over the years, but under the Municipal Land Use Law
8  40:55D-70 which is the statute that basically gives
9  powers to the Zoning Board, one of those powers under
10  subsection (a) is to hear appeals of a decision of a
11  zoning officer.  We normally don't hear this.  Normally
12  we hear what are called C Variances which we just heard
13  five of them, or D Variances which are use variances.
14  So this is an A Variance or an A -- it's an appeal
15  under Section A.
16         So essentially our zoning officer, Mr.
17  Mashanski has made a determination with respect to the
18  issuance of a zoning permit and I would like him once
19  I'm done speaking to indicate what he did or did not do
20  in this matter.  And the applicant has appealed that
21  decision which is their right under the statute, and
22  they're going to make a presentation to this Board
23  which will then be considered as to whether or not Mr.
24  Mashanski's decision was correct.  So that's
25  essentially why we're here tonight.

Colloquy                                             6

1        So I know if Mr. Himelman wants to introduce
2   himself we can do that, but I'd like Mr. Mashanski as
3   well to indicate, you know, what action he took.
4        MR. HIMELMAN:  Thank you, Mr. Sachs.
5   Chairman Green, nice to see you, members of the Board
6   nice to see you.
7        As Mr. Sachs indicated this is a matter
8   involving a denial of the zoning permit application by
9   the zoning officer Mr. Mashanski.  I represent the
10  permit applicant, if you will, Recovery Centers of
11  America.  I do have an opening statement.  I'd like to
12  at least have the Board understand how we got here,
13  what the issues are, who our witnesses are going to be
14  this evening, and the order of our presentation.  And
15  obviously you may have questions of me before I proceed
16  with any witnesses, but at least allow me the
17  opportunity to go through my presentation.  I would
18  appreciate that.
19       As he indicated, and Mr. Sachs is absolutely
20  correct, so my client Recovery Centers of America filed
21  an appeal for this hearing after Mr. Mashanski denied
22  the zoning permit which our client filed.  That was on
23  July 14th, 2017.  Under the Municipal Land Use Law, and
24  Mr. Sachs correctly pointed out under 40 -- N.J.S.A.
25  40:55D-70(a) and 72(a) as a result of your zoning

Colloquy                                             7

1   officer's administrative action denying the zoning
2   permit this appeal was filed.  And under N.J.S.A.
3   Municipal Land Use Law under Section 70(a) this Board
4   has jurisdiction to hear that.
5        And just for the record I just want to just
6   cite that provision so that there's no misunderstanding
7   because the Zoning Board has the power to hear and
8   decide this appeal where it's alleged by the appellant
9   in this case Recovery Centers of America that there is
10  error in any order, decision or refusal of an
11  administrative officer based on or made in the
12  enforcement of your zoning ordinance.
13       As we present tonight Recovery Centers of
14  America believes that the denial of the zoning permit
15  was an error and such actions were arbitrary and
16  capricious and should be reversed by this Board based
17  on the facts and legal grounds which we intend to
18  present in our appeal tonight.  So that's basically the
19  legal framework why we're here and the right for this
20  Board to hear this.
21       As I indicated we've got several witnesses.
22  We do have a representative of Recovery Centers of
23  America David Dorschu who is currently the chief
24  executive officer at one of our facilities in Mays
25  Landing at Lighthouse and he will be testifying,

Colloquy                                    8

1    basically giving an overview of the various levels of
2    treatment programs available and the services we, RCA
3    provides.  In addition, we'll be introducing a couple
4    of exhibits.  One is an exhibit which compares the
5    previously approved nursing home facility Briarwood and
6    its services that it was approved for by your planning
7    board as a nursing home and long-term care facility and
8    the proposed use that RCA would like to move forward
9    with in the Borough.
10           In addition, we have James Higgins who's our
11   professional planner.  He will testify on the uses and
12   services which Recovery Centers provides and how that
13   falls within the definition of long-term care facility
14   and nursing home as defined in your code which you'll
15   hear later on was the premise by which Mr. Mashanski
16   denied the permit.
17           And finally we'll have John Rea (phonetic)
18   who's our traffic consultant who's going to testify on
19   the traffic impact primarily analyzing -- I know Mr.
20   Rea is not here yet, but will be coming hopefully
21   later.  He has a meeting and he will be arriving.  I
22   know you know John.  And he will basically testify on
23   the traffic impact primarily comparing the previous
24   approved use on this property that was approved by your
25   planning board to what is currently proposed.

Colloquy                                    9

1            Just by way of background, sort of how did we
2    get here, so Recovery Centers of America has finalized
3    business terms to lease the property at 901 Ernston
4    Road which is where the subject property is and they
5    currently -- 901 Ernston Road Realty, LLC currently
6    owns the property.  Historically, some of you may be
7    aware, Sayreville Nursing Home, LLC previously received
8    preliminary and final site plan approval from our
9    planning board and that was on May 21st initially back
10   in 2014 to operate a long-term care nursing facility.
11   The resolution of approval adopted by the planning
12   board confirmed that the applicant at that time
13   proposed to demolish the existing nursing home on the
14   above property and move forward with the plan
15   submitted.  They ultimately filed an amended site plan
16   application to the Sayreville Planning Board in 2015
17   which included modifications to the building,
18   landscaping, other improvements including sidewalks,
19   and copies of those approvals had been submitted with
20   our materials to Mr. Mashanski.
21           The important thing to note here is that the
22   proposed facility to be constructed by Sayreville
23   Nursing was permitted as of right in the prime zone and
24   that was codified in both the resolutions from 2014 and
25   '15.

Colloquy                    10

1    As part of the formal lease agreement my
2    client sought confirmation from the Borough that its
3    intended facility which will operate at the property is
4    a permitted use in the prime zone despite a detailed
5    submission outlining the similarities between RCA's
6    proposed use -- I mean RCA's use and the currently
7    approved use.  Mr. Mashanski as we know at this point
8    determined that the proposed use is not permitted in
9    the prime zone and that was primarily the basis by
10   which he denied the application for the zoning permit.
11   Just to orient the Board and for the Board to
12   better understand the nature of RCA's proposed business
13   -- when I say RCA I'm referring to Recovery Centers of
14   America -- the planning board testimony will -- I'm
15   sorry, the planning testimony will refer and identify
16   certain provisions of your land development code which
17   we believe, and I believe are instructive on the use
18   question.  As you'll hear from representatives from Mr.
19   Dorschu on the services RCA provides a full-range of 24
20   hour direct medical nursing and other health services
21   for it's patients.
22   They provide education, treatment,
23   rehabilitation services, and recovery support for
24   substance abuse and mental health disorders.  The
25   facility services will include a wide range of

Colloquy                    11

1    intensive care treatment options, 24 hour nursing care
2    and monitoring and supervision, rehabilitation
3    programs, psychiatric service, psychological services,
4    recreational therapy, medication monitoring and
5    wellness programs.  In addition they will treat
6    patients and continue to provide services to its
7    patients for an extended period of time.  And as I
8    said, further detail will be provided by RCA's
9    representative on that.
10   Further background, Recovery Centers of
11   America has received approvals and operates in eight
12   facilities in New Jersey, Maryland, Pennsylvania and
13   Massachusetts.  In Devon, Pennsylvania RCA received an
14   approval for its facility recognizing that it operated
15   in a similar manner as the previously occupied long-
16   term care facility at that particular location.
17   In addition, RCA has commenced legal action
18   in Federal Court against Gloucester Township which is
19   in South Jersey upon it's denial of a land use
20   application to operate a long-term care facility.  In
21   that matter the Federal Court issued an injunction in
22   that case directing the zoning board to vote in favor
23   of its application and proposed facility.
24   Focusing on the code section at issue which
25   is in your definition's section under your land

Colloquy                                    12

1   development code there's a provision dealing with long-
2   term care facility and nursing home facility and
3   nursing home.  And in that ordinance and definition it
4   specifically lays out how the Borough was to handle
5   those particular use.
6            And what it goes on to say is it means it's a
7   facility which provides a full range of 24 hour direct
8   medical nursing and other health services, registered
9   nurses, licensed practical nurses and nursing aids
10  provide services prescribed by a resident's physician.
11  It's for those older adults who need health supervision
12  but not hospitalization.  The emphasis is on nursing
13  care, but restorative, physical, occupational speech
14  and respiratory therapies are also provided.  This
15  level of care may also include specialized nursing
16  services such as intravenous feeding or medication,
17  tube feeding, injection medication, daily wound care,
18  rehabilitation services and monitoring unstable
19  conditions.
20           The above-sited definition which I just
21  referred to comports with -- also with the definition
22  described in the complete illustrated book of
23  development definitions which is also a resource that
24  many land use practitioners and planners rely on.  And
25  in that particular fourth edition it defines long-term

Colloquy                                    13

1   care facility to mean an institution or part of an
2   institution that is licensed or approved to provide
3   healthcare under medical supervision for 24 or more
4   consecutive hours to two or more patients.
5            As you know from the documentation and the
6   appeal that we filed we believe, and RCA contends that
7   it meets the definition of a long-term care facility
8   and therefore should be permitted to operate in the
9   prime zone.
10           As far as the previously approved site plan
11  Recovery Centers of America will rely on the previously
12  approved site plan and intends on making no
13  modifications to the footprint of the building or any
14  of the overall approval that the planning board granted
15  back in '14 and then subsequently in 2015.
16           The services of the facility will include,
17  and you'll hear testimony, 24 hour nursing care as well
18  as rehabilitation services listed in the Borough's
19  definitions.  The patients who would receive treatment
20  at the facility will include adults who suffer from
21  physical and mental comorbidities and substance use
22  disorders requiring medical attention usually in the
23  form of nursing care, but typically not
24  hospitalization.  The precise class of people that
25  Borough's definition was intended to support.

Colloquy                                          14

1        Further, on the definition as I indicated in
2   the other -- in the complete illustrated book of
3   development definitions the facility is compliant
4   providing appropriate license, 24 hour care to multiple
5   patients with familiar relation.
6        RCA performs as a long-term care facility
7   including rehabilitation for its patients thus it seems
8   clear to us that the proposed use falls squarely within
9   the definition that I described under the uses in your
10  code relating to long-term care and nursing home
11  facilities.
12       Focusing on a particular phrase in that
13  definition the term older adults as stated in the above
14  ordinance is not defined and in our belief is
15  ambiguous.  Moreover, the term older adults is also not
16  defined in the Municipal Land Use Law.  As such, due to
17  the ambiguity of such term old adults should be
18  construed in favor of RCA.
19       Further, any attempt to discriminate based on
20  age is illegal absent now or exceptions such as a 55
21  older housing community or juveniles and none of those
22  exceptions apply here.  In addition, RCA's patients are
23  handicapped and disabled under federal law including,
24  but not limited to the Federal Fair Housing Act and the
25  American With Disabilities Act otherwise known as ADA.

Colloquy                                          15

1   Similarly disabled individual patients are also
2   protected under New Jersey Law Against Discrimination.
3   Drug and alcohol is a huge problem in this State and
4   this country and as a result the federal and state
5   legislative schemes have recognized that these patients
6   are protected and should be treated accordingly.
7        The failure to consider RCA's facility as a
8   permitted use, in RCA's belief, would constitute
9   discrimination under the New Jersey Law Against
10  Discrimination, the Fair Housing Act, because it says
11  it shall be an unlawful discrimination for a
12  municipality to exercise the power to regulate land use
13  or housing in a manner that discriminates on the basis
14  of disability.
15       More particularly under that particular
16  statute and because the facility has the same or
17  similar uses as a long-term care facility the failure
18  to approve this as a permitted use constitutes unlawful
19  discrimination against disabled persons that is
20  prohibited and entitles a potential applicant to
21  damages.
22       In addition, the Federal Fair Housing Act
23  defines discrimination to include a refusal to make
24  reasonable accommodations in rules, policies, practice
25  or services when such are necessary to provide access

1     to housing for the disabled.  The failure to recognize
2     this proposed facility as a permitted use is in essence
3     a refusal to make reasonable accommodations in such
4     rules, policies, practices and services.  You may ask
5     well what is reasonable accommodation?  The Federal
6     Fair Housing Act defines discrimination to include a
7     refusal to make reasonable accommodations in rules,
8     policies, and practices and services when such
9     accommodations are necessary to provide access to
10    housing for the disabled.
11              Also, as I mentioned the American
12    Disabilities -- the American With Disabilities Act
13    otherwise known as ADA provides that no qualified
14    individual with a disability shall, by reason of such
15    disability, be excluded from participation in or denied
16    the benefits of a service program or activity of a
17    public entity or be subjected to discrimination by such
18    entity and makes it unlawful for a public entity in
19    determining the size or location of facility to make
20    selections that have the purpose or effect of excluding
21    individuals with disabilities from denying them the
22    benefits of or otherwise subjecting them to
23    discrimination.
24              The New Jersey Law Against Discrimination
25    also prohibits a municipality, county or other local

1     civil or political subdivision of the State or officer,
2     employer, agent thereof to exercise the power to
3     regulate land use or housing in a matter that
4     discriminates on the basis of disability.
5               Based upon that sort of detailed analysis the
6     failure to consider this proposed facility as a
7     permitted use would constitute, in our belief,
8     discrimination under the New Jersey Law Against
9     Discrimination under the Fair Housing Act, as I said,
10    because this would be unlawful discrimination for a
11    municipality to exercise the power to regulate land use
12    or housing in a matter that discriminates on the basis
13    of disability.  And because the proposed facility has
14    the same or similar uses as a long-term care facility
15    RCA espouses that the failure to approve this as a
16    permitted use constitutes unlawful discrimination
17    against disabled persons that is prohibited and
18    entitles them to potential damages and attorney's fees.
19              Based on that opening and presentation RCA
20    would ask this Board to ultimately reverse the zoning
21    board's -- the zoning officer's determination and site
22    this as a permitted use in the zone.
23              That's my opening and I don't have any
24    further facts or legal issues to present.  And if the
25    Board doesn't have any questions we can present our

Colloquy                     18

1    first witness.
2             MR. SACHS:  Mr. Chairman, I have one question
3    and a general comment.  First of all Mr. Himelman, the
4    question I have is you referenced a case in Gloucester
5    Township -- was it Gloucester Township?
6             MR. HIMELMAN:  Correct.
7             MR. SACHS:  Okay.  I would assume in that
8    case that was a lawsuit that emanated from a decision
9    by the Gloucester City Zoning Board to deny a use
10   variance application?
11            MR. HIMELMAN:  There were several proceedings
12   I believe both involving the planning and zoning boards
13   in Gloucester Township.  But that is correct.  Yes.
14            MR. SACHS:  All right.  So it went to the
15   merits of a development application.
16            MR. HIMELMAN:  It went to the merits of a
17   development application, but it also dealt with the
18   various federal and state discrimination laws --
19            MR. SACHS:  I understand.
20            MR. HIMELMAN:  -- that I -- but generally
21   that's correct.
22            MR. SACHS:  All right.  Because we know in
23   New Jersey law obviously if someone's going to file a
24   prerogative writ on a denial of a use variance
25   application you certainly have recourse to go to


Colloquy                     19

1    Federal Court as well if you feel.
2             MR. HIMELMAN:  That's correct.
3             MR. SACHS:  Okay.  And my second comment is I
4    appreciate Mr. Himelman's education on the law,
5    however, Mr. Himelman is not a witness in this matter
6    in my opinion, and I think he's done a good job of it.
7    He's provided testimony on behalf of his client.
8    However, it's not evidentiary.  So, yes, it's for
9    educational purposes, but any of his comments that were
10   made on the record in that opening statement are a) not
11   evidentiary, and Mr. Himelman is not a witness, and we
12   will hear from his witnesses and that's what you will
13   base your decision on.  Thank you.
14            MR. HIMELMAN:  Thank you very much.  Does the
15   Board have any other questions or comments before we
16   proceed?
17            MR. SACHS:  Actually I think what we want to
18   do is Mr. Mashanski maybe if you can just give me a
19   minute and just --
20            MR. MASHANSKI:  Certainly.
21            MR. SACHS:  -- explain the genesis of the
22   filing of the application for a permit and just give us
23   the scenario as to your decision resulting in this
24   appeal.
25            MR. MASHANSKI:  Yes.  As you know Mr.

Colloquy                                    20

```
 1        Himelman came in --
 2              MR. SACHS:  Mr. Mashanski -- just for the
 3        record Mr. Mashanski -- Andrew Mashanski is a zoning
 4        officer of the Borough of Sayreville.
 5              MR. MASHANSKI:  Yes.  I think Mr. Himelman
 6        has summed up that this location 901 Ernston Road has
 7        been a long-term healthcare facility, a nursing home
 8        for quite some time and it's reached planning board
 9        site plan approval to rebuild the area.  So we know
10        this area very well.  We know it to be as long-term
11        nursing care facility.
12              Shortly thereafter Mr. Himelman came in with
13        a different kind of use, in my mind, although he does
14        describe the uses are quite similar and comports with
15        exactly what our definition falls under long-term
16        facility.  In his description I have to say that there
17        are a lot of similarities, but as we know and envision
18        901 Ernston Road, Briarwood as we know it, I do not see
19        that there are similarities in complete.  There are
20        some disparities that I would say that it does not
21        jive.
22              One of them, just going by the definition as
23        we know and he did mention it earlier it starts out
24        with long-term facility nursing home needs.  Well, we
25        know a nursing home and what it involves.  The
```

Colloquy                                    21

```
 1        ambiance, the nature of it, it deals with the elderly.
 2        It's a 24 hour facility, yes, there's nurses and
 3        doctors.
 4              But one thing really does stick out with --
 5        that has disparity between the two uses and Mr.
 6        Himelman does try to define it and try to separate and
 7        then bring it back to a similarity and it falls under
 8        the level -- the actual age.  And the -- it states it
 9        is for those older adults who need health supervision.
10        That's a key word, older adults.  Mr. Himelman will say
11        that it's -- there's no definition of it.  Well, you
12        don't need a definition.  And just because there is no
13        definition doesn't mean that you exempt it and don't
14        include it and you cannot compare.  It's up to the
15        Board to decide what is considered older adults.  His
16        use deals with all ages.  And older adults as we know
17        it as 901 Briarwood, that deals with mom and dad,
18        grandpa, and it's different.
19              Now there might be case law, I can't get
20        involved with that, that's not my expertise, but the
21        best way to summarize it would be is Mr. Himelman will
22        say everything jives, it comports, it walks like a
23        duck, it swims like a duck, it flies like a duck, must
24        be a duck.  Well, it might be a goose.  They all do the
25        same thing.  And a goose is not a duck.  So that's how
```

Colloquy                          22

1    I kind of looked at it just to keep it in my mind.  But
2    ultimately it's up to the Board to decide is this the
3    same thing.  All right.  That's it.
4              MR. SACHS:  Thank you, Mr. Mashanski.
5              MR. HENRY:  Mr. Chairman, can I get one --
6    ask our lawyer here for a clarification.  Is the
7    question here is then the age of the people that are
8    going to be using the facility?
9              MR. SACHS:  No.  The question is -- I mean,
10   that's obviously what the definition in our ordinance
11   talks about what a long-term facility is or a nursing
12   home is.  But your determination based after you hear
13   the testimony and the evidence from Mr. Himelman's
14   witnesses and not from Mr. Himelman, but from Mr.
15   Himelman's witnesses whether or not Mr. Mashanski's
16   decision not to grant the zoning permit was not
17   arbitrary, capricious, and unreasonable.  That's the
18   standard.
19             I mean, the zoning officer in every
20   municipality in the State of New Jersey has the
21   authority to issue a zoning permit.  If after
22   investigating a particular application determines that
23   the use is the same use.  If it is a different use, if
24   it a different use by a scintilla then it's not the
25   same use.  All right.  So you'll hear the testimony and

Colloquy                          23

1    you'll make a decision based on that.  I mean, I have a
2    number of questions which I'll reserve to ask because
3    I'm curious.  But we'll proceed forward.
4              MR. HIMELMAN:  Thank you.  Any other
5    questions?
6                   (No audible response)
7              MR. HIMELMAN:  Okay.  Great.  David.  As I
8    indicated our first witness is David Dorschu on behalf
9    -- and he'll be testifying on behalf of Recovery
10   Centers of America.  And I guess we should have Mr.
11   Dorschu sworn in.
12        D A V I D   D O R S C H U, WITNESS, SWORN
13             MR. SACHS:  Please state your name, spelling
14   your last name, professional affiliation for the
15   record.
16             THE WITNESS:  My name is David Dorschu and
17   I'm the CEO of --
18             MR. SACHS:  Can you spell your last name,
19   sir?
20             THE WITNESS:  D as in David -o-r-s-c-h-u.
21   I'm employed by Recovery Centers of America.  I'm the
22   Chief Executive Officer of one of the RCA facilities
23   which is located in Mays Landing, New Jersey, Atlantic
24   County.
25             MR. SACHS:  Okay.  Thank you.  What was the

Dorschu - Direct/Himelman                    24

1    spelling again Mr. Dorschu?  It was D-o-r --
2              THE WITNESS:  s-c --
3              MR. SACHS:  -- s-c --
4              THE WITNESS:  -- h-u.
5              MR. SACHS:  Got you.  Thank you.
6              MR. HIMELMAN:  We'll have to share a mic.
7              MR. SACHS:  Okay.  Does the other one work?
8    Hold on.  Maybe it's working now.  It's temperamental.
9              MR. HIMELMAN:  Don't worry about it.  I'll
10   speak loudly.
11   DIRECT EXAMINATION BY MR. HIMELMAN:
12        Q    Mr. Dorschu, good evening.  You've indicated
13   whom you're currently employed.  Can you just give a
14   brief background of what your current responsibilities
15   are.  And I'm going to use RCA for the record.  Just so
16   it's clear I'm referring to Recovery Centers of
17   America.
18        A    Yes.  Good evening, ladies and gentlemen of the
19   Board.  I appreciate the opportunity to present
20   tonight.  My name is David Dorschu.  And as I said I'm
21   the Chief Executive Officer of the Lighthouse.  The
22   Lighthouse is an RCA facility located in Mays Landing,
23   New Jersey.  So my responsibilities include financial
24   performance, include maintaining licensure and
25   compliance issues, that type of thing.


Dorschu - Direct/Himelman                    25

1         Q    And to your knowledge how many facilities
2    does RCA own, and/or manage?
3         A    Currently we own and manage eight facilities.
4         Q    Okay.  Very good.  Now just turning
5    specifically to the RCA services could you describe the
6    general treatment options which RCA intends to provide
7    to its patients at the proposed facility here in
8    Sayreville?
9         A    Yes.  There will be a total of five what we refer
10   to as clinical levels of care as defined by the
11   American Society of Addiction Medicine.  And those
12   levels of care are detoxification services, residential
13   services, partial care, intensive out-patient and
14   general out-patient services.
15        Q    Now have you had an opportunity to review the
16   -- or have a general working knowledge of the prior
17   approval that Mr. Mashanski was referring to --
18        A    Yes, I do.
19        Q    -- at the current property?
20        A    Uh-huh.
21        Q    And what's your understanding of that prior
22   approval?
23        A    Well, my understanding is that for a long-term
24   nursing care facility as was stated earlier is defined
25   as offering medical and nursing services on a 24 hour a

1    day basis which is what our facility in Mays Landing
2    does and what the proposed facility here in Sayreville
3    will do.
4         Q    Very good.  Now we've brought some exhibits
5    with us this evening, is that correct?
6    A    Yes.
7              MR. HIMELMAN:  And one exhibit, Mr. Sachs, I
8    guess we can mark this --
9              MR. SACHS:  As A-1?
10             MR. HIMELMAN:  -- as A-1.
11        Q    Can you initial that?  Mark it A-1 and just
12   initial that with your initials and put today's date on
13   it.  Okay.  And for the record could you please
14   identify -- and we also have handouts for the Board
15   members I believe of this exhibit.  Do we have those?
16   Here we go.  Joe, you want to circulate these?  While
17   we're --
18             UNIDENTIFIED SPEAKER:  If you want to use
19   this --
20             MR. HIMELMAN:  Oh, that's fine.  We'll rent
21   it free.
22             UNIDENTIFIED SPEAKER:  No charge.
23             MR. HIMELMAN:  You'll be able to see --
24   members of the Board you'll be able to see this and
25   hopefully as you look at your handout.

1         Q    So Mr. Dorschu just for the record if you
2    could identify what's now been marked as A-1.  If you
3    could just identify what that is and then we'll get
4    into some questions.
5    A    Sure.  This is the rehabilitation services
6    approved use for Briarwood and the proposed use for
7    Recovery Centers of America at the 901 Ernston Road
8    site.
9         Q    So this is basically as I understand it, and
10   you correct me if I'm wrong, it's a comparison between
11   the prior approved use by the planning board of
12   Briarwood for a nursing facility breaking down
13   services, quality of life, mission operations and
14   clinical staffing and comparing that to the same
15   proposed use that RCA will look to operate at the 901
16   Ernston Road location, is that correct?
17   A    That is correct.
18        Q    So if you could just walk us through sort of
19   the highlights of A-1 and illustrate for us the various
20   services and other items that we will perform -- when I
21   say we RCA and Briarwood -- and what your understanding
22   of that comparison is.
23   A    Sure.  I'll hit on some highlights.  Under the
24   services section 24 hour skilled nursing care is the
25   first listing.  In our facility we have both registered

1    nurses and licensed practical nurses that are at the
2    facility 24 hours a day.  So we have 24 hour a day
3    coverage of nursing care.  We also have intra
4    disciplinary care planning which means both from a
5    medical perspective as well as from a clinical
6    perspective.  The care planning also includes aftercare
7    planning for when clients are leaving the facility and
8    being discharged.
9            We have seven days a week therapy.  We have
10   therapy groups.  We have educational groups.  We have
11   family groups.  We also have adjunctive therapy such as
12   art therapy, music therapy, fitness, that type of
13   thing.  Health management including management of
14   chronic illnesses, we have a registered dietician.  We
15   have extensive medical care through medical director,
16   physicians, psychiatrists, nurse practitioners and
17   psychiatric nurse practitioners as well.
18           We also do diagnostic lab work as well.
19   Moving down to quality of life we provide semi-private
20   accommodations.  In my facility all of our rooms have
21   only two beds and we have one single -- and we have one
22   room with a single bed.  We have -- our meals are
23   provided and we receive excellent patient satisfaction
24   scores on our meals.  So the food that we provide is
25   very pleasing and satisfying to the clients and we pay

1    attention to those satisfaction surveys very closely.
2    Laundry services, phone services.  We offer religious
3    or spiritual services for various denominations that
4    are able to explore the spiritual aspect of their
5    recovery.  So we offer that as well.
6            Mission of operations, to improve the health
7    and well-being for our residents.  The mission of
8    Recovery Centers of America is to help one million
9    people gain long lasting and meaningful recovery.  And
10   that is a very compelling mission, but, you know, that
11   is what we are striving for as a company.  That is what
12   we strive for everyday in the facility in Mays Landing
13   and will also occur in Sayreville as well.
14           As far as our staffing we have, as I
15   mentioned, physicians, we have a medical director who
16   is certified in addiction medicine, we have
17   psychiatrists, we have nurse practitioners.  As I
18   mentioned we have both registered nurses and licensed
19   practical nurses.  We have licensed social workers, we
20   have licensed counselors on staff as well as recovery
21   support staff, administrative staff, et cetera.  As I
22   said we have licensed nursing staff, on-staff
23   physicians, we have social service professionals which
24   assist the clients in what we refer to as our case
25   management duties of ensuring that the clients when

Dorschu - Direct/Himelman                    30

1    they're discharged from our facility are discharged to
2    an appropriate, you know, clinical setting as they step
3    down in levels of care and experienced administrative
4    professionals.
5         So everything on this list as Mr. Himelman
6    had indicated for Briarwood -- for approved use for
7    Briarwood is also consistent with number one, the
8    proposed use at Ernston Road but also currently what we
9    do in my facility in Mays Landing.
10   Q    So what conclusions do you draw from this
11   particular exhibit, and what is it that -- what idea do
12   you want to convey to the Board on that exhibit?
13   A    What I want to convey to the Board is that the
14   approved use is very consistent and actually identical
15   with what -- with the proposed use that would occur
16   through Recovery Centers of America.
17   Q    Thank you.  Now you've heard and you've had
18   -- I presume had an opportunity to look at the
19   Sayreville ordinance that both myself and Mr. Mashanski
20   was referring to, correct?
21   A    Yes.
22   Q    Okay.  Let me just finish my question before
23   you -- because I want you to pick up on the tape
24   correctly.  Now based upon the definition that I
25   described and went through under long-term care

Dorschu - Direct/Himelman                    31

1    facilities and a nursing home facilities as Mr.
2    Mashanski referred to, do you believe that the uses and
3    the various programs and staffing that the ordinance
4    was intended to cover would be included both for the
5    approved use of Briarwood and for the proposed RCA use?
6    A    I do.  The services that we offer, the staffing
7    levels that we maintain, we are licensed by the New
8    Jersey Office of Licensing, so the services that we
9    offer, the staffing that we maintain, the fact that we
10   are a 24 hour a day facility to me is consistent with
11   the approved use of Briarwood.
12   Q    And as you've indicated both the approved use
13   of Briarwood and the proposed use of RCA will operate
14   on a 24 hour basis, correct?
15   A    Yes.  Twenty-four hours a day, seven days a week.
16   Q    Okay.  Thank you.  Now in your position in
17   your -- now how long have you worked in the industry?
18   A    I've worked in the industry for 22 years post-
19   graduate.  I've worked for RCA for 13 months, since
20   August of 2016.
21   Q    Now as to your understanding are the patients
22   both at Mays Landing facility and what will reside at
23   the proposed use here in Sayreville, are those patients
24   protected or considered handicapped or disabled --
25   A    Yes.

Dorschu - Direct/Himelman                    32

 1        Q    -- under federal and state law?
 2   A    Under federal and state law they are protected
 3   under the ADA as was mentioned earlier.
 4        Q    So turning to the proposed RCA facility
 5   you're generally familiar with the site and the
 6   proposed project, is that correct?
 7   A    I am.
 8        Q    What is the range of size of facilities that
 9   you have worked at previously?
10   A    Well, the facility that I currently work at is a
11   total of 53 beds and we're expanding to 135 beds.  I
12   have also worked in facilities that totaled 110 beds
13   and 132 beds.
14        Q    And how many beds are proposed for the RCA
15   facility here?
16   A    The RCA facility here proposed number of beds is
17   149.
18        Q    One hundred forty-nine.  Okay.  Now what does
19   that mean in terms of the number of patients?
20   A    Well, if we're projecting 90 percent capacity then
21   we're looking at about 134, 135 patients.
22        Q    Now just for to educate the Board can you --
23   I mean I know you went through the services and
24   described them and compared them to the approved use,
25   but can you sort of give us a flavor of the care that


Dorschu - Direct/Himelman                    33

 1   the patients receive and how that is generally handled?
 2   A    Sure.  When a patient is admitted into our
 3   facility then they go through a thorough
 4   biopsychosocial assessment to assess again what we
 5   refer to as appropriate level of care.  They go through
 6   a clinical assessment and admission assessment as well
 7   as a nursing and medical assessment.  So it is assessed
 8   what level of care would be appropriate for them.
 9        In a detoxification level of care they are
10   receiving medical care as they go through the
11   detoxification process.  The detoxification process
12   usually lasts an average of about seven days.  During
13   that time they are receiving medications for the
14   detoxification protocol, they are attending group
15   sessions, they are attending education sessions as well
16   as individual therapy.  As they step down to the
17   residential level of care they are also receiving group
18   services, they're also receiving family services.  We
19   have a very robust family program because research
20   indicates the more the families are involved in the
21   treatment process that that projects to more favorable
22   treatment outcomes.
23        So I also mentioned that we have adjunctive
24   therapy such as art therapy, music therapy, we offer
25   spiritual services.  So between groups, education, and

1   individual therapy that's what the services that we
2   offer to the client.
3           We also work very hard to make sure as I
4   mentioned when the clients are discharged, prior to
5   their discharge that they have been set up with
6   appropriate continuing care.  When they leave our
7   facility where are they going, what level of care are
8   they going into?  And that includes not only treatment
9   services but also if the need exists sober living
10  services as well.  Living in a sober living or what is
11  also referred to as a recovery house, because that is a
12  need that some of the clients have.
13          Q    Now you talked a little bit in the beginning
14  of your testimony about some of the levels of care and
15  you mentioned detoxification program.  Can you just
16  basically describe a little bit what that is
17  particularly from the transition from when the patient
18  is an in-patient and then when they leave and then come
19  back as an out-patient.  If you could sort of describe
20  that and how that works.
21  A    Sure.  Most of -- at Lighthouse where I work about
22  99 percent of our clients actually enter into our
23  facility in a detox level of care and then step down to
24  a residential level of care.  And after the residential
25  level of care, after that time is exhausted then

1   clients are stepping down to either a partial level of
2   care or an intensive out-patient level of care.  When
3   you hit partial level of care or intensive out-patient
4   then they're not staying in your facility any more 24
5   hours a day.
6           At the detoxification level and at the
7   residential level they are staying in your facility.
8   As they are discharged they're stepping down to either
9   a partial level of care or intensive out-patient level
10  of care.  So as you progress through the treatment
11  process each subsequent level of care is decreasing in
12  treatment intensity.
13          Q    Now you mentioned a little bit about some of
14  the staffing and you know the definition under the
15  Sayreville code talks about under long-term care
16  facilities it talks about registered nurses, licensed
17  practical nurses, et cetera.  Can you describe the
18  staff that will provide the care at the proposed
19  facility?
20  A    We have different disciplines within our facility
21  and what will be at this facility as well.  As I
22  mentioned we have full medical services which are
23  provided by physicians.  As I mentioned both
24  psychiatrist, physicians, nurse practitioners.  All
25  certified by the state.  We also have nursing staff, we

Dorschu - Direct/Himelman                    36

1    have a director of nursing and we have registered
2    nurses as well as LPNs that are also serving the
3    clients.
4              It should be noted that our staffing patterns
5    at RCA actually exceed the state regulations because we
6    want to provide the best care possible so the
7    regulations say you're staffing at that level, but we
8    actually staff higher than that.  We also have primary
9    therapists who are clinically trained and our primary
10   therapists are masters level clinicians or above and
11   most of them are licensed by the state as well as what
12   we refer to as LCADCs.
13             We have recovery support specialists and
14   their job is to provide education to the clients as
15   well as what we refer to as milieu management.  And
16   that basically means making sure the clients are
17   monitored, they're observed and they're where they need
18   to be as far as in this group or seeing the doctor or
19   having an individual session, that type of thing.
20             We also have a family therapist who is a
21   licensed marriage and family therapist.  Again our
22   family program is really foundational to the treatment
23   philosophy that we have.  We also have drivers.  We
24   provide transportation for clients.  We have
25   administrative staff.  We have an entire admissions

Dorschu - Direct/Himelman                    37

1    department whose single job is to work with the client
2    when they come in the door for admission.
3              We also have utilization review staff which
4    is the interface between the facility and the funding
5    source.  So those are the primary, you know,
6    disciplines that we have from a staffing standpoint.
7         Q    So is it fair to say, again, going back to
8    Exhibit A-1, so we're talking about nurses who are
9    licensed, therapists, physicians, et cetera, those
10   particular professionals would be, in your view, be
11   within a nursing home as we understand that and as Mr.
12   Mashanski referred to in the ordinance versus what is
13   proposed here.  Is that a fair statement?
14   A    Well, it's a fair statement to say that it does
15   equal or meet the approved use currently at my facility
16   in Mays Landing but then also for the proposed use on
17   Ernston Road.
18        Q    Okay.  Thank you very much on that.  If you
19   could just give us a little information on what license
20   and approvals the RCA facility will operate under.
21   A    The RCA facility will operate under actually three
22   different licenses, again, licensed by the New Jersey
23   State Office of Licensing.  You have a license to
24   provide detoxification services, you have a license to
25   provide long-term rehabilitation services which is the

1    way the Office of License defines it, as well as
2    licenses for partial care, intensive out-patient, and
3    out-patient.  So those are the licenses that we're
4    dealing with.  We are inspected by the State on an
5    annual basis.
6         Q    And the license that would be required for
7    the Briarwood facility would be also approved and be
8    sought from the State of New Jersey?
9    A    What would be sought from the State of New Jersey
10   would be through the Office of Licensing.  Yes.
11        Q    And that would apply both for the approved
12   use and the proposed use, correct?  Now we talked a
13   little bit about this, but if you could just educate us
14   on -- are all the patients at the proposed use going to
15   be residential?
16   A    No.  At the proposed use -- at the proposed use
17   site probably about 85 percent of the patients will be
18   what we refer to as residential which is the highest
19   two levels of care, detoxification and residential.
20   And then approximately 15 percent of those clients will
21   be what we refer to as under the umbrella of out-
22   patient which again includes partial care intensive
23   out-patient and out-patient.  So approximately 85
24   percent will be living there and 15 percent will be
25   coming for their treatment and then going home at

1    night.
2         Q    Thank you.  Now if you could tell us what
3    percentage of the staff is used for the out-patient
4    compared to the residential treatment, please.
5    A    The out-patient staff at my facility is about five
6    percent of my total number of employees.  And that
7    would be projected to be similar at the proposed site.
8         Q    Now do the out-patient and residential
9    patients interact at all?
10   A    They do not.  Programmatically they are kept
11   separate and physically separated.  So your detoxing
12   residential patients are not interacting with the out-
13   patient folks.
14        Q    Now is the family counseling part of the
15   residential care and out-patient treatment?
16   A    Yes.  As I said we have a strong component of our
17   treatment offerings is family therapy.  And we do that
18   in a number of different ways.  We have, as I said, a
19   licensed marriage and family therapist who provides
20   family counseling which is so important in the
21   treatment process.  So that could be a husband is in
22   treatment and the wife is coming for family counseling
23   or in that context couples counseling.  It could be a
24   sister, a mother, a father, it could be children that
25   are coming for a family therapy.

1      But we also have a wide range of family
2  education options that we offer to families if in
3  conjunction with family therapy, but just to learn more
4  about what is addiction?  How do we get there?  How
5  does the family member react to the person who's
6  getting treatment, appropriate boundaries, that type of
7  thing.  If you have a loved one who's ever struggled
8  with addiction it is a very scary and painful
9  experience to go through.  And so the better that the
10 family is educated on the disease concept, the
11 addiction process and what treatment is all about and
12 the goals and objectives of treatment then the outcomes
13 have proven to be more improved.  So that's a very
14 important part of not only the folks who are in-
15 patients, but also the folks that are out-patients as
16 well.
17      I was speaking to a client yesterday who had
18 a family session with her father and this young woman
19 is in her early 20s and she said I was literally crying
20 through my family session because my father -- it was
21 explained to my father what addiction was about, that I
22 wasn't a bad person, that I wasn't a moral failure and
23 he apologized to me and it really helped to reconcile
24 our relationship and now he's firmly in my corner and
25 really behind my recovery.  And that's something that's

1  very rewarding as a treatment provider to be able to
2  share.
3      Q    Thank you for that explanation.  Now you
4  mentioned about family visits.  Could you expound upon
5  that and what do they entail?
6  A    Family visits occur on Saturdays and Sundays.  And
7  actually what we do is people come in and they are
8  oriented to the facility where they will be meeting
9  with their family member.  There is a limit to the
10 number of family members that are allowed to come to
11 visit their loved one in the facility.  And that occurs
12 on Saturdays and Sundays.  It's really important that
13 the patient feel like they're still connected to their
14 family, you know, and someone still cares about them
15 and is in their corner.  So that occurs on Saturdays
16 and Sundays.
17      Q    Now you mentioned a little bit about the
18 residential treatment and the outpatient treatment.
19 But if you can give us sort of an overview.  You know,
20 how does RCA and how will they get their patients and
21 how are they referred to the facility, generally?
22 A    RCA has different advertising means.  We do radio
23 advertising, television advertising, we speak at
24 different professional symposiums and make
25 presentations, we have a business development

Dorschu - Direct/Himelman                    42

1   department that also visits with, you know, hospitals
2   and different treatment providers in order to -- that's
3   how we acquire our clients.  Some of our clients are
4   alumni.  They've been through our program before and
5   they're coming back again.  So we have, you know, many
6   ways in which our clients come to us.
7         Q    Now do you limit, and will RCA limit the time
8   it receives new clients?
9   A    It will not.  We admit clients 24 hours a day,
10  seven days a week.
11        Q    Now turning to sort of another topic how will
12  RCA and how does it currently at your facility screen
13  patients for safety and how is security managed?
14  A    We have, as I mentioned, a series of very thorough
15  assessments that we go through with clients to make
16  sure that they're clinically appropriate to receive the
17  treatment that we're offering for them.  So those
18  assessments include, as I mentioned, medical
19  assessments but also psychiatric assessments to make
20  sure that they're appropriate for our type of facility
21  and the type of treatment that we offer.
22        As far as security measures go we have very,
23  very few incidents ever.  We are constantly monitoring
24  our clients, our staff, document and make rounds --
25  what we refer to as make rounds on our clients to make


Dorschu - Direct/Himelman                    43

1   sure that they are where they need to be.  We have
2   security cameras, we do review footage if the need
3   arises, but we have had very, very few instances of any
4   type of altercations between clients or anything like
5   that.  We have to operate under the approach that
6   client safety is number one and we take that very
7   seriously.
8         Q    Thank you for that.  Now what if the patients
9   want to leave the facility, what is the protocol and
10  how is that handled?
11  A    Well we have -- you can categorize the two
12  discharges into two types.  In my facility the average
13  length of stay that someone is in both a detox and a
14  residential level of care is 17 days.  That's the
15  average.  But the two ways you would categorize
16  discharges would be successful discharges and that
17  means they've completed all of their treatment plan
18  care objectives and they've stayed a certain amount of
19  days in order to be discharged.  And then as I said we
20  are then arranging for aftercare and continuing care
21  for them whether that be partial care IOP, whether that
22  be in one of our programs or another program if they're
23  going to an area where we don't have an out-patient
24  program.
25        We also have another type of discharge which

1    we'll broadly label as non-routine discharge.
2    Sometimes folks leave before the team feels -- the
3    clinical team feels like it's appropriate for them to
4    leave.  But we also attempt to set them up with
5    continuing care as well, because, you know, we want to
6    make sure that they land on their feet and they are
7    receiving the services that they need.
8              There are, as you all know, there are too
9    many people dying.  New Jersey's overdose rate is three
10   times higher than the national average.  This year more
11   people will overdose and die in New Jersey from drugs
12   than the number of people that will be killed through
13   motor vehicle accidents and gun violence combined.
14   It's over four people a day.  So we want to make sure
15   that under whatever circumstances they're leaving our
16   facility that we are giving them a safe place to land
17   and doing our best to meet their needs.
18        Q    Thank you for that explanation.  Now turning
19   to just some -- a few operational questions, how many
20   employees are intended for the proposed facility, and
21   will there be shifts for those employees?
22   A    The total number of employees at this point are
23   215.  Now, the height of the busiest time and the
24   period of time when the most employees will be on the
25   campus we project to be about 115 employees and we do

1    have three shifts, 7a to 3p, 3p to 11p, and 11p to 7a.
2         Q    Will there be any amenities, and if so what
3    will be afforded at the proposed facility, if you could
4    just describe that for us?
5    A    As I mentioned we offer art therapy, we offer
6    music therapy, we offer family therapy, we offer
7    fitness, we offer something I've just become familiar
8    with and I was unfamiliar with and that's Reiki.  We
9    offer spiritual services.  We offer a wide array of
10   services to best meet the needs of our clients because
11   one of the things that's really important from a
12   treatment perspective is not to treat every client, you
13   know, as everyone in the same way.  Everyone needs
14   individualized treatment to best meet their needs and
15   to improve their chances of recovering.
16        Q    Just circling back to A-1 and also
17   specifically about the definition that we referred to
18   earlier under the Sayreville code.  So I just want to
19   ask you a few questions and then we can summarize your
20   testimony.  But in referring to the definition, you
21   know, it talks about 24 hour direct medical nursing and
22   other health services.  So that will be provided at the
23   proposed facility, correct?
24   A    It will be provided.  It's being provided now at
25   our other facilities, and it will be at the proposed

Dorschu - Direct/Himelman                    46

facility.
Q    And when the ordinance definition refers to
registered nurses and practical nurses and resident
physicians they will all be staffed at the proposed
facility as they would be in the approved Briarwood,
correct?
A    Correct.
Q    And the health -- the overall healthcare
facility this is not a hospital, correct?
A    It's not a hospital.
Q    Right.  And it's under medical supervision.
A    It is.
Q    And it includes -- it will include as you've
indicated at the RCA facility will include a variety of
rehabilitation services, correct?
A    A wide array of rehabilitative services.  Yes.
Q    Okay.  Fine.  Mr. Dorschu, do you have
anything else you'd like to add or any other points
you'd like to make about your testimony or any of the
questions that I've asked and your responses, or are
you comfortable with what you've presented?
A    I'd just like to say that our mission is to save
lives and that's what we're doing, and we, you know, we
need assistance in being able to do that.
        I've been in the field as I mentioned for 22

Dorschu - Direct/Himelman                    47

years.  And when I got into the field you still had
some of your old guard substance abuse treatment people
who felt like you had to beat down the clients and make
them feel really badly about themselves and heap more
shame on them and then build them back up.
        Well, what we've learned from research is
that that's exactly the opposite tact that we should
take.  People come into my facility and they are broken
and they are desperate and they need help.  And there
is nothing more rewarding than when we have somebody
come back to our facility after they've been discharged
and they say if have 90 days clean or we have a year
clean.
        You know, we're bringing families back
together.  We're allowing people to be re-engaged with
their destinies and that's why it's such a privilege to
do what we do and to work with a population of people
that we work with.  And I want to thank you for your
time tonight.
        MR. HIMELMAN:  Thank you very much.  Does any
of the Board or any of your professionals have any
questions?
        MR. SACHS:  Yes.  I have a few questions for
Mr. Dorschu.
                CROSS EXAMINATION

Dorschu - Cross/Sachs                    48

1    BY MR. SACHS:
2        Q    Mr. Dorschu, looking at A-1 which is the, I
3    guess the comparison chart, your mission of operations
4    it says here to improve the health and well-being for
5    our residents.  Where does that come from?
6    A    Where does that come from?  That comes from our
7    clinical -- what's referred to as our clinical plan of
8    service that has been developed by the company.
9        Q    And you're claiming that that's the same
10   mission that was for the approved use for Briarwood?
11   A    Yes.
12       Q    Okay.  Because, correct me if I'm wrong, but
13   I guess the mission statement for Recovery Centers of
14   America, and again tell me if I'm misinterpreting this
15   states that the Recovery Centers of America's mission
16   is to save a million lives one neighborhood at a time
17   creating treatment for addiction and mental health
18   disorders that is as affordable and accessible as the
19   treatment for other diseases.  We strive to ensure that
20   every patient receives the higher standard of clinical
21   addiction treatment close to where they live and work.
22   A    Yes.
23       Q    Okay.  So that's your mission statement.
24   A    Uh-huh.
25       Q    That's not the mission statement of Briarwood

Dorschu - Cross/Sachs                    49

1    is it?
2    A    I don't believe it's the mission statement of
3    Briarwood particularly.  No.
4        Q    In fact, it wouldn't be, because --
5    A    Right.
6        Q    -- Briarwood was not --
7    A    It's not.
8        Q    -- Briarwood -- the nursing home at Briarwood
9    would not be -- in fact I don't even think they would
10   be treating any addiction or rehabilitation -- any
11   addiction services because that's not what they're
12   geared for, that's not what they're planned for,
13   correct?
14   A    Uh-huh.
15       Q    All right.  I'd also ask you a question about
16   the out-patient services because I think you testified
17   that 15 percent of your services are out-patient
18   services.  So tell me what the out-patient services
19   entail, how many out-patients would be treated on a
20   daily basis, because I'm assuming they'd be treated on
21   a daily basis, is that correct?
22   A    It depends on the level of care.
23       Q    Okay.
24   A    So I mentioned under the out-patient services
25   umbrella I mentioned three levels of care.  The first

1  is partial care.  That is five days a week, Monday
2  through Friday and that is for six hours a day.  So the
3  answer to your question for partial level of care is
4  yes, they're there everyday five days a week.  As they
5  progress through the treatment continuum they're
6  stepping down then to intensive out-patient.
7          Intensive out-patient includes a total of ten
8  hours of treatment per week which is three, three hour
9  groups, let's say Monday, Wednesday, Friday and then
10 one individual session which makes that tenth hour.
11 Then they're progressing down to what the State refers
12 to as general out-patient.
13         General out-patient is our groups either
14 twice or one time a week and they're about an hour and
15 a half.  So you're down then to about, you know, one
16 and a half to three hours a week.  Again, as you
17 progress through the treatment continuum and, you know,
18 you're going through -- you're meeting your treatment
19 care plan objectives then the intensity of your
20 treatment is decreasing as you move through it.
21     Q    So at the first level of out-patient the most
22 partial -- the partial we're talking five days a week.
23 You could be coming five days a week?
24 A    Yes.
25         Q    Now do you happen to know the proposed

1  operations of Briarwood under the Planning Board
2  approval from 2015?
3  A    I do not.
4          Q    Well, I happen to have been the planning
5  board attorney when that application was approved so
6  I'm familiar with it.  If I were to tell you that there
7  were no out-patient services at the nursing home would
8  that surprise you?
9  A    Probably --
10         Q    Well, let's take it one step further.  Do we
11 generally have out-patient services at a long-term care
12 facility or nursing home?
13 A    I don't believe so.
14         Q    Yes.  In fact we know that when you go to a
15 nursing home or you go to a long-term care facility
16 you're usually there for some type of chronic disease,
17 chronic illness, Alzheimer's.
18 A    Uh-huh.
19         Q    In fact, again if you're not familiar with
20 this particular approval for Briarwood you -- do you
21 know for a fact whether or not there was an Alzheimer's
22 unit on that -- in that approval?
23 A    In that approval I do not.
24         Q    Okay.  All right.  In your other facilities,
25 and I know you just operate -- you're the executive

1   director for the facility in Mays Landing, do you have
2   an oncology nurse who's on staff 24/7?
3   A    We do not.
4        Q    Okay.  Do you have an orthopaedic's nurse
5   who's on staff 24/7?  Do you have a dialysis unit
6   that's on -- I didn't think so.  All right.  And by the
7   way, I believe your -- and I was very impressed with
8   your presentation.  I believe this is a service that's
9   much needed in the community and the State, but what
10  this Board has to concentrate on are the distinctions
11  between what your type of use is with what was approved
12  at this particular site.
13            All right.  Let me just go back to A-1.  Now,
14  again, these are all services that you've testified to,
15  you know, which are similar.  By the way, these
16  services are all accessory services to the primary use
17  of your business which is for treatment for addiction.
18  A    Correct.
19       Q    But you've indicated on here 24 hour skilled
20  nursing care, intradisciplinary care planning, seven
21  days a week therapy, social services, psychiatry,
22  psychotherapy services, health management including
23  management of chronic illnesses, pain management and
24  diagnostic lab work.
25            All right.  So those are services that you

1   are providing.  Your contention is those are the same
2   services that were being provided for Briarwood.
3   Aren't those the same services, by the way, that would
4   be offered by a large regional hospital?
5   A    I would imagine.  Yes.
6        Q    Okay.  I mean I think we could take judicial
7   notice of that fact.  All right.  Secondly, you have
8   quality of life.  It states here private and semi-
9   private accommodations, comprehensive therapeutic
10  recreation program, nutrition meals and snacks,
11  beautician services, satellite TV and wi-fi phone
12  services, laundry services, resident managed
13  commissary, religious services for all denominations.
14            Again, would those be the same services that
15  might be offered by a large regional hospital located
16  within the State of New Jersey?
17  A    Yes.
18       Q    All right.  And let's just go down to the
19  last section which is your clinical -- well, the
20  mission of operations I guess for a generic term I
21  guess every hospital is there to improve the health and
22  well-being of their patients certainly.
23            And then going to the clinical staffing you
24  have licensed therapists, professional cooks, licensed
25  nursing staff, on-staff physicians, social service

Colloquy                                      54

1   professionals and experienced administrative
2   professionals.
3              Again, I think you can concede that all of
4   those are services that would be attended to the
5   operation of a large regional hospital within the State
6   of New Jersey?
7   A     Right.
8              MR. SACHS:  Okay.  All right.  I don't have
9   anything further, Mr. Chairman.
10             MR. CHAIRMAN:  I have some questions.  Are
11  you going to have any teenagers involved in this?
12             THE WITNESS:  We will not.
13             MR. CHAIRMAN:  So a person 18 or older would
14  be admitted.
15             THE WITNESS:  Correct.
16             MR. CHAIRMAN:  Can anyone leave your facility
17  at anytime?
18             THE WITNESS:  Yes.
19             MR. CHAIRMAN:  So hypothetically speaking
20  someone at 11:00, 12:00 at night could just turn around
21  and say I've had enough and I want to leave and you
22  would let them go.
23             THE WITNESS:  Yes.  They're not -- it's not a
24  locked unit and they are free to go.
25             MR. CHAIRMAN:  When they come to your

Colloquy                                      55

1   facility is it voluntary or is some of it mandated by a
2   court or a hospital psychiatrist or psychologist?
3              THE WITNESS:  It is voluntary.
4              MR. CHAIRMAN:  Voluntary.
5              THE WITNESS:  Yes.  Now, some of our clients
6   do have legal issues, but no judge is saying you have
7   to go to, as my example, Lighthouse for treatment and
8   you have to be there on Tuesday.
9              MR. CHAIRMAN:  I have a few more questions,
10  but I'm going to yield to the Board to ask any
11  questions.
12             MR. HENRY:  I have a couple here, if I may.
13  I guess this has more or less to do with the site plan
14  which I don't know if we should be going into, but it
15  seems as if you're talking about a lot of people coming
16  and going constantly there.  And I know Briarwood when
17  they're up there they've always had a problem with
18  parking.  Are you going to be, I guess, will this be
19  within the guidelines of our code for parking spaces,
20  too?
21             THE WITNESS:  I defer to --
22             MR. HIMELMAN:  As you know the original
23  approval for Briarwood did include a proposed parking
24  limitation.  And it's my understanding that, and I
25  think Mr. Cornell can corroborate this, but my

Colloquy                              56

 1    understanding is that Briarwood has filed -- did file
 2    an application with the Planning Board to address that
 3    parking issue and that application was not heard by the
 4    Planning Board pending a review by this Board because
 5    we've also -- RCA's also filed an application for a use
 6    variance.  So that issue that you've raised will be
 7    potentially heard if the use variance is prosecuted.
 8              MR. SACHS:  Let me just -- there really are
 9    no site plan considerations this evening, all right.
10    So I wouldn't -- yeah, but if this -- if Mr.
11    Mashanski's decision is sustained then the applicant
12    has filed a use variance application where they will
13    have to address site plan issues.
14              MR. HIMELMAN:  That's correct.
15              MR. ESPOSITO:  Can you -- Mays Landing, is it
16    right?
17              THE WITNESS:  Yes.
18              MR. ESPOSITO:  Is it comparable in size?
19              THE WITNESS:  Mays Landing is currently 53
20    beds and so it's currently smaller than the proposed
21    use.
22              MR. ESPOSITO:  Right.  You had how many?  I'm
23    sorry, I wrote it down.
24              THE WITNESS:  One hundred forty-time.  And it
25    will be --


Colloquy                              57

 1              MR. ESPOSITO:  So it's three times as big.
 2    Okay.
 3              THE WITNESS:  Then we have started
 4    construction expansion and at Mays Landing we'll be
 5    expanding to 135 beds.
 6              MR. ESPOSITO:  Okay.  To Mr. Henry's point
 7    how many parking spaces do you currently have just in
 8    case we see it later on?  I mean, is this really even
 9    feasible that we can accommodate 149 beds at this
10    point?
11              THE WITNESS:  Are you speaking for Mays
12    Landing?
13              MR. ESPOSITO:  Yes.  For Mays Landing how
14    many spots do you have available?
15              THE WITNESS:  We have 70 parking spaces.
16              MR. ESPOSITO:  And how many do we have at
17    Briarwood, do we know?
18              UNIDENTIFIED SPEAKER:  Mr. Chairman the
19    approved site plan contained 92 parking spaces.  The
20    application that was submitted to the Board that Mr.
21    Himelman referred to was looking to increase it to 130
22    spaces.  So they were looking to add more spaces.
23              THE WITNESS:  Okay.  So it looks like go.
24              UNIDENTIFIED SPEAKER:  That has not been
25    heard by the Planning Board.

Colloquy                              58

1          THE WITNESS:  No, of course.  But it looks
2    like the plans are it looks like it'll accommodate the
3    amount of beds that they have if and when -- if it's
4    ever approved it looks like they'll be able to
5    accommodate.
6          MR. SACHS:  Well, we would need to hear more
7    testimony on --
8          THE WITNESS:  Of course.  Yes.
9          MR. SACHS:  -- staffing and, I mean, I'll
10   raise the issue now, I mean, you're going to have out-
11   patients coming to this facility as well in addition
12   to, you know, the in-patient residents.  That's got to
13   be more fully vetted out as well.
14         THE WITNESS:  May I add to that point?
15         MR. SACHS:  Sure.
16         THE WITNESS:  We provide transportation so
17   about one-third of our out-patients currently at Mays
18   Landing we pick them up and bring them.  So from a
19   parking perspective, you know, that's very favorable.
20         MR. KUCZYNSKI:  Mr. Chairman, I have a
21   question.  Can you, sort of a question, just maybe a
22   little bit more information.  Can you talk more about
23   the family services?  What goes on there?  What's kind
24   of happening, how often?  That type of thing.
25         THE WITNESS:  We offer a family orientation

Colloquy                              59

1    program every Saturday and Sunday and currently at Mays
2    Landing on Monday night as well.  So we are orienting
3    the families to as I mentioned why is addiction a
4    disease?  What does treatment look like?  What are
5    appropriate boundaries that you're supposed to have
6    with your loved one?  Because the family members are
7    confused and scared and angry and mistrusting and have,
8    you know, been through the wringer.  And so we're
9    attempting to educate them about the disease of
10   addiction and what treatment entails.  So that is an
11   orientation.
12         We also offer a support group for families.
13   And that's for people whether they have loved ones in
14   your facility or not.  Members of the community are
15   allowed to come as well just for family support.  So
16   you might be familiar with Alcoholics Anonymous, you
17   might have heard that term, or Narcotics Anonymous.
18   There's also something called Alan-Non and Nara-Non
19   which is for family members of addicts.
20         We also offer, as I mentioned, family therapy
21   by a licensed marriage and family therapist.  So it's a
22   wider, you know, array to meet the needs of the family
23   because addiction is a family disease.  The person
24   leaving our facility is a lot of times returning home
25   and therefore the family needs to be educated on how to

Colloquy                    60

1     deal with that.
2              MR. KUCZYNSKI:  So these are regularly
3     scheduled or are they just ad hoc?
4              THE WITNESS:  They are regularly scheduled.
5              MR. KUCZYNSKI:  Okay.  For about how long?
6              THE WITNESS:  The orientations are actually
7     an hour and a half on Saturday and Sunday and about an
8     hour and a half on Monday night.  Very comprehensive.
9              MR. KUCZYNSKI:  And even for people that
10    their family member might not even be in the facility
11    yet?  Is that possible or --
12             THE WITNESS:  Family member might not be in
13    the facility yet.  Family member might have been
14    discharged six months ago.  We have a Monday night
15    support group and we have -- and I facilitated that a
16    couple Monday nights ago.  And we have people who have
17    been going to that support group for literally six and
18    seven years.  So obviously their loved one's still not
19    in treatment there, but they're receiving the support
20    that they need.
21             MR. KUCZYNSKI:  Okay.  And one other
22    question.  I was just wondering you said that there was
23    no interaction between the out-patient and the in-
24    patient.  Is there any reason for that or just not
25    practical or --

Colloquy                    61

1              THE WITNESS:  It's not practical.  It's not
2     -- we have to establish appropriate boundaries.  It's
3     not appropriate if someone steps down from our
4     residential unit --
5              MR. KUCZYNSKI:  Do you want some water?  Have
6     some water.  You've been talking for a long time.
7              THE WITNESS:  Thank you.  From our
8     residential unit to our out-patient unit.  And since
9     they're a different group or receive different
10    treatment it's advised that they are separate.
11             MR. KUCZYNSKI:  Okay.  Thank you.
12             UNIDENTIFIED SPEAKER:  Mr. Dorschu, I just
13    have one followup from Mr. Kuczynski and I may have
14    been distracted and I didn't hear your answer.  Did you
15    state that family members could still be going to this
16    site event though their loved one wasn't a patient in
17    the facility?
18             THE WITNESS:  Correct.
19             UNIDENTIFIED SPEAKER:  Okay.  Thank you.
20             MR. HENRY:  Mr. Chairman, just one last
21    question.  You talk about pain management.  Is that
22    something like for your back or what do you mean by
23    pain?
24             THE WITNESS:  We know that four out of every
25    five heroin users start with opioid based

Colloquy                          62

 1   prescriptions.  Prescription runs out, heroin is cheap
 2   and very readily available so many times you have
 3   people who are developing an addiction as a result of
 4   pain issues.  So as I said our medical director at Mays
 5   Landing is certified in addiction medicine and works
 6   with people to manage the pain not using narcotics or
 7   opioid based pain killers.
 8           MR. HENRY:  So you could have someone who was
 9   in a car accident, something like that and they have a
10   problem with their back.  Instead of taking drugs to
11   help that they would go to your facility and you would
12   give them some other kind of prescription or some kind
13   of other therapy?
14           THE WITNESS:  Both.  Yes.  We see now, and I
15   didn't see it so much ten, 15 years ago, but we seen
16   now people let's say they're in their 40s who come into
17   treatment and this becoming more and more common.  I
18   was in a work-related accident, I was in a car accident
19   and I developed, you know, I had severe pain and
20   developed this addiction.  Never had addiction issues
21   through high school, college years, 20s, but we're
22   seeing more and more of that.  So how do we manage that
23   pain not using those opioid based pain killers?
24           MR. HENRY:  Thank you.
25           UNIDENTIFIED SPEAKER:  Mr. Dorschu, as a

Colloquy                          63

 1   followup to that question now.  The criteria for
 2   admission into your facility however, would have to be
 3   that you have an addiction problem, is that correct?
 4           THE WITNESS:  Correct.  Per our licensure.
 5           UNIDENTIFIED SPEAKER:  All right.  Right.  So
 6   therefore if Mr. Henry says if I just happen to have
 7   had back surgery and I'm in pain, but I don't have an
 8   addiction problem and I just need palliative care until
 9   I recover would I be coming to your facility?
10           THE WITNESS:  No.  Under our license you
11   don't --
12           UNIDENTIFIED SPEAKER:  I didn't think so.
13   Right.  Okay.  Thank you.
14           THE WITNESS:  However, if you have developed
15   an addition --
16           MR. SACHS:  Correct.  Then I would come.
17           THE WITNESS:  That's what we're working with.
18           MS. CATALLO:  I also have a question.  Mr.
19   Green asked you about the facility being open 24/7,
20   correct?
21           THE WITNESS:  Yes.
22           MS. CATALLO:  You also said the door is never
23   locked.
24           THE WITNESS:  Correct.
25           MS. CATALLO:  So anybody can come in, anybody

Colloquy                                    64

```
 1    can go out at any time.  Is there any security to keep
 2    people from coming in when they're not supposed to or
 3    go out when they're not supposed to?
 4              THE WITNESS:  Yes.  Our doors are locked as
 5    far as people coming in, in the overnight shift.  Okay.
 6    We also have security cameras.  Our employees have bar
 7    coded badges to gain entrance into the building.  Any
 8    patient can walk -- anyone can walk out, but for
 9    security reasons, you know, the doors are locked at
10    nine o'clock at night.
11              MS. CATALLO:  Okay, so --
12              THE WITNESS:  As far as anybody like coming
13    in at three o'clock in the morning.
14              MS. CATALLO:  All right.  But let's say even
15    during the day, you know, somebody decides I don't want
16    to be here anymore and they just want to walk out on
17    their own, I guess they can just walk out and nobody's
18    going to stop them.
19              THE WITNESS:  Yes.  But what we do is we
20    immediately -- well, we attempt to what we refer to as,
21    you know, try to keep them, encourage them to stay in
22    treatment.  And we're very successful at that.
23              MS. CATALLO:  But sometimes it doesn't work.
24              THE WITNESS:  Sometimes it does not work.
25    Yes.  And so what we do though procedurally is we
```

Colloquy                                    65

```
 1    followup with those clients immediately to see do you
 2    want to return to the facility?  Can we maybe refer you
 3    to another facility?  Because we want to see them
 4    remain in treatment.
 5              MS. CATALLO:  Okay.  But let's say they walk
 6    out and they just walk out into the street and they
 7    walk out into a neighborhood somewhere and they're
 8    wondering around.  This person walked out and nobody
 9    followed them or stopped them.
10              THE WITNESS:  Well, we would attempt to stop
11    them.
12              MS. CATALLO:  You would attempt.
13              THE WITNESS:  Absolutely.
14              MS. CATALLO:  Okay.
15              THE WITNESS:  Absolutely.
16              MR. ESPOSITO:  Can I followup on that a
17    little bit?  Okay, so you have someone -- if someone
18    leaves I'm going to presume they're irate, they're
19    unhappy, they're pissed off, right, I don't want do
20    this any more and they leave.  Do you alert the police
21    and say look, we've got someone wondering a nice
22    neighborhood, you know, there's some expensive homes
23    around there, you know, people don't want that.  So
24    would you alert the police to say look, there's
25    somebody walking around?
```

Colloquy                                66

```
 1          THE WITNESS:  We alert the police if we feel
 2   like the client is in danger, you know, to do any type
 3   of harm to themselves.
 4          MR. ESPOSITO:  So it's subjective.
 5          THE WITNESS:  Well, it's clinically assessed.
 6   Yes.
 7          MR. ESPOSITO:  So if someone's mad wouldn't
 8   that constitute look, he's possible -- he could
 9   possibly, or she, possibly do some damage to someone,
10   the property, themselves, you know, walking around the
11   neighborhood?
12          THE WITNESS:  Yes.  And I can tell that in 13
13   months at Mays Landing that's never occurred.
14          MR. ESPOSITO:  Never occurred.
15          THE WITNESS:  I mean you can leave treatment
16   unfortunately prematurely, but that's never occurred.
17          MR. ESPOSITO:  Okay.  Thank you.
18          MR. HIMELMAN:  Any other questions?
19          MR. EMMA:  I have a --
20          MR. KREISMER:  In a nursing home situations
21   there are occasions where events occur, things come up
22   that can't be handled in a nursing home.  I don't know
23   if you have the same kinds of situations, but I'd like
24   to know what kind of situation would require outside
25   help or whatever and how often that occurs.  And I
```

Colloquy                                67

```
 1   realize your facility is right now smaller than -- but
 2   just to get an idea of what kind of things happen and
 3   what the protocol is.
 4          THE WITNESS:  I'll put my answer into two
 5   categories.  One category is occasionally, and this is
 6   not common, somebody might not be psychiatrically
 7   appropriate for our facility so we will refer them to a
 8   facility that can better meet their clinical needs.
 9   Much more common though are folks with medical
10   situations that we're not in a position to manage.  So
11   then we send them to the nearest hospital.  As you can
12   imagine people who have, you know, many years of active
13   addiction beat their bodies up pretty well and it
14   really takes a toll on their health.  So yes, there are
15   situations where we are referring out.
16          MR. KREISMER:  Any idea what the number might
17   be on a quarter, half year, year?
18          THE WITNESS:  Maybe a couple a week.  Now,
19   many times they go to the hospital, they're medically
20   cleared at the hospital and then they come back.  So if
21   they're leaving it doesn't mean they're leaving and not
22   returning necessarily.
23          MR. EMMA:  I have a question.
24          MR. HIMELMAN:  Any other questions?
25          MR. EMMA:  Yes.  It's to you, Larry.
```

Colloquy                              68

```
 1              MR. SACHS:  Yes.
 2              MR. EMMA:  I just need some clarification on
 3      what's being presented.  I've got a good handle on the
 4      services that you provide, and I don't want to over
 5      simplify this, but what we're being asked is to, I
 6      guess, differentiate between the services that were
 7      presented to the Planning Board, because we don't have
 8      any of that documentation, we weren't there, and then
 9      how our zoning official is interpreting it, correct?
10              MR. SACHS:  Well, no.  What you're being
11      asked to interpret -- not to interpret -- you're being
12      asked to decide whether or not Mr. Mashanski's decision
13      not to issue a zoning permit to this applicant was the
14      correct decision.  Now Mr. Mashanski's decision was
15      that this facility is not a long-term care or nursing
16      home facility which was the approval for this
17      particular use for the Briarwood site by the Planning
18      Board.
19              You've heard testimony and you'll have to
20      make your decision based on that.
21              MR. EMMA:  Okay.
22              MR. HIMELMAN:  And the only thing I would add
23      to Mr. Sachs is that I think, and I'll -- Mr. Mashanski
24      can correct me if he thinks that I'm wrong, but I think
25      he was relying also on the definition that we've been
```

Colloquy                              69

```
 1      referring to all evening on long-term care facility and
 2      nursing care facilities.  Included in that is a
 3      description of services and treatment and staffing, et
 4      cetera that we've been alluding to which is why we're
 5      spending some time going over the RCA proposed use
 6      versus what was previously approved.  So that gives you
 7      the context.  But we're not asking the Board to go back
 8      and look at conditions of the site plan from Briarwood.
 9      We're basically saying that was a permitted -- that
10      particular approval was permitted as of right in the
11      prime zone.  As of right.  So we're demonstrating, we
12      hope, that the services between the two facilities are
13      the same.  And that's why we're going through this
14      exercise.
15              UNIDENTIFIED SPEAKER:  So right now there's
16      nobody there.  It's barren.
17              MR. SACHS:  Correct.
18              UNIDENTIFIED SPEAKER:  Do we have any
19      potential tenants coming in at some point in time?  I
20      mean, why would we not want what's in there?
21              MR. SACHS:  No, no, we may want -- right.
22      This is a use that if it's -- well, first of all if Mr.
23      Himelman's application is successful tonight then he
24      will be issued a zoning permit and he can go forward
25      with this use.  If you determine that Mr. Mashanski was
```

Colloquy                          70

```
 1    correct and that maybe it quacks like a duck -- maybe
 2    it looks like a duck and it quacks like a duck but it's
 3    not a duck it's really a goose in comparing the two
 4    uses then Mr. Himelman's client will, as he's already
 5    done that, he's filed a use variance application, and
 6    this Board will hear the proofs that are necessary to
 7    sustain getting a use variance.
 8              Now I will note that this is a use that is an
 9    inherently beneficial use.  So if in fact it does
10    ultimately go to a hearing on a use variance it's a use
11    that is -- it's a use where the applicant doesn't have
12    to prove the positive criteria.  It's already proven.
13    There are certain uses in New Jersey that we know are
14    inherently beneficial uses.  So then it's just a
15    question of dealing with the negative criteria and
16    dealing with the site plan issues.
17              UNIDENTIFIED SPEAKER:  Personally, I think
18    it's a stretch.  The parallels are a stretch.
19              MR. SACHS:  Well, listen, that's --
20              UNIDENTIFIED SPEAKER:  However, why would we
21    not want another business in here?
22              MR. SACHS:  At the end of the day yes, we
23    probably want another business in there and we probably
24    want --
25              UNIDENTIFIED SPEAKER:  A good business.
```

Colloquy                          71

```
 1              MR. SACHS:  -- and a good business and a
 2    business that serves the community.  But we're dealing
 3    with a municipal land use law which is very specific
 4    and we're dealing with the burden of proof that the
 5    applicant has with respect to this.
 6              Mr. Chairman, maybe we should take a five
 7    minute recess if we're done with this witness?
 8              UNIDENTIFIED SPEAKER:  That's fine with me,
 9    Mr. Chairman.  That's up to you.
10              MR. CHAIRMAN:  We're going to call for a five
11    minute recess.
12                        (Recess)
13              MR. CHAIRMAN:  I call the Zoning Board
14    meeting.  Roll call.
15              THE SECRETARY:  Mr. Green.
16              MR. GREEN:  Yes.
17              THE SECRETARY:  Mr. Kuczynski.
18              MR. KUCZYNSKI:  Here.
19              THE SECRETARY:  Mr. Kreismer.
20              MR. KREISMER:  Here.
21              THE SECRETARY:  Ms. Catallo.
22              MS. CATALLO:  Here.
23              THE SECRETARY:  Mr. Corrigan.
24              MR. CORRIGAN:  Here.
25              THE SECRETARY:  Mr. Henry.
```

1          MR. HENRY:  Here.
2          THE SECRETARY:  Mr. Emma.
3          MR. EMMA:  Here.
4          THE SECRETARY:  Mr. Esposito.
5          MR. ESPOSITO:  Here.
6          MR. CHAIRMAN:  Mr. Himelman, I understand you
7     want to make a statement?
8          MR. HIMELMAN:  Mr. Green, thank you very
9     much.  Yes.  I've had an opportunity to talk with your
10    counsel Mr. Sachs during the intermission break.  And
11    it seems maybe appropriate to pursue in this fashion on
12    both the appeal that's pending and the use variance
13    subject to the Board's approval.
14         Obviously we're getting into issues on the
15    type of level of services, levels of care, site plan
16    related issues, so what I think what may make some
17    sense here is to defer, delay any decision on this
18    particular appeal, let the applicant proceed with its
19    use variance application at the next meeting which has
20    been submitted and we will notice for that, and then we
21    can prosecute the use variance.  And it may be that if
22    the Board ultimately rules favorably upon the use
23    variance that the appeal would be rendered in essence
24    moot and we could dispose of that.
25         So that's what we're proposing and if you're

1     okay with that we would be okay proceeding in that
2     direction.
3          MR. SACHS:  And Mr. Green -- Mr. Chairman,
4     I'm comfortable with that.  I mean, I know that some of
5     the Board members have expressed concerns about some
6     site plan issues which really we can't even think about
7     this evening because that's not what we're here about.
8     I think it's probably prudent for the applicant to go
9     forward with the use variance application.
10         I'm sure you'll hear some of the same
11    testimony, but it'll be a little bit different because
12    we're not going to worry about the Briarwood use, we'll
13    be worrying about what this use is.
14         MR. HIMELMAN:  Correct.
15         MR. SACHS:  And it can all be addressed by
16    the applicant, by its engineer, by its planner, by its
17    traffic engineer --
18         MR. HIMELMAN:  That's correct.
19         MR. SACHS:  -- to proceed forward.  So that's
20    fine.  And what was your question?
21         MR. CHAIRMAN:  We want to proceed with this
22    on October 27th -- 25th I believe.
23         MR. HIMELMAN:  Yes.  And I will -- I'm going
24    to -- I mean the application for the use variance was
25    submitted a couple of weeks ago, it's now been reviewed

Colloquy                                74

```
 1    by everybody so I -- Mr. Mashanski gave me the green
 2    light to go ahead and notice for the October meeting
 3    which I will do shortly.  So we will be providing legal
 4    notice and proof of publication to Ms. Kemble and we
 5    will -- we would like to be agenized for the October
 6    meeting.  Correct.
 7            MR. SACHS:  Well, why don't we do this, we'll
 8    notice it for the 25th.
 9            MR. HIMELMAN:  Okay.
10            MR. SACHS:  You have some other applicants
11    that evening.
12            MR. HIMELMAN:  Yes.
13            MR. SACHS:  And if we have to carry it to the
14    November meeting, you know, we'll do it and you won't
15    have to renotice.  We'll just make that.
16            MR. HIMELMAN:  All right.  Well hopefully we
17    can get started on the -- we'll have to see how that
18    goes.
19            MR. SACHS:  I think what's happened lately is
20    that we've had applications that have been scheduled
21    and then they don't go forward.
22            MR. HIMELMAN:  I understand that.
23            MR. SACHS:  Maybe, you know, the Temple
24    application did not go forward tonight.  Who knows what
25    will happen with the Billboard application.
```

Colloquy                                75

```
 1            MR. HIMELMAN:  No, I appreciate that.  So to
 2    Mr. Sachs' suggestion if, Mr. Chairman, if you're okay
 3    so we will notice for the October meeting and obviously
 4    depending on how the agenda shakes out we will
 5    hopefully be able to move forward at that evening.
 6            MR. CHAIRMAN:  Yes.  That'll be on the 25th.
 7            MR. HIMELMAN:  On the 25th of October.
 8            MR. CHAIRMAN:  Yes.
 9            MR. HIMELMAN:  Correct.
10            MR. CHAIRMAN:  Okay.  Very good.
11            MR. HENRY:  I have a question for
12    clarification.  Mr. Sachs, is this -- they're pulling
13    their appeal then?  I don't understand what's
14    happening.
15            MR. SACHS:  No, what he's asking -- no, he's
16    not pulling it.  What he's asking is, I guess, for no
17    action to be taken on this appeal.
18            MR. HIMELMAN:  Correct.
19            MR. SACHS:  He'll defer it and if the
20    application is approved for the use variance then
21    obviously the appeal will be dismissed.  If the --
22            MR. HIMELMAN:  Withdrawn.
23            MR. SACHS:  -- withdrawn.  Right.  And if the
24    use variance is not granted then he has recourse to go
25    to court to challenge the use variance decision.
```

1         MR. HENRY:  Okay.
2         MR. KUCZYNSKI:  Isn't he kind of saying that
3    by asking for a variance agreeing that the decision was
4    correct?
5         MR. SACHS:  I'm not going to prove -- I think
6    obviously Mr. Himelman has heard the questions and I'll
7    just leave it at that.
8         MR. KUCZYNSKI:  And what -- how long do you
9    have to appeal a decision?
10         MR. SACHS:  You're talking abut a decision of
11    the -- well, statutorily you have 45 days to appeal.
12    But we don't -- we can handle the -- this instant
13    application.
14         MR. HIMELMAN:  There's no time -- if the
15    Board -- we're asking for a continuance of this appeal
16    request.  There's no -- no time is triggered on an
17    appeal until a decision is actually rendered.
18         MR. SACHS:  Correct.
19         MR. HIMELMAN:  So what I'm suggesting is
20    we're going to -- we're asking the Board to continue
21    this appeal, let the applicant prosecute its use
22    variance and if the Board looks favorably upon the use
23    variance then the appeal would be withdrawn.
24         MR. SACHS:  And by the way, what Mr. Himelman
25    did at filing the use variance contemporaneously with

1    this appeal is what many applicants do.
2         MR. HIMELMAN:  Correct.
3         MR. SACHS:  It's not uncommon.
4         MR. HIMELMAN:  And I did speak to Mr. Sachs
5    about this so he was aware.
6         UNIDENTIFIED SPEAKER:  Do applicants drop
7    their appeal and go to variance like this?
8         MR. SACHS:  No.  Well, he hasn't dropped it
9    yet, but yes.
10         UNIDENTIFIED SPEAKER:  Okay.
11         MR. SACHS:  It's not uncommon.
12         UNIDENTIFIED SPEAKER:  Okay.  Mr. chairman,
13    we're going to push this off to the 25th.  I'm just
14    concerned with scheduling.  We've got the Temple, we've
15    got the outdoor sign advertising and that in itself was
16    like two hours the last meeting.
17         MR. CHAIRMAN:  We're going to review this in
18    the next couple of days and get it all in order and
19    we'll let everybody know.
20         MR. SACHS:  And by the way, it's not the
21    appeal that -- this appeal is not going to be heard on
22    the 25th.  It's going to be the use variance
23    application that respond.  Correct.
24         UNIDENTIFIED SPEAKER:  And that could be the
25    same time, it could be a little bit longer.

Colloquy                                          78

```
 1              UNIDENTIFIED SPEAKER:  Yes.
 2              UNIDENTIFIED SPEAKER:  It could.
 3              UNIDENTIFIED SPEAKER:  I just -- can we fit
 4      everything in?
 5              MR. HIMELMAN:  I was going to ask on that.
 6      I'm sorry, Mr. Chairman.  So I know that you've done
 7      this although limited in other cases, but we are under
 8      some time constraints with our landlord so what I was
 9      going to ask is it possible to potentially schedule
10      this for a special meeting, this use variance?  Is that
11      something that we could entertain?  I normally wouldn't
12      ask that, but this is, I think, a unique situation
13      given the potential use and the feedback that we're
14      hearing from the Board.  So perhaps a special meeting
15      might be warranted?
16              MR. CHAIRMAN:  It's very possible we could do
17      that.
18              MR. SACHS:  Let's leave it on for the 25th
19      now.
20              MR. HIMELMAN:  Fine.
21              MR. SACHS:  If it turns out it's a crazy
22      night and we're not going to get to it that night then
23      we'll think about a special meeting shortly thereafter.
24              MR. HIMELMAN:  That would be very much
25      appreciated.
```

Colloquy                                          79

```
 1              MR. CHAIRMAN:  And you have the Billboard
 2      situation coming up also.
 3              MR. HIMELMAN:  I know that.  And we're
 4      supposed to meet on that.  Right.  Mr. Chairman, I'm
 5      through with that.  So if that's okay so we will
 6      proceed in that fashion.  We'll continue the appeal and
 7      we will notice for the October 25th meeting on the use
 8      variance.
 9              MR. CHAIRMAN:  Yes.
10              MR. HIMELMAN:  Okay.  Thank you very much for
11      your time and your patience.  Not to use that pun, but
12      good night.
13                          *  *  *  *  *
14
15
16
17
18
19
20
21
22
23
24
25
```

80

### C E R T I F I C A T I O N

        I, KIMBERLY UPSHUR, the assigned transcriber, do hereby certify the foregoing transcript of proceedings on CD is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript of the proceedings as recorded, and to the best of my ability.


/s/ Kimberly Upshur
KIMBERLY UPSHUR    AOC #528
J&J COURT TRANSCRIBERS, INC.  DATE:  December 26, 2017

# EXHIBIT C

BOROUGH OF SAYREVILLE BOARD OF
ADJUSTMENT MEETING
MIDDLESEX COUNTY, NEW JERSEY


IN THE MATTER OF:          )
                           )              TRANSCRIPT
                           )
Application #17-29,        )              OF
RECOVERY CENTERS OF        )
AMERICA,                   )    BOARD OF ADJUSTMENT MEETING
901 Ernston Road           )
Sayreville, New Jersey     )


                         Place:  Municipal Building
                                 167 Main Street
                                 Sayreville, NJ 08872

                         Date:   November 8, 2017

ZONING BOARD MEMBERS PRESENT:

  RON GREEN, CHAIRMAN
  KEN KREISMER
  MARIA CATALLO
  JOHN CORRIGAN
  BILL HENRY
  PHIL EMMA
  ANTHONY ESPOSITO

PLANNING BOARD CONSULTANTS:

  JOHN LEONCAVALLO, PP (John Leoncavallo Associates)
  Township Planner
  JAY CORNELL, PE, PP (CME Associates)
  Township Engineer


                         Transcriber, Lori Knollmeyer
                         **J&J COURT TRANSCRIBERS, INC.**
                         **268 Evergreen Avenue**
                         **Hamilton, NJ 08619**
                                 **(609)586-2311**
                         **FAX NO.   (609)587-3599**
                         **E-mail:   jjcourt@jjcourt.com**
                         **Website:  www.jjcourt.com**

                         Audio Recorded

2

APPEARANCES:

   LAWRENCE B. SACHS, ESQ. (Law Offices of Lawrence B.
                               Sachs)
   Attorney for the Board


   DAVID B. HIMELMAN, ESQ. (Law Offices of David B.
                               Himelman)
   Attorney for the Applicant

---

3

## <u>A D D E N D U M</u>

       Individuals identified within the text of the following transcript do not represent necessarily all of the individuals in attendance at this meeting. Their presence, speaker identification and other information regarding title page and appearance, along with various words, proper nouns and other spellings found within this transcript were able to have been extrapolated from minutes of the meeting and discussions with the Board Secretary and, of course, that which is evident and that which can be concluded by way of the tape recording itself, which is of fair quality.

       Areas of the tape which were unable to be discerned were identified by placing the word (indiscernible) or (inaudible) followed by a short explanation.

* * * * *

4

<u>**I N D E X**</u>

**PAGE**

**OPENING STATEMENTS**
  By Mr. Himelman                                      6


**WITNESSES FOR RECOVERY CENTERS OF AMERICA**
DENI CARISE
  Direct Examination by Mr. Himelman            25
  Examination by Vice Chairman Henry            68
  Examination by Chairman Green                 72
  Examination by Mr. Sachs                      74
  Examination by Chairman Green                 76
  Examination by Unidentified Speaker           78
  Examination by Mr. Himelman                   82
  Examination by Ms. Catallo                    83
  Examination by Mr. Esposito                   85

SCOTT TURNER
  Direct Examination by Mr. Himelman            96
  Cross-Examination by Mr. Sachs               105
  Examination by Unidentified Speaker          106
  Examination by Mr. Emma                       109
  Examination by Mr. Cornell                    109
  Examination by Unidentified Speaker          111

5

**WITNESSES FOR RECOVERY CENTERS OF AMERICA (Continued):**

KARL PEHNKE
  Direct Examination by Mr. Himelman           113
  Examination by Mr. Esposito                  119

JAMES HIGGINS
  Direct Examination by Mr. Himelman           121
  Examination by Unidentified Speaker          135


EXHIBITS

<u>ID</u>  <u>Rec'd</u>

A-1  Amended Site Plan                           98

Colloquy                                          6

1        MR. CHAIRMAN:  Good evening, ladies and
2    gentlemen.  Welcome to the Sayreville Board of
3    Adjustment special meeting.  Would everyone please
4    stand for the salute to the flag.
5             (Recitation of Pledge of Allegiance)
6        MR. CHAIRMAN:  Notice of the meeting has been
7    satisfied in accordance with Chapter 231 PL 1975, by
8    advertising in the Home News Tribune, notifying the
9    Centennial Publishing Company and The Star Ledger, and
10   posting on the bulletin board and filling with the
11   borough clerk.
12        Roll call.
13        THE CLERK:  Mr. Green?
14        MR. GREEN:  Here.
15        THE CLERK:  Mr. Kreismer?
16        MR. KREISMER:  Here.
17        THE CLERK:  Ms. Catallo?
18        MS. CATALLO:  Here.
19        THE CLERK:  Mr. Corrigan?
20        MR. CORRIGAN:  Here.
21        THE CLERK:  Mr. Henry?
22        MR. HENRY:  Here.
23        THE CLERK:  Mr. Emma?
24        MR. EMMA:  Here.
25        MR. CHAIRMAN:  This special meeting was

Opening Statement/Himelman                        7

1    called for tonight in reference to Case No. 17-29,
2    Recovery Centers of America, 901 Ernston Road.
3             The applicant for Recovery or RCA, please
4    step up.
5        MR. SACHS:  Mr. Chairman, before Mr. Himelman
6    starts, I believe we did accept notice at the last
7    zoning board meeting in October.  So the Board does
8    have jurisdiction for this application this evening.
9        MR. HIMELMAN:  Thank you, Mr. Sachs.  I'm not
10   sure this is one.
11       MR. CHAIRMAN:  Yeah.
12       THE CLERK:  Yeah.
13       MR. HIMELMAN:  Can you hear it?
14       THE CLERK:  Yeah.
15       MR. HIMELMAN:  Okay.  Good evening, Mr.
16   Chairmen, members of the Board.  It's a pleasure to be
17   here this evening.
18            As you are aware, I represent 901 Ernston
19   Road, LLC, and I'm going to have a brief outline of the
20   -- of the evening in terms of our witnesses, some of
21   the issues that we need to address relative to your
22   professionals' reports, and just give the Board and
23   overview of the standards and proofs required for this
24   -- for this particular application.
25            As I indicated, the applicant is 901 Ernston

1    Road.  Recovery Centers of America is an affiliate
2    entity of the applicant.  As you are aware, the
3    applicant filed an application with your board for use
4    variance and amended site plan approval for the
5    substance abuse treatment facility and residential
6    healthcare treatment facility for the property
7    identified for the record as block 438, lot 1, block
8    452, lot 1, on the current tax map here in Sayreville,
9    and otherwise known as 901 Ernston Road.
10           The property, as you know, consists of
11   approximately 6.96 acres and is located in the prime
12   zone.
13           In terms of the witnesses for this evening in
14   support of the use variance relief and the amended site
15   plan, we have several witnesses.  Our first is Dr. Deni
16   Carise, who is our chief clinical officer, who will
17   testify as to the operation and treatments generally
18   offered in the proposed treatment facility.
19           Then we have Scott Turner, who is our
20   professional engineer from Menlo, who will testify on
21   the amended site plan to additional parking at the
22   subject property.
23           Next is our traffic engineer, Karl Pehnke,
24   who will testify on the traffic impact for the proposed
25   facility.  And then we'll proceed into planning, James

1    Higgins, who will be our -- one of our professional
2    planners, who will outline the planning, justification,
3    and opinions to support the grant of the use variance,
4    relief sought for the proposed facility based upon the
5    negative and positive criteria analysis.
6            And then, last but not least, we have
7    Christine Cofone, who is another professional planner
8    the applicant will produce, who will testify in some
9    greater detail on the negative and positive criteria,
10   including the public interest at stake, providing
11   reasonable accommodations for those who are disabled,
12   pursuant to the various discrimination laws, and that
13   the rehabilitation is a strong public policy and the
14   weighting of any such detriment.
15           By way of background, RCA has finalized its
16   business terms for a lease agreement with 901 Ernston
17   Road Realty, LLC, who is the current of the property.
18   Sayreville Nursing, LLC, had previously received
19   preliminary and final site plan approval from the
20   Sayreville Planning Board on May 21st, 2014, to operate
21   a long-term care nursing home facility.
22           The resolution of approval adopted by the
23   planning board in 2014, which included proposed
24   modifications to the building and landscaping and other
25   improvements, including sidewalks.  I believe a copy of

1    the approved site plan from 2015 has been submitted to
2    the zoning board.
3              The proposed facility to be conducted by then
4    SNL was permitted as of right in the prime zone.  This
5    was confirmed upon review by the Board engineer and the
6    planner at that time.
7              The applicant seeks to rely on the previously
8    granted site plan approval issued by the -- by the
9    Sayreville planning board, except as it relates to the
10   proposed parking for the facility.
11             The applicant also seeks to modify the
12   previously approved site plan granted the planning
13   board to increase the number of parking spaces from 92
14   to 130 spaces.
15             The amended site plan application filed by
16   the applicant then in June of 2017 with the planning
17   board will now be heard, as you're aware, as part of
18   this use variance application.
19             In terms of the project scope, it will
20   include a renovation of the existing and main building,
21   to include 149 patient beds, clinical rooms, therapy
22   rooms, offices, a kitchen and dining facility, and a
23   cyber café, a treatment center, to include clinical
24   rooms, therapy rooms, meeting rooms for in and out
25   patient services, and construction of a gymnasium for

1    physical therapy treatment.
2              The proposed facility is licensed by the
3    State Department of Health.
4              As you know from our previous discussions on
5    this matter, RCA, the parent entity, provides a full
6    range to 24-hour direct medical nursing and other
7    health services for its patients.  In addition, RCA
8    provides education, treatment, rehabilitation services
9    and recovery support for substance abuse and mental
10   health disorders.
11             Moreover, the facility services include a
12   wide range of intensive care treatment options, 24-hour
13   nursing care, and monitoring, supervision,
14   rehabilitation programs, psychiatric programs and
15   services, psychological services, recreational therapy,
16   medication monitoring, and wellness programs.
17             RCA treats its patients and continually
18   provides services to its patients for an extended
19   period of time.  Clearly, we will have representatives
20   of the applicant to further testify on the full range
21   of treatment and programs they offer.
22             Currently, RCA has received approvals for and
23   operates 13 facilities located in New Jersey, Maryland,
24   Pennsylvania, and Massachusetts.  In Devon,
25   Pennsylvania, RCA recently received approval for a

1  facility, recognizing that it is operated in a similar
2  manner as the previously occupied long-term care
3  facility.
4          Turning to the ordinance, which is relevant,
5  long-term care facilities and nursing homes are defined
6  in your ordinance, and they include and provide a
7  variety of descriptions, which I think are relevant
8  here, one of which is that long-term care facilities
9  are defined to include a facility which provides a full
10 range of 24-hour and direct medical nursing and other
11 health services, registered nurses, licensed
12 practitioners and nurse's aides.  And the emphasis is
13 on nursing care, but restorative physical, occupation,
14 speech, and respiratory therapies are also provided.
15         The applicant filed this application with the
16 -- the applicant filed this application originally with
17 the zoning officer, and he determined that the proposed
18 facility, as you know, is not permitted use in the
19 prime zone, and thus required a D1 use variance,
20 although long-term care nursing facilities are
21 conditionally permitted in the prime zone.
22         Pursuant to municipal land use law under
23 N.J.S.A. 40:55D-70, D1, the law conferred upon zoning
24 boards such as yours the following powers.  In
25 particular cases and for special reasons, grant a

1  variance to allow departure from regulations to permit
2  one, which is D1, a use or principal structure in a
3  district restricted against such use or principal
4  structure.
5          The applicant is part of the D1 use variance
6  relief, so it must provide sufficient proofs as to what
7  is generally referred to as the positive and negative
8  criterial.  The special reasons of the Municipal Land
9  Use Law is also referred to as the positive criteria.
10         The special reasons the Court have generally
11 recognized to support a D1 use variance include the
12 following:  That the use is inherently beneficial; that
13 the site is particularly suited for the use; and the
14 use advances one or more purposes of planning, as
15 stated in the municipal land use law.
16         In Sica v. Board of Adjustment Township of
17 Wall, the Court set forth a four-part balancing test in
18 determining whether to grant a use variance for
19 inherently beneficial use.  One, identify the public
20 interest at stake; two, identify the detrimental effect
21 that will ensue from the grant of the variance; three,
22 in some situations, the Board may reduce the
23 detrimental effect by imposing reasonable conditions on
24 the use; and four, weigh the public interest against
25 the detrimental effects to determine whether the

```
 1      variance would cause substantial detriment.
 2               As you will hear from the applicant's
 3      planners, we believe, and the applicant believes, that
 4      special reasons can be justified in this instance as
 5      the use is inherently beneficial as defined under the
 6      Municipal Land Use Law.
 7               Generally, an inherently beneficial use is a
 8      use which fundamentally serves the public good and
 9      promotes the general welfare.  Moreover, as you will
10      hear from the applicant's chief clinical officer, the
11      proposed facility provides much needed education,
12      medical, rehabilitation services and recovery support
13      for substance abuse and mental health disorders in an
14      effort to address the drug epidemic problem in this
15      state and elsewhere.
16               The applicant believes the intended use will
17      serve the public good and promote the general welfare.
18               Under N.J.S.A. 40:55D-4, specifically in the
19      Municipal Land Use Law, lists the following uses which
20      are inherently beneficial, a hospital, a school child
21      care center, a group home, or a wind/solar energy
22      facility.
23               Hospitals have been confirmed as inherently
24      beneficial by the legislature.  Moreover, it has been
25      held by the courts in New Jersey that a drug
```

```
 1      rehabilitation center and treatment center under the
 2      case -- I'm sorry, under the supervision of the
 3      Commissioner of Health, was deemed to be a hospital.
 4      And that was decided in the case of Scerbo v. Orange
 5      Board of Adjustment.
 6               Thus, the applicant believes, and will
 7      support through testimony, that its intended use is
 8      inherently beneficial use as well, since it would
 9      qualify as a hospital, as recognized by the Municipal
10      Land Use Law, and the courts, given the medical,
11      rehabilitative, and related treatment services it will
12      provide to its patients.
13               The applicant anticipates, after hearing all
14      the testimony, the Board will -- this board will concur
15      that the positive criteria is satisfied as the proposed
16      treatment facility is inherently of beneficial use.
17               Under the first prong under Sica, which is
18      the public benefit, as noted above in determining
19      whether to grant a use variance for inherently
20      beneficial use, the Board, the public interest at
21      stake, the first question is why is a drug and alcohol
22      rehabilitation center inherently beneficial?  The use
23      concerns a matter of public interest.
24               There is a strong public policy in this state
25      to treat drug addiction, which has been codified in
```

1    various statutory enactments.  Two examples of
2    legislative determinations that define drug and alcohol
3    rehabilitation to be a matter of public interest are
4    N.J.S.A. 30:6C-2, which provides, "It is declared to be
5    the public policy of this state that the human
6    suffering and social and economic loss caused by drug
7    addiction are matters of grave concern to the people of
8    this state, and it is imperative that as a
9    comprehensive program to be established and implemented
10   through the facilities of the state, the counties, the
11   federal government, and local and private agencies to
12   prevent drug addiction and to provide drug diagnosis
13   and treatment care and rehabilitation care for drug
14   addicts, to end those that are unfortunate individuals
15   may be restored to good health and again become useful
16   citizens in the community."
17           Based on the above, it is obvious that the
18   state rehabilitation is a matter of public policy and
19   beneficial to the public welfare.
20           The testimony to be provided by Dr. Carise,
21   the clinical director of the project, will show through
22   statistics and evidence that there is a critical demand
23   for these type of facilities.
24           Moreover, the applicant's patients are
25   handicapped and disabled under federal law, including

1    the Federal Fair Housing Act and the Americans With
2    Disabilities Act.  Similarly, disabled individual
3    patients are protected under the New Jersey law against
4    discrimination.
5           Further, the Federal Fair Housing Act defines
6    discrimination to include a refusal to make reasonable
7    accommodations in rules, policy, practices, or
8    services, when such are necessary to provide access to
9    housing for the disabled.
10           The failure to recognize RCA's proposed
11   facility as a permitted use is a refusal to make
12   reasonable accommodations in such rules, policies,
13   practices, and services.
14           The question is what is a reasonable
15   accommodation?  The Fair Housing Act defines reasonable
16   -- defines discrimination to include a refusal to make
17   reasonable accommodation in rules, policies, practices,
18   or services when such accommodations are necessary to
19   provide access to housing for the disabled.
20           You will hear from the applicant's planners
21   that in their professional opinion the variance can be
22   granted as a reasonable accommodation and, moreover,
23   that the facility treats disabled persons, the
24   applicant is entitled to a reasonable accommodation
25   through the grant of the use variance to provide access

1    to such treatment.
2              There is no financial or administrative
3    burden on the Borough in granting the variance.  And,
4    moreover, the project is privately funded, and there is
5    no administrative burdens involved.
6              Under the second prong of Sica, the
7    applicant's planners will discuss the magnitude of any
8    potential negative impacts from the proposed use on the
9    nearby properties.
10             The potential negative impacts on the
11   surround properties include aesthetics, noise, traffic,
12   and safety, as will be further addressed in testimony.
13   The applicant believes such testimony will demonstrate
14   that there is no negative impact on the surrounding
15   properties from the proposed treatment.
16             Also, the applicant must submit proofs that
17   the use will not substantially impair the intent and
18   purpose of the zone plan and zoning ordinance.  The
19   applicant will provide testimony that the proposed
20   treatment facility will include medical, education,
21   daycare, rehabilitative and related services for
22   substance abuse and mental health disorders.
23             All of those services fall within the
24   definition of long-term care facilities, which are
25   permitted in the prime zone.  As you will hear from the

1    applicant's witnesses, there will be no significant
2    modifications of the site plan for the previously
3    approved long-term nursing care facility and thus no
4    significant impact to the zone.
5              The third and fourth prongs of Sica -- of the
6    Sica case providing measures to mitigate any negative
7    impacts and weighing the public interest against
8    detrimental effects to determine whether the variance
9    would cause substantial detriment.  As you will hear
10   from the applicant's witnesses, the public interest is
11   urgent and immediate.
12             As the applicant will provide through
13   testimony, no significant impacts will be identified.
14   And while the applicant has anticipated and/or
15   addressed such impacts, the Board can, within its
16   discretion, impose as a condition of an approval to be
17   certain of such negative impacts are avoided in the
18   future.
19             As explained earlier, to justify the D1 use
20   variance sought, the applicant must address the
21   negative criteria.  As to the negative criteria, the
22   applicant must prove that the use will not
23   substantially impair the intent and purpose of the zone
24   plan and zoning ordinance and that the granting of the
25   variance will not have a significant impact on the

1    surrounding properties.
2              The Municipal Land Use Law specifically
3    provides under N.J.S.A. 40:50D-70D that no variance may
4    be granted, including relief that involves an
5    inherently beneficial use, without balancing the
6    negative and positive criteria.
7              This again was reinforced in the <u>Sica</u>
8    decision, establishing the four-prong test to be
9    applied to uses which are inherently beneficial.
10             The applicant will demonstrate that the
11   granting of the variance will not have a significant
12   impact on the surrounding properties.  In addition, the
13   applicant will provide additional testimony that the
14   site is particularly suited, since it's already been
15   approved for a nursing home, which is very similar to
16   the proposed use.
17             On balance, the use variance, we believe, is
18   justified and should be granted, because the public
19   interest far outweighs any detriment and the applicant
20   will explain the important need is and the legislature
21   has also determined rehabilitation is in the public
22   policy of this state.
23             So that gives you sort of an overview of the
24   applicant's position and what it intends to prove
25   during testimony.  And I thank the Board for their

1    patience as I delivered that opening.  Thank you.
2              MR. CHAIRMAN:  Thank you.  Mr. Sachs, do you
3    want to respond to the comments made?
4              MR. SACHS:  Yes.  I feel compelled to advise
5    the Board that the 20-minute opening statement by Mr.
6    Himelman is not evidentiary.  Mr. Himelman, to my
7    knowledge, is not a planner licensed in the State of
8    New Jersey.  He is an attorney, but he's not a licensed
9    professional planner.
10             So any of the testimony -- any of his
11   comments that were made during the opening statement
12   are not considered evidentiary, are not to be
13   considered whatsoever in your deliberations during
14   these proceedings.  Apparently --
15             MR. HIMELMAN:  I have no issue with that, and
16   my intent of my opening statement, Mr. Chairman and
17   members of the Board, was to lay out what the applicant
18   needs to prove and substantiate.
19             MR. SACHS:  Well, that's -- yeah, but that's
20   -- I understand.
21             MR. HIMELMAN:  And so, I am not hear
22   testifying as a planner.
23             MR. SACHS:  I want to make it clear that
24   that's the case, because, obviously, you've got five
25   witnesses.  You've got an operations individual who is

```
 1      going to testify.  You've got your site engineer.
 2      You've got your traffic engineer.  You've got two
 3      professional planners.
 4               But, again, I just want the record to be
 5      clear that I believe Mr. Himelman -- and, again, it was
 6      in the nature of an opening statement -- was giving
 7      essentially some planning testimony, which is not --
 8      not permissible in this matter.  He's not a licensed
 9      professional planner.
10               You will gauge your decision based upon the
11      testimony of the witnesses who are qualified to do so
12      under oath.
13               MR. HIMELMAN:  That's fine.
14               MR. CHAIRMAN:  Thank you.
15               MR. HIMELMAN:  We can call our -- if the
16      Board doesn't have any other questions, we can call our
17      first witness.
18               MR. KREISMER:  Can I ask one question?
19               MR. HIMELMAN:  Sure.
20               MR. KREISMER:  Because I heard two
21      definitions.  One, is the application -- the applicant
22      applying for variance as a nursing home or as a
23      hospital?  Because you mentioned both of them in your
24      testimony.
25               MR. HIMELMAN:  Well, it was approved as --
```

```
 1      currently, the prior approval was granted to the
 2      current owner as a nursing home facility.
 3               We are applying for a D1 use variance to
 4      operate a drug rehabilitation facility, which you'll
 5      hear from the applicant's witnesses what that legally
 6      means, and I'll just answer it that way.
 7               MR. SACHS:  And, Mr. Kreismer, let me respond
 8      to that as well, and just for the members of the
 9      public.
10               The applicant had previously appeared before
11      this board maybe in September on an appeal of Mr.
12      Mashanski's determination that this was not a permitted
13      use in the zone.
14               The proofs at that particular time by the
15      applicant were that the applicant was -- the
16      applicant's operations were akin to the operation of a
17      hospital and/or a nursing home, which this board
18      determined was not the case.  So, therefore, this board
19      did require this applicant to come before the Board for
20      a D1 use variance to operate as an in-patient drug
21      rehabilitation center.
22               MR. HIMELMAN:  Well --
23               MR. SACHS:  So they're not here as a nursing
24      home.  They're not here as a hospital.  They're here as
25      an in-patient and out-patient drug rehabilitation
```

1    center.
2              MR. HIMELMAN:  The only point of
3    clarification I would make is I don't think the Board
4    actually made a final determination on that -- on that
5    appeal.
6              MR. SACHS:  That's correct.  I agree.  I
7    agree.
8              MR. HIMELMAN:  And so what the applicant, at
9    the encouragement of this board --
10             MR. SACHS:  Correct.
11             MR. HIMELMAN:  -- the applicant requested
12   that that appeal be deferred and continued and that we
13   prosecute this variance application.
14             MR. SACHS:  That's correct, Mr. Himelman.  I
15   agree.  I agree.  But that's essentially what the --
16             MR. HIMELMAN:  And to answer your -- just
17   also you'll hear from -- and I'm not -- again, I don't
18   want to necessarily -- I don't disagree with your
19   counsel's interpretation.
20             The point of a hospital, that will be
21   discussed by our planners as it relates to inherently
22   beneficial use.  I think that's a good way to answer
23   that.
24             MR. SACHS:  And, by the way, I would agree
25   that a hospital and/or nursing home statutorily is

1    considered to be an inherently beneficial use.
2              MR. HIMELMAN:  That was my only point.
3              MR. SACHS:  Okay.  Okay.
4              MR. HIMELMAN:  Chairman Green, I don't have
5    any -- does anyone have any further questions before we
6    proceed?
7              MR. CHAIRMAN:  There is no further questions.
8    Proceed.
9              MR. HIMELMAN:  Okay.  All right.  We will
10   call our first witness, Dr. Deni Carise, and she will
11   be testifying as our clinical director.
12             Have her sworn in.
13             MR. CHAIRMAN:  Doctor, please raise your
14   right hand and I'll swear you in.
15   D E N I   C A R I S E, WITNESS, SWORN
16             MR. CHAIRMAN:  All right.  Please state your
17   name, spelling your last name, professional affiliation
18   for the record.
19             THE WITNESS:  Sure.  I'm Dr. Deni Carise.
20   The last name is C-A-R-I-S-E.  I'm chief clinical
21   officer at Recovery Centers of American, and I'm an
22   adjunct clinical professor at the University of
23   Pennsylvania School of Medicine, Department of
24   Psychiatry.
25             MR. CHAIRMAN:  Okay.  Thank you.

1   DIRECT EXAMINATION BY MR. HIMELMAN:
2        Q    Dr. Carise, nice to see you here this
3   evening.  You did give a brief background and
4   description, but if you would be a little more
5   elaborate, providing the Board and the public a little
6   bit more information about your background and the work
7   you've done on sites similar to the proposed site in
8   Sayreville.  Thank you.
9        A    Sure.  First I want to thank the Board for having
10  us here and letting us have this discussion and thank
11  the members of the community as well for letting us
12  answer questions for you.
13            I've been in the substance abuse treatment
14  research and policy field for 32 years.  I was 18 years
15  as a federally funded NIH, mostly federally funded
16  investigator and scientist, funded by grants.  And I
17  researched evidence-based practices.  I tracked drug
18  trends for the country for the Office of National Drug
19  Control Policy.  I helped start treatment actually in
20  about 15 different countries that never had treatment
21  before.
22            And I did a lot of grant writing, grant
23  reviewing, article writing.  I've published over 150
24  peer-reviewed articles, chapters, and books.
25            I left research a little while ago and I went

1   back to clinical, which is my first love.  I was chief
2   clinical officer at a place called Phoenix House.
3   Phoenix House had 120 sites across the country, and I
4   was chief clinical officer for them, which means I set
5   standards for care for all of the sites, developed
6   training teams that went out and trained on that and
7   implemented and kept track of those sites.
8            I did the same thing for another company
9   called CRC.  CRC has 140 treatment programs across the
10  United States, and I had the same position there as
11  well.
12            And then I went onboard at Recovery Centers
13  of America to basically start from scratch a number of
14  treatment programs.  The greatest things about these
15  countries that were just starting treatment was that
16  you could start from scratch with the best that science
17  had to offer.  You know, you could pick and choose and
18  say, this is what science says really works the best
19  and create it.  And I never thought I'd have that
20  opportunity in my own country.
21            So I came onboard at RCA and did that.
22       Q    Okay.  Great.  Now, just to follow up with
23  RCA, you're currently employed by them, correct?
24       A    Yes, I am.
25       Q    Okay.  And what are your specific

1   responsibilities?
2   A     So, chief clinical or chief scientific officer.  I
3   develop, oversee clinical care standards, what we will
4   be implementing, identify evidence-based practices that
5   best for use with our patients, develop both the in-
6   patient and the out-patient list of services and how we
7   will treat folks and the protocols behind which we'll
8   do that.
9             MR. CHAIRMAN:  Mr. Himelman, before you
10  proceed any further, are you offering Dr. Carise as an
11  expert witness or as an operations witness?
12            MR. HIMELMAN:  Operations witness.
13            MR. CHAIRMAN:  Okay.  Thank you.
14  BY MR. HIMELMAN:
15       Q     With regard to -- and we've talked a little
16  bit about the epidemic drug problem.  Maybe you could
17  just sort of highlight for the Board and members of the
18  public the scope of that problem and some of the issues
19  that you have faced as clinical director.
20  A     I mean, I think that we stuff in the paper all the
21  time about what's going on.  We are -- the U.S. is 4.6
22  percent of the world's population, and we consume 80
23  percent of the world's opioids.  We are a country with
24  really an incredible demand for opioids.
25            So that -- if you don't know, that was really

1   fueled, frankly, by Pharma coming in and developing
2   opioids that they said were less abuse potential.  So
3   many people have gotten into trouble, particularly with
4   opioids and heroin, came through that door through a
5   prescription drug that was typically prescribed for
6   them or for somebody else.
7             So this is a very different look than the
8   past -- than the past years.  So the heroin user of
9   today, the opioid user of today, is very different than
10  the opioid user of the '90s and the '80s.
11            You know, New Jersey has the sixth highest
12  rate in the nation of ER visits due to opioid problems.
13  And Middlesex County is in the top five counties in the
14  state for overdose deaths.
15            So that's interesting, given the size.
16  There's been an 893 percent increase in fentanyl deaths
17  in the country.  This is incredibly important, because
18  there used to be no Fentanyl on the street, and
19  Fentanyl actually was more expensive than heroin.
20            What has happened with the Fentanyl and
21  carfentanil -- I'll just talk for two minutes about
22  this, because it's important to the future of our
23  communities and the feel is that carfentanil and
24  fentanyl have started being made in basically
25  clandestine laboratories.  They're not pharmaceutical.

1    So fentanyl is a drug that's only used typically by
2    anesthesiologists or for very extreme pain, usually
3    right after surgery.  It's about 50 to 100 times
4    stronger than heroin.  It is a lethal drug, but
5    unfortunately, carfentanil has come along.
6           Carfentanil actually has one appropriate use,
7    and that is for -- by veterinarians to sedate very
8    large animals, rhinos and African elephants.  And that
9    is about 10,000 times stronger than morphine and 100
10   times stronger than the fentanyl.
11          The problem with that is several fold.  One
12   is that people never know what they're getting, which
13   is why they're overdosing at such high rates right now.
14   Another piece of that is that the drug -- the overdose
15   reversal drug, Narcan, actually, the carfentanil lives
16   in your system longer than the Narcan.  So while Narcan
17   will stop the overdose and bring you right back, the
18   Narcan has a shorter half life, so it will dissipate
19   out of the system, and without doing anymore drugs, the
20   person can actually overdose again an hour later.
21          And so that's becoming a really significant
22   problem.  Almost all of this is brought in through mail
23   order, frankly, from China.  China was the last country
24   by far to sign a trade agreement with the U.S. saying
25   that we will stop, you know, we will prosecute, and we

1    will look for and seek to prosecute folks who are
2    distributing this.
3           But they were the last to sign, and they
4    don't seem to be doing quite a bit about it.  The
5    reason this is so important is because of the huge
6    concern about what's going to happen in our future.
7           So fentanyl has a molecular structure and
8    carfentanil is an analog of that.  It just changes kind
9    of one thing, one piece of that.
10          Right now what we're looking at is new drugs
11   coming into the country, mostly from China, that have
12   -- that don't even have a name yet.  There's W18, there
13   is C2055.  And what they do is they change one
14   molecule, and it's exactly -- it's the potency of
15   carfentanil.  The overdose rate is as high as
16   carfentanil.  However, it's not illegal.  It's not
17   illegal, because it didn't exist yesterday.
18          And, by the way, we can't test for it to find
19   out what it is, because we don't have a test for it,
20   because it didn't exist yesterday.  There's actually
21   dozens of these out there now.
22          And with that going on, we don't see an end
23   to this issue, and we don't see -- you know, federally,
24   there is a very big concern about that being kind of
25   the next wave and what will we need to be able to do to

```
 1    stop that.
 2              So this is an enormous problem.  This is --
 3    the people that we treat, they are your neighbors.
 4    They are your coworkers.  They are people that often
 5    got into an addiction from a prescription drug.
 6              And so this is the people we see today, and
 7    this is the target that we have to really be out there
 8    and to help people.
 9         Q    Now, Dr. Carise, you've talked a little bit
10    about the magnitude of the problem.  Maybe you could
11    address a little bit about the benefits that this
12    proposed facility would address and certainly respond
13    to that magnitude drug epidemic problem you just
14    discussed, if you would explain that.
15         A    And so if I look at how we would address that at
16    this facility, one of the things that I think is
17    incredibly strong is to be a neighborhood model.  We
18    tend to get most of our patients from a 50-mile radius
19    around our site.
20              I purposely designed our sites this way,
21    because what I call this flyaway model that we have,
22    where somebody goes to Malibu or down to Florida to get
23    well, they're there for four weeks, they, you know,
24    basically spill out their guts, they develop intense
25    friendships with others trying to get sober, they
```

```
 1    develop an intense relationship with a therapist and
 2    psychiatrist, and they fly back home and they don't
 3    have any of those supports around them.  We know that
 4    doesn't work well.
 5              And in addition to not working well, it's
 6    also very, very high risk time for overdose, because
 7    what's happened is they don't kind of have the tools to
 8    really live in a recovery lifestyle, but their system
 9    is cleansed of the drugs.  It's completely out of their
10    system.  So when they come home, that tends to be a
11    very high risk time for them to use drugs.
12              So we are very heavily based on the
13    neighborhood model.  The other thing we're very heavily
14    based on is all the literature, all the science shows
15    that if your family or your employer is involved in
16    your treatment, your chances of success go up very
17    high.  So we invest a lot in having family therapists,
18    having education for families.
19              We have education sessions also for families
20    that are not families of our patients, but just
21    neighbor -- being a good neighbor, you know, families
22    in the neighborhood that want to learn more, that want
23    to say, "How do I talk to my kid about this?"
24              But when somebody is in treatment with us
25    also, we have family therapy, we have family education
```

1    sessions.  When a person comes into treatment, we get
2    the history both from the patient and separately in
3    another room from the family, so we have corroborating
4    advise.  And we deliver evidence-based practices.
5            Do you want me to go on about our treatment?
6        Q    No.  I think -- one question I did want to
7    ask you.  Is it fair to say that as a result of going
8    through your particular treatment program that you will
9    offer that it clearly limits and hopefully will reduce
10   future medical costs for your patients as they move
11   forward beyond treatment?
12   A    Yeah.  I mean, absolutely, there is no doubt about
13   that.  And the -- so the healthcare expenses, the other
14   healthcare expenses of the average person with a
15   substance use disorder are about 11 times that of an
16   average person.
17           Interestingly, the non-using spouse of a
18   substance use disordered person uses eight times the
19   healthcare costs of the average person.  So that would
20   be, you know, a benefit, I think, to the county and the
21   country, particularly in a place where you're very high
22   up in terms of how many people show up at your ER's and
23   need to be revived with Narcan in the state.
24       Q    Thank you.  Now, in terms of the facilities,
25   how many facilities does -- does RCA own and manage, if

1    you could briefly discuss that?
2    A    Yeah, sure.  So there are five residential
3    facilities that are similar to the one we are proposing
4    here.  They are in Mays Landing, New Jersey,
5    Earleville, Maryland, Devon, Pennsylvania, Westminster
6    and Danvers, Massachusetts.
7            And they're pretty similar -- very similar to
8    what we're designing here.
9            We also have six outpatient programs.  Three
10   of those residential sites also have outpatient.  It's
11   incredibly important to have a continue of care for
12   people so that you can continue to treat them and
13   continue to support them.
14           It's a very small part of our work, but it's
15   really vital.  We have also -- so our six outpatient,
16   three are in Mays Landing, Devon, and Danvers.  There
17   is a separate one -- a standalone in Wilmington,
18   Delaware, and two more in New Jersey, Voorhees and
19   Manahawkin.  And we have four residential centers under
20   construction or proposal, Blackwood, New Jersey,
21   Waldorf, Maryland, Upper Marlboro, Maryland, and this
22   site in Sayreville, New Jersey.
23       Q    Thank you.  Turning to the different
24   treatment options, could you just describe what will be
25   provided in terms of the types of care that RCA would

Carise - Direct/Himelman                    36

1    provide to its patients at the Sayreville facility?
2    A    Uh-huh.
3         Q    Thank you.
4    A    At the Sayreville facility, the majority will be
5    in two modalities of care.  Just like a hospital has
6    inpatient, outpatient, we have two types of care where
7    people live on the facility.
8              One is detoxification, and that is a very
9    medical, you know, time that they are detoxifying from
10   the drugs.  Some of these detoxifications are life
11   threatening, in the case of, for example, alcohol, or
12   the benzodiazepines.  And some of them are very, very
13   painful for folks.  So we detox them in a taper so that
14   they can tolerate the withdrawal.
15             And that typically is anywhere, depending on
16   the person and the drug, it could be three days, it
17   could be seven days.
18             After detox, they're transferred to
19   residential care.  In residential care, they are
20   learning more of the skills of how to cope without
21   drugs, how to socialize without drugs.  We have a lot
22   of different things going on.
23             The majority of our patients are 18 to 28
24   years old.  Our average age is 35, but that really
25   breaks into -- that's not the modal age.  So the

Carise - Direct/Himelman                    37

1    majority of our patients are 18 to 28, and then we have
2    a cadre of patients who are 40, 50, 60, 70.
3              And so in the detox, again, that's about a
4    safe, comfortable withdrawal.  Residential is very
5    intensive, very structured.  They're busy from 8:00
6    a.m. until 9:00, 10:00, 10:30 p.m., you know, getting
7    care.
8              And then there is three levels of outpatient.
9    The most intense level is called partial hospital.
10   That's six hours -- well, it's five hours a day.  It's
11   usually 9:00 to 3:00, with an hour for lunch, and they
12   are in different classes, learning how to -- anything
13   from writing a resume to more group therapy to how to
14   develop social support networks in sobriety.  And that
15   usually lasts sometimes five, seven, eight days.
16             And then they go to intensive outpatient,
17   which is three hours a day, three days a week, and they
18   have groups and educational seminars there as well.
19   And then outpatient would be just one and a half hours
20   once a week, maybe, an individual session each week,
21   too.
22             So those are the modalities.
23        Q    Now, turning to the actual services that we
24   will -- the RCA will provide, could you briefly go over
25   that in terms of the treatment services?

1    A    Yeah.  So all of our RCA residential facilities
2    that I've spoken about, as well as planned for
3    Sayreville, have a set of core clinical curriculum.  So
4    these are things that everybody gets.  And the reason
5    for that is because these are things that the science
6    has shown has the best impact and the best success
7    rates.
8            So there is a primary therapy group.  That's
9    five days a week.  It's an hour and a half.  There are
10   four evidence-based practices that are evidence-based,
11   based on the Department of Health and Human Services.
12   One is on getting motivated to change, staying
13   motivated to remain drug free.  And that's four to six
14   sessions once a week.
15           The other one is relapse prevention, the same
16   thing.  That's an evidence-based practice.  That's at
17   least weekly.  There is four to six different sessions.
18           The other one is called Unlock Your Thinking.
19   That's about cognitive distortions, how to change
20   cognitive distortions, when your head says you want to
21   use, how to kind of think through that instead of just
22   acting on it right away.
23           And the last one would be a 12-step --
24   multimedia 12-step group, where we really introduce the
25   person through some videos and workshops and whatnot

1    to, you know, what it means to be fully ingrained in
2    the 12-step community, because that has been shown to
3    be so successful when patients are ready to maintain
4    recovery on their own.
5            Again, the hours of treatment, these patients
6    are not lying around.  They are in these groups, as
7    well as educational sessions.  There's seven different
8    sets of educational sessions and topics.  There is one
9    every day.  There's 28 seminars on these.  There's a
10   set on wellness.  There's a set on thinking things
11   through.  There's a set on the biomedical aspects of
12   addiction.  So there's all different topics that come
13   up.  There's a set on family norms and family, you
14   know, issues in substance use disorders.  So they are
15   in these groups all day.
16           The other thing particularly, because we have
17   so many young adults, is that we have yoga, we have
18   exercise classes.  These are -- these are monitored.
19   You know, these are done by trained addiction
20   specialists, yoga teachers, and exercise specialists.
21           Some of our sites will have tai chi or yoga
22   or karate as well.  We work with that in particular
23   with our young adult women to develop their confidence
24   and their strength.
25           And so there's -- I know I'm forgetting a

Carise - Direct/Himelman                    40

1  number of things we do every day all day, but those are
2  really the core.
3          Then we have also art therapy, and we have
4  music therapy.  We have relaxation techniques.  We have
5  for our young adults, we plan courses on -- for our
6  young women, they have a course on budgeting and a
7  course on compulsive spending, because many of our
8  young women are compulsive spenders, how to get your
9  credit rating back.
10          So it's everything from seeing the
11  psychiatrist and the doctor for your medical disorders
12  to learning how to cope in the everyday world.
13      Q    Maybe you could also address how and what
14  your goals are in getting -- obviously getting help to
15  people to get back to work or school.  Could you
16  briefly go over that?
17  A    Yeah.  I mean, some of the things we do, we
18  implement sessions with particularly the young adults
19  on how to get back to school in terms of we work with
20  their school if they're on kind of an academic
21  probation from their school.
22          We also work on applying to school.  We work
23  on identifying what area you'd like to work on or
24  vocational strengths and whatnot.
25          We also, if somebody comes in and they're

Carise - Direct/Himelman                    41

1  still in school, we give them time and tutoring to help
2  them move along in their schooling.  So we do a number
3  of different things to try and help kids not just get
4  back to school, but also be able to live kind of in the
5  real world.  Again, budgeting, how to check your credit
6  rating, why that's important, cooking, you know, doing
7  laundry, really basic skills that these young adults
8  don't have.
9      Q    Okay.  And you mentioned about family
10  visitation.  Maybe you could just briefly go over that
11  for the Board.
12  A    So I'll go over the family program, which includes
13  some visitation.  Again, families are incredibly
14  important.  The science shows that your likelihood of
15  staying sober and doing well are much higher when your
16  family is involved.
17          We get family involved right away.  Even if
18  they are at odds with each other, we get the family
19  involved in education sessions.  Those are typically on
20  the weekends, and we get the family involved in family
21  therapy sessions, because we know we need to get these
22  folks together.
23          The other piece we have is that we do allow
24  visitors.  We allow family to visit.  And I want to
25  just tell you a little bit about that and the safety

1   and what we do for the safety around that.
2            A family member can visit if they've been on
3   a list and the primary therapist and the patient have
4   discussed who that family member is, what their role in
5   their recovery will be.  We've called them, we've
6   spoken with them with the patient and without the
7   patient in the room to confirm their support of
8   recovery, that this really is a mother, a father, an
9   uncle.
10            And there are just three times during the
11   week that family can visit.  There's about a three-hour
12   visiting time on Saturdays, two hours on Sundays, and
13   one hour on Wednesday nights.
14            When the family comes, you can't get in
15   unless you've been pre-approved and you're somebody
16   that we've spoken with.  We tell them to leave all of
17   their belongings in the car.  They can't bring in, you
18   know, a big bag or a big purse or a cell phone, because
19   we don't want our patients to have access to cell
20   phones.  And they are also searched when they come in.
21            If they do bring in something -- let's say
22   they bring in an extra pair of pajamas and a hat or
23   whatever for the patient.  Anything they do bring in,
24   they go right to the front desk, and it's searched in
25   front of them, and we go through it.  So we really --

1   and, by the way, the patient is not allowed to go hang
2   out with them in the car.  They can't leave the
3   premises with them.  And, in fact, all the visitation
4   is done in an assigned room.
5            It might be the cafeteria, where we have a
6   few groups of families meeting, and there's always
7   staff there.
8        Q    Thank you.  Now, you mentioned a little bit
9   about outpatient versus residential.  Maybe you could
10   describe the relative differences between percent of
11   staff and the space allocated for the residential
12   versus the outpatients.
13   A    Yeah.  So outpatient really is a vital but a
14   smaller part of our treatment.  In the building, about
15   5 percent of the building is for outpatients, compared
16   to 95 percent for detox and residential.
17            About 5 percent of the staff also are
18   outpatient staff.  If you really look at the man hours,
19   it's only 2 percent of man hours are actually
20   outpatient.
21            The important thing to know is -- it's
22   particularly -- in most states, we're not allowed to
23   have these two groups mix.  So the outpatient center
24   will have a separate entrance.  It will have a separate
25   person that there to take a copay or show them to their

1    group.
2            We typically -- you know, I'm estimating
3    about no more than 22 outpatient at any one time.  And
4    that would only be if we had that PHP program that runs
5    9:00 to 3:00, and also an IOP group that's running from
6    9:00 to 12:00.
7            But typically the intensive outpatient is
8    9:00 a.m. to noon, or it could be 5:00 to 8:00 for
9    people who are working.  And then the other single
10   groups are generally in the evening as well.
11           So there's not a lot of outpatients there at
12   a time, but the continuity of care is incredibly
13   important.
14       Q    Thank you.  Now, turning to the staff at the
15   proposed facility, can you just briefly go over and
16   describe the different staff that will be available and
17   employed?
18       A    Yeah.  So the staff mandates that I put in place
19   again are based on the science.  So many of our
20   patients have a medical problem as well.  We have got
21   patients with diabetes very frequently, hypertension,
22   you know, that just need some medical monitoring.  So
23   we have physicians, as well as psychiatrists that can
24   see the patients.
25           We have RN's 24 hours a day, seven days a

1    week.  That's not a requirement.  We can have LPN's,
2    for example, overnight, but I made a decision that we
3    would not do that.
4            So we have RN's and LPN's, but we always have
5    at least one RN there 24/7.  We have licensed social
6    workers, clinical and family therapists, counselors,
7    and patient support staff.
8            The -- if we were at 90 percent capacity, for
9    example, which is a common number that we run at about
10   98 -- 90 percent, sorry, capacity, we would have about
11   134 patients, and we would have about 217 staff.
12   That's a pretty common ratio for us.  It's 1.6 staff
13   for every patient.
14           This is a very heavy laden -- staff laden
15   business where you need people around, and you need to
16   keep the patients occupied and engaged across the day.
17   So 365 days a year, 24 hours a day, we have various
18   staff.  They come on at different times, if that's
19   important to you.
20           Like, the nurses will come on maybe -- nurses
21   will be, like, 7:00 to 3:30, 3:00 to 11:00, 11:00 to
22   6:00 or 7:00.  And then the administrative staff all
23   tend to be 8:30 to 4:00.  The recovery support staff,
24   they are all different hours.  They start at all
25   different times.

1          So we have this kind of staggering so there
2     is not, you know, the whole staff load there at that
3     time.
4          About -- if you ask me -- I'm just estimating
5     what your questions might be.  If you ask me how many
6     will be there at the most at one time, I'm going to say
7     about 115, and that would be when the administrative
8     and daytime staff overlap.
9          Q    Great.  Thank you.  Turning to your potential
10    patients and your client base, can you describe who the
11    facility will be treating?
12    A    Yeah.  So we are -- we are adults only, so it's 18
13    and older.  This is predominantly a middle class
14    population.  These are not prisoners there in lieu of
15    incarceration.  These are not indigent folks or
16    homeless folks.  Again, 82 percent fully employed.
17         The average age, again, is 35, but that
18    really tends to have two groupings to it, the 18 to 28
19    and the 40-50 year-olds.
20         They are commercially -- 90 percent
21    commercially insured, and about 10 percent will be self
22    pay.  Sometimes people even with insurance self pay
23    because they don't want it on their records, because
24    there is still a pervasive stigma out there.
25         They are in treatment voluntarily.  This is

1     not court-mandated treatment.  We have no contracts
2     with drug courts or with criminal justice systems to
3     take their patients.
4          We may have patients that have had a DUI or
5     whatnot, but they are -- this is a completely voluntary
6     facility.
7          We have specialized programs separately by
8     gender for young adult males, young adult females.  We
9     also have a separate program for impaired
10    professionals, so doctors, nurses, pilots, EMTs require
11    some special groups and some special attention
12    paperwork, frankly.  So we have a dedicated unit for
13    that.
14         And they may be there mandated treatment,
15    because they will lose their license, but they have a
16    very high success rate with that group.
17         We do have exclusion criteria.  So we don't
18    take patients that we don't feel that we can perfectly
19    well care for at our site.  So somebody with a really
20    significant acuity psychiatrically.  We would not take,
21    for example, somebody that is suicidal.  We would not
22    take somebody that is experienced hallucinations or
23    command hallucinations.  They are just too
24    psychiatrically disabled for us, and we would not be
25    able to take them.

1    And then one thing I didn't say is that when
2  they contact us -- and I'll describe it more later --
3  but they contact the call center, and there is an
4  admission kind of done there on the phone with them and
5  usually a family member, and we ask all these different
6  questions.  And I'll go into them later, if you want.
7    When they show -- and so we really can rule
8  out a number of people just through that.  If they
9  happen to show up and we decide when they show up that
10 they're not appropriate for us, we would transfer them
11 out to a higher level of care.
12    And then three days after they're with us,
13 they get a comprehensive individual bio/psych social
14 where we do a lot of these questions and more again,
15 and that gives us another kind of check and balance.
16 So this is -- if their symptoms are out of control,
17 either with psychiatric or medical, we can't take them.
18    They -- you know, individuals with a
19 substance use disorder are considered to have a
20 disability under the ADA, and so we like to treat as
21 many people as we can, but we are well aware of what
22 our limitations are.
23    So, for example, I might take a young woman
24 who is binging on food and has that kind of an eating
25 disorder where she binges and may vomit or purge.

1    But I would not take a young woman who has
2  anorexia who might require tube feeding or anything
3  like that.
4    Q    Thank you.
5  A    Is that enough?
6    Q    That's very well done.  Now, you mentioned a
7  little bit about patient referral.
8    How are patients referred for admission to
9  the facility?
10 A    So we get referrals from everything from EAP's to
11 local corporations to unions.  We actually have a
12 pretty high referral rate from alumni, which is great.
13 We get referrals where people see on our website what
14 we offer, and they call us up at the call center.
15    So it really ranges from all of those.  We
16 actually get about 36 percent of our referrals from
17 either other hospital or our competitors when either
18 they can't take the patient, they're full, this is a
19 better location.
20    We get quite a bit from alumni, like I said,
21 from family, a very small amount from radio and TV, but
22 unions, insurance companies as well.
23    Q    Okay.  Great.  And how do the patients
24 physically get to the facility?
25 A    So in terms of literal transportation, when

Carise - Direct/Himelman                    50

1   somebody is coming in for a residential appointment,
2   we've already screened them at the call center.  We've
3   done an assessment at the call center, and we arrange
4   transportation at the call center.
5            Our preference is that a family member drive
6   them in and go through the intake at the same time as
7   them.  We actually do them separately.  We ask the
8   family member a lot of the same questions, because you
9   might have a patient who says, "I do XYZ," and you
10  might have a family member who says, "They do ABC and
11  XYZ."
12           So we get this what's called collateral
13  information.  So that is our ideal way.
14           We also have drivers and cars available that
15  we will go out and we'll pick somebody up and we will
16  bring the into treatment.  And that's for our
17  residential folks.
18           We don't have anybody that comes -- and they
19  can't leave a car in the parking lot or on the
20  facility, because that's -- again, we're looking at
21  risk for the patient to want to go home, and the easier
22  it is, the more likely they may do it.
23           Our outpatients may come by public
24  transportation as well or by an arranged service
25  through RCA or by family members.

Carise - Direct/Himelman                    51

1       Q    Terrific.  Thank you.  Now, turning to safety
2   and security.  What kind of safety and security
3   measures will the facility have?  If you could briefly
4   go over that.
5   A    Briefly?  Okay.  You know, patient safety is our
6   number one concern, as well as safety for our staff,
7   safety for our neighbors.
8            Again, I've described who comes into
9   treatment.  These are not indigent criminals that are
10  adjudicated to us.  These are people who are
11  voluntarily coming into treatment.
12           That said, we go to, I think, very great
13  lengths to ensure safety.  So one way is that we have a
14  comprehensive 150 -- at this site it will be closer to
15  200 cameras.  These cameras are inside and outside.  We
16  cannot legally have a camera in a bathroom or focused
17  on a bed, of course, but every square inch of the
18  facility is seen by these cameras, as well as the
19  outside facility of the facility.
20           Every nursing station has a screen up that
21  shows what's going on by all of those cameras.  And
22  then we also have a camera of the outdoors and whatnot
23  that's in a station.  We have a full-time groundskeeper
24  who does rounds around in the grounds and makes sure
25  that there are no patients out there.

1          To be clear, if a patient comes and goes to
2    go out a door during the day, they want to go out and
3    take a walk, that's not okay.  Anytime outside the
4    building, if for any reason -- and we might take three
5    patients out to do yoga on the lawn or something.  They
6    are always with a staff member.  They can't just decide
7    they want to take a walk or go jogging around the
8    premises.  It's just not allowed.
9          Every staff member knows if you see a
10   patient, or worse, two patients, you know, walking out
11   the front door, there is an all-out alert that goes out
12   to make sure that they are not out there alone and that
13   they're not out there, you know, just by themselves.
14         So the cameras are there.  There are also --
15   some are motion detected and some are not.  So, for
16   example, 2:00 o'clock in the morning, the doors are
17   locked from the outside.  Nobody can get in.  But
18   we're, by law -- I think by fire code.  I don't --
19   that's not my area.  But we're not allowed to lock them
20   in, but they're all alarmed.
21         And so if somebody went out a door, an alarm
22   would go off, and it would be -- the alarm would go off
23   at all of the nurse's stations.  They would know right
24   away.  And they're fully trained.  We have a number of
25   different trainings.  They -- a certain number of the

1    nurses or staff will go to where that person left and
2    go and, you know, do what they can with that patient.
3          We also have, in addition to ground rounds,
4    where we do rounds on the ground, we have patient
5    rounds.  So we have staff that are just dedicated to
6    knowing where the patient is at all times.  Are they
7    where they're supposed to be?  And these staff 24 hours
8    a day.  If the patient is in detox, it's every half
9    hour, minimum.
10         If the patient is in the rehab side of the
11   building, it's once an hour.  And this is -- again,
12   it's 24 hours a day.  The patients know this.  We open
13   the door to their bedroom.  We make sure it's the
14   patient we think should be in that bed in that bed,
15   make sure they're breathing, check their respirations.
16   And, again, that's every half hour in detox and every
17   hour in the residential.  But that's above and beyond
18   when we see them in the times and places that we're
19   supposed to see them.
20         Every patient coming in will get a bracelet
21   with an RFID chip in it.  And we will be able to tell
22   where they are at any time in the building.
23         This also kind of helps us with the groups.
24   It's also a great way to document that they're
25   attending different sessions and different groups.  If

1    somebody isn't in a group they're supposed to be in,
2    the support staff that are in charge of this will go
3    find that person.  Typically they're either still in
4    bed or they're in the cafeteria.  We'll know the minute
5    they're a minute late, and they will go and they will
6    get them and bring them to group.
7              MR. SACHS:  For the record, what's an RFID
8    chip?
9              THE WITNESS:  I'm sorry.  It's a microchip
10   that can tell where somebody is at any time.  It's kind
11   of like the one in your phone.
12             MR. SACHS:  No, but what does RFID stand for?
13   Do we know?
14             THE WITNESS:  RFID?
15             MR. SACHS:  Radio frequency or something?
16             UNIDENTIFIED SPEAKER:  Yeah, radio frequency.
17             MR. SACHS:  All right.  All right.  Just so
18   the record is clear.
19             THE WITNESS:  It's been so long since I
20   spelled it out.  Yeah.  Sorry.
21   BY MR. HIMELMAN:
22        Q    Deni, before you go, so just so I'm clear and
23   the Board and public, so security cameras are
24   monitored, it's viewed at each nursing station,
25   correct?

1    A    Yes.
2         Q    Okay.  And all exits and entrances have
3    remote alarm systems, correct?
4    A    Yes.
5         Q    Okay.  Thank you.
6    A    Let me give you just a couple more things.  When a
7    patient is admitted, again, these specialists will, in
8    front of the patient, we search every piece of their
9    luggage, including linings, sneaker linings,
10   everything, and including the person themselves.  They
11   are in a very small hospital gown, and we move it
12   aside, and we search both the person and every bit of
13   their belongings.
14             We confiscate anything that we think is
15   inappropriate, and we lock it up.  Just as an aside, we
16   also take their cell phone.  If they were silly enough
17   to bring a laptop or an iPad, which we told them not
18   to, we would take that.
19             We take their wallets, because they don't
20   need any cash or credit cards, and we take their keys,
21   and we put them in a locked, secure facility that only
22   the staff have access to.
23        Q    Now, when the patients are admitted, they are
24   thoroughly searched and their belongings are
25   inventoried, correct?

Carise - Direct/Himelman                    56

1   A     Yes.
2        Q     So will you confiscate anything, if need be?
3   Because I wanted to address that.
4   A     We absolutely will.  So, anything that's
5   considered contraband we will confiscate.  The
6   contraband is defined as anything that can be used as a
7   weapon or pose any kind of threat.
8              And a cell phone, frankly, is a kind of a
9   threat in our sites, because a cell phone can be used
10  to call a drug dealer or to call somebody that they
11  want to -- to deliver drugs.  It would be tough for
12  them to get on site, but we don't even want to give
13  them that.
14             So contraband falls into kind of three areas.
15  So one would be cash, phones, iPads, laptops, credit
16  cards, wallets, cameras.  Nobody can take pictures of
17  the site, with the exception of our 200 cameras.
18             Any kind of alcohol, illegal drugs, or
19  unauthorized prescriptions, they will be confiscated
20  and they will be disposed of according to a waste --
21  narcotic waste policy.
22             And then razor blades, straight razors,
23  knives, any kind of rope, any kind of chains, corded
24  items, aerosol cans, we take all of those.  We,
25  frankly, even take aftershave or perfume, because it's

Carise - Direct/Himelman                    57

1   got alcohol in it as well.  We take hand sanitizer,
2   because that has alcohol as well, and people have been
3   known to drink that.
4              So anything in those areas are put back in a
5   locked facility.
6        Q     Okay.  Does RCA have any type of patient
7   safety management plan?
8   A     We do.  We have plans for numerous different
9   things.  And I'm trying to remember if I have the --
10  kind of notes here.
11             But we have patient safety monitoring plans
12  for what to do if a patient does try and leave, what to
13  do if there's a hazard, what to do if there is, you
14  know, a nearby shooting, what to do -- I mean, there I
15  probably about eight or ten of them.  And they're very
16  thoroughly thought out, and we are drilled on them all
17  the time.
18        Q     Thank you.  Now, you just mentioned about
19  discharge.  What will the facility do if a patient
20  wants to leave before their scheduled discharge, if you
21  could address that, please?
22  A     So, it's just the nature of the business.  A
23  certain percentage of patients are going to want to
24  leave before we think it's best clinically.
25             Sometimes that's not concerning.  You know,

1  we had a father recently that was supposed to leave
2  Monday.  That was his discharge date.  We were all set
3  for that.  But his daughter graduated on a Saturday.
4  So he left early, and that's technically considered he
5  left against medical advice.
6          We do have other ones where people say, "I'm"
7  -- you know, "I'm not buying this anymore.  I don't
8  want to be here."  So there's an entire protocol of
9  things we go through for that.
10          And you've got to remember and keep in mind
11  that, again, the majority of our patients, we've got
12  their phones, we've got their keys, we've got their
13  wallet, we've got their credit cards.
14          So we have protocols in place first to try
15  and do what we call block that against medical advice
16  leave.  We have everybody from the psychiatrist to
17  their primary therapist to their family therapist to
18  calls to the family members to get them to talk the
19  patient into staying.
20          People are very high risk to leave right
21  after detox, because they've gotten the drugs out of
22  their system, but that's also the highest risk time for
23  them to overdose when they go out, because the drugs
24  are all out of their system.  If they take anywhere the
25  same amount, they will overdose.  So we put a lot of

1  effort into this.
2          If we've got the -- the family, the family
3  therapists, the psychiatrist, then we even get patients
4  involved, the patients that are there that are
5  committed, they try to get the person to stay.
6          If that doesn't work, we say, "All right, you
7  know, I hear you.  You're going to leave."  And that
8  process, by the way, of convincing them with all
9  different people generally takes about an hour to an
10  hour and a half.  And then it takes about another to
11  hour to hour and a half to get everything else done
12  they need to leave.
13          So what we need to do to let them leave is
14  they have to sign a form that says they're going
15  against medical advice.  We have to know that they know
16  what that form means.  They have to go and pack all
17  their belongings.  They have to complete a discharge
18  survey.  They don't want to leave without the
19  prescriptions they're on, so we get the doctor to come
20  in and write them a prescription for the next five or
21  so days.
22          We get with them on their continuing care
23  plan.  We start a continuing care plan and what they'll
24  do after residential from the day they come in.  So
25  it's always being updated and whatnot.  But we want to

Carise - Direct/Himelman                    60

1    finish that off before they go so they have the next
2    place to go.
3            We have to go get their personal belongings.
4    They have to sign for all of those.  And then we do not
5    let them leave on their own.  They have to either have
6    RCA transportation -- we have a car service of drivers
7    that work for us full time that will take them home or
8    where they want to go, within reason.  And, also, their
9    family can come and pick them up, but it has to be a
10   family member that we already know that's on the
11   approved list that comes into the facility and we walk
12   them to the car.
13        Q    Okay.  Thank you for that explanation.  How
14   do you handle overdoses and other medical emergencies?
15        A    So if it's a medical emergency or psychiatric
16   emergency, we call an EMT, we call an ambulance, and
17   they come and they take them.
18            If we're in doubt about that, we will call
19   and we will have them transferred to a hospital.  The
20   hospital will generally check them out.  If the
21   hospital says they're okay to come back, we still have
22   our doctor check them out to make sure we believe
23   they're okay and safe to come back.
24            And sometimes it's just somebody fainted, and
25   we find out that they have an electrolyte imbalance.

Carise - Direct/Himelman                    61

1    And other times, you know, we identify new medical
2    disorders, or their psychiatric problems, their
3    depression or whatnot really starts to escalate.
4            If somebody OD's on the site, 100 percent of
5    our staff are trained in administering Narcan.  It's
6    available throughout the treatment center, and we give
7    them the Narcan.  Like I said earlier, you cannot give
8    somebody Narcan, even if they're fine after that, and
9    just let it go.  You have to still take them to the
10   hospital and have them observed for a while to make
11   sure the drugs in their system aren't going to
12   reattach.
13            If they've overdosed in the facility, we go
14   back out to the emergency room when they say they're
15   ready and we check with them, we do an intake right
16   there with them to make sure that they are safe.  But
17   by this time, we've also searched all of their
18   belongings, which we have the right to do, and make
19   sure that they have no other drugs in the facility.
20            And sometimes we will bring them back, and if
21   we feel that it was an impulsive move and that they
22   feel -- you know, they see it as a mistake, we may
23   bring them back.  We may put them at a different RCA
24   facility and tell them, "You're getting another chance
25   here."  But to not continue treating somebody because

Carise - Direct/Himelman                          62

1    they had a symptom of their disease is not something
2    that we would do, unless it were unsafe.
3           Anybody that brings drugs into the facility,
4    that gives them to other patients, that's unsafe.  Now
5    I'm going to decline an admission, because I have an
6    obligation to the rest of the patients and staff.
7        Q    Thank you.  In terms of licensure by any
8    state agencies in New Jersey, what's required to
9    obtain?
10   A    So, we're required to be licensed by the state for
11   each level of care, as we are in our other states.  And
12   then also, in addition to that, we choose to be
13   accredited by the Joint Commission of Hospitals, which
14   is really the top level accreditation.  There's another
15   accreditation called CARF, that is much easier to get,
16   but we really go for the Joint Commission, because that
17   is what all hospitals are accredited by.
18       Q    So you will be licensed by the State of New
19   Jersey, correct?
20   A    Yes, we will.
21           MR. SACHS:  What type of licensing is it?
22   Can you please describe the specific licenses?
23           THE WITNESS:  You know, I might have to
24   defer.  The New Jersey state -- I believe it's your
25   single state agent.  Every state has an SSA, and they

Carise - Direct/Himelman                          63

1    license out of that office, but I'll have to --
2           MR. SACHS:  Commissioner of Health?  I mean
3    --
4           THE WITNESS:  It's usually Commissioner of
5    Health, Department of Health and Human Services.
6           MR. SACHS:  And can you provide that
7    information for us, Mr. Himelman?
8           THE WITNESS:  I can.
9           MR. HIMELMAN:  Yes.  Absolutely.
10          MR. SACHS:  Okay.  Thank you.
11          MR. HIMELMAN:  We can provide that shortly.
12   BY MR. HIMELMAN:
13       Q    In terms of the community benefit to the
14   Borough of Sayreville should the facility be
15   implemented and approved, can you briefly describe
16   that?
17   A    Yeah.  I mean, I think there's a number of things.
18   Again, we're very committed to a community-based
19   response.  I think that this is a disease and this is
20   an epidemic that is only going to be addressed at the
21   local and community levels, that it can't be something
22   that is done nationally that will fit everybody.
23          So we're very committed to that.  One of the
24   things we do in our communities is we offer seminars,
25   both -- free seminars for family members of loved ones

Carise - Direct/Himelman                    64

1   with problems.  We offer support groups for them.  We
2   often go to the police, to the chief of police -- and I
3   know your chief of police here is very involved and
4   very passionate about this issue -- and we offer to do
5   educational sessions or in any way that we can, you
6   know, kind of work with them.
7             We go to schools in the area and we provide
8   free seminars.  And we also provide a place for
9   students, often in associate degree nursing programs or
10  counseling programs or up to physician assistant
11  programs we have now, too, where the students rotate in
12  our site, so to provide that.  You know, we provide
13  revenue in the forms of payroll and taxes and income --
14  income tax and -- I'm sorry, real estate tax.
15            We'll have over 200 employees.  We tend to
16  really hire locally.  In a place where you have the
17  number five employee, and we now have over 1000
18  employees, this is a place where people really can move
19  up and grow in a career.
20            Our average salary -- it's a real range, but
21  we're going to say an average is about $55,000 a year.
22  We provide a career track, like I said, for everybody.
23  We like to employ -- also, we've employed a lot of
24  retired folks and a lot of veterans in our other sites
25  to be either our drivers or other, you know, spots

Carise - Direct/Himelman                    65

1   where they feel like they can, you know, be of service
2   with us and get employed.  And really, our goal is to
3   help sick folks to get well.  And if we can do that in
4   a community, we think we can see a real ripple effect.
5        Q    Now, how will patients be covered -- you
6   mentioned that a little bit, but if you can just
7   reiterate that.  How will patients be covered and pay
8   for treatment at the proposed facility?
9        A    Typically, we are about 90 percent commercial
10  insurance.  There's often a copay or a, you know, a
11  piece that they pay up-front.  But insurance coverage
12  is quite good in general.
13            And then about 10 percent of people will
14  actually self pay.  Self pay comes in one of two ways.
15  It's either somebody that doesn't want this on their
16  insurance record -- which is a shame, because we still
17  do have the stigma of what a substance abuser is, you
18  know, that this is a bad, dirty, you know, homeless
19  person that, you know, has low willpower, as opposed to
20  somebody with, you know, a medical disorder.
21            So some people will choose to be entirely
22  self pay.  But more often, the self pay piece is when
23  insurance will cover 14, 15, 16 days, they'll pay for
24  another six, eight, nine, ten days.
25        Q    Thank you.  I don't have any further direct

1   questions, Dr. Carise.  If you wanted to add something
2   or supplement your testimony, or do you think we've
3   covered all the issues?
4   A    We've covered all the issues, but I can't help but
5   want to reinforce that this is an enormous problem in
6   our culture today, and this is -- these are not bad
7   people trying to get good.  These are sick people
8   trying to get well.  That I understand communities and
9   their concerns about things, and I hope that some of
10  what I said tonight can alleviate some of that, but
11  also that I can answer any questions.
12       I can commit to you that I will be completely
13  transparent about what we do and about how we do it.
14  And, you know, this -- the opioid crisis, which really
15  did start with pharmaceutical companies and the
16  proliferation of the medications and the teaching of
17  doctors that everybody should be in no pain and then to
18  get the measurement of pain put onto one of the five
19  vital signs, which led to doctors being sued if they
20  didn't take care of the pain and getting low health
21  grade scores and being trained by pharmaceutical
22  companies that these are not addictive, really, when
23  they really are.
24       I know Purdue Pharma was fined $624 million
25  and paid that fine which is, for them, frankly, the

1   cost of doing business.  That really started this whole
2   thing, along with a resurgence of -- of heroin from
3   Mexico.
4        We used to get about 90 percent of our heroin
5   from Colombia, and now today we get about 90 percent of
6   our heroin from Mexico.  And they really revolutionized
7   the dealing and delivery of it.  And the dealers
8   actually -- they were a no weapons, no problems,
9   customer service oriented.  They really put out -- and
10  they were often one town, frankly.  They put out --
11  they were the Domino's of heroin delivery.  It was the
12  first time, maybe eight years ago, you could call them
13  up and they would come and they would deliver to the
14  CVS near your house or this or that.
15       They were nice guys.  They specifically
16  targeted, as did Purdue Pharma, these kind of rural
17  American areas where people had -- I mean, you wonder
18  why such a problem in Kentucky and Ohio, there's really
19  real reasons why, that places that had many people who
20  had injuries from either coal mines or steel mills that
21  had shut down, many of whom were on Medicaid, they were
22  really targeted in the sales force for pharmaceutical
23  opioids and the Mexican group really followed right
24  behind them with this whole new customer service.
25       If you said to them -- I mean, they were

Carise - Direct/Himelman                    68

 1   trained in customer service.  If you said, "We don't
 2   want -- I'm going to quit.  I don't want anymore," they
 3   said, "Okay, no problem."
 4          And they'd call you up, like, four or five
 5   days later, "I just want to make sure you still quit.
 6   I've got some great stuff, but if you quit, it's okay."
 7   And they really revolutionized.
 8          So those two things really developed this
 9   into a problem that is, frankly, middle class America.
10   These are your spouses.  These are your kids.  These
11   are your neighbors.  These are your coworkers.
12          And I just can't impress how different that
13   is and how much we've also had to adjust treatment for
14   that and that we really need to get a handle on this
15   before it gets worse.
16          MR. HIMELMAN:  Thank you very much for your
17   detailed and well thought out explanation.
18          Mr. Chairman, do you have -- does the board
19   or your professionals have any questions for Dr.
20   Carise?
21          MR. CHAIRMAN:  I'm sure we have some
22   questions.
23   EXAMINATION BY VICE CHAIRMAN HENRY:
24     Q    Now, just to clarify a couple of things here.
25   Now, do you have a security guard there?


Carise - Examination/Vice Chairman Henry     69

 1     A    We do.  We have a full time, and we have about
 2   anywhere from 8 to 12 basically security staff.  Yeah.
 3     Q    Okay.
 4     A    We -- again, I'll be totally up-front.  We do not
 5   have an armed guard there.
 6     Q    Right.  No.  I was just curious.
 7     A    Okay.  I just want to be clear.
 8     Q    Yeah, someone to take care of any problems
 9   that might come about or something like that.
10     A    Yes.  Absolutely.
11     Q    Now, you say they can leave, technically.
12   They're not locked in there.
13     A    That's right.
14     Q    They can leave technically at any time they
15   want.  Say if someone wanted to leave at 2:00 o'clock
16   in the morning, they're not sure about it.  They just
17   go out and leave.
18     A    Yep.
19     Q    Would you call the police?
20     A    Yes, we would.  There's a very clear protocol.  So
21   if they left at 2:00 in the morning, you've got to
22   appreciate, they're leaving without their phone,
23   without their keys, without their wallet, without their
24   money.  It's 2:00 in the morning.  They go out a door.
25   The door is locked and alarmed.  An alarm will go off

```
 1    at all of the nurse's station, and there's a very clear
 2    protocol of who goes and goes right to that area to
 3    find the person.
 4              If we find the person, we try very, very hard
 5    to bring them back in.  We talk to them about how we
 6    want to give their money and their keys back and their
 7    phone back.  That will give them transportation home.
 8    If we cannot do that, frankly, they are now not a
 9    patient of ours.  They are, frankly, what do you call
10    it, trespassing.  And we will call the police to let
11    them know the person left.
12              I will tell you, this has not happened in any
13    of our sites yet.  But if that happened, we have a very
14    clear protocol about it, and we would call the police,
15    yes.
16         Q    And how many people do you have on staff,
17    say, the midnight shift, 12:00 to 7:00 or so?
18    A    I would say -- we have 115 during the day.  I'm
19    going to say we have 90 overnight.  Yeah.
20         Q    Do you take criminals?
21    A    Do we take criminals?
22         Q    Yes.
23    A    I'm pretty sure, based on New Jersey law, we can't
24    decline somebody because they're a criminal, because
25    this is a group that's covered by the ADA.
```

```
 1              So we can't decline them because they're a
 2    criminal.  We ask them and we ask their collateral
 3    spouses all about criminal activity, about setting
 4    fires.
 5              I can decline to take somebody because
 6    they've engaged in activity that would be harmful to
 7    our patients, possibly our staff, and even our
 8    neighbors.  So I can decline them for that, but I can't
 9    decline them for -- you know, I can't say, "You're a
10    criminal, so we won't take you."
11         Q    Right.
12    A    But we have very clear things.  I've never once
13    taken somebody who's had an arson problem.
14         Q    Now, do you supply Methadone?  I know there's
15    Methadone clinics out there.  Do you do that kind of
16    service?
17    A    No.  We're not a Methadone clinic.  In detox, we
18    use medications so that we can taper them down off
19    their drug.  Typically, it's Suboxone or other
20    medications like that, but we are not a Methadone
21    clinic.  We will not do Methadone outpatient.  It's a
22    whole separate license with a whole separate DEA
23    license as well.  That is not what we do.
24         Q    Yeah, I think you just might have mentioned
25    it.  I'm not sure.  Have you had problems at other
```

1    locations, you know, criminal-type problems, so to say?
2    A    Criminal theft problems, did you say?
3         Q    Well, at other locations, someone wanted to
4    leave and -- I don't know --
5    A    We haven't had people leave in the middle of the
6    night, and we haven't had any kind of theft problems.
7         We've had clinical problems.  We've had --
8         Q    But you haven't had any kind of problems
9    where people from your facility have gone and created
10   some kind of robbery or anything else like that?
11   A    Absolutely not.  Yeah.
12        Q    And what is your success rate for the people?
13   A    It's a great question with a terrible answer.  You
14   know, we're a field that doesn't have a definition of
15   success.  And when we do define success, we do it in a
16   terrible way.  We define it as though -- success in
17   diabetes treatment means that a year after treatment
18   you've never had a sugar crisis.
19        So when a field does define success, they
20   tend to say sober for one year.  First of all, we
21   haven't been open that long.  But also, we -- you know,
22   we're not defining success that way.
23        We would define success by things like less
24   ER visits, less time -- less family discord.  And we
25   collect data on that, but we're fairly new.

1         VICE CHAIRMAN HENRY:  Thank you.
2         MR. HIMELMAN:  For the record, I did verify
3    the license that's required.
4         THE WITNESS:  Thank you.
5         MR. HIMELMAN:  So that would be issued by the
6    New Jersey Department of Health, Division of Mental
7    Health and Addiction Services.  And they are licensed
8    for the following programs:  general outpatient
9    program, intensive outpatient program, partial care
10   program, subacute residential detox, and long-term
11   residential program.
12        MR. SACHS:  Thank you.
13        MR. HIMELMAN:  You're welcome.
14        MR. CHAIRMAN:  I have a couple of questions.
15   EXAMINATION BY MR. CHAIRMAN:
16        Q    Could you clarify again how -- how much of
17   your staff is on staff from, say, midnight until 7:00
18   o'clock in the morning?
19   A    You know, I don't have the exact number.  I can
20   get that for you.  It is less than is on during the
21   day, because the administrative staff aren't there.
22   But I don't -- do any of you guys have the numbers of
23   that?  Yeah, I can look it up and get it for you.
24        It is not -- I will tell you this.  It is not
25   a skeleton staff.  We have, again, always a full-time

```
 1    RN.  We have nurses, LPN's.  We have those recovery
 2    support staff.  We have the people doing the rounds
 3    during the day.  We have the ground rounds outside at
 4    night.  But I can get you an exact number.
 5        Q    Okay.
 6    A    I'm sorry.  I don't have that right away.
 7        Q    And I want to clarify this.  Did you say
 8    before if a person overdoses in your facility that they
 9    are taken to a hospital, a local hospital?  Am I
10    correct in that?
11    A    Yes.
12        Q    That is automatic?
13    A    That is automatic.
14        Q    They're taken to a hospital?
15    A    Oh, absolutely.
16        Q    Okay.  Let's say that a person in Sayreville
17    is drunk and disorderly and he's picked up by the
18    Sayreville Police Department and he's taken to the
19    hospital.  Let's say Perth Amboy or New Brunswick.
20    A    Okay.
21        Q    And while he's at that hospital, that
22    hospital decides to call you --
23    A    Yeah.
24        Q    -- and ask you for a referral admission.
25    Would you do that?
```

```
 1    A    We would have -- we would have --
 2             MR. SACHS:  Let me just stop for a second.
 3    You're talking about someone who is arrested?  Because
 4    my understanding is the applicant has agreed -- and I
 5    believe this would have to be a condition if this board
 6    were to act favorably, that you will not accept any
 7    referrals from any criminal agency in the State of New
 8    Jersey.  That would include Department of Corrections.
 9    That would include the Superior Court of New Jersey.
10    That would include the Sayreville Municipal Court or
11    any other authority.  I mean, so -- is that what you
12    were alluding to, Mr. Chairman?
13             MR. CHAIRMAN:  Well, there are times when the
14    person is just taken to the hospital without an arrest.
15             MR. HIMELMAN:  That's different.
16             MR. SACHS:  Okay.  That's different.
17    BY MR. CHAIRMAN:
18        Q    What you're saying, if we're going to use the
19    two prongs here, if there is an arrest, you're not
20    going to accept him, correct?
21    A    What --
22        Q    I think you've stipulated that you do not
23    take any -- any referrals from any -- from any criminal
24    courts or law enforcement agencies.
25             MR. HIMELMAN:  Mr. Sachs, that's my
```

Carise - Examination/Mr. Sachs                    76

```
 1    understanding.
 2    BY MR. CHAIRMAN:
 3         Q    That is something that is akin to a prison.
 4              MR. HIMELMAN:  No.  Mr. Sachs, that's my
 5    understanding.  I believe you're correct.
 6              THE WITNESS:  Yeah.  That's right.
 7              MR. SACHS:  All right.  All right.  I just
 8    want to make sure that's clear.
 9              MR. HIMELMAN:  And I think she testified to
10    that.
11              MR. SACHS:  All right.
12              MR. HIMELMAN:  You can clarify.
13              THE WITNESS:  You know, let me --
14              MR. ESPOSITO:  Well, you're a criminal --
15    after you get arrested, you're a criminal after you get
16    found guilty in court.  There is that fine line.
17              MR. SACHS:  Well, yeah.  I don't think -- I
18    don't think there could be a restriction of this site
19    to not accept someone who has been convicted of a crime
20    at some point in their past.  And I think that's a
21    screening process that I think this witness has
22    testified to.
23              MR. HIMELMAN:  That's correct.
24              MR. CHAIRMAN:  So I don't want to play on
25    words when you talk a criminal arrest.  I'm talking
```

Carise - Examination/Mr. Chairman                    77

```
 1    about someone who, let's say, is intoxicated, drunk,
 2    and disorderly, which is a very minor charge.  Yes,
 3    there is an arrest there.  He's being held against his
 4    will, or she is being held against the will, but taken
 5    to the hospital, and they say, "Let's call RCA up and
 6    ask if you'll take them."
 7    BY MR. CHAIRMAN:
 8         Q    That's what I'm asking.  Would you -- do you
 9    take those kind of referrals?
10    A    Are they still being held against their will, and
11    are they sending us to be held against their will?  No,
12    we wouldn't take that.
13         Q    You wouldn't take that?
14    A    No.  Now -- and, again, I just wanted to be as
15    transparent as possible.  Do we take people that have
16    been -- whose lawyers say, "You know, you've been, you
17    know, arrested for drunk driving, it would look good if
18    you're treatment"?
19         Q    That's different.  I understand.
20    A    Okay.  I just want to make sure.  I don't want to
21    --
22              MR. HIMELMAN:  That's a different -- the
23    question is are we taking referrals directly from any
24    --
25              THE WITNESS:  No.  We don't take directly
```

Carise - Examination/Unidentified Speaker          78

1      from criminal justice system --
2              MR. HIMELMAN:  -- any criminal --
3              THE WITNESS:  We're never -- never in lieu of
4      jail.  Never.
5              MR. CHAIRMAN:  Right.  That's -- I want that
6      --
7              THE WITNESS:  I just want to make sure.  I
8      want to be as honest as, you know, possible.
9              MR. SACHS:  Well, you can be transparent, but
10     I'm going to tell you -- and I appreciate that -- but I
11     want it to be clear what stipulations could be imposed
12     here if this board acts favorably, and I'm going to
13     tell you, that would be one of them.
14             MR. HIMELMAN:  We understand.
15             MR. SACHS:  Amongst others, but --
16             MR. HIMELMAN:  Chairman Green, are you
17     comfortable with that response?
18             MR. CHAIRMAN:  Yes.  Okay.  Does the board
19     have any other questions?
20             UNIDENTIFIED SPEAKER:  I have a couple.
21             THE WITNESS:  Okay.
22     EXAMINATION BY UNIDENTIFIED SPEAKER:
23         Q    What determines outpatient versus inpatient?
24     A    That's a great question.  There is a set of
25     criteria from the American Association of Addiction

---

Carise - Examination/Unidentified Speaker          79

1      Medicine, and they have very specific criteria, as do
2      the insurance companies, as to what they will cover in
3      inpatient versus outpatient.
4              It's incredibly common that insurances will
5      say, "They don't need in-patient, they need
6      outpatient."
7              In an ideal world, somebody gets some time
8      away from the world to focus 24 hours a day on getting
9      well, and then they get continued in the outpatient.
10     We don't want to provide a higher level of care than
11     they need, but we don't want to provide a lower level
12     of care than they need.  So we go by the AAAM criteria.
13         Q    Do you have patients who are in-patient,
14     complete the program, and then go into outpatient?
15     A    Yes.  Yeah.  Almost all of our outpatients are
16     patients from our own facility.
17         Q    Okay.  The second one is emergency treatment.
18     And you mentioned they would be transported to a
19     hospital for treatment.  And the transportation would
20     be by private ambulance or --
21     A    Yes.
22         Q    Okay.
23     A    Yeah.
24         Q    Because we have a volunteer first aid squad.
25     A    Well, actually, I'm sorry, because I thought you

Carise - Examination/Unidentified Speaker          80

1   meant by private ambulances versus would RCA drive
2   them.  If there's an emergency, we're not going to
3   drive them.  So I'd have to learn more about that, but
4   I can imagine it can be either, but I don't know enough
5   to know that.
6           What I do know is if there's a medical
7   emergency, we're not putting them in our car and taking
8   them, because we want medical -- you know, high level
9   medical as fast as possible.
10      Q     And are there -- or will there be any
11  arrangements with a specific hospital?
12      A     What we generally do is before we open up in an
13  area, we go to talk to the local hospitals and we talk
14  to them about -- you know, in some places they'll say,
15  "No, you have to go here first, you go there first," so
16  we try to make these liaison arrangements with the
17  hospital, so that they know we're there and that when
18  they call, you know, they're familiar with us.
19      Q     And I guess my final question is with regard
20  to a program to detect collusion between a staff member
21  and a patient.
22      A     Yep.  Got it.  So we have a lot of things in place
23  for that.  There are some things that you can just --
24  you spell it out to your staff, and they sign a
25  commitment form that that's what they will do.  So, for

---

Carise - Examination/Unidentified Speaker          81

1   example, male staff members are not allowed alone in a
2   female's room ever, for any reason.  There has to be
3   two people.
4           And they will -- they can get fired if they
5   are in a room with a female, whether it's a group room,
6   the bedroom, whatever, whether they're fixing the TV,
7   you know, whatever.  And so that's one of them.
8           We have -- on the women's unit -- we're going
9   to actually separate women and men, because we -- this
10  is an issue that -- that men and women are, you know,
11  bound to want to join each other, join together, so we
12  do -- in this site we're separating men and women.
13  When possible, all of the staff on the women's unit
14  will be female staff.  When that's simply not possible,
15  a male staff will never be alone with a female staff.
16      Q     Okay.  Now, what about if you have contraband
17  that has been taken from a patient coming that's
18  secured?
19      A     Yes.
20      Q     Does the staff have access to that to share
21  with patients?
22      A     There will be one or two staff that have a key to
23  that room.  If -- I can tell you if we found a staff
24  member sharing it with them, we would fire them
25  immediately.  I can --

1          Q    I know, for example, hospitals have codes
2     that they use that they can track then who accessed
3     that.
4     A    Oh, yeah.  Oh, yeah.  Yeah.  There's only, like,
5     two people that will have a key to that.  So if it's
6     open, it's going to be one of two people.
7               The -- the worst thing we've had is a staff
8     member that feels bad for a patient and lets them call
9     their mother on their cell phone, because they don't
10    know the number.  But even that is not acceptable.
11              MR. HIMELMAN:  Can I just ask a follow-up
12    question about the referrals?
13    EXAMINATION BY MR. HIMELMAN:
14         Q    So I presume that many of your records -- if
15    I'm wrong -- many of the referrals would be from local
16    medical practices and medical groups from the area?  Is
17    that fair to say?
18    A    It's fair to say.  36 percent come from either
19    local hospitals or other treatment programs.  It's very
20    interesting that in this field the medical profession
21    is typically a low referral source comparatively to the
22    others.  It's very interesting to me.
23              It's not surprising when you realize that
24    until just recently there was absolutely no education
25    required on substance use treatment or substance use

1     disorders in medical schools, and now we have a
2     requirement of, like, a two-hour class on it, which is
3     just crazy.  So it doesn't surprise me that they don't
4     refer as often.
5               But we do have people that are in the
6     community that work for RCA that make relationships
7     with docs that might need us.  They will make
8     relationship with, you know, different healthcare
9     providers to let them know that we're here and try and,
10    you know, boost that up.  But it's interesting.
11              MR. HIMELMAN:  Thank you.  Chairman Green,
12    did you have any other questions?
13              MS. CATALLO:  I have a question.
14    EXAMINATION BY MS. CATALLO:
15         Q    You mentioned you treat drug addiction,
16    alcohol addiction, and you mentioned something about
17    mental health disorders.
18    A    Right.
19         Q    Can you explain that to me?
20    A    Yeah, I can.  We -- many of our patients coming in
21    have a co-occurring mental health diagnosis.  It's
22    typically anxiety disorder or depression.  We are not a
23    psychiatric facility in the sense that we don't take
24    patients who just have a psychiatric disorder and not
25    substance use disorder.

1         The psychiatric disorder, sometimes it's
2    tough to tell, but it's usually -- it's definitely
3    secondary in terms of the presenting problem at that
4    moment.  I think it's incredibly important that we have
5    psychiatry availability that people can talk with
6    somebody about what's going on.  I believe strongly
7    that giving a diabetic insulin and giving somebody who
8    is profoundly depressed an antidepressant are very
9    equivalent things.
10        That said, we really, you know, are very
11   careful about what we would prescribe to somebody with
12   a substance use disorder, as is anybody in recovery
13   careful about what they would take.
14   EXAMINATION BY MR. CHAIRMAN:
15        Q    Question.  Do you accept Medicare or Medicaid
16   patients?
17   A    In two of our sites, we do, and in three of our
18   sites, we don't.  I think part of it depends upon the
19   need, what's available, and whether or not we can get a
20   good -- a contract with them that allows us to treat
21   them.
22        I think that we do not have it planned for
23   this facility.  We have a facility in New Jersey
24   already, and we have checked out, you know, what it
25   would be like to take Medicaid patients, and it's not a

1    viable thing for this state right now.  I believe it
2    might be possible in the future, because I -- honestly,
3    I don't want to not care for people who need our care.
4         But right now, it's not something that we do
5    in New Jersey, and I -- I don't know that it would
6    change.
7    EXAMINATION BY MR. ESPOSITO:
8         Q    Is there -- is it a financial reason that you
9    don't?  They don't pay as well?
10   A    Um --
11        Q    I mean, it's fine.  I'm a capitalist.  I like
12   money.
13   A    You know what, it's okay.  It's not the only
14   reason.  Part of it is some of the rubrics.  But let me
15   give you an example.
16        Q    Please.
17   A    Medicaid may pay $200 a day to treat a patient.
18   It costs us 500 or 600, you know, a day for our staff.
19        Q    Sure.
20   A    You know, we had another state that negotiated a
21   way that we could break even with them, and so we want
22   to be able to treat everybody with this disease.
23        Q    Okay.  So it's not so much the financial
24   status of the person, it's the payout of Medicare?
25   A    Yeah.

1      Q    Okay.  That's -- thank you.
2           MR. CHAIRMAN:  Any other questions?
3           MR. EMMA:  I have a couple of questions.
4    EXAMINATION BY MR. EMMA:
5      Q    As far as, like, the monitoring, the patients
6    are monitored at all times, except for the bathroom?
7    A    Right.  Yes.
8      Q    You spoke about the cameras.  Now, the
9    nurse's stations, they have the ability to view some of
10   the -- some of the cameras?
11   A    The camera guy actually is here.  Maybe he can do
12   more.  But -- is he allowed to -- I'm sorry.
13           MR. HIMELMAN:  We do have someone here who is
14   familiar with our security system protocol, and we can
15   certainly have him brought up, if need be.  But why
16   don't you ask your question, and then we can see where
17   we can go from there.
18   BY MR. EMMA:
19     Q    Well, I'm wondering how much -- how many of
20   the cameras do they get to view?  And are you relying
21   on the nurses to actually monitor these cameras?
22   Because you talked about you have about eight to ten
23   security staff.  Do they do that also?
24   A    They do that also.  And the nurses have -- again,
25   there is 150 to 200 cameras.  The nurses will have, I

1    believe, visibility to all the cameras on their unit,
2    as well as the fact that if a door is opened that is
3    not supposed to be opened, they will all get a buzz,
4    you know, an alarm that will go off at the nurse's
5    station.  It's something that when nurses are there
6    doing paperwork, they can see right away.
7           The other thing I don't think I mentioned
8    earlier is that the cameras record, some motion
9    detected, some all the time.  And that is not taped
10   over, you know, a week or two weeks later.  That is
11   kept.  And right now it's kept indefinitely.
12     Q    Okay.  The doors are armed.  Are the windows
13   armed, and can they -- do they have the ability to
14   climb out of a window?
15   A    They don't have the ability to climb out of a
16   window.  I don't know if we have them basically
17   permanently locked or armed.  And one of the reasons
18   for that, too, is the safety issue for patients to not
19   be able to crawl out of a window, as well as, you know,
20   not wanting them to leave.
21           The other piece is that with the RFID
22   bracelets, they're very -- they're significant
23   bracelets.  They're not like ankle bracelets, but they
24   are very sturdy bracelets.  And there are -- you can
25   imagine in a place like this, there are no knives,

1   there are no scissors hanging around.  They are very
2   hard to get off.  So the idea that somebody could get
3   one of those off and leave from their bed is -- is hard
4   to imagine.
5        Q    Are all the residential units on the -- this
6   is like two floors?  Three floors?  That's a picture of
7   it?
8             MR. HIMELMAN:  Well, that's a picture of the
9   current building under construction.
10  BY MR. EMMA:
11       Q    So there aren't going to be any rooms on the
12  bottom floor, so they wouldn't have the ability to
13  climb out of a window?
14  A    I don't know if we have patients on the bottom
15  floor, because I tend to get involved with the
16  clinical.
17            Do we have patients on the bottom floor?
18            UNIDENTIFIED SPEAKER: No.
19  A    No.  No patients on the bottom floor.  That's
20  pretty common.
21       Q    All right.  So they're all upstairs.
22  A    And, again, because this building -- we have a
23  prototype if we build a building that I know there
24  wouldn't be any.  But when we take a building that's
25  almost done, sometimes it's different.  But there are

1   no patient rooms scheduled for the bottom floor, and
2   the -- you know, the windows are locked.
3             MR. HIMELMAN:  And it's my understanding we
4   can have further testimony that the windows are not
5   operable, so nobody could just get out.
6             THE WITNESS:  Right.
7             MR. CHAIRMAN:  I have another question, but
8   I'm not sure that it's for you.  I'll throw the
9   question out there so that when the right person comes
10  --
11            THE WITNESS:  Thank you.
12            MR. CHAIRMAN: -- to the microphone, they'll
13  be able to answer it.
14            MR. HIMELMAN:  Sure.
15            MR. CHAIRMAN:  It's my understanding that RCA
16  is going to lease this property from Briarwood.  Am I
17  correct in that statement?
18            MR. HIMELMAN:  From the current owner,
19  correct.
20            MR. CHAIRMAN:  From the current owner.  Is
21  this -- what kind of a lease is this?  Is this a
22  short-term lease, a long-term lease?  What's the
23  expected time element that this lease will be in
24  effect?
25            MR. HIMELMAN:  I am not sure of the details

1   of that, because that's being negotiated at this point.
2   I certainly can have a representative of the applicant
3   address that question.
4            UNIDENTIFIED SPEAKER: 15 years.
5            MR. HIMELMAN:  Oh, a 15-year lease.
6            UNIDENTIFIED SPEAKER: With four ten-year
7   options.
8            MR. HIMELMAN:  With four ten-year options.
9            THE WITNESS:  That's what I was going to say.
10           MR. CHAIRMAN: Okay.  So it's a long-term
11  lease?
12           MR. HIMELMAN:  Yes.
13           MR. ESPOSITO: Whose option?  Yours or theirs?
14           MR. SACHS: The tenant's.
15           MR. HIMELMAN:  It would be the tenant's
16  option.
17           MR. ESPOSITO: Okay.
18           MR. CHAIRMAN: Always will be the tenant's
19  option.
20           MR. ESPOSITO: Always?  Okay.
21           MR. CHAIRMAN: Yeah.  Any other questions from
22  the Board?
23           THE WITNESS:  Thank you so much for your
24  patience and your --
25           MR. HIMELMAN:  Mr. Sachs, I do have some

1   handouts that I would probably want to mark.  This is
2   just for the -- pretty much providing a lot of the
3   information in detail that this witness provided.  I
4   mean, we can have it marked or -- but I do have
5   handouts which reflect a lot of the information, plus
6   there are some pictures of existing facilities, either
7   that are approved or under construction or operating by
8   RCA.
9            MR. SACHS:  My only concern is the -- is the
10  hearsay issue, if it's not being testified to.
11           MR. HIMELMAN:  Well, I understand that.  I
12  mean, a lot of the information is what she did testify
13  to.
14           MR. SACHS:  I think the record will reflect
15  that.  If you like, Mr. Himelman, I'll take a look at
16  it.
17           MR. HIMELMAN:  Okay.
18           MR. SACHS:  I think maybe we'll probably be
19  taking a break anyway, because we've been going for
20  about an hour and a half.  But I'll take a look at it.
21  If it's -- if it's something that wasn't testified to,
22  I would probably exclude it as hearsay.  But if it's
23  part of her -- you know, I mean, we do have --
24  obviously --
25           MR. HIMELMAN:  And we have other witnesses,

Carise - Examination/Mr. Emma                    92

1       also.
2               MR. SACHS:  I understand.  Yeah.  Okay.
3       That's fine.
4               MR. HIMELMAN:  Thank you.
5               THE WITNESS:  Just so you know, I was just
6       told, we do take Medicaid for out-patient in New
7       Jersey.
8               MR. HIMELMAN:  Okay.
9               UNIDENTIFIED SPEAKER: Medicaid or Medicare?
10              THE WITNESS:  I'm sorry.  Medicare.
11              UNIDENTIFIED SPEAKER: Medicare.
12              THE WITNESS:  No, I'm sorry.
13              MR. HIMELMAN:  Medicaid.
14              THE WITNESS:  Medicaid.
15              MR. HIMELMAN:  Medicaid.
16              THE WITNESS:  Medicaid.
17              MR. HIMELMAN:  Medicaid through the state.
18              UNIDENTIFIED SPEAKER: Medicaid?
19              MR. HIMELMAN:  Medicaid, yes.
20              MR. CHAIRMAN:  We're going to take a
21      ten-minute break.
22              MR. HIMELMAN:  Done.
23              MR. CHAIRMAN:  We'll resume with your next
24      witness.
25              MR. HIMELMAN:  Thank you very much.


                            Colloquy                         93

1               (Recess)
2               MR. CHAIRMAN:  Okay.  I'm going to call this
3       meeting back to order.  First I need a roll call.
4               THE CLERK:  Mr. Green?
5               MR. GREEN:  Here.
6               THE CLERK:  Mr. Kreismer?
7               MR. KREISMER:  Here.
8               THE CLERK:  Ms. Catallo?
9               MS. CATALLO:  Here.
10              THE CLERK:  Mr. Corrigan?
11              MR. CORRIGAN:  Here.
12              THE CLERK:  Mr. Henry?
13              MR. HENRY:  Here.
14              THE CLERK:  Mr. Emma?
15              MR. EMMA:  Here.
16              THE CLERK:  Mr. Esposito?
17              MR. CHAIRMAN:  Okay.  Before we continue, Mr.
18      Sachs has a statement he wants to make to --
19              MR. SACHS:  Thank you, Mr. Chairman.  And
20      this is, I think, directed to the members of the
21      public, just so -- to give you an understanding of
22      what's going to be proceeding for the rest of the
23      evening and whether or not this application will be
24      voted on this evening.
25              First of all, we can only go until about

Colloquy                    94

1   10:15 this evening.  So we have about another hour.  I
2   know Mr. Himelman has four more witnesses.  I'm
3   assuming we'll get through maybe at least two, maybe
4   three.  All right.  But it's -- we're obviously going
5   to come back at another meeting, most likely our next
6   meeting in -- next scheduled zoning board meeting,
7   which is in December.  All right.
8            And at that particular time, if you have
9   questions, all of their witnesses will be back here.
10  All of their five witnesses will be back here, and
11  you'll have an opportunity during that public portion
12  to ask any questions you might have.
13           All right.  So does that answer some of the
14  questions that were raised during the break?  Okay.
15  All right.  Thank you.
16           MR. CHAIRMAN:  Before we continue, Joan, what
17  is our meeting date for December?
18           THE CLERK:  December 13th.
19           MR. CHAIRMAN:  December 13th?
20           THE CLERK:  December 13th.  We do have a
21  couple of uses and --
22           MR. CHAIRMAN:  So it will be December 13th.
23  And you will not receive any further notice, but don't
24  leave, because we probably have another hour's worth of
25  testimony.  All right.  But December 13th will be the

---

Colloquy                    95

1   zoning board meeting when this application will be
2   carried to.  And I would assume it will be carried to
3   conclusion on that evening.  All right.
4            And at that meeting on December 13th, I will
5   open it up to the public, and you'll get your
6   opportunity to ask any questions that you have and
7   discuss it further.  Okay.  Mr. Himelman --
8            MR. HIMELMAN:  Yes.
9            MR. CHAIRMAN:  -- December 13th will be that
10  next one.
11           MR. HIMELMAN:  Yes, Mr. Chairman.
12           MR. CHAIRMAN:  That's -- you're agreeable
13  with that?
14           MR. HIMELMAN:  Yes.  I mean, obviously, we
15  would have liked to have gotten through the testimony,
16  but we understand one of your board members has to
17  leave at 10:15.
18           MR. CHAIRMAN:  Let's see how far you get.
19           MR. HIMELMAN:  Right.
20           MR. CHAIRMAN:  Let's see how far you get.
21           MR. HIMELMAN:  Very good.  Thank you, Mr.
22  Chairman.
23           MR. CHAIRMAN:  Proceed.
24           MR. HIMELMAN:  Next we have Scott Turner, who
25  is our civil site engineer from Menlo Engineering.  We

1    would have to have him sworn and qualified.
2            Scott.
3            MR. CHAIRMAN:  Mr. Turner, please raise your
4    right hand.
5    S C O T T   T U R N E R, WITNESS, SWORN
6            MR. CHAIRMAN:  Please state your name,
7    spelling your last name, professional affiliation for
8    the record.
9            THE WITNESS:  Scott Turner, T-U-R-N-E-R.  And
10   I -- I work for Menlo Engineering Associates.
11   DIRECT EXAMINATION BY MR. HIMELMAN:
12        Q    And can you just give a brief description of
13   your professional background, licenses you've held, and
14   if you've testified before any zoning and planning
15   boards in the State of New Jersey?
16   A    Sure.
17        Q    Thank you.
18   A    Yes.  I am a graduate of the New Jersey Institute
19   of Technology.  I hold a bachelor's of science degree
20   in civil engineering.  I'm a principal engineer with
21   Menlo Engineering Associates.  I have nearly 30 years
22   of experience in the field of civil engineer and land
23   development.  I'm a licensed professional engineer in
24   the State of New Jersey, and I have provided
25   professional engineering testimony in front of many

1    planning and zoning boards throughout the State of New
2    Jersey.
3            MR. HIMELMAN:  Thank you, Mr. Turner.  I
4    would offer him, Mr. Sachs, as an expert in civil and
5    site engineering.
6            MR. SACHS:  I believe Mr. Turner has
7    testified here on other occasions.
8            THE WITNESS:  I have.
9            MR. SACHS:  So, Mr. Chairman --
10           MR. CHAIRMAN:  Make the motion that we accept
11   his credentials?
12           UNIDENTIFIED SPEAKER: So moved.
13           UNIDENTIFIED SPEAKER: Second.
14           MR. CHAIRMAN:  Proceed.
15           MR. SACHS:  Thank you, Mr. Chairman.
16           MR. HIMELMAN:  Thank you, Mr. Chairman.
17   BY MR. HIMELMAN:
18        Q    Mr. Turner, I understand you've brought
19   several exhibits with you this evening.  We can have
20   those marked.
21           Before we do that, though, just to sort of
22   orient the Board and the members of the public, it's my
23   understanding that your testimony primarily relates to
24   an amended site plan application that was originally
25   filed with the Sayreville Planning Board to increase

Turner - Direct/Himelman                98

1    the parking at this particular property location; is
2    that correct?
3    A    Yes, that is correct.
4         Q    Okay.  And have you brought any exhibits with
5    you for this evening?
6    A    I have.  I have one exhibit that I plan on using,
7    so I'd like to mark that one.
8         Q    Please.  Why don't you have that marked.
9              MR. SACHS:  Let's mark that as A-1.
10             (EXHIBIT A-1 MARKED FOR IDENTIFICATION)
11             THE WITNESS:  Marked as A-1.
12   BY MR. HIMELMAN:
13        Q    Okay.  Mr. Turner, now, under your direction
14   or through Menlo, did your -- did you or your office
15   prepare an amended site plan relating to the additional
16   parking?
17   A    Yes.
18        Q    And, if so, if you would briefly walk the
19   Board through that application and the proposed site
20   plan amendment and describe in detail the proposed
21   revisions from the original site plan which was
22   approved by the planning board.  Thank you.
23   A    Sure.  I will.  First of all, good evening, Mr.
24   Chairman, Board members.  It's nice to see you all.
25             I'm going to start by giving you a brief

Turner - Direct/Himelman                99

1    overview of the property and the surrounding land uses.
2    The property is, for the record, known as Block 438,
3    Lot 1, and Block 452, Lot 1, and it is located on the
4    north side of Ernston Road, just east of the Garden
5    State Overpass.
6              Ernston Road on this exhibit map, which was
7    just marked as A-1, is an exhibit prepared by my office
8    that's entitled, "Briarwood Site Plan Exhibit," dated
9    November 8, 2017.  Just for orientation purposes,
10   Ernston Road is on the right-hand side of the sheet.
11   North is -- for the purposes of orientation again will
12   be -- I'm going to assume north is sort of pointing to
13   the left of the sheet.  So east would be heading
14   straight up off the sheet to the top.
15             So, again, the site is located on the
16   northern side of Ernston Road, just east of the Garden
17   State Overpass, which is located just off the bottom of
18   the sheet here.  The property contains 6.69 acres.
19   It's approximately 427 feet wide by 620 feet deep.
20             To the south is the Harbor Club multi-family
21   residential development.  That is the development
22   across the street on Ernston Road from the property.
23   The property is to the east, heading down Ernston Road
24   towards Route 35.  Off the top of the sheet is
25   primarily wooded properties, open water properties,

1   until you get almost all the way down to Route 35,
2   where you start to see the commercial development
3   occurring.
4            To the north, which is behind the building
5   that's currently under construction, the property is
6   heavily wooded and even beyond the limits of the rear
7   of our property, it is encumbered by freshwater
8   wetlands, which would prohibit any further development
9   to the rear.
10           And the property is also, of course, governed
11  by the prime zoning standards.  The site is currently
12  under construction.  The building is up.  It's been
13  built in accordance with its current approval, which is
14  for occupancy as a nursing home facility.  The building
15  is a three-story building, with a basement.  It has a
16  total gross floor area of 130,966 square feet, which
17  includes the basement.
18           There is no change or footprint modifications
19  with respect to the building under this application.
20  The parking lot, you can certainly get up to the site.
21  There is an existing driveway off of Ernston Road that
22  will remain undisturbed.  The parking lot on site is
23  somewhat paved, not all of it, but there is a bit of
24  pavement up there now.  The rest of the area is
25  currently rough graded, and it appears that all of the

1   infrastructure, including storm water, sanitary -- gas
2   and sanitary sewer appear to all be constructed.
3            The site plan -- really what we're here for
4   is this minor site plan -- the minor site plan
5   modifications, when compared to the previously approved
6   plan.  What we did in this plan is we eliminated the
7   canopy area and the drop-off lane, and we replaced it
8   with sidewalk that will bring you to the front door
9   from the parking lot.
10  The result of eliminating that canopy is an increase of
11  front yard setback from 223.6 feet, which was
12  previously approved, to 229 feet from Ernston Road.
13           The number of parking spaces on the site have
14  been increased from 92 spaces to 130 spaces.  And the
15  landscaping has been enhanced as necessary to
16  accommodate the needs of the tree preservation.  And
17  that's based on some of the modifications that we had
18  to make to the parking lot geometry itself.
19           Lighting has also been revised as needed,
20  just, again, for those minor parking lot geometry
21  changes.  The lighting still follows the previously
22  approved set of drawings, which included a lighting
23  program of LED fixtures mounted at 20, 25 foot high.
24  Staff, I believe, has reviewed that material and I
25  believe it's been approved as -- as shown on the plans.

Turner - Direct/Himelman                    102

1         The revisions that I've just noted do -- does
2    result in a slight increase in impervious coverage on
3    the site from 37.6 percent to 38.6 percent when --
4    which is still well below the allowable coverage on the
5    site within the P zoning district, which is 85 percent.
6    There is also a slight decrease in parking lot
7    landscaping.  It goes from 11 percent down to 10
8    percent, which, again, is still compliant with
9    ordinance requirements.
10        On-site vehicular movements have not been
11   compromised by changes that we made to the plan.  We
12   still provide complete circulation around the area.  It
13   has 360 degree circulation in the parking lot, all as
14   proposed on the approved plans.
15        The loading zone, the dumpster locations,
16   remain as shown on the approved plans.  They're located
17   in the southwest corner of the building.  And
18   anticipated are two food deliveries per week and an
19   occasional box truck delivering office supplies.
20   Refuse will be picked up as normal, twice a week.
21        Once again, the site is located in the P
22   zoning district, the prime zoning district, and aside
23   from the use that you'll hear testimony on tonight, the
24   project does still comply with the bulk zoning
25   requirements, except for the previously granted

Turner - Direct/Himelman                    103

1    variance for building height.  The permitted building
2    height in the zone is 40 feet.  The planning board
3    previously granted a height of 42 feet.  And there was
4    a waiver also previously granted for the number of
5    loading zones, where we provide one on the site plan
6    where seven are required.  And there is certainly no
7    need for seven loading zones for this particular use.
8         So from a site planning standpoint, it's my
9    view and my opinion that there is no substantial
10   detriment to the public good with respect to the
11   changes that we've made to the site plan, and all of
12   the changes have been made and designed in conformance
13   with township standards, and I don't believe they
14   require any additional technical relief.
15        Q    Mr. Turner, just a couple of follow-up
16   questions, and just addressing, I think, Mr. Cornell in
17   his memo of October 25th, 2017.  He just wanted you to
18   explain -- or the applicant explain the reason for the
19   request for the additional parking.  If you could just
20   elaborate.
21        A    Sure.  Yeah.  And as you heard the testimony
22   before mine is the reason for the additional parking
23   spaces is to support the -- the additional staff that
24   will be on-site.  I believe the maximum on a shift
25   would be 115 employees.  And that leaves an additional

Turner - Direct/Himelman                    104

1   15 parking spaces for -- for visitors and/or, you know,
2   the occasional drop-off that occurs.
3         Q    Great.  And just one follow-up question.  So
4   is it your professional opinion that the proposed site
5   modification, site plan, will have any negative impact
6   to the site as originally approved as a nursing home?
7   For example, storm water impact, buffer requirements,
8   lighting, landscaping, et cetera?
9   A    No.  I believe we have addressed all of those
10  concerns.
11            MR. HIMELMAN:  Thank you very much.
12            Mr. Chairman, I don't have any further direct
13  questions for Mr. Turner unless you or the members or
14  your staff.
15            MR. CHAIRMAN:  Mr. Sachs?
16            MR. SACHS:  Yeah, I just have one question.
17  CROSS-EXAMINATION BY MR. SACHS:
18        Q    Mr. Turner, can you just show the Board the
19  area where the additional parking is going?
20  A    Yes.  The additional parking has been located
21  primarily where the previously approved plans had shown
22  the drop-off lane and the canopy, which is located
23  where the two handicapped parking stalls are shown,
24  obviously, on the northerly side of the parking lot,
25  sort of midway where the main single story entrance is

Turner - Cross/Sachs                       105

1   into the building.
2             MR. SACHS:  Okay.  Thank you.
3             MR. HIMELMAN:  Thank you very much.
4             UNIDENTIFIED SPEAKER:  Quick question.
5   EXAMINATION BY UNIDENTIFIED SPEAKER:
6         Q    The last witness talked about inpatient,
7   outpatient, how they're not mixed.  Are there separate
8   entrances for those?
9   A    I believe I -- I will tell you that I think I
10  heard that there were separate entrances, yes.
11            MR. HIMELMAN:  That's my understanding as
12  well.
13  BY UNIDENTIFIED SPEAKER:
14        Q    Where will they be on the --
15  A    I think -- I'm not sure where they are.  I'm
16  hearing that they're right next to each other.  Whether
17  that's at the main entrance or down at the entrance
18  further to the rest -- we'll get that answer for you.
19  I don't want to guess.
20  EXAMINATION BY UNIDENTIFIED SPEAKER:
21        Q    The food deliveries are box truck deliveries
22  or tractor trailers?
23  A    Food deliveries will be more than likely be by way
24  of tractor trailers.  We've modeled that and similar to
25  the prior plan, the geometry of the parking lot has

Turner - Examination/Unidentified Speaker          106

1     been designed to accommodate a tractor trailer
2     movement.
3          Q    Because I know the original property, they
4     used to get deliveries by box truck, and then they went
5     over to tractor trailers, and they had a great deal of
6     difficulty getting the trucks around that curve back
7     down at Ernston Road.
8     A    Yeah.  And we did model that.  I have been told
9     that they are the smaller tractor trailers.  They're
10    not the extra large tractor trailers that you see on
11    the interstates.  They are the smaller versions.  I
12    have no issues with them getting in and out of the
13    site.
14              UNIDENTIFIED SPEAKER: If I could, Mr. --
15    EXAMINATION BY UNIDENTIFIED SPEAKER:
16         Q    Will there be any improvements to the
17    driveway from Ernston Road up or --
18    A    No.  There are no improvements proposed other than
19    what was previously shown on the approved plans, which
20    basically include some landscape enhancements.
21         Q    Now, landscaping, like -- I see trees there.
22    Are they trees that you're proposing to put in there?
23    Are they current trees there, or --
24    A    They -- it's a combination of both.  There are
25    existing fairly substantial, large trees that are


Turner - Examination/Unidentified Speaker          107

1     located along the curb lines of that driveway.  And
2     they are kind of shown on this exhibit.  You can see
3     they're kind of the lighter circles here.
4              But interspersed in between those and in the
5     grassed area, the green area in there, we do have a
6     large quantity of additional trees to be planted.
7          Q    Would that kind of shade the building from
8     the road?
9     A    Absolutely.
10         Q    Is that what you -- more light and things
11    like that?
12    A    Sure.  More so than that will be the elevation
13    change between Ernston Road and the parking lot and the
14    building itself.  The building is not set back that
15    substantially from the road.  When you're talking about
16    height and visual appearance, when you drive down
17    Ernston Road, that building is up, it's watertight,
18    it's closed.  It's basically a completed shell.
19              I -- I had a hard time seeing it from Ernston
20    Road, because, again, it's close enough where you can't
21    see over the hill into the site and into the parking
22    lot.
23         Q    I just have one last question.  The green
24    part there, where you have, I guess, grass and things
25    like that in the back behind the building.  You're not

1   allowed to build anything back there at all?
2   A    No.  It is completely regulated.  And the
3   topography is such that you really do not want to push
4   back into that portion of the property.
5        Q    Because I was -- you know, I mentioned this
6   at the one meeting we had here about parking.  I
7   remember when it was the Briarwood, going up there,
8   people would be parking all along the -- the driveway
9   there.  And I don't know what their employee numbers
10  were, and I know most of the people just stayed there.
11            So now you're going to have a lot more -- not
12  a lot more, but you have maybe 22 people were
13  mentioned, coming, going with cars.  You have 117 staff
14  members.  My concern was just a little bit about
15  parking.  I know it's within the regulations, but,
16  again, you know, Briarwood might have been within the
17  regulations, too, but you had so many more additional
18  cars there that weren't anticipated.  And you have --
19  that's -- I just wanted to bring that up, just to see
20  if you could put more parking back there, but I guess
21  you can't.
22  A    It would be very difficult, especially since the
23  building is up and finished at this point.  And, again,
24  I think with the 130 spaces, we've substantially
25  increased the number of stalls from the prior approval

1   by 38 spaces.
2            So based on the needs that we've been told
3   that we had to try to maintain, that's what we've been
4   able to mend -- to meet.
5            UNIDENTIFIED SPEAKER: Thank you.
6            MR. CHAIRMAN:  Mr. Emma.
7   EXAMINATION BY MR. EMMA:
8        Q    Is there any fencing around the facility?
9   A    No.
10           MR. CHAIRMAN:  Anyone else have any
11  questions?  Mr. Cornell?
12  EXAMINATION BY MR. CORNELL:
13       Q    There was one item in our report that was
14  addressed with the original application but not
15  addressed with the amendment.  It has to do with the
16  installation of a sidewalk connection between Ernston
17  and the site.
18           Initially there was discussion that since it
19  was a nursing facility, that wasn't necessary.  Is
20  there any reason that is now unnecessary that you need
21  to have pedestrian access from Ernston Road leading
22  into the site?
23  A    Yeah, that's a good question, and we had some
24  discussions about that.  And right now the answer is
25  no, that we don't believe there is a need specifically

Turner - Examination/Unidentified Speaker        110

1   to undertake the installation of a sidewalk from
2   Ernston Road.
3          I was out there again today, and I drove up
4   that driveway.  And, Mr. Cornell, if you've seen that,
5   there is some fairly substantial slopes on either side
6   of that driveway.  It would be quite an undertaking to
7   get a sidewalk in there.  And, gain, based on the need
8   of the program, we just don't believe it's a necessary
9   requirement.
10         MR. CORNELL:  Thank you.
11         MR. HIMELMAN:  Thank you, Mr. Turner.
12  EXAMINATION BY UNIDENTIFIED SPEAKER:
13     Q    Any contact with the fire department in terms
14  of reviewing the site for access with their equipment?
15  A    I am sure it was all reviewed when it was under
16  the application from one or two years ago, or else we
17  wouldn't have been able to do what we've done on site
18  with building the building and putting the
19  infrastructure up, so --
20     Q    But you have made some changes.
21  A    We have made some changes, absolutely.  I have not
22  seen a report from the fire official or fire company at
23  this point.  I don't know if the Board directly does --
24  does that themselves in terms of getting it to the
25  other agencies.  If not, we'll certainly solicit that.


Pehnke - Direct/Himelman          111

1          MR. HIMELMAN:  Thank you very much.
2          UNIDENTIFIED SPEAKER: I have another
3   question.
4   EXAMINATION BY UNIDENTIFIED SPEAKER:
5      Q    Mr. Turner, I know Mr. Emma asked about
6   fencing.  Is there the ability to put fencing on the
7   perimeter of the site?
8   A    Yeah.  Yes.  Behind the building.  It would have
9   to be limited to just basically where the limits of
10  disturbance have been.
11     Q    Okay.
12  A    But there is nothing there that would prohibit us
13  from adding a fence.
14         UNIDENTIFIED SPEAKER: All right.  Thank you.
15         MR. CHAIRMAN:  Anyone else?  Any questions?
16         MR. HIMELMAN:  Mr. Chairman, thank you for
17  asking.  So no further questions for Mr. Turner?  Okay.
18  We will call our traffic consultant next.  Karl.
19         MR. CHAIRMAN:  Mr. Pehnke, please raise your
20  right hand.
21  K A R L   P E H N K E,  WITNESS, SWORN
22         MR. CHAIRMAN:  All right.  Please state your
23  name, spelling your last name, professional affiliation
24  for the record.
25         THE WITNESS:  For the record, my name is

1    Karl, with a K, Phenke, P -- as in  Peter -- E-H-N-K-E.
2    I'm a vice president with Langan Engineering and
3    Environmental Services.
4            By way of qualifications, I am a registered
5    professional engineer in the State of New Jersey, as
6    well as several other states.  My area of expertise is
7    traffic engineering.  I've been practicing for over 33
8    years, registered in New Jersey since 1992.  I have
9    appeared throughout the state, including in the
10   Borough.
11           MR. HIMELMAN:  Mr. Chairman, we would offer
12   Mr. Pehnke as an expert in the field of traffic --
13   traffic safety.
14           MR. SACHS:  Mr. Chairman, I am familiar with
15   Mr. Pehnke.  He has testified in front of many boards.
16           MR. CHAIRMAN:  Make a motion that we accept
17   --
18           MR. GREEN: So moved.
19           MR. CHAIRMAN:  Okay.  Proceed.
20           THE WITNESS:  Thank you, Mr. Chairman.
21   DIRECT EXAMINATION BY MR. HIMELMAN:
22       Q    Mr. Pehnke, it's my understanding that a
23   traffic report was submitted to this Board and prepared
24   by McDonough & Rea Associates; is that correct?
25   A    That is correct.

1        Q    Okay.  And Mr. Rea cannot be here this
2    evening.  It's my understanding that you're here
3    testifying on his behalf relative to the findings of
4    that report, correct?
5    A    That is correct.
6        Q    Okay.  And you've had an opportunity to
7    review that report and analyze it?
8    A    Yes.  I've had an opportunity to review the
9    report, the data published therein.  Also, I've had the
10   opportunity to visit the site, to converse with the
11   applicant and the operator, listen to the testimony you
12   heard this evening, as well as to independently check
13   the calculations in Mr. -- Mr. Rea's report so that I
14   was comfortable appearing before the Board on his
15   behalf this evening.
16       Q    Okay.  And what conclusions or findings does
17   the McDonough Rea report reach about traffic impact and
18   the level of service concerning the proposed facility,
19   if you would go into that detail?
20   A    Sure.  Yeah.  So, very basically, it's a very
21   straightforward report.  This Board has heard from
22   traffic engineers in the past.  The report documents a
23   collection of data that was undertaken along the site
24   at Ernston Road in order to record traffic flow along
25   the roadway system.

1          In addition, in order to project and
2    understand the traffic flow associated with the
3    proposed use on this site, the best opportunity was to
4    go and monitor and existing facility.  As you heard
5    earlier this evening, there are several existing
6    facilities that are similar that have outpatient
7    services, one being in Mays Landing.
8          The report documents a week-long traffic
9    monitoring program that was conducted of that facility
10   to understand the traffic operating conditions.  That
11   data was utilized to project the amount of traffic that
12   we would anticipate coming in and out of this facility,
13   particularly during the peak hours.  And what was
14   identified by the review of the data from Mays Landing,
15   as well as the data along with the site (indiscernible)
16   on Ernston Road was that the peak area where the
17   traffic would have its greatest impacts would occur
18   generally between 8:00 and 9:00 in the morning, which
19   also coincides with the roadway peak.
20         That's the period in the morning when there
21   is activity associated with you administrative staff
22   coming in, your therapists are coming in.  Your nursing
23   staff really is coming in a little earlier.  As you
24   heard, they're generally coming in starting at 6:00 in
25   the morning, but you have that morning activity.

1          And then the evening activity is actually a
2    little offset to the roadway peak.  The roadway peak
3    here is generally occurring from 5:30 to 6:30.  The
4    facility peaks about 4:00 to 5:00.  And what's
5    happening at that point in time is you have your
6    nursing -- your daytime nursing staff leaving, your
7    therapists leaving, your administrative staff who come
8    8:30 to 4:30 are leaving.  So that's a critical period
9    for when this facility would have its largest traffic
10   loads, coinciding with higher traffic loads on the
11   adjacent roadway system.
12         So utilizing the Mays Landing, utilizing the
13   projected difference in staffing between the two
14   facilities, Mays Landing is a smaller facility, but, as
15   you heard, there was a distinct ratio as to how these
16   are operated, 1.6 employees or staff to patients, so it
17   is a direct comparison.  We're basically able to
18   project the amount of traffic in and out of the site.
19         So during those peaks, as documented in Mr.
20   Rea's report -- and I concur with his projection based
21   upon some calculations I did -- we would anticipate
22   about 70 vehicles coming in over the course of that
23   eight to nine hours and about 30 exiting.  And it's
24   actually about the reverse of that in that evening hour
25   of 4:00 to 5:00.

Pehnke - Direct/Himelman                116

1       As you are aware, this facility has existed
2  for some time in some form.  The driveway has been
3  there and the function to a nursing home.  So the
4  location is established.  It's not a new point of
5  access on the roadway system.  I've visited the site
6  and the driveway -- the site -- the driveway is
7  actually well established.  It has great site lines as
8  you're leaving the driveway, even though it does have
9  some tight geometry as you move up the hill to climb up
10 to the plateau that the facility is located on.  As you
11 approach Ernston Road, you have great site lines
12 looking to the left and to the right.
13      And, basically, utilizing the data, the
14 traffic projections, the addition -- the existing
15 traffic flow on the roadway, we're able to analyze the
16 operation of the driveway and determine how it will
17 operate and function.  And as documented in the report,
18 and as I've independently confirmed, we're basically
19 expecting that left turns into this facility will
20 operate at very good levels of service, very little
21 delay, without any queuing on Ernston Road.  And
22 leaving the facility, again, is projected to operate in
23 B and C levels of service.  Higher levels of service
24 basically means there is very little delay in queuing
25 on the driveway approach and that people will be able

Pehnke - Direct/Himelman                117

1  to find the appropriate gaps to enter the driveway.
2       We do expect about two-thirds of the traffic
3  to head to the west, to the regional road network and
4  Route 9, with about a third heading toward Route 35.
5       So, overall, basically the findings of the
6  report is that the traffic projected associated with
7  this facility will be accommodated on the driveway.
8  The driveway will operate safely and efficiently with
9  the modest additional traffic flow along Ernston Road.
10 It certainly won't change the operating conditions
11 along Ernston Road.
12      I concur with the testimony of Mr. Turner
13 earlier this evening that the parking has been laid out
14 in a logical manner and will accommodate the types of
15 vehicles needing to come to the site, including service
16 deliveries, and that the number of parking spaces
17 proposed are actually appropriate and will accommodate
18 the needs of this particular site.
19      Q    Okay.  So just so I understand, is it your
20 testimony that the subject property that will be
21 developed for this use can accommodate the anticipated
22 traffic and that the access and exit to and from the
23 site can operate in a safe manner; is that correct?
24 A    Yes.
25      Q    Now, I think Mr. Cornell in his memorandum of

Pehnke - Direct/Himelman                    118

```
 1    October 25th had a couple of comments with regard to
 2    the traffic report.  I think you've clarified those.  I
 3    think Mr. Cornell -- there was just some -- he was
 4    pointing out some -- I guess some -- I guess some
 5    typographical or --
 6    A    Basically some typographical errors.  It did not
 7    have any impact on the conclusions of Mr. Rea's report
 8    --
 9         Q    Fine.
10    A    -- and the analysis in his report.  And certainly,
11    as a condition of approval, we could have Mr. Rea just
12    update his report to correct those issues if the Board
13    sees fit.  It has no meaningful impact on his
14    conclusions and the analysis.
15         Q    Thank you very much.  Do you think you've
16    covered all your testimony, all the points you want to
17    raise?  Do you want to add anything else?
18    A    No, that does it.
19         MR. HIMELMAN:  Okay.  Thank you.
20         Mr. Chairman, I don't have any direct
21    questions of this witness, but you or members of the
22    Board might or your staff.
23         MR. CHAIRMAN:  Anybody from the Board have
24    questions?
25         MR. ESPOSITO: I have one, please.
```

Pehnke - Examination/Mr. Esposito          119

```
 1    EXAMINATION BY MR. ESPOSITO:
 2         Q    Can you give me some sort of indication as to
 3    where -- I know where this school is, Eisenhower,
 4    right?  And you have this one turn going into it.  So
 5    Eisenhower is there (indicating)?
 6    A    So you're got the Parkway right to the west of us.
 7         Q    Okay.
 8    A    And then Eisenhower is immediate to that.
 9         Q    Okay.  So you're more towards the Gateway
10    Center?  You're that way, towards --
11    A    Correct.  So the residential community across the
12    street off of Gondeck Drive, basically Harbor Club is
13    just to the east of us.
14         Q    Gotcha.  Okay.  Okay.  I was just wondering,
15    because -- I was wondering because there's that
16    somewhat dangerous curve near the school.  And if you
17    guys are going to be making lefts out of there, I mean,
18    it's just -- it's just a dangerous area.
19    A    Yes.
20         Q    But I don't think it's going to impact it at
21    all.
22    A    Right.  The driveway has existed, which is great.
23    It would be nice to have the driveways exist before we
24    have to test the site lines.
25         Q    Yeah.
```

1    A    And this, we were actually able to go out, sit in
2    the driveway, check the site lines.  Looking left, you
3    can see way down towards --
4         Q    Sure.
5    A    -- 35.  Looking right, you see under the bridge.
6    You see through the full curve, you see
7    (indiscernible).  It actually -- it's (indiscernible)
8    simpler.
9              MR. HIMELMAN:  Any other questions?
10             THE WITNESS:  Thank you, Mr. Chairman.
11             MR. CHAIRMAN:  Mr. Himelman, you can proceed.
12             MR. HIMELMAN:  Yeah.  Thank you, Mr.
13   Chairman.  Our next witness would be our -- correction,
14   one of our planners, Mr. Higgins.
15             MR. CHAIRMAN:  Mr. Higgins, please raise your
16   right hand, and I'll swear you in.
17   J A M E S   H I G G I N S,   WITNESS, SWORN
18             MR. CHAIRMAN:  All right.  Please state your
19   name, spelling your last name, professional
20   affiliations.
21             THE WITNESS:  All right.  James W. Higgins,
22   H-I-G-G-I-N-S.  I'm a licensed professional planner in
23   the State of New Jersey.
24   DIRECT EXAMINATION BY MR. HIMELMAN:
25             Q    Thank you, Mr. Higgins.  If we could

1    just qualify you as an expert.  Can you give a brief
2    description of your professional background, education,
3    and licenses that you hold?  And we will hopefully
4    admit you as a qualified planner.
5    A    Surely.  I've been a licensed planner in the state
6    for over 40 years.  I have a bachelor of science degree
7    from Rutgers University in landscape architecture.  I
8    have testified before several hundred boards throughout
9    the state, Superior Courts, and at least five counties.
10   I have been accepted as an expert before all those
11   boards, before those -- before the Superior Court, and
12   I have been recognized by the state Supreme Court as an
13   expert in the field of planning, and I've been
14   recognized by this Board as an expert in the field of
15   planning.
16             MR. CHAIRMAN:  Okay.  I make a motion that we
17   accept his credentials.  Can I have a second on that?
18             MR. KREISMER: Second.
19             MR. HIMELMAN:  Thank you, Mr. Chairman.
20   BY MR. HIMELMAN:
21        Q    Mr. Higgins, it's my understanding that
22   you've had an opportunity to review this application,
23   and you have -- are prepared to testify on the
24   justification for the relief sought, which in this case
25   is a use D-1 variance.  So if you could outline for the

1   Board just a brief description of the application, a
2   description of the use, and your conclusions and
3   findings relative to the planning justification for the
4   relief.  Thank you.
5   A    Yes.  Surely.  Well, the application is an
6   application for a drug rehabilitation facility.  It has
7   primarily inpatient care, but also an element of
8   outpatient care associated with it.  It will be 149
9   beds with follow-up outpatient care and family
10  counseling.
11            They will provide 24-hour medical and social
12  care for extended periods of time for individuals.
13  That will include skilled nursing care,
14  interdisciplinary care planning, cognitive therapy,
15  social services, psychiatry and psychotherapy services,
16  diabetic management, pain management, diagnostic lab
17  work, movement therapy, development of social support,
18  all the things you would expect to have in a facility
19  such as this.
20            The staffing includes licensed nursing staff,
21  licensed therapists, on staff physicians, licensed
22  social service professionals, administrative
23  professionals.
24            The site is in the prime zone.  This zone
25  permits a variety of uses, including long-term care

1   facilities.  It has a definition of long-term care
2   facility, which I think is important in this instance.
3   So it's a -- a long-term care facility means facility
4   which provides a full range of 24-hour direct medical,
5   nursing, and other health services.  Registered nurses,
6   licensed practical nurses and nurse's aides provide
7   service prescribed by a resident's physician.  It is
8   for those older adults who need health supervision, but
9   not hospitalization.  The emphasis is on nursing care,
10  but restorative physical, occupational, speech, and
11  respiratory therapies are also provided.
12            This level of care may also include
13  specialized nursing services, such as intravenous
14  feeding or medication, tube feeding, injected
15  medication, daily wound care, rehabilitation services,
16  and monitoring of unstable conditions.
17            Now, your zoning officers determined that
18  this facility is not a long-term care facility, which
19  is why we're here asking for a D-1 variance at this
20  point in time.  However, I think it's important to note
21  thought many of the facilities -- many of the uses in
22  this facility are indicative of a long-term care
23  facility and very similar to a long-term care facility.
24            The application does require a D variance,
25  and a D variance requires two separate prongs of

Higgins - Direct/Himelman                    124

1    proofs.  One is the positive criteria that there is a
2    positive, a special reason for the granting of the
3    variance.  The second is that there is not going to be
4    any substantial negative impact.
5            In this instance, the use, I believe -- and I
6    think it's fairly clear -- is an inherently beneficial
7    use.  An inherently beneficial use is a use thought --
8    I'm quoting the land use law -- fundamentally serves
9    the public good and promotes the general welfare.
10           In this instance, the use provides medical,
11   therapeutic, rehabilitative, educational, and
12   recreational services under medical and nursing
13   supervision, as well as doctor supervision and to meet
14   the needs of participants in need of rehabilitation.
15   So, clearly, it's a facility that both serves the
16   public good and promotes the general welfare and
17   qualifies as an inherently beneficial use.  It's also a
18   use that's licensed by the State Board of Health, as
19   has been discussed earlier, and that there is a strong
20   public policy in the state and -- and now in the
21   nation, because the federal government has recognized
22   that the opioid crisis is a crisis that has to be dealt
23   with nationally, not just in New Jersey.
24           But there is a strong public policy in the
25   state to treat drug addiction that has been codified,

Higgins - Direct/Himelman                    125

1    as Mr. Himelman talked about earlier, if you have
2    N.J.S.A. 30:6(c)(1), which provides that, "It is
3    declared to be the public policy of this state that the
4    human suffering and social and economic loss caused by
5    drug addiction are matters of grave concern to the
6    people of the state, and it is imperative that a
7    comprehensive program be established and implemented
8    through the facilities of the state, the several
9    counties, the federal government, and local and private
10   agencies to prevent drug addiction and to provide
11   diagnosis, treatment, care, and rehabilitation for drug
12   addicts to the end that these unfortunate individuals
13   may be restored to good health and again become useful
14   citizens of the community."  So that's one policy of
15   the state.  It's very clear.
16           Another is NJSA 26:2(b)(b-1).  That's a
17   statutory scheme established by the government's
18   Council on Alcohol and Drug Abuse.  And it provides,
19   "The legislature finds and declares that alcoholism and
20   drug abuse are major health problems facing residents
21   of this state.  The full resources of this state,
22   including counties, municipalities, and residents of
23   the state must be mobilized in a persistent and
24   sustained manner in order to achieve a response capable
25   of meaningfully addressing not only the symptoms, but

1    the root causes of this pervasive problem."
2            Clearly, when you look at all this, what the
3    application is proposing here is a use that serves the
4    public good and promotes the general welfare and is an
5    inherently beneficial use.  And, again, as Mr. Himelman
6    discussed earlier, the Supreme Court in the Sica case
7    determined that there would be a four-step process for
8    boards to look at in determining whether or not
9    inherently beneficial use, once they find its
10   inherently beneficial use, whether that use should be
11   approved by the Board.
12            First of all, the Board should be aware, I
13   was Dr. Sica's planner in that application.  However, I
14   can't take credit for that four-step process.  That was
15   developed during the court case by the Supreme Court.
16   It was not developed during the course of the
17   application.
18            MR. SACHS: Kudos to you, Mr. Higgins.
19            THE WITNESS:  What's that?
20            MR. SACHS: Kudos to you, then.
21   A    But the first step is establishing the magnitude
22   of the benefit.  And in this case, clearly there is a
23   great need for this use.  It's been established by the
24   state and the federal government that there is a
25   crisis, and the crisis has to be addressed.

1            I did look up online -- and I apologize.  I
2    thought I had the documentation for this with me, and I
3    don't.  But at the next hearing, I will provide it, if
4    the Board so wants it.  But in 2016, the overdose
5    deaths exceeded 2,000, which is up 30 percent from 2015
6    in New Jersey.  And the deaths in New Jersey were three
7    times the national average and have increased 700
8    percent in the last decade.
9            So, clearly, that shows that there is a great
10   need for what's being proposed here.  The magnitude of
11   the increase of the overdose deaths as well as the
12   increase in the individual and family distress that
13   accompanies the epidemic of drug addiction exceeds the
14   ability of the existing proposed treatment facilities
15   to adequately address the problem.
16            Clearly when you have both the federal
17   government and the state government identifying that
18   this is a crisis and has to be addressed, it's clear
19   that the facilities necessary to address this crisis
20   don't yet exist.  They have to be developed.
21            The patients of the proposed rehabilitation
22   facility they are legally disabled persons and are a
23   protected class under both federal and state law.  And
24   Mr. Himelman will follow up on that in more detail.
25   But clearly, again, as Mr. Himelman discussed earlier,

Higgins - Direct/Himelman                    128

 1      those -- those protections require that the state
 2      provide for reasonable accommodations for this use, for
 3      helping these people, for providing a place for them to
 4      live during rehabilitation, those types of things.
 5              And finally, the federal and state
 6      governments have recognized the crisis and have
 7      instituted legislation and a number of programs to
 8      combat the epidemic.  So when you look at the magnitude
 9      of the benefit, this will be 149 beds that don't
10      currently exist that are needed, very badly needed, the
11      magnitude is substantial, in terms of the benefit to
12      the public.
13              With regard to determining the magnitude of
14      potentially negative impacts, you would look at
15      aesthetics.  And what's being proposed here -- first of
16      all, the building and the site is really separated from
17      surrounding properties and not readily visible.  So
18      aesthetics isn't a real concern.  But when you look at
19      the building and the improvements proposed for the
20      site, the site will be very attractive, even though it
21      would be more from internally than from externally,
22      because it won't be that readily visible from -- from
23      the street or from surrounding properties.
24              Second would be noise.  And, clearly, with
25      respect to use, there is not going to be any

Higgins - Direct/Himelman                    129

 1      significant noise that would impact surrounding
 2      properties.
 3              The third would be traffic.  And you just
 4      heard traffic testimony that there is going to be no
 5      substantial negative impact with regard to traffic.
 6              A fourth would be safety.  And in that
 7      regard, you've heard extensive testimony tonight as to
 8      how this facility is going to be run, the safety
 9      measures that are taken into account, what -- what
10      measures are going to be taken to monitor the
11      residents, to assure that they don't leave the facility
12      unless they're accompanied by somebody.  And the fact
13      that the facility is licensed by the state and will be
14      monitored by the state I think is an additional
15      assurance that safety is not going to be a significant
16      concern.
17              The last will be the impact on zoning.  And
18      as I said earlier on my testimony, this use is very
19      similar to uses that are permitted in the prime zone.
20      It may not be specifically permitted as determined by
21      your zoning officer, but it is not inconsistent with
22      other uses that are permitted in the zone.  So it's not
23      out of character with what could exist in this zone.
24      And, therefore, the use itself I don't think is
25      contrary to what your zone -- your ordinance

1    anticipated for the zone.
2            In addition, the layout of the building, the
3    layout of the site, should 15 years from now this
4    applicant decide he needed a bigger facility, decided
5    this facility for some reason wasn't working for him,
6    wanted to leave it, the building is laid out perfectly
7    for a nursing home, for a long-term care facility,
8    other uses that could exist in the prime zone.  So it's
9    not going to have a substantial negative impact, either
10   short term or long term, on your zoning ordinance.
11           So when I look at that, I don't think -- I
12   don't think there are any substantial negative impacts
13   that are associated with this application.
14           The third prong is to provide measures to
15   mitigate those impacts.  I think the applicant has
16   anticipated all of those impacts and has included them
17   both in the site plan and in their operational
18   organization so that I don't think there is any
19   additional measures that might be needed to mitigate
20   the impacts.
21           There was the one point that Mr. Sachs
22   brought up as far as having a condition that you don't
23   have a criminal element, people being referred from the
24   courts or from other criminal agencies to the site that
25   don't want to be there.  So I think that's an adequate

1    condition that the Board could put on this application
2    to mitigate any potential negative impact from that
3    aspect.
4            And then any measures to reduce negative
5    impacts, I don't see any that are necessary, other than
6    that one condition.
7            The other aspect would be is whether the site
8    is particularly suited for this use and the general
9    welfare would be advanced.  Clearly the use is a
10   beneficial use.  The site, being a former nursing home,
11   and because it's secluded from surrounding properties,
12   you can't see it, the layout of the building, the
13   layout of the site are ideally suited to this use,
14   which, again, is very similar in its function to a
15   nursing home or a long-term care facility.
16           So I think the site is particularly suited to
17   use and the general welfare is advanced because of that
18   particular suitability.  And, again, I subscribe that I
19   don't think there are any substantial negative impacts.
20   So in that regard, you could make one finding or the
21   other as far as the positive criteria and the negative
22   criteria.
23       Q    Mr. Higgins, just a few follow-up questions.
24   Can you describe for us -- I understand you reviewed
25   the relative ordinance in the Borough and if a drug and

1      alcohol facility is permitted anywhere or in any zone
2      district?
3      A    No, it is not permitted in any zone in the
4      Borough.
5          Q    Okay.  And that's after your review of the
6      ordinances?
7      A    Yes.  Yes.  And I think that also goes to the
8      benefit of this use and the magnitude of the benefit.
9          Q    Okay.  I just wanted to ask you a couple of
10     follow-up questions, just so I understand your
11     testimony.  So your testimony is that this particular
12     use is inherently beneficial and that in your opinion
13     both the positive criteria and negative criteria have
14     been satisfied?
15     A    Yeah.  In fact, it's my opinion that this use, in
16     terms of inherently -- being inherently beneficial, is
17     one of the most inherently beneficial uses that you can
18     have, because there is a crisis.  There's a crisis
19     statewide.  There is a national crisis.  And this is
20     directly addressing that crisis.
21             I think it's the Holy Grail of inherently
22     beneficial uses, if I can use that term, as a planner.
23         Q    Now, you also discussed a reasonable
24     accommodation.
25     A    Yes.

1          Q    Is it your opinion that because of the state
2      and federal law you believe that the approval, if the
3      Board should so grant this use variance, would satisfy
4      that reasonable accommodation?
5      A    Yes, it would.
6          Q    Okay.  And why is that?
7      A    Why?  Because right now the use is not permitted
8      anywhere in the Borough.  And in order to provide
9      reasonable accommodation, it has to be permitted
10     somewhere in the Borough.
11             And this site -- the site is ideal for it
12     because of the layout of the site, the fact that it's
13     not readily visible from surrounding properties.  The
14     building is situated and well suited to the use.  And
15     to provide it here I think is a very reasonable
16     accommodation for this use, which is a necessary use.
17         Q    Okay.  Now, under the Sica four-prong test,
18     you mentioned the balancing aspect or the balancing
19     test.  And is it your testimony that we satisfied the
20     balancing test to the extent that any negative impacts
21     are de minimis and the public interest is urgent and
22     immediate?  Is that your belief?
23     A    Yes.  That and I think it's important for the
24     Board to understand, too, that under the Sica test, the
25     balancing is different than what you're normally used

Higgins - Examination/Unidentified Speaker        134

```
 1   to.  Normally, the benefits have to substantially
 2   outweigh the detriments.
 3            Under the Sica test, the detriments have to
 4   substantially outweigh the benefits if you're going to
 5   deny the application.  In this case, the benefits do
 6   substantially outweigh the detriments.  The detriments
 7   are minimal, in my opinion.  The benefits are
 8   substantial.
 9            So I think either way you look at it -- but
10   when you have to look strictly under the Sica criteria,
11   you're supposed to look at whether or not the benefits
12   substantially outweigh the benefits.  And in this case,
13   the benefits substantially outweigh the detriments, so
14   the balance is way in the other direction.
15   Q     And just to sum, is it fair to say, based on
16   your testimony, that you believe the variance should be
17   granted as a reasonable accommodation and that the
18   facility will be treating disabled persons, as you
19   indicated, and that, because of that, the applicant is
20   entitled to a reasonable accommodation through the
21   granting of a use variance?
22   A     Yes.
23            MR. HIMELMAN:  Okay.  Thank you.
24            I don't have any direct questions -- further
25   questions of Mr. Higgins, but the Board and your
```

Higgins - Examination/Unidentified Speaker        135

```
 1   professionals might, Mr. Chairman.
 2            MR. CHAIRMAN:  Any questions from the Board?
 3            UNIDENTIFIED SPEAKER: I have a couple of
 4   questions.
 5   EXAMINATION BY UNIDENTIFIED SPEAKER:
 6   Q     Okay.  Granted, we have a situation which
 7   obviously needs to be addressed in terms of the drug
 8   problem.  On the other hand, we have a situation where
 9   we have an aging population in the country which would
10   be served by another nursing home facility.  Do you see
11   a difference between those two?
12            And the next question is when you say there
13   is no zone in the community that would accommodate
14   this, does the community have to have a zone for this
15   kind of situation?
16   A     That's picking a last question first.  It's my
17   opinion that the community has to make reasonable
18   accommodation for this type of use.  So -- so I would
19   say yes, you have to make reasonable accommodation,
20   particularly since you have a site that is so well
21   suited to this use.
22   Q     Why does the community have to make this
23   accommodation?
24   A     Because these people are protected under federal
25   and state law.  And because they have those
```

Higgins - Examination/Unidentified Speaker        136

1    protections, you can't exclude them.  And if you don't
2    permit it somewhere in your community, you're excluding
3    them.  So, therefore, you're in violation of the
4    protections that are provided in those state and
5    federal laws.
6         Q    So every community has to have a --
7    A    They should --
8         Q    -- provision --
9    A    They should make accommodation, yes, for this type
10   of use.  That doesn't mean it has to be there.  They
11   have to make accommodation for it to be there.
12        MR. SACHS: Actually, if there's other
13   questions, I'll respond when Mr. Higgins has completed.
14        UNIDENTIFIED SPEAKER: No, go ahead.
15        MR. LEONCAVALLO: Okay.
16        MR. HIMELMAN:  Did you want to -- you had a
17   second part.
18   BY UNIDENTIFIED SPEAKER:
19        Q    Yeah.  We're trading off one condition to
20   address a concern for another one to address a concern.
21   A    And you have a zone that permits nursing homes.
22        Q    Right.  So why --
23   A    So you could build a nursing home other places in
24   that zone.  You don't permit this use, so you can't put
25   this use anyplace in that zone unless you come before

Higgins - Examination/Unidentified Speaker        137

1    this Board and get a use variance.  So, again, that I
2    think goes to a reasonable accommodation.  There is no
3    reasonable accommodation for this use.
4         Q    But they could be located at some other in
5    the borough?
6    A    Only if they had to come in and get a use
7    variance, and that's not before the Board at this point
8    in time.  Here you have somebody that is willing,
9    somebody that is capable of building this use on this
10   site.  And I'm stealing a little bit of Ms. Cofone's
11   testimony -- or her thunder, but they are willing, they
12   are capable, and they are ready to go immediately, to
13   the point where they've even started renovating the
14   building, taking that risk.
15        And, therefore, you are making -- by
16   approving this, you are making a reasonable
17   accommodation.  And I think that's -- that's the
18   difference.
19        MR. SACHS:  Let me respond briefly to, I
20   guess, the conceptual reason of why we even have a
21   Zoning Board of Adjustment, okay?  It's impossible to
22   account for every -- every single conceivable use that
23   could be generated anywhere within the State of New
24   Jersey.  And, as you know, every municipality has
25   zones, and every municipality has permitted uses within

 1    zones.  And the ones that kind of fall in that gray
 2    area are the ones that come before a zoning board
 3    seeking use variance relief, and that's exactly what
 4    this applicant is doing.
 5            Now, there are other types of uses which are
 6    prohibited in zones, and they're specifically
 7    prohibited.  Again, that would require something that
 8    would also be before this Board for a use variance.
 9            So I understand the argument by the applicant
10    that this is similar to a nursing home or -- or a
11    hospital, but our zoning officer has determined that
12    it's not, and that's why they're here for a use
13    variance.
14            UNIDENTIFIED SPEAKER:  So, looking at -- I'm
15    not an attorney, so you guys help me out here.  42 U.S.
16    Code 139 -- 1396R, "Requirements for Nursing
17    Facilities," and it goes on to define what a nursing
18    home facility is.  And it says, "Rehabilitation
19    services for rehabilitation of injured, disabled, or
20    sick persons or on a regular basis health-related care
21    and services to individuals who, because of their
22    mental or physical condition, require care and services
23    above the level of room and board which can be made
24    available to them only through institutional facilities
25    and is not primarily for the care and treatment of

 1    mental illness."
 2            MR. SACHS:  Well, yeah.  And I think in Mr.
 3    Higgins' own definition of what our ordinance says a
 4    long-term care facility is, it specifically states that
 5    it's for the care of elderly residents or --
 6            THE WITNESS:  It says "older adults."
 7            MR. SACHS:  Older adults.
 8            MR. HIMELMAN:  Older adults.
 9            THE WITNESS:  That's a term that's so vague,
10    but we don't want to get into an argument now.
11            MR. SACHS:  All right.  But older adults.
12    All right.  Now, you have heard testimony this evening
13    from the operations witness that their average age is
14    35 and that their targeted group is 18 to 28.  I would
15    not consider -- I think we could take judicial notice
16    of the fact that those are not older adults.  All
17    right.
18            Now, that doesn't mean that this is not a
19    site that's suitable for this proposed use, and that's
20    obviously a determination that this Board will have to
21    make --
22            THE WITNESS:  Just --
23            MR. SACHS:  -- considering all the testimony.
24            THE WITNESS:  Let me read a sentence from my
25    outline which I did not cover in my direct testimony

Higgins - Examination/Vice Chairman Henry        140

1    that may help you a little bit, too.
2              In terms of the impact on zoning, the use
3    consists of a variety of activities encompassing
4    medical, educational, and daycare.  All of these uses
5    are permitted uses in the prime zone in long-term care
6    facilities.  The overwhelming need for this service,
7    meaning the drug rehabilitation, has evolved more
8    recently than the date of the adoption of the
9    ordinance, and the use was likely not considered at the
10   time of adoption of the ordinance, which goes back to
11   what Larry was saying.  You don't -- you can't consider
12   every possible use, especially if the use isn't that
13   common.
14             So the point I was trying to make in my
15   testimony is that it's very similar use to what's
16   permitted in the zone, so it's not going to have a
17   negative impact on the zoning.
18             UNIDENTIFIED SPEAKER:  Thank you.
19             VICE CHAIRMAN HENRY:  I just have one
20   question.
21   EXAMINATION BY VICE CHAIRMAN HENRY:
22        Q    You talk about the negative impact.  Are drug
23   addicts themselves considered a negative impact in an
24   area?
25        A    From a planning and zoning standpoint, no.

Colloquy                        141

1              VICE CHAIRMAN HENRY:  Okay.  Thank you.
2              MR. SACHS:  Let me comment on that.
3              THE WITNESS:  Yeah, just qualify.  That's if
4    they're in a facility where they are being
5    rehabilitated.
6              MR. SACHS:  Right.
7              THE WITNESS:  Clearly if they're out on the
8    street and they're destitute and they're wandering
9    around and affecting neighborhoods, yeah, then they
10   would be negative.
11             But when they're in a controlled environment
12   in a facility to where they're being rehabilitated,
13   they are not considered a negative impact.
14             MR. SACHS:  Well, when we're talking about
15   negative detriment to the surrounding community, we're
16   talking about impacts of traffic, we're talking about
17   impacts of aesthetics, we're talking about impacts of
18   lighting, noise.  Those are the impacts we're talking
19   about that would be negative impacts.
20             The mere fact that someone is a substance
21   abuser doesn't necessarily make them a negative
22   detriment to the community, just understand under the
23   case law that's --
24             THE WITNESS:  That's correct.
25             MR. SACHS:  Yeah.  That's -- we're dealing

1   with zoning issues.  We're not dealing with morality
2   issues.  This is a zoning issue.  This is a Zoning
3   Board of Adjustment.
4           MR. LEONCAVALLO:  Mr. Chairman, one comment.
5   We talked about this before.  Our ordinance has some
6   obsolete items in it, because it was approved in 1999.
7   That's not a significant amount of time.
8           We are looking at some of these things in the
9   prime zone.  Back then, we didn't have this type of
10  animal.  We didn't have, you know, drug rehabilitation
11  to this kind of degree and scale.
12          I agree with my research, yeah, we have a
13  real problem.  And as Mr. Higgins said, it's a state
14  problem and a nationwide problem.  And there's a lot of
15  reasons for that.  So -- but I concur with him in terms
16  of there is a significant need.
17          And I think the need can be demonstrated that
18  there is a licensure procedure to follow, and that is
19  indicative of a need.  And then I think we can go to
20  the issues with, you know, the populations that are in
21  this.
22          And I think, of course, they're younger, but
23  you could have people that are older that -- that
24  become addicted to opioids, you know, because of, you
25  know, pain or relief of pain.  So -- and I think the

1   policies of the state are apparent.  I think -- I agree
2   with his balancing test.
3           I think this is -- if you're going to have a
4   balancing test done -- and I didn't know that he was on
5   the Sica case, which is a --
6           MR. HIMELMAN:  I knew that.
7           MR. SACHS:  That's impressive.
8           MR. CHAIRMAN:  It's very impressive, Jim.
9           MR. LEONCAVALLO:  So I think it's something
10  you have to think of.  He's looked at the aesthetics,
11  the noise, the traffic, safety.  A lot of those things
12  are minimal in this case.  I think this is a -- you
13  know, an appropriate place for this.
14          And it is isolated, given the elevation it's
15  at and the situation with the adjacent parkway being
16  right there.
17          So I think we have to look at this in the
18  future in terms of remodifying some of our ordinance.
19  We talked about doing signage over again, because a lot
20  of the signage regulations that we have from then, or
21  really before 1999, probably 1997, 1998, really don't
22  -- aren't all applicable now.  And some of them I
23  mentioned, there was, like, a monument sign.  We don't
24  have a monument sign in the ordinance.  So every time
25  you have to give a waiver for that if someone comes in

Colloquy                              144

1    with an office situation and wants a monument sign at
2    the entrance of the building.
3            So I concur with Jim, and I agree with his
4    opinions.
5            MR. CHAIRMAN:  Okay.  Any other questions?
6            MR. HIMELMAN:  Mr. Chairman, I just wanted to
7    -- I just wanted to thank Mr. Higgins, because when I
8    first got involved in this application, I realized the
9    significant planning and zoning issues, as Mr. Sachs
10   alluded to, and I felt and recommended to the client
11   retaining someone of Mr. Higgins' stature, because this
12   is, you know, a complicated and complex problem.
13           And I just wanted to personally on the record
14   thank him for his time and his testimony.  I think it
15   was well done.  Thank you.
16           MR. SACHS:  Mr. Himelman, you have another
17   witness who I don't think we're going to get to this
18   evening.
19           MR. HIMELMAN:  It appears that -- Mr.
20   Corrigan, you have to leave, I understand.  So, Mr.
21   Sachs, I will respect that.
22           MR. SACHS:  All right.  So, Mr. Chairman, I
23   know we've -- before we resumed for the -- after the
24   break, the applicant has agreed to come back on -- Dc
25   13th?


Colloquy                              145

1            MR. HIMELMAN:  Correct.
2            MR. CHAIRMAN:  December 13th.
3            MR. SACHS:  All right.  So on December 13th,
4    you will have Ms. Cofone who will testify, and also
5    your other witnesses will be available?
6            MR. HIMELMAN:  Everyone will be back on the
7    13th.
8            MR. SACHS:  So this way the members of the
9    public certainly will have an opportunity to comment
10   and ask any questions of the witnesses.  All right.
11           So, again, there will be no further notice
12   with respect to this application.  December 13th it
13   will be carried to.
14           MR. HIMELMAN:  Thank you.  Mr. Chairman, I
15   just wanted to thank you and the members of the Board
16   and your professionals for holding this special meeting
17   tonight, and we very much -- the applicant very much
18   appreciates that, and I presume the public does as
19   well.  So, thank you.
20           MR. CHAIRMAN:  We'll see you on the 13th.
21           MR. HIMELMAN:  Have a good evening.
22           (Meeting adjourned.)
23
24
25

# C E R T I F I C A T I O N

I, LORI KNOLLMEYER, the assigned transcriber, do hereby certify the foregoing transcript of proceedings on CD is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript of the proceedings as recorded, and to the best of our ability.

/s/ Lori Knollmeyer
LORI KNOLLMEYER   AOC #004-AAERT-T

J&J COURT TRANSCRIBERS, INC.  DATE:  January 29, 2018

# EXHIBIT D

```
 1                              BOARD OF ADJUSTMENT
                                BOROUGH OF SAYREVILLE
 2                              COUNTY OF MIDDLESEX
                                STATE OF NEW JERSEY
 3
      In the Matter of          )
 4    The Application of:        )    Transcript of
      RECOVERY CENTERS OF AMERICA)     proceedings
 5    #17-29                     )
      901 Ernston Road           )
 6    ---------------------------

 7

                                Wednesday, December 13, 2017
 8                              Municipal Building
                                167 Main Street
 9                              Sayreville, New Jersey

10
                        BOARD OF ADJUSTMENT
11
                        RON GREEN, Chairman
12                      TOM KUCZYNSKI
                        MARIA CATALLO
13                      JOHN CORRIGAN
                        BILL HENRY
14                      ANTHONY ESPOSITO
                        PHIL EMMA
15                      KEN KREISMER

16
                        JOAN KEMBLE, Recording Clerk
17                      JOHN LEONCAVALLO, Township Planner
                        JAY CORNELL, Township Engineer
18

19

20

21

22    ------------------------------------------------------
      ------------------------------------------------------
23                      DEBORAH A. MASTERTON
                      Certified Court Reporter
24                       29 Hilltop Boulevard
                East Brunswick, New Jersey 08816
25                       732-690-2411
                      dmasterton@comcast.net
```

```
 1      A p p e a r a n c e s:

 2              LAWRENCE B. SACHS, ESQUIRE,
                 Attorney for the BOARD
 3
                DAVID HIMELMAN, ESQUIRE,
 4               Attorney for the APPLICANT

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                I  N  D  E  X

2       WITNESS                                              PAGE

3       DENI CARISE
         DIRECT EXAMINATION BY MR. HIMELMAN                    5
4        CONTINUED                                            17
         CONTINUED                                            24
5
        DAVID DORSCHU
6        DIRECT EXAMINATION BY MR. HIMELMAN                   14
         CONTINUED                                            65
7
        EDMUND CAMPBELL
8        DIRECT EXAMINATION BY MR. HIMELMAN                   21

9       MICHAEL DESROSIERS
         DIRECT EXAMINATION BY MR. HIMELMAN                   80
10
        CHRISTINE COFONE
11       DIRECT EXAMINATION BY MR. HIMELMAN                   85

12      DENNIS O'LEARY
         SWORN                                                96
13
        DEBORAH LEE
14       SWORN                                               101

15      ROBERT RASA
         SWORN                                               103
16
        PAUL LIEBERMAN
17       SWORN                                               107

18      DENNIS O'LEARY, SR.
         SWORN                                               110
19
        PRASANNA KULKARNI
20       SWORN                                               113

21      ERVIN AGOSTON
         SWORN                                               116
22
        ZENNABELLE SEWELL
23       SWORN                                               119

24

25

1          THE CHAIRMAN:  The only application on

2     tonight is Recovery Centers of America, 901 Ernston

3     Road.

4          MR. HIMELMAN:  Mr. Chairman, members of

5     the board, good evening.  My name is David Himelman,

6     and I represent the applicant, 901 Ernston Road,

7     LLC, which as you know is RCA.  Mr. Chairman, as you

8     recall from the November 8 meeting, we did have

9     several witnesses that appeared and testified.

10     Since that time, we have -- I believe concluded with

11     Mr. Higgins' testimony, and so for tonight I have

12     two additional witnesses.  I'd like to recall our --

13     one of our witnesses from RCA, Dr. Carise, who you

14     recall from the last meeting, and primarily to

15     address the issue that I had spoken to Mr. Sachs

16     about and also was referenced in Mr. Leoncavallo's

17     memo regarding certain issues relative to the RCA

18     Massachusetts facilities, and Dr. Carise will

19     address that matter.  And then Christine Cofone, our

20     planner, additional planner, we will have her

21     testify on certain planning issues relative to this

22     application.  And that would conclude our direct

23     testimony, and then obviously, I presume at that

24     point, they will be subject to further questions

25     from the board.  Obviously, the public is here, and

1        we can see how the rest of the evening progresses,

2        but that's sort of the line up that we were

3        thinking.

4                So if the board doesn't have any

5        questions at this point, I will call Dr. Carise up,

6        and, Mr. Sachs, if I recall, she had been sworn in

7        at the last meeting, but we can certainly swear her

8        in again.

9                MR. SACHS:  That's okay.  You're still

10       under oath.  Thank you.

11

12       D E N I   C A R I S E, having been previously sworn,

13       resumed and testified as follows:

14       DIRECT EXAMINATION BY MR. HIMELMAN:

15           Q.    Good evening.  Now, have you had an

16       opportunity to I guess review Mr. Leoncavallo's

17       memorandum?

18           A.    Yes.

19           Q.    And he had asked us to sort of discuss

20       certain issues regarding the facts and circumstances

21       relative to two facilities that were -- are managed

22       and operated by RCA.  So if you would sort of give

23       the board a brief overview of that, and then we can

24       discuss and respond to any questions that the board

25       may have.  Here's the microphone.

1              THE WITNESS:  Okay.  So I was asked to

2      talk about the incidences up in Boston.  We have two

3      treatment facilities up in Boston.  One is in

4      Danvers, Massachusetts, and that is a place where we

5      had a patient death, and we had a second patient

6      that was rushed to the hospital, and he consequently

7      died at the hospital afterwards.  So there were two

8      deaths.  The other facility is in Westminster, about

9      an hour away, and in Westminster, that was a

10     facility that, unlike our others, we bought it when

11     there was a group of people that got it together,

12     kind of rehabbed it and were going to open it, and

13     we bought it, and it came with some staff that were

14     already committed.  So we basically brought the

15     building, the zoning, and some of the staff people

16     to open it up and to run it as an RCA facility.

17             So let me just go first about the

18     deaths.  So in February 2017, you know, the reality

19     is that this is a deadly disease.  People die from

20     all kinds of things with this disease, not just

21     overdoses, but from all kinds of cardiac or other

22     events.  I can't get into real specifics.  That

23     would violate HIPAA, but I feel like I can tell you

24     we had one older gentleman died of natural causes.

25     He was with us less than 20 hours.  He was a

Carise - direct

7

1    long-term multiple heroin, cocaine, and alcohol

2    abuser.

3              There was a second death in August of

4    2017.  This person was rushed to the hospital in

5    distress, and we don't have a final determination of

6    cause of death from that person.

7              The important thing to know is that we

8    reported these to the state when they happened the

9    way we should, the way we always will.  When the

10   articles came out about this, that's when the state

11   came in afterwards.  They already know about it and

12   looked into it.  They came in after the articles,

13   and they stopped admissions in the Danvers site

14   only, okay.  So the Westminster site, up, running,

15   has been since that day, still is, and in the

16   Danvers site, they didn't come in and close the

17   site, which they could.  State regulators do that.

18   They came in and they stopped admissions, and what

19   they said to us was that if you surrender your

20   license, we'll expedite it for to do a whole new

21   full review and get you your license back, and that

22   would be better for us than if you say you won't

23   surrender your license.

24             We surrendered our license.  Since then

25   actually, the state regulators have been great.

1     We've been working with them on every nook, cranny,

2     policy.  They have looked at everything from fire

3     extinguishers to medication storage to training

4     programs to clinical care, and we've been -- they

5     have visited us a third time now.  The last visit

6     they made to us was on December 4.  We're still

7     waiting for the report from that visit, and we

8     expect to be open again there this month.

9          Q.    Now, just for the record, the regulatory

10    agency you're referring to in Massachusetts?

11         A.    It's called BSAS.  It's the Bureau of

12    Substance Abuse Services for Massachusetts.  It's

13    called a Single State Agency.

14         Q.    So they came in you said and they did a

15    review of the Danvers facility; is that correct?

16         A.    Yeah, they came in and they reviewed.

17    They've been there three times.  The reason for that

18    is they have to review the detox separately from the

19    residential care.  They call one ATS.  They have to

20    review it separately, and there's a different team

21    that reviews the residential care.

22         Q.    And have they concluded their review

23    investigation?

24         A.    We believe they've completed their

25    review and investigation.  They were very positive

Carise - direct

```
 1    when they were there on the 4th of December, and

 2    they said that you will get our written -- we can't

 3    do anything until we have a written report from

 4    them, and again, we expect to be open this month.

 5         Q.    Okay, but thus far there's been no

 6    indication from that agency that there's been any

 7    wrongdoing?

 8         A.    No, there's been no allegation of

 9    wrongdoing or cause of death assigned to us.

10         Q.    And so what's the status now?

11         A.    The status right now is that we're

12    waiting for their report, and we again expect to be

13    open this month; could be next week.

14         Q.    So you anticipate getting your licensure

15    back, correct.

16         A.    Yes, we do.  The Westminster site is on

17    a provisional license.  That is exactly what they do

18    with everybody.  You come, in the state gives you a

19    provisional license, particularly if you're a new,

20    you know, health care provider in the field.  If you

21    don't have sites up and running in that state

22    already, they always give you a provisional license,

23    and then they reevaluate you in 6 or 12 months and

24    make a decision on whether they're going to give you

25    another provisional or a full license.
```

Carise - direct

1          Q.     Okay.

2          A.     I'm happy to answer any questions.

3                 MR. SACHS:   Thank you, Mr. Chairman.

4     Just a couple questions just based on your

5     testimony, Dr. Carise.  The two deaths that

6     occurred, and they were both at the Danvers site?

7                 THE WITNESS:   Patients were both at

8     Danvers, yes.

9                 MR. SACHS:   Were those deaths attributed

10    to any overdoses?

11                THE WITNESS:   The first one was natural

12    causes.

13                MR. SACHS:   That doesn't answer my

14    question.  Was it attributed to an overdose?

15                THE WITNESS:   No.

16                MR. SACHS:   Okay.  What about the second

17    death?

18                THE WITNESS:   The second death, we do

19    know that there was prescribed suboxone and some

20    cocaine in the system, but the death has not been

21    linked to the overdose but can only imagine was a

22    part of it.

23                MR. SACHS:   And how long had that

24    patient been in the facility from the time of

25    admission to the time of the death?

Carise - direct

11

1              THE WITNESS:  That patient had been in

2     the Westminster facility for about 2 months, and he

3     transferred over to Danvers, and he had been at

4     Danvers for 7 days.  One thing I will tell you is

5     that that patient -- one of the things we did with

6     that patient, which you'll remember from our last

7     meeting told you we never do anymore, is that we

8     allow them to have access to their cell phone and

9     the internet, and that is something that we make no

10    exceptions for anymore because we can imagine that's

11    how the drugs came.

12             MR. SACHS:  And you referenced a written

13    report that was going to be issued by the

14    Commonwealth of Massachusetts.

15             THE WITNESS:  Yes.

16             MR. SACHS:  Has that been issued yet?

17             THE WITNESS:  No, the site visit was

18    before so we are awaiting that report.

19             MR. SACHS:  All right, and when that

20    report gets issued -- and I can ask this through

21    counsel -- perhaps this board can be provided with a

22    copy of that report.

23             MR. HIMELMAN:  Sure.  It's a public

24    record.

25             THE WITNESS:  Yeah, it is public record.

Carise - direct

12

```
 1                    MR. HIMELMAN:  Absolutely.
 2                    MR. SACHS:  All right.  My last question
 3         to you is you mentioned an agency called the Bureau
 4         of Substance Abuse Services.
 5                    THE WITNESS:  Yes.
 6                    MR. SACHS:  That's a regulatory agency
 7         in Massachusetts.
 8                    THE WITNESS:  Yes, it is.
 9                    MR. SACHS:  Is there an equivalent
10         agency in New Jersey?
11                    THE WITNESS:  Yes, there is.
12                    MR. SACHS:  What agency is that?
13                    FROM THE FLOOR:  New Jersey Office of
14         Licensure.
15                    THE WITNESS:  The New Jersey Office of
16         Licensure is what yours is called.
17                    MR. SACHS:  New Jersey Office of
18         Licensure?
19                    THE WITNESS:  Yes, and that's the agency
20         that licenses Lighthouse, our current New Jersey
21         site.
22                    MR. SACHS:  That's a licensing agency.
23         Is there an oversight agency that deals with your
24         facility in -- I know you have one in Hamilton and
25         one in Cape May.
```

```
 1                    THE WITNESS:  In Mays Landing.

 2                    MR. SACHS:  Mays Landing, down in Mays

 3      Landing.  What's the agency that provides the

 4      oversight, though.  I understand the New Jersey

 5      Office of Licensure is just a licensing facility,

 6      just like all over professions and other types of

 7      businesses are licensed, but what's the regulatory

 8      agency that provides the oversight to your

 9      particular --

10                    THE WITNESS:  It's the same.  In Boston,

11      BSAS gives you the license, and they do the

12      oversight.  They come and do site visits.  All the

13      state agencies do site visits themselves and provide

14      oversight.

15                    MR. SACHS:  All right, so the New Jersey

16      Office of Licensure does do site visits?

17                    THE WITNESS:  Yes.  This is the CEO.

18                    MR. SACHS:  And how often do those

19      visits occur?

20                    THE WITNESS:  I'm sorry.

21                    MR. SACHS:  If you want to come up, sir.

22                    THE WITNESS:  I'm sorry.  He knows the

23      detail of this state more than I do.  He is our CEO

24      of the Mays Landing facility, which is very similar

25      to Sayreville, and he testified here before.
```

1          MR. SACHS:  He did testify previously.

2          THE WITNESS:  He knows the details

3    better than I do.

4          MR. SACHS:  That's fine.  And you know,

5    sir, since it's a new hearing, we'll swear you in.

6    Please raise your right hand; I'll swear you in.

7

8    D A V I D   D O R S C H U,  sworn.

9    DIRECT EXAMINATION BY MR. HIMELMAN:

10         MR. SACHS:  Please state your name,

11   spelling your last name, and your affiliation with

12   the applicant.

13         THE WITNESS:  My name is David Dorschu,

14   and that is spelled D-o-r-s-c-h-u, and I'm the chief

15   executive officer of the Recovery Centers of America

16   site in Mays Landing.

17         MR. SACHS:  Okay.  So my question to Dr.

18   Carise, and I guess you can answer it, is I

19   understand that you get licensed by this New Jersey

20   Office of Licensure.  What type of oversight,

21   however, and what I mean by oversight is actual site

22   visits, audits of your facility, random visits, how

23   often does that occur, and tell me the procedure

24   that occurs.

25         THE WITNESS:  The Department of the

Dorschu - direct

15

1    Office of Licensing is under the Department of Human

2    Services moving -- it's being transitioned to under

3    the Department of Health.  They conduct annual

4    inspections, and what they're doing when they

5    conduct their inspections is they are just reviewing

6    all of their regulations and assessing if we are

7    complying with those regulations.  So at the end of

8    that site visit, you perhaps have some deficiencies,

9    and they issue a report, and then you respond with a

10   plan of correction.  So in my facility, we are in

11   good standing with the state, full licensure for our

12   inpatient program as well as outpatients.

13            MR. SACHS:  Okay, and are there any

14   other regulatory agencies in the State of New Jersey

15   that provide any oversight?

16            THE WITNESS:  In the State of New

17   Jersey, no.  We do have accreditation bodies, the

18   Joint Commission on the Accreditation of Health Care

19   Organizations, that's an accreditation body, but to

20   answer your question, no.

21            MR. SACHS:  So it's just this one

22   agency.

23            THE WITNESS:  Yes.

24            MR. SACHS:  And they come in annually?

25            THE WITNESS:  They come in annually.

1    Yes, that's the licensure span of 12 months.

2              MR. SACHS:  And how often -- when they

3    come to the facility, how often do they stay at the

4    facility?  How long -- you know, what -- how

5    comprehensive is the --

6              THE WITNESS:  It's extremely

7    comprehensive.  They're there typically for two to

8    three days, and they are inspecting everything from

9    the cleanliness of the kitchen to the personnel

10   files of all the staff.  They are reviewing medical

11   records of the clients.  They are reviewing our

12   quality assurance procedures.  So it's very

13   comprehensive.

14             MR. SACHS:  Okay.  Thank you.

15             THE WITNESS:  You're welcome.

16             THE CHAIRMAN:  I have a question.  In

17   view of this inspection you're talking about, are

18   you aware of when they come?  Are you notified ahead

19   of time when they're coming?

20             THE WITNESS:  No, you are not.

21             THE CHAIRMAN:  You're not.

22             THE WITNESS:  In the State of New

23   Jersey, you are not.

24             THE CHAIRMAN:  So they just come when

25   they feel as though they want to come.

1          THE WITNESS:  Correct.  It's called an

2     unannounced inspection, and so you have to be, you

3     know, the idea is that you are prepared 100 percent

4     of the time, you are in 100 percent compliance.  So

5     you're upholding the regulations.

6          THE CHAIRMAN:  But it is once a year.

7          THE WITNESS:  It is once a year.

8          MR. HIMELMAN:  Thank you very much.

9          THE WITNESS:  You're welcome.

10

11    D E N I   C A R I S E,   continued.

12         THE CHAIRMAN:  Doctor, I have a

13    question.  Doctor, you were here on the meeting of

14    November 8, that special meeting.

15         THE WITNESS:  Yes.

16         THE CHAIRMAN:  This incident -- and you

17    testified on that date, November 8.  This incident

18    or these incidents that occurred up in Massachusetts

19    were in August.

20         THE WITNESS:  February and August.

21         THE CHAIRMAN:  Would you tell the board

22    why you didn't mention that to us when you were here

23    the last time.

24         THE WITNESS:  Why I didn't mention to

25    you that at another site we had a death?

1           THE CHAIRMAN:  Yes.

2           THE WITNESS:  It was still under

3    investigation.  You know, it wasn't something

4    that -- the reality is that people die from this

5    disease all the time, and while you hope it never

6    happens, you just want to make sure you get quality

7    care.  I wasn't trying to hide it.  I didn't know

8    that it was something that I should bring up.

9           THE CHAIRMAN:  Well, there were two

10   incidents, not one, but two in one place, and the

11   last one was in August, August the 18th, and the

12   other one was in February.

13          THE WITNESS:  Yes.

14          THE CHAIRMAN:  And yet you were here in

15   November, and you never mentioned to us once about

16   what had occurred back then, and I was wondering why

17   you didn't tell us about that.

18          THE WITNESS:  I didn't --

19     Q.    Doctor, is it fair to say, number 1, the

20   matter was under investigation then, and at this

21   point today, we have a clear picture that, A, there

22   is no evidence of any wrongdoing and most likely you

23   will receive your licensure back; is that fair to

24   say?

25     A.    That's fair to say, but I just didn't

Carise - continued

19

1      think it that was something I would bring up for New

2      Jersey.

3                  THE CHAIRMAN:  Any questions?

4                  MR. HENRY:  If I could.  Thank you.

5      I'll ask you, Doctor.  I'm not sure if this is the

6      right person to ask or not, but some articles we

7      were reading about those things up in Massachusetts

8      said -- I believe said the staffing was under

9      proportion that it should have been.  Could you

10     address that.

11                 THE WITNESS:  I really can.  So again,

12     when we took those facilities on, Danvers was one

13     that we hired ourselves.  In Westminster, we had a

14     group of people working there.  People were hired

15     with different job titles.  People were -- there was

16     a CEO there that we eventually had to get rid of.

17     There were a number of allegations that were made by

18     some disgruntled employees to the newspaper that

19     were put on there.  The fact that we have shoddy

20     care is just not accurate.  The fact that our staff

21     ratios are higher than the state requires so that

22     was found untrue.  The staffing ratio at Lighthouse

23     in Mays Landing right now is higher than your state

24     requires.  That's just the way that we do it.

25                     Again, a lot of this was from

Carise - continued

1    disgruntled employees that was proven false when we

2    looked into it.  If we had a fault, I would say one

3    thing we did poorly was electronic health records.

4    We had a little glitch with those.  We didn't train

5    on those enough, and so that's what, you know, where

6    you'll see there were also accusations that patients

7    didn't get treatment.  That was completely

8    unfounded.  We went through hours and hours and

9    hours of videotape.  Like I said last time I was

10   here, we had video cameras in every group room,

11   every room except the bedroom and bathroom, which

12   we're not allowed by law, and we documented and

13   showed the state of people going in and out of group

14   rooms all day all the time.

15           MR. HENRY:  A couple other questions.

16   Now, I believe in south Jersey there is a couple

17   towns that you folks were declined when you came in

18   front of the zoning board?

19           MR. HIMELMAN:  That's correct.

20           THE WITNESS:  Haddonfield.

21           MR. HENRY:  Can you address why that

22   might have happened.

23           THE WITNESS:  I'm not sure I can say why

24   the board declined us.

25           MR. HIMELMAN:  I'm not sure what your

1    question is.

2                 MR. HENRY:  Well, you were presenting in

3    front of the zoning board in the past.

4                 MR. HIMELMAN:  Correct.

5                 MR. HENRY:  I don't remember the

6    towns -- I don't have my records with me -- and you

7    were declined.

8                 MR. HIMELMAN:  Gloucester Township.

9                 MR. HENRY:  And you were declined.  I

10   was just wondering why they declined you.  Is that

11   public record?

12                MR. HIMELMAN:  Well, there wasn't an

13   actual decline, that's correct.

14                Ed, you want to address that.  This is

15   Ed -- he's an attorney --

16                MR. SACHS:  Let me -- even though you

17   are a counsel, I'm going to swear you in.  Wait a

18   minute, sir.  Please raise your right hand.

19

20   E D M U N D   C A M P B E L L,  sworn.

21   DIRECT EXAMINATION BY MR. HIMELMAN:

22                MR. SACHS:  Please state your name,

23   spelling your last name, professional affiliation

24   with the applicant.

25                THE WITNESS:  My name is Edmund

1       Campbell.  My last name is spelled C-a-m-p-b-e-l-l.

2       I'm a partner with the law firm of Campbell Rocco

3       Law, and our law firm serves at counsel to RCA.  I'm

4       licensed as an attorney in Pennsylvania and New

5       Jersey.  Grew up -- lifelong resident of New Jersey.

6                   So there are -- in two municipalities we

7       made applications.  One is Gloucester Township and

8       the other is Haddonfield, and in Gloucester

9       Township, we originally got some site plan

10      approvals, and then we had site plan approvals

11      denied.  We took appeals from those denials, and

12      subsequently, our appeal was essentially sustained.

13      The court directed the planning board to convene and

14      rehear the matter at its first available hearing and

15      grant us the relief that we had been requested,

16      which they did.

17                  With regard to Haddonfield, we made an

18      application there, and candidly, in response to

19      litigation, they're offering to buy the property

20      from us, and -- which is a completely different

21      avenue to pursue, but I think it's -- it is not

22      accurate to say we made applications in other

23      municipalities that were denied for the reasons that

24      we understand you are concerned about tonight,

25      nothing to do with that whatsoever.  In one instance

Campbell - direct

23

1        the court sent it back and it was approved, and the

2        other we're working out a different compromise.

3               Q.    So but in Gloucester Township it was

4        remanded, correct?

5               A.    Correct.

6               Q.    And then ultimately --

7               A.    It was a consent order with the board

8        and we agreed that the judge sent back.

9               Q.    It was a denial at some point, correct?

10              A.    Correct, which took an appeal, and it

11       went back.

12                    MR. SACHS:  These were prerogative writ

13       lawsuits.

14                    THE WITNESS:  Correct.

15                    MR. SACHS:  And I'm assuming they were

16       use variance applications, as well?

17                    THE WITNESS:  Correct.  They were both

18       site plan applications, not use variances, but

19       actually, there's other litigation, as well,

20       regarding under Americans With Disabilities Act --

21                    MR. SACHS:  I understand.

22                    THE WITNESS:  -- and fair housing.

23                    MR. SACHS:  Understand.  I just caution

24       the board.  Obviously, what happened in another town

25       is of no relevance for purposes of your

```
 1     consideration before this board.  Every application
 2     stands on its merits in this particular town.  So
 3     what happened in Gloucester, what happened in
 4     Haddonfield, what happened anywhere else in New
 5     Jersey in terms of an approval or denial is of no
 6     relevance.
 7
 8     D E N I   C A R I S E,  continued.
 9          THE WITNESS:  I just want to say, I
10     mean, there's universal agreement that people are
11     dying in unprecedented numbers.  There is a need.
12     But frankly, nobody wants it in their community, and
13     that's why we spent so much time at zoning meetings
14     trying to, you know, be very up front about what we
15     do, who we do it with, how we do it, and what we'll
16     be able to and willing to do to accommodate
17     concerns.  Middlesex County had 5,705 residents who
18     were admitted to substance abuse treatment last year
19     alone, so the need here is great.  We also had -- a
20     couple weeks ago, we were coming to transport a
21     resident here to our Lighthouse facility a couple
22     hours away.  The car was due at 7:30, and again, we
23     had to drive an hour and a half, and the person
24     overdosed and died at 7 o'clock at night.  So right
25     before we got there to take him all the way back out
```

1    to Lighthouse, he passed away.

2              So there's a huge need, but again,

3    everybody doesn't want it in their neighborhood,

4    which I understand.

5              MR. HENRY:  Now, this facility here in

6    Sayreville, was it 145 beds?

7              THE WITNESS:  I believe it's 149 with an

8    expected occupancy of 90 percent, which is 134.

9              MR. HENRY:  And what is the largest

10   facility you have now?

11             THE WITNESS:  Danvers was 207 beds, and

12   we have one in Devon that was an expansion is going

13   to be 240.

14             MR. HENRY:  And then my last question

15   is, you know, we talked about the deaths you had up

16   in Massachusetts.  Has there ever been any instances

17   that you had to call the police or with any of your

18   facilities that created problems or anything else

19   like that?

20             THE WITNESS:  Not that created problems,

21   and I don't know if you got a letter from the chief

22   of police in Mays Landing who said that he was

23   really glad that we were there and -- oh, mayor.

24             MR. SACHS:  We received a letter from

25   the mayor.

Carise - continued

26

1               THE WITNESS:  Saying they were glad we

2       were there.  But to answer your question directly,

3       if a patient has a heart attack or if a patient --

4       in the one case where a patient used drugs, when we

5       call an ambulance for whatever reason, in some

6       states, the police are obligated to arrive, as well.

7               MR. HENRY:  I understand.  I'm talking

8       about more of a criminal aspect more so than, you

9       know, emergency aspect where someone is dying or

10      something like that.

11              THE WITNESS:  Not to my knowledge.

12              MR. HENRY:  All right.  Thank you.

13              THE WITNESS:  You're welcome.

14              THE CHAIRMAN:  Doctor, I have another

15      question.  Correct me if I'm wrong with this

16      question.  My understanding at the Sayreville

17      facility, there will be no Medicare, no Medicaid, no

18      scholarship fund, and no beds for people without

19      insurance; am I correct in that?

20              THE WITNESS:  No, you're not correct

21      with that.  We scholarship as a company more than

22      anyplace I have ever worked.  We -- I forget what it

23      was, but, I mean, we've only been open a year and a

24      half, and we've been $3 million in scholarships

25      across all of our sites.  We scholarship all the

Carise - continued

27

1 time.  Some of our sites have Medicaid, and some do

2 not.  I do not know what the New Jersey negotiation

3 will be for that, but my -- I don't believe

4 Lighthouse has Medicaid, and so my guess is that

5 this state is not negotiating a rate that we can

6 even come close to so that we probably won't have

7 Medicaid, but we will have scholarships.

8     THE CHAIRMAN:  Okay.  That's as --

9 you're talking about the Sayreville facility now.

10     THE WITNESS:  Yes.

11     THE CHAIRMAN:  Do you have to have

12 insurance?

13     THE WITNESS:  I would say that

14 97 percent of our folks have insurance.  Well, if

15 you look at scholarships, some of our scholarships

16 don't have insurance.  About 97 percent are

17 insurance, and then there's about 2 percent that are

18 cash or self-pay, but the insurance that we take --

19 what's really important is that there's not other

20 sites -- there's one other site I think in New

21 Jersey that takes what's called in-network

22 insurance, which means your insurance is in-network

23 with us.  We have a negotiated rate with them.  We

24 don't bill them what's called out of network, which

25 is a much higher billing procedure and insurance

1    really dislikes so we try and go in-network for the

2    benefit of the patient and for the ability to serve

3    many more people.

4              THE CHAIRMAN:  Can you explain to the

5    board the scholarship fund that would be set up at

6    the Sayreville facility.

7              THE WITNESS:  I don't know because we

8    don't have a, you know, a dedicated amount, and we

9    don't have like -- we basically scholarship a lot of

10   people when we open because it's better for

11   everybody to treat 10 or 12 patients than 1 or 2 or

12   3 so we scholarship a lot when we open.  We

13   scholarship a lot when people's insurance runs out.

14   But if the board wanted something more formal, we

15   could probably put that together.

16      Q.    Maybe you can explain in your other

17   facilities.  I think the chairman is looking for

18   general sense of how the scholarship program would

19   work; is that correct, Mr. Chairman?

20             THE CHAIRMAN:  That's correct.

21      Q.    So if you could just maybe Lighthouse or

22   one of those facilities.

23      A.    I'll give you -- to the best of my

24   ability I'll give you.  Typically, it's a fireman's

25   daughter or it's a teacher's son, and they can't

Carise - continued

29

1          afford to put them through.  Sometimes it's an

2          employee's spouse or an employee's friend.  You

3          know, sometimes it's -- I won't say the mayor, but

4          it's been a public official's kid, and, you know,

5          again, I've worked in hundreds of treatment

6          programs.  I've never seen the volume of

7          scholarships, and I know that that's not a tangible

8          exactly how we do it.  If the board wanted that, we

9          could look at that, but the reality is that we --

10         frankly, it's more like we scholarship left and

11         right in an amazing way.

12              Q.    But is it fair to say, just to follow up

13         on the chairman's question, that, A, there will be a

14         scholarship program offered for the Sayreville

15         facility, and the funding and how that works will be

16         similar to your other facilities; is that correct?

17              A.    That's correct.

18              MR. SACHS:  I think we'd like to see

19         information about how these scholarships work, and

20         listen, quite frankly, I'm not concerned about the

21         public official's child.  I'm concerned about the

22         indigent child of Sayreville or the individual who

23         may not have insurance, be it a child or an adult,

24         who happens to live in Sayreville.  That's really

25         what I think.

Carise - continued

1              MR. ESPOSITO:  Or, if I may, and I'm not

2      saying this is true, but if the mayor's son who

3      wrote the letter, okay, and the letter goes out the

4      window, doesn't it?  I'm not saying that was his

5      son.

6              THE WITNESS:  No, I can tell you it

7      wasn't.  I can't tell you what public official it

8      was.

9              MR. SACHS:  So, Mr. Himelman, I think

10     maybe we would like to see some information,

11     detailed information as to how this scholarship

12     information works.

13             MR. HIMELMAN:  Sure.

14             THE WITNESS:  Yeah.  I'll work with

15     finance to get that together because they know more

16     than me exactly who they scholarship when.

17             THE CHAIRMAN:  Mr. Esposito.

18             MR. ESPOSITO:  Thank you, Mr. Chairman.

19     Just one question.  So you learned from the person's

20     death in Boston or Massachusetts that no longer are

21     you allowed phones or internet service, but with all

22     the cameras and all the security, even with internet

23     service, how did he get drugs into that facility,

24     assuming he did?

25             THE WITNESS:  It pains me to say this.

Carise - continued

1    We've looked every way from Sunday.  We don't know.

2    We have looked at all the video.  We've looked at

3    multiple things.  We search every package that gets

4    delivered.  When visitors come, we search their

5    bags.  The reality is that the, you know, a hundred

6    percent of the time -- I wish we could catch it a

7    hundred percent of the time.

8              MR. ESPOSITO:  Where there's a will

9    there's a way would you say?  If they want it bad

10   enough.

11             THE WITNESS:  It has to be an incredibly

12   strong will.  Remember, too, this is kind of a

13   disorder characterized by impulsive thinking and a

14   drive to get the drug.  Again, if there are other

15   things we should be doing, I'd want to know about

16   them and I'd want to do them, but again, we search

17   every bag, we search every visitor, we search every

18   parcel that comes in in front of the patient.  The

19   patients are not allowed to walk out the door and

20   see somebody and come back in.  If their family is

21   visiting, they don't get to go to the car to say

22   good-bye, and sometimes where there is a will,

23   there's a way.

24             MR. ESPOSITO:  Thank you.

25             MS. CATALLO:  Excuse me.  Do your

Carise - continued

1      employees get checked when they come in?

2              THE WITNESS:  Employees get checked --

3      you know, that's a good question.  The employees

4      don't get checked every day when they come in.  They

5      do get literally tested to make sure that employees

6      are not using.  That's a thought.  It's a thought.

7      Boy, I hate to --

8              MS. CATALLO:  Could an employees have

9      passed him something if he brought it in?

10             THE WITNESS:  Boy, that's -- that's a

11     possibility, you're right about that.  I'd hate to

12     imagine it, but we don't -- you're right that we

13     don't check every employee's bag every time they

14     come in.

15             MR. ESPOSITO:  Do you drug test the

16     people when they're in there, or is the presumption

17     because of coming in --

18             THE WITNESS:  No, we do drug test.  We

19     drug test upon them entering the facility, and then

20     we drug test about once a week or if there's any

21     cause for suspicion.  Cause for suspicion for us is

22     even if somebody has to go out and get an EKG at the

23     hospital and come back, we have staff go with them

24     and come back.  Anybody time anybody leaves the site

25     for a reason, we test them when they come back in.

Carise - continued

```
 1      The other tests would be for cause.  If we feel
 2      their behavior, you know, shows something unusual,
 3      we will test them there.  So we test them during the
 4      time they're there if there's any reason for cause.
 5      We test them when they come in, and depending upon
 6      what they're using when they come in, sometimes
 7      we'll do what's called quantitative testing because,
 8      for example, if somebody tests positive for
 9      marijuana, they'll test positive for the next month,
10      but if you do a quantitative, you can see the level
11      of THC going down.  So we don't want to say, hey,
12      you're positive again two weeks later when the
13      level's going down.
14              MR. ESPOSITO:  So is it possible to say
15      that the person who died -- somehow -- I mean, who
16      knows how he got these drugs.  Could it have been
17      right after a drug test and between drug tests and
18      the fact that he had something in his system, he
19      took a lesser amount than he normally would have
20      so -- I mean, I'm trying to figure out how this --
21      this is scary how it can happen, and it's got to be
22      inside job I would think, and you would think -- I
23      hate to presume, but people are capable of anything,
24      but, you know, how does it happen if every guest is
25      checked.  It's really scary.
```

Carise - continued

34

1                    THE WITNESS:   My first thought was that

2          he had it mailed, but I was reassured that we search

3          everybody's mail.

4                    MR. ESPOSITO:   Are these random tests?

5          Do you test unannounced?

6                    THE WITNESS:   They're unannounced, yes.

7          The reason we don't test them on a real regular

8          basis -- I don't know if you've been seeing this in

9          the news.   There's a really significant problem in

10         our industry right now with the Affordable Care Act

11         when it was passed had basically a loophole in it

12         and that it allowed for drug treatment programs to

13         test people for drugs and alcohol like three and

14         four times a week at a thousand dollars a pop, and

15         the loophole basically meant that they got paid for

16         that each time even when there was no reason to do

17         it, and treatment programs, unethical treatment

18         programs are making 25, 30 percent of their profit

19         is on urine drug screens, and then the people go

20         home, and if their insurance doesn't cover it, they

21         could have a hundred thousand dollar bill just for

22         that.   So we don't want to unnecessarily test, and

23         when we do test, we do it basically at cost.   In

24         fact, we don't bill separately for tests at all.

25         It's built in.   But we do it when they come.   We do

1       it to look at levels going down.  We do it for any

2       possible cause of suspicion.

3                    MR. ESPOSITO:  Thank you.

4                    MR. KUCZYNSKI:  So you check everything

5       coming in, and this is -- pertains to what's going

6       to be happening that might affect the area.  How

7       often do you find something, somebody trying to

8       sneak something in, because if they're trying to

9       sneak it in, then it's passing through our

10      community.  That's why I'm concerned.

11                   THE WITNESS:  Yeah, I'm not aware of us

12      finding anything.  Very rare.  It's amazing, though,

13      what people will do.  This is not with RCA, but at

14      another job, another place, we had a patient's mom,

15      who was a doctor, smuggling opiate pills in a bible

16      to her son in treatment because she said we weren't

17      treating his pain well enough.  I mean, it is just

18      -- this is not RCA.  It was another site.  It is

19      amazing what people do.  So again, we do leaf

20      through books when somebody mails them books.  We

21      check pockets of everything and the hems of

22      everything.  When they first come in, we actually do

23      a full body search, and I mean a full body search,

24      because we cannot afford to have drugs being brought

25      in the community.  We had no evidence whatsoever

Carise - continued

 1      with this patient that any other patient in the site

 2      used any drugs, and typically what we'll do is we

 3      will test anybody they hung around with, their

 4      roommate.  Nobody else tested positive.

 5              MR. KREISMER:  I have one question.  In

 6      the Danvers facility, you mentioned part of the

 7      problem was the staff that was acquired with the

 8      facility.

 9              THE WITNESS:  Yes.

10              MR. KREISMER:  Can you give us some idea

11      what -- how you will acquire staff in the Sayreville

12      site, how you will train the staff.

13              THE WITNESS:  Sure, absolutely.  It's

14      actually quite amazing the efforts we go to.  So we

15      have a site in Billingsley that's opening in April.

16      We're already -- tomorrow is the job fair in

17      Billingsley for a site that's scheduled to open in

18      April.  So we have job fairs typically off site at a

19      hotel.  We actually had 500 people respond to the ad

20      that went out about the job fair and on a computer

21      program saying that they're showing up, give us

22      their name and resume.  So they're expecting 500

23      people tomorrow.  We go through.  Everybody

24      interviews with somebody who is a specialist, so a

25      driver interviews with one of our drivers, a

1     clinical interviews with clinical.  We do the job

2     interviews.  We call references.

3             And then as for training when they come

4     in, there is about a month's worth of training, and

5     it ranges from anything from, you know, obviously

6     the driver's training is very different from the

7     clinician's training.  But to speak from the

8     clinical aspect, we train them in assessment.  We

9     train them in motivational interviewing and a number

10    of different other practices.  We're training them

11    much better now on how to enter notes and what kind

12    of notes to do and the electronic health record.  So

13    they get trained on everything, you know, A to Z.

14    We have a staff of 18 full-time masters level

15    trainers, and all they do is go to the sites that

16    they open and train and go back to the sites.

17            MR. KREISMER:  Do you do background

18    checks on those people that apply?

19            THE WITNESS:  We do a background check,

20    yes, and I believe we do a urine drug screen on

21    everybody that applies.

22            MR. KREISMER:  And what period of time

23    -- I mean, how long does it take to get up and

24    running?

25            THE WITNESS:  At a site.  The ramp-up is

Carise - continued

1    typically when we open, you know, we're looking to

2    ramp up maybe eight new patients a week so, you

3    know, and sometimes we hit that.  Actually, almost

4    every time we've hit it up to a certain point, and

5    when we get to a certain point, we want to -- we

6    stay kind of stable at that point for a while, make

7    sure everything is ironed out the way that we want,

8    but the ramp-up is about eight per week.

9         MR. KREISMER:  And for situations where

10   you need to seek care in a local hospital, whatever,

11   do you have meetings with the hospital?

12        THE WITNESS:  We do.  We go proactively

13   before we open, and we meet with the nearby

14   hospitals.  We have a patient advocate teams in

15   every area.  In fact, I was talking to somebody in

16   patient advocate in this area was sending us about

17   12 to 15 people a month to our Lighthouse site.

18   That person here, where they are, they're also

19   responsible for reaching out to mothers groups or

20   parents groups, but also to law enforcement, to

21   prevention programs, to the hospitals, and making

22   sure that we have a really quick line of

23   transportation if the person becomes acutely sick or

24   medically in need of additional treatment.

25        MR. KREISMER:  So I had a conversation

Carise - continued

39

1      with a doctor who is connected with a number of

2      hospitals in the area who expressed concerns about

3      their ability to deal with this kind of situation.

4                THE WITNESS:  I'm just looking for

5      something I know I have here.  So New Jersey had an

6      893 percent increase in fentanyl deaths last year

7      alone, and let me just see if I can find this.  They

8      -- you are number 6 in the country for the amount of

9      overdose visits in the ER.  So what I'd like to hope

10     is that we can decrease those overdoses in the long

11     run and that it will be a benefit to them because

12     you're not the biggest state, but per hundred

13     thousand people, you're number 6 in the country for

14     overdose visits in the ER.  Your ER's are getting

15     really slaughtered.

16               MR. KREISMER:  I guess the concern is

17     with the staff the hospital has now, there was some

18     concern about being able to deal with a number of

19     patients that are -- that that would be -- might

20     potentially be transferred to their facility and to

21     deal with that within their facility.

22               THE WITNESS:  Right.  Well, some of the

23     things that we'll do -- and again, these are people

24     that by and large live in Middlesex County so

25     they're going to your ER's anyway.  One of the

Carise - continued

1    things I'm really adamant about at our sites is that

2    we have a full medical presence, that we have

3    psychiatry and medicine so that we -- and that we

4    have RN's on staff.  We always have multiple teams

5    of nurses, but the states don't require us to have

6    RN's 24/7.  I require us to have RN's 24/7 so that

7    if somebody has a diabetic, you know, episode or

8    something that we can take care of at our site, we

9    can alleviate that kind of ER visit.  I don't think

10   that you're going to have more overdoses because a

11   treatment program's here than you did before the

12   treatment program was here.

13            MR. KREISMER:  You mentioned moving

14   someone from this area to a facility that you have

15   was like 2 and a half --

16            THE WITNESS:  Mays Landing.

17            MR. KREISMER:  Yeah.  Would you be doing

18   the same thing with potential patients or patients

19   from other counties?

20            THE WITNESS:  Yeah, we are -- and we

21   pride ourselves on and we are profoundly committed

22   to the neighborhood model.  That's why we do have

23   the advocates in the neighborhood making liaisons

24   with the hospitals, with the police chief, with the

25   whoever else, you know, we can do that with.  So we

Carise - continued

41

1       plan to get most people -- with 5,700 admissions

2       last year, we think we've got enough people right

3       here.  In fact, we had interventionists tonight

4       while we're here that are just a few blocks away

5       doing an intervention on a patient, and we will take

6       that patient to Lighthouse because we don't have

7       anything here yet.  So the reason that we're taking

8       people from here out to Lighthouse is because we

9       don't have anything here.  My expectation is, you

10      know, again, we really pride ourselves on being a

11      local place because that's what it kind of a

12      background of our clinical care, which is this.  If

13      you can get detox and residential treatment and

14      outpatient treatment and go to NA and AA and your

15      parents or your family can get family therapy or

16      education and we can have spiritual services for

17      recovering people all in one place, that's when

18      people get well.

19                  MR. KREISMER:  Thank you.

20                  MR. SACHS:  Mr. Chairman, just one other

21      question.  In terms of the nursing, the RN that's on

22      staff, are you saying that you'll have an RN on

23      site, not on staff, on site 24/7?

24                  THE WITNESS:  Yes.

25                  MR. SACHS:  Okay, and how about --

Carise - continued

1           THE WITNESS:  And by the way, that's not

2      all we'll have.

3           MR. SACHS:  No, I understand.  That's my

4      next question.  Who is going to be on site 24/7?

5           THE WITNESS:  Generally, like David

6      Dorschu, who was up here, he is on site a massive

7      number of hours, as well as his clinical director.

8      When they're not there, that's a key person in

9      charge.  You can ask him, but on his site, he

10     probably gets called in the middle of the night or

11     he gets called at different times.  One of the

12     issues we had with the Westminster site was that the

13     staff there that we inherited didn't believe in

14     doing admissions 24/7, and they had a real problem

15     with that, and they really rebelled against it, and

16     the reality is you have like this much time when

17     somebody is ready to go into treatment to get them

18     in treatment.  So we do admissions 24/7.  The

19     admission staff are there, nursing is there 24/7.

20     There's always somebody identified as the key

21     person, who is a high level person, and the -- sorry

22     to say, but our CEO's and our clinical directors are

23     on call all the time.

24          MR. SACHS:  What about physicians?

25          THE WITNESS:  There's not a physician

Carise - continued

1    there 24/7.  There is a full-time physician.  There

2    are nurse practitioners.  There are RN's, but they

3    are also on call.

4              MR. SACHS:  All right, so let's go back

5    to the physician.  So the physicians are not 24/7,

6    which --

7              THE WITNESS:  No.

8              MR. SACHS:  How many hours a day will a

9    physician generally be there?

10             THE WITNESS:  I think back to my

11   scheduling.  So here's what we're -- here's what our

12   staffing ratio is.  In a site about the size of

13   Sayreville, we would have a full-time medical

14   director.  In our staffing, we have a full-time

15   psychiatrist, and we have I think one or two

16   psychiatric nurse practitioners and one or two

17   medical nurse practitioners.  So those are the

18   medical staff above and beyond the RN level nurse.

19             MR. SACHS:  So those professionals would

20   be there during the daytime hours?

21             THE WITNESS:  Not all during the day.

22   That's why we separate that out.  So typically --

23   and again, it would be based on what the experience

24   is, but the experience is that we don't need as much

25   medical between midnight and 8 a.m.  Typically, the

Carise - continued

1        medical director is there from 7:30 until about 5.

2        Typically, one or two of the nurse practitioners are

3        there between maybe 3 and midnight, and then one of

4        them is there on the weekend.

5                    MR. SACHS:  All right.

6                    THE WITNESS:  And that's -- frankly,

7        that's higher in terms of --

8                    MR. SACHS:  I understand.

9                    THE WITNESS:  Okay.

10                   MR. SACHS:  Mr. Himelman, I think what

11       I'd like to also see, and I'm sure the board would

12       probably like to see it, as well, is -- there was

13       some ambiguity with the testimony previously, and

14       I'm not blaming any of your witnesses --

15                   MR. HIMELMAN:  Sure.

16                   MR. SACHS:  -- but I want to pin down

17       what the staffing -- what the staffing -- the

18       minimum staffing on this site will be 24/7.

19                   THE WITNESS:  I'll get that to you.

20                   MR. SACHS:  If you want to break it down

21       however you break down your shifts, if it's from 7

22       till 4, 4 till midnight, midnight till 7, I think we

23       need to know that.

24                   MR. HIMELMAN:  That's fine.  I think we

25       can get you that tonight.

    Carise - continued

 1                    MR. SACHS:  That's fine.

 2                    MR. HIMELMAN:  Also, I just wanted to

 3      add -- I'm sorry, Mr. Sachs, did you have any other

 4      questions?  Mr. Chairman, any board members have any

 5      questions?

 6                    THE CHAIRMAN:  No.

 7                    MR. HIMELMAN:  Okay.

 8                    THE CHAIRMAN:  Your facility would be

 9      21 days, correct, in-patient?

10                    THE WITNESS:  Well, what we're trying to

11      do is be a 30-day program because we don't think 21

12      is enough, but the reality is that we have to fight

13      insurance for every single day, so in terms of

14      residential care, we're shooting for a 30-day

15      program.

16                    THE CHAIRMAN:  Okay, but presently it's

17      21.

18                    THE WITNESS:  Presently depending upon

19      which site, it's between 15 and 21.

20                    THE CHAIRMAN:  Okay.  Now, a person who

21      comes in for 15 to 21 --

22                    THE WITNESS:  Yes.

23                    THE CHAIRMAN:  -- and relapses, now,

24      when that person relapses and he's brought back in,

25      is the treatment almost identical to the primary

Carise - continued

1        treatment that he had when he first came there.

2                    THE WITNESS:  It's a good question.  So

3        the residential part of care is really to stabilize

4        somebody and get them ready for the next level of

5        care.  So what we typically see with relapsers is

6        about I would say if you looked nationally only

7        about 35 percent of people who go for treatment are

8        going for the first team.  That's a national figure,

9        right.  So the reality is that the people who

10       relapse right after a residential care are people

11       that don't go to outpatients.  So we would try and

12       do things differently with that patient.  They would

13       be in some different groups, but the more of the

14       emphasis would be on making absolutely sure that

15       patient is brought into, has met their outpatients

16       therapy and committed to continuing in outpatients.

17                   Now, the other piece would be that if we

18       feel somebody needs a residential level of care of

19       90 or 120 days, we would refer them to a place that

20       specializes in that.

21                   THE CHAIRMAN:  Doctor, are you going to

22       -- are you in charge of Mays Landing?

23                   THE WITNESS:  No, I'm not.  I'm globally

24       across the board.

25                   THE CHAIRMAN:  You're in charge of all

Carise - continued

47

1      of them so you'll have a lot to say in Sayreville?

2                    THE WITNESS:  I'd like to think so,

3      yeah.

4                    MR. HIMELMAN:  We hope so.

5                    THE CHAIRMAN:  Now, you testified the

6      last time you were here that methadone would not be

7      used; am I correct?

8                    THE WITNESS:  What I testified was that

9      this is not a methadone clinic.  People are not

10     going to come every day to get methadone.  I did

11     say, too, though, that we used methadone in detoxing

12     people.  There's some people that are addicted to

13     methadone, and that's the right medication for them

14     for a period of five days or so to detox them off

15     methadone, but this is not a place where people will

16     come back to to get methadone every day.  It's not a

17     methadone clinic.

18                    THE CHAIRMAN:  Okay.  There's also a

19     drug I want to ask you about.  I don't know if I'm

20     going to pronounce this correct.  I'll spell it.

21     S-u-b --

22                    THE WITNESS:  Suboxone?

23                    THE CHAIRMAN:  Yes.

24                    THE WITNESS:  Okay.

25                    THE CHAIRMAN:  Do you use that?

Carise - continued

```
1              THE WITNESS:  Yes, we do use that for

2     detoxing, also.  So suboxone -- whereas methadone is

3     a complete agonist, suboxone is a partial agonist,

4     partial antagonist.  It is widely replacing

5     methadone in the field, although there's still a few

6     detoxing patients who do better with the methadone,

7     but the suboxone is that it is -- it's got both

8     Naloxone and Subutex in it, which means that if you

9     try and crush it and inject it, the Naloxone, which

10    is actually an opiate blocker, that becomes -- it's

11    inert unless you try and mess with the pill, and

12    then it becomes active and it blocks your body from

13    getting any of the opiate.  So we use suboxone to

14    detox people in decreasing doses.

15             THE CHAIRMAN:  So you will use those

16    drugs in your outpatients.

17             THE WITNESS:  No, just inpatient, just

18    for detox purposes, yes.

19             THE CHAIRMAN:  Board have any other

20    questions?

21             MR. EMMA:  I do.

22             THE WITNESS:  Yes, sir.

23             MR. EMMA:  During the treatment, do the

24    patients ever -- do you ever take them outside?  Do

25    they ever walk around the grounds just to get some
```

1   air, or are they really relegated, you know, to the

2   building?

3                THE WITNESS:  They go outside, but they

4   don't go outside without a staff member that's

5   responsible for them, and they don't go outside like

6   50 patients and one staff.  It's a much higher ratio

7   than that.  So it's not uncommon that they might

8   have a softball game and 10 of them will be out

9   there with two staff playing softball.  In our

10  Earleville site in Maryland, it's right on a hiking

11  trail, and there is an adventure therapist that will

12  take six people out for a hike.  So they do get

13  outside, but they don't -- and then also, we do

14  allow people to smoke.  We have a designated smoking

15  area outside.  There's always staff with them.  But

16  -- so they get out, but in a very controlled way.

17               MR. EMMA:  I'd like to piggyback what

18  Mr. Esposito was talking about with respect to how

19  the drugs were getting into the facility with those

20  two deaths.  If they're allowed outside, you're

21  saying you have a couple of monitors that are --

22               THE WITNESS:  No, what I'm saying is

23  that we're not sending 50 patients outside without,

24  you know -- that's just unheard of.

25               MR. EMMA:  Is it 1-to-1, or do you have

Carise - continued

1       a group?  What I'm saying is drugs outside, they go

2       outside, pick them up.  Are they searched when they

3       go back in?

4                     THE WITNESS:  They're not searched when

5       they go back in because the staff is with them all

6       the time, and so, for example, they might walk them

7       to the volleyball court, play volleyball, and go.

8       Now, if they had somebody come and plant drugs

9       there, they'd have to be able to pick them up

10      without us seeing them do that, and the other piece

11      of it is, too, people don't go outside and play

12      volleyball.  In fact, the state won't allow it if

13      they're still in detox, so by the time they go out

14      at all for a walk with staff or for a volleyball

15      game, they're already well into treatment, and we

16      feel like they're less of a risk.  If we ask you to

17      promise you it could never happen, I couldn't do

18      that, you know, at a hundred percent, you know, with

19      you, but I can tell you a hundred percent somebody

20      will be with them and will be on top of them, not

21      with them like watching them over there, with them

22      like the way I'm with this group of you right now.

23                     MR. EMMA:  I mean, the facility isn't

24      fenced in so someone actually could walk onto the

25      property and potentially do that.

Carise - continued

51

1              THE WITNESS:  It's possible, but I will

2       tell you we have people walking on the perimeter of

3       the property.  We have -- again, it's not every

4       second, every minute, and every square inch, but we

5       have people outside walking and monitoring the

6       property.  Everybody stops anybody who is on the

7       property that they don't know why they're on there.

8       Even our construction guys are just harassed because

9       everybody doesn't know who all the different

10      construction folks are that work for the company.

11      So, you know, can somebody do it, yeah, but we do

12      have monitors that walk the grounds that look for

13      that kind of stuff.  We have -- any staff that sees

14      somebody will say something.

15              MR. EMMA:  I know we mentioned this at

16      the last meeting.  If you could just refresh it.  As

17      far as the people are there, it's their choice to be

18      there.  They're not forced to be there.  So if they

19      get halfway through the program, they just want to

20      call it quits, they can literally get their clothes

21      and leave.  What's the process of you notifying the

22      police department?  What's the process of someone

23      just walking out the door, walking down the street.

24              THE WITNESS:  Right.  So I'll go over

25      this again.  If somebody wants to leave before their

```
 1        treatment is done, we have a step process of
 2        literally six or eight things that happen before
 3        they can leave, and it ends with you can only leave
 4        by being picked up by a family member we know and we
 5        walk you to the car or our car will take you
 6        somewhere.  It starts with we have a team of staff
 7        that will try and do what's called AMA blocking.
 8        AMA is leaving against medical advice.  They will
 9        try and AMA block.  So they will get with a person,
10        talk about why.  They have releases.  They'll call
11        their parents or spouse and say they want to go
12        home, why don't you talk to them.  They get all
13        different staff involved.  Then they gets patients
14        involved.  There's a group of patients that are kind
15        of high on the ladder of the patients that are
16        getting ready to leave and doing really well.
17        They'll try and block it.  If they still want to go,
18        again, it's not a lock-down facility, but again, we
19        have their keys, we have their wallet, we have their
20        iPhone.  We have -- if they brought a laptop in,
21        which they shouldn't, we have that, and we have to
22        sign that out.  They have to fill out a satisfaction
23        survey.  They have to sign something that says
24        they're leaving AMA.  If they're on any medications,
25        which many of them are on different medications like
```

1  heart medications or whatnot, we have to get the

2  doctor to get the scrip so that they have that

3  medication for the next two weeks while they're out

4  in the field.  So it's not a matter of just deciding

5  they want to go and walking out the door.  If they

6  did do that, we would alert authorities.  But again,

7  it means that a pretty much a middle class person is

8  left without their keys, their wallet, their cell

9  phone and whatnot.

10            MR. EMMA:  If they wanted to leave, they

11  could just walk.  There's nothing stopping them from

12  just walking.

13            THE WITNESS:  By law we're not allowed

14  to pin them down and stop them.

15            MR. SACHS:  Why would you call the

16  authorities?  Mr. Emma mentioned it, but you don't

17  have to call the police.  They're not -- you're

18  making the assumption perhaps that someone is a

19  criminal.  We've already indicated that this will

20  not accept any referrals.  So if somebody wants to

21  leave and they want to leave on their own volition

22  and you've gone through the whole procedure, they

23  can leave.

24            THE WITNESS:  They can leave.  We don't

25  call the police --

          1                MR. SACHS:  I would suggest you don't

          2        call the police because that would be an invasion of

          3        privacy of that individual to call the police and

          4        say, oh, by the way, Joe Smith, who has a drug

          5        problem, is leaving here.  That's not a police

          6        matter, and nor should it be.

          7                THE WITNESS:  I will tell you there

          8        could be a case where we feel that this is --

          9                MR. SACHS:  If they're a risk --

         10                THE WITNESS:  -- this is some kind of a

         11        danger --

         12                MR. SACHS:  That I understand.

         13                THE WITNESS:  -- and we would call

         14        because at the point at which they're not our

         15        patient and they're on our property, even if they're

         16        walking off, they're trespassing.  That's how we

         17        get --

         18                MR. SACHS:  I understand.

         19                MR. EMMA:  What happens if Joe Smith

         20        walks out of the facility and just walks 200 feet

         21        down Ernston Road and then they're at the school.

         22                MR. SACHS:  Again, we're taking a big

         23        leap that somebody who in this facility is a

         24        criminal, which obviously they're not.  We cannot --

         25                MR. EMMA:  I'm not saying they're a

Carise - continued

1       criminal, but they have some issues.

2                   MR. SACHS:  They have some issues.

3                   MR. EMMA:  Now they are on school

4       property.

5                   MR. SACHS:  Just like anybody else might

6       have issues.  I want to understand, and again, it's

7       not incumbent upon this board to require that when

8       someone leaves you contact the police.  This is a

9       voluntary facility.  It would be like if somebody

10      left a nursing home facility against medical advice,

11      would we call the police?  Probably not, unless they

12      were an Alzheimer's patient and perhaps we're

13      concerned about their safety.

14                  MR. HIMELMAN:  Correct, and, Mr. Sachs,

15      just to follow up with that, it's like any other

16      business.  If somebody were trespassing or they were

17      -- they feared for their safety, we call the police,

18      but as a normal protocol, no, correct, Dr. Carise;

19      is that fair to say?

20                  THE WITNESS:  Normal protocol, no, but I

21      just want you to stop for one second.  If this was

22      your daughter or this was your son in treatment and

23      they decided to leave and we did everything we could

24      to get them to stay, do you think that they're a

25      danger to the community?  I mean, half the people

Carise - continued

1    here with me tonight are in long-term recovery,

2    including myself.  These are your neighbor's kids.

3    These are your, you know, colleagues.  These are not

4    people that we're busing in from Camden.

5           Q.    Thank you, Doctor.

6                 MR. HENRY:  One question.  Do you have

7    any facilities by schools right now?

8                 THE WITNESS:  We have one that's close

9    to a college.  Devon is close to a school.  I

10   apologize that I don't know off the top of my head.

11                FROM THE FLOOR:  Devon is close.

12                THE WITNESS:  Close to a middle school

13   in Devon.

14                MR. ESPOSITO:  You can see the concern.

15   I don't know if you were present or you were.  We're

16   dealing with kindergarten kids and preschoolers so

17   you can understand the community's concern,

18   obviously, and the board's for that matter.  It's

19   not the overwhelming history, but it is a concern.

20                THE WITNESS:  Yes, and I don't blame you

21   for the concern.  I checked with two out of my five

22   sites today.  I got word back and I was checking a

23   lot of data.  They've never had a single person walk

24   out.  I didn't get back from the other three sites.

25   I would tell you if they did.  I really would.  I

Carise - continued

57

1      understand the concern and --

2                 MR. SACHS:  I'm thinking, you know, if

3      the board were to act favorably on this application,

4      one of the possible conditions could be that in

5      terms of your operations nobody leaves the site

6      unless they are brought into a vehicle, a motor

7      vehicle, and escorted in a motor vehicle off of the

8      site.

9                 THE WITNESS:  That's what we do.

10                 MR. SACHS:  That could be a condition of

11     any approval.

12                 MR. EMMA:  If someone didn't want to get

13     into that vehicle and just walk?

14                 MR. SACHS:  What we're going to say is

15     that, first of all, that would have to be their

16     procedure, but we could make that a condition of any

17     approval, as well.

18                 MR. ESPOSITO:  You do that now, but it

19     could be a friend.

20                 THE WITNESS:  No, if they're leaving

21     what's called AMA, we let them -- again, we go

22     through all kinds of different checks and balances.

23     It takes about 4 or 5 hours to leave AMA.  It's not

24     like they tell us and they're gone.  So at that

25     point -- and we only release them to -- usually it's

1    a parent, frankly, but the car to drive home of

2    somebody that's been involved in treatment with them

3    like a parent or our car will take them out.

4              MR. HIMELMAN:  Mr. Sachs, just thought

5    that was an excellent suggestion on your

6    recommendation on the if a patient is going to be

7    voluntarily leaving and they go through all the

8    screening process and they're checked out, we have

9    no issue with the condition being implemented that

10   they would have to be escorted into a motor vehicle,

11   which, by the way, is a very similar condition that

12   was imposed by RCA -- to RCA on another application

13   in another jurisdiction, exactly what you're

14   recommending, and there's been no issue.  I can have

15   the client testify.

16             THE CHAIRMAN:  I have one more question,

17   Doctor.  Hopefully, this is the last question.

18             THE WITNESS:  That would be great.

19             THE CHAIRMAN:  Person gets admitted to

20   your facility and goes through the 21 days.

21             THE WITNESS:  Yes.

22             THE CHAIRMAN:  And let's say that the

23   recommendation after the 21 days is the outpatients.

24             THE WITNESS:  Yes.

25             THE CHAIRMAN:  And that goes to the

Carise - continued

59

1      30-day period.  So we're talking 21 days admitted

2      plus the outpatients to come up to 1 month.  I'm not

3      sure you can answer this, but what's the average

4      cost for a 30-day treatment in your facility?

5                  THE WITNESS:  Now, I know that the

6      newspaper quoted $24,000 for a month.  That's just

7      not true for a cost.  The -- it would depend on

8      which site, and it would depend on -- I'll give you

9      an example.  If we're in network with Blue Cross of

10     New Jersey or Horizon or whatever and our network

11     rate is 550 a day, that's what they agree to pay us,

12     that's what we agree to accept, so it would be that

13     times 21 days and then the outpatient, which I

14     really hope will last longer than 1 week, maybe

15     anywhere from once a week to three times a week to

16     five days a week.  So there's different levels of

17     out patient so that would be additional cost but

18     obviously much less than the day rate.

19                 THE CHAIRMAN:  Any other questions of

20     the board?

21                 MR. EMMA:  I do.  I have one, one more.

22     You mentioned the last time you were here, but can

23     you go over the criteria of what you determine is a

24     success for a patient or a successful outcome.  Kind

25     of vague the last time that you were here you

Carise - continued

1    couldn't like pin what your success rate is.  I

2    mean, can you give us --

3                    MR. HIMELMAN:  Is that for outpatients

4    or --

5                    MR. EMMA:  For just recovery for in

6    patient.

7                    THE WITNESS:  Yeah.  The thing about

8    this field is that you got to go back to how it

9    evolved.  It's a paraprofessional field.  It was.

10   One addict helping another getting people sober,

11   right, and so the goal was always a hundred percent.

12   So the field starting measuring itself.  As the

13   field become more professionalized, and as we got

14   covered by the Affordable Care Act as one of the 10

15   essential benefits that insurers had to cover it,

16   and as we started getting paid more by insurance,

17   the field has had to really change and to really

18   deliver care, document care, and the field wants to

19   get paid for it like a regular medical field, right,

20   you know, and all that came around the same time as

21   we showed the genes that the addiction gene was

22   located on and other things.  So the reality is

23   because of those transitions, the fields never had a

24   gold standard.  If you asked me personally from my

25   professional career as an NIH researcher for

Carise - continued

61

1     18 years, the number 1 goal of residential --

2     actually, there's two goals in residential.  They're

3     equally important.  One is to stabilize the patient,

4     stabilize medical, psychiatric, family problems,

5     stabilize the patient.  The second goal of

6     residential treatment, equally as important, is get

7     them involved in outpatient treatment because when

8     somebody goes, particularly if they go to just detox

9     and leave, that's an incredibly high risk time for

10    that person to overdose and die because they no

11    longer have the drugs in their system if they go

12    back out and use again.  That's when most people

13    die.  There's two times that people are very high

14    risk for death.  One is upon discharge from jail,

15    and the other is upon discharge from detox, okay.

16    So my goal, the first goal I would look at is did

17    they transition to outpatient care, and the way the

18    government, the feds would define that would be --

19    or the NIH -- would be attending at least three

20    sessions.  The goal I would have for somebody -- a

21    lot of the research centers around 90 days.  It

22    seems that if you can get somebody to commit to

23    something and do it on a regular basis for 90 days,

24    they have a really greatly increased chance of

25    sticking with that.  Whether it's frankly a diet or

Carise - continued

1      quitting drugs or exercising, there's a 90-day kind

2      of piece.  If I can get somebody to stay in some

3      kind of treatment, even if it's just outpatient once

4      a week, for longer than that time period, that's my

5      next goal.

6                  MR. EMMA:  So you're saying that the

7      high risk for a patient is right after they finish

8      their inpatient and that transition to outpatient,

9      so do you keep any type of records?  Do you know

10     what your --

11                 THE WITNESS:  Absolutely, we keep both

12     records, and we really push to get people to

13     transition to the next level of care with us so that

14     it's an easier transition.  We try and drive them

15     there and meet their therapist, see that they go.  I

16     can tell you the national statistics about

17     50 percent of outpatients first visits don't show

18     up, and 50 percent of those that show up the first

19     time don't show up the second time, so what we do to

20     try and alleviate that is to go and introduce them

21     to the outpatient therapist.  I even design my

22     outpatients to use the same furniture, the same type

23     tones and colors so they feel like they're kind of

24     coming home, you know.  What we do is we set up a

25     campus where we also have, you know, detox,

1    inpatient, and outpatient, and then as we grow in

2    that community, we see where the folks are coming

3    from and we site satellite outpatients around.  So

4    because we're kind of new, we don't have as much of

5    that, but in New Jersey, so we have outpatients in

6    Mays Landing site.  We also have it in Manahawkin, I

7    believe Cherry Hill, and Voorhees, and so we try and

8    get them into that site.  We have -- I think about

9    26 percent of people stay at Mays Landing to do

10   their outpatients there.  Another I think 25 or so

11   percent connect with other outpatients, and we're

12   still working to get that number higher and higher.

13   The biggest risk is when they're right out of detox,

14   but it's also out of residential.

15              MR. EMMA:  So I guess what I'm getting

16   at is I'm trying to quantify what success is.  Like

17   how do you gauge success to know that your program

18   is effective, maybe you can do something different.

19   How do you weigh that?

20              THE WITNESS:  What we can do, again,

21   since there's no gold standards and since

22   treatment --

23              MR. EMMA:  What do you guys use as a

24   standard?

25              THE WITNESS:  What we use is length of

Carise - continued

1    time in treatment.  We use satisfaction ratings,

2    which is something we get now on a random and

3    regular basis.  We use transitions to outpatient.

4    We use type of discharge.  We call people up for the

5    first four weeks after they've gone and ask them a

6    bunch of questions, and we're just putting together,

7    you know, a calling center that will call people for

8    up to a year, and while I do say that the goal is

9    the abstinence from drugs and alcohol, I also want

10   to for the community and for -- you know, everybody

11   is different, has a different goal.  So your police

12   system want to know that they haven't been arrested.

13   Their insurance wants to know that they haven't been

14   in and out of the ER because substance abusers take

15   11 times the amount of medical treatment costs as a

16   non substance abuser.  So I also want to look at

17   things that the community values because frankly,

18   the community doesn't really always care if they

19   don't have a drink for a year and they get their

20   birthday cake.

21             THE CHAIRMAN:  Any other questions from

22   the board?

23             MR. HIMELMAN:  Mr. Chairman, thank you.

24   So to address your questions and Mr. Sachs'

25   questions, I'd like to call David Dorschu, who will

1      address the scholarship issue and also the staffing.

2      If you recall, he operates one of the RCA facilities

3      in south Jersey.  If he can address that and pretty

4      much he's going to explain how that works there, and

5      be very similar here.  I'll let David explain that.

6              MR. SACHS:  You're still under oath,

7      sir.

8

9      D A V I D   D O R S C H U,   continued.

10             Q.    Just for the record, just state your

11     name, spelling it, please.

12             MR. SACHS:  No, he's okay.  He's all

13     right.  We swore him in already.

14             MR. HIMELMAN:  No, but for the reporter.

15     I want to make sure that --

16             MR. SACHS:  Didn't I swear him in

17     already?

18             Q.    David, if you would just explain how the

19     scholarship program works at your facility and also

20     the staffing requirements to address Mr. Sachs'

21     questions about the staggering of shifts and would

22     that apply to the Sayreville facility.

23             A.    First of all, when it comes to

24     scholarships, Dr. Carise made a statement I think is

25     really important to repeat, and that statement is

Dorschu - continued

66

1      that Recovery Centers of America scholarships more

2      clients than personally any organization I've ever

3      been involved with.  So I've been in the substance

4      abuse treatment field for over 22 years

5      post-graduate, and I can tell you that we frequently

6      do scholarship people, okay.  How do those

7      scholarships come about?  Our business development

8      folks makes me aware of someone who's in need, and

9      then what the process is that I will then take that

10     to my corporate office, the corporate finance

11     office, with a plan for that patient as to how many

12     days I'm requesting that scholarship and then what's

13     the plan once they leave, do they have stable

14     housing, can we get them into outpatient, and that

15     type of thing.  I can tell you that 75 percent of my

16     scholarship requests are approved, and I'm very

17     proud to say that.  So there's not necessarily a

18     scholarship fund per se, but that's the process that

19     is followed when it comes to scholarship.  Does that

20     satisfy your --

21          Q.    Well --

22               MR. SACHS:  Not really, no.

23          Q.    So if you could address for the board

24     and for the public, so you mentioned that 75 percent

25     of the requests are approved for scholarship

1     requests, correct?

2           A.     Uh-huh.

3           Q.     Okay.  Can you quantify that, and you

4     can also explain how that process works.

5           A.      It probably equates to about two clients

6     per month that we are approving scholarships for,

7     probably about 20 to 25 days total of scholarship

8     per month of what we refer to as patient days.

9                  MR. EMMA:  Is it per facility?

10                 THE WITNESS:  I'm sorry?

11                 MR. EMMA:  Is it per facility?

12                 THE WITNESS:  I can only speak to my

13    facility, which is in Mays Landing.  I can't speak

14    to the other facilities.

15          Q.     And in Mays Landing, since you've been

16    there, can you give us a sense of the dollars that

17    have been awarded scholarships and for what period

18    of time, just broadly if you can.

19          A.      Probably about an average probably about

20    $2,000 a month, $2,500 a month.  That's off the top

21    of my head.

22          Q.     And for how long has that -- since the

23    facility has been operational?

24          A.      Well, since I've been CEO, which is

25    16 months, which is since August of 2016.

Dorschu - continued

68

```
 1                  MR. SACHS:  So what you're saying is

 2      that Mays Landing your average is about two clients

 3      per month are there on scholarship.

 4                  THE WITNESS:  Uh-huh.

 5                  MR. SACHS:  All right, so that's 24

 6      scholarships a year?

 7                  THE WITNESS:  Approximate.

 8                  MR. SACHS:  All right, and what -- and

 9      it's for 20 to 25 days?

10                  THE WITNESS:  Between the two clients.

11                  MR. SACHS:  Okay.

12                  THE WITNESS:  So in other words, number

13      of patient days would be between 20, 25.

14                  MR. SACHS:  What happens after the

15      scholarship -- the program I know runs longer than

16      20 days in some circumstances.

17                  THE WITNESS:  Uh-huh.

18                  MR. SACHS:  Twenty-one days?

19                  THE WITNESS:  Yes.  So then what we're

20      doing is we are trying to arrange for them if they

21      have housing needs to attempt to get them into sober

22      housing, to utilize community supports for that,

23      contacts that we have within the sober living

24      community.

25                  MR. SACHS:  So you're having them
```

1        removed from the site is what you're saying.

2                    THE WITNESS:  Uh-huh.

3                    MR. SACHS:  Okay.  All right.

4         Q.    Okay.  Now -- I'm sorry?

5                    MR. ESPOSITO:  You're a private company

6         so I'm not going to ask you your cost per patient.

7         It's your business.  So scholarship in the

8         traditional sense is you have an endowment and you

9         take from that endowment, but it doesn't really cost

10        you much to have a patient.  If you have 130

11        patients and five are on scholarship, doesn't really

12        cost you anything, or do you build charitable -- I

13        don't even know if it's charitable organizations out

14        there that fund those scholarship.  So it's just you

15        saying, you know what, here's a bed, we're not going

16        to bill for that bed so that's kind of your

17        scholarship.  It's kind of just a charity that

18        you're providing.

19                    THE WITNESS:  The cost associated with

20        scholarshipping a client include feeding that

21        client, includes medication if they require

22        medication because there's no insurance to help pay

23        for that medication, staff, staffing obviously, but

24        also, I run in Mays Landing at or near capacity so

25        if someone is in that scholarship bed, then it could

Dorschu - continued

70

1    mean that someone else isn't.  So there is a cost

2    involved.

3                MR. ESPOSITO:  Okay.

4                THE WITNESS:  Yes, and is someone else

5    underwriting that, no.

6                MR. ESPOSITO:  So if I may ask, if it

7    were my company, I don't know if I would be so

8    charitable.  Maybe I would, maybe I wouldn't.  Why

9    are you?

10               THE WITNESS:  Because people are dying,

11   and I don't mean to sound overly dramatic, but

12   that's the case.  It is my personal approach to any

13   scholarship request that I receive as CEO of Mays

14   Landing Lighthouse that I never say no.  Now, I

15   don't have final decision making authority, but my

16   practice is I never say no, and I always make that

17   request then to our corporate office.  That's my

18   protocol I have to follow.

19               MR. ESPOSITO:  Thank you.

20               MR. HENRY:  For clarification.  You had

21   indicated that it cost about $2,500 for these

22   25 days for the scholarship fund.

23               THE WITNESS:  Uh-huh.

24               MR. HENRY:  The doctor before said costs

25   about $500 a day so I was wondering how you came up

Dorschu - continued

 1     with that number.

 2               FROM THE FLOOR:  You're wrong.  You made

 3     a big mistake.

 4               THE WITNESS:  Can you repeat that.

 5     Sorry.

 6               MR. HENRY:  The doctor said it cost $500

 7     a day for a --

 8               THE WITNESS:  I think she was using the

 9     example of a reimbursement that we would receive

10     from an insurance company.

11               MR. HENRY:  So I was just wondering how

12     you came up with $2,500.

13          Q.    I think there was an error.  My

14     understanding -- let me ask this question.  Do you

15     want to sort of correct your testimony on the

16     $2,500?  You want to elaborate on that just so we're

17     clear.  Maybe you --

18          A.    So I'm not clear of the question,

19     though.

20          Q.    Well, first let's find out what the --

21     we can have Dr. Carise come up and address that

22     question.

23               MR. HIMELMAN:  Deni, why don't you come

24     up.  I think it was a math error.

25               DR. CARISE:  I actually think it's a

Dorschu - continued

72

1    math error.  What does it cost per day to treat a

2    patient about?  What do we get from insurance to a

3    patient?

4              THE WITNESS:  Well, it costs -- we

5    receive from insurance and it averages about $725 a

6    day.

7              DR. CARISE:  So what's what we receive

8    in insurance as our average between detox and

9    residential.

10             THE WITNESS:  Right, right.

11             DR. CARISE:  And you would multiply that

12   times 25 days.

13             MR. HIMELMAN:  That's correct.

14             DR. CARISE:  You're way off.

15             MR. HIMELMAN:  He's not a math major.

16   Does that clarify that?

17             MR. HENRY:  Yes, it does.

18             MR. HIMELMAN:  Thank you.  I thought the

19   same thing actually.  I was going to follow up on

20   that.  Any other questions on the scholarship

21   program?  Okay.

22        Q.   David, if you would address the other

23   issue regarding the staffing, how that works at your

24   facility and would it work similar to Sayreville,

25   and if you could describe who's on site, you know,

Dorschu - continued

1     24/7 and what the shifts are and personnel, et

2     cetera?

3          A.     I'd like to give an example of right

4     now.  It is about 10 minutes of 9 on Wednesday

5     evening so this is our second shift.  Currently, I

6     have 45 clients in my Mays Landing site, and for

7     those 45 clients, I have five nursing -- nurses on,

8     and I have six what we refer to as recovery support

9     specialists.  I have two admissions staff members.

10    I have one what we call grounds monitor, which is

11    checking the grounds and that type of thing for

12    security reasons.  And I have a receptionist and a

13    housekeeper.  So that's how many staff members I

14    have on right now.

15          During our first shift, obviously, those

16    numbers are higher for those same 45 clients.

17          Q.     What are the shift hours?

18          A.     Its depends on the department.  As an

19    example, the nursing shift is a 12-hour shift, 7A to

20    7:30P or 7P to 7:30A.  So they're working 12-hour

21    shifts.  When it comes to the recovery support

22    specialist staff, that is 7 to 3, 3 to 11 p.m.,

23    11 p.m. to 7 a.m.

24          Q.     And the recovery specialist encompasses

25    what?

Dorschu - continued

```
 1              A.     They are -- essentially you might think

 2      of them as techs.  They're there to work with the

 3      client, to make sure the clients are where they're

 4      supposed to be.  They run groups, they do lectures,

 5      that type of thing.

 6              Q.     Okay, so we have the registered nurses?

 7              A.     Uh-huh.

 8              Q.     And we have the recovery systems --

 9              A.     I want to be clear on that just for

10      clarity sake.  We always have -- Dr. Carise

11      mentioned there's one RN that is physically in the

12      building 24/7.  We also have a minimum of four other

13      nurses.  Some of those other nurses might be RN's,

14      might be LPN's.

15              Q.     Fair point.  Other staff.

16              A.     So recovery sports specialist.  We have

17      nurses -- and this is right now.  We also have two

18      admissions counselors on.  We have some as I

19      mentioned called a grounds monitor that is checking

20      the grounds and doing the security piece of it.  We

21      have a receptionist, and we have a housekeeper.

22              Q.     Any medical physicians there 24/7 --

23              A.     No.

24              Q.     -- or are they doing rounds, or how does

25      that work?
```

1          A.    We have a medical staff on about --

2     physically in the building an average of about

3     10 hours a day, and when they are not physically in

4     the building, they are on call.  So there's always

5     medical personnel that are at a minimum available on

6     call.

7          Q.    But they are there during the working

8     day, as well?

9          A.    Uh-huh.

10         Q.    Any other staff that you didn't cover?

11         A.    For this point in time, no.  For a

12    second shift, no.

13         Q.    And is it your understanding that there

14    would be a similar staff arrangement and shifts for

15    the Sayreville facility?

16         A.    Well, yes, taking into consideration

17    that I have currently 45 clients or a total bed

18    capacity of 53.

19         Q.    I understand?

20         A.    Sayreville will be more than twice as

21    large.

22         Q.    But on a proportional basis.

23         A.    On a proportional basis.

24         Q.    But the staffing shifts will virtually

25    be the same, correct?

```
1              A.     Uh-huh.

2                     MR. SACHS:  Well, Sayreville will be

3      three times larger.

4                     THE WITNESS:  Uh-huh.

5                     MR. SACHS:  I preface this as a former

6      prosecutor, okay.  Nothing ever -- nothing good ever

7      happens at 2 a.m., okay.  We know that.  Nothing

8      good ever happens at 2 in the morning.  Tell me in

9      your Mays Landing staff, in your Mays Landing

10     facility, who's there at 2 a.m. in the morning.

11                    THE WITNESS:  Two o'clock in about 4 or

12     5 hours?

13                    MR. SACHS:  Two a.m.

14                    THE WITNESS:  We will have five nurses

15     on.

16                    MR. SACHS:  So you'll still have five.

17                    THE WITNESS:  We'll still have the five

18     nurses.

19             Q.     Yeah.  Is one an RN?

20             A.     And one is an RN out of those five, a

21     minimum of one.  There could be two RN's on at

22     night.

23                    MR. KUCZYNSKI:  Is that because it's

24     12-hour shifts?

25                    THE WITNESS:  It's 12-hour shifts, okay.
```

Dorschu - continued

77

 1    We will have two RSS staff on, and at that time we

 2    will have our grounds monitor on, as well.

 3                MR. SACHS:  So you won't have the --

 4                THE WITNESS:  We won't have a

 5    receptionist.

 6                MR. SACHS:  You lose a receptionist and

 7    you lose some administrative staff.  All right.  And

 8    you lose some of your recovery staff.

 9                THE WITNESS:  Right.

10                MR. SACHS:  Okay.  All right.  But you

11    do have the five RN's, the five --

12                THE WITNESS:  Five nurses.

13                MR. SACHS:  Okay.  All right.

14                MR. ESPOSITO:  How many beds do you

15    have?  How many can you fill?

16                THE WITNESS:  Fifty-three.

17                MR. ESPOSITO:  Fifty-three, okay.  So if

18    you had full capacity in Sayreville, you're not

19    going to triple the staff.  That would be

20    outrageous.  But what would it be, double, one and a

21    half?  More nurses.  You don't need more

22    receptionists obviously, but more nurses?

23                THE WITNESS:  I don't -- I couldn't give

24    you an exact number.  No, it would not triple, but

25    perhaps twice as many or at least one and a half

1        times as many, and that's an estimate.

2                    MR. ESPOSITO:  Okay.  Of course.

3                    MR. HENRY:  Could you explain what your

4        ground monitor does, his job.

5                    THE WITNESS:  Grounds monitor position

6        is there to inspect the clients when they come in,

7        any packages, luggage, that type of thing when

8        someone is being admitted.  They're also constantly

9        checking the grounds, both outside as well as inside

10       the building.  They are checking video cameras, that

11       type of thing.  It's basically a security position.

12                   MR. HENRY:  Okay.  Thank you.

13                   THE WITNESS:  And we have grounds

14       monitors seven days a week.

15                   MR. EMMA:  Are they licensed to carry?

16       Are they licensed to carry a weapon?

17                   THE WITNESS:  No.

18                   MR. ESPOSITO:  How many would be in

19       Sayreville?  I mean, one security guard for 135

20       people seems a little -- seems minimal.  I don't

21       know your business.

22                   THE WITNESS:  No, that's one for 53.

23                   MR. ESPOSITO:  So you think you would

24       double --

25                   THE WITNESS:  It would at least double.

 1            MR. SACHS:  I don't want to speculate as

 2    to what it's going to be.  I'd like to know what

 3    it's going to be.

 4            DR. CARISE:  I can get it.  I can get

 5    it.

 6            MR. SACHS:  If you can provide that

 7    information, that's fine.

 8            MR. HIMELMAN:  We can do that tonight.

 9    That's very good.

10            MR. SACHS:  I don't want it to be, well,

11    maybe.

12            MR. HIMELMAN:  Fair point.  Fair point.

13            MR. SACHS:  Okay.  Fine.

14            MR. HIMELMAN:  Mr. Chair, any other --

15            MS. CATALLO:  I have another question.

16    I'm reading here that you're looking to put a patio

17    behind the building.  I don't think this is for you.

18    Whoever it is for.  You're looking to build a patio

19    back there for the patients.  What kind of security

20    measures are you going to take back there when they

21    spend time back there?

22            MR. HIMELMAN:  We can have one of our

23    RCA representatives address that question.  Why

24    don't you just state your name.

25            MR. SACHS:  First of all, please raise

1    your right hand.

2

3    M I C H A E L   D E S R O S I E R S,   sworn.

4    DIRECT EXAMINATION BY MR. HIMELMAN:

5              MR. SACHS:  Please state your name,

6    spelling your last name, and profession.

7              A.    Michael Desrosiers, D-e-s-r-o-s-i-e-r-s.

8    I'm the director of operations at Lighthouse, but I

9    also serve in a lot of different facilities,

10   capacities, and all of our sites across the board.

11             Q.    And where is Lighthouse?

12             A.    Lighthouse is, in Mays Landing New

13   Jersey.

14             Q.    Thank you.

15             A.    So when we have space such as like a

16   patio or we have, you know, some outdoor type of

17   events, like Dr. Carise already spoke about they're

18   all attended with RSS staff, so on and so forth, and

19   it's proportional to how many staff is out there to

20   -- how many patients are out there versus how much

21   staff is out there.  So I haven't looked at the

22   plans yet for the patio, but again, that will be

23   first monitored -- you guys asked about the grounds

24   monitor, and I would like to expand upon that.  This

25   is a person with a background.  We use somebody in

 1          the military or we use somebody who has a lot of

 2          treatment experience or law enforcement, and that's

 3          kind of where we're really targeting, people who

 4          worked in the treatment space who really understand

 5          what we're looking for, not just the average person

 6          to say, hey, we're a security guard and we stood at

 7          a bank and so on and so forth.  It's more people

 8          with treatment type of experience that understand

 9          what we do and things that we would be looking for

10          at all times.

11                We talked about when they do go out

12          there and they do come in, what would they be

13          looking for or how do we know that they're not

14          coming back with stuff.  These people are trained

15          for that specifically, understanding that a soda can

16          in the yard could mean something to really turning

17          over every single stone to make sure that's going

18          on.  So when we talk about an outside space like a

19          patio or a garden or a hike or a walk, these people

20          once, like I said, the ratios are strictly followed,

21          so so many patients per staff, and then that grounds

22          monitor also will be out there patrolling that area

23          and making sure it's safe.

24                MS. CATALLO:  My question is is it going

25          to be fenced in. You know, if you have one security

Desrosiers - direct

82

1    guard out there with let's say 20 people, 25 people,

2    is it possible that somebody could just walk off?

3                    THE WITNESS:  So again, no, because it's

4    not just that one security guard.  That security

5    guard is the preventative measure before the

6    patients even get outside, looking, making sure

7    there's nothing outside and so on and so forth, but

8    the recovery support specialist will be with those

9    patients outside, with them at all times.

10                   MS. CATALLO:  So the area does not get

11   fenced in.

12                   THE WITNESS:  I can't speak -- like I

13   said, I haven't seen the plans to say.

14                   MR. HIMELMAN:  My understanding is the

15   outdoor patio as presented on the revised site plan

16   does have a fence around the perimeter.

17                   MS. CATALLO:  There will be a fence.

18                   MR. SACHS:  My recollection is there was

19   some discussion at the last meeting about fencing,

20   and I see on the revised plans there is fencing.

21                   MR. HIMELMAN:  Mr. Sachs, that's

22   correct, and I think the chairman had asked --

23                   MR. SACHS:  It's a good idea.

24                   MR. HIMELMAN:  Yeah.  My understanding

25   is the chairman had asked that we take a look at

Desrosiers - direct

83

1        that, and we did submit revised plans showing fence

2        around the perimeter.

3                    MS. CATALLO:  Okay.  That's good.

4                    MR. HIMELMAN:  Does that address your

5        question?

6                    MS. CATALLO:  Yeah.

7                    MR. HIMELMAN:  Mr. Chairman, did you

8        have any other questions?  Or anyone else?  I'm

9        sorry.

10                    MR. EMMA:  You're talking about the

11        ratio between patient and staff; what is that ratio?

12                    THE WITNESS:  You know, I think it

13        varies from state to state.  What's our ratio -- I'm

14        sorry.

15                    MR. HIMELMAN:  In you don't know the

16        answer, I'll have David answer.

17                    MR. SACHS:  You're going to get me the

18        staffing information, right?

19                    MR. HIMELMAN:  We're going to come --

20        when you say the staffing information, you mean the

21        number per shift and all that?  I think David just

22        testified to that.

23                    MR. SACHS:  No, no.  You're going to get

24        me something for this site.  I don't care about Mays

25        Landing.  I want to --

1              DR. CARISE:  What I will get you is the

2      staffing per shift and the people we're hiring for

3      this site.

4              MR. SACHS:  That's what I want to know.

5              DR. CARISE:  The ratio there is 1.4, 1.4

6      staff to each patient.

7              MR. SACHS:  Okay.  Fine.

8              MR. HIMELMAN:  Fine.  Okay.  Any other

9      questions?  Okay.  And, Mr. Sachs, that would

10     include the grounds monitor.  We will also provide

11     that information to you, but my understanding is

12     there will be two for the site.

13             Mr. Chairman, I don't think we have any

14     further questions of these witnesses.  I would like

15     to proceed, but, Mr. Sachs, you might have a

16     question.

17             MR. SACHS:  I don't have any questions.

18     Are you okay?

19             MR. HIMELMAN:  We'll take a break.

20             MR. SACHS:  Take a 5-minute break, Mr.

21     Chairman?

22             THE CHAIRMAN:  Five-minute break.

23             (Board recess)

24             MR. HIMELMAN:  Mr. Chairman, thank you

25     very much.  We have one additional witness this

1      evening, Christine Cofone, who is our additional

2      planner on this application.  We have to have her

3      sworn in and qualified.

4             MR. SACHS:  Miss Cofone, please raise

5      your right hand.

6

7      C H R I S T I N E    C O F O N E,  sworn.

8      DIRECT EXAMINATION BY MR. HIMELMAN:

9             MR. SACHS:  Please state your name,

10     spelling your last name, professional affiliation

11     for the record.

12            THE WITNESS:  Christine Ann Nazzaro,

13     N-a-z-z-a-r-o, Cofone, C-o-f-o-n-e.  Business

14     address is 125 Half Mile Road, Suite 200, Red Bank,

15     New Jersey, and I'm the principal and the owner of

16     the Cofone Consulting Group.

17        Q.   Miss Cofone, can you just give a brief

18     background of your CV and educational experience --

19     educational background and experience.  I know

20     you've testified before numerous planning and zoning

21     board, but for the record.

22        A.   I have, yes.  I've been practicing for

23     about 22 years.  I've testified here in Sayreville

24     and before about 380, 385 other planning and zoning

25     boards throughout the State of New Jersey.  So

Cofone - direct

1      clearly the balance of my practice or the lion's

2      share of my practice is really offering testimony

3      before planning and zoning boards.  I'm an

4      affordable housing special master working for about

5      eight different judges and about 25 different

6      municipalities.  I'm a planning and zoning

7      instructor for the Rutgers Center For Government

8      Services.  I'm a professor adjunct at Monmouth

9      University.  I'm teaching a special real estate

10     course this spring, and in addition to my private

11     work and teaching, I am also a public consultant for

12     the Casino Redevelopment Authority and a number of

13     municipalities throughout the state.

14                 THE CHAIRMAN:  Okay.  I want to make a

15     motion that we accept her credentials.  Proceed.

16                 MR. HIMELMAN:  Mr. Chairman, thank you.

17          Q.    Miss Cofone, you've had an opportunity

18     to review this application in some detail, correct?

19          A.    I have.

20          Q.    Okay, and you were here at the last

21     hearing when Mr. Higgins was testifying on the

22     planning and zoning related issues; is that my

23     understanding?

24          A.    Yes, I was.

25          Q.    Okay.  Now -- and you've reviewed this

1    matter, and could you just briefly discuss why you

2    believe this particular application is inherently

3    beneficial and discuss your other planning opinions.

4         A.    Sure.  The concept of inherently

5    beneficial uses is to deal with those uses, it's a

6    judicially created term, meaning it's not something

7    that's defined in your land use ordinance.  It's not

8    a permitted use.  Inherently beneficial uses are

9    those uses that are created --

10              FROM THE FLOOR:  Excuse me, her mic

11   isn't working.

12              THE WITNESS:  Is that better?  Okay.  So

13   what I was saying was what's an inherently

14   beneficial use, and I know Mr. Higgins testified

15   last month.  Mr. Leoncavallo also spoke last month,

16   and they both were in agreement that the proposed

17   use is an inherently beneficial use, and under the

18   law, they're judicially created to deal with those

19   uses to deal with a relatively narrow range of

20   enterprises so universally considered to be a

21   community value that municipalities should be

22   favorably disposed towards their inclusion, and

23   they're generally institutional in nature.

24              Right now, in the current climate that

25   we live in, as a land use professional who testified

Cofone - direct

1   on hundreds of applications, inherently beneficial

2   and otherwise, I can't think of a more inherently

3   beneficial use in this kind of climate than the

4   proposed recovery center that's being proposed here

5   this evening.

6          Further, there have been decisions in

7   New Jersey that have rendered these type of

8   facilities as inherently beneficial.  Judge

9   Jacobson, who is the assignment judge in Mercer

10  County, overturned a decision in Lawrence Township,

11  where a detox center was denied by the zoning board

12  of adjustment, and then that was subsequently

13  overturned by Judge Jacobson, and in her decision,

14  she found that that recovery -- that detox center

15  was, in fact, an inherently beneficial use.

16         I found the testimony and the

17  information that Dr. Carise provided to this board

18  to be staggering as to the benefits and the need for

19  these type of facilities in the state.  The Federal

20  Fair Housing Act -- this is a protected class.  The

21  persons who are going to be occupying this facility

22  are -- have a disability.  The Federal Fair Housing

23  Act considers discrimination a refusal to make

24  reasonable accommodations for persons with

25  disabilities.  In Sayreville, there is no zone where

1      we can go and see and say, well, we might not be

2      permitted here in the prime zone, but elsewhere we

3      would be permitted.  Based on my review of your

4      zoning ordinance, there is no alternative for us to

5      go to another site and be treated as a permitted

6      use.

7                      So in the instance you have a situation

8      where we are asking you for the permission to use

9      the facility here.  I did not attend the

10     interpretation hearing on this phase or that phase

11     of the applications or the progressing of this

12     application, but in so doing, I did have an

13     opportunity to look at the definition of long-term

14     care facility, and whether we're an inherently

15     beneficial use or not, certainly that makes sure

16     that we presumptively satisfy the positive criteria.

17     We don't have to satisfy particular suitability

18     because we're an inherently beneficial use, but we

19     still have to talk to you a little bit about the

20     negative criteria.  The negative criteria does not

21     ask you as a board to hold this or any other

22     applicant that there be no detriment at all, just

23     that the benefits of the grant of the deviation

24     outweigh any detriment.

25                     So when you look at the long-term care

Cofone - direct

1        facility definition, and I understand the zoning

2        board has already determined we're not a long-term

3        care facility, we're here asking for the relief, but

4        the impacts of that are very similar.  So when you

5        talk about an impairment of Sayreville's zone plan,

6        you allow for facilities that provide a full range

7        of 24-hour direct medical nursing and other health

8        services, registered nurses, licensed practical

9        nurses, and nurses aides provide service prescribed

10       by a resident physician.  It is for those older

11       adults who need health supervision but not

12       hospitalization.  The emphasis is on nursing care,

13       but restorative physical, occupational, speech, and

14       respiratory therapies are also provided.  This level

15       of care may also include specialized nursing

16       services, such as intravenous feeding or medication,

17       tube feeding, injected medication, daily wound care,

18       rehab services, and monitoring of unstable

19       conditions.

20               While that is exactly not what we do at

21       RCA, it sounds a lot like it based on the testimony

22       that you have.  So from a planning and land use

23       impact point of view, I don't see the substantial

24       detriment to your zone plan.  I've been to the site.

25       I've looked at the facility.  So when you're looking

1      at the negative criteria, of course, you want to

2      minimize or mitigate any conditions with the

3      imposition of reasonable conditions.  I heard a lot

4      of things at the prior hearing and at this hearing

5      that I think that this board can do and impose as

6      reasonable conditions to mitigate any negative or

7      perceived negative conditions.  I think clearly the

8      overture that we would be willing to not act as an

9      alternative to incarceration or the criminal justice

10     system.  So we are not here to house people who are

11     using this as an alternative to escape prison.

12              One of the truest things that I think

13     Dr. Carise said is we're not hearing housing bad

14     people trying to get good.  We're here housing sick

15     people trying to get well.  So when you think about

16     the negative criteria, I think that that's certainly

17     one thing that we can do.  There are a number of

18     other conditions, you know, making sure that a

19     person is not discharged into the community or

20     certainly things that we can do to minimize any

21     negative impacts.  So I think, clearly, I think we

22     meet our statutory burden of proof.

23              The other thing that I'll speak to you

24     is more from a personal level.  I know there's been

25     a lot of questions tonight about, you know, who is

Cofone - direct

92

1          going to be in this facility, who comes to RCA, what
2          type of people attend these facilities.  Well, i can
3          tell you right now it's people like me, certainly
4          not in families like mine.  I'm certainly not in
5          recovery.  I wouldn't want to represent that to the
6          board, but we did bury my daughter's father three
7          Octobers ago.  October 2 of 2017, we lost my
8          daughter's father to the battles of opioid
9          addiction.  So this is a disease that does not
10         discriminate against financial.  It does not
11         discriminate on color.  It is a sickness.  The
12         people who are coming here are sick, and they're
13         trying to get well, and they need help.  Just like
14         you wouldn't have a cancer facility turned down or
15         if somebody died in a cancer facility you wouldn't
16         look at them as not doing the job properly.  The
17         work that's being done in recovery is an epidemic.
18         You cannot -- the statistics that Dr. Carise
19         provided were great.  You almost can't scroll onto
20         the AsburyParkPress.com without reading about
21         somebody who is lost to addiction.  When my ex
22         husband and my daughter's father was lost a few
23         years ago, I called the Ocean County Prosecutors
24         Office and offered to come and speak to their groups
25         because, like I said, you wouldn't expect upper

Cofone - direct
93

1    middle income Rumson residents who are well

2    educated, who belong to beach clubs and country

3    clubs, that's who you may have at your facilities.

4              So I beg the board, please accept this

5    application.  Impose reasonable conditions on it.

6    It's your legal right to do it, but I think that

7    this application has certainly met its statutory

8    burden of proof for the grant of the use variance.

9    It is categorically an inherently beneficial use.

10   That's not just my opinion.  It's certainly the

11   opinion of the assignment judge in Mercer County.  I

12   think the board can impose reasonable conditions to

13   ensure that the use is granted with no substantial

14   detriment to the public, and I really would

15   encourage the board to allow for this facility to

16   operate at this location, and I do think that we've

17   met our burden of proof.

18        Q.    Thank you, Miss Cofone.  Would you like

19   to add anything else, or do you think you've covered

20   everything?

21        A.    I think I've covered everything, and

22   Mr. Higgins, of course, testified at length last

23   month on the positive -- Mr. Higgins testified of

24   course last month at length on the positive and

25   negative criteria.  Mr. Leoncavallo indicated that

1      it was his opinion, as well, that it was an

2      inherently beneficial use.  So I think you have

3      three planners with lots of experience who are all

4      in agreement that it's an inherently beneficial use.

5         Q.     Thank you, Miss Cofone.

6              MR. HIMELMAN:  Mr. Chairman, I don't

7      have any direct questions of this witness.  I don't

8      know if you or the professionals or any members of

9      the board.

10              THE CHAIRMAN:  Questions?  No.

11              MR. HIMELMAN:  Thank you.

12              THE WITNESS:  Thank you.

13              MR. HIMELMAN:  Mr. Chairman, we don't

14      have any further witnesses on direct presentation.

15      Obviously, everyone is here to answer questions that

16      the board may have or the public as we proceed.  I

17      turn it back to you, Mr. Chairman.

18              THE CHAIRMAN:  Thank you.

19              MR. HENRY:  If I could, one quick

20      question.  I see these posters around here.  Was

21      someone going to explain what they were?  I didn't

22      look at them myself.  The red dots, you know, the

23      bar scale over there.  I just --

24              MR. HIMELMAN:  We certainly can have

25      someone explain them.  They were here at the last

1       meeting.  Obviously, one is of the site plan, and

2       there are other depictions of the facilities.  We

3       can have somebody walk you through those exhibits if

4       you would want to.

5                    MR. SACHS:  Well, actually, I think the

6       only one that's marked probably is the site plan.

7                    MR. HIMELMAN:  That's correct.

8                    MR. SACHS:  So the other ones are just

9       unmarked exhibits --

10                   MR. HIMELMAN:  Right.

11                   MR. SACHS:  -- and informational.

12                   MR. HIMELMAN:  It's informational and

13      more for the public's benefit.

14                   MR. SACHS:  They're really not for the

15      board's benefit.  They're not evidentiary.  They're

16      not for your consideration this evening.

17                   MR. HENRY:  Okay.  Thank you.

18                   THE CHAIRMAN:  Okay.  I'm going to open

19      up the meeting to the public.  Anyone from the

20      public wish to speak on this application?  Sir, come

21      on up.  It is also noted for the public or anyone,

22      you want to look at these exhibits, feel free to do

23      so at any time.  Yes, sir.

24                   MR. SACHS:  Sir, please raise your right

25      hand and I'll swear you in.

1        D E N N I S   O ' L E A R Y,   sworn.

2                 MR. SACHS:  Please state your name,

3        spelling your last name, your address for the

4        record.

5                 MR. O'LEARY:  My name is Dennis O'Leary.

6        My last name is spelled O-'-L-e-a-r-y.

7                 MR. SACHS:  And your address, sir.

8                 MR. O'LEARY:  Seven eleven Sunshine

9        Court, Parlin, New Jersey.

10                MR. SACHS:  Thank you.

11                MR. O'LEARY:  And that's the Harbour

12       Club.  Thank you guys for giving me the opportunity

13       to speak here.  It's been a couple of meetings now

14       waiting patiently to have a conversation with this

15       board.

16                FROM THE FLOOR:  The mic isn't working.

17                MR. O'LEARY:  It's not working.  I speak

18       loud so I didn't want to blow anybody's ears out.

19                I've heard a lot of conversation over

20       these last two meetings about beneficial use, fair

21       housing, Americans With Disabilities Act, as if

22       what's being supplanted is not a beneficial use.

23       Ratios.  How many nursing homes are in the town of

24       Sayreville at this time?  Can anybody answer that

25       question?  Can anybody tell me from the zoning

1   board?  We have one.  Everybody in Sayreville, the
2   ratio is one nursing home.  That's a beneficial use
3   with no down side, but somehow over the last course
4   of all these testimonies, that's just been pushed
5   aside as if the community should just absorb that
6   and the zoning board should just bow to the fact
7   that we should supplant a need in our community
8   amongst our elderly, amongst our individuals that
9   need geriatric care, as if somehow in the equation
10  of things that are necessary and beneficial to this
11  town are just somehow put aside for whatever
12  pressing need or whatever monetary incentive happens
13  to be the du jour.
14              There is a beneficial use.  In 1967,
15  there was an election that was held in this town by
16  the individuals on this wall, Miss Peggy Kerr.  I
17  don't know if you guys are familiar with who she is.
18  My grandmother came alongside of her during that
19  election, and one of the things I learned in
20  Sayreville from my grandmother was that when it's
21  time to speak up in Sayreville for what's good for
22  Sayreville, you get up and you go and you serve and
23  you speak.  So I want to thank the board for coming
24  here and enduring meetings like I've just witnessed
25  for the last two times and all this testimony.

1          Discrimination, I heard some of that conversations

2          being leveled at the board.  It's discriminatory to

3          just cast off our elderly in this town for the sake

4          of whatever we see as the new thing that we should

5          be doing.

6                    You know, there's been testimony about

7          who's going to keep an eye on these people.  They

8          can leave whenever they want.  Nobody can stop them.

9          Two o'clock in the morning, they walk down the hill

10         from that facility, they end up on Ernston Road.

11         It's uphill that way.  It's uphill that way.  But

12         the Harbour Club is straight across from there.

13         Where are they going to go 2 o'clock in the morning?

14         There's been testimony there's no phones.  They have

15         nothing.  They need money to find something, some

16         kind of means to move on.  Nobody can stop them.

17         There's no guards there.  They can come and go as

18         they please.  For a very large facility that RCA

19         hasn't had the experience of running.

20                   My mother was supposed to be here

21         tonight.  My mother worked 30 years in the nursing

22         home business.  I learned a lot from her.  I learned

23         a lot from my grandmother about how politics work,

24         about how the zoning board works.  I'm not going to

25         stand here and allow anybody to say that geriatric

1     care in the only nursing home in this community just

2     needs to be set aside, somehow it's a nonbeneficial

3     use.  It's an absolute beneficial use.

4              You know, I returned from the military

5     service after 10 years.  I group up in Sayreville.

6     I was born in '67.  I was born in that year that

7     they ran on this board and this town and this

8     mayorship, and I came back to a community where my

9     grandmother went into Kennedy Park, the 55 and older

10    community there, and it was a wonderful thing that

11    she ended up there, but the potential was that she

12    could have gotten old enough that she might have

13    needed some nursing home care, and we had the

14    nursing home on Ernston Road.  I got out and I

15    bought into the Harbour Club because my parents

16    lived there, and I bought across the street -- I

17    brought the grandkids home and we had community

18    there.  My grandmother passed away.  My parents

19    moved to Spinnaker Pointe, a new 55 and older

20    community adjacent to Harbour Club, adjacent to the

21    nursing home on the hill.  But now that's not a

22    beneficial use now.  Now it's a different kind of

23    use.  We got a new use with down size right across

24    from a residential area where there's really nowhere

25    for the people who live in that community to go.

1    People with -- in different stages of their life

2    getting ready to move in possible nursing home care

3    close to their friends and family.  Just telegraphed

4    to you that we've stayed very close in Sayreville

5    all these years.

6              So I think it's a bit humorous and

7    frankly offensive that somehow we have to make room

8    for whatever is new.  It has a detriment to it.  So

9    that's really what I wanted to come out here and say

10   and impress upon this board that my grandmother said

11   get up and do what's right, speak up when it's

12   right, do what's right for Sayreville, and I'm

13   counting on this board to reject this proposal.

14   Eleventh hour bait and switch.  A nursing home that

15   we've been counting on to become some kind of new

16   unknown, not sure how much staff, not sure how many

17   parking spots we need, not sure if we're going to

18   put a fence up behind the perimeter, not sure if

19   you're going to get to the Parkway or our kids'

20   school right down the street, not really sure, but

21   we're pretty sure it's going to be okay.  I reject

22   that.  I'm not here to grandstand.  Just saying my

23   piece.  That's really all I have to say.  Thank you

24   very much.

25              MR. ESPOSITO:  Thank you for your

1    service, too, by the way.

2              MR. SACHS:  Miss Lee, please raise your

3    right hand.

4

5    D E B O R A H   L E E,   sworn.

6              MR. SACHS:  Please state your name,

7    spelling your last name, and address for the record.

8              MS. LEE:  Certainly.  Deborah Lee; L-e-e

9    is the last name.  I live at 72 Prusakowski

10   Boulevard in Parlin.  That is at the Spinnaker Point

11   community that Dennis just referenced.  I wanted to

12   comment on this because for us it's the same

13   concerns.  We are an active adult community.  We're

14   here around maybe 13, 14 years.  We're not so

15   active.  We're not so young any longer.  The idea of

16   having a nursing home in town accessible to all of

17   our homes was very important to us because as we

18   age, and we've seen our residents already use the

19   nursing facility, have a convenience so that we can

20   go back and forth, visit our loved ones there.

21   Additionally, between the Harbour Club and Spinnaker

22   Pointe, there's another community being constructed,

23   another adult community.  I can see them having the

24   same concerns and needs as we do for having a

25   nursing home there.  To have no nursing homes in

```
1     town puts all of us at risk having to run back and

2     forth or not having convenient location for our

3     families as they age.  So that's concern number 1.

4              The other thing that really disturbed me

5     is the outpatient aspect of this.  I understand that

6     they're supposed to be escorted in and out by

7     vehicle, but how do you manage that, how do you

8     monitor it.  So we could have potentially -- there's

9     a bus stop right there, right next to the home

10    that's being built.  We could have people coming and

11    going not being monitored, not being in vehicles.

12    No one's really going to know.  You can say you're

13    going to do that, but you can't police that day and

14    night.  There's a school within walking distance.

15    There's the Harbour Club there.

16             I have no problem with supporting these

17    facilities.  It is a beneficial use.  I don't

18    disagree with that, but not in a residential

19    community next to a school.  There's land in

20    Sayreville.  This just happens to be convenient for

21    this concern because they can move right in to an

22    existing facility.  They can go build one.  Go build

23    one that isn't in a residential neighborhood and

24    I'll support you completely in Sayreville.

25
```

 1      R O B E R T    R A S A,    sworn.

 2                MR. SACHS:  All right.  Please state

 3      your name, spelling your last name, address for the

 4      record.

 5                MR. RASA:  My name is Robert Rasa,

 6      R-a-s-a, 49 Scheid Drive, Parlin, New Jersey.

 7                No one here is really denying the need

 8      for these type of treatment centers.  My concerns,

 9      as stated from the last meeting when Dr. Carise had

10      spoke was really about the outpatient situation.

11      Just for the record, I wanted you to know that I'm

12      going into my 36th year now working in the

13      perioperative area as a clinical consultant with

14      medical devices specializing in anesthesia, airway

15      management.  I'm in most of the hospitals in New

16      Jersey on a daily basis in operating rooms.  I see a

17      lot.  I'm legally bound by HIPAA laws not to profess

18      or speak about anything going on, but staffing

19      situation is definitely a concern in the evenings.

20      We're talking about different types of patients,

21      different types of clinical outcomes as opposed to

22      patients who have cancer, patients -- versus

23      patients who have addiction issues.  The

24      staff-to-patient ratio in the evenings, if I heard

25      correctly, sounded like somewhere around 15 to maybe

```
 1        benefit of the doubt 20 people per 134 beds; 250

 2        cameras, which I heard at the November 8 meeting;

 3        someone watching the grounds, inspecting all the

 4        packages, taking everything from these patients,

 5        potential patients as they're coming in.  But

 6        there's an overdose in-house, an in-house overdose.

 7        How do we account for that?  How did they get the

 8        drugs?  Someone on the board mentioned that maybe it

 9        was an inside job, quote, or maybe someone just bent

10        down and tied their shoe outside.  These are

11        concerns that we have as residents in the area about

12        what -- how do we handle these situations in the off

13        hours.  What happens?  Nothing good happens at 2 in

14        the morning.  You're absolutely correct.  And when

15        you -- and I've seen this with my own eyes, all

16        right.  I've seen doctors, nurses, janitors, be

17        walked out in handcuffs during the evening because

18        of drugs, because of taking drugs in their pockets.

19        So anything could happen, and we're dealing with 330

20        million variables in this country at minimum.

21        They're called people.  Everybody is different.

22        Everybody has different needs.  Everybody has

23        different clinical issues.  No two people are the

24        same.

25                    I think what we're trying to do here as
```

1    residents is to try to ensure the safety of our own

2    community in those types of situations.  I don't

3    think anybody is denying the need for treatment

4    center, for an inpatient treatment center.  This

5    looks like a hotel.  I mean, what can I say wrong

6    about the construction or how it's built, but again,

7    the gentleman in the back made a very good point.

8    We are a generation now where we're starting to get

9    older, where there's a need for us to be taken care

10   of, and as residents of the town, we would like to

11   see the opportunity of having more of that here, of

12   -- but as he had stated so eloquently, this is the

13   new thing.  We hear it on commercials from the

14   governor.  We understand these issues.  We do know

15   these issues.  I see these issues on day-to-day

16   basis.

17            What I'm mostly concerned about is the

18   protection of the children that are in Eisenhower,

19   of the residents, of the goings on of the police

20   lights flashing in the middle of the night.  These

21   are concerns that we have to take into

22   consideration.

23            It was my understanding that the home

24   was rebuilt for the purposes of a nursing -- a

25   skilled nursing facility.  That was the original --

1     and I've been here 30 years, and I saw it before,

2     and I seen it be built, and this is exactly what our

3     intentions were, that this was going to be a nursing

4     home.  That's great.  A beautiful place.  The

5     variance abuse just came into play.  How did that

6     happen?  A lease is already prepared, a 55-year

7     lease, I believe 15 years with four or five 10-year

8     options.  I'm also a landlord for commercial and

9     residential property in New York so I know that

10    these things are prepared and with the expectation

11    that this is sort of like a done deal.  If that's

12    the way it is, I think we're all doing ourselves a

13    big injustice.

14              I think we need to really look a little

15    bit further into the ramifications of what this will

16    be 5 years from now, 5 months from now, 10 years

17    from now, how it's going to impact us as residents,

18    because for myself speaking personally, I'm going to

19    be downsizing, looking for something smaller in the

20    area, and a lot of us are.  We're getting to that

21    age.  There's no guarantee that I'm not going to

22    need nursing care.  No one has that guarantee.  It

23    would be nice to know I wouldn't have to go too far

24    away for it.  You know, that's what my main concern

25    is.  And I thank you very much for the opportunity.

```
1        P A U L   L I E B E R M A N,   sworn.

2                 MR. SACHS:  Please state your name,

3        spelling your last name, address for the record.

4                 MR. LIEBERMAN:  My name is Paul

5        Lieberman, L-i-e-b-e-r-m-a-n.  My address is 24

6        Wlodarczyk Place, Parlin, New Jersey.  I happen to

7        live behind the Harbour Club, behind the Spinnaker

8        Pointe.  I am actually at Landings of Spinnaker

9        Pointe and also on the board there.

10                I have a 6-year-old daughter who's going

11       to be 7, and she doesn't go to Eisenhower, but she

12       comes here to OLV, and I sit there and I talk to so

13       many of the different parents that actually do have

14       children in Eisenhower, and they're very concerned

15       about it.  A lot of them couldn't come tonight

16       because of the holidays this evening as well as them

17       being out.  I'd actually like to even make a motion

18       to adjourn this meeting for this evening because I

19       think that they need to prove from Boston that they

20       -- that it's completely cleared before something

21       like this could ever be approved in this area.  I

22       think that first and foremost, before anything is

23       even considered, that needs to be completely taken

24       care of and cleared and making sure because

25       everything that everybody is reading in the news and
```

1     everything else is saying just the opposite and

2     contrary to.

3              The CEO that was talking to you about

4     $2,500 -- I'm sorry to come back to this, but bottom

5     line, he said it was $2,500 a month.  That five days

6     a month for charity, and if that's really the case,

7     I think corporate should come up with a number if

8     they're going to be not only issuing different types

9     of scholarships, I think that should be written in

10    stone of what that should be based on the revenue

11    that's going to come in from that facility.

12             I have no issues with Recovery of

13    America in Sayreville.  I do think it's also a need.

14    I also do think we need this nursing home.  But I

15    think they should choose another site.  I think they

16    should choose a site that's probably a little bit

17    more in a commercial area that won't affect as many

18    residents as it is.  If you take a look at the

19    statistics of these recovery centers, outpatient

20    centers, methadone clinics, even though they say

21    they're not going to be, crime has gone up in those

22    areas.  California is a perfect example of that.

23    You can take a look in California, and every single

24    county that these centers are in crime has gone up

25    by over 34 percent.  You can take a look at the

1     statistics yourself.  I am worried that the same

2     thing is going to happen here.  The gentleman this

3     evening said that somebody can walk out, that is

4     correct.  One security guard in that whole facility

5     for a hundred.  I worked with Health and Hospitals

6     Corporation in New York.  I have worked with the

7     nursing skilled facilities at Gouverneur Hospital.

8     I have worked with Jacobi Medical Center for their

9     senior.  I have worked with Mt. Sinai for so many

10    different of the senior population programs as well

11    as the different methadone clinics all throughout

12    the Bronx for Bronx Lebanon Hospital, and every

13    single one of those areas are indigent areas that

14    need this type of program.  And I'm not saying that

15    Sayreville doesn't have a need.  It's like I said;

16    it becomes a hotel.  But the bottom line is I don't

17    think it can happen here.  It just can't happen in

18    our own back yards.  That's all I am saying.

19              We have a school that's right there.  We

20    have a neighborhood.  They're talking about grounds

21    of 24/7 groundskeepers.  I'm sorry.  Look at the

22    size of this facility.  One person is going to walk

23    that entire facility.  One person is going to sit

24    there and look at all the mail.  One person is going

25    to make sure that every single part of that facility

1      is protected.  I don't think so.  Take a look at

2      Gouverneur Hospital.  It has almost twice as many

3      beds.  There's 27 security guards at that facility,

4      and that's a long-term nursing facility.  So how can

5      only one do it?  You tell me.

6              That's all I have.

7

8      D E N N I S   O ' L E A R Y ,   S R,   sworn.

9              MR. SACHS:  Please state your name,

10     spelling your last name, address for the record.

11             MR. O'LEARY, SR.:  My name is Dennis

12     O'Leary, Sr.  I live in 71 Wieczorkowski in

13     Spinnaker Pointe, and I'm happy to hear some of the

14     things that were said at the last meeting.  You gave

15     an example of a beneficial use, the benefits

16     outweigh the negative, and you said a nursing -- you

17     asked a question is a nursing home a good example of

18     that, and I think a nursing home is a good example

19     of that, and you heard some of the witnesses at the

20     last meeting say, well, we're sort of a nursing

21     home, we're the same thing as a nursing home, and

22     Mr. Mashanski, the zoning officer, he made a very

23     good analogy.  He said it could sort of look like a

24     duck and sort of sound like a duck, but, you know,

25     it's a goose.  It's not a nursing home, and it might

1       have some negative effects, this place.

2                I have here something was published in

3       the Journal of Sustainable Real Estate, 2014.  It

4       says that homes in the area of a treatment center

5       that includes addiction to heroin or morphine, the

6       home values are reduced by anywhere from 15 to

7       17 percent, so that is a negative impact.

8                Really, a nursing home -- this is the

9       only nursing home in Sayreville, and when you walk

10      out the door of this place, there is 400 some units

11      in the Harbour Club.  You walk behind there, there's

12      a new plan, the Regence, 96 units.  In you go behind

13      there is Spinnaker Pointe with a hundred units, and

14      then the Landings are next to that.  If you go right

15      under the bridge, you have La Mer, and you have the

16      school.  So there's really -- if you walk out the

17      door of this nursing home, there's probably 15 --

18      talking 15, 1600 residences there.  So in 10 minutes

19      walk of the driveway, there's probably 15, 1600

20      homes.  There's nothing else.  There's no stores.

21      There's no -- at the last meeting, we heard

22      testimony that the patients might come and go by

23      public transportation.  There is no public

24      transportation coming to and from this place.  There

25      is a 6 clock to 7 o'clock in the morning bus to New

1       York City.  That's the only transportation.  You got

2       to go several miles to go to a train or a bus.  So I

3       think that is one of the negative -- there's no

4       place else to go if -- you know, it was said at the

5       earlier, it was said you could -- if I'm in there, I

6       can walk out the door.  I can walk out the door and

7       there's nowhere else for me to go.  Nobody can stop

8       me.  It was mentioned that you can't call the

9       police.  I'm not a criminal so I can come and go as

10      I please.  Where am I going to go?  You took my

11      phone.  You took my money.  What am I going to do if

12      I walk out of this place?

13              So, I mean, a nursing home is -- this is

14      the only nursing home in Sayreville, and I hope we

15      keep the nursing home.  I saw the owner of the

16      facility, of the property here, and my wife is just

17      retired, retired a while back from a business office

18      of a nursing home, and the operator works for the

19      facility that this gentleman owns.  He's known as a

20      very good man.  So I'd just like to end with that.

21      Please, you might make more money with this Recovery

22      Center of America, but do the right thing.  We need

23      a nursing home in this town.  Do the right thing.

24      You can do it.

25              THE CHAIRMAN:  Yes.

1        MR. SACHS:  Sir, please raise your right

2   hand; I'll swear you in.

3

4   P R A S A N N A   K U L K A R N I,   sworn.

5        MR. SACHS:  Please state your name,

6   spelling your last name, address for the record.

7        MR. KULKARNI:  My name is Prasanna

8   Kulkarni; my last name is K-u-l-k-a-r-n-i.  My

9   address is 26 Wlodarczyk Place, W-l-o-d-a-r-c-z-y-k,

10  Place, Parlin, New Jersey.  So I am one of the

11  residents from Landing.  Paul is my neighbor, and we

12  are at the walking distance of this facility.  I

13  just want to bring a slightly different perspective

14  than what other gentlemen brought in.  I am one of

15  the, you know, younger generations with very small

16  kids, 6-month-old and a 4-year-old, commuters to New

17  York.  There are many like me who reach home at 8

18  o'clock or so so that's why probably we don't see

19  people like us.

20        My main concern is that we are raising

21  kids.  We are sending them to the family school,

22  which is just 200 feet from this facility, and we

23  all know that these are kids who are extremely

24  curious.  My 4-year one is so curious, he asks

25  questions about everything.  Definitely he's going

```
 1      to ask questions about the cops and the cars and,
 2      you know, all sorts of things that he is going to
 3      see near the school.  His curiosity may not be, you
 4      know, nothing else but just out of curiosity, he and
 5      kids like him are going to try or they might think
 6      of things that they're not supposed to or they are,
 7      you know, that we don't want them to, and the reason
 8      why we bought this house here because we wanted --
 9      we found a very, you know, this place is very nice
10      that gives us a peace of mind.  My wife and I, both
11      of us work in New York, so while we are out, we feel
12      very secure in the neighborhood, but as soon as I
13      heard about it -- and believe me, it was extremely
14      difficult to find it out.  Coincidently, Paul told
15      me about it, but I'm sure many of people like me are
16      not even aware of this thing going on, and I am
17      having sleepless nights because after the tough
18      commute and the lifestyle that we have, the only
19      thing we want is peace of mind and environment where
20      we feel comfortable raising our kids, and just to
21      hear the word drug and, you know, whatever it is.
22      No justification.  Just to hear the word, my
23      4-year-old is going to ask, dad, what is this and
24      why is this.  Why there are cops here.  And it just
25      brings so many things to my mind, and I'm sure it
```

1   will bring to everyone in my age group, and

2   obviously, I was not even aware that this nursing

3   home, and I completely support everyone comment

4   about having nursing home because only nursing home

5   over there, and obviously, you want to set up these

6   kind of facilities.  Please do set up in commercial

7   areas, not near schools.  I mean, I wouldn't even

8   imagine making money or even increasing revenue or

9   changing anything by setting this thing up or

10  testifying, you know, to raise this facility

11  200 feet next to a primary school.  If it is next to

12  a college, at least the college kids have education

13  and they know what is good and what is bad, but how

14  will our primary kids, you know, and how their

15  curiosity.

16          So I am shocked to hear about this case,

17  and I really urge the board members to not approve

18  this, and please encourage to even not approve these

19  facilities near family schools anywhere in the

20  country.  Not a Sayreville issue.  It's basically a

21  moral issue for everybody.  So that's all I want to

22  say.

23          THE CHAIRMAN:  Anyone else wish to

24  speak?

25          MR. SACHS:  Sir, please raise your right

1     hand.

2

3     E R V I N    A G O S T O N,   sworn.

4              MR. SACHS:  Please state your name,

5     spelling your last name, address for the record.

6              MR. AGOSTON:  My name is Ervin Agoston,

7     E-r-v-i-n; last name is Agoston, A-g-o-s-t-o-n.  The

8     reason I moved like 12 years ago to 14 Wlodarczyk

9     Place, in Parlin, New Jersey.  That's on the

10    Landings.  I spent 5 years with my wife looking for

11    the perfect home.  We checked criminal records.  We

12    looked Long Island, Massachusetts, everywhere, and

13    we fell in love with this place.  I work long hours.

14    I come home.  I feel home safely.  I can leave the

15    house open, the car open, all those beautiful things

16    anybody can wish to have, and that's what I have for

17    my kid, and I feel very, very good to have that for

18    him, and now suddenly, I feel, you know, when we

19    purchased the house, the economy went down on the

20    ground and that's not my case.  I think it was the

21    whole country.  The house went almost to less than

22    half the price.  And we choose to stay.  A lot of

23    people lose their houses, foreclosures everywhere.

24    I didn't care.  I worked double just to make sure

25    that I keep my house.  I pay taxes.  I do everything

1          right for my family to stay in this place, and it's

2          just same thing and also it make a lot of damage to

3          our neighbors, and we choose to stay, and right now,

4          we are recovering a little bit.  We still very low

5          on the prices of the houses, and now we feel that we

6          never going to recover or anything, but besides

7          that, the fact what really tricks me is I respect

8          these facilities, but I don't think it's appropriate

9          to have it in our neighbor.  I think the double

10         moral issue.  I had a problem with that always

11         because I was raised right and we had a choice in

12         life, and you choose, and we choose, and whatever

13         you choose, you pay for it, and I grow up that way,

14         and when do I say double moral is we don't have

15         enough money to teach in our schools to our children

16         not to use drugs, not to do this, not to do that,

17         because we are pure communities trying to reach our

18         kids to grow up to be a good person, and now we have

19         a facility that wants to profit our pockets because

20         that's what I see.  I don't see any -- I see the use

21         and the helpful for the community, but I don't see

22         it on our neighbors.  I see it like this double

23         issue moral.

24                    I would like to ask how many drug users

25         are in Sayreville.  Did you guys have the records?

1    How many of you people live in the area?  Probably

2    none of you.  How many of you had a drug center near

3    to your home?  I would like you to bring the proof

4    to the council.  Any of you just raise your hand.

5    Just bring it.

6              MR. SACHS:  Sir, do me a favor.  Address

7    the board.  We don't want you addressing the public.

8    Address the board.

9              MR. AGOSTON:  Just that's my bigger

10   concern here is we are really -- we like to have our

11   right conscious mind.  I want to grow older making

12   sure that I choose the right for my family, and I'm

13   part of this town now, and I will fight the right

14   way without discriminating, but I think that I hear

15   wonderful things about senior citizens or older

16   people.  That is a wonderful case.  And helping

17   people in need, it will be great, but not in our

18   area.  I think we have plenty, plenty of places.  I

19   see that pure, they are all those places that work

20   for -- right facility you just across the street

21   from where the facility are.

22              So I thank you very much for your time,

23   and please do this for your grandchildren and your

24   children because that's the right thing to do.  Not

25   to do it --

```
 1               THE CHAIRMAN:  Anyone else from the

 2      public wish to speak on this application?

 3               MR. SACHS:  By a show of hands, how many

 4      other people would like to speak this evening?  This

 5      will be the last speaker then.

 6               Ma'am, please raise your right hand.

 7

 8      Z E N N A B E L L E   S E W E L,   sworn.

 9               MR. SACHS:  Please state your name,

10      spelling your last name, address for the record.

11               MS. SEWELL:  My name is Zennabelle

12      Sewell; last name, S-e-w-e-l-l, and I live at the

13      Harbour Club, 1907 Bayhead Drive.  I just want to

14      say to you that when you consider this application

15      for the change of the area from a nursing home to

16      this drug rehab center, just think of the residents

17      who live across the street.  Think of us having

18      invested all our earnings to purchase these homes.

19      Think about what we are going to lose not being able

20      to get back on our investments.  Think about the

21      people who have to commute into the city every day.

22      I commute into the city every day.  I take the bus,

23      that limited service bus that goes into New York in

24      the morning and come home in the evenings.  Most of

25      the time when I'm getting off the bus, it's dark.
```

1      Think about us, think about our safety, and just

2      remember that we have to be considered in the

3      process.  Yes, this facility needs to be somewhere,

4      but I do not think that that is an ideal location

5      for a facility like that, and you as members of the

6      community and our elected individuals, you need to

7      take that into consideration.  You need to remember

8      your citizens when you make your decisions.  Thank

9      you.

10                THE CHAIRMAN:  Is there anyone else that

11     wishes to speak on this application?  Anyone else?

12     If there's no one else, I make the motion that the

13     public portion of this application be closed.

14                MR. HENRY:  Second.

15                THE CHAIRMAN:  Public portion is closed.

16                MR. HIMELMAN:  Mr. Chairman, I would

17     like to request before we break for the evening I

18     would like an opportunity to talk to your counsel

19     about an issue that he raised during the break, and

20     I would like to be able to discuss that with him

21     because it may impact his direction on where we go

22     from here, and I -- is that -- would you just give

23     me 5 minutes.

24                THE CHAIRMAN:  Yes.

25                MR. HIMELMAN:  Thank you very much, be

1    very brief.

2                    THE CHAIRMAN:  All right.  We're going

3    to take a 5-minute recess.

4                    (Board recess)

5                    THE CHAIRMAN:  I am going to call the

6    meeting back to order.

7                    MR. HIMELMAN:  Mr. Chairman, I want to

8    first thank you for the recess, and I do apologize.

9                    THE CHAIRMAN:  First thing I do need to

10   do a roll call.

11                   MR. HIMELMAN:  Thank you.

12                   MS. KEMBLE:  Mr. Green.

13                   THE CHAIRMAN:  Here.

14                   MS. KEMBLE:  Mr. Kuczynski.

15                   MR. KUCZYNSKI:  Here.

16                   MS. KEMBLE:  Mr. Kreismer.

17                   MR. KREISMER:  Here.

18                   MS. KEMBLE:  Ms. Catallo.

19                   MS. CATALLO:  Here.

20                   MS. KEMBLE:  Mr. Corrigan.

21                   MR. CORRIGAN:  Here.

22                   MS. KEMBLE:  Mr. Henry.

23                   MR. HENRY:  Here.

24                   MS. KEMBLE:  Mr. Emma.

25                   MR. EMMA:  Here.

1            MS. KEMBLE:  Mr. Esposito.

2            MR. ESPOSITO:  Here.

3            THE CHAIRMAN:  Okay.  Proceed.

4            MR. HIMELMAN:  Mr. Chairman, thank you.

5     Mr. Chairman, I've had an opportunity to talk to

6     your counsel during the break, and it's my

7     understanding that, as you know Mr. Sachs, has asked

8     for certain information, and he would like to see to

9     him in writing from me.  One concerns the staffing

10    and the shifts that would be incorporated in a

11    proposed facility here in Sayreville, and I'm

12    prepared to do that, obviously with the assistance

13    of the applicant, and the second, Mr. Sachs is

14    asking for information and confirmation as to the

15    closure of the investigation in Massachusetts and

16    information relating to that investigation, both

17    deficiencies and closure, and I also will be

18    submitting that to Mr. Sachs before your next

19    meeting.

20            THE CHAIRMAN:  Very good.

21            MR. SACHS:  So, Mr. Chairman, I guess in

22    light of that -- and those are the two things that

23    we really need, you know.  I mentioned that probably

24    several hours ago at this point that those were some

25    of the things that I thought the board would

```
 1    require.  So if Mr. Himelman will provide that, I

 2    think what we can do is carry this meeting, carry

 3    this application to the next meeting.  Quite

 4    frankly, I don't think you'll have any additional

 5    testimony except if there's any questions regarding

 6    what's provided.

 7                  MR. HIMELMAN:  Correct.

 8                  MR. SACHS:  All right.  You know, the

 9    public has spoken.  Certainly, we'll have to do a

10    public portion at that point, but I would imagine

11    after that is concluded, there'll be a vote on this

12    application very early in the evening of the next

13    meeting.

14                  THE CHAIRMAN:  Yes.

15                  MR. SACHS:  So that would be the 24th of

16    January?

17                  THE CHAIRMAN:  Is that the meeting the,

18    24th of January?

19                  MR. SACHS:  So, Mr. Himelman, what we'll

20    do is we'll carry this application to January 24 at

21    7:30 p.m.  I know we have a few bulk variances that

22    evening, which take about 5 minutes each, and then

23    you'll be number 1 on the list.

24                  MR. HIMELMAN:  Very much appreciate

25    that, Mr. Chairman, Mr. Sachs, and the board
```

1      members.

2                    THE CHAIRMAN:  The only thing that could

3      possibly hold this up is if we don't have the

4      results back on the investigation out of

5      Massachusetts.

6                    MR. HIMELMAN:  No, no, I have that

7      information.  I'm getting it to Mr. Sachs.

8                    THE CHAIRMAN:  As long as we have all

9      that information, we'll be ready to proceed on that

10     date.

11                   MR. HIMELMAN:  Duly noted.

12                   MR. ESPOSITO:  Mr. Chairman, is there a

13     time period that they have to submit this so we have

14     a chance to look at that information?

15                   MR. HIMELMAN:  I will get you the

16     information within the next several days to Mr.

17     Sachs.

18                   MR. SACHS:  So you'll have it well in

19     advance of that meeting.  So I know there's members

20     of the public here this evening.  You will not

21     receive any further notice of the rescheduling of

22     this meeting.  I'm going to give it to you right

23     now.  This meeting will be carried to Wednesday,

24     January 24, 2018, at 7:30 p.m.

25                   MR. HIMELMAN:  Thank you, Mr. Sachs, Mr.

1          Chairman, members of the board, and we look forward

2          to coming back January 24, and happy holidays and

3          happy new year.

4                    MR. SACHS:  Same to you.

5                    MR. HIMELMAN:  Thank you.

6                    MR. KUCZYNSKI:  Mr. Chairman, will there

7          be a public session?

8                    MR. SACHS:  Yes.  We always have to have

9          a public session so we'll have one more public

10         session.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                                   BOARD OF ADJUSTMENT
                                     BOROUGH OF SAYREVILLE
 2                                   COUNTY OF MIDDLESEX
                                     STATE OF NEW JERSEY
 3
        In the Matter of          )
 4      The Application of:        )    Transcript of
        RECOVERY CENTERS OF AMERICA)     proceedings
 5      #17-29                     )
        901 Ernston Road           )
 6      --------------------------

 7


 8


 9          I, DEBORAH A. MASTERTON, a Certified Court
        Reporter and Notary Public of the State of New
10      Jersey, certify that the foregoing is a true and
        accurate transcript of the proceedings in the above
11      entitled matter at the time and place aforesaid.

12

13

14

15
        DATE:  December 17, 2017
16

17

18

19                               _____
20                               License No. XI001655

21

22

23

24

25
```

# EXHIBIT E

```
 1                   BOROUGH OF SAYREVILLE
                     BOARD OF ADJUSTMENT
 2
       In the Matter of:              :
 3                                     :      Transcript
       FILE #17-29                     :
 4                                     :           of
       RECOVERY CENTERS OF AMERICA     :
 5     901 Ernston Road                :      Proceedings
       Block 452, Lot 1                :
 6     --------------------------------x

 7                            Wednesday, January 24, 2018
                              167 Main Street, Third Floor
 8                            Sayreville, New Jersey 08872
                              Commencing at 7:55 p.m.
 9

10     BOARD MEMBERS PRESENT:

11          RONALD GREEN, Chairman
            WILLIAM HENRY, Vice Chairman
12          TOM KUCZYNSKI
            MARIA CATALLO
13          JOHN CORRIGAN
            ANTHONY ESPOSITO
14          PHIL EMMA

15          JOAN KEMBLE, Recording Clerk
            JAY CORNELL, Township Engineer
16          SUSAN GRUEL, Township Planner
            JOHN BARREE, Township Planner
17
       A P P E A R A N C E S :
18
            KARL KEMM, ESQUIRE
19          Attorney for the Board

20          DAVID B. HIMELMAN, ESQUIRE
            Attorney for the Applicant
21
                         MICHAEL LOMBARDOZZI,
22                       Certified Shorthand Reporter

23                   DEBORAH A. MASTERTON
                     Certified Court Reporter
24                    29 Hilltop Boulevard
               East Brunswick, New Jersey 08816
25                      732-690-2411
                    dmasterton@comcast.net
```

```
1                      TABLE OF CONTENTS

2          AUDIENCE MEMBERS SWORN   (NUMBERS ARE PAGE 3)

3    NAME                 PAGE  NAME                  PAGE

4    Robert Krzyzkowski    24   Elias Ciudad          83

5    Laruie Esposito       30   Paul Lieberman        84

6    Ursula Jones          32   Lisa Rom              85

7    Robert Platner        35   Reyne Quackenbush     87

8    Elias Muhammad        40   Lorraine Vaglio       88

9    Paula Gervasi         42   Kathleen Bartolotti   87

10   Eugene Harris         44   Lenore Lambert        89

11   Al Lambert            46   Linda Darkins         93

12   Carmen Campbell       50   Alejandra Bustos      94

13   Scott Tabacco         53   Mary Cibelli          95

14   David Barr            55   Hannan Torres         98

15   Ruth Ann Mahoney      57   Katrina Arboleda     100

16   Christopher Hunter    59   Jack Caveney         101

17   Al Pillar             61   Leonardo Cotugno     101

18   John Bartlinski       64   Mohan Lokanadham     102

19   George Podolak        70   Daphne Stanley       103

20   Gary Szamreta         72   Olga Correa          104

21   Nikunjkumar Patel     75   Sandra Charles       104

22   Michael Murray        77   Kevin Reid           105

23   Francesca Gervasi     79   Carol Gitune         108

24   Qadira Ismail         80   Yasmeen Anderson     109

25   Geraldine Bennington  81   Daniel Astarita      111
```

```
 1              AUDIENCE MEMBERS SWORN

 2    NAME                PAGE  NAME                PAGE

 3    Melba Garcia         112  John McCormick       119

 4    Barbara Shanley      113  Jonnie Robinson      120

 5    Bill Policastro      114  Stephanie Taite      122

 6    George Nagy          115  Pragnesh Khatri      122

 7    Shafka Mahmood       117  Pradima Jhala        123

 8    Dawn Dantzler        117  Debbie Indrawis      123

 9    Paulene Kuria        118


10                   E X H I B I T S

11    NO.         DESCRIPTION                        PAGE

12
      Platner-1  Printout regarding rehab
13               recidivism rates and statistics      38

14    Platner-2  The Rehab Industry Needs to Clean
                 Up It's Act, Here's How              38
15

16

17

18

19

20

21

22

23

24

25
```

1            CHAIRMAN GREEN:  Okay.  The next

2    application is 17-29, which is Recovery Centers

3    of America, at 901 Ernston Road.

4            Mr. Himelman, you're the attorney

5    for RCA?  Proceed.

6            MR. HIMELMAN:  Yes, Mr. Chairman,

7    good evening, David Himelman for the applicant,

8    901 Ernston Road, LLC, which, as you know, is an

9    affiliate of RCA.  Good evening.

10            Mr. Chairman, as you know from the

11    last meeting, your professionals had requested

12    that we provide certain documentation on a few

13    issues, which we have done.  To my knowledge, we

14    have not gotten any feedback from your

15    professionals or the board members or staff.

16            As you know also, we had presented

17    our case at the November and the December

18    hearings, and my understanding is that our case

19    in chief has pretty much been closed at this

20    point.  We are prepared to move forward with the

21    application, in terms of summarizing the

22    testimony and the information provided.

23            However, I understand from your

24    attorney that the chairman and members of the

25    board wish to have -- obviously, have the members

5

1    of the public speak, to the extent they haven't

2    already, and given the amount of people standing

3    in the room, perhaps it would make sense to open

4    this up to the public at this point, and then the

5    applicant can summarize its case.  And I would

6    suggest that that may be a course of action to

7    pursue, but I leave that to the chair and your

8    professionals' discretion.

9                CHAIRMAN GREEN:  Is that the way you

10   want to proceed, is we'll open it to the public

11   first, and you'll summarize after the public is

12   completed?

13                MR. HIMELMAN:  That would make the

14   most sense to me.

15                PUBLIC SPEAKER:  No.

16                (Public interruption.)

17                MR. KEMM:  So, Mr. Himelman, as you

18   can tell, I think some members of the public may

19   not have been here at the last hearing, so could

20   we follow this protocol?  Would you mind -- you

21   certainly can give a summary overview of your

22   application, and then we will open it to the

23   public, and then we will give you time after the

24   public speaks to respond to any questions the

25   public may have, including a summary at that

1      point?

2              MR. HIMELMAN:  Well, I guess the

3      issue with that is we've had our professionals,

4      including our traffic consultant, professional

5      planners, engineer, testify for over two

6      hearings.  I certainly can outline a summary, if

7      you want, and a closing position on that, but,

8      quite frankly, I know the chairman, at the last

9      meeting, indicated that he wanted to give the

10     public an opportunity to speak at the meeting,

11     and quite frankly, I think that makes the most

12     sense.

13              Unfortunately, for me to sit here

14     and summarize every single witness and what

15     they've testified to, I think would be more

16     lengthy than perhaps is in order.  I mean, I'm

17     certainly prepared to go through my closing

18     statement, but, again, I think it would make

19     sense to hear the concerns of the public first.

20     But that's --

21              (Audience interruption.)

22              MR. KEMM:  Ladies and gentlemen, I

23     appreciate everyone's here, they're out tonight

24     away from their loved ones, and not at home

25     watching TV, as we all would like to be, but we

1    need to have a sense of decorum.  Everyone who

2    wants to speak will have the opportunity to come

3    up to the microphone and say what they'd like --

4              MR. HIMELMAN:  Fine, I'll --

5              MR. KEMM:  -- but please wait your

6    turn, and everyone will get a chance the to

7    speak.

8              So Mr. Himelman, if I may impose

9    upon you, if you wouldn't mind giving a brief

10   summary, and then, again, we will give you a

11   chance to address the public when the public

12   is --

13             MR. HIMELMAN:  Well, I certainly can

14   read an outline of what I believe the essential

15   elements of this application -- what we believe

16   the applicant has established.  So if you bear

17   with me, I'd be happy to do that.

18             MR. KEMM:  That would be great, we

19   appreciate you accommodating us.

20             MR. HIMELMAN:  Mr. Chairman, members

21   of the board, obviously, for the benefit of the

22   public, first, I want to thank the board for

23   hearing the testimony that has taken place over

24   the course of several hearings on this.  I think

25   the board has been thoughtful and careful in its,

1    thus far, deliberations on this issue, and I

2    believe that the board is very sensitive to the

3    particular issue at hand, which is substance

4    abuse and treatment.

5                Just by way of background, I'm sure

6    you'll agree, it's worth noting that this is not

7    your typical land use application, and that's

8    really for several reasons.  We had testimony

9    from Dr. Deni Carise, who gave explicit and

10   direct testimony on the substance abuse problem

11   which we all face here in Middlesex County, and

12   across this state, and the urgent need to provide

13   critical treatment to individuals affected by

14   this issue, in order to address this most severe

15   problem.  And I don't think any member of the

16   board, or quite frankly the public, would dispute

17   that.

18                Even those who have previously

19   testified from the public, and who we may hear

20   from this evening, that objected on this

21   application, acknowledged certainly that there's

22   a crisis in our community, in this county, and

23   the state, and the nation.  And we have made the

24   point, Mr. Chairman, that there are certain laws

25   in place, both state and federal laws, which

1    require all of us, including this borough, to

2    extend special consideration to this application.

3    And the real lessons here -- and we've discussed

4    this at length during these hearings -- the term

5    that these laws use is "reasonable accomodation."

6              As you know, and I have indicated in

7    discussions with the board, it's my humble

8    opinion that the board is required to grant the

9    requested d(1) use variance relief, not simply

10   because the applicant has met its burden and the

11   elements necessary for that relief, but because

12   state and federal laws require the approval of a

13   use variance in this case as a reasonable

14   accomodation under such laws.

15             Here, reasonable accomodation can be

16   demonstrated, since this applicant is willing and

17   able to construct and operate this facility on

18   the subject site at this time, as opposed to the

19   possibility that some other entity that does not

20   currently exist may choose to open such a

21   facility on some other yet-to-be-identified site

22   in the borough, at some undisclosed time in the

23   future.

24             Now, as far as the -- as far as what

25   the Municipal Land Use Law requires -- and that's

1    pursuant to 40:55D-70(d)(1), which is the

2    Municipal Land Use Law, as you know from prior

3    applications, the law conferred upon zoning

4    boards the following powers; in particular, cases

5    for special reasons, granting a variance to allow

6    departure from regulations to permit a use or

7    principal structure in a district restricted

8    against such use or principal structure.

9              The applicant's belief is that, as

10   part of the d(1) variance relief sought, we must

11   provide sufficient proofs for what is generally

12   referred to as the positive and negative

13   criteria.  And we've discussed this at length.

14             The special reasons requirement of

15   the Municipal Land Use Law is also referred to as

16   the positive criteria.  The special reasons,

17   which the courts have generally recognized, to

18   support a d(1) variance, include that the use is

19   inherently beneficial; that the site is

20   particularly suited for the use, and that the use

21   advances one or more purposes of the -- of

22   planning, as stated in the Municipal Land Use

23   Law.

24             Respectfully, the record, through

25   the testimony of the applicant's planners, James

1    Higgins and Christine Cofone, and also confirmed

2    by your board's planner, that has been set forth

3    before you, and we think we've established the

4    following:

5            One, that RCA meets all the

6    requirements required for a d(1) variance.  And

7    as I've indicated, they fall into two categories,

8    the positive criteria proofs and the negative

9    criteria proofs.

10           Under the Municipal Land Use Law, as

11    I've indicated, the positive proofs refer to

12    special reasons that justify, generally, a

13    departure from the zoning ordinance.  New Jersey

14    courts consistently hold that, if the use is

15    inherently beneficial, then the burden to

16    establish positive criteria proofs have, in fact,

17    been met.  As a matter of law, it is undisputed

18    that the proposed use, a drug and alcohol

19    rehabilitation facility, as proposed, is

20    inherently beneficial.  It is undisputed, one,

21    that a hospital is expressly identified by

22    statute as an inherently beneficial use; two, a

23    drug and alcohol rehab supervised by the New

24    Jersey Department of Health is deemed to be a

25    hospital, pursuant to numerous cases.

1      Now, we've talked, and Mr. Higgins

2   and Ms. Cofone talked about the elements under

3   Sica, and what needs to be established, and

4   there, they've both indicated that, under the

5   Sica decision, the courts set forth a four-part

6   balancing test in determining whether to grant

7   the use variance for inherently beneficial use,

8   which all professionals have confirmed:

9      One, we have to identify the public

10   interest at stake.

11      Two, identify the detrimental effect

12   that would ensue from the grant of the variance.

13      Three, in some situations, the board

14   may reduce the detrimental effect by imposing

15   reasonable conditions on such use.

16      Four, weigh the public interest

17   against the detrimental effects to determine

18   whether the variance would cause such detrimental

19   detriment.

20      Here, we believe the four-part Sica

21   test to evaluate inherently beneficial use has

22   been met.

23      Let's look at them:

24      The public interest at stake.  There

25   is a clear public interest.  The undisputed

1    testimony demonstrates the urgent epidemic of

2    substance abuse here in Middlesex County,

3    throughout the state, and the country.  There can

4    be no greater example of a public interest at

5    stake.

6                 Express the public policy.  Under

7    N.J.S.A. 30:6C-1, provides specifically that the

8    public policy of this state, that human suffering

9    and social and economic loss caused by drug

10   addictions are matters of grave concern to the

11   people of this state, and it's imperative that a

12   comprehensive program be established.

13                 In addition, there's a statutory

14   scheme that established the Governor's Council on

15   Alcoholism and Drug Use, and it provides that the

16   legislature finds and declares that alcoholism

17   and drug abuse are major health problems facing

18   the residents of this state.  The full resources

19   of this state, including counties,

20   municipalities, and residents of the state, must

21   be mobilized in a persistent and sustained

22   manner, in order to achieve a response of capably

23   and meaningfully addressing not only the

24   symptoms, but the root causes of the pervasive

25   problem.

1          In addition, the testimony of

2     Dr. Carise is undisputed.  It's undisputed that

3     we provided statistics regarding drug deaths in

4     Middlesex County, which are two key elements that

5     support the statutory scheme.

6          Let's look at the negative impacts.

7     The testimony overwhelmingly established there's

8     no negative impact on the community in terms of

9     aesthetic, noise, traffic, safety, and security.

10     The applicant's traffic engineer --

11          (Audience interruption.)

12          MR. HIMELMAN:  Hold on, you've got

13     to listen to the testimony.

14          The applicant's traffic engineer

15     testified that, based on the proposed use, the

16     site can accommodate -- can operate compatible

17     with existing traffic conditions.

18          Further, the applicant provided

19     detailed testimony on site security and safety,

20     and we believe we've addressed all the board's

21     concerns regarding this.

22          Notwithstanding that, RCA is open

23     and willing to accept reasonable conditions that

24     the board might impose on this use, which address

25     some of the issues discussed and raised by the

1      board and its professionals.  The applicant has,

2      in fact, addressed and provided to this board,

3      relating to this those concerns, specifically

4      about site safety, the admission of outpatients,

5      staffing, and referral of patients, which we've

6      discussed at length at multiple hearings.

7                    The final aspect of Sica then turns

8      to the balancing analysis of the public interest

9      at stake, and the impact of any negative or

10     detrimental impacts.  If the test shows that the

11     detriments do not substantially outweigh the

12     benefits, the Supreme Court has ruled the

13     application should be approved.  The public

14     interest is urgent and immediate.  The impacts,

15     if any, are so de minimis, as to make the

16     balancing clear and overwhelming, that the

17     benefits substantially outweigh the detriments,

18     so the application should be approved.

19                    The point to this board and its

20     professionals, and the public, is that, based

21     upon the facts and the law, there's no dispute

22     that the proposed use is inherently beneficial.

23     The negative -- the negative proofs require a

24     demonstration that RCA's proposed use has no

25     substantial negative impacts on the surrounding

1    property, including aesthetics, noise, traffic,

2    safety, and security.

3                We have demonstrated that, by clear

4    and convincing evidence --

5                (Audience interruption.)

6                MR. HIMELMAN:   Come on.

7                It is important to remember that

8    this is a very different application.   This is

9    not a use variance for a commercial or

10   residential use.   This use provides critical care

11   to a class of individuals who are entitled to

12   reasonable accomodation.   The patients are

13   handicapped and disabled under federal law,

14   including but not limited to the Fair Housing

15   Act -- and we talked about that -- and the

16   Americans with Disabilities Act.   Similarly,

17   disabled individual patients are also protected

18   under New Jersey Law Against Discrimination.

19   These laws make it clear that those who suffer

20   from addiction, and who are actively in recovery

21   and treatment, are disabled.

22               The Federal Housing Act defines

23   discrimination to include a refusal to make

24   reasonable accommodations.   The Fair Housing Act

25   defines discrimination to include a refusal to

1    make reasonable accommodations to either rules,

2    practices, or policies, or services, when such

3    accommodations are necessary to provide access to

4    housing for the disabled.

5              The applicant believes that

6    Sayreville's obligated, under the ADA and the

7    Federal Fair Housing Act, to provide reasonable

8    accomodation to this use.  Some may ask, well,

9    what does that mean in this case?  It really

10   means the obligation to provide reasonable

11   accomodation extends to Sayreville's zoning

12   regulations and how they are enforced.

13   Sayreville's zoning ordinance does not expressly

14   permit a drug and alcohol rehabilitation to

15   operate anywhere, although I will add, you know,

16   that this particular site is located in the PRIME

17   zone, which is not a residential zone, and

18   conditionally --

19              (Audience interruption.)

20              MR. KEMM:  Ladies and gentlemen,

21   please.

22              (Audience interruption.)

23              MR. KEMM:  Everybody, listen, you

24   cannot speak out randomly.  Give the gentleman

25   time to speak, you all want to come talk -- you

1    can come up to the microphone when he's finished

2    and say what you would like to say; until then,

3    we need to have the room quiet.  When you're up

4    here speaking, we will not let people speak up

5    and interrupt you; please extend the courtesy to

6    the applicant's attorney.

7             Thank you.

8             MR. HIMELMAN:  Thank you, Counsel.

9             The point I was making is that the

10   Borough of Sayreville has made a determination of

11   how this particular area should be zoned, and as

12   we know from the prior applications, the zoning

13   officer determined that this was not a permitted

14   use, and the applicant agreed to stay that

15   particular appeal to this board, and move

16   forward, and prosecute the use variance

17   application.

18             But the reality is this site, and

19   this use, is in the PRIME zone, which is not a

20   residential zone, and the applicant submits --

21   and I think your professionals concur -- that

22   this is a permitted -- this is a conditionally

23   permitted use in the zone.

24             Getting back -- and just bear with

25   me a few minutes, I'm almost done -- so we've

1   discussed -- we've discussed the positive

2   criteria, and we've also noted that, given the

3   negative proofs that have been established --

4   meaning we believe we've addressed any potential

5   negative or detrimental impacts -- it would not

6   be unreasonable to permit this use as proposed.

7                 I would like to point out -- and I

8   understand and can anticipate some of the

9   comments that the members of the public will make

10  this evening, because we've already heard from

11  many members of the public as to why they are

12  objecting to this particular application.  But as

13  I indicated, this is a national crisis, and I

14  don't know if the members of the board, the

15  professionals, or even the public -- there was an

16  article in this Sunday's New York Times, on the

17  front page of this Sunday's New York Times, and

18  the headline read:  One Son, Six Hours, Four Over

19  Doses, a Family's Anguish.  And you can read this

20  article at your leisure, but the conclusion of

21  the article, the New York Times reporters

22  carefully followed this particular gentleman,

23  named Patrick, and his sister, for many, many

24  years, and he had a very difficult life of

25  suffering from drug and substance abuse.

```
 1                    (Audience interruption.)

 2                    MR. HIMELMAN:  At the end, he did --

 3         his life has been turned around, and there's only

 4         one reason why:  It was turned around because he

 5         got help and he got treatment.  And what we're

 6         saying is this is an opportunity for this borough

 7         to be able to help people like Patrick and his

 8         sister.

 9                    Now, I can tell you, I've been

10         practicing land use, zoning and planning, for

11         over 30 years.  And I recognize that all of you

12         up here, with the exception of your

13         professionals, are volunteers, and you volunteer

14         your time.  But there are very few applications

15         that I have handled over this many, many years,

16         that has touched me in this way.  Every --

17                    (Audience interruption.)

18                    MR. HIMELMAN:  Hold on a minute,

19         just give me a chance.

20                    MR. KEMM:  Let him speak.

21                    MR. HIMELMAN:  And I think it's

22         important for the board to understand, no matter

23         where we go, newspapers, social media,

24         everywhere, television, this national crisis is

25         facing this country, it's right in front of our
```

1    nose.  I've had friends, personal friends, who

2    have passed away from it, from a drug overdose;

3    I'm sure all of you have been -- know someone,

4    God forbid, that was in the same situation.  The

5    point is, this board has an opportunity to try

6    and deal with the Patricks of the world that were

7    on the front page of the New York Times.

8              PUBLIC SPEAKER:  Stop it.

9              MR. HIMELMAN:  And what I'm

10   suggesting is, this site was already approved for

11   a nursing home.

12             (Audience interruption.)

13             MR. HIMELMAN:  Hold on.  And the

14   applicant has already demonstrated that the uses

15   are virtually identical.

16             (Audience interruption.)

17             MR. HIMELMAN:  Hold on.  You may not

18   agree with me, but that's a fact.  The reality

19   is, we believe we have absolutely demonstrated

20   why this site is particularly suited for this

21   use.

22             And the most important element is

23   that all of your professionals agree, and the

24   applicant's professionals agree, that as far as

25   the standard that must be looked at, is whether

1    this is inherently beneficial, and there's no

2    question that that's the case.

3                    And based on that, I believe this

4    board has no choice but to approve this.

5                    (Audience interruption.)

6                    MR. HIMELMAN:  As a matter of law,

7    for the reasons I have -- for the reasons I

8    outlaid -- now, I understand that members of the

9    public are -- may be frustrated with this

10   particular use --

11                   PUBLIC SPEAKER:  Yes.

12                   MR. HIMELMAN:  -- but the reality

13   is, this board and this community have an

14   obligation to provide a reasonable

15   accomodation --

16                   (Audience interruption.)

17                   MR. HIMELMAN:  Hold on -- and our

18   professionals have testified to the reasons why.

19                   So, Mr. Chairman, I think this gives

20   you a pretty good summary of our -- the

21   applicant's position on this, and what our

22   witnesses have offered, in terms of testimony.  I

23   would certainly offer and have no -- obviously

24   have no issue with members of the public

25   speaking; the only thing that I would ask is that

1    there's already been members of the public who

2    have spoken, and for the interest of time, and

3    due -- and all respect to the board --

4              (Audience interruption.)

5              MR. HIMELMAN:  Hold on -- that you

6    allow these members of the public who have not

7    spoken, give them a chance to speak.  That's how

8    I would recommend proceeding.  But I will leave

9    that to your discretion.

10              (Audience interruption.)

11              CHAIRMAN GREEN:  Okay.  Thank you.

12              MR. HIMELMAN:  Thank you.

13              CHAIRMAN GREEN:  Okay.  I'm going to

14    open this to the public at this time.  The only

15    thing I do want to say is, at our last meeting on

16    December the 13th, there were people here who did

17    speak.  I would ask that the people who spoke on

18    December the 13th refrain from speaking, and let

19    the people who have not spoken in the past come

20    up and speak first.

21              So do I have a motion to open this

22    to the public?

23              COMMISSIONER KUCZYNSKI:  So moved.

24              CHAIRMAN GREEN:  All right.  Will

25    the first person come up?

```
 1              MR. KEMM:  Good evening, sir, we
 2      have to swear you in.  I need to swear you in.
 3              MR. KRZYZKOWSKI:  My name is Robert
 4      Krzyzkowski --
 5              MR. KEMM:  We need to swear you in.
 6              R O B E R T   K R Z Y Z K O W S K I,
 7      having been duly sworn, testified as follows:
 8              MR. KEMM:  Good evening, sir.  If
 9      you would just give us your name, spell your last
10      name.
11              MR. KRZYZKOWSKI:  My name is Robert
12      Krzyzkowski, K-R-Z-Y-Z-K-O-W-S-K-I.  I live at 26
13      Gillen Drive in the Parlin section of this
14      borough.
15              MR. KEMM:  Thank you, sir.  Please
16      go ahead.
17              MR. KRZYZKOWSKI:  I'd like to
18      preface my remarks by saying that I'm speaking
19      for myself and many neighbors who live in
20      proximity to this proposed drug treatment
21      facility.  We do not believe this community is
22      against treatment.  People who are addicted need
23      help, and God bless and help all of them.  This
24      is a question about where it is most appropriate
25      to place such a major drug treatment facility.
```

1          And let's be clear about what this

2    proposed facility is:  It is a major drug

3    addiction treatment center.  It is a large

4    facility, with the capacity for not only

5    outpatient treatment, but also a

6    several-hundred-bed facility for inpatient

7    treatment.  This facility will not be able to

8    discriminate about who it chooses to treat,

9    whether they are wealthy or poor.  It could be a

10   major drug addiction, such as cocaine and heroin,

11   and sometimes, with that type of addiction, comes

12   the crime necessary to support the habit.

13          Outpatients, apparently, would have

14   access of egress to and From the facility, honest

15   glory.  Has the borough been provided with the

16   type of data from the applicant, such as the type

17   and professional nature of the staff, the ratio

18   and number of the staff of inpatient and

19   outpatient, ratio of security to the number of

20   patients, and the type of security measures that

21   would be in place?  These are all important

22   considerations.  They have been -- and have they

23   been answered to the borough's satisfaction?

24          South Amboy has an outpatient

25   methadone treatment center, and has, in its

1    wisdom, required that the facility be placed in

2    an industrial zone, on the very outskirts of the

3    city, away from schools --

4              (Audience applause.)

5              MR. KRZYZKOWSKI:  -- away from

6    schools and residential areas.  Sayreville should

7    do the same.  We, as a community, have a right to

8    determine what our community is.  We, as a

9    community, should be willing to locate a

10   treatment center, but in the appropriate

11   location.  This proposed location is not, by any

12   means, the right location, so close to a school.

13             (Audience applause.)

14             MR. KRZYZKOWSKI:  The applicant

15   cloaks their application with terms like

16   "beneficial use."  The original application for a

17   nursing home facility was also a beneficial use.

18             (Audience applause.)

19             MR. KRZYZKOWSKI:  The facility was

20   intended to replace an older nursing home

21   facility, which was demolished at the very spot.

22   At some point, though, it was determined that

23   leasing the property would be much more

24   profitable than administering a nursing home.

25   The applicant -- sorry, the lessor's profit,

1     however, should not be an influence of

2     determining what is best overall for our

3     community.  Sayreville does need a nursing home

4     facility, especially since the other facility was

5     demolished.

6                    (Audience applause.)

7                    MR. KRZYZKOWSKI:  With respect to

8     the concept of beneficial use, suppose the

9     applicant has submitted an application for a

10    private, for-profit, long-term incarceration

11    facility -- prison -- to be established at this

12    location.  That could be deemed beneficial use,

13    but I do not believe the community would ever

14    consider granting an approval for such a facility

15    so close to a school or densely populated

16    residential area, nor should it.  This proposed

17    drug facility poses a different set of problems,

18    but the inherent risks to our community are very

19    real, because it would be so close to a grammar

20    school.

21                    We, as a community, do all in our

22    power to help our children be safe from the

23    scourge of addiction.  We establish drug-free

24    zones in areas near and around our schools.  I

25    question whether this facility meets the letter

1    of the law with respect to those requirements.

2                    (Audience applause.)

3                    MR. KRZYZKOWSKI:   Does it?   Does

4    anyone here have that answer?   The proposed

5    facility is within a very short, easy walk from

6    the Eisenhower Grammar School.   There's a

7    concrete walkway from the school's property to

8    the entrance of this drug treatment facility.   To

9    propose to locate a major drug rehab facility of

10   this nature so close to our school is ludicrous

11   on its face.

12                   (Audience applause.)

13                   MR. KRZYZKOWSKI:   That the applicant

14   wants to establish a treatment center within the

15   community, there are certainly other areas within

16   the borough that could accommodate such a

17   facility.   There's a large parcel of land at the

18   base of the Edison and Victory Bridges where the

19   old movie theater is located --

20                   (Audience applause.)

21                   MR. KRZYZKOWSKI:   -- and that land

22   has been vacant for years.   It is on the

23   outskirts of the borough, and not close to

24   schools or densely populated residential areas.

25   It is accessible from major roadways.   It would

1   be a much more appropriate area for such a major

2   drug treatment facility.

3                    (Audience applause.)

4             MR. KRZYZKOWSKI:   In closing, I

5   believe approval of this variance would be a very

6   inappropriate and unwise move by the board, and

7   detrimental to our community.  I believe the

8   board needs to stand for what is best for the

9   community at large.

10                   (Audience applause.)

11            MR. KRZYZKOWSKI:   If denying the

12  variance poses potential cost and suits to the

13  borough, then so be it.  Sometimes taking a stand

14  for what is best is not easy.  It takes internal

15  fortitude from each of you.  We pay our taxes to

16  this community, and if some of those tax proceeds

17  have to be utilized to further fight for our

18  rights as a community, it is a totally justified

19  use of those monies.

20            I do not believe any part, whatever

21  determined, that we as a community are being

22  discriminatory, because we are taking a stand

23  protecting our children, by not placing a hard

24  drug addiction facility within a few minute walk

25  from our schools.  Think about this for a minute,

1     a major drug treatment facility placed within

2     minutes from our school, with unsupervised

3     outpatient access and egress.

4                   PUBLIC SPEAKER:   And residential

5     also.

6                   MR. KRZYZKOWSKI:   There may be other

7     instances where this type of drug treatment

8     facility would prove to be so-called beneficial

9     use; however, this case is more unique, because

10    the proximity to our community school, and we as

11    a community should be willing to go to the bat

12    for our children's safety, whatever it takes.

13                   Thank you for your consideration.

14                   (Audience applause.)

15                   CHAIRMAN GREEN:   Okay.  The next

16    person to speak on this application?

17                   MR. KEMM:   Good evening, ma'am, I

18    need to swear you in.

19                   L A U R I   E S P O S I T O, having

20    been duly sworn, testified as follows:

21                   MR. KEMM:   Please give us your name,

22    spell your last name.

23                   MS. ESPOSITO:   Laurie Esposito,

24    E-S-P-O-S-I-T-O.

25                   MR. KEMM:   Thank you, Ms. Esposito.

1      MS. ESPOSITO:  Hi, we have a little
2   young lady here --
3      MR. KEMM:  I'm sorry, what's your
4   address?
5      MS. ESPOSITO:  24 Rubar Drive,
6   Parlin.
7      PUBLIC SPEAKER:  Speak into the
8   microphone, ma'am.
9      MS. ESPOSITO:  I am.
10      MR. KEMM:  You kind of have to hold
11   it close.
12      MS. ESPOSITO:  Real close?
13      PUBLIC SPEAKER:  Yeah.
14      MS. ESPOSITO:  All right.  We have a
15   young lady here from the Eisenhower School.  I
16   sat on our board of ed for three years, and most
17   of my job was watching out for our students, and
18   for our parents, and for our town.
19      This facility, everybody's very
20   passionate about drug addiction, we're passionate
21   about our students, we're passionate about our
22   seniors.  There's a waiting list at the Venetian.
23   Okay?  There's children right by this facility.
24      It's just the wrong area.  We're
25   passionate about, you know, rehab; just put it in

1    a different area.  No big deal.  Very simple,

2    very basic.

3                    U R S U L A   J O N E S, having been

4    duly sworn, testified as follows:

5                    MR. KEMM:  Please give us your name,

6    spell your last name.

7                    MS. JONES:  Ursula Jones, J-O-N-E-S.

8                    MR. KEMM:  And your address?

9                    MS. JONES:  16 Straton Court,

10   Parlin, New Jersey.

11                   I'm Ursula Jones, I'm a registered

12   nurse, critical care.  So I wanted to address

13   some of the issues that were thrown out about

14   disabilities.  I agree we have a problem; I work

15   in it every day.  I work in the emergency room.

16   I have to put critical care patients, 99 years

17   old, who are dying, in the hallway, because

18   people with addictions have taken up our beds.

19   So I empathize.  I come home late almost every

20   day having to deal with this.

21                   What this board needs to know is

22   along with addiction comes a lot of mental

23   health.  It's called dual diagnosis.  So a lot of

24   these people are unstable.

25                   I've also had the ability to work at

1    numerous, numerous detox and rehab facilities in

2    New York -- New Jersey and New York, and I can

3    tell you that the picture that they're painting

4    is not the picture that you're going to see.

5                    (Audience applause.)

6                    MS. JONES:  Patients have come in

7    positive to heroin; 30 days later, they're

8    positive to seven substances.  Inpatient.  People

9    are bringing it in.  They're getting it some kind

10   of way.  Patients have educated me, I've been a

11   nurse for 25 years, I learned 15 years ago that

12   patients did come in for a tune-up, they came in

13   for an oil change.  They're court ordered.

14   They're mandated.  The job wants them to go.  The

15   family wants them to go.  There's a very high

16   recidivism rate in drug addiction.

17                    I'm very passionate about drug

18   diction, but along with of the people in this

19   room, it's not what we do, and how we do, and

20   where we do it.  That's my concern.  My concern

21   is that, if we put that place there, we're going

22   to have something on our hands bigger than Sandy

23   Hook.

24                    A lot of these people that are

25   coming in and out of these facilities are

1    unstable.  They're very unstable.  There's an

2    incident in Summit, New Jersey, where the nanny

3    got beat up.  It was on the camera.  What you

4    didn't hear was that the guy who did it had got

5    turned down from going into a bed at Summit Oaks.

6    That's why he was in that area.  He brutalized

7    that woman in this house, to rob her, and I'm

8    afraid that that's what's going to happen to our

9    people in this town.

10                   (Audience applause.)

11                   MS. JONES:  So I'm begging you guys

12   to think about this.  We do need it.  Addiction

13   is at its worst right now, and I understand that

14   New Jersey, on the whole, is one of the worst in

15   the country.  We need help; it's just where that

16   help goes.  This is a highly densely populated

17   residential area, and I think it's a disaster

18   waiting to happen.  You can mark my words, we

19   will make the news.

20                   RCA, as well, have had lots of

21   problems at their facilities.  There's gross

22   understaffing, gross.  I've had the opportunity

23   to work through some of their facilities.

24   There's gross understaffing.  They make the books

25   look like there's three nurses there, when

```
 1      there's only one nurse and two aides.  People are

 2      not getting the counseling that they need to be

 3      getting.

 4                  Right now, I have decided that I

 5      won't even do -- I'm pursuing a master's degree

 6      in psychology, but I will not work addiction, I

 7      will not, because I want to help people, and I

 8      don't see that most of these facilities that are

 9      making millions and millions of dollars are

10      helping the people who need the help.  That's

11      what RCA has a history of.

12                  So I just want you to know that

13      going forward.  RCA, don't -- does not do what

14      they're supposed to do with these patients.  And

15      we're putting our neighborhoods and our children

16      in great danger.

17                  Thank you.

18                  (Audience applause.)

19                  MR. PLATNER:  My name is Robert

20      Platner, P-L-A-T-N-E-R, I live at 68 Prusakowski

21      Boulevard in Parlin.

22                  MR. KEMM:  I need to swear you in,

23      sir.  You did the first part good, though.

24                  R O B E R T   P L A T N E R, having

25      been duly sworn, testified as follows:
```

```
 1            MR. KEMM:  Thank you, sir.  Please
 2    continue.
 3            MR. PLATNER:  Okay.  Do we need redo
 4    the last part, or can we skip over it?
 5            MR. KEMM:  No, you got your name
 6    right.  I believe you gave us your correct name
 7    and address, I don't doubt that, sir.
 8            MR. PLATNER:  I want to thank last
 9    speaker.  I want to thank the petitioner for what
10    he had to say.  If I have this right, he
11    basically was of the opinion that reasonable
12    accomodation is required by law.  I believe, as
13    law goes, that reasonable accomodation of a
14    reasonable effort would be accommodated.
15            And I have very few words to say,
16    other than -- and I'm going to submit the
17    document for the -- for your consideration -- the
18    Substance Abuse and Mental Health Service
19    Association found that 90 percent of the people
20    most in need of drug rehab do not get it.  This
21    stands for what the petitioner was trying to say,
22    that people need to get access to drug abuse --
23    I'm sorry, to drug rehabilitation.
24            An article in Scientific American
25    about rehab success rates and statistics, which I
```

1    will submit, says that there is no accrediting

2    association, so everybody can define success as

3    they choose, and as a consequence, the relapse

4    rates in the United States are abysmal.  Amy

5    Winehouse was in rehab over and over and over

6    again, and died.

7              So, anyway, I would like to say,

8    one, that we do need this kind of an institution

9    somewhere; I think there's a better place for it.

10             I would ask that the board inquire

11   what makes the petitioner better suited to

12   provide rehab services than the problems that

13   are -- that are noted in this other article, as

14   far as why rehab doesn't work, or hasn't worked.

15   It doesn't mean it can't work; it means that, as

16   it's currently constituted, it's not working.

17             Who can I give these documents to,

18   and say thank you?

19             MR. KEMM:  Sir, you're giving us two

20   documents?

21             MR. PLATNER:  Yes.

22             MR. KEMM:  All right.  If you can

23   give those to the secretary, and just wait for

24   one second, so I can make sure we get this -- so

25   your name is Platner, P-L-A-T-N-E-R.  Correct?

1           MR. PLATNER:  That's correct.

2           MR. KEMM:  So I'm going to mark one

3    Platner-1 and Platner-2.  Okay?

4           And Platner-1, if I'm understanding

5    you correctly, this is a printout from online

6    about the --

7           MR. PLATNER:  Yes, they both are.

8           MR. KLEMM:   -- rehab recidivism

9    rates and statistics?

10           And then, what I'm going to mark as

11    Platner-2 is another printout, The Rehab Industry

12    Needs to Clean Up It's Act, Here's How, by The

13    Influence.

14           (Exhibits Platner-1 and Platner-2

15    are marked for identification.)

16           MR. PLATNER:  So the first article

17    deals with the fact that whatever statistics that

18    have been published are published on different

19    measures, and since there is no one metric that

20    anybody agrees on, some people say, well, gee,

21    you know, I scratched my back, and that relieves

22    my problem, and I'm cured.

23           And the second article deals with

24    the problems that exist in the industry.  So if

25    the petitioner can convince you gentlemen that

1    they can do a perfect job in that location faster

2    than anybody else can, then do it.

3              I'm ready to give this microphone to

4    somebody else.

5              MR. KEMM:  Thank you, sir.  I just

6    wanted to make sure we got these marked and we

7    have them correct.

8              MR. PLATNER:  Okay.  Basically, my

9    points are two, and there's one more that I'd

10   like -- I can't speak to, because I wasn't

11   here -- and that is the numbers that are in the

12   business plan that sits behind this whole

13   thing -- I have no idea; perhaps you gentlemen

14   do -- how many patients they intend to see, how

15   many beds they intend to fill, how many people

16   are on their staff, where are those people going

17   to park, and how they're going to get to work,

18   because there already is a problem of traffic on

19   Ernston Road, and if there are 2 or 300 people a

20   day going in and out of Ernston Road, and there's

21   another 200 people in beds that are going to have

22   family visiting them, I believe the traffic

23   situation needs to be analyzed more than somebody

24   testified that it's okay.

25              Thank you very much.  Good night.

1          (Audience applause.)

2          E L I A S   M U H A M M A D, having

3     been duly sworn, testified as follows:

4          MR. KEMM:  And please give us your

5     name, spell your last name.

6          MR. MUHAMMAD:  My name is Elias

7     Muhammad, M-U-H-A-M-M-A-D.  I currently live at

8     101 Woodlake Drive in Parlin section.

9          MR. KEMM:  Thank you, sir.  Please

10    continue.

11         MR. MUHAMMAD:  I am a new resident

12    to this area, so I can't speak on -- I don't know

13    the politics of Parlin.  I don't know the

14    politics of Middlesex County.  But what I can

15    speak on, something that I do know, is

16    individuals that are addicted to drugs.  I am a

17    major crimes detective in Plainfield, New Jersey.

18    I investigate homicides, shootings, and such.

19    Years prior to that, for several years, I was a

20    narcotics detective.  I worked undercover.

21         If anyone is familiar with

22    investigations, in order to do narcotics work,

23    your lifeline is your informants.  Your

24    informants are these people that are addicted to

25    drugs.  So I had to spend a considerable amount

1    of time around these people.  I had to dress like

2    them, live in their world for a little while.

3                  And one thing that I can definitely

4    tell you -- I can't predict the future, but just

5    based on my training, my education, and my

6    personal experience with these people, people

7    that are addicted to these drugs, especially

8    heroin, being such a physical drug, I don't know

9    how the security is going to work in this place,

10   if it's going to be constantly locked down.  But

11   if these individuals can get in and out when they

12   want to break into a car, they're going to walk

13   over to Harbortown.  When they want to steal a

14   package, they're going to walk over to La Mer.

15   That's what they're going to do.  And it's not so

16   much that they're horrible people, especially

17   when you talk about heroin, it's an extreme

18   physical addiction.  It's going to force them to

19   do it.  It's going to force them to do it.  So

20   it's going to create a lot of problems that,

21   believe me, you don't want.

22                  In Plainfield, we have a methadone

23   center in Plainfield.  We found, from undercover

24   investigations, from sitting in the car, and we

25   found that the drug dealers would come to that

1    center and sit outside, and pick these people

2    off.

3                    (Audience applause.)

4                    MR. MUHAMMAD:  Like I said, this is

5    the only thing that I can speak to, is that, if

6    you put that -- this rehabilitation center there,

7    it's going to bring all the problems that,

8    believe me, you do not want.

9                    (Audience applause.)

10                   MR. MUHAMMAD:  Lastly, this has

11   nothing to do with the center, but there's a

12   really nice old lady standing in the back with

13   black hair.  One of you young guys should get up

14   and give her your chair.

15                   P A U L A   G E R V A S I, having

16   been duly sworn, testified as follows:

17                   MR. KEMM:  Please give us your name,

18   spell your last.

19                   MS. P. GERVASI:  My name is Paula

20   Gervasi, G-E-R-V-A-S-I.  I am a cemeterian and

21   family service counselor at Hollwood Memorial

22   Park and Cemetery.

23                   MR. KEMM:  And your address?

24                   MS. P. GERVASI:  4 Leshyk Drive,

25   Parlin.

1    MR. KEMM:  Thank you, please

2  continue.

3    MS. P. GERVASI:  I am a family

4  service counselor and cemeterian at Hollwood

5  Memorial Park and Cemetery.  I see too many over

6  doses in my cemetery, and I believe there is a

7  big epidemic that has to be stopped, and I

8  believe that this epidemic has to stop with the

9  people here.  You have to watch out for our

10  children, and if you don't watch out for our

11  children, it's only going to get worse.

12    I am a single mom to an 11-year-old

13  child that goes to middle school.  I know for a

14  fact there are drugs in middle school already.

15  This is unacceptable.  It's more unacceptable to

16  keep a facility like this away from elderly, who

17  need that care, than somebody -- somebody who

18  chose -- chose to have this addiction.

19    I'm sorry, but I cannot freely, as a

20  single mom, think of my daughter walking my dog

21  in a place that I purchased with my hard-earned

22  days, to have somebody walk in and destroy my

23  life, or her life, or my community's life,

24  because I watched every single day --

25    (Audience applause.)

 1            MS. P. GERVASI:  -- there is not a

 2      month that I have not laid down a drug overdosed

 3      individual.  Doesn't matter what age, 17, 61, 35.

 4      The parents come in distraught, they come in with

 5      their hearts broken.  Yes, there's an epidemic,

 6      yes, we need a place, but yes, it cannot be in

 7      our community.  It can be where that movie

 8      theater was.  It can be somewhere that's more

 9      industrial, that we're not looking over our

10      shoulders while we're walking our dogs, or

11      walking through the park with our children.

12            E U G E N E   H A R R I S, having

13      been duly sworn, testified as follows:

14            MR. KEMM:  Please give us your name,

15      spell your last name.

16            MR. HARRIS:  All right.  My name is

17      Eugene Harris, last name H-A-R-R-I-S.  I live at

18      5 Biesiada Court, Parlin.

19            Okay.  I'm going to keep this brief.

20      I'm a former elementary and middle school

21      principal.  I've been involved with -- I've been

22      shot at making a home visit, involving adults who

23      were under the influence of drugs and alcohol.  I

24      have physically taken down a parent who came into

25      the building with a baseball bat, under the

1    influence of drugs.  And as a former elementary

2    principal, I've also been involved in about a

3    four-and-a-half-hour lockdown, because of armed

4    intruders.

5                Living in the La Mer complex, and

6    being very close to the elementary school there,

7    I believe that -- I've seen it at both ends, I've

8    dealt with students who have been under the

9    influence of drugs and alcohol, had treatment;

10   dealt with parents the same.  It is a disease,

11   and these individuals do need help, and I'm for

12   that.

13               My concern is, as an educator, still

14   an educator over 22 years, is that the proximity

15   of the proposed facility is just literally less

16   than a thousand yards away.  And one of the

17   things, as a principal, that we're charged with,

18   is not only to educate children, but it's also to

19   provide a protection, and I've been directly

20   involved in protecting students.

21               So my concern is that I think the

22   borough is big enough, there's enough real

23   estate, that I believe that the borough does need

24   a facility, I think there are adequate

25   accommodations, but to place that in very close

1    proximity, within a thousand yards of an

2    elementary school, which has a lot of egress, has

3    a lot of access, and to be frank with you, other

4    than the police force, minimum security, because

5    of our good neighborhood, we have literally

6    dozens of family who simply walk to school from

7    the both complexes, I think it would present a

8    clear and present danger to the students at the

9    elementary school.

10                  So from my point of view, as a

11   current educator, former elementary and middle

12   school principal, who has directly dealt with

13   these students, and dealt with adults who have

14   tried to trespass the building, I would say that

15   it's the wrong place and the wrong location.

16                  Thank you.

17                  (Audience applause.)

18                  A L   L A M B E R T, having been

19   duly sworn, testified as follows:

20                  MR. KEMM:  Please give us your name,

21   spell your last name.

22                  MR. LAMBERT:  My name is Al Lambert,

23   63 Prusakowski Boulevard here in Parlin.  Spell

24   that one.  It's a little test for you guys.

25                  Most importantly, I don't know if

1    tonight you were going to put a stamp of approval

2    on this, and this was going to be effected

3    complete; I would suggest that you don't do that.

4    How many people in here?

5              (Audience applause.)

6              MR. LAMBERT:  I think the lesson is

7    being sent.  I'm a former special-ed teacher,

8    automobile business 54 years, and the

9    entertainment business 54 years.  I lived on

10   Staten Island most of my life, and lived right

11   near a facility such as this, which now has a

12   very crime rate and a lot of trouble.  I would

13   suggest to you, very, very importantly, to think

14   about your decision here.

15             The entire time the gentleman spoke,

16   about seven times he told us how severe and

17   serious the issue is.  We all know that.  We all

18   know that.  Every one of us in the room, this has

19   touched us, our family, our friends, our

20   neighbors, and probably all of you too.  So he

21   was driving that home; he didn't have to drive

22   that home.  But he made us kind of -- a little

23   demeaning, because he made us feel that we

24   weren't for people who were disabled, and didn't

25   accuse us of it, but he did mention that several

```
 1    times.
 2                My concern is, I would have been
 3    here the day they put the shovel in if I would
 4    have known that this was -- this would have been
 5    a drug facility.  We were all under the
 6    impression it was going to be a nursing home,
 7    weren't we?  Weren't we?
 8                (Audience applause.)
 9                MR. LAMBERT:  Their logic was just
10    build it and we'll throw it in later.  Did they
11    always intend to make this a drug facility?
12                Can you answer that, sir?  No, you
13    can't answer that.  I don't think so either.
14                (Audience applause.)
15                MR. LAMBERT:  So the point is, I
16    think we were duped.  We were duped.  I would
17    have been here the day the shovel went in the
18    ground, had I known -- when this came about, I
19    said, you know something?  There's a scheme here.
20    There's a scheme.  It's build it, and they will
21    come.  Well, they built it; we should not be
22    approving this.  We are senior citizens -- I know
23    I don't look it -- but we have a senior citizen
24    community there, we have families there, we have
25    a school there.
```

```
1              And he mentioned the traffic.  The
2     corner of Gondek and Ernston Road, you need a
3     traffic light there now.
4                   (Audience applause.)
5                   MR. LAMBERT:  You want to add this,
6     and say that the traffic is good?
7                   Do you drive there?  Come on.
8                   The point is, okay, everything about
9     this is wrong.  Drugs, believe me, it's such a
10    sad situation.  And the gentleman who spoke first
11    was extremely articulate and prepared, and he did
12    tremendous, and he was right.  The fact that
13    everything about drugs is crime.  Possession is
14    crime.  To take it, even though they say that it
15    is not legal -- and I'm not a lawyer -- my son
16    is, but I am not -- the bottom line is, you take
17    it, that means you have possession, it's a crime.
18    You sell it, it's a crime.
19                  There is nobody who will be living,
20    going in and out of there, except the employees,
21    that will not be involved with crime, because
22    that's what drug brings.  And statistically,
23    sadly, the medical profession, in and of itself,
24    has one of the highest instances of drug
25    addiction.  Okay?  So what happens there is
```

1   access to, in hospitals, to drugs, et cetera.

2   Also adds to the entire criminal picture.

3              So I would just suggest -- you all

4   look like very intelligent people -- to think

5   about this before you put a stamp of approval.

6   And I suggest that we all know how to contact

7   them.  They should be getting 780 e-mails a day,

8   so they won't forget that the community is not in

9   agreement with this.  Bring it back to a nursing

10  home.

11             I realize the business aspect.  I'm

12  a businessman.  You can't put it by the movie

13  theater, that would cost another $62,000,000.

14  I'm hip to that.  But you can revert it back to a

15  nursing home, your client -- if you're not a

16  partner, your clients can rethink it, come up

17  with an idea, and do the nursing home idea, and

18  still be solvent, so no one has to lose any

19  money.

20             I thank you very much.

21             C A R M E N   C A M P B E L L,

22  having been duly sworn, testified as follows:

23             MR. KEMM:  Please give us your name,

24  spell your last name.

25             MS. CAMPBELL:  Carmen Campbell, C-A

1    -M-P-B-E-L-L, I'm a resident of 1306 Harbour Club

2    Drive, which is right across from where the

3    facility is proposed to be built.

4              First of all, I want to say thank

5    you guys for having this tonight, and thanks to

6    my neighbors for showing up in numbers.  I work

7    full time for the United Nations in New York, and

8    I commute every day, and I stand at the bus stop

9    which is right across from the proposed site.

10             In Harbour Club, we have over 400

11   residents.  Right next to me is La Mer and

12   Camelot, and across from there is a school.

13             When I heard about this proposal

14   initially, it was supposed to be replacing the

15   nursing home.  I consider this a bait and switch.

16             (Audience applause.)

17             MS. CAMPBELL:  I don't want to

18   accuse the board or Sayreville of getting money

19   from this deal; however, my respect to the

20   attorney, I'm sure, where you live, you will not

21   want one of these accommodations --

22             (Audience applause.)

23             MS. CAMPBELL:  -- you would not want

24   to live next to it.

25             I'm a single mother, and I bought

1  Harbour Club for my daughter and myself.  She's

2  now 20 years old, in college, in her third year,

3  she went to Sayreville War Memorial High School,

4  and when I bought into Sayreville, I bought into

5  it because this was a home resident area.  The

6  nursing home was there, which I also used to go

7  visit patients there myself, just to talk to the

8  women, cheer them up, because some of them did

9  not have family coming in.  So when I heard about

10  this coming in, it was a great idea for us to

11  have the nursing home replaced, but not by a drug

12  facility.

13          Like the gentleman said earlier, it

14  would be great if they could put it out by where

15  the old theater is, that would be great, and I'm

16  sure you guys would support that.

17              (Audience applause.)

18              MS. CAMPBELL:  However, as a

19  resident -- I mean, right now, La Mer is pulling

20  in new homes in La Mer, so there'll be more

21  people coming into the community.  You can't even

22  cross the street there.  Traffic -- this is a

23  residential community; not for a drug rehab

24  facility.

25          We pay our taxes, and I know you

1    guys are residents in this community as well.  He

2    does not live here; neither does any member of

3    the board from the company he works with.  And I

4    would like you guys to really consider this,

5    Maria, Thomas, all of you, consider this:  We do

6    not want this facility in our community.

7              Thank you.

8              S C O T T   T A B A C C O, having

9    been duly sworn, testified as follows:

10             MR. KEMM:  Please give us your name,

11   spell your last name.

12             MR. TABACCO:  Scott Tabacco,

13   T-A-B-A-C-C-O.  I live at 98 Woodmere Drive,

14   Parlin.  I live in La Mer.

15             First, I'd like to say that the

16   gentleman who spoke first was very eloquent.  And

17   I don't think I'll do as good a job as him, but I

18   will be very brief.

19             In reference to what the lawyer was

20   saying about how everything is going to be

21   secure, and they have security and everything,

22   there's one thing, though, that I'm sure he

23   failed to mention, is that the treatment industry

24   is self-regulated.  Right there, that tells you

25   everything that you need to know, as far as I'm

1    concerned.  Self-regulated, they don't have to

2    worry about state regulations; they don't have to

3    worry about federal regulations.  It's

4    self-regulating.  They can have as many people in

5    there as they want.

6              Today, I downloaded a couple of

7    articles that was on the Huffington Post,

8    statnews.com as well, talking about places

9    becoming brothels, patients selling their drugs

10    for sex.  I mean, this is what's going to happen.

11              The treatment center, as many people

12    have said, it's right across from Harbour Club.

13    The school is next door.  Camelot is right across

14    from the school.  La Mer is right there.  And

15    then, behind the school, you have hundreds of

16    residential homes.  To be putting a facility like

17    this so close to the school, as has been brought

18    up before, it's a drug free zone, they have drugs

19    in their -- as the cop also said, drug dealers

20    are going to be parked outside waiting for them

21    to come out.

22              This was not thought out well by

23    this board, if it plans to let this happen.  I

24    think you guys have to really think about what

25    you're letting come into our community, and

```
 1    where.
 2                 Thank you.
 3                 D A V I D   B A R R, having been
 4    duly sworn, testified as follows:
 5                 MR. KEMM:  And please give us your
 6    name, spell your last name.
 7                 MR. BARR:  My name is David bar,
 8    B-A-R-R, I'm from 115 Prusakowski Boulevard in
 9    Parlin.
10                 I'm relatively new to Parlin.  I
11    recently moved from New York, where I was, for 20
12    years, a New York City police officer, and for 10
13    years a New York City Fireman.
14                 (Audience applause.)
15                 MR. BARR:  The first thing a major
16    police department does when a facility like this
17    comes into the neighborhood is assign extra
18    police patrols and extra police vehicles at that
19    area.  Is this board willing to spend that extra
20    money on extra police coverage for La Mer,
21    Spinnaker Pointe -- I don't know the name of the
22    other one, I'm sorry.
23                 Also, if I may, if the board can
24    indulge me a moment, there's an article from the
25    August 2017 Boston Globe entitled Behind the
```

1    Luxury:  Turmoil and Shoddy care Inside Five-Star

2    Treatment Centers.  They're specifically speaking

3    about RCA facilities in Massachusetts --

4              (Audience applause.)

5              MR. BARR:  -- where the patients --

6    it says in the article from the Boston Globe,

7    after interviewing employees, former employees,

8    state investigation documents from investigations

9    at this site say the staff complained repeatedly

10   to management that the -- that they were not able

11   to keep their patients safe.  If they can't keep

12   their patients safe in their facility, how are we

13   going to be safe outside the facility?

14              (Audience applause.)

15              MR. BARR:  It quotes one person as

16   saying that the patients have sex with each other

17   in the facility, and they don't have the manpower

18   to stop it in any way.

19              These facilities are not safe.  Drug

20   rehab centers that use methadone, if they do not

21   see the patient take the methadone, it is sold

22   outside the facility.  People will be selling

23   their, quote, recovery drugs on the streets 1,000

24   feet away from an intermediate school.

25              Thank you.

```
 1              (Audience applause.)
 2              R U T H   A N N   M A H O N E Y:
 3      Having been duly sworn, testified as follows:
 4              MR. KEMM:  Please give us your name,
 5      spell your last name.
 6              MS. MAHONEY:  Ruth Ann Mahoney,
 7      M-A-H-O-N-E-Y, 2 Gerard Place, Parlin.
 8              I live nowhere near where this
 9      facility is proposed.  My concern initially was
10      the school zone.  Isn't it in what's supposed to
11      be a drug free school zone?
12              PUBLIC SPEAKER:  Yeah.
13              MR. BARR:  Wouldn't people going
14      there then be eligible for arrest, because
15      they're in a drug free school zone?  I'm just
16      saying.
17              The nursing home was proposed.  We
18      need a nursing home; yeah, we need drug rehab
19      too.  But not in -- my concern is the school.
20      Biggest concern is the school.  If people are
21      allowed to walk, and they're not in prison, so
22      they can leave here, they can walk to the school.
23      Children are naive, they'll believe what you tell
24      them.  And there are children, as I'm sure we've
25      all read and heard, elementary school children,
```

1    who get hooked on drugs.  They go to the middle

2    school and they're already hooked on drugs.  This

3    just gives more access for our children to drugs.

4    It needs to be -- we need the rehab; not there,

5    not in a drug free school zone.

6              My husband, my son, are teachers for

7    long periods of time, high school.  They see it

8    every day.  It's sad.

9              I'd like to address our police.  We

10   don't have enough police officers as it is in

11   Sayreville.  That's a documented fact.

12             (Audience applause.)

13             MR. BARR:  We're going to need many,

14   many more police officers, who then will put --

15   we're putting many, many more people at risk.

16             PUBLIC SPEAKER:  And more taxes.

17             MR. BARR:  And we need more police

18   officers as it is, and we're -- we would need

19   plenty, plenty more, and I'm sure they must

20   agree, but they can't right now.

21             (Audience applause.)

22             MR. BARR:  This also brings to

23   mind -- I'm new at this, I've been coming to town

24   council meetings and so forth for a year -- the

25   building part of this, the builder involved,

1    although it's a different builder, reminds me of

2    what's happening with COAH and the builders

3    there.  They're switching what their uses are.

4    PRIME property, as I understand, as the gentleman

5    said, is also for recreation.  Who's going to go

6    recreate at the drug facility, or near it?  Not

7    I, nor my children, although they're old.

8                    There's got to be, and there is,

9    many other places in Sayreville that this could

10   go.  I don't know where the gentleman's from, I

11   don't know if his town has one of these, but

12   would he be up here speaking for his town in

13   favor of it or against it?  I don't know.  But

14   please think of our children.  That's all, just

15   our children.  And keep them safe.

16                    And if you want this, as a zoning

17   board, find another place, please.

18                    Thank you.

19                    (Audience applause.)

20                    C H R I S T O P H E R   H U N T E R,

21   having been duly sworn, testified as follows:

22                    MR. KEMM:  And please give us your

23   name, spell your last name.

24                    MR. HUNTER:  Christopher R. Hunter,

25   H-U-N-T-E-R.  I live at 6 Fela Drive in La Mer.

1        I've been a resident of La Mer for

2    the past 21 years.  During that time, I've seen

3    the community change in various ways.  It's

4    grown.  I want to be considered a rebuttal

5    witness to the statement that the lawyer made

6    earlier, that this is not a residential area.

7        I'd like to state for the record

8    that -- maybe members of this particular zoning

9    board, maybe you're not a member, but at the

10   time, when the Kaplan organization wanted to

11   expand La Mer, they put a proposal in front of

12   you to expand to 1,500 units.  They've expanded

13   past that.  It's very difficult to say that 1,500

14   units of single-family houses, rental properties,

15   condo properties, three or four pools, a track --

16   I don't know what else to say we have there --

17   but it's a nonresidential area.  I don't know how

18   you define that, sir, quite frankly.

19               (Audience applause.)

20               MR. HUNTER:  I want to be respectful

21   of this board's time and my colleagues behind me,

22   to say I've put three kids through the Eisenhower

23   School.  It's a great school.  It's been a safe

24   school.  The families that have moved here for

25   the same benefit that I did -- I moved from

1    Brooklyn New York, someone talked a lot about

2    where they came from.  Let me tell you, coming to

3    Sayreville to raise a family was the best thing

4    I've ever done.  I'd like to see that continue.

5                    Thank you for your time.

6                    (Audience applause.)

7                    A L   P I L L A R, having been duly

8    sworn, testified as follows:

9                    MR. KEMM:  Give us your name, spell

10   your last name.

11                   MR. PILLAR:  My name is Al Pillar,

12   P-I-L-L-A-R.

13                   MR. KEMM:  And your address, sir?

14                   MR. PILLAR:  251 Morgan Avenue,

15   Morgan.

16                   So my family's been here for about

17   104 years.

18                   (Audience applause.)

19                   MR. PILLAR:  And over the years,

20   I've watched my town really go the wrong

21   direction.  And not to single any of you, the

22   past boards, but I don't think -- I don't think

23   you have my best interests at heart.  The folks

24   sitting behind me who I don't know I think have

25   my back.

1          You know, I watched this zoning

2     board approve not one, but two massage parlors,

3     one adult bookstore, one hourly hotel, two go-go

4     bars, and you let that happen.  It happens -- the

5     massage parlors and the bookstore on Morgan,

6     that's right, this property sits in Morgan --

7     it's residential.

8               And, you know, Old View (sic)

9     Nursing Home to my heart.  That was my first job

10    in high school, I washed dishes there.  And I

11    have an elder grandmother, and she's headed

12    toward a nursing home, and what you're telling me

13    is, for me to get my grandmother in this

14    facility, I have to get her addicted to cocaine.

15    That's what it comes down to.

16               My other comment is, can we take

17    those 700 beds and put it toward our affordable

18    housing bill we have?  This is crazy.

19               I tried to do some research on this

20    corporation.  Is it a corporation?  Is it a

21    company? an LLC?  I couldn't find out too much

22    about these folks.  I don't know.  Will you

23    answer questions if I ask you question, or I'm

24    only allowed to speak?

25               MR. KEMM:  It's for comments.  If

1    you have questions for the applicant, you can

2    certainly ask the applicant --

3                   MR. PILLAR:  It's actually for the

4    board.

5                   MR. KEMM:  The board does not answer

6    questions.

7                   (Audience interruption.)

8                   MR. KEMM:  That's not the legal

9    jurisdiction of the board.  The board is here to

10   hear the record made by the applicant and by the

11   public.

12                  MR. PILLAR:  I got it.

13                  Is the applicant the original

14   permit-holder of the property?

15                  MR. KEMM:  They'll have a chance to

16   respond.  Just ask the questions, and when they

17   respond, they can answer them.

18                  MR. PILLAR:  Okay.  I find it

19   concerning too that this facility, like many

20   other facilities in Sayreville, has taken oh so

21   long to build.  Okay?  Because I think you -- I

22   think we've been hoodwinked on this.  Okay?

23                  And I think, in my opinion, this is

24   a done deal, this is all a formality, we're

25   trying to fight these people --

```
 1                    (Audience interruption.)

 2                    MR. PILLAR:  I hope not.

 3                    PUBLIC SPEAKER:  When is the final

 4      vote for this?  We don't know.

 5                    (Audience interruption.)

 6                    MR. PILLAR:  Let me continue.  Let

 7      me continue.

 8                    I hope I'm wrong, but my past

 9      experiences, been here a long time, you know,

10      we're trying to fight these folks emotionally.

11      The only way you fight these people is legally.

12      I don't know if we're prepared to do that.

13                    PUBLIC SPEAKER:  Yes, we are.

14                    MR. PILLAR:  I'm not in favor of

15      suing myself or the Borough of Sayreville, but

16      this is insane.

17                    Thank you.

18                    J O H N   B A R T L I N S K I,

19      having been duly sworn, testified as follows:

20                    MR. KEMM:  Please give us your name,

21      spell your last name.

22                    MR. BARTLINSKI:  John Bartlinski,

23      B-A-R-T-L-I-N-S-K-I.

24                    MR. KEMM:  And you address, sir?

25                    MR. BARTLINSKI:  5 Grand Street in
```

1    the Morgan section of Sayreville.

2                   MR. KEMM:  Thank you, sir, please

3    continue.

4                   MR. BARTLINSKI:  I'm not here as

5    long as the gentleman in front of me.  I'll be

6    57; 56 years I'm in the borough of Sayreville.

7    I'm a Morgan fireman, did 20 years as a -- became

8    a life member; since 1981 I've been involved with

9    them.  I raised my family in Sayreville; they

10   still live in Sayreville, both of my sons bought

11   homes in this town.

12                   I also chose to have a career in the

13   borough of Sayreville.  I'm very proud of my

14   town.  I love my town.  Okay?

15                   Yes, we have a problem.  Addiction

16   is running wild.  We can't turn our back on it

17   any longer.  There -- we have to meet it head on;

18   however -- and excuse me for having to go to my

19   notes -- the attorney mentioned before, we have

20   to make reasonable accomodation.  Is that what

21   you said, sir?  Can you -- please, let's not play

22   games.

23                   MR. HIMELMAN:  Yes.

24                   MR. BARTLINSKI:  Reasonable

25   accommodations, and I understand that, and I

1   agree with you, but it's an unreasonable location

2   for reasonable accomodation.

3                    Years ago, in the city of South

4   Amboy, Strathmore Clinic came in and wanted to

5   open a methadone clinic, and if I remember

6   correctly, it was on the site of the old My

7   Wife's Place go-go bar, the California Motel

8   area, which is now a senior housing development.

9   The City of South Amboy, through their people,

10  through negotiations with Strathmore, put this

11  clinic down on Lower Main Street.  And why is

12  that?  Because Strathmore did the right thing.

13                   Do the right thing.  I have no

14  problem with a clinic coming into my town.  It's

15  needed.  It's needed.  I question certain things

16  about it that, that I will get into it.  That

17  location is not conducive to what you want to put

18  there.  You've got a grammar school, K to 3, in

19  less than a thousand feet as the crow flies from

20  that location.  That's not necessary.  Okay?

21                   There's a big recidivism with that.

22  It's a disease, it's a sickness, I understand

23  that.  Okay?  But where there's a will, there's a

24  way.  Where there's a need, this need must be

25  fulfilled.  Like someone said before, we're going

1    to go take packages, we're going to -- and it's

2    not all of them.  I'm not worried about all of

3    the addicts; it's the certain few that we have to

4    concern ourselves with.

5                    This corporation has got a less than

6    stellar track record.

7                    (Audience applause.)

8                    MR. BARTLINSKI:  Less than stellar.

9    The parent company of this corporation is just as

10   good.  Look at The Pointe, and that's the parent

11   company.  Is it not?  Is this O'Neill Properties

12   involved with this?  Because everything I read in

13   the newspaper or read on Google said it was.  Is

14   it?

15                   MR. HIMELMAN:  Legally, no.

16                   MR. BARTLINSKI:  Legally no, but

17   O'Neill is involved.  Correct?  It's a

18   subsidiary.

19                   MR. HIMELMAN:  Don't worry about it.

20                   MR. BARTLINSKI:  No, I'm worried

21   about it.  Is it or is it not?

22                   MR. HIMELMAN:  Address the board.

23                   MR. BARTLINSKI:  They said I can ask

24   you questions.

25                   MR. HIMELMAN:  I'm not going to

```
1    answer.
2              MR. BARTLINSKI:  See, already, you
3    don't want to answer questions.  So guess what?
4    Damaged bill of goods.  This is what you're
5    trying to give us.
6              Folks, they got approval for a
7    nursing home, a nursing home that we need.  Okay?
8    And I don't remember where I seen the numbers,
9    but I believe it's, like, a 4.1 margin of addicts
10   needing places to go, and a 10 point something
11   with seniors needing someplace to go.  So who
12   needs it more?  Who needs it more?
13             Another thing -- and I really don't
14   want to take the whole night up on this -- I know
15   people who have dealt with what happens here.
16   I've buried friends' children.  I've been on
17   numerous -- some people know why I'm involved and
18   how.  Okay?  One of the things most important
19   with recovery is you have to get away from what
20   you're doing.  You need a change of scenery.  You
21   cannot go back to where you were.  So how can a
22   kid that lives on Weber Avenue in Sayreville,
23   who's addicted to drugs, go to someplace in
24   Sayreville?  It's not a new location.  It's not
25   new scenery.  It's the same place.  It's a
```

1    10-minute ride away.

2              You're going to mix inpatient with

3    outpatient.  Outpatient can bring drugs in, give

4    them to the inpatients.

5              Can the inpatient people leave when

6    they want?  Sir?

7              I'm going to leave it at this -- and

8    we can see right now from tonight, they'll answer

9    questions, but they don't want to answer

10   questions when you paint them into a corner.

11   Yes, we need something.  Does Sayreville need it?

12   Maybe Sayreville doesn't need it, but the people

13   need it.  We need a place for rehab.

14             Do the right thing.  Okay?  They're

15   saying that we can't discriminate.  I also

16   understand -- if you'll answer this -- that if

17   you don't have insurance or cash, you're not

18   taking people in.  Are you going to take charity

19   care?  Are you going to take medicaid and

20   medicare?

21             MR. CAMPBELL:  Yes.  If you were

22   here before, you heard that.  We've done all that

23   in the past.

24             MR. BARTLINSKI:  All they're saying,

25   if we can't discriminate, how can they?  Are

1     Sayreville people going to get first preference?

2               There's a lot here.  I really think

3     this is a big mistake.  If you approve this --

4               PUBLIC SPEAKER:  They should

5     postpone the approval.  They should not vote

6     tonight.

7               MR. BARTLINSKI:  They should not --

8     again, this was put through to this board as a

9     nursing home that's desperately needed.  And,

10    again, you want to put a rehab in, that's fine,

11    put it by the cinema, put it out on Jernee Mill

12    Road, put it out on Bordentown Avenue, where it's

13    not affecting residential areas.

14               Thank you.

15               (Audience applause.)

16               G E O R G E   P O D O L A K, having

17    been duly sworn, testified as follows:

18               MR. KEMM:  Thank you, sir.  Please

19    give us your name, spell your last name.

20               MR. PODOLAK:  My name is George

21    Podolak, that's P-O-D-O-L-A-K.  My address is 48

22    Scott, S-C-O-T-T, Avenue, the Melrose section.

23               I'm new to Melrose, I'm only here 76

24    years.  Where they want to put this additional

25    drug rehabilitation is where an old movie used to

1   be, the drive-in.  Within walking distance, as

2   Mr. Bartlinski said, South Amboy put a methadone

3   clinic right on the South Amboy, Melrose -- which

4   is Sayreville, not South Amboy -- borderline.

5   You could walk from one to the other.  And there

6   are times when people are coming from Perth Amboy

7   with scrap metal, they stop at Beacon Metal to

8   make a stop, they go to the methadone clinic, do

9   what they have to do.

10              Please, Venetian, I understand, has

11   a waiting list for elderly.  We have elderly in

12   this borough.  I'm getting up there myself.  I

13   hope I never need it, but where am I going to go

14   if you give me a drug clinic?

15              Yes, they have problems, but a lot

16   of it is because they get additional

17   prescriptions, get after the doctors.  Okay?  Not

18   the people.  All right?

19              And don't -- how would you say, when

20   you initiated the application, it was for a

21   nursing home, which means for elderly people, not

22   for drug addicts.  You're changing the horse in

23   the middle of the race.  Don't give us that.

24   Don't give us the political two-step.  You're

25   dancing around the issue.  Keep it a nursing

1   home.

2                Thank you very much.

3                (Audience applause.)

4                G A R Y   S Z A M R E T A, having

5   been duly sworn, testified as follows:

6                MR. KEMM:  Please give us your name,

7   spell your last name.

8                MR. SZAMRETA:  Gary Szamreta,

9   S-Z-A-M-R-E-T-A, 55 Fela Terrace, Parlin, New

10  Jersey.

11               I live in the Oak Tree development

12  behind Eisenhower school.  I'm in the borough for

13  30 years.  I many in-laws have been here for over

14  50 years, before they passed on recently.

15               My wife and I, our last five years,

16  have gone through a lot with nursing homes, and

17  having close relatives in and out of facilities,

18  and it's really -- if our eyes weren't open

19  before, really opened our eyes to the need for

20  such facilities here in Sayreville.  We found

21  ourselves, to get quality care, having to go at

22  least a half hour away from Sayreville, which

23  took a lot of time out of our days, and our

24  family's days, to try and visit our relatives.

25  And I'm sure most people in this room, and in the

1    whole community, are having to go through the

2    same thing.  So the need is going to get more and

3    more exaggerating over time, as the baby boomer

4    generation gets older.

5              What I know about Eisenhower School,

6    and that area that we're talking about, when my

7    children went there, one of the things that they

8    would do, with the Girl Scouts and with

9    Eisenhower School, is the children would go over

10   to the facility there and entertain the older

11   people.  The older people really appreciated it.

12   The children got to meet with some good role

13   models that had been in the community for a

14   number of years, and it helped the community in

15   general.  So, now, there's a situation where we

16   had the Sayreville I remember, it was win, win,

17   win, all around.  Why can't we do something like

18   that now?

19             PUBLIC SPEAKER:  That's beneficial

20   use.

21             MR. PODOLAK:  That's beneficial use

22   to the third power.

23             One of the gentlemen that came up

24   here earlier referenced this Boston Globe

25   article, which was, I think, reprinted or

1    summarized by the Huffington Post.  I read that

2    about a week ago, and I refreshed my memory when

3    I was coming here tonight to read it.  And did

4    somebody put that into the record, that article?

5    Is there a copy of that in, the Boston Globe

6    article?

7                    PUBLIC SPEAKER:  Yeah.

8                    MR. PODOLAK:  For those of you that

9    haven't read that, go online, just Google RCA,

10   and it'll be one of the first things that comes

11   up, and read that article.  It's a few pages.

12   It's definitely worth it.

13                   PUBLIC SPEAKER:  Give it to them.

14                   MR. PODOLAK:  They said they had it.

15                   MR. KEMM:  We do have a copy in the

16   record.

17                   PUBLIC SPEAKER:  Read it out loud.

18                   MR. PODOLAK:  Well, I'm not sure

19   that's -- but I'll tell you, when I read it, it

20   really opened my eyes; there was steam coming out

21   of my ears.  It talked about the total

22   mismanagement of the facility in Danbridge,

23   Massachusetts.  It talked about some of the

24   things that were mentioned earlier.

25                   But the article ended by saying this

1    was sold as a community-based center, and what

2    the investigation by the Boston Globe showed was

3    that there were no roots, there were no roots at

4    all in the community with this center.  They had

5    aggressive sales teams, profit is their ultimate

6    motive, and they don't know how to manage these

7    facilities.  The reason why the Boston Globe

8    started the investigation, the way I read the

9    article, was that there were deaths happening

10   within, it was becoming a brothel, and some of

11   the things you heard earlier, and I won't

12   reiterate that.

13            But it ended with a sentence that

14   really put and, I think, summed it up well.  It

15   said that they prey on the vulnerable people and

16   the families of the people going to the facility,

17   who they constantly recycle through, and make

18   money on these folks.  Okay?

19            So if half of what I read in that

20   article is true, I would be embarrassed if I was

21   RCA, to even put an application in any community,

22   until you got your act together.

23            (Audience applause.)

24            N I K U N J K U M A R   P A T E L,

25   having been duly sworn, testified as follows:

1          MR. KEMM:  Please give us your name,

2     spell your last name.

3          MR. PATEL:  My first name is Kunj,

4     last name Patel.  I live in 7 Biesiada in La Mer.

5          MR. KEMM:  Spell your last name for

6     us.

7          MR. PATEL:  Patel, P-A-T-E-L.

8          MR. KEMM:  Thank you, sir, please

9     continue.

10          MR. PATEL:  I think the residents of

11     Sayreville have done a fantastic job today coming

12     out in a huge crowd.  This is my first meeting

13     I'm coming down.  I think, if we had known there

14     were previous two meetings, I think this crowd

15     would have been three times bigger.

16               (Audience applause.)

17          MR. PATEL:  I'm going to keep it

18     very simple and short.  I have two young

19     daughters, so yesterday I told my house and my

20     wife that, okay, I have to go to a town hall

21     today.  So my 11-year-old asked, what is a drug

22     rehab center.  I think I have done enough

23     explanations driving down 35, what those clubs

24     are; now I have to explain to them what drug

25     rehab means now.  Right?  I think I'm going to

```
 1      have THE conversation at a later age, but I don't
 2      think that's a suitable conversation for an
 3      11-year-old.  Right?
 4                  So I think, all in all, we all agree
 5      there is a need for a rehab, but not in that
 6      location.
 7                  PUBLIC SPEAKER:  Not in my town.
 8                  MR. PATEL:  So I don't know if we're
 9      going to go to a vote or not, but this community
10      strongly is against that location.
11                  (Audience applause.)
12                  MR. PATEL:  And as a resident of
13      Sayreville, as a taxpayer of Sayreville, I think
14      it's not only urge, but I think it's our right to
15      do the right thing.  Right?  If we have to take a
16      legal route, we will all go the legal route.
17                  That's all.
18                  CHAIRMAN GREEN:  Is there anybody
19      else from the public who wishes to speak?
20                  M I C H A E L   M U R R A Y, having
21      been duly sworn, testified as follows:
22                  MR. KEMM:  Please give us your name,
23      spell your last name.
24                  MR. MURRAY:  My name is Michael
25      Murray, 69 Buchanan Avenue, in President Park.
```

1              MR. KEMM:  Spell your last name,

2      please.

3              MR. MURRAY:  M-U-R-R-A-Y.

4              MR. KEMM:  Thank you, please

5      continue.

6              MR. MURRAY:  I get a little

7      emotional.

8              I've lived here for 42 years.  I

9      came from New York.  I came from New York to my

10     kids to grow up in a drug free area.  That was 42

11     years ago.  My children have gone to the schools;

12     as a matter of fact, both of them graduated from

13     the school we're talking about.  One is -- thank

14     God, is a school teacher today, and the other one

15     works in Sayreville also.  They both live in

16     Sayreville, as I do.

17             What I want to say is, the legal

18     representative was very elaborate about the war

19     on drugs, and I don't think anybody in this room

20     has denied that.  What everybody is saying

21     about -- they're not talking about the war on

22     drugs, they're talking about the location.  And

23     the fact -- not saying that this was -- is a

24     nonresidential area.  I don't know, it's a

25     residential area -- I've lived on Ernston Road

```
 1    for 27 years, it seemed residential then, and it
 2    certainly is more now.
 3              But, again, what I will do is say my
 4    personal experience.  The gentleman's talking
 5    about the war on drugs.  I've been blessed to be
 6    in recovery for 32 years.  Okay?
 7              (Audience applause.)
 8              MR. MURRAY:  And the idea is to make
 9    my children safe, and I want my grandchildren
10    safe, and all anybody here is asking is to change
11    the damn location.  Stop making it about the
12    dollar.
13              Thank you.
14              F R A N C E S C A   G E R V A S I,
15    having been duly sworn, testified as follows:
16              MR. KEMM:  Please give us your name.
17              MS. F. GERVASI:  My name is
18    Francesca Gervasi, G-E-R-V-A-S-I.
19              MR. KEMM:  And that was your mom
20    that was up before?
21              MS. F. GERVASI:  Yeah.
22              MR. KEMM:  Okay.  Go ahead.  Tell us
23    what you have to say.
24              MS. F. GERVASI:  For there to be,
25    like, a rehab center right next to schools, it's
```

1    really scary, because you don't know what they

2    could do.  And yes, they need help, but they --

3    drugs can, like, make you crazy in the mind

4    sometimes.  So we don't want anyone robbing our

5    communities or houses, or us being scared to walk

6    our dogs, or go to the park, like my mom said.

7    And I just think that it should be in a different

8    location, so we don't have to be scared to do

9    things normally, like, that we do every day.

10                  (Audience applause.)

11                  Q A D I R A   I S M A I L, having

12    been duly sworn, testified as follows:

13                  MR. KEMM:  Please give us your name,

14    spell your last name.

15                  MS. ISMAIL:  My name is Qadira

16    Ismail, my last name is spelled I-S-M-A-I-L.

17                  MR. KEMM:  Thank you.  Go ahead, say

18    what you have to say.

19                  MS. ISMAIL:  I just wanted to say

20    that I think it's a little scary that rehab

21    centers are being built, like, by schools,

22    because if kids are walking home from school, or

23    from the bus stops, and something bad happens, I

24    mean, it's a hazard, and it's really scary.

25                  MR. KEMM:  Thank you for coming out.

```
 1                    (Audience applause.)
 2                    CHAIRMAN GREEN:  Is there anyone
 3      else from the public who wishes to speak at this
 4      time?  Would you please step forward?
 5                    G E R A L D I N E
 6      B E N N I N G T O N, having been duly sworn,
 7      testified as follows:
 8                    MR. KEMM:  Please give us your name,
 9      spell your last name.
10                    MS. BENNINGTON:  Gerry Bennington,
11      B-E-N-N-I-N-G-T-O-N.
12                    MR. KEMM:  And your address, please?
13                    MS. BENNINGTON:  Sand Castle Court.
14                    MR. KEMM:  Thank you.  Please
15      continue.
16                    MS. BENNINGTON:  I just want to
17      reiterate what everyone else said, that I think
18      it's a very dangerous facility to have in the
19      area.  I understand people with addiction, we
20      have it in our family, and close friends; I've
21      lost sons to suicide from drugs.
22                    I'd like to know, we will need more
23      police, who is going to pay for that.  Are taxes
24      going to go up?  What happens to the resale value
25      of our home?  Who's going to buy our home when
```

1        there's a drug facility up the street?

2                   And the kids, I mean, there's a

3        school right next door.  Who's going to be

4        responsible if one of the -- something happens to

5        one of these kids, or somebody gets injured by

6        one of these clients, patients, at this facility?

7        If they break into a home, rape, murder somebody,

8        rob?  Who's responsible, all of you?  Is it going

9        to be on your head for allowing this to happen?

10                  People are showing we don't want it.

11       It's not the place for this facility.  It's a

12       residential area.  These are homes.  Our kids go

13       to school here.  It's not the place.  Put it

14       someplace in an industrial area, where these

15       patients and the people that have to go visit

16       them go out, and they're not tying up the

17       streets, and bringing more drugs or crime to the

18       area.  We have enough.

19                  Our taxes are high enough.  The

20       resale value of our homes are going down as it

21       is.  If you have this in the area, we're getting

22       nothing.  It's not fair to the people of

23       Sayreville to have it where this is proposed to

24       be.

25                  The elderly need a place to go.

1      PUBLIC SPEAKER:  That's right, yes.

2          MS. BENNINGTON:  I'm right there

3   with them, it's going to be a couple years.

4   Where am I going to go?  There's one place, the

5   Venetian.  They tore down the other place.  It

6   was supposed to be a nursing home.  Keep it to

7   what it was supposed to be.  Think of the people

8   in this community; not the money.  Greed runs

9   everything.  You have to have a conscience.  You

10  can't do this to people.  It's wrong.  It's just

11  wrong.

12          Thank you.

13          (Audience applause.)

14          CHAIRMAN GREEN:  Anyone else wish to

15  speak in reference to this application?  Please

16  come forward.  Is there anyone else from the

17  public who wishes to speak on this application?

18          E L I A S   C I U D A D, having been

19  duly sworn, testified as follows:

20          MR. KEMM:  Please give us your name,

21  spell your last name.

22          MR. CIUDAD:  Elias Ciudad, last name

23  is spelled C-I-U-D-A-D.

24          MR. KEMM:  And your address, please?

25          MR. CIUDAD:  25 Scheid Drive,

1    Parlin, New Jersey.

2                    MR. KEMM:  Thank you, please

3    continue.

4                    MR. CIUDAD:  I'm happy that, today,

5    you have restructured yourself, or the board

6    restructured yourself.  And I can see you have

7    pretty good people, you've got councilman, but

8    today you were told you must approve this, you

9    must do that, and I can see how you feel how

10   something gets shoved down your throat.

11                   So with all the expertise and all

12   the knowledge, and the bases that you have, what

13   are you going to do about it?  How are you going

14   to act?

15                   That's all I have tonight.  Thank

16   you.

17                   MR. LIEBERMAN:  My name is Paul

18   Liberman, I was sworn in last week.

19                   I know you asked people not to talk,

20   but I just have one --

21                   MR. KEMM:  You understand you're

22   still under oath?

23                   MR. LIBERMAN:  I'm still under oath.

24   My name is Paul Lieberman, I'm at 24 Wlodarczyk

25   Place, Parlin, New Jersey.

```
1              MR. KEMM:  Thank you, Mr. Lieberman.
2              MR. LIBERMAN:  I've been living in
3     this town for 12 years.  First home I looked at
4     was the first home I bought.  But I need every
5     single one of you here, I don't care if you just
6     state your name and address, tell them you don't
7     want this here.  I need you all to do this, but
8     we need you to come up here and say it.  You've
9     got to come up, state your name, tell them we
10    don't want this here.
11             MS. ROM:  My name is lease roam --
12             MR. KEMM:  Wait, one person at a
13    time.  Please give us.
14             (Audience interruption.)
15             L I S A   R O M, having been duly
16    sworn, testified as follows:
17             MR. KEMM:  You need the
18    microphone -- give us your name, and spell your
19    last name.
20             MS. ROM:  My name is Lisa Rom,
21    R-O-M.  I live at 121 Woodmere Drive, Parlin, New
22    Jersey, for many years.  I'm from New York.
23             I'm very upset, disgusted, and just
24    very sad.  My mother was in that nursing home for
25    three and a half years.  She died, and now my
```

1    dad, 88, lives with me.  He walks my little dog

2    Lola every day, and he now won't be able to,

3    because we're going to be living in fear.

4              My dad also will be needing a

5    nursing home in a few months, and we thought he

6    would go there.  Now what?  When my mother was in

7    the home, we would go -- he would go every day,

8    and if you don't believe me, ask anyone who

9    worked there.  Every day, he went to see my

10   mother, and I went every other day, and every

11   weekend.  Now, I've got to pass that area and be

12   scared out of my wits.

13             My development, particularly my

14   street, the cop in the room might be well aware,

15   has enough problems with some crazy acts that go

16   on, just with residents.  Now we're going to have

17   drug addict things, and it's going to just be

18   horrible.

19             But having said that, I really have

20   sympathy for people addicted to drugs, because

21   two of my cousins were.  One beat it, and one is

22   still an addict.  She is 55 years old.  I don't

23   know how she's still alive.  My aunt, her mother,

24   lived in La Mer.  Would not let her daughter come

25   to La Mer, because in the past she robbed my

1    aunt, her blood, her mother.  My aunt had to

2    practice tough love.  I wanted to send her a

3    Christmas card.  My aunt would not allow me --

4    she wouldn't give my address, because of fear.

5              These people are not acting in their

6    right mind.  They might not want to hurt you, but

7    they do.  And I'm a nervous person to begin with.

8    I have a lot going on.  I enjoy Sayreville, but

9    I'm sick, I can't sleep.  I work in a law

10   department at Johnson & Johnson in New Brunswick.

11   I'm a respectful person, I try to look at both

12   sides of the spectrum, but this is absolutely,

13   positively, without a doubt, the wrongest

14   decision the borough of Sayreville can make.  And

15   I really urge, beg, plead, and pray to God that

16   you do the right thing for us.

17              Thank you very much.

18              (Audience applause.)

19              R E Y N E   Q U A C K E N B U S H,

20   having been duly sworn, testified as follows:

21              MR. KEMM:  Please give us your name.

22              MS. QUACKENBUSH:  Reyne Quackenbush,

23   87 Harding avenue, Parlin.

24              MR. KEMM:  Spell your last name.

25              MS. QUACKENBUSH:

```
 1      Q-U-A-C-K-E-N-B-U-S-H.

 2                  The people -- I am so proud of my

 3      town this evening.

 4                  (Audience applause.)

 5                  MS. QUACKENBUSH:  -- and everybody

 6      showing up here, coming out to support.

 7                  We are compassionate people, and we

 8      care about the community.  It is the wrong

 9      location.

10                  I agree with what has been said

11      before, we do need a facility for our seniors.

12                  That's all I'll say.  I am

13      completely against the location of this facility.

14      Completely, 110 percent against it.

15                  Thank you.

16                  L O R R A I N E   V A G L I O,

17      having been duly sworn, testified as follows:

18                  MR. KEMM:  Please give us your name,

19      spell your last name.

20                  MS. VAGLIO:  My name is Lorraine

21      Vaglio, V-A-G-L-I-O.  I live at 123 Woodmere

22      Drive in Sayreville.

23                  As a registered nurse for 40 years

24      already, I am fully aware of the drug epidemic

25      that we're facing, and I am fully respectful of
```

1    the need -- the desperate need for rehab

2    facilities and treatment for these patients.  I

3    think everybody that has spoken before me has

4    spoken eloquently about our concerns,

5    particularly for the safety concerns involved,

6    for our children, for ourselves, for our parents,

7    and for the residential area, that it is being

8    proposed to be opened in.

9                I just wanted to put my name on the

10   record.  I ask you please, do not approve this.

11               Thank you.

12               MS. BARTOLOTTI:  Kathleen

13   Bartolotti, B-A-R-T-O-L-O-T-T-I.

14               K A T H L E E N

15   B A R T O L O T T I, having been duly sworn,

16   testified as follows:

17               MR. KEMM:  Please give us your

18   address.

19               MS. BARTOLOTTI:  2502 Ridgeview

20   Court, I'm in La Mer.

21               MR. KEMM:  Please continue.

22               A.  Moved to Le Mer 21 years ago from

23   Brooklyn, wanted to get my daughter out of

24   Brooklyn because of the influx of drugs and

25   crime.  And I was very happy, she graduated,

1    she's a teacher with her master's degree.

2              But I'm concerned, I put 21 years,

3    worked my butt off to keep paying a mortgage as

4    a single woman, and I'm worried about my

5    property values.  I'm worried about the location

6    being so close to the schools.

7              This gentleman made it seem like

8    it's Sayreville's responsibility to rehabilitate

9    drug addicts.  Well, why doesn't Sayreville put

10   more resources into the school system to educate

11   children, and get it -- nip it in the bud.

12             (Audience applause.)

13             MS. BARTOLOTTI:  Children need to be

14   more educated on drugs, and what it could do, and

15   how it can tear families and lives apart.  I've

16   seen it, I lost a lot of friends when I lived in

17   Brooklyn, and I beg you gentlemen, put your

18   resources somewhere else, don't allow this in a

19   residential neighborhood, and near a school.

20   Teach the children to stay away from drugs.

21             Thank you.

22             L E N O R E   L A M B E R T, having

23   been duly sworn, testified as follows:

24             MR. KEMM:  Please give us your name,

25   spell your last name.

1          MS. LAMBERT:  My name is Lenore

2    Lambert, L-A-M-B-E-R-T.  I live at 63 Prusakowski

3    Boulevard.

4          I just would like to say that I

5    enjoy living in Sayreville.  I'm not originally

6    from here, but I've been here for the last five

7    years.  I have raised a daughter with autism, and

8    it scares me to think that I protect her every

9    day, now 25 years old, trying to make it in this

10   world, and have the fear that she walks around

11   with the headphones in here ears, in our

12   development, and listens to music, and learns,

13   and goes to Kean University as a part-time

14   student, works at PetSmart as a part-time

15   employee, to get a life, and it scares me to

16   think that she's going to have these things in

17   her ears listening to music, and somebody could

18   scare her for the rest of her life; put her in a

19   position that she's not able to help herself.

20          We know that you all have lives out

21   of these chairs, but let me tell you that, until

22   something comes and hits you, that's when it

23   affects you, and that's when you start to

24   realize, maybe I shouldn't have been so harsh and

25   so quick to make a decision.  I think of every

1    decision and everything I do every day.

2              I work in a high school, and the

3    high school that I work in is not in this town,

4    but it is in New Jersey, and it is a tough town,

5    and those children have -- have needs, and they

6    learn from their teachers and they learn from the

7    staff, because sometimes they cannot learn from

8    their parents, because they are addicted.  But

9    that addiction, and putting a rehab center here

10   to help them, isn't going to help them, it's

11   going to hurt them.  They need to know how not to

12   take drugs, how not to become what their parents

13   have become.

14             I have my mom here, who I moved here

15   with me several years ago, in my development,

16   because I don't want her to be alone, because she

17   is getting older.  And if that was a nursing home

18   that could help her at some point, or me some

19   day, because I'm not -- I'm getting old -- that's

20   the decision you on the board should be thinking

21   about, helping our community, listening to all

22   the people that are here, that are asking you for

23   your help.  That's what we want.

24             This man, thankfully, he's probably

25   a very good lawyer, knows what he's doing and

1    saying, and I'm sure when he leaves here he has a

2    heart, but as an attorney in a courtroom, his

3    heart is cold.  It's about the dollar and it's

4    about his win.  Please don't let him win.

5                    L I N D A   D A R K I N S, having

6    been duly sworn, testified as follows:

7                    MR. KEMM:  Please give us your name,

8    spell your last name.

9                    MS. DARKINS:  Linda A. Darkins,

10   D-A-R-K-I-N-S.

11                   MR. KEMM:  And your address, please?

12                   MS. DARKINS:  56 Fela Drive, Parlin,

13   New Jersey.

14                   MR. KEMM:  Thank you, please

15   continue.

16                   MS. DARKINS:  I'm going to be very

17   brief.  I actually used to visit a nursing home

18   across the street from Harbour Club, it was

19   called Briarwood, and they -- when they decided

20   to close it and move the residents, and they

21   moved them to the Venetian, I actually visited

22   the nursing home, I visited both once a month,

23   from my church.

24                   I think the community definitely

25   needs a nursing home.  I agree with everyone that

1    went before me, individuals that are drugs and

2    rehab patients need it, but the location where

3    Briarwood used to be is not conducive for that,

4    because, as everyone has said before me, we have

5    the elementary school next to it.

6              I live in La Mer, right across from

7    it.  There is a big concern, La Mer is totally

8    open, any -- it's open not only to car traffic,

9    but walking, you can walk in anywhere into La

10   Mer, and the same thing with Harbour Club and the

11   other communities.  We're not saying that those

12   individuals, all of them, will commit crimes, but

13   we know, from what people have said also, that if

14   there's a need, they're going to need to fill it,

15   and they're going to fill it where they're

16   closest to.

17             So please, I'm only here to put my

18   name down on the record, and I'm here to say

19   that, yes, we do need a rehab center, but we do

20   not need it where Harbour Club used to be --

21   where Briarwood used to be, nursing home.  We do

22   need a nursing home.

23             Thank you.

24             A L E J A N D R A   B U S T O S,

25   having been duly sworn, testified as follows:

1          MR. KEMM:  And please give us your

2    name, spell your last name.

3          MS. BUSTOS:  My name is Alejandra

4    Bustos, B-U-S-T-O-S.  I live at 61 Nathan

5    Boulevard in Parlin, the La Mer community.  I've

6    been here for about 20 years now, and I live with

7    my mother.

8          I previously lived in Massachusetts,

9    where there was a big drug issue, which is why

10   she moved me here, because it was a family --

11   it's a family town over here, and here, the

12   neighbors help the neighbors.  If you ever have

13   an issue, they're here to help you.

14          It's not an appropriate area to

15   have -- I agree that we do need a drug

16   rehabilitation center, but that would not be the

17   appropriate place for it to be.  We desperately

18   do need a nursing home.

19          Thanks.

20          CHAIRMAN GREEN:  Ma'am, one second.

21          Stenographer, do you need a break?

22          M A R Y   C I B E L L I, having been

23   duly sworn, testified as follows:

24          MR. KEMM:  Please give us your name,

25   spell your last name.

1           MS. CIBELLI:  My name is Mary, last

2    name is Cibelli, that's C-I-B-E-L-L-I.

3           MR. KEMM:  And your address?

4           MS. CIBELLI:  My address is 119

5    Prusakowski Boulevard.

6           MR. KEMM:  Thank you.  Please

7    continue.

8           MS. CIBELLI:  That's in Spinnaker

9    Pointe.

10          Originally, I came from Staten

11   Island, and with my husband, we purchased a mini

12   farm in Millstone, where we lived for 18 and a

13   half years, where my husband passed, which was a

14   wonderful life.  And when my husband passed, my

15   daughter Lenore, who just spoke a little while

16   ago, said mom, please come and live where we live

17   at Spinnaker Pointe, you'll feel safer, you'll

18   feel like you have some -- somebody there to help

19   you as you get older.  And I am reaching that

20   point.

21          And I was so, so happy to hear that

22   there was a nursing home that might help me as I

23   went into my September years.  I am a board

24   certified orthotist, had a business where I took

25   care of people who had breast surgery, and I want

1    to tell you, it's a wonderful thing to be able to

2    help people, but if you're going to help people,

3    be sure that it's what they want.  We all know --

4    and I am 81 years old, and I know how much --

5                    (Audience applause.)

6                    MS. CIBELLI:  -- for so many

7    diseases.  It is an epidemic, and we can help,

8    but we cannot rush into anything.  It's just not

9    fair to just decide that there's going to be a

10   rehab center where there was a nursing home.  It

11   just doesn't make any sense to me.

12                    You know, I look at each and every

13   one of you, and I see heart, and I see love in

14   your eyes, and I see some kind of -- some kind of

15   something that you're listening to the public.

16   Well, listen to us.  Take heed to what we need.

17   We need to have a nursing home.

18                    PUBLIC SPEAKER:  That's right.

19                    MS. CIBELLI:  We do not need to have

20   a rehab center that nobody wants, and everyone is

21   afraid of.  These children here listening to this

22   tonight, it's upsetting me that they are so

23   frightened.

24                    Please, please, each and every one

25   of you, think of your grandchildren, think of

1    your elderly parents, and think the right way.

2              And I want to tell you one more

3    thing, I've sat on many boards, where the board

4    members had set minds that they were going to do

5    exactly what the public did not want.  Please

6    don't be like that.  Listen to us.  Listen to us.

7              Thank you very much.

8              (Audience applause.)

9              H A N N A N   T O R R E S, having

10   been duly sworn, testified as follows:

11             MR. KEMM:  Please give us your name,

12   spell your last name.

13             MS. TORRES:  It's Hannan, last name

14   is Torres, T-O-R-R-E-S.

15             MR. KEMM:  And your --

16             MS. TORRES:  I live at 6405

17   Fernandez Court in La Mer.

18             MR. KEMM:  Thank you.  Please

19   continue.

20             MS. TORRES:  So I'm going to keep it

21   brief.  I moved to La Mer, into Parlin, the

22   Sayreville community, over a year ago.  I moved

23   from Elizabeth.  I moved to get my sons a

24   different atmosphere.  Me and my husband are very

25   hardworking, we have very heavy schedules, and

1    it -- I used to just fear, you know, him walking

2    home from school with his friends, of, you know,

3    people following him, or as -- what we are here

4    talking about today, drug addicts or, you know,

5    gang initiations, or all that stuff that comes

6    with a rehab center being right across the

7    street, from what I tried to get my son away

8    from.

9                  Where he is now, he's free.  He

10   don't have to worry about being afraid to go

11   outside or, you know, he can't go to the

12   basketball court because there's gangs there,

13   there's kids fighting, or they're selling drugs,

14   or there's people peddling asking for money or

15   following him.  I didn't move to this

16   neighborhood for that, and this is something they

17   moved away from, and it seems like I'm moving

18   right into it.

19                  So I please ask, like, you know,

20   these kids are getting off the bus, a lot of us

21   are hardworking, we're a working community, and

22   some of the kids get home before we do.  Now

23   they're going to have to worry about if they're

24   okay, if they're safe getting home, if there's

25   people following them into the house, or do we

1   have to worry about that.  Do we all have to get

2   alarm systems on our house now?

3                So I just ask you to please consider

4   all those things, you know, in reference to the

5   kids and the elderly, and, you know, I hope that

6   you do not follow through with this.

7                Thank you.

8                K A T R I N A   A R B O L E D A,

9   having been duly sworn, testified as follows:

10               MR. KEMM:  Please give us your name,

11   spell your last name.

12               MS. ARBOLEDA:  Katrina, last name

13   A-R-B-O-L-E-D-A.

14               Again, like she just spoke and

15   said --

16               MR. KEMM:  Your address, please?

17               MS. ARBOLEDA:  I'm sorry, 2008

18   Bayhead Drive, I'm in Harbour Club, directly

19   across from where the proposed building is being.

20               I'm just against it.  I have

21   children who go to the Eisenhower School.  I also

22   have children who go to the middle school.  It's

23   not something I want for my children.  I just

24   sold my home in Plainfield and moved here to get

25   away from everything that was just stated before.

1    My job is to keep my children safe, and I feel

2    like that's almost impossible with this rehab

3    directly across the street children live, where

4    they play, where they should feel safe.  I'm just

5    against it.

6                   J A C K   C A V E N E Y, having been

7    duly sworn, testified as follows:

8                   MR. KEMM:  Please give us your name,

9    spell your last name.

10                  MR. CAVENEY:  Jack Caveney,

11   C-A-V-E-N-Y.

12                  MR. KEMM:  Your address, sir?

13                  MR. CAVENEY:  44 Straton Court.

14                  Okay.  I'm a resident of La Mer, and

15   I just can't understand how you can look to put a

16   rehab so close to a school, and if that's the

17   zoning we have, then the zoning's wrong.

18                  I think it's fait accompli, but

19   don't vote your conscience, vote the right way.

20                  L E O N A R D O   C O T U G N O,

21   having been duly sworn, testified as follows:

22                  MR. KEMM:  Please give us your name,

23   spell your last name.

24                  MR. COTUGNO:  Leonardo Cotugno,

25   C-O-T-U-G-N-O.

1          MR. KEMM:  Your address?

2          MR. COTUGNO:  1 Sandpiper Drive in

3     Parlin, La Mer.

4          MR. KEMM:  Thank you, please

5     continue.

6          MR. COTUGNO:  We moved from Queens

7     14 years ago because the school, you know, we

8     went to Google and did -- at that time, it was

9     the best school, Eisenhower.  Now, if you put a

10    drug addict over there, you're going to go Google

11    La Mer, drug alley across the street.  Very nice.

12    It's not good.

13          Thank you.

14          MR. LOKANADHAM:  My name is Mohan

15    Lokanadham, last name is L-O-K-A-N-A-D-H-A-M.

16          MR. KEMM:  And your address?

17          MR. LOKANADHAM:  9 Mioduski Court,

18    Parlin, New Jersey.

19          M O H A N   L O K A N A D H A M,

20    having been duly sworn, testified as follows:

21          MR. KEMM:  Please continue.

22          MR. LOKANADHAM:  So it's almost 10

23    o'clock, and I'm sure everyone is tired, but I

24    can feel the frustration and the energy, it's

25    easily palpable in the room, on a weekday.

1          So I moved to La Mer when my son was

2    six months old.  He's 11 now.  We've always

3    considered the community as being very safe.  And

4    the fact of the matter is it's a 34-billion

5    industry.  I mean, it's all about the money.

6          The decision with the crowd is

7    unanimous.  I mean, everyone is for the rehab

8    center, but not at the location.  So I just can't

9    understand how the decision of the board could be

10   any different.

11         So I also believe -- I don't want to

12   reiterate what everyone else has said, because

13   everyone has been very eloquent in how they

14   expressed their feelings.  I also believe in

15   karma, and I think what goes around comes around,

16   and I think everyone needs to really look into

17   themselves when they make this decision.

18         Thanks.

19         D A P H N E   S T A N L E Y, having

20   been duly sworn, testified as follows:

21         MR. KEMM:  Please give us your name,

22   spell your last name.

23         MS. STANLEY:  My name is Daphne,

24   last name Stanley, S-T-A-N-L-E-Y.

25         MR. KEMM:  Your address, please.

1          MS. STANLEY:  20 Woodmere Drive.  I

2     live in La Mer.

3          I am totally against the location of

4     this drug and alcohol center.  That's all I have

5     to say.  I'm just 100 percent against it.

6          (Audience applause.)

7          O L G A   C O R R E A, having been

8     duly sworn, testified as follows:

9          MR. KEMM:  Please give us your name,

10     spell your last name.

11          MS. CORREA:  C-O-R-R-E-A.

12          MR. KEMM:  And your address?

13          MS. CORREA:  20 Upper Brook Court,

14     Parlin, in La Mer.

15          I just wanted to say that, for my

16     community, and especially for my daughter, I

17     don't want this place in my neighborhood.  Please

18     don't do that to us.

19          S A N D R A   C H A R L E S, having

20     been duly sworn, testified as follows:

21          MR. KEMM:  Please give us your name,

22     spell your last name.

23          MS. CHARLES:  Sandra Charles,

24     C-H-A-R-L-E-S.  I'm at 27 Woods Edge Court, La

25     Mer.

1    I don't want this in my

2    neighborhood.  To the lawyer, that is a

3    residential neighborhood.  I don't know where you

4    been, you need to take a drive over there, it's

5    residential, completely.

6              K E V I N   R E I D, having been

7    duly sworn, testified as follows:

8              MR. KEMM:  And please give us your

9    name, spell your last name.

10             MR. REID:  Reid, R-E-I-D, first name

11   is Kevin.

12             MR. KEMM:  Spell your last name.

13             MR. REID:  R-E-I-D.

14             MR. KEMM:  Sorry, I didn't hear you.

15             Your address, sir?

16             MR. REID:  904 Giordano.

17             MR. KEMM:  Thank you, please

18   continue.

19             MR. REID:  I came here just to log

20   my name that I oppose this facility, but now that

21   I have the mic, I feel like there's a need to

22   express my feelings.

23             My wife is standing behind me.  We

24   sold our home in Roselle, moved here a little

25   over a year ago.  We have four beautiful girls --

1   no boys, I was trying.  Seems like since I'm the

2   only man in the house, it's my job to protect

3   them.  And the reason we chose Parlin is because

4   of the safety, everything concerning Parlin as

5   well, we need it, and we invested and came to

6   Parlin.

7           The facility that's being proposed

8   now, it's walking distance from one of my

9   daughter's schools.  That's unacceptable, that's

10  unsafe.  As a father, protecting my girls, I

11  leave home at 7 o'clock in the morning, I go to

12  the city, I come back 7 o'clock.  They say --

13  their safety is paramount to me.

14          In the summertime, they're outside

15  playing, I don't have to worry, I feel as though

16  it's a safe neighborhood.  With this facility,

17  I'm not discriminating against the disabled, but

18  that location put us in great danger, not for the

19  patients itself, but everything that's

20  surrounding those people that need the treatment.

21          Thank you very much.

22          K I S H A N   R E I D, having been

23  duly sworn, testified as follows:

24          MR. KEMM:  And please give us your

25  name, spell your last name.

1          MS. REID:  Sure, Reid, R-E-I-D,

2     first name is Kishan (ph).  We're at 904 Giordano

3     Avenue in Camelot, La Mer.

4               As my husband said, we have four

5     daughters, aging from 21 to 5.  Our youngest is a

6     kindergartner at Eisenhower.  My husband, he's an

7     AVP for Cantor Fitzgerald; I work for a mortgage

8     company.  You know, we're a decent working-class

9     family that live in a residential neighborhood,

10    and we work hard, and our 13-year-old daughter

11    picks up my five-year-old daughter from the bus

12    stop, and they walk home together.  I don't have

13    to worry about her.  I have neighbors that look

14    out for our daughter.  Now they're concerned.

15              We have girls, girl children.  These

16    are drug addicted humans that are now going to be

17    around our daughters.  And this is a huge

18    concern.  We don't mind it in the town, but

19    literally next door to a school?  I mean, I don't

20    understand how anyone could fathom that thought.

21              We have young girls walking around

22    in the neighborhood, and that should be a

23    concern, that should be a responsibility.

24              That's all I have to say.

25              C A R O L   G I T U N E, having been

```
1     duly sworn, testified as follows:
2               MR. KEMM:  Same thing, please give
3     us your name, spell your last name.
4               MS. GITUNE:  Sure, first name is
5     Carol, last name is Gitune, G-I-T-U-N-E.
6               MR. KEMM:  And your address, please?
7               MS. GITUNE:  22 Marcinczyk Avenue,
8     Parlin, New Jersey, right in La Mer.
9               I just want to stand up here, when I
10    first purchased that home back in 2003, I was a
11    young 20-something-year-old doing my residency
12    back then.  Today, I'm a mother of three who
13    works very hard to make sure I provide a good
14    home and a safe home for my children.  I can
15    assure you, I have voted some of you in, and when
16    we voted for you, we trusted that you're going to
17    make a decision that is right and that is fair
18    for the citizens of Sayreville.  So, tonight, we
19    hold you accountable.  We put you in office
20    trusting that you can and will make the right
21    decision.
22              As a mother, I can stand here, and I
23    can adamantly tell you there's absolutely no
24    doubt in my mind, this is a residential area.
25    This is an area that has thousands of families
```

1    and thousands of children, and I still have two

2    children to put through that Eisenhower School.

3              I absolutely cannot and will not sit

4    back and watch as you vote on this facility.  So

5    tonight I say, please, make the right decision

6    for the people of Sayreville.

7              Y A S M E E N    A N D E R S O N,

8    having been duly sworn, testified as follows:

9              MR. KEMM:  Could you please give us

10   your name, spell your last name?

11             MS. ANDERSON:  Yas, last name

12   A-N-D-E-R-S-O-N, 83 Giera Court.

13             I understand that, you know,

14   sometimes money is an issue in the communities,

15   you want to bring money in, you want the

16   community to thrive.  I pay money.  I pay taxes.

17   I support this community.  I see people who work

18   at Walmart here.  I see other families who are

19   here that are professional families that bring

20   money into this community.  My daughter's a girl

21   scout.  My kids go to -- I have a daughter at

22   Eisenhower.  I have a daughter who goes to the

23   dance studio here in Parlin.  We spend our money

24   here, we support our community.

25             When my husband comes home from the

1    city, and he gets off the bus at 10:30 at night,

2    and can't park at the park and ride, and has to

3    walk home, I don't need to have my heart in my

4    throat wondering if he'll be walking through that

5    door.  I don't want to have my heart in my throat

6    when I go to work every day, and I worry about my

7    13-year-old who has to pick up my seven-year-old

8    at Eisenhower School, and walk home, because we

9    work.  I don't want to have to think about other

10   families that have supported this community for

11   years, have come here just because of what they

12   had to give, and take it all away because of

13   greed.  My money counts.  My time, my energy, my

14   support of this community, it absolutely means

15   something.  Do you want a dead community with a

16   thousand for sale signs?  Is that what you want?

17            Drugs are real.  Understand, drugs

18   are real.  I don't come from a family land, I

19   wasn't born in Colts Neck, I was born in

20   Brooklyn, New York, born and raised.  My mother

21   is a psychotherapist, she works with people who

22   require -- have huge mental health needs every

23   single day.  There are doctors in this room.

24   There are therapists in this room.  It's real.

25   It is not to be across the street from a school,

1    across the street from where people are raising

2    their families.

3            I can leave my house at 11:45 at

4    night, because I forgot to by Tide, and run to

5    the Walmart, and feel completely safe.  I don't

6    need to have somebody knocking me over the head

7    for $5, because they can't get their act

8    together.  Do we need to fix this problem?

9    Absolutely.  Does it need to be fixed in my

10    backyard?  No, sir, no, ma'am.

11            (Audience applause.)

12           D A N I E L   A S T A R I T A,

13    having been duly sworn, testified as follows:

14            MR. KEMM:  Please give us your name,

15    spell your last name.

16            MR. ASTARITA:  Daniel Astarita,

17    A-S-T-A-R-I-T-A.

18            I just want to go on record saying

19    that I'm against this.  I have a daughter that

20    goes to Eisenhower; I have a son that will be

21    going to Eisenhower.  I just want everyone to

22    know that I'm against this.  All right?  Thank

23    you.

24            MR. KEMM:  We needed your address,

25    sir.

1             MR. ASTARITA:  Oh, 26 Reseau Avenue.

2             MR. KEMM:  Thank you.

3             MR. ASTARITA:  Thanks.

4             M E L B A   G A R C I A, having been

5      duly sworn, testified as follows:

6             MR. KEMM:  Please give us your name,

7      spell your last name.

8             MS. GARCIA:  My name is Melba

9      Garcia, G-A-R-C-I-A.

10             MR. KEMM:  And your address, please?

11             MS. GARCIA:  126 Woodmere Drive,

12      Parlin, in La Mer.

13             I've been a resident of Sayreville

14      in La Mer for the past 12 years.  I moved here to

15      give my children a better life.  All my children

16      have been to all the schools here in Sayreville,

17      high school.  I currently now have grandchildren

18      in the schools, in Eisenhower and also the middle

19      school.  Like many residents have already said,

20      my granddaughter walks to Eisenhower to pick up

21      my grandson every single day when they get out of

22      school, because we, as parents, grandparents, are

23      working.  Okay?

24             We want safety for our children.  We

25      want safety for our community.  And like the

1    young lady said before me, do you really want a

2    dead community?  Do you want a thousand signs of

3    for sale in this community?  Because that's

4    what's going to happen if we are fearful of

5    living in this community.

6                    Thank you.

7                    B A R B A R A   S H A N L E Y,

8    having been duly sworn, testified as follows:

9                    MR. KEMM:  Please give us your name,

10   spell your last name.

11                   MS. SHANLEY:  Barbara Shanley,

12   S-H-A-N-L-E-Y.

13                   MR. KEMM:  And your address, please?

14                   MS. SHANLEY:  21 Woodmere Drive, La

15   Mer.

16                   I moved here 20 years ago.  It was a

17   safe community then; it's still a safe community

18   now.  I commuted back and forth to New York City.

19   Currently, I'm part time working.  I work for a

20   small transportation company, and we transfer

21   special needs children every single day.  Ernston

22   Road is not the greatest road, as far as speed

23   limits being adhered to and everything else.

24   It's not a safe area to begin with.

25                   When I first heard about this, and

1    realized it's a drug free school, by the

2    Eisenhower School, the last thing we need is a

3    rehab community at where Briarwood nursing home

4    used to be.  It was approved as a nursing home,

5    it should stay as a nursing home.

6                    (Audience applause.)

7                    MS. SHANLEY:  I want it to be safe

8    for my -- I'm now 65 years old, and I don't want

9    to have to worry about taking a walk around the

10    community.

11                    Thank you.

12                    (Audience applause.)

13                    B I L L   P O L I C A S T R O,

14    having been duly sworn, testified as follows:

15                    MR. KEMM:  Please give us your name,

16    spell your last name.

17                    MR. POLICASTRO:  Bill Policastro,

18    P-O-L-I-C-A-S-T-R-O.

19                    MR. KEMM:  And your address, sir?

20                    MR. POLICASTRO:  22 Dolan Avenue,

21    right down the street from -- in a residential

22    area.

23                    I'm hip to the addiction that's

24    going on, my mother passed away from a drug

25    overdose in 2011, and I have a younger sibling

1    who's been battling it for 20 years and still is.

2    So I realize that we need it, we need something,

3    but in that place is not the place.

4              I just bought my house November, me

5    and my wife spent about eight months looking for

6    houses, we were in and out of houses every week,

7    just waiting for the right opportunity and the

8    right place to move.  Our daughters are older,

9    they're both in college.

10             I work for NJ Transit.  We live on

11   the end of a dead end.  I don't know if you guys

12   are familiar with where Dolan Avenue is.  We live

13   in the last house on a dead end.  It's dark down

14   there.  I get called into to work all the time

15   for NJ Transit.  I don't need my wife there, and

16   I'm worrying about her when I'm in work, because

17   I know someone -- and I know they're all not like

18   that, but alls it takes is one instance.

19             Guys, I know you guys are going to

20   do the right thing, and I know he's going to come

21   back with a lawsuit with the Disability Act

22   thing.  We'll fight with you.  All right?

23             (Audience applause.)

24             G E O R G E   N A G Y, having been

25   duly sworn, testified as follows:

```
1              MR. KEMM:  And please give us your

2     name, spell your last name.

3              MR. NAGY:  My name is George Nagy,

4     N-A-G-Y, I live at 118 Parker Street, Morgan, New

5     Jersey.

6              I'm also a resident here for the

7     past five years.  I have two young children that

8     go to Eisenhower, and I'm terrified.  My daughter

9     today asked me, what is this?  And like the other

10    gentleman, I had to explain to her.  And she told

11    me how scared she was.  She had they play

12    outside.  Who's going to protect us?  Who's going

13    to protect us?  I know these people need the

14    help, but I don't think they need to be there.

15             I'm totally against this.  It was a

16    facility for elderly people before that.  I had

17    relatives that went through there.  They passed.

18    They took everything we owned from my relatives

19    to be put in there.  All that money now, where's

20    that going for that?  I mean, like, these people

21    are just flim-flomming, taking this money,

22    flipping it back and forth, to make more money.

23    It's a joke.  It's just not right, you know?

24             And I'm just totally against this.

25    I hope yous do the right thing, and realize it's
```

1    just a scam they're doing, another scam.  This is

2    no way to go about it.

3              S H A F K A   M A H M O O D, having

4    been duly sworn, testified as follows:

5              MR. KEMM:  And please give us your

6    name, spell your last name.

7              MR. MAHMOOD:  My name is Shafka

8    Mahmood, M-A-H-M-O-O-D, as in David.

9              MR. KEMM:  And your address, sir?

10             MR. MAHMOOD:  4 Giera Court, Parlin.

11             MR. KEMM:  Thank you, please

12   continue.

13             MR. MAHMOOD:  On the record, totally

14   against.  Also on the record, they are in, I'm

15   out.  I cannot raise my family next to a nuclear

16   reactor, I'm sorry about that.

17             D A W N   D A N T Z L E R, having

18   been duly sworn, testified as follows:

19             MR. KEMM:  Please give us your name,

20   spell your last name.

21             MS. DANTZLER:  My name is Dawn

22   Dantzler, D-A-N-T-Z-L-E-R.  I reside at 8 Denhard

23   court, Parlin, New Jersey, in La Mer.

24             It is a residential area.  The whole

25   area is a residential area.

```
 1              PUBLIC SPEAKER:  He's not listening.
 2              MS. DANTZLER:  Well, he's going to
 3      hear it.
 4              I would just like to say that I feel
 5      very safe out here.  I am a grandmother, and my
 6      grandchildren come over on the weekends, we take
 7      walks, we walk outside, we go to Kennedy Park, we
 8      feel free, we feel safe.
 9              If this facility comes there, we
10      will not feel safe, we'll be in the house all the
11      time.  As a matter of fact, I would be one of the
12      first to put my house up for sale.  I too resided
13      in Brooklyn, New York, and I moved here.  We
14      cannot have this facility in a residential area.
15      Thank you.
16              (Audience applause.)
17              P A U L E N E   K U R I A, having
18      been duly sworn, testified as follows:
19              MR. KEMM:  Please give us your name,
20      spell your last name.
21              MS. KURIA:  The name is Paulene
22      Kuria, last name K-U-R-I-A.  Address is 42
23      Woodmere Drive in Parlin.  And I am against it.
24              MR. KEMM:  Thank you.
25              J O H N   M c C O R M I C K, having
```

1    been duly sworn, testified as follows:

2              MR. KEMM:  Please give us your name,

3    spell your last name.

4              MR. McCORMICK:  My name is John

5    McCormick, I live at 116 Prusakowski Boulevard.

6              MR. KEMM:  Could you spell your last

7    name.

8              MR. McCORMICK:  M-c-C-O-R-M-I-C-K.

9              MR. KEMM:  Thank you.  Please

10   continue.

11             MR. McCORMICK:  At the beginning of

12   the meeting, the RCA counsel opened with a

13   statement that RCA met the burden of their

14   positive and negative proofs.  Well, after some

15   two and a quarter hours, I don't think that

16   they've met the burden of their negative proof,

17   because that's all that you've heard from this

18   community, are the reasons why they don't believe

19   that that drug rehab center should be placed in

20   the middle of a residential community, right next

21   to an elementary school.

22             I also heard counsel threaten --

23   threaten the board and threaten Sayreville with

24   actions under the ADA, Supreme Court decisions,

25   when I think that the site was originally

1    approved as a nursing home, and the senior

2    citizens of Sayreville have just as many rights

3    and EEO protections under the law as the people

4    who need the drug rehabilitation center.

5                   Thank you.

6                   (Audience applause.)

7                   J O N N I E   R O B I N S O N,

8    having been duly sworn, testified as follows:

9                   MR. KEMM:  Please give us your name,

10   spell your last name.

11                  MS. ROBINSON:  Jonnie Robinson,

12   R-O-B-I-N-S-O-N.  My address is 9 Biesiada Court.

13                  I just want to be on the record to

14   say I am completely against this.  I have been a

15   board certified family physician for almost 20

16   years now.  I've worked in many, many facilities.

17                  I've relocated my family here from

18   Bronx, New York, for a better life.  We love

19   Sayreville.  We work and live here.  We do dance

20   here.  We do gymnastics here.  We PTO here.  We

21   love this town.

22                  And I, better than probably a lot of

23   people here, know that, yes, it is an epidemic.

24   Yes, we do need help.  I see it every single day.

25   But next to Eisenhower Elementary School is not

1    the place.  Across from Harbour Club is not the

2    place.  Next to La Mer is not the place.

3                So I implore you to deep dig -- deep

4    dig, very far, down into your conscious, to know

5    that you choose to do the best thing for your

6    community, because we love our community, and we

7    want our children to maintain things safe, we do

8    not want to live in fear, and we do want to keep

9    succeeding in Sayreville.

10               (Audience applause.)

11               MR. KEMM:  And please give us your

12   name, spell your last name.

13               MS. DANIELS:  Orlee (ph) Daniels,

14   D-A-N-I-E-L-S.

15               MR. KEMM:  And your address, please?

16               MS. DANIELS:  Ridgeview Court,

17   Parlin, New Jersey.

18               MR. KEMM:  Thank you, please

19   continue.

20               MS. DANIELS:  Just want to go on

21   record to say I'm against this.  My son passed

22   away four years ago from drug addiction, so I

23   completely understand the need for a facility

24   like this, but not there.  I have children in

25   Eisenhower.  So I just want to say I'm against

 1    it.

 2                     Thank you.

 3                     (Audience applause.)

 4                     S T E P H A N I E   T A I T E,

 5    having been duly sworn, testified as follows:

 6                     MR. KEMM:  And please give us your

 7    name, spell your last name.

 8                     MS. TAITE:  Stephanie Taite,

 9    T-A-I-T-E.  I live at 24 Fela Drive.

10                     MR. KEMM:  Thank you.

11                     MS. TAITE:  I ask that you vote no.

12    Short and sweet.  Thank you.

13                     (Audience applause.)

14                     P R A G N E S H   K H A T R I,

15    having been duly sworn, testified as follows:

16                     MR. KEMM:  Please give us your name,

17    spell your last name.

18                     MR. KHATRI:  Pragnesh Khatri, last

19    name K-H-A-T-R-I.

20                     MR. KEMM:  And your address, please?

21                     MR. KHATRI:  50 Fela Drive.

22                     MR. KEMM:  Thank you.

23                     MR. KHATRI:  I just want to say

24    please, please, please do not approve this.  We

25    love Sayreville, please don't make us move out of

1     here.

2                     (Audience applause.)

3                     P R A D I M A   J H A L A, having

4     been duly sworn, testified as follows:

5                     MR. KEMM:  And please give us your

6     name, spell your last name?

7                     MR. JHALA:  Last name J-H-A-L-A,

8     first name Pradyuman.

9                     MR. KEMM:  And your address?

10                    MR. JHALA:  7 Jasoun Court in

11    Parlin, New Jersey.

12                    I just want to paint a picture

13    around here: hundreds and thousands of drug

14    addicts surrounded by five years old, six years

15    old, seven years old, eight years old, and nine

16    years old.  Any sane person in this room who

17    would want their kids to be around hundreds of

18    drug addicts, raise your hand?  I don't think so.

19                    I'm totally against it, thank you.

20                    D E B B I E   I N D R A W I S,

21    having been duly sworn, testified as follows:

22                    MR. KEMM:  Please give us your name,

23    spell your last name.

24                    MS. INDRAWIS:  Debbie Indrawis,

25    I-N-D-R-A-W-I-S.

1          MR. KEMM:  And your address, please?

2          MS. INDRAWIS:  6 Tall Oaks Court in

3    Parlin.  I live in La Mer.

4          MR. KEMM:  Thank you.

5          MS. INDRAWIS:  I'd just like to go

6    on the record and say that I am against this.  I

7    have three children in the school system.  They

8    walk -- two out of three walk home from the bus.

9    My children went to Eisenhower School.  And I am

10   concerned for the safety of having the facility

11   like this located across where Briarwood was.

12          I'm also a Realtor in town.  I am

13   concerned for the property values, because we

14   would have to disclose that there is a drug rehab

15   center right across from La Mer, Harbour Club,

16   and the Oak Tree development behind Eisenhower

17   School.

18          Thank you.

19          MR. LIEBERMAN:  Paul Lieberman, I

20   have one more thing to add, if it's okay.

21          MR. KEMM:  Yeah, very quickly.

22          MR. LIEBERMAN:  I just want to thank

23   everybody that came in tonight, it was really

24   important that you all do.

25          I'm going to ask you once again,

1    please vote no on this.

2              We -- last week -- last month,

3    when --

4              MR. KEMM:  Sir, you need to address

5    your comments to the board.

6              MR. LIEBERMAN:  I'm sorry.  Last

7    month, when the petitioner was here, he was

8    playing on our sympathies.  He was talking about

9    constantly, well, what if your child had ended up

10   with this?  We have testimony here from our

11   citizens, of people that have lost loved ones,

12   and they too do not want this at a place right

13   next to a school.

14             So, once again, I thank every one of

15   the people that have come here to say something

16   today, and I ask you all to listen to us, to say

17   no to this petitioner.

18             Thank you.

19             (Audience applause.)

20             CHAIRMAN GREEN:  Okay.  I'm going to

21   close the public portion.

22             PUBLIC SPEAKER:  Do the right thing.

23             CHAIRMAN GREEN:  I need a motion to

24   close the public portion.

25             VICE CHAIRMAN HENRY:  So moved.

1      COMMISSIONER CORRIGAN:  Second.

2  Public portion is closed.

3      MR. KEMM:  We were going to give

4  Mr. Himelman the ability to address the comments.

5      PUBLIC SPEAKER:  We don't want to

6  listen to him.

7      MR. HIMELMAN:  I listened carefully

8  to the testimony and the comments by all the

9  residents this evening.  If the board has

10  specific questions that they would like to direct

11  to us from the public, I'd be happy to answer.

12      PUBLIC SPEAKER:  When is the

13  facility being implemented?  When is this

14  happening?

15      MR. KEMM:  Ladies and gentlemen,

16  we've closed public.

17      PUBLIC SPEAKER:  He just said we can

18  ask him questions.

19      MR. HIMELMAN:  I was directing that

20  to the board's attorney.

21      PUBLIC SPEAKER:  He speaks with a

22  forked tongue again.

23      MR. KEMM:  Does the board have any

24  questions of Mr. Himelman?

25      MR. HIMELMAN:  Mr. Chairman, thank

1    you.  We've summarized our case, so we leave it

2    to the board to proceed on this application

3    accordingly.

4              PUBLIC SPEAKER:  Have a seat.

5              CHAIRMAN GREEN:  Mr. Kemm, I want

6    your permission to go into closed session.  I

7    want to discuss with the board and you something

8    that is brought up here tonight, and that's the

9    American Disabilities Act, and the Federal Fair

10   Housing Act.

11             MR. KEMM:  Mr. Chairman, certainly

12   the board does have the ability to go into closed

13   session.

14             Just to expand upon and put it in

15   context for members of the public, all the

16   board's actions, like any public entity, the

17   governing body, the mayor and council, is to be

18   done in open public meeting.

19             There's certain exceptions where we

20   can exclude the public from the meeting, and one

21   of those is a request to have legal advice and

22   legal discussion with the attorney.  So the board

23   has asked for that.  If we want to proceed, we

24   should have a motion on that.

25             If the board decides they want to go

1    into closed session, we will come back to the

2    public session, and we'd conclude any business

3    the board wants to conclude.  So if that is the

4    wish of the chairman, we should have a vote, and

5    then I'll put further information on the record.

6              CHAIRMAN GREEN:  I'm asking for a

7    motion to go into closed session to discuss this

8    legal part of this application.

9              VICE CHAIRMAN HENRY:  So moved.

10              COMMISSIONER EMMA:  Second.

11              COMMISSIONER ESPOSITO:  Mr. Chair,

12    may I make one comment, please?

13              I think people were asking if we're

14    going to take a final vote tonight, so perhaps we

15    can give them some sort of guidance or timeline

16    of what we're doing tonight, before the closed

17    session.  Are we going to make the final vote

18    tonight?  Just to give them some sort of

19    information.

20              MR. KEMM:  That's up to the board

21    when we come out of closed session, whatever

22    action they want to take.  Again, if we take a

23    quick roll call, I'll put more information on the

24    record.

25              COMMISSIONER ESPOSITO:  Thank you.

1              CHAIRMAN GREEN:  I want a roll call
2    to go into closed session.
3              MS. KEMBLE:  Mr. Green?
4              CHAIRMAN GREEN:  Yes.
5              MS. KEMBLE:  Mr. Henry?
6              VICE CHAIRMAN HENRY:  Yes.
7              MS. KEMBLE:  Mr. Kuczynski?
8              COMMISSIONER KUCZYNSKI:  Yes.
9              MS. KEMBLE:  Ms. Catallo?
10             COMMISSIONER CATALLO:  Yes.
11             MS. KEMBLE:  Mr. Corrigan?
12             COMMISSIONER CORRIGAN:  Yes.
13             MS. KEMBLE:  Mr. Emma?
14             COMMISSIONER EMMA:  Yes.
15             MS. KEMBLE:  Mr. Esposito?
16             COMMISSIONER ESPOSITO:  Yes.
17             MR. KEMM:  Okay.  So, ladies and
18   gentlemen, and for the board as well, we will be
19   going into closed session; we'll retire to the
20   chambers behind the dais.  As indicated, the Open
21   Public Meetings Act requires that all activity of
22   the board and board business be conducted in an
23   open public meeting, in which the public is
24   available.  The limited exemptions, there's a
25   number of personnel issues; for example, if the

1    town was to take action against an employee or

2    something of that nature, and including legal

3    advice, as you all know, there's attorney-client

4    privilege.

5              So we will be going in under that

6    exception of the Open Public Meeting Act.  The

7    meeting is not over.  Please understand we are

8    just adjourning for a closed session.  We will

9    come back and reopen the public session, and the

10   board will take whatever action they want.

11             I will also place on the record the

12   sum and substance of the discussion that occurred

13   in closed session; the issues discussed.  Again,

14   it's limited to legal advice to the board.  We're

15   not going to be discussing voting on the

16   application, we're not going to be discussing the

17   merits of the application, or anything anyone

18   said, it solely is -- the chairman has asked to

19   give the board further information or

20   understanding of the laws involved.

21             As you are all aware, we have issues

22   that have been raised by the applicant, as well

23   as the public, on the Federal Fair Housing Act,

24   the Americans with Disabilities Act, and the New

25   Jersey Law Against Discrimination.  So the closed

1   session will be limited to discussing the legal

2   issues surrounding those laws.

3                    MR. HIMELMAN:  Thank you.

4                    MR. KEMM:  So with that in mind, we

5   will adjourn for a moment.  Again, the meeting is

6   not finished, we will be back shortly.

7                    (Whereupon, the board enters closed

8   session.)

9                    CHAIRMAN GREEN:  All right.  I'm

10  going to call this meeting back to order.

11                   COMMISSIONER CATALLO:  We can't.

12                   MR. KEMM:  We have a member that

13  went to the men's room.  I guess we'll hold off.

14                   VICE CHAIRMAN HENRY:  Two.

15                   MR. KEMM:  Give us a minute, thank

16  you.

17                   (Whereupon, there is a brief pause

18  in the proceeding.)

19                   MR. KEMM:  We have all our board

20  members back in.

21                   Ladies and gentlemen, we're now back

22  in public session, as indicated.  As I mentioned

23  before, we did go into closed session; we

24  excluded the public.  The board had requested

25  some guidance on the legal issues that were

1    involved.  We discussed broadly the Americans

2    with Disabilities Act and the Federal Fair

3    Housing Act.

4           In short, I advised them the --

5    those laws, basically, as the applicant's

6    attorney had phrased it, was correct.  There are

7    requirements that individuals who are in

8    rehabilitation facilities, who have drug and

9    alcohol addiction problems, are considered

10    disabled under the Americans with Disabilities

11    Act and the Federal Fair Housing Act, and certain

12    accommodations, reasonable accommodations, need

13    to be made to those individuals, as well as

14    facilities and organizations who provide services

15    to those individuals, which here would be the

16    applicant.  So we did discuss the legal issues

17    involved with that, and as well as the New Jersey

18    Law Against Discrimination.

19           We did not, as indicated before,

20    discuss any of the factual issues involved here.

21    We did not discuss how the board may or may not

22    vote on this matter, what action they may or may

23    not take; it was limited to legal advice on those

24    matters I just described.

25           So with that on the record,

1      Mr. Chairman, I turn it back over to you.

2                  CHAIRMAN GREEN:  Thank you.  What is

3      the board's pleasure in reference this

4      application?

5                  VICE CHAIRMAN HENRY:  Mr. Chairman,

6      I'd like to make a motion that we deny this

7      application.

8                  PUBLIC SPEAKER:  Yes.

9                  CHAIRMAN GREEN:  Do I have a second?

10                 COMMISSIONER CORRIGAN:  Second.

11                 COMMISSIONER EMMA:  Second.

12                 MR. KEMM:  Again, everybody, a yes

13     vote is to deny.

14                 CHAIRMAN GREEN:  Roll call vote.

15                 MS. KEMBLE:  Mr. Green?

16                 CHAIRMAN GREEN:  Yes.

17                 MS. KEMBLE:  Mr. Kuczynski?

18                 COMMISSIONER KUCZYNSKI:  Yes.

19                 MS. KEMBLE:  Mr. Kreismer?

20                 I'm sorry, Ms. Catallo?

21                 COMMISSIONER CATALLO:  Yes.

22                 MS. KEMBLE:  Mr. Corrigan?

23                 COMMISSIONER CORRIGAN:  Yes.

24                 MS. KEMBLE:  Mr. Henry?

25                 VICE CHAIRMAN HENRY:  Yes.

1          MS. KEMBLE:  Mr. Emma?

2          COMMISSIONER EMMA:  Yes.

3          MS. KEMBLE:  Mr. Esposito?

4          COMMISSIONER ESPOSITO:  Yes.

5          MR. KEMM:  Would any board members

6     like to put their reasons on the record for their

7     vote?

8          VICE CHAIRMAN HENRY:  Go ahead,

9     Mr. Chairman.

10          CHAIRMAN GREEN:  Yes, I'm going to

11     put my reasons for my vote against this

12     application on the record at this time.  My

13     reasons are quite lengthy, so bear with me while

14     I reference this.

15          First, I want to thank Mr. Himelman

16     for his presentation in reference this

17     application.  I have reviewed all the testimony.

18     I've spent hours looking over the paperwork.

19     I've been to the scene.  I've been to the

20     surrounding area.

21          The safety of the community, and the

22     negative input, far outweighs the positives of

23     this application.  In that regard, I cannot even

24     put conditions on this application in an attempt

25     to reverse this application to positive.  I am

1  voting no to this application, and denying the

2  application use of the d(1) use variance.

3            Safety is a big part of this

4  application, and here are my safety concerns for

5  my vote of no:

6            Within the transcript that was taken

7  on November the 8th, on page 87, Dr. Carise

8  states, there will be 150 to 200 cameras, and the

9  nurses will have visibility to all the cameras on

10  their unit.  Well, cameras and monitors are only

11  good as the staff who's responsible for them.

12            I have been a police officer for 35

13  years in Sayreville.  I have the experience with

14  cameras and monitors.  It was my responsibility

15  to look at these cameras, and take care of them.

16  We had cameras in the front of the building, the

17  side of the building, in the jail cells, in the

18  sally ports, in the hallways.  And if you get

19  busy, you're not going to see these cameras;

20  you're not going to see the shadow going by.

21            Security could be compromised if

22  you're not watching these cameras at all times.

23  An employee of RCA could be doing a report, could

24  get called, and not see what's actually happening

25  on some of these cameras.  So that could be a

1    safety issue within the facility, and it also

2    could become a safety issue for the community.

3             Also on that transcript from

4    November the 8th, on page 79, outpatient versus

5    inpatient.  The criteria as to whether a person

6    is outpatient or inpatient comes from the

7    American Association of Addiction Medicine and

8    insurance companies.  RCA, through their

9    testimony before this board, has said that

10    insurance companies and that association play a

11    large part as to when and where that patient

12    goes.  That could create a safety situation

13    within the facility.

14             And the transcript from December the

15    13th, on page 35, says that drug addicts are

16    smart, at times desperate, and their personality

17    sometimes matches their addiction.  That's true.

18    I've spent 35 years in the PD.  I've seen

19    thousands of drug addicts and people with alcohol

20    (sic).  That can create another safety problem

21    for the facility and for the people outside.

22             The business is self-regulated.  RCA

23    has chosen accreditation by a commission called

24    the Joint Commission of Hospitals, and the

25    industry is governed by the New Jersey Office of

1    Licensure, but only once a year.  No other

2    inspections or regulations are imposed.  RCA sets

3    the policies, the procedures, the guidelines, the

4    assessments, and the protocols.  Again, it's a

5    safety problem.

6              I need to bring up from testimony

7    from Dr. Carise -- I hope I'm pronouncing that

8    right -- of December the 13th, 2017, starting on

9    page 6, Danvers, Massachusetts, two deaths, one

10   in February of 2017, the other in August of 2017.

11   An investigation took place by the state of

12   Massachusetts.

13             Upon receiving and reading the

14   results of this investigation, it was revealed

15   that RCA did not have the proper policies,

16   procedures, guidelines, assessments, and

17   protocols in place in regards to their patients.

18   That facility, Danvers, Massachusetts, was under

19   the complete control of RCA during the whole

20   time, from February 2017 to August 2017.  This

21   set of facts goes to the credibility of RCA in

22   regards to safety.

23             I must note, according to testimony,

24   RCA representatives tell this board that the

25   policies, procedures, guidelines, protocols, and

1    assessments will be in place for the Sayreville

2    facility, but they were not adhered to in

3    Massachusetts, and only revealed after the state

4    of Massachusetts started an investigation.  How

5    do I know that the safety of the public and the

6    safety of their patients will be adhered to by

7    the policies and procedures of RCA?  It certainly

8    didn't apply to Danvers, Massachusetts.  This is

9    credibility.  This credibility is relevant to

10   this Sayreville application.

11            This facility is also very close to

12   an elementary school and residential properties.

13   Safety in the area could be compromised, and

14   there's a chance, and I'm not willing to take

15   that chance with this application.

16            (Audience applause.)

17            MR. KEMM:  Members of the public,

18   please, we showed respect to you when you all

19   came up to the microphone and spoke; please give

20   the chairman and the board the same respect in

21   putting their reasons on the record.

22            Thank you.

23            Mr. Chairman?

24            CHAIRMAN GREEN:  Thank you.

25            Testimony that was provided

1    indicates that there will be no doctor on the

2    premises at night, and only one R.N. is allotted,

3    which, to me, staffing with 149 beds, and

4    approximately 20 outpatient cares per day, tells

5    me that staffing could be a problem and compound

6    safety issues.

7            And lastly, I want to say this:  I

8    am not against RCA.  Yes, it is needed; not only

9    in the area, but in New Jersey, and really across

10   the United States.  The issue here is the area,

11   residential, senior citizens, a school, and the

12   dense population.  Public transportation is also

13   limited.  There are many other areas within

14   Sayreville that could be explored for this type

15   of facility.

16           Mr. Brian O'Neill, CEO of RCA, he

17   knows Sayreville very well.  He was the executive

18   in charge of a redevelopment project here for

19   many years.  He can find a suitable parcel of

20   land that could be available for this type of

21   project.  Sayreville understands this type of

22   needed use, just not at the present location.

23           That is the reason I voted no.

24           VICE CHAIRMAN HENRY:  Mr. Chairman,

25   if I may.

1      I agree with a lot of what Mr. Green

2  says here, Chairman Green, and I just want to

3  make comment too, as to the police officer that

4  came up here had indicated one of these

5  facilities, they needed to have additional police

6  patrols around these facilities.  I'm not sure

7  what the actual reasons were, but it cost the --

8  you know, the -- they seemed to need to have

9  those additional police officers at these

10  facilities, and I think that would be concern too

11  for the residents of the area.

12      COMMISSIONER ESPOSITO:  Okay.  I'll

13  be brief.

14      So while I definitely believe, and I

15  think most of us do, that there's a need for RCA,

16  and facilities like them, as a sitting board

17  member on the board of education, it alarms me,

18  to say the least, at how close it is to one of

19  our elementary schools.  The ramifications, in my

20  opinion, of when something happens, versus if

21  something happens, keeps me up at night.

22      Now, security is not the only issue;

23  the main issue, in my opinion, is also a

24  financial issue.  I think the people who own

25  homes in that area are convinced, as I am, that

1    they're not safe -- entirely safe when they leave

2    their homes at night, or even during the day.   In

3    previous testimony, RCA had mentioned that there

4    is one un-armed security guard within the entire

5    complex.  I think that the complex is huge; I

6    don't think it's nearly enough.

7                And they were kind enough, when we

8    raised some objections about security, and about

9    personnel, that they would increase security,

10   they'd say, okay, well, what do you think the

11   proper number of security guards are, we'll man

12   them, we'll put them to work?  As far as people

13   coming and going, they would make sure that they

14   would be escorted off the property, they just

15   couldn't leave on their own.

16                And I appreciate that very much, but

17   what bothers me a little bit here is that these

18   should have been put in place before we had to

19   ask.  If my math is correct, you'll bill around

20   $37,000,000 a year, 750 a day times 150 beds, or

21   thereabouts, you could certainly afford more

22   personnel.

23                I also look at these people who have

24   homes in the area, and I've looked at this pretty

25   extensively, and it looks as though home values

1    would be reduced about 17 percent.  Now, for most

2    people, this is their biggest asset, some their

3    only asset, and to lose 17 percent is extremely

4    distressing, to say the least.

5              And quite honestly, on a personal

6    level, I'm in this town 16 years.  I've made

7    quite a few friends, I've seen them in stores, in

8    parks, I see them at Sayreville Day and

9    Independence Day, and I don't think I could look

10   in their eyes and say, you know what?  I voted

11   yes for this to come in, in this particular area,

12   and I had no regard for your safety.  I just

13   couldn't do it.  I couldn't sleep at night.

14             And I understand firsthand how drugs

15   can tear families apart.  And while I agree

16   wholeheartedly they're needed, and I would

17   welcome one in Sayreville in the correct area,

18   just not where it is right now.

19             So that's why I voted no.

20             (Audience applause.)

21             COMMISSIONER EMMA:  My fellow board

22   members already covered a lot of the things that

23   I was going to discuss, and I agree with them.

24             Public safety concerns troubled me

25   the most.  The proximity to the school, how

1    residential areas surround the facility, and all

2    you need is one accident, all you need is one

3    person to escape, and they're really -- if

4    somebody wants out, there's really nothing

5    stopping them from leaving.  If they want out,

6    they'll figure out a way to break out.

7                So for those reasons, and the

8    reasons already mentioned, I won't repeat them, I

9    voted against the facility.

10                COMMISSIONER KUCZYNSKI:  Yeah, I'd

11    like to state my reasons for voting against the

12    application, but first I'd like to just say that

13    we're up here making a decision on facts, we have

14    to weigh different facts on both sides.  So it's

15    not a political rally.  We can't just use our

16    emotions, we have to base this decision on facts.

17    It's like we're judges up here.  And I think the

18    board members have done that.  I know it gets

19    emotional sometimes on both sides, the counsel

20    for the applicant said he was touched by this

21    application, he has many years of practice, and

22    this is maybe one of the few times he's been

23    touched.  I think the members of the board have

24    been touched also up here, from what we've heard

25    from their side, on how they described the people

1     that they deal with.

2               But when it comes down to it, we

3     have to deal with the facts and the law.  I've

4     been on the board a long time.  I take the Sica

5     test very seriously.  I know we just can't say we

6     don't like it, and hope that we made the right

7     decision.  So I do take that very seriously.

8               So for the benefits, there's no

9     doubt that this is an inherently beneficial use.

10    I don't think Sayreville is against it; I think

11    it's just in the wrong location.

12              The detriments, there's a couple

13    that come to mind.  The school is so close.

14    Schoolchildren are walking right in front of the

15    facility.  So that's just a detriment.

16              Police officers have stated that it

17    draws a poor element near the facility.  People

18    that live nearby basically said that they're

19    going to move out, they have families which are

20    going to move out to protect their families.  I

21    think it's going to possibly disable the --

22    distable (sic) the community.  You know, we have

23    families they're, they're going to move out, and

24    possibly other types move in.  You know,

25    Sayreville is a family oriented, working

1    community, so I don't want that neighborhood to

2    change because of this.

3                Yes, it's in the PRIME zone, which

4    is the true, the boundary line is probably

5    Ernston Road, but the neighborhood is right

6    across the street, so there's also master plan

7    considerations.  There's more than just one zone,

8    there's the master plan.  PRIME zone has many

9    other friendly uses to residents that could fit

10   there.

11               So these detriments can't really --

12   we can't put conditions on them.  We can't move

13   the neighborhood, we can't move the school, so we

14   can't change things.  So when you do the balance

15   test, it just -- it just doesn't work out for the

16   applicant.  I think there's other places in

17   Sayreville that would be more suitable, and

18   certainly Sayreville would welcome that.

19               But those are my reasons for voting

20   against the application.

21               COMMISSIONER CATALLO:  I believe

22   that we have a very big problem here in the state

23   of New Jersey with -- a drug problem, and I

24   believe that we do need something in Sayreville.

25   We have our children that we have to worry about,

1   our grandchildren, somewhere down the road we

2   have to worry about all this.

3              But I also believe that we need to

4   protect the children that we have right next to

5   this rehabilitation center that they want to put

6   there.  It's no good.  We're 200 feet away from

7   each other.  They're babies.  They're not even

8   the older children that maybe would know what's

9   going on, or what they're saying to them.

10  They're babies.  They're innocent.

11             So, therefore, I have to say no to

12  this rehabilitation center in that area.  In any

13  other area of Sayreville, I probably would go

14  along with it, but it scares me to have a

15  rehabilitation center so close to a school.

16             COMMISSIONER CORRIGAN:  When I first

17  came in tonight, I was concerned that we were

18  going to be listening to a mob, and we didn't

19  have to listen to a mob, we listened to a

20  community, a united community, whose ideas were

21  compelling, intelligent, and very, very real.

22             From my point of view, there is no

23  more an important objective to have begin with,

24  is to protect both our children and our elderly,

25  who would almost certainly be the victims of any

1      type of brazen crime.

2                      So I -- in all the weighing of all

3      the facts, and all the conditions, I could not

4      destroy the quality of life for the people in

5      this neighborhood, and to put the people of the

6      school, the children of the school, in danger.

7                      So I had to vote no.

8                      (Audience applause.)

9                      CHAIRMAN GREEN:  Okay.  That

10     concludes this application on RCA.

11                     (Audience applause.)

12                     (Whereupon, the hearing concluded at

13     11:17 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5              I, Michael Lombardozzi, a Notary

6    Public and Certified Court Reporter of the State

7    of New Jersey, do hereby certify that the

8    foregoing is a true and accurate transcript of

9    the testimony as taken stenographically by and

10   before me at the time, place, and on the date

11   hereinbefore set forth.

12              I do further certify that I am

13   neither a relative nor employee nor attorney nor

14   counsel of any of the parties to this action, and

15   that I am neither a relative nor employee of such

16   attorney or counsel and that I am not financially

17   interested in this action.

18

19

20   _____
     Michael Lombardozzi,
     Notary Public, State of New Jersey
21   NCRA ID: 6532
     Date:  2018-01-28
22

23

24

25

## #

**#17-29** [1] - 1:3

## $

**$37,000,000** [1] - 141:20
**$62,000,000** [1] - 50:13

## 0

**08816** [1] - 1:24
**08872** [1] - 1:8

## 1

**1** [2] - 1:5, 102:2
**1,000** [1] - 56:23
**1,500** [2] - 60:12, 60:13
**10** [3] - 55:12, 68:10, 102:22
**10-minute** [1] - 69:1
**100** [2] - 2:15, 104:5
**101** [3] - 2:16, 2:17, 40:8
**102** [1] - 2:18
**103** [1] - 2:19
**104** [3] - 2:20, 2:21, 61:17
**105** [1] - 2:22
**108** [1] - 2:23
**109** [1] - 2:24
**10:30** [1] - 110:1
**11** [1] - 103:2
**11-year-old** [3] - 43:12, 76:21, 77:3
**110** [1] - 88:14
**111** [1] - 2:25
**112** [1] - 3:3
**113** [1] - 3:4
**114** [1] - 3:5
**115** [2] - 3:6, 55:8
**116** [1] - 119:5
**117** [2] - 3:7, 3:8
**118** [2] - 3:9, 116:4
**119** [2] - 3:3, 96:4
**11:17** [1] - 147:13
**11:45** [1] - 111:3
**12** [2] - 85:3, 112:14
**120** [1] - 3:4
**121** [1] - 85:21
**122** [2] - 3:5, 3:6
**123** [3] - 3:7, 3:8, 88:21
**126** [1] - 112:11
**13-year-old** [2] - 107:10, 110:7

**1306** [1] - 51:1
**13th** [4] - 23:16, 23:18, 136:15, 137:8
**14** [1] - 102:7
**149** [1] - 139:3
**15** [1] - 33:11
**150** [2] - 135:8, 141:20
**16** [2] - 32:9, 142:6
**167** [1] - 1:7
**17** [3] - 44:3, 142:1, 142:3
**17-29** [1] - 4:2
**18** [1] - 96:12
**1981** [1] - 65:8

## 2

**2** [2] - 39:19, 57:7
**20** [10] - 52:2, 55:11, 65:7, 95:6, 104:1, 104:13, 113:16, 115:1, 120:15, 139:4
**20-something-year-old** [1] - 108:11
**200** [3] - 39:21, 135:8, 146:6
**2003** [1] - 108:10
**2008** [1] - 100:17
**2011** [1] - 114:25
**2017** [6] - 55:25, 137:8, 137:10, 137:20
**2018** [1] - 1:7
**2018-01-28** [1] - 148:21
**21** [5] - 60:2, 89:22, 90:2, 107:5, 113:14
**22** [3] - 45:14, 108:7, 114:20
**24** [5] - 1:7, 2:4, 31:5, 84:24, 122:9
**25** [3] - 33:11, 83:25, 91:9
**2502** [1] - 89:19
**251** [1] - 61:14
**26** [2] - 24:12, 112:1
**27** [2] - 79:1, 104:24
**29** [1] - 1:23

## 3

**3** [2] - 2:2, 66:18
**30** [4] - 2:5, 20:11, 33:7, 72:13
**300** [1] - 39:19
**30:6C-1** [1] - 13:7
**32** [2] - 2:6, 79:6
**34-billion** [1] - 103:4
**35** [6] - 2:7, 44:3, 76:23, 135:12,

136:15, 136:18
**38** [2] - 3:13, 3:14

## 4

**4** [2] - 42:24, 117:10
**4.1** [1] - 68:9
**40** [2] - 2:8, 88:23
**400** [1] - 51:10
**40:55D-70(d)(1** [1] - 10:1
**42** [4] - 2:9, 78:8, 78:10, 118:22
**44** [2] - 2:10, 101:13
**452** [1] - 1:5
**46** [1] - 2:11
**48** [1] - 70:21

## 5

**5** [4] - 44:18, 64:25, 107:5, 111:7
**50** [3] - 2:12, 72:14, 122:21
**53** [1] - 2:13
**54** [2] - 47:8, 47:9
**55** [3] - 2:14, 72:9, 86:22
**56** [2] - 65:6, 93:12
**57** [2] - 2:15, 65:6
**59** [1] - 2:16

## 6

**6** [3] - 59:25, 124:2, 137:9
**61** [3] - 2:17, 44:3, 95:4
**63** [2] - 46:23, 91:2
**64** [1] - 2:18
**6405** [1] - 98:16
**65** [1] - 114:8
**6532** [1] - 148:21
**68** [1] - 35:20
**69** [1] - 77:25

## 7

**7** [4] - 76:4, 106:11, 106:12, 123:10
**70** [1] - 2:19
**700** [1] - 62:17
**72** [1] - 2:20
**732-690-2411** [1] - 1:24
**75** [1] - 2:21
**750** [1] - 141:20
**76** [1] - 70:23
**77** [1] - 2:22
**780** [1] - 50:7

**79** [2] - 2:23, 136:4
**7:55** [1] - 1:8

## 8

**8** [1] - 117:22
**80** [1] - 2:24
**81** [2] - 2:25, 97:4
**83** [2] - 2:4, 109:12
**84** [1] - 2:5
**85** [1] - 2:6
**87** [4] - 2:7, 2:9, 87:23, 135:7
**88** [2] - 2:8, 86:1
**89** [1] - 2:10
**8th** [2] - 135:7, 136:4

## 9

**9** [2] - 102:17, 120:12
**90** [1] - 36:19
**901** [3] - 1:5, 4:3, 4:8
**904** [2] - 105:16, 107:2
**93** [1] - 2:11
**94** [1] - 2:12
**95** [1] - 2:13
**98** [2] - 2:14, 53:13
**99** [1] - 32:16

## A

**A-R-B-O-L-E-D-A** [1] - 100:13
**A-S-T-A-R-I-T-A** [1] - 111:17
**ability** [3] - 32:25, 126:4, 127:12
**able** [7] - 9:17, 20:7, 25:7, 56:10, 86:2, 91:19, 97:1
**absolutely** [6] - 21:19, 87:12, 108:23, 109:3, 110:14, 111:9
**Abuse** [1] - 36:18
**abuse** [6] - 8:4, 8:10, 13:2, 13:17, 19:25, 36:22
**abysmal** [1] - 37:4
**accept** [1] - 14:23
**access** [7] - 17:3, 25:14, 30:3, 36:22, 46:3, 50:1, 58:3
**accessible** [1] - 28:25
**accident** [1] - 143:2
**accommodate** [2] - 14:16, 28:16
**accommodated** [1] - 36:14
**accommodating** [1] - 7:19

**accommodations** [8] - 16:24, 17:1, 17:3, 45:25, 51:21, 65:25, 132:12
**accomodation** [11] - 9:5, 9:14, 9:15, 16:12, 17:8, 17:11, 22:15, 36:12, 36:13, 65:20, 66:2
**accompli** [1] - 101:18
**according** [1] - 137:23
**accordingly** [1] - 127:3
**accountable** [1] - 108:19
**accreditation** [1] - 136:23
**accrediting** [1] - 37:1
**accurate** [1] - 148:8
**accuse** [2] - 47:25, 51:18
**achieve** [1] - 13:22
**acknowledged** [1] - 8:21
**Act** [18] - 3:14, 16:15, 16:16, 16:22, 16:24, 17:7, 38:12, 115:21, 127:9, 127:10, 129:21, 130:6, 130:23, 130:24, 132:2, 132:3, 132:11
**act** [3] - 75:22, 84:14, 111:7
**acting** [1] - 87:5
**action** [7] - 5:6, 128:22, 130:1, 130:10, 132:22, 148:14, 148:17
**actions** [2] - 119:24, 127:16
**actively** [1] - 16:20
**activity** [1] - 129:21
**acts** [1] - 86:15
**actual** [1] - 140:7
**ADA** [2] - 17:6, 119:24
**adamantly** [1] - 108:23
**add** [3] - 17:15, 49:5, 124:20
**addict** [3] - 86:17, 86:22, 102:10
**addicted** [9] - 24:22, 40:16, 40:24, 41:7, 62:14, 68:23, 86:20, 92:8, 107:16
**addiction** [21] - 16:20, 25:3, 25:10, 25:11, 27:23, 29:24, 31:20, 32:22, 33:16, 34:12, 35:6, 41:18, 43:18,

49:25, 65:15, 81:19, 92:9, 114:23, 121:22, 132:9, 136:17
**Addiction** [1] - 136:7
**addictions** [2] - 13:10, 32:18
**addicts** [9] - 67:3, 68:9, 71:22, 90:9, 99:4, 123:14, 123:18, 136:15, 136:19
**addition** [2] - 13:13, 14:1
**additional** [4] - 70:24, 71:16, 140:5, 140:9
**address** [42] - 7:11, 8:14, 14:24, 31:4, 32:8, 32:12, 36:7, 42:23, 58:9, 61:13, 64:24, 67:22, 70:21, 81:12, 83:24, 85:6, 87:4, 89:18, 93:11, 96:3, 96:4, 100:16, 101:12, 102:1, 102:16, 103:25, 104:12, 105:15, 108:6, 111:24, 112:10, 113:13, 114:19, 117:9, 118:22, 120:12, 121:15, 122:20, 123:9, 124:1, 125:4, 126:4
**addressed** [3] - 14:20, 15:2, 19:4
**addressing** [1] - 13:23
**adds** [1] - 50:2
**adequate** [1] - 45:24
**adhered** [3] - 113:23, 138:2, 138:6
**adjourn** [1] - 131:5
**adjourning** [1] - 130:8
**ADJUSTMENT** [1] - 1:1
**administering** [1] - 26:24
**admission** [1] - 15:4
**adult** [1] - 62:3
**adults** [2] - 44:22, 46:13
**advances** [1] - 10:21
**advice** [4] - 127:21, 130:3, 130:14, 132:23
**advised** [1] - 132:4
**aesthetic** [1] - 14:9
**aesthetics** [1] - 16:1
**affected** [1] - 8:13
**affecting** [1] - 70:13

**affects** [1] - 91:23
**affiliate** [1] - 4:9
**afford** [1] - 141:21
**affordable** [1] - 62:17
**afraid** [3] - 34:8, 97:21, 99:10
**age** [2] - 44:3, 77:1
**aggressive** [1] - 75:5
**aging** [1] - 107:5
**ago** [12] - 33:11, 66:3, 74:2, 78:11, 89:22, 92:15, 96:16, 98:22, 102:7, 105:25, 113:16, 121:22
**agree** [14] - 8:6, 21:18, 21:23, 21:24, 32:14, 58:20, 66:1, 77:4, 88:10, 93:25, 95:15, 140:1, 142:15, 142:23
**agreed** [1] - 18:14
**agreement** [1] - 50:9
**agrees** [1] - 38:20
**ahead** [4] - 24:16, 79:22, 80:17, 134:8
**aides** [1] - 35:1
**AI** [4] - 2:11, 2:17, 46:22, 61:11
**alarm** [1] - 100:2
**alarms** [1] - 140:17
**alcohol** [8] - 11:18, 11:23, 17:14, 44:23, 45:9, 104:4, 132:9, 136:19
**Alcoholism** [1] - 13:15
**alcoholism** [1] - 13:16
**Alejandra** [2] - 2:12, 95:3
**alive** [1] - 86:23
**alley** [1] - 102:11
**allotted** [1] - 139:2
**allow** [4] - 10:5, 23:6, 87:3, 90:18
**allowed** [2] - 57:21, 62:24
**allowing** [1] - 82:9
**alls** [1] - 115:18
**almost** [6] - 18:25, 32:19, 101:2, 102:22, 120:15, 146:25
**alone** [1] - 92:16
**Amboy** [7] - 25:24, 66:4, 66:9, 71:2, 71:3, 71:4, 71:6
**AMERICA** [1] - 1:4
**America** [1] - 4:3
**American** [3] - 36:24, 127:9, 136:7
**Americans** [4] - 16:16,

130:24, 132:1, 132:10
**amount** [2] - 5:2, 40:25
**Amy** [1] - 37:4
**analysis** [1] - 15:8
**analyzed** [1] - 39:23
**Anderson** [1] - 2:24
**ANDERSON** [2] - 109:11, 109:12
**Anguish** [1] - 19:19
**Ann** [2] - 2:15, 57:6
**answer** [12] - 28:4, 48:12, 48:13, 62:23, 63:5, 63:17, 68:1, 68:3, 69:8, 69:9, 69:16, 126:11
**answered** [1] - 25:23
**ANTHONY** [1] - 1:13
**anticipate** [1] - 19:8
**anyway** [1] - 37:7
**apart** [2] - 90:15, 142:15
**appeal** [1] - 18:15
**applause** [66] - 26:4, 26:13, 26:18, 27:6, 28:2, 28:12, 28:20, 29:3, 29:10, 30:14, 33:5, 34:10, 35:18, 40:1, 42:3, 42:9, 43:25, 46:17, 47:5, 48:8, 48:14, 49:4, 51:16, 51:22, 52:17, 55:14, 56:4, 56:14, 57:1, 58:12, 58:21, 59:19, 60:19, 61:6, 61:18, 67:7, 70:15, 72:3, 75:23, 76:16, 77:11, 79:7, 80:10, 81:1, 83:13, 87:18, 88:4, 90:12, 97:5, 98:8, 104:6, 111:11, 114:6, 114:12, 115:23, 118:16, 120:6, 121:10, 122:3, 122:13, 123:2, 125:19, 138:16, 142:20, 147:8, 147:11
**Applicant** [1] - 1:20
**applicant** [24] - 4:7, 5:5, 7:16, 9:10, 9:16, 14:18, 15:1, 17:5, 18:14, 18:20, 21:14, 25:16, 26:14, 26:25, 27:9, 28:13, 63:1, 63:2, 63:10, 63:13, 130:22, 132:16, 143:20, 145:16
**applicant's** [8] - 10:9,

10:25, 14:10, 14:14, 18:6, 21:24, 22:21, 132:5
**application** [40] - 4:2, 4:21, 5:22, 7:15, 8:7, 8:21, 9:2, 15:13, 15:18, 16:8, 18:17, 19:12, 26:15, 26:16, 27:9, 30:16, 71:20, 75:21, 83:15, 83:17, 127:2, 128:8, 130:16, 130:17, 133:4, 133:7, 134:12, 134:17, 134:23, 134:24, 134:25, 135:1, 135:2, 135:4, 138:10, 138:15, 143:12, 143:21, 145:20, 147:10
**applications** [3] - 10:3, 18:12, 20:14
**apply** [1] - 138:8
**appreciate** [3] - 6:23, 7:19, 141:16
**appreciated** [1] - 73:11
**appropriate** [5] - 24:24, 26:10, 29:1, 95:14, 95:17
**approval** [7] - 9:12, 27:14, 29:5, 47:1, 50:5, 68:6, 70:5
**approve** [6] - 22:4, 62:2, 70:3, 84:8, 89:10, 122:24
**approved** [5] - 15:13, 15:18, 21:10, 114:4, 120:1
**approving** [1] - 48:22
**Arboleda** [1] - 2:15
**ARBOLEDA** [2] - 100:12, 100:17
**ARE** [1] - 2:2
**area** [44] - 18:11, 27:16, 29:1, 31:24, 32:1, 34:6, 34:17, 40:12, 52:5, 55:19, 60:6, 60:17, 66:8, 73:6, 78:10, 78:24, 78:25, 81:19, 82:12, 82:14, 82:18, 82:21, 86:11, 89:7, 95:14, 108:24, 108:25, 113:24, 114:22, 117:24, 117:25, 118:14, 134:20, 138:13, 139:9, 139:10, 140:11, 140:25, 141:24,

142:11, 142:17, 146:12, 146:13
**areas** [7] - 26:6, 27:24, 28:15, 28:24, 70:13, 139:13, 143:1
**armed** [2] - 45:3, 141:4
**arrest** [1] - 57:14
**article** [16] - 19:16, 19:20, 19:21, 36:24, 37:13, 38:16, 38:23, 55:24, 56:6, 73:25, 74:4, 74:6, 74:11, 74:25, 75:9, 75:20
**articles** [1] - 54:7
**articulate** [1] - 49:11
**aspect** [2] - 15:7, 50:11
**assessments** [3] - 137:4, 137:16, 138:1
**asset** [2] - 142:2, 142:3
**assign** [1] - 55:17
**Association** [2] - 36:19, 136:7
**association** [2] - 37:2, 136:10
**assure** [1] - 108:15
**ASTARITA** [3] - 111:16, 112:1, 112:3
**Astarita** [2] - 2:25, 111:16
**atmosphere** [1] - 98:24
**attempt** [1] - 134:24
**Attorney** [2] - 1:18, 1:20
**attorney** [12] - 4:4, 4:24, 18:6, 51:20, 65:19, 93:2, 126:20, 127:22, 130:3, 132:6, 148:13, 148:16
**attorney-client** [1] - 130:3
**Audience** [83] - 6:21, 14:11, 16:5, 17:19, 17:22, 20:1, 20:17, 21:12, 21:16, 22:5, 22:16, 23:4, 23:10, 26:4, 26:13, 26:18, 27:6, 28:2, 28:12, 28:20, 29:3, 29:10, 30:14, 33:5, 34:10, 35:18, 40:1, 42:3, 42:9, 43:25, 46:17, 47:5, 48:8, 48:14, 49:4, 51:16, 51:22, 52:17, 55:14, 56:4, 56:14, 57:1, 58:12,

58:21, 59:19, 60:19, 61:6, 61:18, 63:7, 64:1, 64:5, 67:7, 70:15, 72:3, 75:23, 76:16, 77:11, 79:7, 80:10, 81:1, 83:13, 85:14, 87:18, 88:4, 90:12, 97:5, 98:8, 104:6, 111:11, 114:6, 114:12, 115:23, 118:16, 120:6, 121:10, 122:3, 122:13, 123:2, 125:19, 138:16, 142:20, 147:8, 147:11

**AUDIENCE** [2] - 2:2, 3:1

**August** [3] - 55:25, 137:10, 137:20

**aunt** [4] - 86:23, 87:1, 87:3

**autism** [1] - 91:7

**automobile** [1] - 47:8

**available** [2] - 129:24, 139:20

**Avenue** [10] - 61:14, 68:22, 70:12, 70:22, 77:25, 107:3, 108:7, 112:1, 114:20, 115:12

**avenue** [1] - 87:23

**AVP** [1] - 107:7

**aware** [3] - 86:14, 88:24, 130:21

## B

**B-A-R-T-L-I-N-S-K-I** [1] - 64:23

**B-A-R-T-O-L-O-T-T-I** [1] - 89:13

**B-E-N-N-I-N-G-T-O-N** [1] - 81:11

**B-U-S-T-O-S** [1] - 95:4

**babies** [2] - 146:7, 146:10

**baby** [1] - 73:3

**background** [1] - 8:5

**backyard** [1] - 111:10

**bad** [1] - 80:23

**bait** [1] - 51:15

**balance** [1] - 145:14

**balancing** [3] - 12:6, 15:8, 15:16

**bar** [2] - 55:7, 66:7

**Barbara** [2] - 3:4, 113:11

**Barr** [1] - 2:14

**BARR** [9] - 55:7, 55:8,

55:15, 56:5, 56:15, 57:13, 58:13, 58:17, 58:22

**BARREE** [1] - 1:16

**bars** [1] - 62:4

**Bartlinski** [3] - 2:18, 64:22, 71:2

**BARTLINSKI** [11] - 64:22, 64:25, 65:4, 65:24, 67:8, 67:16, 67:20, 67:23, 68:2, 69:24, 70:7

**BARTOLOTTI** [3] - 89:12, 89:19, 90:13

**Bartolotti** [2] - 2:9, 89:13

**base** [2] - 28:18, 143:16

**baseball** [1] - 44:25

**based** [5] - 14:15, 15:20, 22:3, 41:5, 75:1

**bases** [1] - 84:12

**basic** [1] - 32:2

**basketball** [1] - 99:12

**bat** [2] - 30:11, 44:25

**battling** [1] - 115:1

**Bayhead** [1] - 100:18

**Beacon** [1] - 71:7

**bear** [3] - 7:16, 18:24, 134:13

**beat** [2] - 34:3, 86:21

**beautiful** [1] - 105:25

**became** [1] - 65:7

**become** [3] - 92:12, 92:13, 136:2

**becoming** [2] - 54:9, 75:10

**bed** [2] - 25:6, 34:5

**beds** [6] - 32:18, 39:15, 39:21, 62:17, 139:3, 141:20

**beg** [2] - 87:15, 90:17

**begging** [1] - 34:11

**begin** [3] - 87:7, 113:24, 146:23

**beginning** [1] - 119:11

**Behind** [1] - 55:25

**behind** [8] - 39:12, 54:15, 60:21, 61:24, 72:12, 105:23, 124:16, 129:20

**belief** [1] - 10:9

**believes** [1] - 17:5

**beneficial** [16] - 10:19, 11:15, 11:20, 11:22, 12:7, 12:21, 15:22, 22:1, 26:16, 26:17, 27:8, 27:12, 30:8, 73:19, 73:21, 144:9

**benefit** [2] - 7:21, 60:25

**benefits** [3] - 15:12, 15:17, 144:8

**Bennington** [2] - 2:25, 81:10

**BENNINGTON** [4] - 81:10, 81:13, 81:16, 83:2

**best** [7] - 27:2, 29:8, 29:14, 61:3, 61:23, 102:9, 121:5

**better** [5] - 37:9, 37:11, 112:15, 120:18, 120:22

**Biesiada** [3] - 44:18, 76:4, 120:12

**big** [9] - 32:1, 43:7, 45:22, 66:21, 70:3, 94:7, 95:9, 135:3, 145:22

**bigger** [2] - 33:22, 76:15

**biggest** [2] - 57:20, 142:2

**bill** [3] - 62:18, 68:4, 141:19

**Bill** [2] - 3:5, 114:17

**bit** [1] - 141:17

**black** [1] - 42:13

**bless** [1] - 24:23

**blessed** [1] - 79:5

**Block** [1] - 1:5

**blood** [1] - 87:1

**Board** [1] - 1:18

**BOARD** [2] - 1:1, 1:9

**board** [77] - 4:15, 4:25, 7:21, 7:22, 7:25, 8:2, 8:16, 9:7, 9:8, 12:13, 14:24, 15:1, 15:2, 15:19, 18:15, 19:14, 20:22, 21:5, 22:4, 22:13, 23:3, 29:6, 29:8, 31:16, 32:21, 37:10, 51:18, 53:3, 54:23, 55:19, 55:23, 59:17, 60:9, 62:2, 63:4, 63:5, 63:9, 67:22, 70:8, 84:5, 92:20, 96:23, 98:3, 103:9, 119:23, 120:15, 125:5, 126:9, 126:23, 127:2, 127:7, 127:12, 127:22, 127:25, 128:3, 128:20, 129:18, 129:22, 130:10, 130:14, 130:19, 131:7, 131:19,

131:24, 132:21, 134:5, 136:9, 137:24, 138:20, 140:16, 140:17, 142:21, 143:18, 143:23, 144:4

**board's** [6] - 11:2, 14:20, 60:21, 126:20, 127:16, 133:3

**boards** [3] - 10:4, 61:22, 98:3

**body** [1] - 127:17

**books** [1] - 34:24

**bookstore** [2] - 62:3, 62:5

**boomer** [1] - 73:3

**Bordentown** [1] - 70:12

**borderline** [1] - 71:4

**born** [3] - 110:19, 110:20

**BOROUGH** [1] - 1:1

**borough** [15] - 9:1, 9:22, 20:6, 24:14, 25:15, 28:16, 28:23, 29:13, 45:22, 45:23, 65:6, 65:13, 71:12, 72:12, 87:14

**Borough** [2] - 18:10, 64:15

**borough's** [1] - 25:23

**Boston** [6] - 55:25, 56:6, 73:24, 74:5, 75:2, 75:7

**bothers** [1] - 141:17

**bottom** [1] - 49:16

**bought** [6] - 51:25, 52:4, 65:10, 85:4, 115:4

**Boulevard** [8] - 1:23, 35:21, 46:23, 55:8, 91:3, 95:5, 96:5, 119:5

**boundary** [1] - 145:4

**boys** [1] - 106:1

**brazen** [1] - 147:1

**break** [4] - 41:12, 82:7, 95:21, 143:6

**breast** [1] - 96:25

**Brian** [1] - 139:16

**Briarwood** [5] - 93:19, 94:3, 94:21, 114:3, 124:11

**Bridges** [1] - 28:18

**brief** [7] - 7:9, 44:19, 53:18, 93:17, 98:21, 131:17, 140:13

**bring** [6] - 42:7, 50:9, 69:3, 109:15,

109:19, 137:6

**bringing** [2] - 33:9, 82:17

**brings** [2] - 49:22, 58:22

**broadly** [1] - 132:1

**broken** [1] - 44:5

**Bronx** [1] - 120:18

**Brook** [1] - 104:13

**Brooklyn** [6] - 61:1, 89:23, 89:24, 90:17, 110:20, 118:13

**brothel** [1] - 75:10

**brothels** [1] - 54:9

**brought** [2] - 54:17, 127:8

**Brunswick** [2] - 1:24, 87:10

**brutalized** [1] - 34:6

**Buchanan** [1] - 77:25

**bud** [1] - 90:11

**build** [3] - 48:10, 48:20, 63:21

**builder** [2] - 58:25, 59:1

**builders** [1] - 59:2

**building** [6] - 44:25, 46:14, 58:25, 100:19, 135:16, 135:17

**built** [3] - 48:21, 51:3, 80:21

**burden** [4] - 9:10, 11:15, 119:13, 119:16

**buried** [1] - 68:16

**bus** [6] - 51:8, 80:23, 99:20, 107:11, 110:1, 124:8

**business** [8] - 39:12, 47:8, 47:9, 50:11, 96:24, 128:2, 129:22, 136:22

**businessman** [1] - 50:12

**Bustos** [2] - 2:12, 95:4

**BUSTOS** [1] - 95:3

**busy** [1] - 135:19

**butt** [1] - 90:3

**buy** [1] - 81:25

## C

**C-A-V-E-N-Y** [1] - 101:11

**C-H-A-R-L-E-S** [1] - 104:24

**C-I-B-E-L-L-I** [1] - 96:2

**C-I-U-D-A-D** [1] - 83:23

**c-O-R-R-E-A** [1] - 104:11

**C-O-T-U-G-N-O** [1] - 101:25

**CA** [1] - 50:25

**California** [1] - 66:7

**Camelot** [3] - 51:12, 54:13, 107:3

**camera** [1] - 34:3

**cameras** [9] - 135:8, 135:9, 135:10, 135:14, 135:15, 135:16, 135:19, 135:22, 135:25

**Campbell** [2] - 2:12, 50:25

**CAMPBELL** [5] - 50:25, 51:17, 51:23, 52:18, 69:21

**cannot** [10] - 17:24, 43:19, 44:6, 68:21, 92:7, 97:8, 109:3, 117:15, 118:14, 134:23

**Cantor** [1] - 107:7

**capably** [1] - 13:22

**capacity** [1] - 25:4

**car** [3] - 41:12, 41:24, 94:8

**card** [1] - 87:3

**care** [11] - 16:10, 32:12, 32:16, 43:17, 56:1, 69:19, 72:21, 85:5, 88:8, 96:25, 135:15

**career** [1] - 65:12

**careful** [1] - 7:25

**carefully** [2] - 19:22, 126:7

**cares** [1] - 139:4

**Carise** [4] - 8:9, 14:2, 135:7, 137:7

**Carmen** [2] - 2:12, 50:25

**Carol** [2] - 2:23, 108:5

**case** [8] - 4:17, 4:18, 5:5, 9:13, 17:9, 22:2, 30:9, 127:1

**cases** [2] - 10:4, 11:25

**cash** [1] - 69:17

**Castle** [1] - 81:13

**Catallo** [2] - 129:9, 133:20

**CATALLO** [5] - 1:12, 129:10, 131:11, 133:21, 145:21

**categories** [1] - 11:7

**caused** [1] - 13:9

**causes** [1] - 13:24

**CAVENEY** [2] -

101:10, 101:13

**Caveney** [2] - 2:16, 101:10

**cells** [1] - 135:17

**cemeterian** [2] - 42:20, 43:4

**Cemetery** [2] - 42:22, 43:5

**cemetery** [1] - 43:6

**center** [27] - 25:3, 25:25, 26:10, 28:14, 41:23, 42:1, 42:6, 42:11, 54:11, 75:1, 75:4, 76:22, 79:25, 92:9, 94:19, 95:16, 97:10, 97:20, 99:6, 103:8, 104:4, 119:19, 120:4, 124:15, 146:5, 146:12, 146:15

**Centers** [2] - 4:2, 56:2

**CENTERS** [1] - 1:4

**centers** [2] - 56:20, 80:21

**CEO** [1] - 139:16

**certain** [6] - 4:12, 8:24, 66:15, 67:3, 127:19, 132:11

**certainly** [14] - 5:21, 6:6, 6:17, 7:13, 8:21, 22:23, 28:15, 63:2, 79:2, 127:11, 138:7, 141:21, 145:18, 146:25

**Certified** [3] - 1:21, 1:23, 148:6

**certified** [2] - 96:24, 120:15

**certify** [2] - 148:7, 148:12

**cetera** [1] - 50:1

**Chair** [1] - 128:11

**chair** [2] - 5:7, 42:14

**CHAIRMAN** [32] - 4:1, 5:9, 23:11, 23:13, 23:24, 30:15, 77:18, 81:2, 83:14, 95:20, 125:20, 125:23, 125:25, 127:5, 128:6, 128:9, 129:1, 129:4, 129:6, 131:9, 131:14, 133:2, 133:5, 133:9, 133:14, 133:16, 133:25, 134:8, 134:10, 138:24, 139:24, 147:9

**chairman** [5] - 4:24, 6:8, 128:4, 130:18, 138:20

**Chairman** [15] - 1:10, 1:11, 4:6, 4:10, 7:20, 8:24, 22:19, 126:25, 127:11, 133:1, 133:5, 134:9, 138:23, 139:24, 140:2

**chairs** [1] - 91:21

**chambers** [1] - 129:20

**chance** [7] - 7:6, 7:11, 20:19, 23:7, 63:15, 138:14, 138:15

**change** [6] - 33:13, 60:3, 68:20, 79:10, 145:2, 145:14

**changing** [1] - 71:22

**charge** [1] - 139:18

**charged** [1] - 45:17

**charity** [1] - 69:18

**CHARLES** [1] - 104:23

**Charles** [2] - 2:21, 104:23

**cheer** [1] - 52:8

**chief** [1] - 4:19

**child** [2] - 43:13, 125:9

**children** [50] - 27:22, 29:23, 31:23, 35:15, 43:10, 43:11, 44:11, 45:18, 57:23, 57:24, 57:25, 58:3, 59:7, 59:14, 59:15, 68:16, 73:7, 73:9, 73:12, 78:11, 79:9, 89:6, 90:11, 90:13, 90:20, 92:5, 97:21, 100:21, 100:22, 100:23, 101:1, 101:3, 107:15, 108:14, 109:1, 109:2, 112:15, 112:24, 113:21, 116:7, 121:7, 121:24, 124:7, 124:9, 145:25, 146:4, 146:8, 146:24, 147:6

**children's** [1] - 30:12

**choice** [1] - 22:4

**choose** [3] - 9:20, 37:3, 121:5

**chooses** [1] - 25:8

**chose** [4] - 43:18, 65:12, 106:3

**chosen** [1] - 136:23

**Christine** [1] - 11:1

**Christmas** [1] - 87:3

**Christopher** [2] - 2:16, 59:24

**church** [1] - 93:23

**Cibelli** [2] - 2:13, 96:2

**CIBELLI** [5] - 96:1,

96:4, 96:8, 97:6, 97:19

**cinema** [1] - 70:11

**citizen** [1] - 48:23

**citizens** [5] - 48:22, 108:18, 120:2, 125:11, 139:11

**City** [4] - 55:12, 55:13, 66:9, 113:18

**city** [4] - 26:3, 66:3, 106:12, 110:1

**CIUDAD** [3] - 83:22, 83:25, 84:4

**Ciudad** [2] - 2:4, 83:22

**class** [2] - 16:11, 107:8

**Clean** [2] - 3:14, 38:12

**clear** [6] - 12:25, 15:16, 16:3, 16:19, 25:1, 46:8

**Clerk** [1] - 1:14

**client** [2] - 50:15, 130:3

**clients** [2] - 50:16, 82:6

**clinic** [6] - 66:5, 66:11, 66:14, 71:3, 71:8, 71:14

**Clinic** [1] - 66:4

**cloaks** [1] - 26:15

**close** [21] - 26:12, 27:15, 27:19, 28:10, 28:23, 31:11, 31:12, 45:6, 45:25, 54:17, 72:17, 81:20, 90:6, 93:20, 101:16, 125:21, 125:24, 138:11, 140:18, 144:13, 146:15

**closed** [16] - 4:19, 126:2, 126:16, 127:6, 127:12, 128:1, 128:7, 128:16, 128:21, 129:2, 129:19, 130:8, 130:13, 130:25, 131:7, 131:23

**closest** [1] - 94:16

**closing** [3] - 6:7, 6:17, 29:4

**Club** [10] - 51:1, 51:10, 52:1, 54:12, 93:18, 94:10, 94:20, 100:18, 121:1, 124:15

**clubs** [1] - 76:23

**COAH** [1] - 59:2

**cocaine** [2] - 25:10, 62:14

**Cofone** [2] - 11:1, 12:2

**cold** [1] - 93:3

**colleagues** [1] - 60:21

**college** [2] - 52:2, 115:9

**Colts** [1] - 110:19

**coming** [15] - 33:25, 52:9, 52:10, 52:21, 58:23, 61:2, 66:14, 71:6, 74:3, 74:20, 76:11, 76:13, 80:25, 88:6, 141:13

**Commencing** [1] - 1:8

**comment** [2] - 62:16, 128:12, 140:3

**comments** [5] - 19:9, 62:25, 125:5, 126:4, 126:8

**commercial** [1] - 16:9

**commission** [1] - 136:23

**Commission** [1] - 136:24

**COMMISSIONER** [23] - 23:23, 126:1, 128:10, 128:11, 128:25, 129:8, 129:10, 129:12, 129:14, 129:16, 131:11, 133:10, 133:11, 133:18, 133:21, 133:23, 134:2, 134:4, 140:12, 142:21, 143:10, 145:21, 146:16

**commit** [1] - 94:12

**communities** [3] - 80:5, 94:11, 109:14

**community** [69] - 8:22, 14:8, 22:13, 24:21, 26:7, 26:8, 26:9, 27:3, 27:13, 27:18, 27:21, 28:15, 29:7, 29:9, 29:16, 29:18, 29:21, 30:10, 30:11, 44:7, 48:24, 50:8, 52:21, 52:23, 53:1, 53:6, 54:25, 60:3, 73:1, 73:13, 73:14, 75:1, 75:4, 75:21, 77:9, 83:8, 88:8, 92:21, 93:24, 95:5, 98:22, 99:21, 103:3, 104:16, 109:16, 109:17, 109:20, 109:24, 110:10, 110:14, 110:15, 112:25, 113:2, 113:3, 113:5,

113:17, 114:3,
114:10, 119:18,
119:20, 121:6,
134:21, 136:2,
144:22, 145:1,
146:20
**community's** [1] -
43:23
**community-based** [1]
- 75:1
**commute** [1] - 51:8
**commuted** [1] -
113:18
**companies** [2] -
136:8, 136:10
**company** [6] - 53:3,
62:21, 67:9, 67:11,
107:8, 113:20
**compassionate** [1] -
88:7
**compatible** [1] - 14:16
**compelling** [1] -
146:21
**complained** [1] - 56:9
**complete** [2] - 47:3,
137:19
**completed** [1] - 5:12
**completely** [6] -
88:13, 88:14, 105:5,
111:5, 120:14,
121:23
**complex** [3] - 45:5,
141:5
**complexes** [1] - 46:7
**compound** [1] - 139:5
**comprehensive** [1] -
13:12
**compromised** [2] -
135:21, 138:13
**concept** [1] - 27:8
**concern** [14] - 13:10,
33:20, 45:13, 45:21,
48:2, 57:9, 57:19,
57:20, 67:4, 94:7,
107:18, 107:23,
140:10
**concerned** [6] - 54:1,
90:2, 107:14,
124:10, 124:13,
146:17
**concerning** [2] -
63:19, 106:4
**concerns** [7] - 6:19,
14:21, 15:3, 89:4,
89:5, 135:4, 142:24
**conclude** [2] - 128:2,
128:3
**concluded** [1] -
147:12
**concludes** [1] -

147:10
**conclusion** [1] - 19:20
**concrete** [1] - 28:7
**concur** [1] - 18:21
**conditionally** [2] -
17:18, 18:22
**conditions** [6] - 12:15,
14:17, 14:23,
134:24, 145:12,
147:3
**condo** [1] - 60:15
**conducive** [2] - 66:17,
94:3
**conducted** [1] -
129:22
**conferred** [1] - 10:3
**confirmed** [2] - 11:1,
12:8
**conscience** [2] - 83:9,
101:19
**conscious** [1] - 121:4
**consequence** [1] -
37:3
**consider** [5] - 27:14,
51:15, 53:4, 53:5,
100:3
**considerable** [1] -
40:25
**consideration** [3] -
9:2, 30:13, 36:17
**considerations** [2] -
25:22, 145:7
**considered** [3] - 60:4,
103:3, 132:9
**consistently** [1] -
11:14
**constantly** [3] - 41:10,
75:17, 125:9
**constituted** [1] - 37:16
**construct** [1] - 9:17
**consultant** [1] - 6:4
**contact** [1] - 50:6
**CONTENTS** [2] - 2:1
**context** [1] - 127:15
**continue** [21] - 36:2,
40:10, 43:2, 61:4,
64:6, 64:7, 65:3,
76:9, 78:5, 81:15,
84:3, 89:21, 93:15,
96:7, 98:19, 102:5,
102:21, 105:18,
117:12, 119:10,
121:19
**control** [1] - 137:19
**conversation** [2] -
77:1, 77:2
**convince** [1] - 38:25
**convinced** [1] -
140:25
**convincing** [1] - 16:4

**cop** [2] - 54:19, 86:14
**copy** [2] - 74:5, 74:15
**CORNELL** [1] - 1:15
**corner** [2] - 49:2,
69:10
**corporation** [4] -
62:20, 67:5, 67:9
**Correa** [1] - 2:20
**CORREA** [2] - 104:11,
104:13
**correct** [8] - 36:6,
37:25, 38:1, 39:7,
67:17, 132:6,
141:19, 142:17
**correctly** [2] - 38:5,
66:6
**Corrigan** [2] - 129:11,
133:22
**CORRIGAN** [6] - 1:12,
126:1, 129:12,
133:10, 133:23,
146:16
**cost** [3] - 29:12, 50:13,
140:7
**Cotugno** [2] - 2:17,
101:24
**COTUGNO** [3] -
101:24, 102:2, 102:6
**council** [2] - 58:24,
127:17
**Council** [1] - 13:14
**councilman** [1] - 84:7
**counsel** [5] - 119:12,
119:22, 143:19,
148:14, 148:16
**Counsel** [1] - 18:8
**counseling** [1] - 35:2
**counselor** [2] - 42:21,
43:4
**counties** [1] - 13:19
**country** [3] - 13:3,
20:25, 34:15
**counts** [1] - 110:13
**county** [1] - 8:22
**County** [4] - 8:11,
13:2, 14:4, 40:14
**couple** [3] - 54:6,
83:3, 144:12
**course** [2] - 5:6, 7:24
**court** [3] - 33:13,
99:12, 117:23
**Court** [19] - 1:23,
15:12, 32:9, 44:18,
81:13, 89:20, 98:17,
101:13, 102:17,
104:13, 104:24,
109:12, 117:10,
119:24, 120:12,
121:16, 123:10,
124:2, 148:6

**courtesy** [1] - 18:5
**courtroom** [1] - 93:2
**courts** [3] - 10:17,
11:14, 12:5
**cousins** [1] - 86:21
**coverage** [1] - 55:20
**covered** [1] - 142:22
**crazy** [3] - 62:18, 80:3,
86:15
**create** [3] - 41:20,
136:12, 136:20
**credibility** [3] -
137:21, 138:9
**crime** [10] - 25:12,
47:12, 49:13, 49:14,
49:17, 49:18, 49:21,
82:17, 89:25, 147:1
**crimes** [2] - 40:17,
94:12
**criminal** [1] - 50:2
**crisis** [3] - 8:22, 19:13,
20:24
**criteria** [7] - 10:13,
10:16, 11:8, 11:9,
11:16, 19:2, 136:5
**critical** [4] - 8:13,
16:10, 32:12, 32:16
**cross** [1] - 52:22
**crow** [1] - 66:19
**crowd** [3] - 76:12,
76:14, 103:6
**cured** [1] - 38:22
**current** [1] - 46:11

## D

**d(1** [5] - 9:9, 10:10,
10:18, 11:6, 135:2
**D-A-N-I-E-L-S** [1] -
121:14
**D-A-N-T-Z-L-E-R** [1] -
117:22
**D-A-R-K-I-N-S** [1] -
93:10
**dad** [2] - 86:1, 86:4
**dais** [1] - 129:20
**damaged** [1] - 68:4
**damn** [1] - 79:11
**Danbridge** [1] - 74:22
**dance** [2] - 109:23,
120:19
**dancing** [1] - 71:25
**danger** [4] - 35:16,
46:8, 106:18, 147:6
**dangerous** [1] - 81:18
**Daniel** [2] - 2:25,
111:16
**DANIELS** [3] - 121:13,
121:16, 121:20
**Daniels** [1] - 121:13

**DANTZLER** [2] -
117:21, 118:2
**Dantzler** [2] - 3:8,
117:22
**Danvers** [3] - 137:9,
137:18, 138:8
**Daphne** [2] - 2:19,
103:23
**dark** [1] - 115:13
**DARKINS** [3] - 93:9,
93:12, 93:16
**Darkins** [2] - 2:11,
93:9
**data** [1] - 25:16
**date** [1] - 148:10
**Date** [1] - 148:21
**daughter** [14] - 43:20,
52:1, 86:24, 89:23,
91:7, 96:15, 104:16,
107:10, 107:11,
107:14, 109:21,
109:22, 111:19,
116:8
**daughter's** [2] - 106:9,
109:20
**daughters** [4] - 76:19,
107:5, 107:17, 115:8
**David** [4] - 2:14, 4:7,
55:7, 117:8
**DAVID** [1] - 1:19
**Dawn** [2] - 3:8, 117:21
**days** [4] - 33:7, 43:22,
72:23, 72:24
**de** [1] - 15:15
**dead** [4] - 110:15,
113:2, 115:11,
115:13
**deal** [7] - 21:6, 32:1,
32:20, 51:19, 63:24,
144:1, 144:3
**dealers** [2] - 41:25,
54:19
**deals** [2] - 38:17,
38:23
**dealt** [5] - 45:8, 45:10,
46:12, 46:13, 58:15
**deaths** [3] - 14:3,
75:9, 137:9
**Debbie** [2] - 3:8,
123:24
**DEBORAH** [1] - 1:22
**December** [5] - 4:17,
23:16, 23:18,
136:14, 137:8
**decent** [1] - 107:8
**decide** [1] - 97:9
**decided** [2] - 35:4,
93:19
**decides** [1] - 127:25
**decision** [15] - 12:5,

47:14, 87:14, 91:25, 92:1, 92:20, 103:6, 103:9, 103:17, 108:17, 108:21, 109:5, 143:13, 143:16, 144:7
**decisions** [1] - 119:24
**declares** [1] - 13:16
**decorum** [1] - 7:1
**deemed** [2] - 11:24, 27:12
**deep** [2] - 121:3
**define** [2] - 37:2, 60:18
**defines** [2] - 16:22, 16:25
**definitely** [4] - 41:3, 74:12, 93:24, 140:14
**degree** [2] - 35:5, 90:1
**deliberations** [1] - 8:1
**demeaning** [1] - 47:23
**demolished** [2] - 26:21, 27:5
**demonstrated** [4] - 9:16, 16:3, 21:14, 21:19
**demonstrates** [1] - 13:1
**demonstration** [1] - 15:24
**Denhard** [1] - 117:22
**Deni** [1] - 8:9
**denied** [1] - 78:20
**dense** [1] - 139:12
**densely** [3] - 27:15, 28:24, 34:16
**deny** [2] - 133:6, 133:13
**denying** [2] - 29:11, 135:1
**department** [2] - 55:16, 87:10
**Department** [1] - 11:24
**departure** [2] - 10:6, 11:13
**described** [2] - 132:24, 143:25
**DESCRIPTION** [1] - 3:11
**desperate** [2] - 89:1, 136:16
**desperately** [2] - 70:9, 95:17
**destroy** [2] - 43:22, 147:4
**detailed** [1] - 14:19
**detective** [2] - 40:17, 40:20
**determination** [1] -

18:10
**determine** [2] - 12:17, 26:8
**determined** [3] - 18:13, 26:22, 29:21
**determining** [2] - 12:6, 27:2
**detox** [1] - 33:1
**detriment** [2] - 12:19, 144:15
**detrimental** [7] - 12:11, 12:14, 12:17, 12:18, 15:10, 19:5, 29:7
**detriments** [4] - 15:11, 15:17, 144:12, 145:11
**development** [6] - 66:8, 72:11, 86:13, 91:12, 92:15, 124:16
**diagnosis** [1] - 32:23
**diction** [1] - 33:18
**died** [2] - 37:6, 85:25
**different** [9] - 16:8, 27:17, 32:1, 38:18, 59:1, 80:7, 98:24, 103:10, 143:14
**difficult** [2] - 19:24, 60:13
**dig** [2] - 121:3, 121:4
**direct** [2] - 8:10, 126:10
**directing** [1] - 126:19
**direction** [1] - 61:21
**directly** [4] - 45:19, 46:12, 100:18, 101:3
**Disabilities** [5] - 16:16, 127:9, 130:24, 132:2, 132:10
**disabilities** [1] - 32:14
**Disability** [1] - 115:21
**disable** [1] - 144:21
**disabled** [7] - 16:13, 16:17, 16:21, 17:4, 47:24, 106:17, 132:10
**disaster** [1] - 34:17
**disclose** [1] - 124:14
**discretion** [2] - 5:8, 23:9
**discriminate** [3] - 25:8, 61:15, 69:25
**discriminating** [1] - 106:17
**Discrimination** [3] - 16:18, 130:25, 132:18
**discrimination** [2] - 16:23, 16:25

**discriminatory** [1] - 29:22
**discuss** [6] - 127:7, 128:7, 132:16, 132:20, 132:21, 142:23
**discussed** [8] - 9:3, 10:13, 14:25, 15:6, 19:1, 130:13, 132:1
**discussing** [3] - 130:15, 130:16, 131:1
**discussion** [2] - 127:22, 130:12
**discussions** [1] - 9:7
**disease** [2] - 45:10, 66:22
**diseases** [1] - 97:7
**disgusted** [1] - 85:23
**dishes** [1] - 62:10
**dispute** [2] - 8:16, 15:21
**distable** [1] - 144:22
**distance** [2] - 71:1, 106:8
**distraught** [1] - 44:4
**distressing** [1] - 142:4
**district** [1] - 10:7
**dmasterton@ comcast.net** [1] - 1:25
**doctor** [1] - 139:1
**doctors** [2] - 71:17, 110:23
**document** [1] - 36:17
**documentation** [1] - 4:12
**documented** [1] - 58:11
**documents** [3] - 37:17, 37:20, 56:8
**dog** [2] - 43:20, 86:1
**dogs** [2] - 44:10, 80:6
**Dolan** [2] - 114:20, 115:12
**dollar** [2] - 79:12, 93:3
**dollars** [1] - 35:9
**done** [9] - 4:13, 18:25, 61:4, 63:24, 69:22, 76:11, 76:22, 127:18, 143:18
**door** [4] - 54:13, 82:3, 107:19, 110:5
**Doses** [1] - 19:19
**doses** [1] - 43:6
**doubt** [4] - 36:7, 87:13, 108:24, 144:9
**down** [17] - 34:5, 41:10, 44:2, 44:24, 42:15, 66:11, 76:13,

76:23, 82:20, 83:5, 84:10, 94:18, 114:21, 115:13, 121:4, 144:2, 146:1
**downloaded** [1] - 54:6
**dozens** [1] - 46:6
**Dr** [4] - 8:9, 14:2, 135:7, 137:7
**draws** [1] - 144:17
**dress** [1] - 41:1
**Drive** [19] - 24:13, 31:5, 40:8, 42:24, 51:2, 53:13, 59:25, 83:25, 85:21, 88:22, 93:12, 100:18, 102:2, 104:1, 112:11, 113:14, 118:23, 122:9, 122:21
**drive** [4] - 47:21, 49:7, 71:1, 105:4
**drive-in** [1] - 71:1
**driving** [2] - 47:21, 76:23
**drug** [72] - 11:18, 11:23, 13:9, 13:17, 14:3, 17:14, 19:25, 21:2, 24:20, 24:25, 25:2, 25:10, 27:17, 27:23, 28:8, 28:9, 29:2, 29:24, 30:1, 30:7, 31:20, 33:16, 33:17, 36:20, 36:22, 36:23, 41:8, 41:25, 44:2, 48:5, 48:11, 49:22, 49:24, 52:11, 52:23, 54:18, 54:19, 56:19, 57:11, 57:15, 57:18, 58:5, 59:6, 70:25, 71:14, 71:22, 76:21, 76:24, 78:10, 82:1, 86:17, 88:24, 90:9, 95:9, 95:15, 99:4, 102:10, 102:11, 104:4, 107:16, 114:1, 114:24, 119:19, 120:4, 121:22, 123:13, 123:18, 124:14, 132:8, 136:15, 136:19, 145:23
**Drug** [1] - 13:15
**drug-free** [1] - 27:23
**drugs** [34] - 40:16, 40:25, 41:7, 43:14, 44:23, 45:1, 45:9, 49:9, 49:13, 50:1, 54:9, 54:18, 56:23, 58:1, 58:2, 58:3,

68:23, 69:3, 78:19, 78:22, 79:5, 80:3, 81:21, 82:17, 86:20, 89:24, 90:14, 90:20, 92:12, 94:1, 99:13, 110:17, 142:14
**dual** [2] - 32:23
**due** [1] - 23:3
**duly** [57] - 24:7, 30:20, 32:4, 35:25, 40:3, 42:16, 44:13, 46:19, 50:22, 53:9, 55:4, 57:3, 59:21, 61:7, 64:19, 70:17, 72:5, 75:25, 77:21, 79:15, 80:12, 81:6, 83:19, 85:15, 87:20, 88:17, 89:15, 90:23, 93:6, 94:25, 95:23, 98:10, 100:9, 101:7, 101:21, 102:20, 103:20, 104:8, 104:20, 105:7, 106:23, 108:1, 109:8, 111:13, 112:5, 113:8, 114:14, 115:25, 117:4, 117:18, 118:18, 119:1, 120:8, 122:5, 122:15, 123:4, 123:21
**duped** [2] - 48:16
**during** [4] - 9:4, 60:2, 137:19, 141:2
**dying** [1] - 32:17

**E**

**e-mails** [1] - 50:7
**E-S-P-O-S-I-T-O** [1] - 30:24
**earned** [1] - 43:21
**ears** [3] - 74:21, 91:11, 91:17
**easily** [1] - 102:25
**East** [1] - 1:24
**easy** [2] - 28:5, 29:14
**economic** [1] - 13:9
**ed** [2] - 31:16, 47:7
**Edge** [1] - 104:24
**Edison** [1] - 28:18
**educate** [2] - 45:18, 90:10
**educated** [2] - 33:10, 90:14
**education** [2] - 41:5, 140:17
**educator** [3] - 45:13, 45:14, 46:11

**EEO** [1] - 120:3

**effect** [2] - 12:11, 12:14

**effected** [1] - 47:2

**effects** [1] - 12:17

**effort** [1] - 36:14

**egress** [3] - 25:14, 30:3, 46:2

**eight** [2] - 115:5, 123:15

**Eisenhower** [22] - 28:6, 31:15, 60:22, 72:12, 73:5, 73:9, 100:21, 102:9, 107:6, 109:2, 109:22, 110:8, 111:20, 111:21, 112:18, 112:20, 114:2, 116:8, 120:25, 121:25, 124:9, 124:16

**either** [2] - 17:1, 48:13

**elaborate** [1] - 78:18

**elder** [1] - 62:11

**elderly** [9] - 43:16, 71:11, 71:21, 82:25, 98:1, 100:5, 116:16, 146:24

**element** [2] - 21:22, 144:17

**elementary** [11] - 44:20, 45:1, 45:6, 46:2, 46:9, 46:11, 57:25, 94:5, 119:21, 138:12, 140:19

**Elementary** [1] - 120:25

**elements** [4] - 7:15, 9:11, 12:2, 14:4

**Elias** [4] - 2:4, 2:8, 40:6, 83:22

**eligible** [1] - 57:14

**Elizabeth** [1] - 98:23

**eloquent** [2] - 53:16, 103:13

**eloquently** [1] - 89:4

**embarrassed** [1] - 75:20

**emergency** [1] - 32:15

**EMMA** [6] - 1:13, 128:10, 129:14, 133:11, 134:2, 142:21

**Emma** [2] - 129:13, 134:1

**emotional** [2] - 78:7, 143:19

**emotionally** [1] - 64:10

**emotions** [1] - 143:16

**empathize** [1] - 32:19

**employee** [5] - 91:15, 130:1, 135:23, 148:13, 148:15

**employees** [3] - 49:20, 56:7

**end** [4] - 20:2, 115:11, 115:13

**ended** [3] - 74:25, 75:13, 125:9

**ends** [1] - 45:7

**energy** [2] - 102:24, 110:13

**enforced** [1] - 17:12

**engineer** [3] - 6:5, 14:10, 14:14

**Engineer** [1] - 1:15

**enjoy** [2] - 87:8, 91:5

**ensue** [1] - 12:12

**enters** [1] - 131:7

**entertain** [1] - 73:10

**entertainment** [1] - 47:9

**entire** [3] - 47:15, 50:2, 141:4

**entirely** [1] - 141:1

**entitled** [2] - 16:11, 55:25

**entity** [2] - 9:19, 127:16

**entrance** [1] - 28:8

**epidemic** [7] - 13:1, 43:7, 43:8, 44:5, 88:24, 97:7, 120:23

**Ernston** [9] - 1:5, 4:3, 4:8, 39:19, 39:20, 49:2, 78:25, 113:21, 145:5

**escape** [1] - 143:3

**escorted** [1] - 141:14

**especially** [4] - 27:4, 41:7, 41:16, 104:16

**Esposito** [5] - 2:5, 30:23, 30:25, 129:15, 134:3

**ESPOSITO** [12] - 1:13, 30:23, 31:1, 31:5, 31:9, 31:12, 31:14, 128:11, 128:25, 129:16, 134:4, 140:12

**ESQUIRE** [2] - 1:18, 1:19

**essential** [1] - 7:14

**establish** [3] - 11:16, 27:23, 28:14

**established** [8] - 7:16, 11:3, 12:3, 13:12, 13:14, 14:7, 19:3, 27:11

**estate** [1] - 45:23

**et** [1] - 50:1

**Eugene** [2] - 2:10, 44:17

**evaluate** [1] - 12:21

**evening** [9] - 4:7, 4:9, 8:20, 19:10, 24:1, 24:8, 30:17, 88:3, 126:9

**everywhere** [1] - 20:24

**evidence** [1] - 16:4

**exactly** [1] - 98:5

**exaggerating** [1] - 73:3

**example** [2] - 13:4, 129:25

**except** [1] - 49:20

**exception** [2] - 20:12, 130:6

**exceptions** [1] - 127:19

**exclude** [1] - 127:20

**excluded** [1] - 131:24

**excuse** [1] - 65:18

**executive** [1] - 139:17

**exemptions** [1] - 129:24

**Exhibits** [1] - 38:14

**exist** [2] - 9:20, 38:24

**existing** [1] - 14:17

**expand** [3] - 60:11, 60:12, 127:14

**expanded** [1] - 60:12

**experience** [3] - 41:6, 79:4, 135:13

**experiences** [1] - 64:9

**expertise** [1] - 84:11

**explain** [2] - 76:24, 116:10

**explanations** [1] - 76:23

**explicit** [1] - 8:9

**explored** [1] - 139:14

**express** [2] - 13:6, 105:22

**expressed** [1] - 103:14

**expressly** [2] - 11:21, 17:13

**extend** [2] - 9:2, 18:5

**extends** [1] - 17:11

**extensively** [1] - 141:25

**extent** [1] - 5:1

**extra** [4] - 55:17, 55:18, 55:19, 55:20

**extreme** [1] - 41:17

**extremely** [2] - 49:11, 142:3

**eyes** [5] - 72:18, 72:19, 74:20, 97:14, 142:10

## F

**face** [2] - 8:11, 28:11

**facilities** [19] - 33:1, 33:25, 34:21, 34:23, 35:8, 56:3, 56:19, 63:20, 72:17, 72:20, 75:7, 89:2, 120:16, 132:8, 132:14, 140:5, 140:6, 140:10, 140:16

**facility** [80] - 9:17, 9:21, 11:19, 24:21, 24:25, 25:2, 25:4, 25:6, 25:7, 25:14, 26:1, 26:17, 26:19, 26:21, 27:4, 27:11, 27:14, 27:17, 27:25, 28:5, 28:8, 28:9, 28:17, 29:2, 29:24, 30:1, 30:8, 31:19, 31:23, 43:16, 45:15, 45:24, 47:11, 48:5, 48:11, 51:3, 52:12, 52:24, 53:6, 54:16, 55:16, 56:12, 56:13, 56:17, 56:22, 57:9, 59:6, 62:14, 63:19, 73:10, 74:22, 75:16, 81:18, 82:1, 82:6, 82:11, 88:11, 88:13, 105:20, 106:7, 106:16, 109:4, 116:16, 118:9, 118:14, 121:23, 124:10, 126:13, 136:1, 136:13, 136:21, 137:18, 138:2, 138:11, 139:15, 143:1, 143:9, 144:15, 144:17

**facing** [3] - 13:17, 20:25, 88:25

**fact** [11] - 11:16, 15:2, 21:18, 38:17, 43:14, 49:12, 58:11, 78:12, 78:23, 103:4, 118:11

**facts** [7] - 15:21, 137:21, 143:13, 143:14, 143:16, 144:3, 147:3

**factual** [1] - 132:20

**failed** [1] - 53:23

**Fair** [7] - 16:14, 16:24, 17:7, 127:9, 130:23,

**132:2, 132:11

**fair** [3] - 82:22, 97:9, 108:17

**fait** [1] - 101:18

**fall** [1] - 11:7

**familiar** [2] - 40:21, 115:12

**families** [13] - 48:24, 60:24, 75:16, 90:15, 108:25, 109:18, 109:19, 110:10, 111:2, 142:15, 144:19, 144:20, 144:23

**family** [19] - 33:15, 39:22, 42:21, 43:3, 46:6, 47:19, 52:9, 60:14, 61:3, 65:9, 81:20, 95:10, 95:11, 107:9, 110:18, 117:15, 120:15, 120:17, 144:25

**Family's** [1] - 19:19

**family's** [2] - 61:16, 72:24

**fantastic** [1] - 76:11

**far** [10] - 8:1, 9:24, 21:24, 37:14, 53:25, 113:22, 121:4, 134:22, 141:12

**farm** [1] - 96:12

**faster** [1] - 39:1

**father** [1] - 106:10

**fathom** [1] - 107:20

**favor** [2] - 59:13, 64:14

**fear** [5] - 86:3, 87:4, 91:10, 99:1, 121:8

**fearful** [1] - 113:4

**February** [2] - 137:10, 137:20

**federal** [4] - 8:25, 9:12, 16:13, 54:3

**Federal** [6] - 16:22, 17:7, 127:9, 130:23, 132:2, 132:17

**feedback** [1] - 4:14

**feelings** [2] - 103:14, 105:22

**feet** [3] - 56:24, 66:19, 146:6

**Fela** [5] - 59:25, 72:9, 93:12, 122:9, 122:21

**fellow** [1] - 142:21

**Fernandez** [1] - 98:17

**few** [9] - 4:12, 18:25, 20:14, 29:24, 36:15, 67:3, 74:11, 86:5, 142:7, 143:22

**fight** [5] - 29:17,

63:25, 64:10, 64:11, 115:22
**fighting** [1] - 99:13
**figure** [1] - 143:6
**FILE** [1] - 1:3
**fill** [3] - 39:15, 94:14, 94:15
**final** [4] - 15:7, 64:3, 128:14, 128:17
**financial** [1] - 140:24
**financially** [1] - 148:16
**fine** [2] - 7:4, 70:10
**finished** [2] - 18:1, 131:6
**fireman** [1] - 65:7
**Fireman** [1] - 55:13
**first** [29] - 5:11, 6:19, 7:22, 23:20, 23:25, 35:23, 38:16, 49:10, 51:4, 53:15, 53:16, 55:15, 62:9, 70:1, 74:10, 76:3, 76:12, 85:3, 85:4, 105:10, 107:2, 108:4, 108:10, 113:25, 118:12, 123:8, 134:15, 143:12, 146:16
**firsthand** [1] - 142:14
**fit** [1] - 145:9
**Fitzgerald** [1] - 107:7
**five** [5] - 72:15, 91:6, 107:11, 116:7, 123:14
**Five** [1] - 56:1
**Five-Star** [1] - 56:1
**five-year-old** [1] - 107:11
**fix** [1] - 111:8
**fixed** [1] - 111:9
**flies** [1] - 66:19
**flim** [1] - 116:21
**flim-flomming** [1] - 116:21
**flipping** [1] - 116:22
**flomming** [1] - 116:21
**Floor** [1] - 1:7
**folks** [5] - 61:23, 62:22, 64:10, 68:6, 75:18
**follow** [2] - 5:20, 100:6
**followed** [1] - 19:22
**following** [5] - 10:4, 11:4, 99:3, 99:15, 99:25
**follows** [57] - 24:7, 30:20, 32:4, 35:25, 40:3, 42:16, 44:13, 46:19, 50:22, 53:9, 55:4, 57:3, 59:21,

61:8, 64:19, 70:17, 72:5, 75:25, 77:21, 79:15, 80:12, 81:7, 83:19, 85:16, 87:20, 88:17, 89:16, 90:23, 93:6, 94:25, 95:23, 98:10, 100:9, 101:7, 101:21, 102:20, 103:20, 104:8, 104:20, 105:7, 106:23, 108:1, 109:8, 111:13, 112:5, 113:8, 114:14, 115:25, 117:4, 117:18, 118:18, 119:1, 120:8, 122:5, 122:15, 123:4, 123:21
**for-profit** [1] - 27:10
**forbid** [1] - 21:4
**force** [3] - 41:18, 41:19, 46:4
**foregoing** [1] - 148:8
**forget** [1] - 50:8
**forgot** [1] - 111:4
**forked** [1] - 126:22
**formality** [1] - 63:24
**former** [5] - 44:20, 45:1, 46:11, 47:7, 56:7
**forth** [6] - 11:2, 12:5, 58:24, 113:18, 116:22, 148:11
**fortitude** [1] - 29:15
**forward** [5] - 4:20, 18:16, 35:13, 81:4, 83:16
**Four** [1] - 19:18
**four** [8] - 12:5, 12:16, 12:20, 45:3, 60:15, 105:25, 107:4, 121:22
**four-and-a-half-hour** [1] - 45:3
**four-part** [2] - 12:5, 12:20
**Francesca** [2] - 2:23, 79:18
**frank** [1] - 46:3
**frankly** [4] - 6:8, 6:11, 8:16, 60:18
**free** [9] - 27:23, 54:18, 57:11, 57:15, 58:5, 78:10, 99:9, 114:1, 118:8
**freely** [1] - 43:19
**friendly** [1] - 145:9
**friends** [7] - 21:1, 47:19, 81:20, 90:16,

99:2, 142:7
**friends'** [1] - 68:16
**frightened** [1] - 97:23
**front** [7] - 19:17, 20:25, 21:7, 60:11, 65:5, 135:16, 144:14
**frustrated** [1] - 22:9
**frustration** [1] - 102:24
**fulfilled** [1] - 66:25
**full** [2] - 13:18, 51:7
**fully** [2] - 88:24, 88:25
**future** [2] - 9:23, 41:4

## G

G-A-R-C-I-A [1] - 112:9
G-E-R-V-A-S-I [2] - 42:20, 79:18
G-I-T-U-N-E [1] - 108:5
**games** [1] - 65:22
**gang** [1] - 99:5
**gangs** [1] - 99:12
**GARCIA** [2] - 112:8, 112:11
**Garcia** [2] - 3:3, 112:9
**Gary** [2] - 2:20, 72:8
**gee** [1] - 38:20
**general** [1] - 73:15
**generally** [3] - 10:11, 10:17, 11:12
**generation** [1] - 73:4
**gentleman** [10] - 17:24, 19:22, 47:15, 49:10, 52:13, 53:16, 59:4, 65:5, 90:7, 116:10
**gentleman's** [2] - 59:10, 79:4
**gentlemen** [9] - 6:22, 17:20, 38:25, 39:13, 73:23, 90:17, 126:15, 129:18, 131:21
**George** [4] - 2:19, 3:6, 70:20, 116:3
**Geraldine** [1] - 2:25
**Gerard** [1] - 57:7
**Gerry** [1] - 81:10
**Gervasi** [4] - 2:9, 2:23, 42:20, 79:18
**GERVASI** [7] - 42:19, 42:24, 43:3, 44:1, 79:17, 79:21, 79:24
**Giera** [2] - 109:12, 117:10
**Gillen** [1] - 24:13
**Giordano** [2] - 105:16, 107:2

**Girl** [1] - 73:8
**girl** [2] - 107:15, 109:20
**girls** [4] - 105:25, 106:10, 107:15, 107:21
**Gitune** [2] - 2:23, 108:5
**GITUNE** [2] - 108:4, 108:7
**given** [2] - 5:2, 19:2
**Globe** [6] - 55:25, 56:6, 73:24, 74:5, 75:2, 75:7
**glory** [1] - 25:15
**go-go** [2] - 62:3, 66:7
**God** [4] - 21:4, 24:23, 78:14, 87:15
**Gondek** [1] - 49:2
**goods** [1] - 68:4
**Google** [4] - 67:13, 74:9, 102:8, 102:10
**governed** [1] - 136:25
**governing** [1] - 127:17
**Governor's** [1] - 13:14
**graduated** [2] - 78:12, 89:25
**grammar** [2] - 27:19, 66:18
**Grammar** [1] - 28:6
**Grand** [1] - 64:25
**grandchildren** [5] - 79:9, 97:25, 112:17, 118:6, 146:1
**granddaughter** [1] - 112:20
**grandmother** [3] - 62:11, 62:13, 118:5
**grandparents** [1] - 112:22
**grandson** [1] - 112:21
**grant** [3] - 9:8, 12:6, 12:12
**granting** [2] - 10:5, 27:14
**grave** [1] - 13:10
**great** [7] - 7:18, 35:16, 52:10, 52:14, 52:15, 60:23, 106:18
**greater** [1] - 13:4
**greatest** [1] - 113:22
**greed** [2] - 83:8, 110:13
**Green** [1] - 140:2
**green** [3] - 129:3, 133:15, 140:1
**GREEN** [25] - 1:10, 4:1, 5:9, 23:11, 23:13, 23:24, 30:15, 77:18, 81:2, 83:14,

95:20, 125:20, 125:23, 127:5, 128:6, 129:1, 129:4, 131:9, 133:2, 133:9, 133:14, 133:16, 134:10, 138:24, 147:9
**gross** [3] - 34:21, 34:22, 34:24
**ground** [1] - 48:18
**grow** [1] - 78:10
**grown** [1] - 60:4
**GRUEL** [1] - 1:15
**guard** [1] - 141:4
**guards** [1] - 141:11
**guess** [5] - 6:2, 68:3, 131:13
**guidance** [2] - 128:15, 131:25
**guidelines** [3] - 137:3, 137:16, 137:25
**guy** [1] - 34:4
**guys** [11] - 34:11, 42:13, 46:24, 51:5, 52:16, 53:1, 53:4, 54:24, 115:11, 115:19
**gymnastics** [1] - 120:20

## H

H-A-R-R-I-S [1] - 44:17
H-U-N-T-E-R [1] - 59:25
**habit** [1] - 25:12
**hair** [1] - 42:13
**half** [5] - 45:3, 72:22, 75:19, 85:25, 96:13
**hall** [1] - 76:20
**hallway** [1] - 32:17
**hallways** [1] - 135:18
**hand** [2] - 8:3, 123:18
**handicapped** [1] - 16:13
**handled** [1] - 20:15
**hands** [1] - 33:22
**Hannan** [2] - 2:14, 98:13
**happy** [5] - 7:17, 84:4, 89:25, 96:21, 126:11
**Harbortown** [1] - 41:13
**Harbour** [10] - 51:1, 51:10, 52:1, 54:12, 93:18, 94:10, 94:20, 100:18, 121:1, 124:15
**hard** [4] - 29:23,

43:21, 107:10, 108:13
**hard-earned** [1] - 43:21
**Harding** [1] - 87:23
**hardworking** [2] - 98:25, 99:21
**Harris** [2] - 2:10, 44:17
**HARRIS** [1] - 44:16
**harsh** [1] - 91:24
**hazard** [1] - 80:24
**head** [3] - 65:17, 82:9, 111:6
**headed** [1] - 62:11
**headline** [1] - 19:18
**headphones** [1] - 91:11
**health** [3] - 13:17, 32:23, 110:22
**Health** [2] - 11:24, 36:18
**hear** [7] - 6:19, 8:19, 34:4, 63:10, 96:21, 105:14, 118:3
**heard** [10] - 19:10, 51:13, 52:9, 57:25, 69:22, 75:11, 113:25, 119:17, 119:22, 143:24
**hearing** [3] - 5:19, 7:23, 147:12
**hearings** [5] - 4:18, 6:6, 7:24, 9:4, 15:6
**heart** [7] - 61:23, 62:9, 93:2, 93:3, 97:13, 110:3, 110:5
**hearts** [1] - 44:5
**heavy** [1] - 98:25
**heed** [1] - 97:16
**help** [25] - 20:5, 20:7, 24:23, 27:22, 34:15, 34:16, 35:7, 35:10, 45:11, 80:2, 91:19, 92:10, 92:18, 92:23, 95:12, 95:13, 96:18, 96:22, 97:2, 97:7, 116:14, 120:24
**helped** [1] - 73:14
**helping** [2] - 35:10, 92:21
**Henry** [2] - 129:5, 133:24
**HENRY** [9] - 1:11, 125:25, 128:9, 129:6, 131:14, 133:5, 133:25, 134:8, 139:24
**hereby** [1] - 148:7
**hereinbefore** [1] - 148:11

**heroin** [4] - 25:10, 33:7, 41:8, 41:17
**herself** [1] - 91:19
**hi** [1] - 31:1
**Higgins** [2] - 11:1, 12:1
**high** [7] - 33:15, 58:7, 62:10, 82:19, 92:2, 92:3, 112:17
**High** [1] - 52:3
**highest** [1] - 49:24
**highly** [1] - 34:16
**Hilltop** [1] - 1:23
**Himelman** [7] - 4:4, 4:7, 5:17, 7:8, 126:4, 126:24, 134:15
**HIMELMAN** [30] - 1:19, 4:6, 5:13, 6:2, 7:4, 7:13, 7:20, 14:12, 16:6, 18:8, 20:2, 20:18, 20:21, 21:9, 21:13, 21:17, 22:6, 22:12, 22:17, 23:5, 23:12, 65:23, 67:15, 67:19, 67:22, 67:25, 126:7, 126:19, 126:25, 131:3
**hip** [2] - 50:14, 114:23
**history** [1] - 35:11
**hits** [1] - 91:22
**hold** [10] - 11:14, 14:12, 20:18, 21:13, 21:17, 22:17, 23:5, 31:10, 108:19, 131:13
**holder** [1] - 63:14
**Hollwood** [2] - 42:21, 43:4
**Home** [1] - 62:9
**home** [65] - 6:24, 21:11, 26:17, 26:20, 26:24, 27:3, 32:19, 44:22, 47:21, 47:22, 48:6, 50:10, 50:15, 50:17, 51:15, 52:5, 52:6, 52:11, 57:17, 57:18, 62:12, 68:7, 70:9, 71:21, 72:1, 80:22, 81:25, 82:7, 83:6, 85:3, 85:4, 85:24, 86:5, 86:7, 92:17, 93:17, 93:22, 93:25, 94:21, 94:22, 95:18, 96:22, 97:10, 97:17, 99:2, 99:22, 99:24, 100:24, 105:24, 106:11, 107:12, 108:10, 108:14, 109:25,

110:3, 110:8, 114:3, 114:4, 114:5, 120:1, 124:8, 141:25
**homes** [9] - 52:20, 54:16, 65:11, 72:16, 82:12, 82:20, 140:25, 141:2, 141:24
**homicides** [1] - 40:18
**honest** [1] - 25:14
**honestly** [1] - 142:5
**hoodwinked** [1] - 63:22
**Hook** [1] - 33:23
**hooked** [2] - 58:1, 58:2
**hope** [7] - 64:2, 64:8, 71:13, 100:5, 116:25, 137:7, 144:6
**horrible** [2] - 41:16, 86:18
**horse** [1] - 71:22
**hospital** [2] - 11:21, 11:25
**Hospitals** [1] - 136:24
**hospitals** [1] - 50:1
**hotel** [1] - 62:3
**hour** [2] - 45:3, 72:22
**hourly** [1] - 62:3
**hours** [2] - 119:15, 134:18
**Hours** [1] - 19:18
**house** [10] - 34:7, 76:19, 99:25, 100:2, 106:2, 111:3, 115:4, 115:13, 118:10, 118:12
**houses** [4] - 60:14, 80:5, 115:6
**Housing** [8] - 16:14, 16:22, 16:24, 17:7, 127:10, 130:23, 132:3, 132:11
**housing** [3] - 17:4, 62:18, 66:8
**Huffington** [2] - 54:7, 74:1
**huge** [4] - 76:12, 107:17, 110:22, 141:5
**human** [1] - 13:8
**humans** [1] - 107:16
**humble** [1] - 9:7
**hundred** [1] - 25:6
**hundreds** [3] - 54:15, 123:13, 123:17
**HUNTER** [2] - 59:24, 60:20
**Hunter** [1] - 2:16
**hunter** [1] - 59:24

**hurt** [2] - 87:6, 92:11
**husband** [8] - 58:6, 96:11, 96:13, 96:14, 98:24, 107:4, 107:6, 109:25

---

**I**

**I-N-D-R-A-W-I-S** [1] - 123:25
**I-S-M-A-I-L** [1] - 80:16
**ID** [1] - 148:21
**idea** [5] - 39:13, 50:17, 52:10, 79:8
**ideas** [1] - 146:20
**identical** [1] - 21:15
**identification** [1] - 38:15
**identified** [2] - 9:21, 11:21
**identify** [2] - 12:9, 12:11
**immediate** [1] - 15:14
**impact** [2] - 14:8, 15:9
**impacts** [5] - 14:6, 15:10, 15:14, 15:25, 19:5
**imperative** [1] - 13:11
**implemented** [1] - 126:13
**implore** [1] - 121:3
**important** [7] - 16:7, 20:22, 21:22, 25:21, 68:18, 124:24, 146:23
**importantly** [2] - 46:25, 47:13
**impose** [2] - 7:8, 14:24
**imposed** [1] - 137:2
**imposing** [1] - 12:14
**impossible** [1] - 101:2
**impression** [1] - 48:6
**in-laws** [1] - 72:13
**inappropriate** [1] - 29:6
**incarceration** [1] - 27:10
**incident** [1] - 34:2
**include** [3] - 10:18, 16:23, 16:25
**including** [7] - 5:25, 6:4, 9:1, 13:19, 16:1, 16:14, 130:2
**increase** [1] - 141:9
**Independence** [1] - 142:9
**indicated** [10] - 6:9, 9:6, 11:7, 11:11, 12:4, 19:13, 129:20,

131:22, 132:19, 140:4
**indicates** [1] - 139:1
**individual** [2] - 16:17, 44:3
**individuals** [10] - 8:13, 16:11, 40:16, 41:11, 45:11, 94:1, 94:12, 132:7, 132:13, 132:15
**Indrawis** [2] - 3:8, 123:24
**INDRAWIS** [3] - 123:24, 124:2, 124:5
**indulge** [1] - 55:24
**industrial** [2] - 26:2, 44:9, 82:14
**industry** [4] - 38:24, 53:23, 103:5, 136:25
**Industry** [3] - 3:14, 38:11
**influence** [4] - 27:1, 44:23, 45:1, 45:9
**Influence** [1] - 38:13
**influx** [1] - 89:24
**informants** [2] - 40:23, 40:24
**information** [5] - 4:22, 128:5, 128:19, 128:23, 130:19
**inherent** [1] - 27:18
**inherently** [9] - 10:19, 11:15, 11:20, 11:22, 12:7, 12:21, 15:22, 22:1, 144:9
**initiated** [1] - 71:20
**initiations** [1] - 99:5
**injured** [1] - 82:5
**innocent** [1] - 146:10
**inpatient** [7] - 25:6, 25:18, 33:8, 69:2, 69:5, 136:5, 136:6
**inpatients** [1] - 69:4
**input** [1] - 134:22
**inquire** [1] - 37:10
**insane** [1] - 64:16
**Inside** [1] - 56:1
**inspections** [1] - 137:2
**instance** [1] - 115:18
**instances** [2] - 30:7, 49:24
**institution** [1] - 37:8
**insurance** [3] - 69:17, 136:8, 136:10
**intelligent** [2] - 50:4, 146:21
**intend** [3] - 39:14, 39:15, 48:11
**intended** [1] - 26:20

**interest** [8] - 12:10, 12:16, 12:24, 12:25, 13:4, 15:8, 15:14, 23:2
**interested** [1] - 148:17
**interests** [1] - 61:23
**intermediate** [1] - 56:24
**internal** [1] - 29:14
**interrupt** [1] - 18:5
**interruption** [18] - 5:16, 6:21, 14:11, 16:5, 17:19, 17:22, 20:1, 20:17, 21:12, 21:16, 22:5, 22:16, 23:4, 23:10, 63:7, 64:1, 64:5, 85:14
**interviewing** [1] - 56:7
**intruders** [1] - 45:4
**invested** [1] - 106:5
**investigate** [1] - 40:18
**investigation** [6] - 56:8, 75:2, 75:8, 137:11, 137:14, 138:4
**investigations** [3] - 40:22, 41:24, 56:8
**involved** [14] - 44:21, 45:2, 45:20, 49:21, 58:25, 65:8, 67:12, 67:17, 68:17, 89:5, 130:20, 132:1, 132:17, 132:20
**involving** [1] - 44:22
**Island** [2] - 47:10, 96:11
**Ismail** [2] - 2:24, 80:16
**ISMAIL** [2] - 80:15, 80:19
**issue** [16] - 6:3, 8:1, 8:3, 8:14, 22:24, 47:17, 71:25, 95:9, 95:13, 109:14, 136:1, 136:2, 139:10, 140:22, 140:23, 140:24
**issues** [11] - 4:13, 14:25, 32:13, 129:25, 130:13, 130:21, 131:2, 131:25, 132:16, 132:20, 139:6
**it'll** [1] - 74:10
**itself** [2] - 49:23, 106:19

## J

**J-O-N-E-S** [1] - 32:7
**Jack** [1] - 2:16

**jack** [1] - 101:10
**jail** [1] - 135:17
**James** [1] - 10:25
**January** [1] - 1:7
**Jasoun** [1] - 123:10
**JAY** [1] - 1:15
**Jernee** [1] - 70:11
**Jersey** [29] - 1:8, 1:24, 11:13, 11:24, 16:18, 32:10, 33:2, 34:2, 34:14, 40:17, 72:10, 84:1, 84:25, 85:22, 92:4, 93:13, 102:18, 108:8, 116:5, 117:23, 121:17, 123:11, 130:25, 132:17, 136:25, 139:9, 145:23, 148:7, 148:20
**JHALA** [3] - 123:7, 123:10
**Jhala** [1] - 3:7
**JOAN** [1] - 1:14
**job** [8] - 31:17, 33:14, 39:1, 53:17, 62:9, 76:11, 101:1, 106:2
**JOHN** [2] - 1:12, 1:16
**John** [4] - 2:18, 3:3, 64:22, 119:4
**Johnson** [2] - 87:10
**Joint** [1] - 136:24
**joke** [1] - 116:23
**JONES** [4] - 32:7, 32:9, 33:6, 34:11
**Jones** [3] - 2:6, 32:7, 32:11
**Jonnie** [2] - 3:4, 120:11
**judges** [1] - 143:17
**jurisdiction** [1] - 63:9
**justified** [1] - 29:18
**justify** [1] - 11:12

## K

**K-H-A-T-R-I** [1] - 122:19
**K-R-Z-Y-Z-K-O-W-S-K-I** [1] - 24:12
**K-U-R-I-A** [1] - 118:22
**Kaplan** [1] - 60:10
**KARL** [1] - 1:18
**karma** [1] - 103:15
**Kathleen** [2] - 2:9, 89:12
**Katrina** [2] - 2:15, 100:12
**Kean** [1] - 91:13
**keep** [12] - 43:16, 44:19, 56:11, 59:15,

71:25, 76:17, 83:6, 90:3, 98:20, 101:1, 121:8
**keeps** [1] - 140:21
**KEMBLE** [15] - 1:14, 129:3, 129:5, 129:7, 129:9, 129:11, 129:13, 129:15, 133:15, 133:17, 133:19, 133:22, 133:24, 134:1, 134:3
**KEMM** [158] - 1:18, 5:17, 6:22, 7:5, 7:18, 17:20, 17:23, 20:20, 24:1, 24:5, 24:8, 24:15, 30:17, 30:21, 30:25, 31:3, 31:10, 32:5, 32:8, 35:22, 36:1, 36:5, 37:19, 37:22, 38:2, 39:5, 40:4, 40:9, 42:17, 42:23, 43:1, 44:14, 46:20, 50:23, 53:10, 55:5, 57:4, 59:22, 61:9, 61:13, 62:25, 63:5, 63:8, 63:15, 64:20, 64:24, 65:2, 70:18, 72:6, 74:15, 76:1, 76:5, 76:8, 77:22, 78:1, 78:4, 79:16, 79:19, 79:22, 80:13, 80:17, 80:25, 81:8, 81:12, 81:14, 83:20, 83:24, 84:2, 84:21, 85:1, 85:12, 85:17, 87:21, 87:24, 88:18, 89:17, 89:21, 90:24, 93:7, 93:11, 93:14, 95:1, 95:24, 96:3, 96:6, 98:11, 98:15, 98:18, 100:10, 100:16, 101:8, 101:12, 101:22, 102:1, 102:4, 102:16, 102:21, 103:21, 103:25, 104:9, 104:12, 104:21, 105:8, 105:12, 105:14, 105:17, 106:24, 108:2, 108:6, 109:9, 111:14, 111:24, 112:2, 112:6, 112:10, 113:9, 113:13, 114:15, 114:19, 116:1, 117:5, 117:9, 117:11, 117:19, 118:19, 118:24, 119:2, 119:6, 119:9,

120:9, 121:11, 121:15, 121:18, 122:6, 122:10, 122:16, 122:20, 122:22, 123:5, 123:9, 123:22, 124:1, 124:4, 124:21, 125:4, 126:3, 126:15, 126:23, 127:11, 128:20, 129:17, 131:4, 131:12, 131:15, 131:19, 133:12, 134:5, 138:17
**Kemm** [1] - 127:5
**Kennedy** [1] - 118:7
**Kevin** [2] - 2:22, 105:11
**key** [1] - 14:4
**KHATRI** [3] - 122:18, 122:21, 122:23
**Khatri** [2] - 3:6, 122:18
**kid** [1] - 68:22
**kids** [12] - 60:22, 78:10, 80:22, 82:2, 82:5, 82:12, 99:13, 99:20, 99:22, 100:5, 109:21, 123:17
**kind** [7] - 31:10, 33:9, 37:8, 47:22, 97:14, 141:7
**kindergartner** [1] - 107:6
**Kishan** [1] - 107:2
**KLEMM** [1] - 38:8
**knocking** [1] - 111:6
**knowledge** [2] - 4:13, 84:12
**known** [3] - 48:4, 48:18, 76:13
**knows** [2] - 92:25, 139:17
**kreismer** [1] - 133:19
**KRZYZKOWSKI** [13] - 24:3, 24:11, 24:17, 26:5, 26:14, 26:19, 27:7, 28:3, 28:13, 28:21, 29:4, 29:11, 30:6
**Krzyzkowski** [3] - 2:4, 24:4, 24:12
**KUCZYNSKI** [5] - 1:11, 23:23, 129:8, 133:18, 143:10
**Kuczynski** [2] - 129:7, 133:17
**Kunj** [1] - 76:3
**KURIA** [1] - 118:21
**Kuria** [2] - 3:9, 118:22

## L

**L-A-M-B-E-R-T** [1] - 91:2
**L-O-K-A-N-A-D-H-A-M** [1] - 102:15
**ladies** [5] - 6:22, 17:20, 126:15, 129:17, 131:21
**lady** [4] - 31:2, 31:15, 42:12, 113:1
**laid** [1] - 44:2
**LAMBERT** [6] - 46:22, 47:6, 48:9, 48:15, 49:5, 91:1
**Lambert** [4] - 2:10, 2:11, 46:22, 91:2
**Land** [5] - 10:2, 10:15, 10:22, 11:10
**land** [6] - 8:7, 20:10, 28:17, 28:21, 110:18, 139:20
**large** [4] - 25:3, 28:17, 29:9, 136:11
**Laruie** [1] - 2:5
**last** [86] - 4:11, 5:19, 6:8, 23:15, 24:9, 30:22, 32:6, 36:4, 36:8, 40:5, 42:18, 44:15, 44:17, 46:21, 50:24, 53:11, 55:6, 57:5, 59:23, 61:10, 64:21, 70:19, 72:7, 72:15, 76:2, 76:4, 76:5, 77:23, 78:1, 80:14, 80:16, 81:9, 83:21, 83:22, 84:18, 85:19, 87:24, 88:19, 90:25, 91:6, 93:8, 95:2, 95:25, 96:1, 98:12, 98:13, 100:11, 100:12, 101:9, 101:23, 102:15, 103:22, 103:24, 104:10, 104:22, 105:9, 105:12, 106:25, 108:3, 108:5, 109:10, 109:11, 111:15, 112:7, 113:10, 114:2, 114:16, 115:13, 116:2, 117:6, 117:20, 118:20, 118:22, 119:3, 119:6, 120:10, 121:12, 122:7, 122:17, 122:18, 123:6, 123:7, 123:23, 125:2, 125:6

**lastly** [2] - 42:10, 139:7
**late** [1] - 32:19
**Laurie** [1] - 30:23
**law** [11] - 10:3, 11:17, 15:21, 16:13, 22:6, 28:1, 36:12, 36:13, 87:9, 120:3, 144:3
**Law** [8] - 9:25, 10:2, 10:15, 10:23, 11:10, 16:18, 130:25, 132:18
**laws** [10] - 8:24, 8:25, 9:5, 9:12, 9:14, 16:19, 72:13, 130:20, 131:2, 132:5
**lawsuit** [1] - 115:21
**lawyer** [5] - 49:15, 53:19, 60:5, 92:25, 105:2
**Le** [1] - 89:22
**learn** [3] - 92:6, 92:7
**learned** [1] - 33:11
**learns** [1] - 91:12
**lease** [1] - 85:11
**leasing** [1] - 26:23
**least** [3] - 72:22, 140:18, 142:4
**leave** [10] - 5:7, 23:8, 57:22, 69:5, 69:7, 106:11, 111:3, 127:1, 141:1, 141:15
**leaves** [1] - 93:1
**leaving** [1] - 143:5
**legal** [14] - 49:15, 63:8, 77:16, 78:17, 127:21, 127:22, 128:8, 130:2, 130:14, 131:1, 131:25, 132:16, 132:23
**legally** [1] - 64:11, 67:15, 67:16
**legislature** [1] - 13:16
**leisure** [1] - 19:20
**length** [3] - 9:4, 10:13, 15:6
**lengthy** [2] - 6:16, 134:13
**Lenore** [2] - 2:10, 91:1, 96:15
**Leonardo** [2] - 2:17, 101:24
**Leshyk** [1] - 42:24
**less** [4] - 45:15, 66:19, 67:5, 67:8
**lesson** [1] - 47:6
**lessons** [1] - 9:3
**lessor's** [1] - 26:25
**letter** [1] - 27:25

**letting** [1] - 54:25
**level** [1] - 142:6
**Liberman** [1] - 84:18
**LIBERMAN** [2] - 84:23, 85:2
**Licensure** [1] - 137:1
**Lieberman** [4] - 2:5, 84:24, 85:1, 124:19
**LIEBERMAN** [4] - 84:17, 124:19, 124:22, 125:6
**life** [13] - 19:24, 20:3, 43:23, 47:10, 65:8, 91:15, 91:18, 96:14, 112:15, 120:18, 147:4
**lifeline** [1] - 40:23
**light** [1] - 49:3
**limited** [6] - 16:14, 129:24, 130:14, 131:1, 132:23, 139:13
**limits** [1] - 113:23
**Linda** [2] - 2:11, 93:9
**line** [2] - 49:16, 145:4
**Lisa** [2] - 4:6, 85:20
**list** [2] - 31:22, 71:11
**listen** [8] - 14:13, 17:23, 97:16, 98:6, 125:16, 126:6, 146:19
**listened** [2] - 126:7, 146:19
**listening** [6] - 91:17, 92:21, 97:15, 97:21, 118:1, 146:18
**listens** [1] - 91:12
**literally** [3] - 45:15, 46:5, 107:19
**live** [38] - 24:12, 24:19, 35:20, 40:7, 41:2, 44:17, 51:20, 51:24, 53:2, 53:13, 53:14, 57:8, 59:25, 65:10, 72:11, 76:4, 78:15, 85:21, 88:21, 91:2, 94:6, 95:4, 95:6, 96:16, 98:16, 101:3, 104:2, 107:9, 115:10, 115:12, 116:4, 119:5, 120:19, 121:8, 122:9, 124:3, 144:18
**lived** [8] - 47:9, 47:10, 78:8, 78:25, 86:24, 90:16, 95:8, 96:12
**lives** [4] - 68:22, 86:1, 90:15, 91:20
**living** [6] - 45:5, 49:19, 85:2, 86:3, 91:5,

113:5
**LLC** [2] - 4:8, 62:21
**locate** [2] - 26:9, 28:9
**located** [3] - 17:16, 28:19, 124:11
**location** [24] - 26:11, 26:12, 27:12, 39:1, 46:15, 66:1, 66:17, 66:20, 68:24, 77:6, 77:10, 78:22, 79:11, 80:8, 88:9, 88:13, 90:5, 94:2, 103:8, 104:3, 106:18, 139:22, 144:11
**lockdown** [1] - 45:3
**locked** [1] - 41:10
**log** [1] - 105:19
**logic** [1] - 48:9
**LOKANADHAM** [3] - 102:14, 102:17, 102:22
**Lokanadham** [2] - 2:18, 102:15
**Lola** [1] - 86:2
**Lombardozzi** [2] - 148:5, 148:20
**LOMBARDOZZI** [1] - 1:21
**long-term** [1] - 27:10
**look** [14] - 12:23, 14:6, 34:25, 48:23, 50:4, 67:10, 87:11, 97:12, 101:15, 103:16, 107:13, 135:15, 141:23, 142:9
**looked** [3] - 21:25, 85:3, 141:24
**looking** [3] - 44:9, 115:5, 134:18
**looks** [1] - 141:25
**Lorraine** [2] - 2:8, 88:20
**lose** [2] - 50:18, 142:3
**loss** [1] - 13:9
**lost** [3] - 81:21, 90:16, 125:11
**loud** [1] - 74:17
**love** [7] - 65:14, 87:2, 97:13, 120:18, 120:21, 121:6, 122:25
**loved** [2] - 6:24, 125:11
**Lower** [1] - 66:11
**ludicrous** [1] - 28:10
**Luxury** [1] - 56:1

# M

**M-c-C-O-R-M-I-C-K** [1]

- 119:8
**M-U-H-A-M-M-A-D** [1] - 40:7
**M-U-R-R-A-Y** [1] - 78:3
**ma'am** [2] - 30:17, 31:8, 95:20, 111:10
**MAHMOOD** [4] - 117:7, 117:8, 117:10, 117:13
**Mahmood** [2] - 3:7, 117:8
**MAHONEY** [2] - 57:6, 57:7
**Mahoney** [2] - 2:15, 57:6
**mails** [1] - 50:7
**main** [1] - 140:23
**Main** [2] - 1:7, 66:11
**maintain** [1] - 121:7
**major** [10] - 13:17, 24:25, 25:2, 25:10, 28:9, 28:25, 29:1, 30:1, 40:17, 55:15
**man** [3] - 92:24, 106:2, 141:11
**manage** [1] - 75:6
**management** [1] - 56:10
**mandated** [1] - 33:14
**manner** [1] - 13:22
**manpower** [1] - 56:17
**Marcinczyk** [1] - 108:7
**margin** [1] - 68:9
**Maria** [1] - 53:5
**MARIA** [1] - 1:12
**mark** [3] - 34:18, 38:2, 38:10
**marked** [2] - 38:15, 39:6
**Mary** [2] - 2:13, 96:1
**Massachusetts** [9] - 56:3, 74:23, 95:8, 137:9, 137:12, 137:18, 138:3, 138:4, 138:8
**massage** [2] - 62:2, 62:5
**master** [2] - 145:6, 145:8
**master's** [2] - 35:5, 90:1
**MASTERTON** [1] - 1:22
**matches** [1] - 136:17
**math** [1] - 141:19
**Matter** [1] - 1:2
**matter** [8] - 11:17, 20:22, 22:6, 44:3, 78:12, 103:4,

118:11, 132:22
**matters** [2] - 13:10, 132:24
**mayor** [1] - 127:17
**McCormick** [5] - 3:3, 119:4, 119:5, 119:8, 119:11
**mean** [11] - 6:16, 17:9, 37:15, 52:19, 54:10, 80:24, 82:2, 103:5, 103:7, 107:19, 116:20
**meaning** [1] - 19:4
**meaningfully** [1] - 13:23
**means** [7] - 17:10, 26:12, 37:15, 49:17, 71:21, 76:25, 110:14
**measures** [2] - 25:20, 38:19
**media** [1] - 20:23
**medicaid** [1] - 69:19
**medical** [1] - 49:23
**medicare** [1] - 69:20
**Medicine** [1] - 136:7
**meet** [2] - 65:17, 73:12
**meeting** [12] - 4:11, 6:9, 6:10, 23:15, 76:12, 119:12, 127:18, 127:20, 129:23, 130:7, 131:5, 131:10
**Meeting** [1] - 130:6
**meetings** [2] - 58:24, 76:14
**Meetings** [1] - 129:21
**meets** [2] - 11:5, 27:25
**Melba** [2] - 3:3, 112:8
**Melrose** [3] - 70:22, 70:23, 71:3
**member** [6] - 8:15, 53:2, 60:9, 65:8, 131:12, 140:17
**MEMBERS** [3] - 1:9, 2:2, 3:1
**members** [21] - 4:15, 4:24, 4:25, 5:18, 7:20, 19:9, 19:11, 19:14, 22:8, 22:24, 23:1, 23:6, 60:8, 98:4, 127:15, 131:20, 134:5, 138:17, 142:22, 143:18, 143:23
**Memorial** [3] - 42:21, 43:5, 52:3
**memory** [1] - 74:2
**men's** [1] - 131:13
**mental** [2] - 32:22, 110:22

**Mental** [1] - 36:18
**mention** [2] - 47:25, 53:23
**mentioned** [6] - 49:1, 65:19, 74:24, 131:22, 141:3, 143:8
**Mer** [38] - 41:14, 45:5, 51:11, 52:19, 52:20, 53:14, 54:14, 55:20, 59:25, 60:1, 60:11, 76:4, 86:24, 86:25, 89:20, 89:22, 94:6, 94:7, 94:10, 95:5, 98:17, 98:21, 101:14, 102:3, 102:11, 103:1, 104:2, 104:14, 104:25, 107:3, 108:8, 112:12, 112:14, 113:15, 117:23, 121:2, 124:3, 124:15
**merits** [1] - 130:17
**met** [5] - 9:10, 11:17, 12:22, 119:13, 119:16
**metal** [1] - 71:7
**Metal** [1] - 71:7
**methadone** [7] - 25:25, 41:22, 56:20, 56:21, 66:5, 71:2, 71:8
**metric** [1] - 38:19
**mic** [1] - 105:21
**MICHAEL** [1] - 1:21
**Michael** [4] - 2:22, 77:24, 148:5, 148:20
**microphone** [6] - 7:3, 18:1, 31:8, 39:3, 85:18, 138:19
**middle** [9] - 43:13, 43:14, 44:20, 46:11, 58:1, 71:23, 100:22, 112:18, 119:20
**Middlesex** [4] - 8:11, 13:2, 14:4, 40:14
**might** [4] - 14:24, 86:14, 87:6, 96:22
**Mill** [1] - 70:11
**millions** [2] - 35:9
**Millstone** [1] - 96:12
**mind** [9] - 5:20, 7:9, 58:23, 80:3, 87:6, 107:18, 108:24, 131:4, 144:13
**minds** [1] - 98:4
**mini** [1] - 96:11
**minimis** [1] - 15:15
**minimum** [1] - 46:4
**minute** [4] - 20:18,

29:24, 29:25, 131:15
**minutes** [2] - 18:25, 30:2
**Mioduski** [1] - 102:17
**mismanagement** [1] - 74:22
**mistake** [1] - 70:3
**mix** [1] - 69:2
**mob** [2] - 146:18, 146:19
**mobilized** [1] - 13:21
**models** [1] - 73:13
**Mohan** [2] - 2:18, 102:14
**mom** [6] - 43:12, 43:20, 79:19, 80:6, 92:14, 96:16
**moment** [2] - 55:24, 131:5
**money** [16] - 50:19, 51:18, 55:20, 75:18, 83:8, 99:14, 103:5, 109:14, 109:15, 109:16, 109:20, 109:23, 110:13, 116:19, 116:21, 116:22
**monies** [1] - 29:19
**monitors** [2] - 135:10, 135:14
**month** [4] - 44:2, 93:22, 125:2, 125:7
**months** [3] - 86:5, 103:2, 115:5
**Morgan** [7] - 61:14, 61:15, 62:5, 62:6, 65:1, 65:7, 116:4
**morning** [1] - 106:11
**mortgage** [2] - 90:3, 107:7
**most** [15] - 5:14, 6:11, 8:14, 21:22, 24:24, 31:16, 35:8, 36:20, 46:25, 47:10, 68:18, 72:25, 140:15, 142:1, 142:25
**Motel** [1] - 66:7
**mother** [11] - 51:25, 85:24, 86:6, 86:10, 86:23, 87:1, 95:7, 108:12, 108:22, 110:20, 114:24
**motion** [5] - 23:21, 125:23, 127:24, 128:7, 133:6
**motive** [1] - 75:6
**move** [13] - 4:20, 18:15, 29:6, 93:20, 99:15, 115:8, 122:25, 144:19,

144:20, 144:23, 144:24, 145:12, 145:13
**moved** [21] - 23:23, 55:11, 60:24, 60:25, 89:22, 92:14, 93:21, 95:10, 98:21, 98:22, 98:23, 99:17, 100:24, 102:6, 103:1, 105:24, 112:14, 113:16, 118:13, 125:25, 128:9
**movie** [4] - 28:19, 44:7, 50:12, 70:25
**moving** [1] - 99:17
**MPBELL** [1] - 51:1
**MR** [304] - 4:6, 5:13, 5:17, 6:2, 6:22, 7:4, 7:5, 7:13, 7:18, 7:20, 14:12, 16:6, 17:20, 17:23, 18:8, 20:2, 20:18, 20:20, 20:21, 21:9, 21:13, 21:17, 22:6, 22:12, 22:17, 23:5, 23:12, 24:1, 24:3, 24:5, 24:8, 24:11, 24:15, 24:17, 26:5, 26:14, 26:19, 27:7, 28:3, 28:13, 28:21, 29:4, 29:11, 30:6, 30:17, 30:21, 30:25, 31:3, 31:10, 32:5, 32:8, 35:19, 35:22, 36:1, 36:3, 36:5, 36:8, 37:19, 37:21, 37:22, 38:1, 38:2, 38:7, 38:8, 38:16, 39:5, 39:8, 40:4, 40:6, 40:9, 40:11, 42:4, 42:10, 42:17, 42:23, 43:1, 44:14, 44:16, 46:20, 46:22, 47:6, 48:9, 48:15, 49:5, 50:23, 53:10, 53:12, 55:5, 55:7, 55:15, 56:5, 56:15, 57:4, 57:13, 58:13, 58:17, 58:22, 59:22, 59:24, 60:20, 61:9, 61:11, 61:13, 61:14, 61:19, 62:25, 63:3, 63:5, 63:8, 63:12, 63:15, 63:18, 64:2, 64:6, 64:14, 64:20, 64:22, 64:24, 64:25, 65:2, 65:4, 65:23, 65:24, 67:8, 67:15, 67:16, 67:19, 67:20, 67:22, 67:23,

67:25, 68:2, 69:21, 69:24, 70:7, 70:18, 70:20, 72:6, 72:8, 73:21, 74:8, 74:14, 74:15, 74:18, 76:1, 76:3, 76:5, 76:7, 76:8, 76:10, 76:17, 77:8, 77:12, 77:22, 77:24, 78:1, 78:3, 78:4, 78:6, 79:8, 79:16, 79:19, 79:22, 80:13, 80:17, 80:25, 81:8, 81:12, 81:14, 83:20, 83:22, 83:24, 83:25, 84:2, 84:4, 84:17, 84:21, 84:23, 85:1, 85:2, 85:12, 85:17, 87:21, 87:24, 88:18, 89:17, 89:21, 90:24, 93:7, 93:11, 93:14, 95:1, 95:24, 96:3, 96:6, 98:11, 98:15, 98:18, 100:10, 100:16, 101:8, 101:10, 101:12, 101:13, 101:22, 101:24, 102:1, 102:2, 102:4, 102:6, 102:14, 102:16, 102:17, 102:21, 102:22, 103:21, 103:25, 104:9, 104:12, 104:21, 105:8, 105:10, 105:12, 105:13, 105:14, 105:16, 105:17, 105:19, 106:24, 108:2, 108:6, 108:9, 111:14, 111:16, 111:24, 112:1, 112:2, 112:3, 112:6, 112:10, 113:9, 113:13, 114:15, 114:17, 114:19, 114:20, 116:1, 116:3, 117:5, 117:7, 117:9, 117:10, 117:11, 117:13, 117:19, 118:19, 118:24, 119:2, 119:4, 119:6, 119:8, 119:9, 119:11, 120:9, 121:11, 121:15, 121:18, 122:6, 122:10, 122:16, 122:18, 122:20, 122:21, 122:22, 122:23, 123:5, 123:7, 123:9, 123:10, 123:22,

124:1, 124:4, 124:19, 124:21, 124:22, 125:4, 125:6, 126:3, 126:7, 126:15, 126:19, 126:23, 126:25, 127:11, 128:20, 129:17, 131:3, 131:4, 131:12, 131:15, 131:19, 133:12, 134:5, 138:17
**MS** [92] - 30:23, 31:1, 31:5, 31:9, 31:12, 31:14, 32:7, 32:9, 33:6, 34:11, 42:19, 42:24, 43:3, 44:1, 50:25, 51:17, 51:23, 52:18, 57:6, 59:17, 79:21, 79:24, 80:15, 80:19, 81:10, 81:13, 81:16, 83:2, 85:11, 85:20, 87:22, 87:25, 88:5, 88:20, 89:12, 89:19, 90:13, 91:1, 93:9, 93:12, 93:16, 95:3, 96:1, 96:4, 96:8, 97:6, 97:19, 98:13, 98:16, 98:20, 100:12, 100:17, 103:23, 104:1, 104:11, 104:13, 104:23, 107:1, 108:4, 108:7, 109:11, 112:8, 112:11, 113:11, 113:14, 114:7, 117:21, 118:2, 118:21, 120:11, 121:13, 121:16, 121:20, 122:8, 122:11, 123:24, 124:2, 124:5, 129:3, 129:5, 129:7, 129:9, 129:11, 129:13, 129:15, 133:15, 133:17, 133:19, 133:22, 133:24, 134:1, 134:3
**MUHAMMAD** [4] - 40:6, 40:11, 42:4, 42:10
**Muhammad** [2] - 2:8, 40:7
**multiple** [1] - 15:6
**Municipal** [5] - 9:25, 10:2, 10:15, 10:22, 11:10
**municipalities** [1] - 13:20

**murder** [1] - 82:7
**Murray** [2] - 2:22, 77:25
**MURRAY** [4] - 77:24, 78:3, 78:6, 79:8
**music** [2] - 91:12, 91:17
**must** [8] - 10:10, 13:20, 21:25, 58:19, 66:24, 84:8, 84:9, 137:23

## N

**N.J.S.A** [1] - 13:7
**Nagy** [2] - 3:6, 116:3
**NAGY** [2] - 116:3, 116:4
**naive** [1] - 57:23
**NAME** [4] - 2:3, 3:2
**name** [169] - 24:3, 24:9, 24:10, 24:11, 30:21, 30:22, 32:5, 32:6, 35:19, 36:5, 36:6, 37:25, 40:5, 40:6, 42:17, 42:19, 44:14, 44:15, 44:16, 44:17, 46:20, 46:21, 46:22, 50:23, 50:24, 53:10, 53:11, 55:6, 55:7, 55:21, 57:4, 57:5, 59:23, 61:9, 61:10, 61:11, 64:20, 64:21, 70:19, 70:20, 72:6, 72:7, 76:1, 76:2, 76:3, 76:4, 76:5, 77:22, 77:23, 77:24, 78:1, 79:16, 79:17, 80:13, 80:14, 80:15, 80:16, 81:8, 81:9, 83:20, 83:21, 83:22, 84:17, 84:24, 85:6, 85:9, 85:11, 85:18, 85:19, 85:20, 87:21, 87:24, 88:18, 88:19, 88:20, 89:9, 90:24, 90:25, 91:1, 93:7, 93:8, 94:18, 95:2, 95:3, 95:24, 95:25, 96:1, 96:2, 98:11, 98:12, 98:13, 100:10, 100:11, 100:12, 101:8, 101:9, 101:22, 101:23, 102:14, 102:15, 103:21, 103:22, 103:23, 103:24, 104:9, 104:10, 104:21, 104:22, 105:9,

105:10, 105:12, 105:20, 106:25, 107:2, 108:3, 108:4, 108:5, 109:10, 109:11, 111:14, 111:15, 112:6, 112:7, 112:8, 113:9, 113:10, 114:15, 114:16, 116:2, 116:3, 117:6, 117:7, 117:19, 117:20, 117:21, 118:19, 118:20, 118:21, 118:22, 119:2, 119:3, 119:4, 119:7, 120:9, 120:10, 121:12, 122:7, 122:16, 122:17, 122:19, 123:6, 123:7, 123:8, 123:22, 123:23
**named** [1] - 19:23
**nanny** [1] - 34:2
**narcotics** [2] - 40:20, 40:22
**Nathan** [1] - 95:4
**nation** [1] - 8:23
**national** [2] - 19:13, 20:24
**Nations** [1] - 51:7
**nature** [3] - 25:17, 28:10, 130:2
**NCRA** [1] - 148:21
**near** [6] - 27:24, 47:11, 57:8, 59:6, 90:19, 144:17
**nearby** [1] - 144:18
**nearly** [1] - 141:6
**necessary** [4] - 9:11, 17:3, 25:12, 66:20
**Neck** [1] - 110:19
**need** [93] - 7:1, 8:12, 18:3, 24:2, 24:5, 24:22, 27:3, 30:18, 34:12, 34:15, 35:2, 35:10, 35:22, 36:3, 36:20, 36:22, 37:8, 43:17, 44:6, 45:11, 45:23, 49:2, 53:25, 57:18, 58:4, 58:13, 58:17, 58:18, 66:24, 68:7, 68:20, 69:11, 69:12, 69:13, 71:13, 72:19, 73:2, 77:5, 80:2, 81:22, 82:25, 85:4, 85:7, 85:8, 85:17, 88:11, 89:1, 90:13, 92:11, 94:2, 94:14, 94:19, 94:20, 94:22, 95:15, 95:18,

95:21, 97:16, 97:17, 97:19, 105:4, 105:21, 106:5, 106:20, 110:3, 111:6, 111:8, 111:9, 114:2, 115:2, 115:15, 116:13, 116:14, 120:4, 120:24, 121:23, 125:4, 125:23, 132:12, 137:6, 140:8, 140:15, 143:2, 145:24, 146:3
**needed** [8] - 66:15, 70:9, 111:24, 139:8, 139:22, 140:5, 142:16
**needing** [3] - 68:10, 68:11, 86:4
**needs** [12] - 12:3, 29:8, 32:21, 39:23, 58:4, 68:12, 92:5, 93:25, 103:16, 110:22, 113:21
**Needs** [3] - 3:14, 38:12
**negative** [13] - 10:12, 11:8, 14:6, 14:8, 15:9, 15:23, 15:25, 19:3, 19:5, 119:14, 119:16, 134:22
**negotiations** [1] - 66:10
**neighborhood** [14] - 46:5, 55:17, 90:19, 99:16, 104:17, 105:2, 105:3, 106:16, 107:9, 107:22, 145:1, 145:5, 145:13, 147:5
**neighborhoods** [1] - 35:15
**neighbors** [6] - 24:19, 47:20, 51:6, 95:12, 107:13
**nervous** [1] - 87:7
**never** [1] - 71:13
**new** [7] - 40:11, 52:20, 55:10, 58:23, 68:24, 68:25, 70:23
**New** [48] - 1:8, 1:24, 11:13, 11:23, 16:18, 19:16, 19:17, 19:21, 21:7, 32:10, 33:2, 34:2, 34:14, 40:17, 51:7, 55:11, 55:12, 55:13, 61:1, 72:9, 78:9, 84:1, 84:25, 85:21, 85:22, 87:10, 92:4, 93:13, 102:18,

108:8, 110:20, 113:18, 116:4, 117:23, 118:13, 120:18, 121:17, 123:11, 130:24, 132:17, 136:25, 139:9, 145:23, 148:7, 148:20
**news** [1] - 34:19
**newspaper** [1] - 67:13
**newspapers** [1] - 20:23
**next** [15] - 4:1, 30:15, 51:11, 51:24, 54:13, 79:25, 82:3, 94:5, 107:19, 117:15, 119:20, 120:25, 121:2, 125:13, 146:4
**nice** [2] - 42:12, 102:11
**night** [8] - 39:25, 68:14, 110:1, 111:4, 139:2, 140:21, 141:2, 142:13
**Nikunjkumar** [1] - 2:21
**nine** [1] - 123:15
**nip** [1] - 90:11
**NJ** [2] - 115:10, 115:15
**NO** [1] - 3:11
**nobody** [2] - 49:19, 97:20
**noise** [2] - 14:9, 16:1
**nonresidential** [2] - 60:17, 78:24
**normally** [1] - 80:9
**nose** [1] - 21:1
**Notary** [2] - 148:5, 148:20
**note** [1] - 137:23
**noted** [2] - 19:2, 37:13
**notes** [1] - 65:19
**nothing** [3] - 42:11, 82:22, 143:4
**noting** [1] - 8:6
**notwithstanding** [1] - 14:22
**November** [4] - 4:17, 115:4, 135:7, 136:4
**nowhere** [1] - 57:8
**nuclear** [1] - 117:15
**number** [5] - 25:18, 25:19, 73:14, 129:25, 141:11
**numbers** [3] - 39:11, 51:6, 68:8
**NUMBERS** [1] - 2:2
**numerous** [4] - 11:25, 33:1, 68:17
**nurse** [4] - 32:12,

33:11, 35:1, 88:23
**nurses** [2] - 34:25, 135:9
**nursing** [38] - 21:11, 26:17, 26:20, 26:24, 27:3, 48:6, 50:9, 50:15, 50:17, 51:15, 52:6, 52:11, 57:17, 57:18, 62:12, 68:7, 70:9, 71:21, 71:25, 72:16, 83:6, 85:24, 86:5, 92:17, 93:17, 93:22, 93:25, 94:21, 94:22, 95:18, 96:22, 97:10, 97:17, 114:3, 114:4, 114:5, 120:1
**Nursing** [1] - 62:9

## O

**o'clock** [3] - 102:23, 106:11, 106:12
**O'Neill** [3] - 67:11, 67:17, 139:16
**Oak** [2] - 72:11, 124:16
**Oaks** [2] - 34:5, 124:2
**oath** [2] - 84:22, 84:23
**objected** [1] - 8:20
**objecting** [1] - 19:12
**objections** [1] - 141:8
**objective** [1] - 146:23
**obligated** [1] - 17:6
**obligation** [2] - 17:10, 22:14
**obviously** [3] - 4:25, 7:21, 22:23
**occurred** [1] - 130:12
**OF** [4] - 1:1, 1:1, 1:4, 2:1
**offer** [1] - 22:23
**offered** [1] - 22:22
**office** [1] - 108:19
**Office** [1] - 136:25
**officer** [4] - 18:13, 55:12, 135:12, 140:3
**officers** [5] - 58:10, 58:14, 58:18, 140:9, 144:16
**oil** [1] - 33:13
**old** [21] - 28:19, 32:17, 42:12, 52:2, 52:15, 59:7, 66:6, 70:25, 86:22, 91:9, 92:19, 97:4, 103:2, 107:11, 110:7, 114:8, 123:14, 123:15, 123:16
**Old** [1] - 62:8
**older** [8] - 26:20, 73:4,

73:10, 73:11, 92:17, 96:19, 115:8, 146:8
**Olga** [1] - 2:20
**once** [4] - 93:22, 124:25, 125:14, 137:1
**one** [65] - 10:21, 11:5, 11:20, 12:9, 19:18, 20:4, 34:14, 35:1, 37:8, 37:24, 38:2, 38:19, 39:9, 41:3, 42:13, 45:16, 46:24, 47:18, 49:24, 50:18, 51:21, 53:22, 55:22, 56:15, 59:11, 62:2, 62:3, 68:18, 71:5, 73:7, 73:23, 74:10, 78:13, 78:14, 82:4, 82:5, 82:6, 83:4, 84:20, 85:5, 85:12, 86:21, 95:20, 97:13, 97:24, 98:2, 106:8, 115:18, 118:11, 124:20, 125:14, 127:20, 128:12, 137:9, 139:2, 140:4, 140:18, 141:4, 142:17, 143:2, 143:22, 145:7
**ones** [2] - 6:24, 125:11
**online** [2] - 38:5, 74:9
**open** [13] - 5:3, 5:10, 5:22, 9:20, 14:22, 23:14, 23:21, 66:5, 72:18, 94:8, 127:18, 129:23
**Open** [2] - 129:20, 130:6
**opened** [4] - 72:19, 74:20, 89:8, 119:12
**operate** [3] - 9:17, 14:16, 17:15
**opinion** [5] - 9:8, 36:11, 63:23, 140:20, 140:23
**opportunity** [6] - 6:10, 7:2, 20:6, 21:5, 34:22, 115:7
**oppose** [1] - 105:20
**opposed** [1] - 9:18
**order** [5] - 6:16, 8:14, 13:22, 40:22, 131:10
**ordered** [1] - 33:13
**ordinance** [2] - 11:13, 17:13
**organization** [1] - 60:10
**organizations** [1] - 132:14
**oriented** [1] - 144:25

**original** [2] - 26:16, 63:13
**originally** [3] - 91:5, 96:10, 119:25
**Orlee** [1] - 121:13
**orthotist** [1] - 96:24
**ourselves** [3] - 67:4, 72:21, 89:6
**outlaid** [1] - 22:8
**outline** [2] - 6:6, 7:14
**outpatient** [9] - 25:5, 25:19, 25:24, 30:3, 69:3, 136:4, 136:6, 139:4
**outpatients** [2] - 15:4, 25:13
**outside** [9] - 42:1, 54:20, 56:13, 56:22, 99:11, 106:14, 116:12, 118:7, 136:21
**outskirts** [2] - 26:2, 28:23
**outweigh** [2] - 15:11, 15:17
**outweighs** [1] - 134:22
**overall** [1] - 27:2
**overdose** [2] - 21:2, 114:25
**overdosed** [1] - 44:2
**overview** [1] - 5:21
**overwhelming** [1] - 15:16
**overwhelmingly** [1] - 14:7
**own** [2] - 140:24, 141:15
**owned** [1] - 116:18

# P

**P-A-T-E-L** [1] - 76:7
**P-I-L-L-A-R** [1] - 61:12
**P-L-A-T-N-E-R** [1] - 37:25
**P-O-D-O-L-A-K** [1] - 70:21
**P-O-L-I-C-A-S-T-R-O** [1] - 114:18
**p.m** [2] - 1:8, 147:13
**package** [1] - 41:14
**packages** [1] - 67:1
**PAGE** [6] - 2:2, 2:3, 3:2, 3:11
**page** [6] - 19:17, 21:7, 135:7, 136:4, 136:15, 137:9
**pages** [1] - 74:11
**paint** [2] - 69:10,

123:12
**painting** [1] - 33:3
**palpable** [1] - 102:25
**paperwork** [1] - 134:18
**paramount** [1] - 106:13
**parcel** [2] - 28:17, 139:19
**parent** [3] - 44:24, 67:9, 67:10
**parents** [8] - 31:18, 44:4, 45:10, 89:6, 92:8, 92:12, 98:1, 112:22
**Park** [4] - 42:22, 43:5, 77:25, 118:7
**park** [5] - 39:17, 44:11, 80:6, 110:2
**parked** [1] - 54:20
**Parker** [1] - 116:4
**parks** [1] - 142:8
**Parlin** [36] - 24:13, 31:6, 32:10, 35:21, 40:8, 40:13, 42:25, 44:18, 46:23, 53:14, 55:9, 55:10, 57:7, 72:9, 84:1, 84:25, 85:21, 87:23, 93:12, 95:5, 98:21, 102:3, 102:18, 104:14, 106:3, 106:4, 106:6, 108:8, 109:23, 112:12, 117:10, 117:23, 118:23, 121:17, 123:11, 124:3
**parlors** [2] - 62:2, 62:5
**part** [13] - 10:10, 12:5, 12:20, 29:20, 35:23, 36:4, 58:25, 91:13, 91:14, 113:19, 128:8, 135:3, 136:11
**part-time** [2] - 91:13, 91:14
**particular** [10] - 8:3, 10:4, 17:16, 18:11, 18:15, 19:12, 19:22, 22:10, 60:8, 142:11
**particularly** [4] - 10:20, 21:20, 86:13, 89:5
**parties** [1] - 148:14
**partner** [1] - 50:16
**pass** [1] - 86:11
**passed** [7] - 21:2, 72:14, 96:13, 96:14, 114:24, 116:17, 121:21
**passionate** [5] -

31:20, 31:21, 31:25, 33:17
**past** [9] - 23:19, 60:2, 60:13, 61:22, 64:8, 69:23, 86:25, 112:14, 116:7
**PATEL** [6] - 76:3, 76:7, 76:10, 76:17, 77:8, 77:12
**Patel** [3] - 2:21, 76:4, 76:7
**patient** [2] - 56:21, 136:11
**patients** [23] - 15:5, 16:12, 16:17, 25:20, 32:16, 33:6, 33:10, 33:12, 35:14, 39:14, 52:7, 54:9, 56:5, 56:11, 56:12, 56:16, 82:6, 82:15, 89:2, 94:2, 106:19, 137:17, 138:6
**Patrick** [2] - 19:23, 20:7
**Patricks** [1] - 21:6
**patrols** [2] - 55:18, 140:6
**Paul** [4] - 2:5, 84:17, 84:24, 124:19
**Paula** [2] - 2:9, 42:19
**Paulene** [2] - 3:9, 118:21
**pause** [1] - 131:17
**pay** [5] - 29:15, 52:25, 81:23, 109:16
**paying** [1] - 90:3
**PD** [1] - 136:18
**peddling** [1] - 99:14
**people** [101] - 5:2, 13:11, 18:4, 20:7, 23:16, 23:17, 23:19, 24:22, 32:18, 32:24, 33:8, 33:18, 33:24, 34:9, 35:1, 35:7, 35:10, 36:19, 36:22, 38:20, 39:15, 39:16, 39:19, 39:21, 40:24, 41:1, 41:6, 41:16, 42:1, 43:9, 47:4, 47:24, 50:4, 52:21, 54:4, 54:11, 56:22, 57:13, 57:20, 58:15, 63:25, 64:11, 66:9, 68:15, 68:17, 69:5, 69:12, 69:18, 70:1, 71:6, 71:18, 71:21, 72:25, 73:11, 75:15, 75:16, 81:19, 82:10, 82:15, 82:22, 83:7, 83:10, 84:7, 84:19,

86:20, 87:5, 88:2, 88:7, 92:22, 94:13, 96:25, 97:2, 99:3, 99:14, 99:25, 106:20, 109:6, 109:17, 110:21, 111:1, 116:13, 116:16, 116:20, 120:3, 120:23, 125:11, 125:15, 128:13, 136:19, 136:21, 140:24, 141:12, 141:23, 142:2, 143:25, 144:17, 147:4, 147:5
**per** [1] - 139:4
**percent** [5] - 36:19, 88:14, 104:5, 142:1, 142:3
**perfect** [1] - 39:1
**perhaps** [4] - 5:3, 6:16, 39:13, 128:14
**periods** [1] - 58:7
**permission** [1] - 127:6
**permit** [4] - 10:6, 17:14, 19:6, 63:14
**permit-holder** [1] - 63:14
**permitted** [3] - 18:13, 18:22, 18:23
**persistent** [1] - 13:21
**person** [9] - 23:25, 30:16, 56:15, 85:12, 87:7, 87:11, 123:16, 136:5, 143:3
**personal** [4] - 21:1, 41:6, 79:4, 142:5
**personality** [1] - 136:16
**personnel** [3] - 129:25, 141:9, 141:22
**Perth** [1] - 71:6
**pervasive** [1] - 13:24
**petitioner** [6] - 36:9, 36:21, 37:11, 38:25, 125:7, 125:17
**PetSmart** [1] - 91:14
**ph** [1] - 121:13
**ph)** [1] - 107:2
**PHIL** [1] - 1:13
**phrased** [1] - 132:6
**physical** [2] - 41:8, 41:18
**physically** [1] - 44:24
**physician** [1] - 120:15
**pick** [3] - 42:1, 110:7, 112:20
**picks** [1] - 107:11
**picture** [4] - 33:3,

33:4, 50:2, 123:12
**PILLAR** [9] - 61:11, 61:14, 61:19, 63:3, 63:12, 63:18, 64:2, 64:6, 64:14
**Pillar** [2] - 2:17, 61:11
**place** [34] - 7:23, 8:25, 24:25, 25:21, 33:21, 37:9, 41:9, 43:21, 44:6, 45:25, 46:15, 59:17, 68:25, 69:13, 82:11, 82:13, 82:25, 83:4, 83:5, 95:17, 104:17, 115:3, 115:8, 121:1, 121:2, 125:12, 130:11, 137:11, 137:17, 138:1, 141:18, 148:10
**Place** [3] - 57:7, 66:7, 84:25
**placed** [2] - 26:1, 30:1, 119:19
**places** [4] - 54:8, 59:9, 68:10, 145:16
**placing** [1] - 29:23
**Plainfield** [4] - 40:17, 41:22, 41:23, 100:24
**plan** [3] - 39:12, 145:6, 145:8
**planner** [1] - 11:2
**Planner** [2] - 1:15, 1:16
**planners** [2] - 6:5, 10:25
**planning** [2] - 10:22, 20:10
**plans** [1] - 54:23
**Platner** [3] - 2:7, 35:20, 37:25
**PLATNER** [9] - 35:19, 35:20, 36:3, 36:8, 37:21, 38:1, 38:7, 38:16, 39:8
**Platner-1** [4] - 3:12, 38:3, 38:4, 38:14
**Platner-2** [4] - 3:14, 38:3, 38:11, 38:14
**play** [4] - 65:21, 101:4, 116:11, 136:10
**playing** [2] - 106:15, 125:8
**plead** [1] - 87:15
**pleasure** [1] - 133:3
**plenty** [2] - 58:19
**PODOLAK** [5] - 70:20, 73:21, 74:8, 74:14, 74:18
**Podolak** [2] - 2:19, 70:21

**point** [16] - 4:20, 5:4, 6:1, 8:24, 15:19, 18:9, 19:7, 21:5, 26:22, 46:10, 48:15, 49:8, 68:10, 92:18, 96:20, 146:22
**Pointe** [4] - 55:21, 67:10, 96:9, 96:17
**points** [1] - 39:9
**Policastro** [2] - 3:5, 114:17
**POLICASTRO** [2] - 114:17, 114:20
**police** [16] - 46:4, 55:12, 55:16, 55:18, 55:20, 58:9, 58:10, 58:14, 58:17, 81:23, 135:12, 140:3, 140:5, 140:9, 144:16
**policies** [5] - 17:2, 137:3, 137:15, 137:25, 138:7
**policy** [2] - 13:6, 13:8
**political** [2] - 71:24, 143:15
**politics** [2] - 40:13, 40:14
**pools** [1] - 60:15
**poor** [2] - 25:9, 144:17
**populated** [3] - 27:15, 28:24, 34:16
**population** [1] - 139:12
**portion** [3] - 125:21, 125:24, 126:2
**ports** [1] - 135:18
**poses** [2] - 27:17, 29:12
**position** [3] - 6:7, 22:21, 91:19
**positive** [10] - 10:12, 10:16, 11:8, 11:11, 11:16, 19:1, 33:7, 33:8, 119:14, 134:25
**positively** [1] - 87:13
**positives** [1] - 134:22
**possession** [2] - 49:13, 49:17
**possibility** [1] - 9:19
**possibly** [2] - 144:21, 144:24
**Post** [2] - 54:7, 74:1
**postpone** [1] - 70:5
**potential** [2] - 19:4, 29:12
**power** [2] - 27:22, 73:22
**powers** [1] - 10:4
**practice** [2] - 87:2, 143:21

**practices** [1] - 17:2
**practicing** [1] - 20:10
**Pradima** [1] - 3:7
**Pradyuman** [1] - 123:8
**Pragnesh** [2] - 3:6, 122:18
**pray** [1] - 87:15
**predict** [1] - 41:4
**preface** [1] - 24:18
**preference** [1] - 70:1
**premises** [1] - 139:2
**prepared** [4] - 4:20, 6:17, 49:11, 64:12
**prescriptions** [1] - 71:17
**PRESENT** [1] - 1:9
**present** [3] - 46:7, 46:8, 139:22
**presentation** [1] - 134:16
**presented** [1] - 4:16
**President** [1] - 77:25
**pretty** [4] - 4:19, 22:20, 84:7, 141:24
**previous** [2] - 76:14, 141:3
**previously** [2] - 8:18, 95:8
**prey** [1] - 75:15
**PRIME** [5] - 17:16, 18:19, 59:4, 145:3, 145:8
**principal** [6] - 10:7, 10:8, 44:21, 45:2, 45:17, 46:12
**Printout** [1] - 3:12
**printout** [2] - 38:5, 38:11
**prison** [2] - 27:11, 57:21
**private** [1] - 27:10
**privilege** [1] - 130:4
**problem** [14] - 8:10, 8:15, 13:25, 32:14, 38:22, 39:18, 65:15, 66:14, 111:8, 136:20, 137:5, 139:5, 145:22, 145:23
**problems** [10] - 13:17, 27:17, 34:21, 37:12, 38:24, 41:20, 42:7, 71:15, 86:15, 132:9
**procedures** [4] - 137:3, 137:16, 137:25, 138:7
**proceed** [4] - 4:5, 5:10, 127:2, 127:23
**proceeding** [2] - 23:8, 131:18

**Proceedings** [1] - 1:5
**proceeds** [1] - 29:16
**profession** [1] - 49:23
**professional** [3] - 6:4, 25:17, 109:19
**professionals** [12] - 4:11, 4:15, 6:3, 12:8, 15:1, 15:20, 18:21, 19:15, 20:13, 21:23, 21:24, 22:18
**professionals'** [1] - 5:8
**profit** [2] - 26:25, 27:10, 75:5
**profitable** [1] - 26:24
**program** [1] - 13:12
**project** [2] - 139:18, 139:21
**pronouncing** [1] - 137:7
**proof** [1] - 119:16
**proofs** [8] - 10:11, 11:8, 11:9, 11:11, 11:16, 15:23, 19:3, 119:14
**proper** [2] - 137:15, 141:11
**Properties** [1] - 67:11
**properties** [3] - 60:14, 60:15, 138:12
**property** [9] - 16:1, 26:23, 28:7, 59:4, 62:6, 63:14, 90:5, 124:13, 141:14
**proposal** [2] - 51:13, 60:11
**propose** [1] - 28:9
**proposed** [20] - 11:18, 11:19, 14:15, 15:22, 15:24, 19:6, 24:20, 25:2, 26:11, 27:16, 28:4, 45:15, 51:3, 51:9, 57:9, 57:17, 82:23, 89:8, 100:19, 106:7
**prosecute** [1] - 18:16
**protect** [7] - 91:8, 106:2, 116:12, 116:13, 144:20, 146:4, 146:24
**protected** [1] - 16:17
**protecting** [3] - 29:23, 45:20, 106:10
**protection** [1] - 45:19
**protections** [1] - 120:3
**protocol** [1] - 5:20
**protocols** [3] - 137:4, 137:17, 137:25
**proud** [2] - 65:13, 88:2

**prove** [1] - 30:8
**provide** [11] - 4:12, 8:12, 10:11, 17:3, 17:7, 17:10, 22:14, 37:12, 45:19, 108:13, 132:14
**provided** [6] - 4:22, 14:3, 14:18, 15:2, 25:15, 138:25
**provides** [3] - 13:7, 13:15, 16:10
**proximity** [5] - 24:20, 30:10, 45:14, 46:1, 142:25
**Prusakowski** [6] - 35:20, 46:23, 55:8, 91:2, 96:5, 119:5
**psychology** [1] - 35:6
**psychotherapist** [1] - 110:21
**PTO** [1] - 120:20
**public** [61] - 5:1, 5:4, 5:10, 5:11, 5:16, 5:18, 5:23, 5:24, 5:25, 6:10, 6:19, 7:11, 7:22, 8:16, 8:19, 12:9, 12:16, 12:24, 12:25, 13:4, 13:6, 13:8, 15:8, 15:13, 15:20, 19:9, 19:11, 19:15, 22:9, 22:24, 23:1, 23:6, 23:14, 23:22, 63:11, 77:19, 81:3, 83:17, 97:15, 98:5, 125:21, 125:24, 126:2, 126:11, 126:16, 127:15, 127:16, 127:18, 127:20, 128:2, 129:23, 130:9, 130:23, 131:22, 131:24, 138:5, 138:17, 139:12, 142:24
**Public** [4] - 129:21, 130:6, 148:6, 148:20
**PUBLIC** [26] - 5:15, 21:8, 22:11, 30:4, 31:7, 31:13, 57:12, 58:16, 64:3, 64:13, 70:4, 73:19, 74:7, 74:13, 74:17, 77:7, 83:1, 97:18, 118:1, 125:22, 126:5, 126:12, 126:17, 126:21, 127:4, 133:8
**published** [2] - 38:18
**pulling** [1] - 52:19
**purchased** [3] - 43:21, 96:11, 108:10

purposes [1] - 10:21
pursuant [2] - 10:1, 11:25
pursue [1] - 5:7
pursuing [1] - 35:5
put [50] - 31:25, 32:16, 33:21, 42:6, 47:1, 48:3, 50:5, 50:12, 52:14, 58:14, 60:11, 60:22, 62:17, 66:10, 66:17, 70:8, 70:10, 70:11, 70:12, 70:24, 71:2, 74:4, 75:14, 75:21, 82:13, 89:9, 90:2, 90:9, 90:17, 91:18, 94:17, 101:15, 102:9, 106:18, 108:19, 109:2, 116:19, 118:12, 127:14, 128:5, 128:23, 134:6, 134:11, 134:24, 141:12, 141:18, 145:12, 146:5, 147:5
putting [5] - 35:15, 54:16, 58:15, 92:9, 138:21

# Q

Q-U-A-C-K-E-N-B-U-S-H [1] - 88:1
Qadira [2] - 2:24, 80:15
QUACKENBUSH [3] - 87:22, 87:25, 88:5
Quackenbush [2] - 2:7, 87:22
quality [2] - 72:21, 147:4
quarter [1] - 119:15
Queens [1] - 102:6
questions [12] - 5:24, 62:23, 63:1, 63:6, 63:16, 67:24, 68:3, 69:9, 69:10, 126:10, 126:18, 126:24
quick [2] - 91:25, 128:23
quickly [1] - 124:21
quiet [1] - 18:3
quite [7] - 6:8, 6:11, 8:16, 60:18, 134:13, 142:5, 142:7
quote [1] - 56:23
quotes [1] - 56:15

# R

R-E-I-D [1] - 105:13
R-O-B-I-N-S-O-N [1] - 120:12
R-O-M [1] - 85:21
R.N [1] - 139:2
race [1] - 71:23
raise [3] - 61:3, 117:15, 123:18
raised [6] - 14:25, 65:9, 91:7, 110:20, 130:22, 141:8
raising [1] - 111:1
rally [1] - 143:15
ramifications [1] - 140:19
randomly [1] - 17:24
rape [1] - 82:7
rate [2] - 33:16, 47:12
rates [4] - 3:13, 36:25, 37:4, 38:9
ratio [2] - 25:17, 25:19
RCA [26] - 4:5, 4:9, 11:5, 14:22, 34:20, 35:11, 35:13, 56:3, 74:9, 75:21, 119:12, 119:13, 135:23, 136:8, 136:22, 137:2, 137:15, 137:19, 137:21, 137:24, 138:7, 139:8, 139:16, 140:15, 141:3, 147:10
RCA's [1] - 15:24
reaching [1] - 96:19
reactor [1] - 117:16
read [14] - 7:14, 19:18, 19:19, 57:25, 67:12, 67:13, 74:1, 74:3, 74:9, 74:11, 74:17, 74:19, 75:8, 75:19
reading [1] - 137:13
ready [1] - 39:3
real [8] - 9:3, 27:19, 31:12, 45:22, 110:17, 110:18, 110:24, 146:21
reality [3] - 18:18, 21:18, 22:12
realize [4] - 50:11, 91:24, 115:2, 116:25
realized [1] - 114:1
really [24] - 8:8, 17:9, 42:12, 53:4, 54:24, 61:20, 68:13, 70:2, 72:18, 72:19, 73:11, 74:20, 75:14, 80:1, 80:24, 86:19, 87:15,

103:16, 113:1, 124:23, 139:9, 143:3, 143:4, 145:11
Realtor [1] - 124:12
reason [4] - 20:4, 75:7, 106:3, 139:23
reasonable [18] - 9:5, 9:13, 9:15, 12:15, 14:23, 16:12, 16:24, 17:1, 17:7, 17:10, 22:14, 36:11, 36:13, 36:14, 65:20, 65:24, 66:2, 132:12
reasons [18] - 8:8, 10:5, 10:14, 10:16, 11:12, 22:7, 22:18, 119:18, 134:6, 134:11, 134:13, 138:21, 140:7, 143:7, 143:8, 143:11, 145:19
rebuttal [1] - 60:4
receiving [1] - 137:13
recently [2] - 55:11, 72:14
recidivism [4] - 3:13, 33:16, 38:8, 66:21
recognize [1] - 20:11
recognized [1] - 10:17
recommend [1] - 23:8
record [21] - 10:24, 60:7, 63:10, 67:6, 74:4, 74:16, 89:10, 94:18, 111:18, 117:13, 117:14, 120:13, 121:21, 124:6, 128:5, 128:24, 130:11, 132:25, 134:6, 134:12, 138:21
Recording [1] - 1:14
recovery [4] - 16:20, 56:23, 68:19, 79:6
RECOVERY [1] - 1:4
Recovery [1] - 4:2
recreate [1] - 59:6
recreation [1] - 59:5
recycle [1] - 75:17
redevelopment [1] - 139:18
redo [1] - 36:3
reduce [1] - 12:14
reduced [1] - 142:1
refer [1] - 11:11
reference [6] - 53:19, 83:15, 100:4, 133:3, 134:14, 134:16
referenced [1] - 73:24
referral [1] - 15:5
referred [2] - 10:12,

10:15
refrain [1] - 23:18
refreshed [1] - 74:2
refusal [2] - 16:23, 16:25
regard [2] - 134:23, 142:12
regarding [3] - 3:12, 14:3, 14:21
regards [2] - 137:17, 137:22
registered [2] - 32:11, 88:23
regulated [3] - 53:24, 54:1, 136:22
regulating [1] - 54:4
regulations [5] - 10:6, 17:12, 54:2, 54:3, 137:2
rehab [35] - 3:12, 11:23, 28:9, 31:25, 33:1, 36:20, 36:25, 37:5, 37:12, 37:14, 38:8, 52:23, 56:20, 57:18, 58:4, 69:13, 70:10, 76:22, 76:25, 77:5, 79:25, 80:20, 89:1, 92:9, 94:2, 94:19, 97:10, 97:20, 99:6, 101:2, 101:16, 103:7, 114:3, 119:19, 124:14
Rehab [2] - 3:14, 38:11
rehabilitate [1] - 90:8
rehabilitation [11] - 11:19, 17:14, 36:23, 42:6, 70:25, 95:16, 120:4, 132:8, 146:5, 146:12, 146:15
REID [7] - 105:10, 105:13, 105:16, 105:19, 107:1
Reid [3] - 2:22, 105:10, 107:1
reiterate [3] - 75:12, 81:17, 103:12
relapse [1] - 37:3
relating [1] - 15:3
relative [2] - 148:13, 148:15
relatively [1] - 55:10
relatives [4] - 72:17, 72:24, 116:17, 116:18
relevant [1] - 138:9
relief [3] - 9:9, 9:11, 10:10
relieves [1] - 38:21
relocated [1] - 120:17

remarks [1] - 24:18
remember [4] - 16:7, 66:5, 68:8, 73:16
reminds [1] - 59:1
rental [1] - 60:14
reopen [1] - 130:9
repeat [1] - 143:8
repeatedly [1] - 56:9
replace [1] - 26:20
replaced [1] - 52:11
replacing [1] - 51:14
report [1] - 135:23
Reporter [3] - 1:21, 1:23, 148:6
reporters [1] - 19:21
representative [1] - 78:18
representatives [1] - 137:24
reprinted [1] - 73:25
request [1] - 127:21
requested [2] - 4:11, 9:9, 131:24
require [4] - 9:1, 9:12, 15:23, 110:22
required [4] - 9:8, 11:6, 26:1, 36:12
requirement [1] - 10:14
requirements [3] - 11:6, 28:1, 132:7
requires [2] - 9:25, 129:21
resale [2] - 81:24, 82:20
research [1] - 62:19
Reseau [1] - 112:1
reside [1] - 117:22
resided [1] - 118:12
residency [1] - 108:11
resident [9] - 40:11, 51:1, 52:5, 52:19, 60:1, 77:12, 101:14, 112:13, 116:6
residential [30] - 16:10, 17:17, 18:20, 26:6, 27:16, 28:24, 30:4, 34:17, 52:23, 54:16, 60:6, 62:7, 70:13, 78:25, 79:1, 82:12, 89:7, 90:19, 105:3, 105:5, 107:9, 108:24, 114:21, 117:24, 117:25, 118:14, 119:20, 138:12, 139:11, 143:1
residents [11] - 13:18, 13:20, 51:11, 53:1, 76:10, 86:16, 93:20,

112:19, 126:9, 140:11, 145:9
**resources** [3] - 13:18, 90:10, 90:18
**respect** [6] - 23:3, 27:7, 28:1, 51:19, 138:18, 138:20
**respectful** [3] - 60:20, 87:11, 88:25
**respectfully** [1] - 10:24
**respond** [3] - 5:24, 63:16, 63:17
**response** [1] - 13:22
**responsibility** [3] - 90:8, 107:23, 135:14
**responsible** [3] - 82:4, 82:8, 135:11
**rest** [1] - 91:18
**restricted** [1] - 10:7
**restructured** [2] - 84:5, 84:6
**results** [1] - 137:14
**rethink** [1] - 50:16
**retire** [1] - 129:19
**revealed** [2] - 137:14, 138:3
**reverse** [1] - 134:25
**revert** [1] - 50:14
**reviewed** [1] - 134:17
**Reyne** [2] - 2:7, 87:22
**ride** [2] - 69:1, 110:2
**Ridgeview** [2] - 89:19, 121:16
**rights** [2] - 29:18, 120:2
**risk** [1] - 58:15
**risks** [1] - 27:18
**road** [2] - 113:22, 146:1
**Road** [10] - 1:5, 4:3, 4:8, 39:19, 39:20, 49:2, 70:12, 78:25, 113:22, 145:5
**roadways** [1] - 28:25
**roam** [1] - 85:11
**rob** [2] - 34:7, 82:8
**robbed** [1] - 86:25
**robbing** [1] - 80:4
**Robert** [5] - 2:4, 2:7, 24:3, 24:11, 35:19
**Robinson** [2] - 3:4, 120:11
**ROBINSON** [1] - 120:11
**role** [1] - 73:12
**roll** [3] - 128:23, 129:1, 133:14
**Rom** [2] - 2:6, 85:20
**ROM** [2] - 85:11, 85:20

**RONALD** [1] - 1:10
**room** [13] - 5:3, 18:3, 32:15, 33:19, 47:18, 72:25, 78:19, 86:14, 102:25, 110:23, 110:24, 123:16, 131:13
**root** [1] - 13:24
**roots** [2] - 75:3
**Roselle** [1] - 105:24
**route** [2] - 77:16
**Rubar** [1] - 31:5
**ruled** [1] - 15:12
**rules** [1] - 17:1
**run** [1] - 111:4
**running** [1] - 65:16
**runs** [1] - 83:8
**rush** [1] - 97:8
**Ruth** [2] - 2:15, 57:6

## S

**S-H-A-N-L-E-Y** [1] - 113:12
**S-T-A-N-L-E-Y** [1] - 103:24
**sad** [3] - 49:10, 58:8, 85:24
**sadly** [1] - 49:23
**safe** [26] - 27:22, 56:11, 56:12, 56:13, 56:19, 59:15, 60:23, 79:9, 79:10, 99:24, 101:1, 101:4, 103:3, 106:16, 108:14, 111:5, 113:17, 113:24, 114:7, 118:5, 118:8, 118:10, 121:7, 141:1
**safer** [1] - 96:17
**safety** [26] - 14:9, 14:19, 15:4, 16:2, 30:12, 89:5, 106:4, 106:13, 112:24, 112:25, 124:10, 134:21, 135:3, 135:4, 136:1, 136:2, 136:12, 136:20, 137:5, 137:22, 138:5, 138:6, 138:13, 139:6, 142:12, 142:24
**sale** [3] - 110:16, 113:3, 118:12
**sales** [1] - 75:5
**sally** [1] - 135:18
**Sand** [1] - 81:13
**Sandpiper** [1] - 102:2
**Sandra** [2] - 2:21, 104:23

**Sandy** [1] - 33:22
**sane** [1] - 123:16
**sat** [2] - 31:16, 98:3
**satisfaction** [1] - 25:23
**SAYREVILLE** [1] - 1:1
**Sayreville** [61] - 1:8, 18:10, 26:6, 27:3, 51:18, 52:3, 52:4, 58:11, 59:9, 61:3, 63:20, 64:15, 65:1, 65:6, 65:9, 65:10, 65:13, 68:22, 68:24, 69:11, 69:12, 70:1, 71:4, 72:20, 72:22, 73:16, 76:11, 77:13, 78:15, 78:16, 82:23, 87:8, 87:14, 88:22, 90:9, 91:5, 98:22, 108:18, 109:6, 112:13, 112:16, 119:23, 120:2, 120:19, 121:9, 122:25, 135:13, 138:1, 138:10, 139:14, 139:17, 139:21, 142:8, 142:17, 144:10, 144:25, 145:17, 145:18, 145:24, 146:13
**Sayreville's** [4] - 17:6, 17:11, 17:13, 90:8
**scam** [2] - 117:1
**scare** [1] - 91:18
**scared** [4] - 80:5, 80:8, 86:12, 116:11
**scares** [3] - 91:8, 91:15, 146:14
**scary** [3] - 80:1, 80:20, 80:24
**scene** [1] - 134:19
**scenery** [2] - 68:20, 68:25
**schedules** [1] - 98:25
**Scheid** [1] - 83:25
**scheme** [4] - 13:14, 14:5, 48:19, 48:20
**School** [13] - 28:6, 31:15, 52:3, 60:23, 73:5, 73:9, 100:21, 109:2, 110:8, 114:2, 120:25, 124:9, 124:17
**school** [68] - 26:12, 27:15, 27:20, 28:10, 30:2, 30:10, 43:13, 43:14, 44:20, 45:6, 46:2, 46:6, 46:9, 46:12, 48:25, 51:12,

54:13, 54:14, 54:15, 54:17, 56:24, 57:10, 57:11, 57:15, 57:19, 57:20, 57:22, 57:25, 58:2, 58:5, 58:7, 60:23, 60:24, 62:10, 66:18, 72:12, 78:13, 78:14, 80:22, 82:3, 82:13, 90:10, 90:19, 92:2, 92:3, 94:5, 99:2, 100:22, 101:16, 102:7, 102:9, 107:19, 110:25, 112:17, 112:19, 112:22, 114:1, 119:21, 124:7, 125:13, 138:12, 139:11, 142:25, 144:13, 145:13, 146:15, 147:6
**school's** [1] - 28:7
**schoolchildren** [1] - 144:14
**schools** [13] - 26:3, 26:6, 27:24, 28:24, 29:25, 78:11, 79:25, 80:21, 90:6, 106:9, 112:16, 112:18, 140:19
**Scientific** [1] - 36:24
**SCOTT** [1] - 70:22
**Scott** [3] - 2:13, 53:12, 70:22
**scourge** [1] - 27:23
**scout** [1] - 109:21
**Scouts** [1] - 73:8
**scrap** [1] - 71:7
**scratched** [1] - 38:21
**seat** [1] - 127:4
**second** [8] - 37:24, 38:23, 95:20, 126:1, 128:10, 133:9, 133:10, 133:11
**secretary** [1] - 37:23
**section** [4] - 24:13, 40:8, 65:1, 70:22
**secure** [1] - 53:21
**security** [14] - 14:9, 14:19, 16:2, 25:19, 25:20, 41:9, 46:4, 53:21, 135:21, 140:22, 141:4, 141:8, 141:9, 141:11
**see** [22] - 33:4, 35:8, 39:14, 43:5, 56:21, 58:7, 61:4, 68:2, 69:8, 84:6, 84:9, 86:9, 97:13, 97:14, 109:17, 109:18,

120:24, 135:19, 135:20, 135:24, 142:8
**seem** [1] - 90:7
**self** [4] - 53:24, 54:1, 54:4, 136:22
**self-regulated** [3] - 53:24, 54:1, 136:22
**self-regulating** [1] - 54:4
**sell** [1] - 49:18
**selling** [3] - 54:9, 56:22, 99:13
**send** [1] - 87:2
**senior** [5] - 48:22, 48:23, 66:8, 120:1, 139:11
**seniors** [3] - 31:22, 68:11, 88:11
**sense** [6] - 5:3, 5:14, 6:12, 6:19, 7:1, 97:11
**sensitive** [1] - 8:2
**sent** [1] - 47:7
**sentence** [1] - 75:13
**September** [1] - 96:23
**serious** [1] - 47:17
**seriously** [2] - 144:5, 144:7
**service** [2] - 42:21, 43:4
**Service** [1] - 36:18
**services** [3] - 17:2, 37:12, 132:14
**session** [16] - 127:6, 127:13, 128:1, 128:2, 128:7, 128:17, 128:21, 129:2, 129:19, 130:8, 130:9, 130:13, 131:1, 131:8, 131:22, 131:23
**set** [6] - 11:2, 12:5, 27:17, 98:4, 137:21, 148:11
**sets** [1] - 137:2
**seven** [4] - 33:8, 47:16, 110:7, 123:15
**seven-year-old** [1] - 110:7
**several** [6] - 7:24, 8:8, 25:6, 40:19, 47:25, 92:15
**several-hundred-bed** [1] - 25:6
**severe** [2] - 8:14, 47:16
**sex** [2] - 54:10, 56:16
**shadow** [1] - 135:20

**Shafka** [2] - 3:7, 117:7
**SHANLEY** [3] -
  113:11, 113:14,
  114:7
**Shanley** [2] - 3:4,
  113:11
**Shoddy** [1] - 56:1
**shootings** [1] - 40:18
**short** [4] - 28:5, 76:18,
  122:12, 132:4
**Shorthand** [1] - 1:21
**shortly** [1] - 131:6
**shot** [1] - 44:22
**shoulders** [1] - 44:10
**shoved** [1] - 84:10
**shovel** [2] - 48:3,
  48:17
**showed** [2] - 75:2,
  138:18
**showing** [3] - 51:6,
  82:10, 88:6
**shows** [1] - 15:10
**sibling** [1] - 114:25
**sic** [2] - 62:8, 144:22
**sic)** [1] - 136:20
**Sica** [5] - 12:3, 12:5,
  12:20, 15:7, 144:4
**sick** [1] - 87:9
**sickness** [1] - 66:22
**side** [2] - 135:17,
  143:25
**sides** [3] - 87:12,
  143:14, 143:19
**signs** [2] - 110:16,
  113:2
**similarly** [1] - 16:16
**simple** [2] - 32:1,
  76:18
**simply** [2] - 9:9, 46:6
**single** [13] - 6:14,
  43:12, 43:20, 43:24,
  51:25, 60:14, 61:21,
  85:5, 90:4, 110:23,
  112:21, 113:21,
  120:24
**single-family** [1] -
  60:14
**sister** [2] - 19:23, 20:8
**sit** [3] - 6:13, 42:1,
  109:3
**site** [14] - 9:18, 9:21,
  10:19, 14:16, 14:19,
  15:4, 17:16, 18:18,
  21:10, 21:20, 51:9,
  56:9, 66:6, 119:25
**sits** [2] - 39:12, 62:6
**sitting** [3] - 41:24,
  61:24, 140:16
**situation** [5] - 21:4,
  39:23, 49:10, 73:15,

136:12
**situations** [1] - 12:13
**six** [2] - 103:2, 123:14
**Six** [1] - 19:18
**skip** [1] - 36:4
**sleep** [2] - 87:9,
  142:13
**small** [1] - 113:20
**smart** [1] - 136:16
**so-called** [1] - 30:8
**social** [2] - 13:9, 20:23
**sold** [4] - 56:21, 75:1,
  100:24, 105:24
**solely** [1] - 130:18
**solvent** [1] - 50:18
**someone** [4] - 21:3,
  61:1, 66:25, 115:17
**someplace** [3] -
  68:11, 68:23, 82:14
**sometimes** [7] -
  25:11, 29:13, 80:4,
  92:7, 109:14,
  136:17, 143:19
**somewhere** [4] - 37:9,
  44:8, 90:18, 146:1
**son** [6] - 49:15, 58:6,
  99:7, 103:1, 111:20,
  121:21
**Son** [1] - 19:18
**sons** [3] - 65:10,
  81:21, 98:23
**sorry** [10] - 26:25,
  31:3, 36:23, 43:19,
  55:22, 100:17,
  105:14, 117:16,
  125:6, 133:20
**sort** [2] - 128:15,
  128:18
**sought** [1] - 10:10
**South** [6] - 25:24,
  66:3, 66:9, 71:2,
  71:3, 71:4
**speaker** [1] - 36:9
**SPEAKER** [26] - 5:15,
  21:8, 22:11, 30:4,
  31:7, 31:13, 57:12,
  58:16, 64:3, 64:13,
  70:4, 73:19, 74:7,
  74:13, 74:17, 77:7,
  83:1, 97:18, 118:1,
  125:22, 126:5,
  126:12, 126:17,
  126:21, 127:4, 133:8
**speaking** [6] - 18:4,
  22:25, 23:18, 24:18,
  56:2, 59:12
**speaks** [2] - 5:24,
  126:21
**special** [7] - 9:2, 10:5,
  10:14, 10:16, 11:12,

47:7, 113:21
**special-ed** [1] - 47:7
**specific** [1] - 126:10
**specifically** [3] - 13:7,
  15:3, 56:2
**spectrum** [1] - 87:12
**speed** [1] - 113:22
**spell** [59] - 24:9,
  30:22, 32:6, 40:5,
  42:18, 44:15, 46:21,
  46:23, 50:24, 53:11,
  55:6, 57:5, 59:23,
  61:9, 64:21, 70:19,
  72:7, 76:2, 76:5,
  77:23, 78:1, 80:14,
  81:9, 83:21, 85:18,
  87:24, 88:19, 90:25,
  93:8, 95:2, 95:25,
  98:12, 100:11,
  101:9, 101:23,
  103:22, 104:10,
  104:22, 105:9,
  105:12, 106:25,
  108:3, 109:10,
  111:15, 112:7,
  113:10, 114:16,
  116:2, 117:6,
  117:20, 118:20,
  119:3, 119:6,
  120:10, 121:12,
  122:7, 122:17,
  123:6, 123:23
**spelled** [2] - 80:16,
  83:23
**spend** [3] - 40:25,
  55:19, 109:23
**spent** [3] - 115:5,
  134:18, 136:18
**Spinnaker** [3] - 55:21,
  96:8, 96:17
**spoken** [5] - 23:2,
  23:7, 23:19, 89:3,
  89:4
**spot** [1] - 26:21
**staff** [7] - 4:15, 25:17,
  25:18, 39:16, 56:9,
  92:7, 135:11
**staffing** [3] - 15:5,
  139:3, 139:5
**stake** [4] - 12:10,
  12:24, 13:5, 15:9
**stamp** [2] - 47:1, 50:5
**stand** [6] - 29:8,
  29:13, 29:22, 51:8,
  108:9, 108:22
**standard** [1] - 21:25
**standing** [3] - 5:2,
  42:12, 105:23
**stands** [1] - 36:21
**Stanley** [2] - 2:19,

103:24
**STANLEY** [2] -
  103:23, 104:1
**Star** [1] - 56:1
**start** [1] - 91:23
**started** [2] - 75:8,
  138:4
**starting** [1] - 137:8
**state** [19] - 8:12, 8:23,
  8:25, 9:12, 13:3,
  13:8, 13:11, 13:18,
  13:19, 13:20, 54:2,
  56:8, 60:7, 85:6,
  85:9, 137:11, 138:3,
  143:11, 145:22
**State** [2] - 148:6,
  148:20
**statement** [3] - 6:18,
  60:5, 119:13
**Staten** [2] - 47:10,
  96:10
**states** [1] - 135:8
**States** [2] - 37:4,
  139:10
**statistically** [1] - 49:22
**statistics** [5] - 3:13,
  14:3, 36:25, 38:9,
  38:17
**statnews.com** [1] -
  54:8
**statute** [1] - 11:22
**statutory** [2] - 13:13,
  14:5
**stay** [3] - 18:14, 90:20,
  114:5
**steal** [1] - 41:13
**steam** [1] - 74:20
**stellar** [2] - 67:6, 67:8
**stenographer** [1] -
  95:21
**stenographically** [1] -
  148:9
**step** [2] - 71:24, 81:4
**Stephanie** [2] - 3:5,
  122:8
**still** [10] - 45:13,
  50:18, 65:10, 84:22,
  84:23, 86:22, 86:23,
  109:1, 113:17, 115:1
**stop** [8] - 21:8, 43:8,
  51:8, 56:18, 71:7,
  71:8, 79:11, 107:12
**stopped** [1] - 43:7
**stopping** [1] - 143:5
**stops** [1] - 80:23
**stores** [1] - 142:7
**Strathmore** [2] - 66:4,
  66:10, 66:12
**Straton** [2] - 32:9,
  101:13

**street** [11] - 52:22,
  82:1, 86:14, 93:18,
  99:7, 101:3, 102:11,
  110:25, 111:1,
  114:21, 145:6
**Street** [4] - 1:7, 64:25,
  66:11, 116:4
**streets** [2] - 56:23,
  82:17
**strongly** [1] - 77:10
**structure** [2] - 10:7,
  10:8
**student** [1] - 91:14
**students** [6] - 31:17,
  31:21, 45:8, 45:20,
  46:8, 46:13
**studio** [1] - 109:23
**stuff** [1] - 99:5
**subject** [1] - 9:18
**submit** [2] - 36:16,
  37:1
**submits** [1] - 18:20
**submitted** [1] - 27:9
**subsidiary** [1] - 67:18
**Substance** [1] - 36:18
**substance** [5] - 8:3,
  8:10, 13:2, 19:25,
  130:12
**substances** [1] - 33:8
**substantial** [1] - 15:25
**substantially** [2] -
  15:11, 15:17
**succeeding** [1] -
  121:9
**success** [2] - 36:25,
  37:2
**suffer** [1] - 16:19
**suffering** [2] - 13:8,
  19:25
**sufficient** [1] - 10:11
**suggest** [5] - 5:6,
  47:3, 47:13, 50:3,
  50:6
**suggesting** [1] - 21:10
**suicide** [1] - 81:21
**suing** [1] - 64:15
**suitable** [3] - 77:2,
  139:19, 145:17
**suited** [3] - 10:20,
  21:20, 37:11
**suits** [1] - 29:12
**sum** [1] - 130:12
**summarize** [3] - 5:5,
  5:11, 6:14
**summarized** [2] -
  74:1, 127:1
**summarizing** [1] -
  4:21
**summary** [5] - 5:21,
  5:25, 6:6, 7:10,

22:20
**summed** [1] - 75:14
**summertime** [1] - 106:14
**Summit** [2] - 34:2, 34:5
**Sunday's** [2] - 19:16, 19:17
**supervised** [1] - 11:23
**support** [8] - 10:18, 14:5, 25:12, 52:16, 88:6, 109:17, 109:24, 110:14
**supported** [1] - 110:10
**suppose** [1] - 27:8
**supposed** [5] - 35:14, 51:14, 57:10, 83:6, 83:7
**Supreme** [2] - 15:12, 119:24
**surgery** [1] - 96:25
**surround** [1] - 143:1
**surrounded** [1] - 123:14
**surrounding** [4] - 15:25, 106:20, 131:2, 134:20
**SUSAN** [1] - 1:15
**sustained** [1] - 13:21
**swear** [3] - 24:2, 24:5, 30:18, 35:22
**sweet** [1] - 122:12
**switch** [1] - 51:15
**switching** [1] - 59:3
**SWORN** [2] - 2:2, 3:1
**sworn** [58] - 24:7, 30:20, 32:4, 35:25, 40:3, 42:16, 44:13, 46:19, 50:22, 53:9, 55:4, 57:3, 59:21, 61:8, 64:19, 70:17, 72:5, 75:25, 77:21, 79:15, 80:12, 81:6, 83:19, 84:18, 85:16, 87:20, 88:17, 89:15, 90:23, 93:6, 94:25, 95:23, 98:10, 100:9, 101:7, 101:21, 102:20, 103:20, 104:8, 104:20, 105:7, 106:23, 108:1, 109:8, 111:13, 112:5, 113:8, 114:14, 115:25, 117:4, 117:18, 118:18, 119:1, 120:8, 122:5, 122:15, 123:4, 123:21

**sympathies** [1] - 125:8
**sympathy** [1] - 86:20
**symptoms** [1] - 13:24
**system** [2] - 90:10, 124:7
**systems** [1] - 100:2
**SZAMRETA** [2] - 72:8, 72:9
**Szamreta** [2] - 2:20, 72:8

# T

**T-A-B-A-C-C-O** [1] - 53:13
**T-A-I-T-E** [1] - 122:9
**T-O-R-R-E-S** [1] - 98:14
**TABACCO** [1] - 53:12
**Tabacco** [2] - 2:13, 53:12
**TABLE** [1] - 2:1
**Taite** [2] - 3:5, 122:8
**TAITE** [2] - 122:8, 122:11
**Tall** [1] - 124:2
**tax** [1] - 29:16
**taxes** [6] - 29:15, 52:25, 58:16, 81:23, 82:19, 109:16
**taxpayer** [1] - 77:13
**teach** [1] - 90:20
**teacher** [3] - 47:7, 78:14, 90:1
**teachers** [2] - 58:6, 92:6
**teams** [1] - 75:5
**tear** [2] - 90:15, 142:15
**television** [1] - 20:24
**term** [2] - 9:4, 27:10
**terms** [4] - 4:21, 14:8, 22:22, 26:15
**Terrace** [1] - 72:9
**terrified** [1] - 116:8
**test** [6] - 12:6, 12:21, 15:10, 46:24, 144:5, 145:15
**testified** [62] - 6:15, 8:19, 14:15, 22:18, 24:7, 30:20, 32:4, 35:25, 39:24, 40:3, 42:16, 44:13, 46:19, 50:22, 53:9, 55:4, 57:3, 59:21, 61:8, 64:19, 70:17, 72:5, 75:25, 77:21, 79:15, 80:12, 81:7, 83:19, 85:16, 87:20, 88:17, 89:16, 90:23, 93:6,

94:25, 95:23, 98:10, 100:9, 101:7, 101:21, 102:20, 103:20, 104:8, 104:20, 105:7, 106:23, 108:1, 109:8, 111:13, 112:5, 113:8, 114:14, 115:25, 117:4, 117:18, 118:18, 119:1, 120:8, 122:5, 122:15, 123:21
**testify** [1] - 6:5
**testimony** [20] - 4:22, 7:23, 8:8, 8:10, 10:25, 13:1, 14:1, 14:7, 14:13, 14:19, 22:22, 125:10, 126:8, 134:17, 136:9, 137:6, 137:23, 138:25, 141:3, 148:9
**thankfully** [1] - 92:24
**THE** [1] - 77:1
**theater** [4] - 28:19, 44:8, 50:13, 52:15
**themselves** [1] - 103:17
**therapists** [1] - 110:24
**there'll** [1] - 52:20
**thereabouts** [1] - 141:21
**therefore** [1] - 146:11
**they've** [4] - 6:15, 12:4, 60:12, 119:16
**thinking** [1] - 92:20
**Third** [1] - 1:7
**third** [2] - 52:2, 73:22
**Thomas** [1] - 53:5
**thoughtful** [1] - 7:25
**thousand** [5] - 45:16, 46:1, 66:19, 110:16, 113:2
**thousands** [4] - 108:25, 109:1, 123:13, 136:19
**threaten** [3] - 119:22, 119:23
**three** [10] - 12:13, 31:16, 34:25, 60:15, 60:22, 76:15, 85:25, 108:12, 124:7, 124:8
**thrive** [1] - 109:16
**throat** [3] - 84:10, 110:4, 110:5
**throughout** [1] - 13:3
**throw** [1] - 48:10
**thrown** [1] - 32:13

**Tide** [1] - 111:4
**timeline** [1] - 128:15
**tired** [1] - 102:23
**today** [10] - 54:6, 76:11, 76:21, 78:14, 84:4, 84:8, 99:4, 108:12, 116:9, 125:16
**together** [3] - 75:22, 107:12, 111:8
**TOM** [1] - 1:11
**tongue** [1] - 126:22
**tonight** [16] - 6:23, 47:1, 51:5, 69:8, 70:6, 74:3, 84:15, 97:22, 108:18, 109:5, 124:23, 127:8, 128:14, 128:16, 128:18, 146:17
**took** [4] - 72:23, 96:24, 116:18, 137:11
**tore** [1] - 83:5
**Torres** [2] - 2:14, 98:14
**TORRES** [3] - 98:13, 98:16, 98:20
**total** [1] - 74:21
**totally** [7] - 29:18, 94:7, 104:3, 116:15, 116:24, 117:13, 123:19
**touched** [5] - 20:16, 47:19, 143:20, 143:23, 143:24
**tough** [2] - 87:2, 92:4
**toward** [2] - 62:12, 62:17
**town** [22] - 31:18, 34:9, 58:23, 59:11, 59:12, 61:20, 65:11, 65:14, 66:14, 76:20, 77:7, 85:3, 88:3, 92:3, 92:4, 95:11, 107:18, 120:21, 124:12, 130:1, 142:6
**Township** [3] - 1:15, 1:15, 1:16
**track** [2] - 60:15, 67:6
**traffic** [13] - 6:4, 14:9, 14:10, 14:14, 14:17, 16:1, 39:18, 39:22, 49:1, 49:3, 49:6, 52:22, 94:8
**training** [1] - 41:5
**transcript** [4] - 135:6, 136:3, 136:14, 148:8
**Transcript** [1] - 1:3
**transfer** [1] - 113:20

**Transit** [2] - 115:10, 115:15
**transportation** [2] - 113:20, 139:12
**treat** [1] - 25:8
**Treatment** [1] - 56:2
**treatment** [22] - 8:4, 8:13, 16:21, 20:5, 24:20, 24:22, 24:25, 25:3, 25:5, 25:7, 25:25, 26:10, 28:8, 28:14, 29:2, 30:1, 30:7, 45:9, 53:23, 54:11, 89:2, 106:20
**Tree** [2] - 72:11, 124:16
**tremendous** [1] - 49:12
**trespass** [1] - 46:14
**tried** [3] - 46:14, 62:19, 99:7
**trouble** [1] - 47:12
**troubled** [1] - 142:24
**true** [4] - 75:20, 136:17, 145:4, 148:8
**trusted** [1] - 108:16
**trusting** [1] - 108:20
**try** [3] - 21:5, 72:24, 87:11
**trying** [6] - 36:21, 63:25, 64:10, 68:5, 91:9, 106:1
**tune** [1] - 33:12
**tune-up** [1] - 33:12
**turmoil** [1] - 56:1
**turn** [3] - 7:6, 65:16, 133:1
**turned** [3] - 20:3, 20:4, 34:5
**turns** [1] - 15:7
**TV** [1] - 6:25
**two** [20] - 6:5, 11:7, 11:22, 12:11, 14:4, 35:1, 37:19, 39:9, 62:2, 62:3, 71:24, 76:14, 76:18, 86:21, 109:1, 116:7, 119:15, 124:8, 131:14, 137:9
**two-step** [1] - 71:24
**tying** [1] - 82:16
**type** [9] - 25:11, 25:16, 25:20, 30:7, 139:14, 139:20, 139:21, 147:1
**types** [1] - 144:24
**typical** [1] - 8:7

## U

**ultimate** [1] - 75:5
**un-armed** [1] - 141:4
**unacceptable** [3] - 43:15, 106:9
**unanimous** [1] - 103:7
**under** [19] - 9:14, 11:10, 12:2, 12:4, 13:6, 16:13, 16:18, 17:6, 44:23, 44:25, 45:8, 48:5, 84:22, 84:23, 119:24, 120:3, 130:5, 132:10, 137:18
**undercover** [2] - 40:20, 41:23
**understaffing** [2] - 34:22, 34:24
**undisclosed** [1] - 9:22
**undisputed** [5] - 11:17, 11:20, 12:25, 14:2
**unfortunately** [1] - 6:13
**unique** [1] - 30:9
**unit** [1] - 135:10
**United** [3] - 37:4, 51:7, 139:10
**united** [1] - 146:20
**units** [2] - 60:12, 60:14
**University** [1] - 91:13
**unreasonable** [2] - 19:6, 66:1
**unsafe** [1] - 106:10
**unstable** [3] - 32:24, 34:1
**unsupervised** [1] - 30:2
**unwise** [1] - 29:6
**Up** [2] - 3:14, 38:12
**up** [45] - 5:4, 7:3, 18:1, 18:3, 18:4, 20:12, 23:20, 23:25, 32:18, 33:12, 34:3, 42:13, 50:16, 51:6, 52:8, 54:18, 59:12, 68:14, 71:12, 73:23, 74:11, 75:14, 78:10, 79:20, 81:24, 82:1, 82:16, 85:8, 85:9, 88:6, 107:11, 108:9, 110:7, 112:20, 118:12, 125:9, 127:8, 128:20, 137:6, 138:19, 140:4, 140:21, 143:13, 143:17, 143:24

**Upper** [1] - 104:13
**upset** [1] - 85:23
**upsetting** [1] - 97:22
**urge** [2] - 77:14, 87:15
**urgent** [3] - 8:12, 13:1, 15:14
**Ursula** [3] - 2:6, 32:7, 32:11
**uses** [3] - 21:14, 59:3, 145:9
**utilized** [1] - 29:17

## V

**V-A-G-L-I-O** [1] - 88:21
**vacant** [1] - 28:22
**VAGLIO** [1] - 88:20
**Vaglio** [2] - 2:8, 88:21
**value** [2] - 81:24, 82:20
**values** [3] - 90:5, 124:13, 141:25
**variance** [14] - 9:9, 9:13, 10:5, 10:10, 10:18, 11:6, 12:7, 12:12, 12:18, 16:9, 18:16, 29:5, 29:12, 135:2
**various** [1] - 60:3
**vehicles** [1] - 55:18
**Venetian** [4] - 31:22, 31:10, 83:5, 93:21
**versus** [2] - 136:4, 140:20
**Vice** [1] - 1:11
**VICE** [8] - 125:25, 128:9, 129:6, 131:14, 133:5, 133:25, 134:8, 139:24
**victims** [1] - 146:25
**Victory** [1] - 28:18
**View** [1] - 62:8
**view** [2] - 46:10, 146:22
**virtually** [1] - 21:15
**visibility** [1] - 135:9
**visit** [5] - 44:22, 52:7, 72:24, 82:15, 93:17
**visited** [2] - 93:21, 93:22
**visiting** [1] - 39:22
**volunteer** [1] - 20:13
**volunteers** [1] - 20:13
**vote** [18] - 64:4, 70:5, 77:9, 101:19, 109:4, 122:11, 125:1, 128:4, 128:14, 128:17, 132:22,

133:13, 133:14, 134:7, 134:11, 135:5, 147:7
**voted** [6] - 108:15, 108:16, 139:23, 142:10, 142:19, 143:9
**voting** [4] - 130:15, 135:1, 143:11, 145:19
**vulnerable** [1] - 75:15

## W

**wait** [3] - 7:5, 37:23, 85:12
**waiting** [5] - 31:22, 34:18, 54:20, 71:11, 115:7
**walk** [18] - 28:5, 29:24, 41:12, 41:14, 43:22, 46:6, 57:21, 57:22, 71:5, 80:5, 94:9, 107:12, 110:3, 110:8, 114:9, 118:7, 124:8
**walking** [11] - 43:20, 44:10, 44:11, 71:1, 80:22, 94:9, 99:1, 106:8, 107:21, 110:4, 144:14
**walks** [4] - 86:1, 91:10, 112:20, 118:7
**walkway** [1] - 28:7
**Walmart** [2] - 109:18, 111:5
**wants** [7] - 7:2, 28:14, 33:14, 33:15, 97:20, 128:3, 143:4
**War** [1] - 52:3
**war** [3] - 78:18, 78:21, 79:5
**washed** [1] - 62:10
**watch** [3] - 43:9, 43:10, 109:4
**watched** [3] - 43:24, 61:20, 62:1
**watching** [3] - 6:25, 31:17, 135:22
**ways** [1] - 60:3
**wealthy** [1] - 25:9
**Weber** [1] - 68:22
**Wednesday** [1] - 1:7
**week** [4] - 74:2, 84:18, 115:6, 125:2
**weekday** [1] - 102:25
**weekend** [1] - 86:11
**weekends** [1] - 118:6
**weigh** [2] - 12:16, 143:14

**weighing** [1] - 147:2
**welcome** [2] - 142:17, 145:18
**whole** [6] - 34:14, 39:12, 68:14, 73:1, 117:24, 137:19
**wholeheartedly** [1] - 142:16
**wife** [5] - 72:15, 76:20, 105:23, 115:5, 115:15
**Wife's** [1] - 66:7
**wild** [1] - 65:16
**WILLIAM** [1] - 1:11
**willing** [6] - 9:16, 14:23, 26:9, 30:11, 55:19, 138:14
**win** [5] - 73:16, 73:17, 93:4
**Winehouse** [1] - 37:5
**wisdom** [1] - 26:1
**wish** [3] - 4:25, 83:14, 128:4
**wishes** [1] - 77:19, 81:3, 83:17
**witness** [2] - 6:14, 60:5
**witnesses** [1] - 22:22
**wits** [1] - 86:12
**Wlodarczyk** [1] - 84:24
**woman** [2] - 34:7, 90:4
**women** [1] - 52:8
**wonderful** [2] - 96:14, 97:1
**wondering** [1] - 110:4
**Woodlake** [1] - 40:8
**Woodmere** [7] - 53:13, 85:21, 88:21, 104:1, 112:11, 113:14, 118:23
**Woods** [1] - 104:24
**words** [2] - 34:18, 36:15
**working-class** [1] - 107:8
**works** [5] - 53:3, 78:15, 91:14, 108:13, 110:21
**world** [3] - 21:6, 41:2, 91:10
**worried** [4] - 67:2, 67:20, 90:4, 90:5
**worry** [12] - 54:2, 54:3, 67:19, 99:10, 99:23, 100:1, 106:15, 107:13, 110:6, 114:9, 145:25, 146:2
**worrying** [1] - 115:16
**worse** [1] - 43:11

**worst** [2] - 34:13, 34:14
**worth** [2] - 8:6, 74:12
**wrongest** [1] - 87:13

## Y

**yards** [2] - 45:16, 46:1
**Yas** [1] - 109:11
**Yasmeen** [1] - 2:24
**year** [8] - 52:2, 58:24, 98:22, 105:25, 107:11, 110:7, 137:1, 141:20
**years** [65] - 19:24, 20:11, 20:15, 28:22, 31:16, 32:16, 33:11, 40:19, 45:14, 47:8, 47:9, 52:2, 55:12, 55:13, 60:2, 61:17, 61:19, 65:6, 66:5, 66:3, 70:24, 72:13, 72:14, 72:15, 73:14, 78:8, 78:11, 79:1, 79:6, 83:3, 85:3, 85:22, 85:25, 86:22, 88:23, 89:22, 90:2, 91:7, 91:9, 92:15, 95:6, 96:13, 96:23, 97:4, 102:7, 110:11, 112:14, 113:16, 114:8, 115:1, 116:7, 120:16, 121:22, 123:14, 123:15, 123:16, 135:13, 136:18, 139:19, 142:6, 143:21
**yesterday** [1] - 76:19
**yet-to-be-identified** [1] - 9:21
**York** [18] - 19:16, 19:17, 19:21, 21:7, 33:2, 51:7, 55:11, 55:12, 55:13, 61:1, 78:9, 85:22, 110:20, 113:18, 118:13, 120:18
**young** [8] - 31:2, 31:15, 42:13, 76:18, 107:21, 108:11, 113:1, 116:7
**younger** [1] - 114:25
**youngest** [1] - 107:5
**yourself** [2] - 84:5, 84:6
**yous** [1] - 116:25

## Z

**zone** [14] - 17:17,

18:19, 18:20, 18:23,
26:2, 54:18, 57:10,
57:11, 57:15, 58:5,
145:3, 145:7, 145:8

**zoned** [1] - 18:11

**zones** [1] - 27:24

**zoning** [10] - 10:3,
11:13, 17:11, 17:13,
18:12, 20:10, 59:16,
60:8, 62:1, 101:17

**zoning's** [1] - 101:17