UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

901 ERNSTON ROAD LLC,   .   Case No. 3:18-cv-02442(AET)
                  .
      Plaintiff,   .
                  .   402 East State Street
        v.          .   Trenton, NJ 08608
                  .
BOROUGH OF SAYREVILLE   .
ZONING BOARD OF       .
ADJUSTMENT, et al.    .
                  .
      Defendants.   .
                  .   April 25, 2018
. . . . . . . . . . . . ..   11:00 a.m.


TRANSCRIPT OF A HEARING
BEFORE HONORABLE ANNE E. THOMPSON
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For the Plaintiff:        Marino Tortorella & Boyle, PC
                        By:  KEVIN HARRY MARINO, ESQ.
                        437 Southern Boulevard
                        Chatham, NJ 07928-1488

For the Borough of      Piro Zinna Cifelli Paris &
Sayreville and the        Genitempo LLC
Sayreville Board of     By:  RICHARD A. GRODECK, ESQ.
Adjustment:             360 Passaic Avenue
                        Nutley, NJ 07110



Audio Operator          Kimberly Stillman


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

(609)586-2311    Fax No. (609) 587-3599

2

```
APPEARANCES (Cont'd):

For Borough of          McKenna, Dupont, Higgins & Stone
Sayreville:             By:  EDWARD G. WASHBURNE, ESQ.
                        229 Broad Street
                        Red Bank, NJ 07701

For Sayreville Zoning   McManimon, Scotland & Baumann, LLC
Board of Adjustment:    By:  WILLIAM W. NORTHGRAVE, ESQ.
                        75 Livingston Avenue, Second Floor
                        Roseland, NJ 07068

                    - - -
```

**I N D E X**

                                                          **PAGE**

**EXHIBITS**

Demonstrative exhibit showing proposed location        9

   of facility

Statistics Chart                                       11

4

1              THE COURT:  Who do we have?

2              MR. MARINO:  Good morning, Your Honor.

3              THE COURT:  Yes.  Plaintiff, who do we have?

4              MR. MARINO:  It's Kevin Marino, Marino Tortorella &

5    Boyle for the plaintiff 901 Ernston Road LLC.

6              THE COURT:  Very well.  And across the aisle?

7              MR. GRODECK:  Good morning, Your Honor, Richard

8    Grodeck, Piro Zinna for the Borough of Sayreville and the

9    Sayreville Board of Adjustment.

10             THE COURT:  Very well.  Yes, sir.

11             MR. WASHBURNE:  Good morning, Judge, Edward

12   Washburne, McKenna, DuPont, Higgins & Stone and my firm is

13   Borough Counsel in a general sense for the Borough of

14   Sayreville.

15             THE COURT:  Very well.

16             MR. NORTHGRAVE:  Good morning, Your Honor, William W.

17   Northgrave, McManimon, Scotland & Baumann on behalf of the

18   Zoning Board.  And just to be clear, Judge, Mr. Grodeck's role

19   is for the insured claims.  I represent the Zoning Board on the

20   uninsured claims, the prerogative of writ type claims as I

21   think Mr. Washburn represents the Borough of Sayreville

22   although can't announce if there's really any claims against

23   the Borough just yet.  It's solely against the -- as to

24   prerogative writ they're solely against the Zoning Board.

25             THE COURT:  Very well.  Now, I'd like for you, Mr.

5

1   Marino, to say for the record the status of this case.  In

2   other words, what has happened thus far from your filing, and

3   where we are.

4           MR. MARINO:  Your Honor, we --

5           THE COURT:  And the rest of you may be seated.

6           MR. MARINO:  Your Honor, we have filed, as the Court

7   is aware, a verified complaint and together with that an order

8   to show cause with temporary restraints.  Your Honor entered

9   the order to show cause and scheduled the hearing for this

10  morning.

11          And it is a hearing primarily at this juncture

12  directed to our request that Your Honor order the Sayreville

13  Board of Zoning Adjustment to enter the appropriate approval so

14  that we may move forward with the neighborhood drug and

15  substance abuse treatment facility in Sawyerville that is the

16  subject of our application.

17          Since that allocation has been filed we have placed

18  before the Court all the relevant documents of the proceedings

19  below.  My friends across the table have filed their

20  opposition, we've filed our replies, and Your Honor marked down

21  this morning for a hearing on the subject.  We have since had

22  conversations with counsel for the Board, and conferenced the

23  matter with Your Honor, and --

24          THE COURT:  Well, even before --

25          MR. MARINO:  -- that's where we stand at the moment.

1          THE COURT:  -- conferencing with me this morning I

2   want to know what efforts were made between counsel from the

3   time you came in here with your application to now.  I mean, I

4   assume that the lawyers in a matter of this sort having to do

5   with governmental bodies, having to do with approvals I would

6   anticipate that the lawyers would try as best they can to

7   resolve this through some even compromising efforts to see if

8   in fact the parties could work this out.

9          MR. MARINO:  And, of course, Your Honor's correct and

10  we have done that consistent with how we behave really in every

11  case and particularly in a case as Your Honor indicates such as

12  this one that involves a public body as well as a private

13  entity such as RCA and 901 Ernston Road which is a wholly owned

14  subsidiary of RCA.  We've had conversations, I've spoken with

15  Mr. Northgrave at length.  I know that Mr. Northgrave has

16  spoken with his client being the Board.  He and I have been in

17  fairly regular communication during the pendency of this

18  application trying to find as Your Honor intimates here a path

19  forward or a way to resolve this dispute.  And that's -- we'd

20  very much like, I think, to continue to talk to one another

21  about where we stand.

22          As Your Honor is aware, we have claims here for the

23  functional equivalent of an action in lieu of prerogative

24  writs.  That's in Counts 5 and 6 of our complaint.  We also

25  have a claim for monetary damages under various discrimination

1  statutes that are enumerated in our verified complaint.  And so

2  I think we're here today and I'll note the presence in the

3  courtroom for Your Honor.  You can see we have quite a crowd

4  gathered.

