NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

901 ERNSTON ROAD, LLC,

    Plaintiff,

v.

BOROUGH OF SAYREVILLE ZONING
BOARD OF ADJUSTMENT; and BOROUGH
OF SAYREVILLE,

    Defendants.

Civ. No. 18-2442

OPINION

RECEIVED
MAY 11 2018
AT 8:30_____M
WILLIAM T. WALSH
CLERK

THOMPSON, U.S.D.J.

# INTRODUCTION

This matter comes before the Court on the Motion for Preliminary Injunction and Application for Order to Show Cause by Plaintiff 901 Ernston Road, LLC ("Plaintiff"). (ECF No. 6.) Defendants Borough of Sayreville Zoning Board of Adjustment ("Defendant Board") and the Borough of Sayreville ("Defendant Borough") (collectively, "Defendants") oppose. (ECF Nos. 10, 12.) The Court has decided this Motion based on the written submissions and oral argument held on April 25, 2018. For the reasons stated herein, Plaintiff's Motion is granted.

# BACKGROUND

Plaintiff is an affiliate of Recovery Centers of America, LLC ("RCA"),[1] which runs neighborhood-based recovery campuses for drug and alcohol addiction treatment and recovery. (Compl. ¶¶ 5, 14, ECF No. 1.) On January 18, 2018, Plaintiff entered into a long-term lease (15

---

[1] Hereinafter, Plaintiff and RCA are used interchangeably.

1

years with four, ten-year renewal options) on a 6.96 acre property at 901 Ernston Road, Sayreville, NJ ("the Property"), located within the Borough of Sayreville, in order to open an RCA facility. (*Id.* ¶¶ 6, 27.) The property is within a "PRIME zone"—"Public Recreational, Institutional Municipal and Educational . . . designated, *inter alia*, as conditionally approved for long-term healthcare and nursing." (*Id.* ¶ 6.) It was previously a nursing home, and a proposal was approved in 2014 for it to be reconstructed and opened as a facility called Sayreville Nursing. (*Id.* ¶¶ 8, 30.) Defendant Borough is a municipal entity located in Sayreville, NJ, and Defendant Board "is a quasi-judicial body created by the Borough of Sayreville and is vested with the authority under the MLUL [Municipal Land Use Law]" to grant variances and hear and decide zoning appeals. (*Id.* ¶¶ 15–16.)

On July 7, 2017, RCA filed an initial application with the Borough of Sayreville Zoning Officer to confirm that the property could be used for a treatment facility, as conditionally permitted in a PRIME zone. (*Id.* ¶ 35.) The application was denied without reason. (*Id.* ¶ 36; *see* Zoning Permit Application, Ex. B, ECF No. 10-2 ("Proposed use is not permitted in zone nor comports with planning board site prior approval.").) RCA appealed to Defendant Board on July 26, 2017 and filed a variance application on September 15, 2017 in an attempt to expedite the approval process. (*Id.* ¶¶ 37, 39.) On September 27, 2017 at an initial hearing, RCA presented testimony that this facility falls within the definition of a "long term care facility/nursing facility/nursing home" pursuant to the Sayreville Zoning Code, suitable for a PRIME zone. (*Id.* ¶¶ 11, 32, 40; Sayreville Zoning Code 26-6, Ex. A, ECF No. 1.) On or about October 12, 2017, Defendants sent notice to proximate landowners and published notice of RCA's application in the local newspaper. (*Id.* ¶ 42.)

Subsequently, Defendant Board held three public hearings on November 8, 2017, December 13, 2017, and January 24, 2018. (*Id.* ¶ 46.) At each, RCA presented witnesses to address the four criteria used to assess variances in New Jersey, in an effort to demonstrate the facility would be a beneficial use and its positive factors would outweigh any negative considerations.[2] (*See id.* ¶¶ 49–78.) All told, Plaintiff presented seven witnesses: Dr. Deni Carise, RCA clinical director (*id.* ¶ 53); James Higgins, licensed professional planner (*id.* ¶ 49); Christine Cofone, professional consultant on planning and zoning (*id.* ¶ 50); Scott Turner, civil and site engineering expert (*id.* ¶ 62); Karl Phenke, traffic and safety expert (*id.* ¶ 65); Michael Desrosiers, director of operations at an existing RCA facility (*id.* ¶ 82); and David Dorschu, the CEO of the Mays Landing RCA facility (*id.* ¶ 98).