5          THE COURT:  Yes.  I want more specificity as to who

6  is here because I want to know who's here prepared to testify.

7          MR. MARINO:  Right.

8          THE COURT:  And on both your side and on the side of

9  Sayreville, et al.

10         MR. MARINO:  With respect to the plaintiff's side,

11 Your Honor, I have in the courtroom the -- for my first witness

12 would be Deni Carise who is standing now.  She was a witness

13 below and is prepared to testify about (a) the magnitude of the

14 opiate problem in Middlesex County and Sayreville in

15 particular, (b) the manner in which Recovery Centers of America

16 and particularly the proposed facility at 901 Ernston Road

17 would address that problem, the safety concerns that have

18 animated some of the discussions -- animated some of the

19 discussions at the Board level in this matter, the leasehold

20 concerns, and particularly the danger of losing that lease and

21 therefore --

22         THE COURT:  What is that right now?

23         MR. MARINO:  So, we're at a standstill.

24         THE COURT:  You got an extension.

25         MR. MARINO:  We got an extension in anticipation of

1    this proceeding, but we are --

2            THE COURT:   What's your date now?

3            MR. MARINO:   It's May 31st.   And we are given to

4    believe, Your Honor, I can tell the Court I don't think I'm

5    telling stories out of school to say as would be something the

6    Court would expect in a transaction of this type.   The owner of

7    the property can't wait forever to see if it's actually going

8    to be developed.

9            THE COURT:   Obviously.

10           MR. MARINO:   And so Your Honor will recall when we

11   initially made this application the Court convened a telephone

12   conference and addressed the very obvious practical concern

13   presented by the very tight time frame of trying to have a

14   hearing on a matter of this magnitude and to do so in a time

15   frame that would accommodate the -- what was then the leasehold

16   termination date.   And so at the Court's suggestion we went

17   back and had further discussions and we're able to get a

18   little, for lack of a better phrase, breathing room on that

19   lease so that we could have at least the opportunity both to

20   explore possible resolution with the powers that be.

21           THE COURT:   All right.   Who else do you have as

22   witnesses?

23           MR. MARINO:   I also have James Higgins standing now,

24   Your Honor, who'll be our planning expert.   He'll be our second

25   witness in the case.

9

1          THE COURT:  What do you mean planning expert?

2          MR. MARINO:  So he is a person who testified, he's an

3     expert in the area of zoning and planning and he gave testimony

4     below on the extent to which the proposed facility would comply

5     with and comport with local zoning rules and so forth.  So he

6     gave that testimony below and would largely reiterate that

7     testimony today.

8          Also, Your Honor, I have an exhibit -- demonstrative

9     exhibit which I'll show to the Court that sets forth exactly

10    where this proposed facility is situated.

11         THE COURT:  Where is it?  Where is it?

12         MR. MARINO:  I'm going to ask my partner John Boyle

13    to bring it forward and show Your Honor.  I should say, Your

14    Honor, that Mr. Boyle has done some fine work in this direction

15    of holding up exhibits in addition to the type of legal work

16    he's done since clerking in this building for Judge

17    Bongiovanni.  I'm sure you'll find he's as good an easel as he

18    was a law clerk.  Move a little closer, if you would, to the

19    Judge.

20         THE COURT:  Yes.  Come around here.  Would you get

21    that easel, put it down, then get this easel behind me and then

22    let it stand right here so I can see this.  Fine.  Now where on

23    that map are we talking about?

24         MR. MARINO:  This is the facility 901 Ernston Road

25    would be here depicted somewhere near the center of this

1  demonstrative exhibit which is entitled legend 901 Ernston

2  Road.  We have a Parkway here, and you see the school that has

3  been referred to as over this bridge from the facility and down

4  the road.  And you'll notice it's essentially wooded area

5  surrounding the facility.

6          THE COURT:  Is there anything else, any other

7  business, any other company, any other activity?

8          MR. MARINO:  There is not, Your Honor.  As you can

9  see it's surrounded on three sides by very substantial wooded

10 area and there's a rather substantial road that runs

11 perpendicular to the Parkway that separates this facility from

12 homes on the other side of that road.  So I think -- I was

13 hoping that this would give Your Honor the kind of physical

14 depiction, give you a sense of what we have planned.

15         So we would have, as I was saying, in addition to Mr.

16 Higgins I've introduce Your Honor to Mr. Brian O'Neill seated

17 in the front row.

18         THE COURT:  Mr. O'Neill.

19         MR. O'NEILL:  Good morning, Your Honor.

20         THE COURT:  What would he be able to testify to?

21         MR. MARINO:  Mr. O'Neill is a principal of the

22 Recovery Centers of America so he has developed these centers

23 all over the country.  And primarily what I would ask him to

24 share with Your Honor is a chart setting forth statistics that

25 really accentuate the rather significant need for this type of

1  facility.  And I envision him -- his testimony would be rather
2  short, but I think important and would provide Your Honor with
3  the ability to at least put some quantitative component to this
4  very significant problem.  Give you a very good sense of the
5  magnitude of the problem.
6      My understanding, and I'll let Mr. Northgrave speak
7  for himself, but my understanding is that he doesn't intend to
8  offer witnesses.  Obviously he would avail himself of the
9  opportunity to cross examine our witnesses, but would rely on
10 the record below.  I think I'm saying that correctly as far --
11 and I'll let him do that.  And with the Court's permission I'll
12 hand up the chart that I was referring to.  And I'll give a
13 copy to Mr. Northgrave as well.  This is the chart that Mr.
14 O'Neill would explain to Your Honor.  He's intimately familiar
15 with these facts and figures and I think could answer any
16 questions the Court has about them.  May I approach, Your
17 Honor?
18     THE COURT:  Yes.  Thank you.
19     MR. MARINO:  So really what this assesses is the
20 extent to which, and I think puts rather graphically depicts
21 just as our blowup here graphically --
22     THE COURT:  The need.
23     MR. MARINO:  Yes.
24     THE COURT:  The need.
25     MR. MARINO:  Graphically depicts the need just as our

1    blowup here graphically depicts this location as a prime

2    location to fill that need.  This really puts the meat on the

3    bones for the Court as to the extent to which this is a very

4    significant and felt need.