Dr. Carise began her testimony with extensive detail as to the nature of the opioid crisis in America. (Nov. 8th Tr., Ex. B, 28:20–31:21, ECF No. 1.) She emphasized that the epidemic particularly plagues this area of the country: "New Jersey has the sixth highest rate in the nation of ER visits due to opioid problems. And Middlesex County is in the top five counties in the state for overdose deaths." (*Id.* 29:11–14.) Dr. Carise then provided an overview of RCA's mission and design, created to provide a new rehabilitative model to address this crisis. RCA is a "neighborhood model" that draws "most patients from a 50-mile radius around [the] site." (*Id.* 32:17–19.) The sites are designed to provide the opportunity for long-term relationships with therapists, family-based therapy, education sessions for families, and both in-patient and out-patient care. (*Id.* 32:20–34:4.) Dr. Carise also gave a snap-shot of the client/patient population:

---

[2] The four factors the board must identify and balance in determining whether to grant a variance include: (1) "the public interest involved," (2) "the detrimental effect that will ensue from the grant of the variance," (3) "reasonable conditions on the use that would reduce its detrimental effect, and (4) the detriment to the public good and interest. *In re Four Three Oh, Inc.*, 256 F.3d 107, 113 (3d Cir. 2001) (quoting *Sica v. Bd. of Adjustment Twp. of Wall*, 603 A.2d 30, 37 (N.J. 1992); (Compl. ¶ 45).

3

"18 and older," "predominately middle class," "82 percent fully employed," "90 percent commercially insured, and about 10 percent . . . self pay." (*Id.* 46:12–22.) None of these patients would be "somebody with a really significant acuity psychiatrically." (*Id.* 47:19–20.) The remainder of Plaintiff's witnesses presented testimony as to "five possibly negative considerations—aesthetics, noise, traffic, safety, and impact on zoning—that the Board might weigh against the public interest." (Compl. ¶ 60.) The witnesses also responded to particular concerns raised by Defendant Board, with extra attention given to safety. (*See id.* ¶¶ 79–90.) This testimony specified the number of surveillance cameras, security staff presence, facilities rounds that are conducted, use of RFID[3] in patient bracelets, patient safety monitoring plans, comprehensive intake searches, and discharge procedures. (Nov. 8th Tr. 51:12–60:12.)

Public comments from Sayreville residents were heard at the end of the second and third hearings. (*Id.* ¶ 47.) Between the two hearings, sixty-five members of the community participated, all speaking out against the approval of the RCA facility. (*Id.* ¶¶ 102, 110.) The public comment period was monopolized by concerns about the facility's close proximity to the Eisenhower school and residential communities and suggestions that it could be built anywhere else in Sayreville where it "won't affect as many residents." (Dec. 13th Tr., Ex. C, 108:15–18, ECF No. 1; *see also id.* 102:18–24, 118:17–21.) It was clear that the residents felt this "just can't happen in our own back yards." (*Id.* 109:16–18; Jan. 24th Tr., Ex. D, 77:4–7, 104:15–16, 111:8–10, ECF No. 1.) A number of comments focused on the pre-approved use of this property as a nursing home and expressed personal preference and community need for a nursing home (*see,*

---

[3] RFID are tracking microchips that can detect where a patient is at all times in the building. (Nov. 8th Tr. 53:20–54:16.) RFID stands for "Radio Frequency Identification," and it uses radio waves to communicate information. *See Radio Frequency Identification (RFID)*, U.S. Food & Drug Admin., https://www.fda.gov/Radiation-EmittingProducts/RadiationSafety/ElectromagneticCompatibilityEMC/ucm116647.htm (last updated Dec. 2, 2017).

4

*e.g.*, Dec. 13th Tr. 98:1–5, 100:6–24, 106:21–24), although a nursing home application was not under consideration in lieu of RCA's application. Some residents brought their own, uncorroborated, facts regarding rehab facilities, crime rates, drug recidivism, and decreasing home values. (*See e.g.*, *id.* 108:18–109:15, 111:2–7; Jan. 24th Tr. 25:10–12, 33:15–16.)

At the close of the January hearing, Defendant Board held a closed-door session to receive legal advice from Defendant Board's counsel, Karl Kemm. (Compl. ¶¶ 113–14.) After that session, Defendant Board announced its decision to deny the variance application, and each member provided a statement of reasons on the record. (*Id.* ¶¶ 115–25.) According to Plaintiff,

> While some Board members mentioned safety and quality of life concerns, those sentiments were blatant pretext for other discriminatory purposes, and the Board's empty statements of concern for patients amounted to nothing more than a not-in-my-backyard ("NIMBY") defense premised on the perceived danger caused by those suffering from alcohol and drug dependency.