5           So, that would be what our presentation would entail.

6    Understanding Your Honor always likes to have a very complete

7    record we brought witnesses here, not to elongate the

8    proceedings, but to make certain that if the Court wishes --

9           THE COURT:  Well, to put on your case.

10          MR. MARINO:  Yes.  Yes, Your Honor.  And so we --

11   sometimes these applications are handled on the papers --

12          THE COURT:  So, the other persons who are here are

13   not witnesses.

14          MR. MARINO:  That's correct, Your Honor.  We have a

15   number of folks, lawyers, and other in-house executives from

16   RCA.  You can get a flavor just from the sheer numbers here the

17   magnitude of this issue for RCA.  It's obviously a very

18   significant project, one they've been working on for a

19   considerable period of time.  And I can tell Your Honor I've

20   had the pleasure of representing RCA for a couple of years now.

21   This is not the first application of this type that I've had.

22   And the interest that you see manifested by their presence

23   today is reflective of the serious commitment they have to this

24   problem.

25          THE COURT:  All right.  Thank you very much.

1          MR. MARINO:   Thank you, Your Honor.

2          THE COURT:   All right, let's go to the other side and

3     I'd like to know how you would meet Mr. Marino's presentation.

4          MR. NORTHGRAVE:   Thank you, Your Honor, William

5     Northgrave of McManimon, Scotland & Baumann.   Judge, I have the

6     honor of representing a number of governments and what I've

7     learned over the years is that my ability to defend anything

8     they do lives and dies by the record that is made at the

9     relevant hearing.   In this case the Zoning Board hearing.   So

10    in terms of, you know, I would certainly avail myself of the

11    opportunity to cross examine any witnesses that come before the

12    Court, but the evidence that my clients relied upon in

13    rendering the judgment that plaintiffs now challenge is set

14    forth in the transcripts and have previously been submitted and

15    in the legal argument in our briefs.   So, you know --

16         THE COURT:   And you have no broader evidence --

17         MR. NORTHGRAVE:   No, Judge.   I --

18         THE COURT:   -- to --

19         MR. NORTHGRAVE:   -- I don't think the Court would

20    allow me to.   If I were to try to expand the record here I

21    think the Court would rightfully shut me down.   Because

22    regardless of what I introduced no matter how compelling if it

23    were not before the Zoning Board when they made their

24    determination --

25         THE COURT:   Well, if it were supportive of what went

1  on at the Zoning Board it would seem that the Court could hear

2  it.

3         MR. NORTHGRAVE:  Well, all that -- well, the short

4  answer Your Honor is that what is before the Court in terms of

5  the transcripts that have been submitted with both our

6  pleadings and plaintiff's pleadings are what we rely on in

7  support of the action and in defense of the action my client is

8  taking here.

9         THE COURT:  All right.  Thank you.

10        MR. NORTHGRAVE:  Thank you, Your Honor.

11        THE COURT:  Let me hear from counsel, the other

12  attorneys just with regard to this proceeding and how you see

13  yourself fitting in here and how this matter as you see it

14  could best be resolved.

15        MR. GRODECK:  Good morning, Your Honor, Richard

16  Grodeck again from the firm Piro Zinna Cifelli Paris &

17  Genitempo.  As Mr. Northgrave pointed out earlier my firm has

18  been assigned to defend and to represent the interest of both

19  of the defendants, the Borough and the Zoning Board of

20  Adjustment in respect of those claims for which damages are

21  sought and for which indemnification is entitled under the

22  policy.  I have reviewed the underlying record.  I happen to

23  agree with Mr. Northgrave that the decisions of the Zoning

24  Board as reflected in the transcript is what is to be reviewed

25  by Your Honor.  And I suppose that record could be expanded

1    upon, but not with the addition of facts, but perhaps only with

2    the supplementation of opinion or basis.

3         But having read as recently as early this morning the

4    points made by each of the members of the Zoning Board I don't

5    think that there's anything that can be offered to the Court to

6    expand upon that.  So I was prepared to examine witnesses based

7    upon the underlying record, and what I understood to be the

8    Court's directive, to be prepared today to confront the

9    question of substantial likelihood of success on the merits and

10   irreparable harm.  And again, those are the issues before the

11   Court largely in respect of, well, I guess, all of the counts

12   in the complaint, but I was focusing on those that created

13   federal questions of fact regarding the law and Section 1983.

14        THE COURT:  Very well.  Thank you very much.  And

15   counsel, I'd like to hear how you see yourself in this --

16        MR. WASHBURNE:  We represent the Borough as Borough

17   Counsel in general.  At this point in time I have nothing to

18   add to what my colleagues have expressed to Your Honor.

19        THE COURT:  All right.  This case is a substantial

20   case, one somewhat different from some of the applications we

21   are faced with for emergency relief.  The irreparable harm

22   aspects and the likelihood of success were the two factors in

23   Rule 65 that seemed to be the focus and in some ways different

24   from some of the cases.  But, nevertheless, our research with

25   regard to previous cases across the country, in courts indicate

1  that the courts have been sensitive to these arguments which

2  plaintiff has asserted, and we had set the matter down for an

3  opportunity for witnesses to testify.

4         Now, before we do that, and I'm not going to decide

5  at this point whether we will go forward with evidentiary

6  hearing, if the attorneys have some thought as to some ways

7  that the Court's discussion with you in chambers could be

8  effectuated in a way that would if not satisfy at least would

9  do the least harm to each side.  I always try to encourage

10 that.  So let me give you a little time before we actually

11 begin any such evidentiary hearing to ask you to talk to each

12 other, see what you can draft with each other, and we'll resume

13 in a short time.