(*Id.* ¶ 116.) A number reflected that they would welcome the construction of an RCA facility in a different location in Sayreville, but according to Plaintiff, the suggestion "amounts to nothing more than platitudes." (*Id.* ¶ 120.) Plaintiff also alleges that there were some explanations advanced by Defendant Board that lack support in the evidentiary record. (*Id.* ¶¶ 124–26.)

Following the denial, on February 13, 2018, Plaintiff and the landlord amended the lease to include a clause for termination by Plaintiff within 10 days of March 31, 2018. (*Id.* ¶ 28.) On February 21, 2018, Plaintiff filed this lawsuit pleading violations of: (I) Title II of the Americans with Disabilities Act, (II) the Fair Housing Act of 1988, (III) the Rehabilitation Act of 1983, (IV) § 1983 through the denial of the variance application, (V) substantive due process under the Fifth and Fourteenth Amendments, (VI) N.J.S.A. 40:55-D-70(d), (VII) N.J.S.A. 26:2BB-1 and 30:6C-1; and (VIII) the NJ Law Against Discrimination. (*See generally id.*)

On March 6, 2018, Plaintiff filed its emergent Motion for Preliminary Injunction and Application for an Order to Show Cause. (ECF No. 6.) On March 9, 2018 the Court held a

status conference and established a scheduling order for the Motion. (ECF Nos. 7, 8.) Defendant Board opposed (ECF No. 10), and Defendant Board and Borough then opposed jointly (ECF No. 12). Plaintiff replied. (ECF No. 13.) The Court heard oral argument on the Motion on April 25, 2018. (ECF No. 20.) This Motion is presently before the Court.

## **LEGAL STANDARD**

The grant or denial of a preliminary injunction is within the discretion of the Court. *See Am. Express Travel Related Servs., Inc. v. Sidamon–Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994). Affirmative relief or mandatory relief that alters rather than maintains the status quo may also be granted, but "the burden on the moving party is particularly heavy." *Am. Fin. Res., Inc. v. Nationstar Mortg., LLC*, 2016 WL 8201959, at *2 (D.N.J. Apr. 29, 2016) (quoting *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980)). The decision to issue a preliminary injunction is governed by a four-factor test, wherein the plaintiff must demonstrate:

> (1) that they are reasonably likely to prevail eventually in the litigation and (2) that they are likely to suffer irreparable injury without relief. If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiffs and (4) whether granting relief would serve the public interest.

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (quoting *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)).

A preliminary injunction is an "extraordinary remedy, which should be granted only in limited circumstances," *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989), and is "never awarded as of right," *Groupe SEB USA, Inc. v. Euro-Pro Operating,*

6

*LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

## ANALYSIS

In opposition to Plaintiff's application, Defendants raise two threshold arguments. First, Defendant Board contends that Plaintiff does not have standing to raise the discrimination claims contained in its Complaint (*see* Def. Bd. Opp'n at 7, ECF No. 10), and second, Defendants claim that Plaintiff failed to exhaust administrative remedies through writ in the New Jersey Superior Court, Law Division (*see* Defs.' Opp'n at 5–11, ECF No. 12). At oral argument, Plaintiff addressed both issues thoroughly, and the Court is satisfied that neither poses an impediment to its ability to hear these claims.

Plaintiff has standing as a service provider or operator of a facility for handicapped, recovering addicts. *See Horizon House Dev. Servs., Inc. v. Twp. of Upper Southampton*, 804 F. Supp. 683, 692 (E.D. Pa. 1992) (citing 42 U.S.C. § 3604(f)(2)(B)). Plaintiff has also properly brought this action following Defendant Board's final decision to deny Plaintiff's variance application, *see Lauderbaugh v. Hopewell Twp.*, 319 F.3d 568, 574 (3d Cir. 2003); *Congregation Kollel, Inc. v. Twp. of Howell*, 2017 WL 637689, at *6 (D.N.J. Feb. 2, 2017). The failure to file an action in lieu of prerogative writs is not destructive to Plaintiff's present, comprehensive suit brought in federal court. *See, e.g., House of Fire Christian Church v. Zoning Bd. of Adjustment of City of Clifton*, 43 A.3d 1205, 1210 (N.J. Super. Ct. App. Div. 2012) ("It is common that certain aggrieved land use applicants bring parallel state and federal claims as part of a state court action in lieu of prerogative writs or in federal court."). Moreover, a separate pending action in lieu of prerogative writs may run afoul of the entire controversy doctrine by seeking the

7

same relief and claims in two actions. *See Cresci v. Bayonne Parking Auth.*, 2011 WL 55962, at *1, *2 (N.J. Super. Ct. App. Div. Jan. 11, 2011) (per curiam).