14        THE ATTORNEYS:  Thank you very much, Your Honor.

15              (Recess)

16        THE COURT:  After conferring with you on this

17 proposed map, I guess, passed forward I had some questions and

18 I appreciate it if you, Mr. Marino, can elaborate somewhat on

19 the points that are really necessary in order to obtain the

20 relief that you're seeking.

21        MR. MARINO:  Thank you very much, Your Honor.  With

22 the Court's permission I'll begin with the discussion of the

23 exhaustion of available remedies.  As I believe the Court is

24 aware discrimination claims become final even before the

25 exhaustion of administrative remedies.  In this case the

1  defendants have argued that the case is not ripe for

2  adjudication because we did not first file an action in lieu of

3  prerogative writs in the Superior Court of New Jersey Law

4  Division seeking reversal of the denials of our zoning

5  applications.  And, specifically, they contend that we had to

6  file this action in State Court in order to exhaust our

7  remedies.  That's incorrect.  Our claims became ripe for review

8  the moment defendants denied the zoning applications for

9  unlawful and discriminatory reasons.

10          In the context of a zoning board's land use decisions

11  the finality rule exists not to require the exhaustion of

12  administrative remedies.  And that's what the Third Circuit

13  Court of Appeals said in <u>Lauderbaugh</u>, L-a-u-d-e-r-b-a-u-g-h,

14  <u>v. Hopewell Township</u>, 319 F.3d 568 at 575 (3d Cir. 2003).

15  Rather the rule exists to ensure that the local board is,

16  quote, given an opportunity to arrive at a final definitive

17  position regarding how it will apply the regulations at issue

18  to the particular land in question.  The Third Circuit said

19  that in <u>Taylor v. Upper Darby</u>, 983 F.2d 1285 at 1291 (3d Cir.

20  1993).

21          As a result as the <u>Taylor</u> court said at Page 1291,

22  quote, the finality rule allows a suit whenever a decision

23  maker has arrived at a definitive position on the issue that

24  inflicts an actual concrete injury.  For that reason the Third

25  Circuit said in 2004 in <u>Ethan Michael Incorporated v. Union</u>

1  Township report at 108 Federal Appendix 43 at 47 the court

2  should not, quote, stand on formality, but instead should,

3  quote, look beyond whether the zoning hearing board formally

4  rejected the application and determined whether the township

5  has made a final decision however that decision is manifested.

6          The import of all those decisions, Your Honor, is

7  that complete exhaustion of administrative remedies is not

8  required to establish that claims related to a land use

9  decision such as the Sayreville Zoning Board made here are

10  final and ripe for judicial resolution.  And that was very much

11  what the court said in Maq Realty, LLC v. The City of

12  Gloucester, 2010 U.S. District Lexis 82035 at 19 (2010)

13  decision of this court holding that a use variance application

14  was not required to establish ripeness because the Board had a

15  full and fair opportunity to find facts and apply the law to

16  plaintiff's application and in so doing created a substantial

17  record that aids the court in its review.

18          So, in the context of housing discrimination cases

19  courts have routinely found that claims are final and ripe at

20  the time the accommodation is denied and no further exhaustion

21  is required.  I'd say also, Your Honor, even if the plaintiff

22  were required to file an action in lieu of prerogative writs it

23  was permitted to do so in the context of this case, that is to

24  say to file claims that would otherwise be made in a

25  prerogative writ action in this federal complaint.  In, for

1   example, <u>House of Fire Christian Church v. Zoning Board of</u>

2   <u>Adjustment of the City of Clifton</u>, 426 N.J. Super. 157 (App.

3   Div. 2012) a land owner asserted an action in lieu of

4   prerogative writs that succinctly raised conventional MLUL

5   claims with related federal claims.

6          So the New Jersey Appellate Division in that case

7   made clear that a zoning applicant can bring a prerogative writ

8   claim and a federal claim together in one complaint in either

9   state or federal court.  At Page 166 the court specifically

10  said, quote, it is common that certain aggrieved land use

11  applicants bring parallel state and federal claims as part of a

12  state court action in lieu of prerogative writs or in federal

13  courts.

14         <u>Cresci</u>, C-r-e-s-c-i, <u>v. Bayonne Parking Authority</u>,

15  it's a similar effect in the Appellate Division decision issued

16  in 2011.  A 2011 N.J. Super. unpublished Lexis decision at 61

17  where the Appellate Division affirmed the dismissal of an

18  action in lieu of prerogative writs as violating the entire

19  controversy doctrine given the pendency of a previously filed

20  federal suit.

21         So, the Appellate Division has made clear -- New

22  Jersey Appellate Division has made clear it's permissible to

23  bring an action in lieu of prerogative writs simultaneous with

24  related federal claims in federal courts.  As the Court is

25  aware federal courts routinely exercise supplemental

1  jurisdiction over such claims.  That was the case in <u>Lapid-</u>

2  <u>Laurel v. The Zoning Board of Adjustment</u>, 248 F.3d 442 (3d Cir.

3  2002) and also in <u>Cellular Telephone Company v. The Zoning</u>

4  <u>Board of Adjustment</u>, 90 F. Supp. 2d 557 (D.N.J. 2007) in which

5  Judge Bassler found, quote, the court has supplemental

6  jurisdiction to adjudicate plaintiff's action in lieu of

7  prerogative writs challenging the Board's denial on state law

8  grounds.

9         In sum, a zoning application is simply not required

10 to file in the law division an action in lieu of prerogative

11 writs asserting violations of the MLUL before bringing federal

12 claims arising from the same conduct.

13        Now, having addressed that exhaustion of remedies

14 argument, and I believe this satisfactorily explained to the

15 Court why that's not a roadblock here, let me turn to the

16 entitlement to this requested preliminary injunctive relief.