Therefore, the Court turns next to the four-factor preliminary injunction analysis. As emphasized by the Court at status conference and oral argument, the elements of irreparable harm and a likelihood of success on the merits are the sticking points of this case. Accordingly, the thrust of the following discussion focuses on these key elements.

A. Irreparable Harm

In its moving papers, Plaintiff articulates irreparable harm in the form of denying treatment to prospective patients and the monies lost in the planning, leasing, and design of the facility, as well as interest in the property. (*See* Pl.'s Mem. at 28–29, ECF No. 6-2; *see also* Compl. ¶ 141 ("To date, Plaintiff has invested an estimated $1,385,000 in the Property and Facility, including approximately $226,000 to lease the premises, $458,000 for design and preconstruction activities, $651,000 for professional services, and $50,000 for facilities expenses.").) As Defendants appropriately note, the latter claim of irreparable harm will not survive a preliminary injunction analysis because it presents the type of economic harm that can be remedied with money damages. (*See* Defs.' Opp'n at 18 (quoting *Acierno*, 40 F.3d at 655); *see* Def. Bd. Opp'n at 9 (quoting *Frank's GMC Truck Ctr. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1989)).) Thus, the former harm presents the real issue for the Court. Other federal courts that have grappled with issuing preliminary injunctions of such magnitude in the context of discriminatory housing have found that irreparable harm is satisfied by (1) harm to future, potential patients and thus frustration of a care provider's mission; or (2) presumption of harm from the discriminatory conduct and statutory violations.

First, there is irreparable harm where the defendant's conduct delays treatment for prospective members of a community residence. *Easter Seal Soc'y v. Twp. of N. Bergen*, 798 F. Supp. 228, 237 (D.N.J. 1992) (issuing construction permit to ensure necessary renovations may be made to operate residence); *see also Oxford House-Evergreen v. City of Plainfield*, 769 F. Supp. 1329, 1339–40 (D.N.J. 1991). *But see Lapid Ventures, LLC v. Town of Piscataway*, 2011 WL 2429314, at *9 (D.N.J. June 13, 2011). Accordingly, "[f]rustation of a rehabilitation provider's mission can cause irreparable harm." *Carson Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1373 (S.D. Fla. 2012). *See Step by Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112, 135 (N.D.N.Y. 2016) ("The City's actions have deprived [plaintiff] of its ability to pursue its mission and to provide housing and services to its mentally ill clients and this denial constitutes irreparable harm."); *Stewart B. McKinnney Found., Inc. v. Town Planning & Zoning Comm'n of Town of Fairfield*, 790 F. Supp. 1197, 1209 (D. Conn. 1992) ("Monetary damages would not adequately compensate the plaintiff for its inability to achieve its purpose of providing housing in Oldfield property to needy HIV-infected persons pending a final determination of this action."); *see also N. Shore-Chi. Rehab. Inc. v. Village of Skokie*, 827 F. Supp. 497, 502 (N.D. Ill. 1993).

Second, because the Fair Housing Act ("FHA"), 42 U.S.C. § 3613(c), authorizes injunctive relief, some courts find a rebuttable presumption of irreparable harm where there is a substantial likelihood the defendant violated the FHA. *Step by Step*, 176 F. Supp. 3d at 133–34; *Stewart B. McKinnney Found.*, 790 F. Supp. at 1208 (collecting cases). Thus, "[m]andatory injunctions are common in FHA and Rehabilitation Act cases" without any additional showing of irreparable harm. *Baxter v. City of Belleville*, 720 F. Supp. 720, 727 (S.D. Ill. 1989). Courts in the Third Circuit initially declined to apply this presumption, *see, e.g., Easter Seal Soc'y*, 798

9

F. Supp. at 237–38 (citing *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417 (11th Cir. 1984), *cert. denied* 469 U.S. 882 (1984)), but later followed suit, *see Assisted Living Assocs. of Moorestown, LLC v. Moorestown Twp.*, 996 F. Supp. 409, 438–39 (D.N.J. 1998) (applying presumption of irreparable harm to issue injunction exempting proposed facility from a recently-enacted zoning ordinance); *see also Raab Family P'ship v. Borough of Magnolia*, 2009 WL 361135, at *9 (D.N.J. Feb. 13, 2009) (enjoining enforcement of rental ordinances).