17 As Your Honor is aware the <u>Crowe v. DeGioia</u> standard requires

18 us to demonstrate (a) that threat of irreparable harm, (b) a

19 substantial likelihood of success on the merits, (c) that the

20 balance of equities tips in our favor, and (d) that the public

21 interest is served or would be served by the issuance of the

22 sought relief.

23        In this case the complainant search claims for, among

24 other things, violations of the Americans With Disabilities

25 Act, the Fair Housing Act of 1968 as amended by the Fair

1 Housing Amendments Act of 1988, the Rehabilitation Act, and the

2 14th Amendment which claim is brought here through the enabling

3 Statute 42 USC Section 1983, and the New Jersey Municipal Land

4 Use Law which are Counts 6 and 7.

5          The FHA, the ADA, the RA, and of course the 14th

6 Amendment all make it unlawful to discriminate against those

7 with disabilities.  Under the Fair Housing Act it's unlawful to

8 discriminate against or otherwise make unavailable or deny a

9 dwelling to any buyer or renter because of a handicap of that

10 buyer or renter or person residing in or intending to reside in

11 a dwelling after it is sold, rented or made available, or any

12 person associated with a buyer or renter.  To discriminate

13 against any person in the terms, conditions, or privileges of

14 sale or rental of a dwelling or in the provision of services or

15 facilities in connection with such dwelling because it's

16 handicap of course is improper.

17          The Rehabilitation Act, the Americans With

18 Disabilities Act are to similar effect.  Of course the Equal

19 Protection Clause states that a law that treats a disabled

20 person differently from one without a disability when the

21 distinction bears no rational relationship to a legitimate

22 state interest violates the protection clause.

23          Of course, the plaintiff here 901 Ernston Road has

24 standing to bring claims for violation of these statutes,

25 because as the operator of the proposed facility the drug and

1    alcohol treatment facility for which defendants wrongfully

2    denied our zoning approvals we've suffered injury in fact

3    sufficient to confer standing.  I refer the Court to the

4    McKivitz decision, 769 F. Supp. 2d at 817.  Owner whose

5    application for variance to use property as a group home for

6    recovering alcoholics and drug addicts was denied by the

7    Township Zoning Board had standing to sue even though the owner

8    himself was not disabled.  The Southern District of Florida

9    held similarly in Caron Foundation of Florida v. City of Delray

10   Beach, that the operator of that facility which serves

11   qualified individuals with disabilities has standing to sue.

12          In this case the defendants have argued that 901

13   Ernston Road is not a suitable party to raise these claims

14   because it may not be able to allege an injury since no current

15   patients are joined in the action.  That is not correct.  In

16   New Directions Treatment Services v. City of Reading, a Third

17   Circuit decision at 490 F.3d 293 and similarly in Association

18   for the Advancement of the Mentally Handicapped v. The City of

19   Elizabeth, 876 F. Supp. 614 (D.N.J. 1994), and also in Township

20   of West Orange v. Whitman, 8 F. Supp. 2d at 408 this court in

21   1998 all have granted relief in identical circumstances where

22   the plaintiffs brought an action to build a new but as yet

23   unbuilt facility, and they were granted standing to do so.

24          The concept of speculative harm is separate and

25   distinct from a prospective person patient and courts have

1   found irreparable harm to future patients.  There simply is no

2   authority to the contrary.  Here, Your Honor, if the injunction

3   were not to be granted the plaintiff itself would continue to

4   suffer irreparable harm.  And I refer Your Honor to North

5   Jersey Vineyard Church v. The Township of South Hackensack, a

6   2016 decision at U.S. District Lexis 46398 at 8 quoting the

7   Third Circuit's opinion in Minard Run Oil Company v. U.S.

8   Forest Services, 670 F.3d 236 at 256, quote, where real

9   property is at stake preliminary injunctive relief can be

10  particularly appropriate because of the unique nature of the

11  property interest though plaintiff is still required to

12  demonstrate that irreparable harm will result for a temporary

13  cessation of the alleged property right.

14       The FHA, the ADA, the RA and of course the Equal

15  Protection clause all apply to municipal zoning decisions.

16  McKivitz as we've already cited, as well as Bay Area Addiction

17  Research & Treatment Inc. v. The City of Antioch, a Ninth

18  Circuit case from 1999 at 179 F.3d 725, 730 specifically held

19  the ADA and the RA, quote, do apply to zoning.  In Larkin v.

20  The State of Michigan Department of Social Services the Six

21  Circuit in 1996, 89 F.3d 285, 289 held, quote, congress

22  explicitly intended for the FHAA to apply to zoning ordinances.

23       Drug and alcohol addiction which are the disabilities

24  that animate the entire reason for RCA to be in existence are

25  disabilities without any question under the FHA, the ADA, and

1  the RA.   In <u>Oxford house Incorporated v. The Township of Cherry</u>

2  <u>Hill</u>, 799 F. Supp. 450 at 459 this court said in 1992, quote,

3  it is clear that congress contemplated alcoholism and drug

4  addiction as being among the kinds of impairments covered under

5  this definition.   28 CFR 41.31(b)(1)(I) defines drug addiction

6  and alcoholism as, quote, physical or mental impairment

7  qualifying as a handicap under the ADA.

8          In <u>Bragdon v. Abbott</u> the United States Supreme Court

9  at 524 U.S. 624 at 631 in 1998 said the FHA, the ADA and the RA

10 define what qualifies as a disability or handicap almost

11 identically.   Under these statutes a disability is a physical

12 or mental impairment that substantially limits one or more of a

13 person's major life activities.   In <u>RHJ Medical Center Inc. v.</u>

14 <u>City of DeBois</u>, 754 F. Supp. 2d 723 at 756 2762 the court on

15 the Western District of Pennsylvania said in 2010 that both

16 alcohol is an opioid addiction which is a principal focus of

17 Recovery Centers of America and of 901 Ernston Road may and

18 often do substantially limit major life activities.