Defendants attempt to argue that this case is distinguishable—irreparable harm will not result because much of the law on which Plaintiff relies involves pre-existing treatment facilities or eviction of current handicapped residents, *see Innovative Health Sys., Inc. v. City of White Plains*, 931 F. Supp. 222, 240–41 (S.D.N.Y. 1996) (finding irreparable harm where facility was relocating to and renovating a new facility, and its current clients faced treatment interruption); *see also Oxford House-Evergreen*, 769 F. Supp. at 1345 (finding irreparable harm where residents faced eviction from group home for recovering addicts). (Defs.' Opp'n at 14–16.) This argument is unpersuasive. There are other cases in this Circuit, which Defendants do not acknowledge, where courts have granted affirmative relief to permit the construction of facilities on the basis of the irreparable harm that will result to a future facility and its prospective handicapped residents. *See, e.g., Easter Seal Soc'y*, 798 F. Supp. at 238 (finding delay to project endangered recovery of "mentally ill chemical abuser" prospective clients and yet-identified individuals); *id.* at 237 (citing *Oxford House-Evergreen*, 769 F. Supp. at 1339–40, 1345) (describing *Oxford House-Evergreen*'s focus on a generalized "interference with the establishment of a functioning community residence for recovering chemical abusers"); *see also Carson Found. of Fla., Inc.*, 879 F. Supp. 2d at 1361, 1373 (finding irreparable harm where rehab provider was "thwarted" from developing a new facility due to imposition of transient use

ordinance). The *Innovative Health Systems* court specifically relied on both *Easter Seal Society* and *Oxford House-Evergreen.* 931 F. Supp. at 241.

In sum, on both bases, the Court finds that Plaintiff's showing of irreparable harm is satisfied. Whether it is entitled to injunctive relief will largely turn on the likelihood of success on the merits of its injunctive relief claims, specifically the Fair Housing Act pursuant to the statutory presumption.

B. <u>Likelihood of Success on the Merits</u>

While the Complaint seeks injunctive relief on all Counts, Plaintiff's Motion focuses on the merits of its FHA, Rehabilitation Act ("RA"), and Americans with Disabilities Act ("ADA") claims as the basis for an injunction. (*See* Pl.'s Mem. at 16.) The FHA makes discriminatory "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3). The subsequent amendment to the FHA, the Fair Housing Amendments Act ("FHAA"), "was expressly intended to prevent municipalities from using their zoning authority to treat congregate living arrangements of unrelated people with disabilities differently from living arrangements of nondisabled people." *Twp. of W. Orange v. Whitman*, 8 F. Supp. 2d 408, 425 (D.N.J. 1998). FHA and FHAA violations must involve dwellings, and the Third Circuit has found that rehabilitation facilities qualify as dwellings for the duration of a patient's time in treatment. *Lakeside Resort. Enters., LP v. Bd. of Supervisors of Palmyra Twp.*, 455 F.3d 154, 156 n.5 (3d Cir. 2006). The RA provides that no disabled individual "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. And lastly, the ADA expands the scope of the RA to private entities

receiving federal funds. *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 302 (3d Cir. 2007). Beyond the Court's inherent judicial authority to issue a preliminary injunction pursuant to Federal Rule 65, these statutes, as noted above, authorize courts to grant injunctive relief, either temporary or permanent, where "a discriminatory housing practice has occurred or is about to occur." 42 U.S.C. § 3613(c)(1) (FHA); *see also* 29 U.S.C. § 794a (noting ADA remedies are same as those available under the Civil Rights Act enforcement provision, 42 U.S.C. § 2000e-5, which authorizes injunctive relief); 42 U.S.C. § 12133 (same, incorporating ADA remedies and enforcement procedures).

As a predicate to success on any of these claims, a plaintiff must present a class of protected individuals, i.e. handicapped individuals. Courts in this Circuit deem drug and alcohol addiction an impairment and thus handicap under these statutes. *See New Directions Treatment Servs.*, 490 F.3d at 309; *Lakeside Resort. Enters., LP*, 455 F.3d at 156 n.5; *Oxford House, Inc. v. Twp. of Cherry Hill*, 799 F. Supp. 450, 459 (D.N.J. 1992) (discussing statutory construction of FHA which specifically excludes current users, thus implying recovering addicts were contemplated as impaired under the statute).

"A plaintiff may prove a violation of the FHAA, ADA or Rehabilitation Act in one of three ways: (1) showing disparate treatment, also termed intentional discrimination, (2) showing disparate impact, or (3) showing a refusal to make reasonable accommodations." *Lapid Ventures, LLC*, 2011 WL 2429314, at *9. Here, Plaintiff argues that Defendants have engaged in a "not in my backyard" type of discrimination, resulting in discrimination by all three means. As described by another court in this District with respect to RCA, "[t]his case concerns what Plaintiff[] deem[s] to be a 'NIMBY' matter—that the Defendants have systematically rejected Plaintiff['s] efforts to build a cutting edge substance abuse treatment facility for unfounded and

12

misguided 'not in my backyard' reasons." *1840 P. Cheeseman Rd., LLC v. Twp. of Gloucester Zoning Bd. of Adjustment*, 2016 WL 7325470, at *1 (D.N.J. Dec. 16, 2016).