19         We know that the deaths that have been suffered and

20 continue to be suffered on a daily basis throughout the United

21 States, throughout the State of New Jersey in particular and in

22 Middlesex County are really quite staggering.   Individuals

23 recovering from drug and alcohol addiction qualify as disabled

24 therefore under all these anti-discrimination laws <u>Lakeside</u>

25 <u>Resorts Enterprises LP v. The Board of Supervisors of Palmyra</u>

Township, 455 F.3d 154, 156 at Note 5 the Third Circuit said,
quote, recovering alcoholics and drug addicts are handicapped
so long as they are not currently using illegal drugs.

Courts consistently have found as Your Honor averted
to, I believe, at the top of the hour violations of these
statutes where municipalities applies zoning laws to impede an
addiction treatment provider's ability to open and operate in
the community, MX Group Incorporated v. The City of Covington,
293 F.3d 326 (6th Cir. 2002) affirmed a judgment in favor of a
drug treatment provider challenging the denial of a zoning
permit and ordinance targeting methadone clinics as
discriminatory under the ADA and the RA or Rehabilitation Act.

Again, Oxford House, referred to a few moments ago,
v. Township of Cherry Hill, 799 F. Supp. 450 found the
Township's ordinance discriminatory under the FHA and enjoined
the defendant from enforcing it against the operator of a
residential rental home for individuals recovering from
alcoholism and drug addiction.

As the Court is aware there are three types of
discrimination under the FHA, the ADA and the RA.  Plaintiffs
alleging violations of those statutes' prohibitions on
discrimination against the disabled can proceed under any or
all of three related theories of liability, disparate treatment
theory, the disparate impact theory, and the failure to make
reasonable accommodations theory as was the case in Lapid-

1  <u>Laurel LLC v. The Zoning Board of Adjustment of Scotch Plains</u>,

2  284 F.3d 442 at 448.

3          Here, we have presented below and would present here,

4  have witnesses here to present to Your Honor were we not able

5  to simply summarize the thrust of their testimony as the Court

6  has indicated it's willing to hear.  That clearly establishes

7  liability first under the disparate treatment theory.  Just to

8  go over the legal framework quite briefly, to prevail on a

9  disparate treatment claim as the Court is aware, the plaintiff

10 must demonstrate that some discriminatory purpose was a

11 motivating factor behind the challenge --

12          THE COURT:  And how do we have that here?

13          MR. MARINO:  I'm sorry, Your Honor?

14          THE COURT:  And how do we have that here?

15          MR. MARINO:  We have it here, Your Honor, because

16 when you look at what the Board has done in this case what they

17 have said, one Board member actually said I could not look my

18 neighbor in the eye and tell him that I had voted for this

19 facility to permit this facility, because it's unsafe.  There's

20 a safety threat.  And I would suggest to Your Honor that that

21 is one hundred percent driven by a pre-existing animist, a

22 stereotype with respect to recovering drug addicts and

23 alcoholics that doesn't even obtain, doesn't even make sense.

24 But if you think about it where would we ever have a drug

25 treatment or an alcohol treatment facility permitted in any

1   community in this nation if the answer was I can't look my

2   neighbor in the face and tell him I voted for it?

3           THE COURT:  And disparate impact?

4           MR. MARINO:  The disparate impact also, Your Honor, I

5   believe could not be clearer in this case.  And if you think

6   about this and just take a moment to think about the idea of

7   whether this defendant acted with discriminatory intent and

8   came -- actually effectuated a discriminatory impact where are

9   these people to go to get the kind of extraordinary care that

10  RCA offers throughout the United States?  Where are they to go?

11  The impact on them is that they will not get treated.

12          The discriminatory impact is if you were doing

13  something else, and you know how we know this, we know this

14  because the Zoning Board of Adjustment in this case

15  specifically granted a variance for a nursing home.  The answer

16  to that is older folks who are going to be housed in a facility

17  and receive treatment for their infirmities, they're fine.  But

18  if you have a drug problem or an alcohol problem the social

19  stigma associated with that convinces us that you're not fine

20  and you can't be here.

21          I think it's great -- if you took a survey of every

22  legislature, local and state, to consider this issue I assure

23  you of two things, number one every single one of them would

24  acknowledge the magnitude of the drug problem and particularly

25  the opioid crisis in this country.  Every single one, because

1  it's undeniable.  And number two none of them want it in their

2  neighborhood.  Why not?  Because they perceive their role not

3  just as protecting all their constituents which, by the way, in

4  Sayreville, in Middlesex County, in New Jersey and throughout

5  the 50 states comprises a very large number of the addicted,

6  those who are shunned and feared.  Perhaps irrationally, but

7  shunned and feared because of their illness.

8        Can you imagine a circumstance in which someone

9  wanted to put a cancer treatment facility in a neighborhood in

10 Sayreville and the Board would say I could never do that

11 because I couldn't look in the eyes of someone in my

12 neighborhood and tell them I voted for it?  No, because

13 everybody has been touched by that kind of illness and there's

14 no social stigma associated with it.  Using drugs is not

15 illegal.  There's never been a war on cancer at least not one

16 that's ever worked any better than the war on drugs has worked.

17 But we know what's really going on here.  Everybody recognizes

18 the problem, everybody wants these people to be treated,

19 everybody knows that denying them reasonable accommodations is

20 not lawful under any of these statutes or under the

21 constitution, but no one wants it in their neighborhood.

22        THE COURT:  All right.  And so the irreparable harm

23 is as you can encapsulate it.

24        MR. MARINO:  Yes.  As I would encapsulate it, it's

25 two-fold.  First of all the irreparable harm here is every

single day that goes by without those in need receiving this
treatment is an instance of irreparable harm.  And courts
around the country have said it.  Courts around the country
have said it in no uncertain terms.  You know, this notion of,
you know, we take a crab view of irreparable harm, right, it's
a very crab view of irreparable harm.  We think of it according
to the normal construct of will dollars do?  Dollars certainly
will not do to remedy this problem.