1. *Disparate Treatment*

First, Plaintiff argues that Defendants intentionally discriminated against Plaintiff and treated it differently based on handicap, as evidenced by the refusal to grant the application under the Ordinance and the refusal to accept the facility's beneficial use. (Pl.'s Mem. at 24–25.) To advance a claim of disparate treatment, there must be evidence of discriminatory purpose motivating the action. *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005). "The discriminatory purpose need not be malicious or invidious, nor need it figure in 'solely, primarily, or even predominately' into the motivation behind the challenged action." *Id.* (quoting *Cmty. Hous. Tr. v. Dep't of Consumer & Reg. Affairs*, 257 F. Supp. 2d 208, 225 (D.D.C. 2003)).

Defendant Board seemed to widely acknowledge the pressing public health crisis the opioid epidemic has brought on and the serious need for care and treatment, particularly in New Jersey. (*See, e.g.*, Jan. 24th Tr. 140:14–16, 145:21–24.) Ms. Cofone testified that New Jersey courts have very recently found that recovery detox centers are inherently beneficial uses, overturning a township decision to the contrary. (Dec. 13th Tr. 88:6–15.) Members of Defendant Board even conceded "there's no doubt that this is an inherently beneficial use." (Jan. 24th Tr. 144:8–9.) Defendants argue that despite these concessions, Defendant Board properly weighed and applied the *Sica* balancing test over three extensive hearings, finding that the factors did not justify a variance. (Defs.' Opp'n at 22–23.) The testimony presented at and commentary following these three hearings, however, made abundantly clear that Defendant

13

Board and the local residents were of the NIMBY school of thought, with clear opposition by the residents, *cf. Cmty. Servs., Inc.*, 421 F.3d at 182.

At times, comments by Defendant Board members reflected potential animus towards recovering addicts and associations with criminal behavior, prompting Defendant Board's counsel, Lawrence Sachs, to caution members from making logical leaps regarding the danger of RCA's patients. (*Compare* Dec. 13th Tr. 54:19–21 ("What happens if Joe Smith walks out of the facility and just walks 200 feet down Ernston Road and then they're at the school."), *with id.* 54:22–24 ("Again, we're taking a big leap that someone who [is] in this facility is a criminal, which obviously they're not."), *and id.* 55:5–13.) When explaining their decision to deny the application, Defendant Board members' statements seemingly contradicted the testimony of Plaintiff's witnesses, and instead relied on fears of crime and danger associated with RCA in their backyards. *Cf. Get Back Up, Inc. v. City of Detroit*, 2017 WL 2535453, at *6 (E.D. Mich. June 12, 2017) ("[T]he [board] at least referenced concerns, supported by testimony, over property values and aesthetics."). As one Board member tellingly admitted, "I don't think I could look in [my neighbors'] eyes and say, you know what? I voted yes for this to come in, in this particular area, and I had no regard for your safety." (Jan. 24th Tr. 142:8–12.) While Defendant Board did not rely solely on zoning as the rationale for its decision, it is clear that "the fact that the intended occupants of [RCA] were recovering addicts was a motivating factor in their decision." *Oxford House-Evergreen*, 769 F. Supp. at 1343.[4] Accordingly, the Court finds

---

[4] The Court does not ignore some of the more measured and thoughtful comments by members of Defendant Board, which placed great emphasis on safety concerns arising out of inadequate coverage and bona fide reports of issues at RCA facilities in Massachusetts. (*See* Jan. 24th Tr. 134:21–137:22.) These comments, however, still do not have strong support in the record and evidence presented by Plaintiff thoroughly addressed these concerns. Rather, based on the Court's own reading of the entire transcript and testimony at all three hearings, these conclusions seem to have been stirred by inherent biases and the commentary from the community.

that Plaintiff presents sufficient evidence of discriminatory treatment and intent such that it would likely succeed on the merits of these claims.

### 2. *Disparate Impact*

Next, Plaintiff argues that it is subject to a discriminatory disparate impact by Defendants' application of the Ordinance, "when they have already approved an operationally identical nursing home facility." (Pl.'s Mem. at 26.) For a claim of "disparate impact under the FHAA, the plaintiff must show that the Township's action had a greater adverse impact on the protected group . . . than on others." *Lapid-Laurel LLC v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 466–67 (3d Cir. 2002); *Oxford House, Inc.*, 799 F. Supp. at 461 (noting same standard and clarifying that intent is not required). "If the plaintiffs succeed in demonstrating a prima facie case, the burden then shifts to the defendant to show that it had a legitimate, non-discriminatory reason for the action and that no less discriminatory alternatives were available." *Lapid-Laurel LLC*, 284 F.3d at 467.