I refer Your Honor to Gresham v. Windrush Partners
Limited, reported at 730 F.2d 1417 at 423 to 24, an 11th
Circuit decision.  The substantial likelihood of an FHA
violation gives rise to a presumption of irreparable harm, a
presumption, and shifts the burden to defendants to prove that
any injury that may occur is not irreparable.  But even without
a presumption even if a presumption did not arise as the court
Southern District of New York stated in the 1996 decision
Innovative Health Systems, Inc. v. The City of White Plains,
reported at 931 F. Supp. 222 at 240, quote, courts have held
that the deprivation of treatment needed to recover from
addiction or prevent relapse constitutes irreparable injury.

In addition, irreparable injury exists wherever
there's a deprivation of housing or services that poses a
serious risk of harm to vulnerable individuals, Easter Seal
Society v. The Township of North Bergen, 798 F. Supp. 228, 237
District of New Jersey 1992, quote, for each day that this

1  project is delayed eight protected individuals are forced to

2  move into other environments which endanger their recent

3  recovery constituting irreparable harm.

4          Oxford House Evergreen v. The City of Plainfield, 769

5  F. Supp. 1329 at 1345 (D.N.J. 1991) closure of a group home for

6  substance abusers would cause irreparable harm due to the loss

7  of home and supportive and stable environment.  Prospective

8  patient's delay in receiving treatment as a result of

9  defendant's actions constitutes imminent irreparable harm.  And

10  irreparable harm of the worse possible kind.  You're not

11  bringing that person back to life.  The emergency rooms of our

12  state's hospitals are crammed with folks who are suffering.

13  And many of these folks, many of these folks have none or

14  should have none of the stigma that's normally associated with

15  a drug use.  You know we have this image of someone who makes a

16  choice.  It's a complete misapprehension of what it means to

17  suffer from this illness.

18          THE COURT:  All right.  And you can tie that in with

19  what you see as likelihood of success.

20          MR. MARINO:  I don't think we can lose, Your Honor.

21  I don't think we -- not only do I think we don't have -- we

22  have a substantial likelihood of success on the merits I don't

23  think we can lose.  I think it's ineluctable.  I don't think

24  they have a leg to stand on and I think they know it.  It's an

25  outrageous thing.  Think about this, how do I lose under all

those discrimination statutes when I have demonstrated so
palpably that they are being violated, that there isn't a
reason in the world to say I'm not going to treat this person
because it has a stigma associated with its illness?

Yet, I'd readily give and have this very Board has
given approval for a nursing home to treat older individuals,
because our perception is someone becomes on in years and we
want to do what we can to help them, and they don't pose any
danger or threat.

I would tell you also this safety concern is so
overstated.  You're taking folks out of the community who if
they pose a threat, if they are among those drug addicted
individuals who in fact pose a threat because they need their
drugs and they're going to do whatever they need to do to get
those drugs those people are in the community.  These people
are not being imported into Sayreville.  The notion isn't to
bring people into the United States who somehow are this
distinct class of drug addicted persons, this vast threat.
That's not what this is.

These are the people among you many of whom became
addicted to opioids because they had an injury, often a sports
injury, perhaps a back injury, perhaps they suffered from a
fall and the doctor thought it made good sense for them to have
OxyContin and the next thing you know that person is doing
everything in his or her power to get that drug, they crave

1  that drug, their physiological craving for that drug is

2  overwhelming and the next thing you know they are using heroin.

3  How many children do we have to lose to this problem, this

4  extraordinary rampant problem before we say you know what, you

5  got to allow us to put these treatment facilities in and if you

6  don't you're violating all these anti-discrimination laws?

7         THE COURT:  All right.  Now what about defense?  Let

8  me hear from the other side.

9         MR. MARINO:  If I may just to round out one thing I'd

10 like to add on our presentation if you don't mind, Your Honor.

11 You've asked us about substantial likelihood of success and

12 irreparable harm.  If you're satisfied with our presentation

13 there I'll move on.  But I would address the balance of the

14 equities of the public interest if the Court requires that or

15 would like to hear it.  It's obviously in our papers.

16        THE COURT:  Yes, it's in your papers, and quite

17 frankly those elements are sort of subsumed in your irreparable

18 harm arguments.  So I'm satisfied that you don't need to

19 elaborate on that.

20        MR. MARINO:  On the subject of irreparable harm and

21 the likelihood or the substantial likelihood of success on the

22 merits I want to be certain I've left no stone unturned.  Does

23 the Court have any question of me whatsoever whereby I might

24 illuminate either of those issues any further?

25        THE COURT:  Is the Court to consider that you could

1  find some other place, some other locale?

2       MR. MARINO:  My testimony -- the testimony that I

3  would put on of Dr. Carise would establish that there is not a

4  place within 100 miles.  To be exactly accurate I think it's 88

5  and a half miles in one case or 95 and a half miles.  Those are

6  where the facilities that provide this kind of neighborhood

7  treatment provide.  If we were to put all of our evidence on

8  the record or the evidence that was put on the record at the

9  Zoning Board I would illuminate for Your Honor in graphic

10 detail that this type of neighborhood facility simply does not

11 exist.  Not in Sayreville, not within 88 and a half miles of

12 Sayreville.  And if it's not permitted these people are just

13 left bereft.  They're left --

14      THE COURT:  No, I just mean find another spot.  Find

15 another place in or around Sayreville.

16      MR. MARINO:  Let me draw Your Honor's attention, if I

17 may for a moment, perhaps I will provide Your Honor -- I'm

18 referring now to a blowup of a legend which depicts 901 Ernston

19 Road and I will provide Your Honor for your review in chambers,

20 I'll provide you with a smaller version of this.  But if you

21 look at this I can't fathom a more appropriate locale.  These

22 locales are chosen with care.  It's important that they --

23 sure, to be isolated to some extent very important.  You see

24 here the suggestion that 901 Ernston Road is somehow near a

25 school.  You can see that the school is well across the Garden

1  State Parkway, you would have to cross over a bridge to get

2  there.  It's surrounded, nearly completely by wooded area as

3  Your Honor can see clearly depicted on the legend.  And the

4  residential area is on the other side of another major road

5  that runs perpendicular to the parkway.  So in terms of

6  choosing a spot take a look at the this other photo.