The Court is satisfied that Plaintiff establishes a prima facie showing for disparate impact, insofar as Defendant Board's conduct has affected RCA and its recovering addict patients differently than Sayreville Nursing and its elderly patients. Defendants contend, however, that the RCA facility "does not fall within the defined long term care facility set forth in the Ordinance." (Defs.' Opp'n at 20 (emphasis in original).) The Court construes this assertion to be Defendants' legitimate non-discriminatory reason.

Sayreville Zoning Code defines a long-term care facility as:

[A] facility which provides a full range of twenty-four (24) hour direct medical nursing and other health services. Registered nurses, licensed practical nurses and nurses' aides provide services prescribed by a residence physician. It is for those older adults who need health supervision but not hospitalization. The emphasis is on nursing care, but restorative physical occupational speech and respiratory therapies are also provided. This level of care may also include specialized

15

nursing services such as intravenous feeding or medication, tube feeding, injected medication, daily wound care, rehabilitation services and monitoring of unstable conditions.

(Compl. ¶ 32; Sayreville Zoning Code 26-6, Ex. A.) It is true that Sayreville Nursing, a traditional nursing home for elderly patients, received final site plan approval as a long-term care facility in 2014, prior to Plaintiff's application. (Compl. ¶¶ 8, 30; Nov. 8th Tr. 9:18–21; *see also* Resolution of Planning Board of the Borough of Sayreville, Ex. B, ECF No. 10-2.) Plaintiff represents that an RCA facility is nearly identical in nature to a nursing home and comports with this ordinance. (Pl.'s Mem. at 26; Compl. ¶¶ 30–31.)

Based on Dr. Carise's testimony regarding the mission, function, and patient care at RCA, it seems as though the facility could fit within this definition. Mr. Higgins also testified that the type of specialized nursing services would be very similar to the care provided in a long term care facility. (Nov. 8th Tr. 123:12–23.) Some discussions at the first hearing, however, are contradictory. The introduction by RCA's counsel, David Himelman, represented that "it has been held by the courts in New Jersey that a drug rehabilitation center and treatment center . . . under the supervision of the Commissioner of Health, was deemed to be a hospital." (*Id.* 14:24–15:4.) He further acknowledged that RCA "would qualify as a hospital, as recognized by the Municipal Land Use Law." (*Id.* 15:9–10.) Responding to Defendant Board's confusion, Mr. Himelman and Mr. Sachs together clarified: "So they're not here as a nursing home. They're not here as a hospital. They're here as an inpatient and out-patient drug rehabilitation center," seeking a variance. (*Id.* 23:23–24:1.) The Court also notes that under the Ordinance, these facilities are "for those older adults who need health supervision but not hospitalization" (Sayreville Zoning Code 26-6, Ex. A), but Dr. Carise testified that the RCA population would provide care for all adults, 18 years and older, with an average age of 35 (Nov. 8th Tr. 46:12–13, 46:17–19).

16

While the Court will not expressly adjudicate whether the facility comports with the definition of a long-term care facility, it is plausible that Defendant Board felt, based on these representations, that the facility was not properly within the existing ordinance, as compared to a nursing home. Therefore, the Court cannot conclude that Plaintiff has a strong likelihood of success on its disparate impact claim.

### 3. *Failure to Make Reasonable Accommodations*

Finally, Plaintiff asserts that Defendants failed to make reasonable accommodations when it declined to grant the variance application. (Pl.'s Mem. at 27.) To advance this claim, the plaintiff bears the burden of demonstrating that there was a reasonable accommodation that was necessary to "afford handicapped persons an equal opportunity to use and enjoy housing, at which point the burden shifts to the defendant to show that the requested accommodation is unreasonable." *Lapid-Laurel, LLC*, 284 F.3d at 457. As applied to zoning cases, municipalities must "change, waive or make exceptions in their zoning rules." *Hovsons, Inc. v. Twp. of Brick*, 89 F.3d 1096, 1104 (3d Cir. 1996). Unreasonable accommodations would involve "undue financial and administrative burdens," impose "undue hardship on the town," or require "a fundamental alteration in the nature of the zoning program." *Cmty. Servs., Inc. v. Heidelberg Twp.*, 439 F. Supp. 2d 380, 398 (M.D. Pa. 2006) (citing *Lapid-Laurel LLC*, 284 F.3d at 457, 462). Yet a reasonable accommodation may still "result in the imposition of some costs on the accommodator." *Assisted Living Assocs. of Moorestown, LLC*, 996 F. Supp. at 436.