7          THE COURT:  It does seem to be a well chosen spot, I

8  must say.

9          MR. MARINO:  And chosen with enormous care, chosen

10  with -- you know, everyone wants to be in the best possible

11  spot.  We want it to be in a place where it's close enough to

12  the community so these people will have the benefit of family.

13  Remember, these are family members.  It's not -- you know, many

14  of our -- the other -- I don't want to even refer to them as

15  competitors, but other treatment facilities you hear about

16  this, we've heard about this for years.  You send someone off

17  to Utah, fly them to Florida, send them out to California, and

18  they go out there and they have their period of 21, 30, 45 days

19  whatever it is, and then they return to your community.  It's

20  like ship you away.  That's not what we do.

21          Families are involved.  Families are part of the

22  treatment.  This is so important.  It's so much the impetus for

23  forming this company.  When Mr. O'Neill formed this company he

24  formed it with this very idea of a neighborhood facility.  So

25  you face the added hurdle of wanting to have a neighborhood

1   based place where you can actually have this kind of continuing

2   meaningful continuing care.  We have on-sight, on campus, we

3   have NAR-ANON meetings, we have AA meetings, you have

4   aftercare, you have a commitment to completion, you have a

5   commitment to success.

6          Everyone knows you are -- once you fall prey to drug

7   addiction the rest of your life -- or full prey to alcoholism

8   the rest of your life is a period of recovery.  So you ask him

9   he's in recovery.  He could be in recovery for many, many

10  years.  The architect of RCA's business Dr. Carise is a person

11  who herself before going -- and her record is extraordinary.

12  Her record of service after herself falling prey to drug

13  addiction who has been recovering for 32 years became the

14  architect of this system is in the courtroom today.  Dr. Carise

15  who has gone to various countries in Africa and Asia around the

16  world to help build these kinds of facilities, and who's the

17  architect of our neighborhood based approach.

18          It's all designed to take care of these folks in the

19  best possible setting.  Safety concerns, we have addressed

20  safety concerns, to use a colloquialism, six ways from Sunday.

21  We have monitors on the grounds.  We have all sorts of

22  surveillance ongoing there.  We take very seriously the safety

23  concerns.  But this is not a situation where people who sign in

24  -- voluntarily sign in to get well are somehow those who you

25  might expect to try to bust out.  That's not really what

1   happens.  People can leave on their own volition.  When they

2   want to leave we try to persuade them to stay.  If they choose

3   to leave we get a family member to come and get them.  We don't

4   let anybody simply walk off the premises, and we will call the

5   local police if we think there's anything remotely approaching

6   that.  But these are the kind of concerns that, you know, when

7   you're building this sort of --

8         THE COURT:  All right.  Thank you very much.  Thank

9   you very much, Mr. Marino.  I don't want to cut you off, but I

10  don't want to strain the patience of others as well.  I'd like

11  to hear from defense counsel.  At least they're here and their

12  position should be on the record.  Thank you very much.  You

13  may have a seat.

14        MR. MARINO:  Thank you, Your Honor.

15        MR. NORTHGRAVE:  Thank you, Your Honor.  For the

16  record William Northgrave, McManimon, Scotland & Baumann on

17  behalf of defendants Zoning Board on the government claims.

18  Specifically I will be very brief, Your Honor.  We will be

19  relying on our papers.  The Court has the pleadings in front of

20  you.  The book I carried in is about five inches thick so my

21  apologies to the Court for the amount of material there.  But

22  that is the record that was made.  And as I said previously I

23  have to, again, to use a colloquialism, I have to live and die

24  by the record we've created.

25        I just want to address one -- two items quickly.

1  One, we're not addressing the RA, the FHA, the ADA today.

2  Really the question before the Court is, is there a right to

3  relief under -- in the prerogative writ sense?  And that is and

4  boils down to its essence were are the safety and security

5  concerns as discussed by the Zoning Board sufficient to create

6  the denial of the zoning as requested here?  That is really the

7  issue.  I say it solely so the record is clear.

8          I understand plaintiff's position, but I think it's

9  unfair to the Zoning Board to say that they were somehow

10 discriminatory in their denial here.  They had a concern as to

11 the safety and security and that is the only issue that I think

12 is before the Court.  If that issue is legitimate then, you

13 know, that -- then the prerogative writ should be denied.  But

14 if the Court finds it's not then the Court will make its

15 determination.

16         As to just so the record is clear Mr. Marino was

17 referring to a drawing that indicates the facility and location

18 to other places in town.  I have reviewed that drawing.  That

19 drawing is accurate so we would stipulate for purposes of the

20 record that that is an accurate drawing.  It doesn't need any

21 witnesses.  I conferred with the other defense counsel before I

22 made that representation to the Court.  So we're all in

23 agreement.  So we don't need anything further in terms of a

24 witness to authenticate or anything like that.

25         But unless the Court has questions of me my arguments

38

1   are set forth in our papers and I will rely on those arguments.

2           THE COURT:  Thank you very much.  We're taking the

3   matter under advisement and hope to issue an opinion in an

4   order very promptly.

5           MR. NORTHGRAVE:  Thank you, Your Honor.

6           MR. MARINO:  Thank you very much, Your Honor.

7           THE COURT:  Thank you.

8                           *  *  *  *  *

9                   **C E R T I F I C A T I O N**

10          I, KIMBERLY UPSHUR, court approved transcriber,

11  certify that the foregoing is a correct transcript from the

12  official electronic sound recording of the proceedings in the

13  above-entitled matter, and to the best of my ability.

14

15

16  /s/ Kimberly Upshur

17  KIMBERLY UPSHUR

18  J&J COURT TRANSCRIBERS, INC.          DATE:  May 2, 2018

19

20

21

22

23

24

25