Here, it is undisputed, and was discussed many times during the course of the hearings, that because "right now the use is not permitted anywhere in the Borough" (Nov. 8th Tr. 133:1–10), a variance must be granted to accommodate an RCA facility in Sayreville, amounting to a reasonable accommodation for this class of handicapped individuals (*see, e.g., id.* 135:22–136:5;

Jan. 24th Tr. 17:5–18, 132:4–16). *See Cmty. Servs., Inc.*, 439 F. Supp. 2d at 399 (concluding that where a convalescent home was not permitted as of right anywhere, "a special exception or variance is necessary to achieve an equal opportunity" for housing for handicapped individuals).

Shifting to the Defendants' burden, the record below does not indicate that the request for a variance was unreasonable. Testimony made clear that there would be no changes or modifications to the footprint of the building that might impinge on zoning. (Nov. 8th Tr. 100:18–19.) There would only be "minor parking lot geometry changes" (*id.* 101:20–21; *id.* 101:3–9 (describing minor site plan modifications)), and overall "from a planning and land use impact point of view . . . there would be no substantial detriment to [the Board's] zone plan" (Dec. 13th Tr. 90:20–25). There was also no discussion of additional administrative work for Defendants or services they would need to provide. Rather, the key rationale for denial articulated by Defendant Board members emphasized safety concerns and touched on issues of understaffing, industry self-regulation, and decreased home values. These do not represent undue burdens placed on either Defendant Board or Borough to accommodate a variance for RCA.

One board member, Vice Chairman Henry, spoke of a need for increased police personnel and thus funding that would be necessary to accommodate the facility. (*See* Jan. 24th Tr. 140:1–11.) Assuming *arguendo* this were true, it could be deemed an unreasonable burden. But as Plaintiff notes, it is purely speculative: there is no support for this contention anywhere in the record. (Compl. ¶ 124.) Vice Chairman Henry seems to have loosely relied on the conjecture of a resident who spoke during the public comment period from his personal experiences where neighborhoods allegedly assign extra police and patrols to the area surrounding a facility like RCA. (*See* Jan. 24th Tr. 55:15–22.) But Vice Chairman Henry

18

admitted that he did not know the reason for increased police presence. (*Id.* 140:7.) Even if this were supported by the record, however, there is also no evidence that any cost increase would be undue such that the accommodation might be unreasonable.

Accordingly, based on the record and testimony presented, Plaintiff sought an accommodation in the form of a variance, and Defendant failed to demonstrate that this request was unreasonable. All told, the Court is satisfied that Plaintiff has a strong likelihood of success on its FHA, ADA, and RA claims for disparate treatment and failure to make reasonable accommodations. The Court now turns to the final two factors for the preliminary injunction analysis.

C. <u>Remaining Elements: Balance of Equities and Public Interest</u>

Plaintiff asserts that the balance of equities favors an injunction because Defendants will not be harmed by granting the application given its conformity with the PRIME zone and lack of burden on municipal services. (Pl.'s Mem. at 29.) Plaintiffs also emphasize that an injunction permitting RCA to open its facility in Sayreville greatly favors the public interest by providing treatment to address the opioid crisis and preventing discrimination against recovering addicts. (*Id.* at 29–30.) In response, Defendant Board argues that granting the injunction would leave it without remedy if Plaintiff ultimately did not succeed on the merits of its claim, thereby causing it irreparable harm, which in turn weighs against the public interest. (Def. Board Opp'n at 6, 10.) Defendants also assert that this will not serve the public interest because Plaintiff is a for-profit corporation. (Defs.' Opp'n at 24.)

The Court finds Defendants' arguments unavailing. First, the Court has concluded that Defendants are likely required to grant a variance application under the reasonable accommodation standard and have failed to do so based on discriminatory treatment. Therefore,

their framing of alleged harm is not persuasive. Second, federal law has "expressed a strong public policy favoring an end to discrimination in housing on the basis of handicap and favoring the establishment of housing programs for recovering drug addicts." *Oxford House, Inc.*, 799 F. Supp. at 465. This District has expressly concluded that "the public has an interest in the recovery of . . . drug addicts," as reflected by both federal and state enactments. *Oxford House-Evergreen*, 769 F. Supp. at 1346. The fact that Plaintiff is a private corporation has no bearing on the value of the services it intends to provide for this community. In sum, these factors strongly counsel in favor of, rather than against, granting injunctive relief for Plaintiff.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion is granted. A corresponding order will follow detailing the parameters of injunctive relief.

Date: May 11, 2018

ANNE E. THOMPSON, U.S.D.J.